## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | **Chapter 11** |
| **Free Speech Systems LLC** | § | |
| | § | **Case No. 22–60043 (CML)** |
| **Debtor.** | § | |

---

## <u>EXHIBITS (PART 1)</u>

### THE SANDY HOOK FAMILIES' MOTION TO (I) APPOINT TORT CLAIMANTS COMMITTEE AND (II) REMOVE THE DEBTOR IN POSSESSION

*(Related to ECF 102)*

---

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

IN RE:                                §            Case No. 22-60043
                                      §
FREE SPEECH SYSTEMS, LLC,             §            Chapter 11 (Subchapter V)
                                      §
        Debtor.                       §

# EXHIBIT A

```
 1                CAUSE NO. D-1-GN-18-001605

 2 MARCEL FONTAINE,          )   IN THE DISTRICT COURT
                             )
 3       Plaintiff,          )
                             )
 4 vs.                       )   TRAVIS COUNTY, TEXAS
                             )
 5 INFOWARS, LLC, FREE       )
   SPEECH SYSTEMS, LLC, and  )
 6 KIT DANIELS,              )
                             )
 7       Defendants.         )   261ST JUDICIAL DISTRICT

 8

 9            ORAL AND VIDEOTAPED DEPOSITION OF

10        BRITTANY PAZ, CORPORATE REPRESENTATIVE OF

11               FREE SPEECH SYSTEMS, LLC

12                   February 15, 2022

13

14    ORAL AND VIDEOTAPED DEPOSITION OF BRITTANY PAZ,

15 CORPORATE REPRESENTATIVE OF FREE SPEECH SYSTEMS, LLC,

16 produced as a witness at the instance of the Plaintiff

17 and duly sworn, was taken in the above-styled and

18 numbered cause on February 15, 2022, from 9:03 a.m. to

19 3:34 p.m., before Amy M. Clark, Certified Shorthand

20 Reporter in and for the State of Texas, reported by

21 computerized stenotype machine at the offices of Kirker

22 Davis, LLP, 8310-I North Capital of Texas Highway, Suite

23 350, Austin, Texas 78731, pursuant to the Texas Rules of

24 Civil Procedure and the provisions stated on the record

25 or attached hereto.
```

Paz, Brittany                                      02-15-2022

198

1 of costs of products that were not paid to PQPR.
2    Q.   Okay.  How many -- how long has that debt been
3 accruing?
4    A.  I think that that debt was accruing up to a few
5 months ago, and I don't know when it started,
6 unfortunately.  I could tell you the reasons why it was
7 accruing, but I don't -- I don't know when it was
8 started to be accruing.
9    Q.  All right.  Let me see those real quick.
10   A.  This one?
11   Q.  Yeah.  This stack of (inaudible) here -- yeah.
12 Okay.
13           Who -- what -- how did we get to a
14 $53 million note?
15   A.  Sure.  So PQPR is the company that purchases
16 the products that are ultimately sold on the Infowars
17 website.  And for a number of years -- and I'm sorry I
18 don't know for how long -- all of the money was flowing
19 to Free Speech Systems instead of being paid to PQPR.
20 They were kind of just giving the money here and there,
21 but with no regularity.  And so the amount of money that
22 was owed PQPR for those products totals that amount
23 of money.
24   Q.   Okay.  Who at PQPR was able to front
25 $53 million?

199

1    A.  I don't know -- I can't answer anything for
2 PQPR.  I don't represent them as a corporate
3 representative.
4    Q.  Sure.
5    A.  I don't know.
6    Q.  In -- where did you learn about PQPR?
7    A.   When I was discussing the structure of the
8 company from Melinda and how the -- the money is paid
9 from Free Speech to PQPR and who has ownership interests
10 in PQPR and Free Speech.  That's how I found it out.
11   Q.  How --
12   A.  Based on my conversations.
13   Q.  How is the money paid?
14   A.  Now how is it paid to PQPR?  I can say now how
15 it is.  Previously, I don't know.
16           So within the last few months, there is
17 this debt, and Free Speech has been attempting to pay
18 this debt down.  It pays PQPR $11,000 per week -- I
19 believe it's per business day -- five business days.  So
20 it's not seven business days, five -- five business
21 days -- plus a percentage of the products that are sold
22 on the site in attempt to address the backlog.
23           But prior to the last few months when it
24 was -- it wasn't being paid with any regularity.
25   Q.  So 11,000 -- so $44,000 every 20 days?

200

1    A.   Right.  So five days -- so, yes.  So per five
2 business days, $11,000.
3    Q.   The --
4    A.   Plus the percentage.
5    Q.   The -- when you say it started a few months
6 ago, when?
7    A.   I believe that -- based on my conversations
8 with Mr. Roe, the financial disentanglement between the
9 two companies happened within the last few months,
10 perhaps back to September.  But it's relatively recent.
11   Q.   Do you know what triggered that?
12   A.   I know that Mr. Jones had begun some -- some
13 estate management that was in -- in motion in the years
14 prior.  And I also know that PQPR and an attorney
15 associated with PQPR retained Mr. Roe as a consultant to
16 try to disentangle this.  I can't say as to when he
17 was -- he was retained to do that.  He wasn't retained
18 by Free Speech.  He was retained by -- by I believe an
19 attorney -- I can't remember his name -- on behalf of
20 PQPR.
21   Q.   His name's Eric Todd.
22   A.   I don't think that's the person that retained
23 him, no.
24   Q.   The only reason I say this is because
25 Mr. Whittenburg is the attorney you're talking about

201

1 that was retained, correct?
2    A.   No.  That's not accurate.
3    Q.   Well, then who is the attorney that was
4 retained?
5    A.   Like I said, I don't remember his name.
6    Q.   So you don't remember the name of anybody
7 that -- of the person that represents PQPR.  You don't
8 remember the attorney that was retained by that person
9 at PQPR.
10   A.   I don't -- I'm not the corporate representative
11 for PQPR.
12   Q.   I know.
13   A.   So I don't know.
14   Q.   Just trying to figure out what you know.
15   A.   Yeah.
16   Q.   So a lawyer at PQPR hired a lawyer?
17   A.   No.  The lawyer hired Mr. Roe.
18   Q.   Gotcha.
19   A.   Right.  As a consultant.
20   Q.   Okay.  If you look at -- let's look at
21 Exhibit 15.
22   A.   Okay.
23   Q.   Do you see the redactions?
24   A.   Yes.
25   Q.   Why are those redacted?

Paz, Brittany                                    02-15-2022

---

282

```
 1      Given under my hand and seal of office on this _____
 2 day of _____, _____.
 3
 4                        _____
 5                        NOTARY PUBLIC IN AND FOR
 6                        THE STATE OF _____
 7 My Commission Expires: _____
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

283

```
 1              CAUSE NO. D-1-GN-18-001605
 2 MARCEL FONTAINE,         )  IN THE DISTRICT COURT
                            )
 3       Plaintiff,         )
                            )
 4 vs.                      )  TRAVIS COUNTY, TEXAS
                            )
 5 INFOWARS, LLC, FREE      )
   SPEECH SYSTEMS, LLC, and )
 6 KIT DANIELS,             )
                            )
 7       Defendants.        )  261ST JUDICIAL DISTRICT
 8
 9            REPORTER'S CERTIFICATE
10    ORAL AND VIDEOTAPED DEPOSITION OF BRITTANY PAZ,
11 CORPORATE REPRESENTATIVE OF FREE SPEECH SYSTEMS, LLC
12              February 15, 2022
13    I, Amy M. Clark, Certified Shorthand Reporter in and
14 for the State of Texas, hereby certify to the following:
15    That the witness, BRITTANY PAZ, CORPORATE
16 REPRESENTATIVE OF FREE SPEECH SYSTEMS, LLC, was duly
17 sworn and that the transcript of the deposition is a
18 true record of the testimony given by the witness;
19    That the deposition transcript was duly submitted on
20 _____ to the witness or to the attorney for
21 the witness for examination, signature, and return to me
22 by _____.
23    That pursuant to information given to the deposition
24 officer at the time said testimony was taken, the
25 following includes all parties of record and the amount
```

---

284

```
 1 of time used by each party at the time of the
 2 deposition:
 3      Mr. Bill Ogden (5h19m)
           Attorney for Plaintiff
 4      Mr. Mark Bankston (0h0m)
           Attorney for Plaintiff
 5      Ms. Jacquelyn Blott (0h05m)
           Attorney for Defendants
 6      That a copy of this certificate was served on all
 7 parties shown herein on _____ and filed
 8 with the Clerk.
 9      I further certify that I am neither counsel for,
10 related to, nor employed by any of the parties in the
11 action in which this proceeding was taken, and further
12 that I am not financially or otherwise interested in the
13 outcome of this action.
14      Further certification requirements pursuant to
15 Rule 203 of the Texas Code of Civil Procedure will be
16 complied with after they have occurred.
17      Certified to by me on this 21st day of February,
18 2022.
19
20                        _____
21                        Amy M. Clark, CSR
                          Texas CSR 8753
22                        Expiration:  10/31/2023
                          Res Ipsa Litigation Support, LLC
23                        Firm No. 11371
                          501 Congress Avenue, Suite 150
24                        Austin, Texas 78701
                          (512) 334-6777
25
```

---

285

```
 1      FURTHER CERTIFICATION UNDER TRCP RULE 203
 2
 3      The original deposition was/was not returned to the
 4 deposition officer on _____.
 5      If returned, the attached Changes and Signature
 6 page(s) contain(s) any changes and the reasons therefor.
 7      If returned, the original deposition was delivered
 8 to Bill Ogden, Custodial Attorney.
 9      $_____ is the deposition officer's charges to the
10 Plaintiff for preparing the original deposition and any
11 copies of exhibits;
12      The deposition was delivered in accordance with Rule
13 203.3, and a copy of this certificate, served on all
14 parties shown herein, was filed with the Clerk.
15      Certified to by Res Ipsa Litigation Support, LLC on
16 this _____ day of _____, _____.
17
18
19
20                        _____
21                        Res Ipsa Litigation Support, LLC
                          Firm No. 11371
22                        501 Congress Avenue, Suite 150
                          Austin, Texas 78701
23                        (512) 334-6777
24
25
```

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | Case No. 22-60043 |
| | § | |
| FREE SPEECH SYSTEMS, LLC, | § | Chapter 11 (Subchapter V) |
| | § | |
| Debtor. | § | |

# EXHIBIT B

002429

| Docket No. FBT-CV-18-6076475-S | : | **JUDICIAL DISTRICT** |
| : | | |
| **ERICA LAFFERTY, et al.** | : | **OF FAIRFIELD** |
| : | | |
| **v.** | : | **AT BRIDGEPORT** |
| : | | |
| **ALEX JONES, et al.** | : | **JANUARY 24, 2019** |

## RESPONSES TO PLAINTIFFS' FIRST SET OF SPECIAL INTERROGATORIES TO ALEX JONES

**1. Identify:**

**a. All business organizations and/or other entities in which you have ownership and/or control**
**b. The officers or members of all organizations and/or entities responsive to part (a)**
**c. The shareholders or other owners of all organizations and/or entities responsive to part (a)**
**d. The employees of all organizations and/or entities responsive to part (a)**

ANSWER:

a. I, Alex Jones, have ownership and/or control of the following business organizations and/or other entities: Free Speech Systems LLC, InfoWars LLC, InfoWars Health LLC, and PrisonPlanet TV LLC

b. I am the sole officer and member of all the organizations and/or entities responsive to part (a).

c. I am the sole shareholder and owner of all organizations and/or entities responsive to part (a).

d. The employees of all organizations and/or entities responsive to part (a) are attached hereto as Exhibit 1. Free Speech Systems has the employees listed in Exhibit 1, and the Department heads/managers are as follows: Rob Dew, Manager of Media/Video Production; Paul Joseph Watson, Editor/Manager of Writers; Tim Fruge, Director of Business Operations.

concerning that subject matter. Identify the owner of such domain names or URLs.

ANSWER:
Infowars.com, PrisonPlanet.com, prisonplanet.tv

**5. Identify any witnesses you may call at a hearing on a special motion to dismiss.**

ANSWER:
Alex Jones and the Plaintiffs

Under the penalty of perjury, I certify the above answers to these interrogatories are true and complete to the best of my knowledge.

_____ Dated: 3-2 9 - 19
Alex Jones

Subscribed and Sworn before me:

_____ Dated: 3-29-19
Timothy Fruge

My Commission Expires:

TIMOTHY JAMES FRUGE
Notary Public, State of Texas
Comm. Expires 04-21-2022
Notary ID 129791368

Docket No. FBT-CV-18-6076475-S : JUDICIAL DISTRICT
:
ERICA LAFFERTY, et al. : OF FAIRFIELD
:
v. : AT BRIDGEPORT
:
ALEX JONES, et al. : JANUARY 24, 2019

## RESPONSES TO PLAINTIFFS' FIRST SET OF SPECIAL INTERROGATORIES TO FREE SPEECH SYSTEMS LLC, INFOWARS, LLC, PRISON PLANET TV LLC and INFOWARS HEALTH, LLC

1. Identify:
a. Your officers
b. Your members
c. Your shareholders or other owners
d. Your employees
e. All business organizations and/or other entities in which you have ownership and/or control

ANSWER:
a. b. & c .  I, Alex Jones, am the sole owner, officer and member of each of the above named LLCs.

d.  Only Free Speech Systems LLC has employees those employees are attached hereto as Exhibit 1.  The Department heads/managers of Free Speech Systems LLC are as follows: Rob Dew, Manager of Media/Video Production; Paul Joseph Watson, Editor/Manager of Writers; Tim Fruge, Director of Business Operations.

2. Identify employees responsible for marketing data, research, and/or analytics concerning Infowars, Infowars.com, The Alex Jones Radio Show, and Alex Jones. If such responsibilities were outsourced our contracted out, identify the individual and/or entities to whom they were contracted.

Shooting, Sandy Hook Investigation, Non-Governmental Investigation, Sandy Hook Families, or Sandy Hook Hoax Theory, or otherwise contain content concerning that subject matter. Identify the owner of such domain names or URLs.

ANSWER:
As to Free Speech Systems LLC only: Infowars.com, PrisonPlanet.com, prisonplanet.tv. There are dozens of other URLs, but those are either not active or are set up to act as pointer (redirect) site to the main Info Wars website. A list can be assembled, there are no such URLs referencing Sandy Hook or mass shootings.

The other entities have no URLs.

**5. Identify any witnesses you may call at a hearing on a special motion to dismiss.**

ANSWER:
Alex Jones and the Plaintiffs

Under the penalty of perjury, I certify the above answers to these interrogatories are true and complete to the best of my knowledge.

_alex_____ _Jones_____ Dated: _3-29-19_

Alex Jones as member of Infowars LLC, Free Speech Systems LLC, Infowars Health LLC, Prison Planet TV LLC

Subscribed and Sworn before me:

_____ Dated: _3-29-19_
Timothy Fruge

My Commission Expires:

TIMOTHY JAMES FRUGE
Notary Public, State of Texas
Comm. Expires 04-21-2022
Notary ID 129791368

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

IN RE:                                 §          Case No. 22-60043
                                       §
FREE SPEECH SYSTEMS, LLC,              §          Chapter 11 (Subchapter V)
                                       §
        Debtor.                        §

# EXHIBIT C

002434

Michael Zimmerman  30(b)(6), Confidential
June 24, 2021

```
NO. X06-UWY-CV-18-6046436S    )  SUPERIOR COURT
                              )
ERICA LAFFERTY, ET AL,        )  COMPLEX LITIGATION DOCKET
                              )
VS.                           )  AT WATERBURY
                              )
ALEX EMRIC JONES, ET AL,      )  JUNE 24, 2021
                              )
_____)
                              )
NO. X-06- UWY-CV18-6046437-S  )  SUPERIOR COURT
                              )
WILLIAM SHERLACH,             )  COMPLEX LITIGATION DOCKET
                              )
VS.                           )  AT WATERBURY
                              )
ALEX EMRIC JONES, ET AL.      )  JUNE 24, 2021
                              )
_____)
                              )
NO. X06-UWY-CV-18-6046438S    )  SUPERIOR COURT
                              )
WILLIAM SHERLACH, ET AL.,     )  COMPLEX LITIGATION DOCKET
                              )
VS.                           )  AT WATERBURY
                              )
ALEX EMRIC JONES, ET AL.      )  JUNE 24, 2021
```

-----------------------------------

CONFIDENTIAL

ORAL AND VIDEOTAPED DEPOSITION OF
FREE SPEECH SYSTEMS, LLC
BY
MICHAEL ZIMMERMANN
JUNE 24, 2021

-----------------------------------


        ORAL AND VIDEOTAPED DEPOSITION OF MICHAEL ZIMMERMANN,

    produced as a witness at the instance of the PLAINTIFF, and

    duly sworn, was taken in the above-styled and -numbered cause

    on JUNE 24, 2021, from 9:00 a.m. to 4:10 p.m., before

Michael Zimmerman  30(b)(6), Confidential
June 24, 2021

1  Rosalind Dennis, Notary in and for the State of Texas, reported

2  by machine shorthand, appearing remotely from Dallas, Texas,

3  pursuant to the Federal Rules of Civil Procedure and the

4  provisions stated on the record or attached hereto.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Michael Zimmerman  30(b)(6), Confidential
June 24, 2021

```
 1                     A P P E A R A N C E S

 2

 3    FOR THE PLAINTIFFS:

 4         CHRISTOPHER M. MATTEI, ESQ.
           MATTHEW S. BLUMENTHAL, ESQ.
 5         KOSKOFF KOSKOFF & BIEDER, PC
           350 Fairfield Avenue, Suite 501
 6         Bridgeport, Connecticut 06604
           Cmattei@koskoff.com
 7         mblumenthal@koskoff.com
           (203) 336-4421
 8

 9    FOR THE DEFENDANTS:

10         JAY MARSHALL WOLMAN, ESQ.
           RANDAZZA LEGAL GROUP
11         100 Pearl Street
           14th Floor
12         Hartford, Connecticut 06103
           jmw@randazza.com
13         (702) 420-2001

14
      ALSO PRESENT:
15         Joel Raguso - Videographer

16

17

18

19

20

21

22

23

24

25
```

Michael Zimmerman  30(b)(6), Confidential
June 24, 2021

1

2

3

4

5      Q.   Okay.  Moving forward to the next episode of

6   preparation, you believe that was earlier this week on Monday

7   or Tuesday at Free Speech Systems offices?

8      A.   That is correct.

9      Q.   Okay.  And that was about an hour?

10      A.   That's correct.

11      Q.   Who participated in that prep session?

12      A.   I spoke to Bill Love on the phone who's the -- the

13   CPA to confirm, you know, some details.

14

15

16

17

18

19

20

21

22

23

24

25

Michael Zimmerman 30(b)(6), Confidential
June 24, 2021

1          Did -- you said that you also asked -- well,

2    did -- did Mr. Love provide you any other information about

3    Free Speech Systems's relationships with any other corporate

4    entities?

5          A.   I believe we discussed PQPR.

6          Q.   Okay.  And what did tell you about PQPR's

7    relationship with Free Speech Systems?

8          A.   Right.  Well, it's my understanding PQPR is a comp-

9    -- company that develops and prepares supplement products for

10   Free Speech Systems to then retail through its e-commerce

11   platform.

12         Q.   And did he describe for you any contractual

13   relationship between PQPR and Free Speech Systems?

14         A.   He didn't.

15         Q.   Okay.  Did he tell you who has the controlling

16   ownership of PQPR?

17              MR. WOLMAN:  Objection.

18         A.   He didn't.

19         Q.   I'm sorry?

20         A.   He did not.

21

22

23

24

25

Michael Zimmerman  30(b)(6), Confidential
June 24, 2021

1      Q.   But the only information you have is that from

2   Alex Jones and that's what you've described, right?

3      A.   That's correct.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19      Q.   (BY MR. MATTIE)     And then, you said that you also

20   asked him about Free Speech Systems's business relationship

21   with PQPR, correct?

22      A.   That's correct.

23      Q.   And what did he advise you about that?

24      A.   He indicated to me that PQPR is a company that

25   basically develops and procures supplements that are then sold

Michael Zimmerman  30(b)(6), Confidential
June 24, 2021

1    on the Infowars store by Free Speech Systems.

2        Q.    Okay.  And did he say anything about who owns PQPR?

3        A.    We did not discuss that.

4        Q.    Okay.  Does -- who -- who does own PQPR?

5        A.    It's owned by two other LLCs.

6        Q.    What are they?

7        A.    What are they?

8        Q.    Huh-uh.

9        A.    I don't have the names in front of me right now.

10       Q.    Okay.  So I understand that, sir, but what -- you are

11   testifying as Free Speech Systems.

12             So as you sit here today as Free Speech Systems,

13   I understand that your testimony is that Free Speech Systems is

14   unaware of the two corporate entities that have an ownership

15   interest in PQPR, correct?

16             MR. WOLMAN:  Objection.  That's beyond the scope

17   of Number 3.

18       A.    Free Speech Systems has knowledge of PQPR and its

19   business relationship, but not the management or structure of

20   PQPR.

21

22

23

24

25

Michael Zimmerman  30(b)(6), Confidential
June 24, 2021

```
 1
 2
 3
 4
 5
 6
 7
 8      Q.   Okay.  Since 2012, has Free Speech System taken on
 9  any debt?
10      A.   I can't testify to that today.  It keeps financial
11  records.
12      Q.   Okay.  So Free Speech Systems is unaware whether it
13  has taken on any debt since 2012, correct?
14           MR. WOLMAN:   Objection.
15      Q.   (BY MR. MATTIE)    Correct?
16      A.   Correct.
17
18
19
20
21
22
23
24
25
```

Michael Zimmerman  30(b)(6), Confidential
June 24, 2021

```
1
2
3
4
5
6
7
8
9
10
11
```

12  BY MR. MATTEI:

13      Q.   Mr. Zimmermann, did anybody provide you with any

14  information during the break?

15      A.   No.

16      Q.   Okay.  All right.  So, Mr. Zimmermann

17  Free Speech Systems is owned and operated by Alex Jones,

18  correct?

19      A.   That's correct.

20      Q.   And does he have authority over all Free Speech

21  Systems operations?

22      A.   That's correct.

23      Q.   Okay.  He is the CEO and owner?

24      A.   That's correct.

25      Q.   And does he have the authority to hire and fire

Michael Zimmerman   30(b)(6), Confidential
June 24, 2021

```
 1   anybody of his choosing?

 2        A.   That's correct.

 3        Q.   And does he have authority to overrule any decision

 4   made by a subordinate?

 5        A.   That's correct.

 6        Q.   And he has ultimate authority over Free Speech

 7   finances?

 8        A.   That's correct.

 9        Q.   And he is not accountable to a board of directors or

10   any governing authority, correct?

11        A.   Correct.

12        Q.   When did Free Speech Systems hire its first employee?

13        A.   The company maintains records.  I don't have

14   information on that with me today?

15        Q.   Can Free Speech Systems approximate the year that it

16   first hired an employee?

17        A.   Approximately 2007, 2008.

18        Q.   How many people are employed by Free Speech Systems

19   presently?

20        A.   Presently, approximately 80.

21

22

23

24

25
```

Michael Zimmerman  30(b)(6), Confidential
June 24, 2021

```
 1  NO. X06-UWY-CV-18-6046436S    )  SUPERIOR COURT
                                  )
 1  ERICA LAFFERTY, ET AL,        )  COMPLEX LITIGATION DOCKET
                                  )
 1  VS.                           )  AT WATERBURY
                                  )
 1  ALEX EMRIC JONES, ET AL,      )  JUNE 24, 2021
                                  )
 1  _____ )
                                  )
 1  NO. X-06- UWY-CV18-6046437-S  )  SUPERIOR COURT
                                  )
 1  WILLIAM SHERLACH,             )  COMPLEX LITIGATION DOCKET
                                  )
 1  VS.                           )  AT WATERBURY
                                  )
 1  ALEX EMRIC JONES, ET AL.      )  JUNE 24, 2021
                                  )
 1  _____ )
                                  )
 1  NO. X06-UWY-CV-18-6046438S    )  SUPERIOR COURT
                                  )
 1  WILLIAM SHERLACH, ET AL.,     )  COMPLEX LITIGATION DOCKET
                                  )
 1  VS.                           )  AT WATERBURY
                                  )
 1  ALEX EMRIC JONES, ET AL.      )  JUNE 24, 2021
```

15                   REPORTER'S CERTIFICATION

16           DEPOSITION OF MICHAEL ZIMMERMANN

17                      JUNE 24, 2021

18

19       I, Rosalind Dennis, Notary in and for the State of Texas,

20   hereby certify to the following:

21       That the witness, MICHAEL ZIMMERMANN, was duly sworn by

22   the officer and that the transcript of the oral deposition is a

23   true record of the testimony given by the witness;

24       That the original deposition was delivered to Mr. Mattei.

25       That the amount of time used by each party at the

Michael Zimmerman 30(b)(6), Confidential
June 24, 2021

1   deposition is as follows:

2   MR. MATTEI        .....05 HOUR(S): 23 MINUTE(S)
    MR. WOLMAN        .....00 HOUR(S): 26 MINUTE(S)

3

4        That pursuant to information given to the deposition

5   officer at the time said testimony was taken, the following

6   includes counsel for all parties of record:

7   Mr. Mattei                      Attorney for the Plaintiff.

8   Mr. Wolman                      Attorney for the Defendant.

9        I further certify that I am neither counsel for, related

10  to, nor employed by any of the parties or attorneys in the

11  action in which this proceeding was taken, and further that I

12  am not financially or otherwise interested in the outcome of

13  the action.

14       Certified to by me this 12th day of July, 2021.

15

16

17                              ROSALIND DENNIS
                                Notary in and for the
18                              State of Texas
                                Notary:  129704774
19                              My Commission Expires:  10/8/2022
                                US LEGAL SUPPORT
20                              8144 Walnut Hill Lane
                                Suite 120
21                              Dallas, Texas 75231
                                214-741-6001
22                              214-741-6821 (FAX)
                                Firm Registration No. 343

23

24

25

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

IN RE:                                          §                    Case No. 22-60043
                                                §
FREE SPEECH SYSTEMS, LLC,                       §                    Chapter 11 (Subchapter V)
                                                §
    Debtor.                  §

# EXHIBIT D

1

```
XO6 UWY CV18-6046436-S      :    SUPERIOR COURT

ERICA LAFFERTY, ET AL       :    JUDICIAL DISTRICT OF WATERBURY

V                           :    AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES, ET AL     :    NOVEMBER 15, 2021
```
-----------------------------------------------------------------
```
XO6 UWY CV18-6046437-S      :    SUPERIOR COURT

WILLIAM SHERLACH, ET AL     :    JUDICIAL DISTRICT OF WATERBURY

V                           :    AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES, ET AL     :    NOVEMBER 15, 2021
```
-----------------------------------------------------------------
```
XO6 UWY CV18-6046438-S      :    SUPERIOR COURT

WILLIAM SHERLACH, ET AL     :    JUDICIAL DISTRICT OF WATERBURY

V                           :    AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES, ET AL     :    NOVEMBER 15, 2021
```

## COURT'S RULING

B E F O R E:

        THE HONORABLE BARBARA N. BELLIS, JUDGE


A P P E A R A N C E S:


  Representing the Plaintiffs:

        ATTORNEY CHRISTOPHER MATTEI
        ATTORNEY ALINOR STERLING
        ATTORNEY MATTHEW BLUMENTHAL
        Koskoff Koskoff & Bieder
        350 Fairfield Avenue
        Bridgeport, Connecticut  06604

2

Representing the Defendants:

    ATTORNEY JAY MARSHALL WOLMAN
    Randazza Legal Group
    100 Pearl Street
    Hartford, Connecticut  06103

    ATTORNEY CAMERON L. ATKINSON
    Pattis & Smith
    383 Orange Street
    New Haven, Connecticut  06511

    ATTORNEY MARIO CERAME
    Brignole Bush & Lewis
    73 Wadsworth Street
    Hartford, Connecticut  06106

                    Recorded and Transcribed By:
                    Patricia Sabol
                    Court Monitor
                    400 Grand Street
                    Waterbury, Connecticut  06702

3

1          THE COURT:  All right.  So I will order a copy of

2      the transcript of the following ruling, and I will

3      sign it and I will place it in the court file as my

4      decision for the purposes of any appeal.

5          So I'll first address the Clinton deposition

6      issue and the conduct of July 1, 2021.  In the July

7      19, 2021 court filing by the defendants Infowars, LLC,

8      Free Speech Systems, LLC, Infowars Health, LLC and

9      Prison Planet, LLC, they described how in the motion

10     to depose Hillary Clinton, testimony designated by the

11     plaintiffs as highly confidential was filed in the

12     Clinton deposition motion.  They explained that this

13     was done because in their opinion, the plaintiffs did

14     not have a good-faith basis to designate the

15     deposition as highly confidential before the

16     deposition had commenced, despite the fact that the

17     Jones defendants had previously done so themselves.

18     And it is not lost on the Court that the highly

19     confidential information was improperly filed in the

20     middle of the first deposition of a plaintiff.

21         The July 19, 2021 filing is in sharp contrast to

22     the Jones defendants' position at the October 20, 2021

23     sanctions hearing where the Court addressed what, if

24     any, sanctions should enter.  At the October 20

25     hearing, the Jones defendants claim they could publish

26     confidential information as long as they did not

27     reveal the name of the witness.  That is, they argued

4

1   unconvincingly that they didn't understand the very

2   protective order that they themselves drafted and

3   asked the Court to approve as a Court order, which the

4   Court did.

5       The position of the Jones defendants at the

6   October 20, 2021 sanctions hearing did nothing but

7   reinforce the Court's August 5th, 2021 order and

8   findings that the cavalier actions on July 1st, 2021

9   constituted willful misconduct and violated the

10  Court's clear and unambiguous protective order.

11      The history of the attorneys who have appeared

12  for the defendants, Alex Jones, Infowars, LLC, Free

13  Speech Systems, LLC, Infowars Health, LLC and Prison

14  Planet TV, LLC is a convoluted one, even putting aside

15  the motions to withdraw appearance, the claims of

16  conflict of interest and the motions for stay advanced

17  by these five defendants.

18      As the record reflects, on June 28, 2018,

19  Attorney Wolman appeared for all five of the Jones

20  defendants.  Eight months later, on March 1st, 2019,

21  Attorney Wolman is out of the case and Pattis & Smith

22  filed an in-lieu-of appearance for all five

23  defendants.  On February 24, 2020, Attorney Latonica

24  also appeared for all five defendants.  Five months

25  later on July 7, 2020, Attorney Latonica and Pattis &

26  Smith is now out of the case and Attorney Wolman is

27  back in the case for all five defendants.  Then on

5

1    June 28, 2020, Pattis and Smith is back in the case,

2    but now only appears for the four LLC defendants.

3        But what is perhaps more significant is the

4    transparent attempt to cloud the issues by Pattis &

5    Smith, for example, by listing the names of only three

6    of the four clients they represent when filing the

7    motion to take the deposition of Hillary Clinton and

8    then listing all four clients in the July 19, 2021

9    filing relating to the issue.  And by Attorney Wolman

10   who then argued in his October 20, 2021 file that

11   Infowars, LLC had no involvement in the motion for

12   commission because their lawyer did not list their

13   name on the motion.  It is simply improper under our

14   rules of practice for an attorney to do so.

15       Turning to the issue of the subsidiary ledgers.

16   The five Jones defendants on November 6, 2020 filed

17   with the Court their discovery objections relating to

18   the deposition of Free Speech Systems' accounting

19   manager and current employee, Melinda Flores.  In

20   response to the plaintiff's request for subsidiary

21   ledgers, the Jones defendants objected on the basis

22   that the production of the subsidiary ledgers was

23   oppressive, unduly burdensome, disproportionate,

24   harassing and that it will require digging through

25   eight years of accounting.  No objection was raised as

26   to the term "subsidiary ledger", although parties

27   frequently will object to a discovery request if they

6

1    consider it vague or confusing.

2         On April 29, 2021, the Court overruled the

3    objection.   On May 6, 2021, the Court ordered the

4    deposition of Flores to take place on June 4, 2021 and

5    ordered the documents to be produced by the close of

6    business on May 14, 2021 stating that failure to

7    comply may result in sanctions.

8         On May 14, 2021, the five Jones defendants

9    responded to the document request and Court order and

10   stating that the subsidiary ledgers were incorporated

11   into the trial balances and had been produced.

12        At her June 4, 2021 deposition, Flores, the

13   accounting manager, testified that subsidiary ledgers

14   or detail was easily accessible and available to her.

15   She testified that it would show the sources of

16   advertising income and she testified repeatedly that

17   Free Speech Systems maintained subsidiary ledger

18   information.   Flores did not believe she was obligated

19   to produce the subsidiary ledgers, and it is unclear

20   as to whether they have been produced.

21        It was impossible to reconcile the expert hired

22   by Free Speech Systems with the November 6, 2020

23   objections filed with the Court and with Flores'

24   deposition testimony.   While the Jones defendants in

25   their May 5th, 2021 motion state that Flores would be

26   the best employee to identify and produce the

27   requested documents and further state that Flores

7

1    would be compelled by Free Speech Systems to produce

2    the requested documents at the deposition, the

3    defendants hired expert, Mr. Roe, said that Flores was

4    wrong and that Free Speech Systems doesn't use or have

5    subsidiary ledgers.

6        The Court, in its August 6, 2021 order, found

7    that the subsidiary ledger information was easily

8    accessible by Flores by clicking on each general

9    account, that, despite the Court orders and although

10   the information exists and is maintained by Free

11   Speech Systems and was required by the Court order to

12   be produced, it had not been produced.  And, again, it

13   is still unclear as to what documents have been

14   produced.

15       The Court rejected Roe's statements in his

16   affidavit as not credible in light of the

17   circumstances.  The Court found that the plaintiffs

18   were prejudiced in their ability to prosecute their

19   claims and conduct further meaningful depositions and

20   that sanctions would be addressed at a future hearing.

21       At the October, 2021 sanctions hearing, the Court

22   addressed whether sanctions should enter.  The Court

23   finds that sanctions are, in fact, appropriate in

24   light of the defendant's failure to fully and fairly

25   comply with the plaintiff's discovery request and the

26   Court's orders of April 29, 2021, May 6, 2021 and

27   August 6, 2021.

8

1      Turning to the trial balances.  In addition to

2      objecting to the deposition of Flores, the Jones

3      defendants, as I mentioned, filed discovery objections

4      to the request for production directed to Flores.  The

5      Court ruled in favor of the defendants on one

6      production request and ruled in favor of the

7      plaintiffs with respect to others.

8          In addition to the subsidiary ledgers, the Court

9      ordered production of the trial balances.  Flores had

10     run trial balances in the past unrelated to this

11     action.  Flores testified at her June 4, 2021

12     deposition that she personally accessed Quick Books

13     and selected the option to generate trial balances for

14     2012 to 2019.  She testified that she ran the reports

15     and printed them out and believed that the reports

16     were produced.  Her testimony the reports that she ran

17     were produced was left uncorrected by counsel at the

18     deposition.

19         The reports were not produced by the

20     Court-ordered deadline of May 14, 2021.  They were not

21     produced at her June 4, 2021 deposition, and they have

22     not been produced to date, despite their obligation to

23     do so.

24         While the Jones defendants, in their May 5, 2021

25     Court filing, emphasized that Flores would be the best

26     employee to identify and produce the requested

27     documents which would include the trial balances and

9

1    that Flores would be compelled by Free Speech Systems

2    to produce the documents at her deposition, not only

3    were the reports not produced, but the Jones

4    defendants in their October 7, 2021 filing now claim

5    that Flores, a mere bookkeeper, provided flawed

6    information to the defendants that the defendants,

7    through Roe, had to correct.  And the Court rejects

8    that position.

9        The Jones defendants argue that Roe combined some

10   accounts that were not used consistently and

11   consolidated some general accounts because various

12   transactions all involved the same account and those

13   records created by the Jones defendants' outside

14   accountant were the records that were produced.  But

15   these records that removed accounts and consolidated

16   accounts altered the information in the reports that

17   their own accounting manager had produced, and they

18   contain trial balances that did not balance.  These

19   sanitized, inaccurate records created by Roe were

20   simply not responsive to the plaintiff's request or to

21   the Court's order.

22       Turning to the analytics.  The date for the

23   parties to exchange written discovery has passed after

24   numerous extensions by the Court.  On May 14, 2021,

25   the Court ordered that the defendants were obligated

26   to fully and fairly comply with the plaintiff's

27   earlier request for disclosure and production.

10

1    On June 1, 2021, the defendants filed an

2    emergency motion for protective order apparently

3    seeking protection from the Court's own order where

4    the defendants again attempted to argue the scope of

5    appropriate discovery.

6    The Court, on June 2, 2021, declined to do so and

7    extended the deadline for final compliance to June 28,

8    2021 ordering the defendants to begin to comply

9    immediately on a rolling basis.  In its June 2nd

10   order, the Court warned that failure to comply would

11   result in sanctions including default.

12   With respect to analytics, including Google

13   Analytics and social media Analytics, the defendants

14   on May 7, 2019 represented that they had provided all

15   the analytics that they had.  They stated with respect

16   to Google Analytics that they had access to Google

17   Analytics reports, but did not regularly use them.  As

18   the Court previously set forth in its September 30,

19   2021 order, the defendants also claim that on June 17,

20   2019, they informally emailed zip files containing

21   Google Analytics reports to the plaintiffs, but not

22   the codefendants, an email the plaintiffs state they

23   did not receive and that the Court found would not

24   have been in compliance with our rules of practice.

25   On June 28, 2021, the Jones defendants filed a

26   notice of compliance stating that complete final

27   supplemental compliance was made by the defendants,

11

1       Alex Jones and Free Speech Systems, LLC and that

2       Infowars, LLC, Infowars Health, LLC and Prison Planet,

3       LLC, quote:  Had previously produced all documents

4       required to be produced, end quote, representing that

5       with respect to the Google Analytics documents, Free

6       Speech Systems, LLC could not export the dataset and

7       that the only way they could comply was through the

8       sandbox approach.

9          Then on August 8, 2021, the Jones defendants for

10      the first time formally produced Excel spreadsheets

11      limited to Google Analytics apparently for Infowars

12      dot com and not for any of the other websites such as

13      Prison Planet TV or Infowars Health.  Importantly, the

14      Jones defendants to date have still not produced any

15      analytics data from any other platform such as Alexa,

16      Comcast or Criteo.

17         The Jones defendants production of the social

18      media analytics has similarly been insubstantial and

19      similarly has fallen far short both procedurally and

20      substantively, despite prior representations by the

21      Jones defendants that they had produced the social

22      media analytics and despite the May 25, 2021

23      deposition testimony of Louis Certucci, Free Speech

24      Systems social media manager for nearly a decade, that

25      there were no such documents.

26         At the June 28, 2021 deposition of Free Speech

27      Systems corporate designee Zimmerman, Mr. Zimmerman

12

1        testified that, in fact, he had obtained some

2        responsive documents from Certucci which were then

3        loaded into a deposition chat room by counsel for the

4        Jones defendants.  It appears that these documents

5        were minimal summaries or reports for Facebook and

6        Twitter, but not for other platforms used by the

7        defendants such as You Tube.

8        Any claim of the defendants that the failure to

9        produce these documents was inadvertent falls flat as

10      there was no evidence submitted to the Court that the

11      defendants had a reasonable procedure in place to

12      compile responsive materials within their power,

13      possession or knowledge.

14      Months later, on October 8, 2021, the Jones

15      defendants formally produced six documents for the

16      spring of 2017 for Facebook containing similar

17      information to the Zimmerman chat room documents, but

18      not included in the chat room documents and screen

19      shots of posts by Free Speech Systems to an

20      unidentified social media account with no analytics.

21      The defendants represented that they had produced

22      all the analytics when they had not done so.  They

23      represented in court filings that they did not rely on

24      social media analytics and this, too, is false.

25      I'm going to need to take a thirty second water

26      break, please.

27      (A short break in the proceedings occurred.)

13

1      This response was false.  The plaintiffs in

2   support of their motion for sanctions on the analytics

3   issue attached as exhibit D, an email dated December

4   15, 2014 between former Free Speech Systems business

5   manager Timothy Fruge and current Free Speech Systems

6   employee Buckley Hamman.  Fruge attaches annotated

7   charts of detailed analytics concerning Jones' 2014

8   social media audience including gender demographics

9   engagement and social media sites that refer people to

10   Infowars dot com.  As pointed out by the plaintiffs,

11   Fruge's annotations are even more telling than the

12   charts themselves and totally contradict the Jones

13   defendants misrepresentations to the Court that,

14   quote:  There is no evidence to suggest that Mr. Jones

15   or Free Speech Systems ever used these analytics to

16   drive content, end quote.

17      The next image on the document shows key

18   indicators on Twitter.  Those are engagement and

19   influence.  Again, this is reading from Fruge's notes.

20   Again, the next image shows the key indicators on

21   Twitter.  Those are engagement and influence.  Notice

22   our influence is great and our engagement is low.  I

23   bring this up -- again these are Fruge's notes --

24   because we should try and raise our engagement with

25   our audience.  Engagement is how well we are

26   communicating and interacting with our audience.  The

27   higher our engagement, the more valuable our audience

14

1   will become to our business.  And that is the end of

2   Fruge's notes.

3       I would note that regardless of this reliance on

4   social media analytics, the concept is simple.  The

5   defendants were ordered to produce the documents and

6   our law requires them to produce information within

7   their knowledge, possession or power.  Discovery is

8   not supposed to be a guessing game.  What the Jones

9   defendants have produced by way of analytics is not

10  even remotely full and fair compliance required under

11  our rules.

12      The Court finds that the Jones defendants have

13  withheld analytics and information that is critical to

14  the plaintiff's ability to conduct meaningful

15  discovery and to prosecute their claims.  This callous

16  disregard of their obligations to fully and fairly

17  comply with discovery and Court orders on its own

18  merits a default against the Jones defendants.

19      Neither the Court nor the parties can expect

20  perfection when it comes to the discovery process.

21  What is required, however, and what all parties are

22  entitled to is fundamental fairness that the other

23  side produces that information which is within their

24  knowledge, possession and power and that the other

25  side meet its continuing duty to disclose additional

26  or new material and amend prior compliance when it is

27  incorrect.

15

1      Here the Jones defendants were not just careless.

2   Their failure to produce critical documents, their

3   disregard for the discovery process and procedure and

4   for Court orders is a pattern of obstructive conduct

5   that interferes with the ability of the plaintiffs to

6   conduct meaningful discovery and prevents the

7   plaintiffs from properly prosecuting their claims.

8      The Court held off on scheduling this sanctions

9   hearing in the hopes that many of these problems would

10  be corrected and that the Jones defendants would

11  ultimately comply with their discovery obligations and

12  numerous Court orders, and they have not.

13     In addressing the sanctions that should enter

14  here, the Court is not punishing the defendants.  The

15  Court also recognizes that a sanction of default is

16  one of last resort.  This Court previously sanctioned

17  the defendants not by entering a default, but by a

18  lesser sanction, the preclusion of the defendant's

19  special motions to dismiss.  At this point entering

20  other lesser sanctions such as monetary sanctions, the

21  preclusion of evidence or the establishment of facts

22  is inadequate given the scope and extent of the

23  discovery material that the defendants have failed to

24  produce.

25     As pointed out by the plaintiffs, they are

26  attempting to conduct discovery on what the defendants

27  publish and the defendants' revenue.  And the failure

1    of the defendants to produce the analytics impacts the

2    ability of the plaintiffs to address what is published

3    and the defendants failure to produce the financial

4    records such as sub-ledgers and trial balances affects

5    the ability of the plaintiffs to address the

6    defendants' revenue.  The prejudice suffered by the

7    plaintiffs, who had the right to conduct appropriate,

8    meaningful discovery so they could prosecute their

9    claims again, was caused by the Jones defendants

10    willful noncompliance, that is, the Jones defendants

11    failure to produce critical material information that

12    the plaintiff needed to prove their claims.

13        For these reasons, the Court is entering a

14    default against the defendants Alex Jones, Infowars,

15    LLC, Free Speech Systems, LLC, Infowars Health, LLC

16    and Prison Planet TV, LLC.  The case will proceed as a

17    hearing in damages as to the defendants.  The Court

18    notes Mr. Jones is sole controlling authority of all

19    the defendants, and that the defendants filed motions

20    and signed off on their discovery issues jointly.  And

21    all the defendants have failed to fully and fairly

22    comply with their discovery obligations.

23        As I said, I will order a copy of the transcript.

24    I will sign it and I will file it in the Court as the

25    Court's order.

26

27                        Bellis, J.

17

```
1    XO6 UWY CV18-6046436-S    :    SUPERIOR COURT.

2    ERICA LAFFERTY, ET AL     :    JUDICIAL DISTRICT OF WATERBURY

3    V                         :    AT WATERBURY, CONNECTICUT

4    ALEX EMRIC JONES, ET AL   :    NOVEMBER 15, 2021

5    -------------------------------------------------------

6    XO6 UWY CV18-6046437-S    :    SUPERIOR COURT

7    WILLIAM SHERLACH, ET AL   :    JUDICIAL DISTRICT OF WATERBURY

8    V                         :    AT WATERBURY, CONNECTICUT

9    ALEX EMRIC JONES, ET AL   :    NOVEMBER 15, 2021

10   -------------------------------------------------------

11   XO6 UWY CV18-6046438-S    :    SUPERIOR COURT

12   WILLIAM SHERLACH, ET AL   :    JUDICIAL DISTRICT OF WATERBURY

13   V                         :    AT WATERBURY, CONNECTICUT

14   ALEX EMRIC JONES, ET AL   :    NOVEMBER 15, 2021

15

16               C E R T I F I C A T I O N

17       I hereby certify the foregoing pages are a true and

18   correct transcription of the audio recording of the

19   above-referenced case, heard in the Superior Court, Judicial

20   District of Waterbury, at Waterbury, Connecticut, before the

21   Honorable Barbara N. Bellis, Judge, on the 15th day of

22   November, 2021.

23       Dated this 15th day of November, 2021, in Waterbury,

24   Connecticut.

25                              _____

26                              Patricia Sabol

27                              Court Monitor
```

002464

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | Case No. 22-60043 |
| | § | |
| FREE SPEECH SYSTEMS, LLC, | § | Chapter 11 (Subchapter V) |
| | § | |
| Debtor. | § | |

# EXHIBIT E

```
 1                    UNITED STATES BANKRUPTCY COURT
                      SOUTHERN DISTRICT OF TEXAS
 2                          HOUSTON DIVISION

 3    Avi Moshenberg,              )  CASE NO:  22-60043
                                   )  ADVERSARY
 4               Plaintiffs,       )
                                   )  Houston, Texas
 5        Vs.                      )
                                   )  Wednesday, August 3, 2022
 6    Free Speech Systems LLC,                         )
                                   )  10:02 a.m. - 5:05 p.m.
 7               Defendants.       )
      ------------------------------)

 8

 9                               TRIAL

10       BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
                 UNITED STATES BANKRUPTCY JUDGE

11

12    APPEARANCES:

13    For Plaintiffs:         MARCEL FONTAINE
                              McDowell Hetherington LLP
14                            1001 Fannin Suite 2700
                              Houston, Texas 77002
15
      For Defendant:          RAY BATTAGLIA
16                            Law Offices of Ray Battaglia, PLLC
                              66 Granburg Circle
17                            San Antonio, Texas 78218

18    Court Reporter:

19    Courtroom Deputy:       Zilde Martinez

20    Transcribed by:         Veritext Legal Solutions
                              330 Old Country Road, Suite 300
21                            Mineola, NY 11501
                              Tel: 800-727-6396
22

23

24    Proceedings recorded by electronic sound recording;
      Transcript produced by transcription service.
25
```

002466

1

2

3

4

5

6        MR. BATTAGLIA:  This is your courtroom.

7        So, the remaining two matters, Your Honor, are the

8   cash collateral motion and the critical vendor motion.  And

9   where we stand on those, Mr. Martin and I have had several

10   conversations on the cash collateral motion.  There's

11   certain accommodations being made, and I'll -- the biggest

12   one relates to a $250,000 payment to PQPR that is shown in

13   the budget.  That is a -- the way the Debtor operates with

14   PQPR in inventory, if PQPR purchase inventory, pays for it,

15   sells it through our sales channel, the Debtor gets 20

16   percent of the net.  PQPR gets 80 percent of the net.  If

17   it's FSS's inventory, and obviously, FSS is Free Speech

18   Systems, 90 percent goes to the Debtor and 10 percent goes

19   to PQPR for its involvement in the purchasing and

20   involvement in the -- as I understand it, supplements have

21   to have, and don't hold me to this word -- be sold under

22   some certification, and Dr. Jones individually, PQPR holds

23   that certification.  That's my very basic understanding.

24

25

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
```

13              CROSS-EXAMINATION OF W. MARC SCHWARTZ

14   BY MR. MOSHENBERG:

15   Q    All right.  Mr. Schwartz, you made some declarations in

16   this case, correct?

17   A    I believe I did one.

18   Q    Okay.  And you understand that the statements you made

19   in that declaration was under oath?

20   A    Yes.

21   Q    And that's the same oath that you're under today,

22   correct?

23   A    Yes.

24   Q    And you understand that it's important to tell the

25   truth in a declaration, correct?

 1    I believe --

 2            THE COURT:  Mr. Lee was representing the Debtors

 3    too.

 4            THE WITNESS:  -- and Mr. Jordan who represented --

 5    I think still does represent Mr. Jones.  I don't know when

 6    those were, but it was after we had been substantially

 7    convinced that we were going to be terminating the InfoWars

 8    bankruptcy.

 9            THE COURT:  You wrote the letter on May 19th.

10            THE WITNESS:  On May 19th, Mr. Lee asked me to

11    send him an engagement letter for Free Speech -- the Free

12    Speech engagement.

13            THE COURT:  Okay.

14            THE WITNESS:  And to be quite honest with you, I

15    didn't even think about it at that time.

16            THE COURT:  No, I appreciate the honesty.  I

17    appreciate disclosure.  It seeks a retainer.  When did you

18    receive that retainer?

19            THE WITNESS:  Lord --

20            THE COURT:  That month?

21            THE WITNESS:  No, it was --

22            THE COURT:  Let just say if the letter was signed

23    on June -- the letter was officially signed on June 6th --

24            THE WITNESS:  June 6th.

25            THE COURT:  When did you -- did you receive it

1    before or after you were retained, or right about that time?

2              THE WITNESS:  It was -- no, it was not right

3    around -- it was after, definitely.

4              THE COURT:  After.  Okay.

5              THE WITNESS:  You know, it was several weeks after

6    at least.

7              THE COURT:  Okay.  Okay.  Sorry.  That was the

8    question -- that was the clarification that I had mentioned

9    I had wanted to understand the day before.  I guess Mr. Lee

10   a few questions as well at some point, but I'll need to

11   understand that as well, but today's not that day.  Today's

12   cash collateral, and so I do want -- and I know I took this

13   off on tangent.  Now, I'm going to bring it back.  I did

14   want to focus on cash collateral, and I want to focus on

15   critical vendor, and I want to understand -- I've given you

16   some leeway.  Maybe that's the better way of saying.  I've

17   given you some leeway to kind of have general conversation

18   about the CRO role and what investigation and he's done to

19   formulate in connection with the budget, but now I'm going

20   to ask you to laser focus on these two motions.

21   BY MR. MOSHENBERG:

22   Q    Okay.  Let's look at that part of Exhibit 3, the ledger

23   (indiscernible).  I want to focus on the part where it

24   provides for a budget for Alex Jones of $54,000 every other

25   week.  Do you see that part?

1   A    Not yet.

2   Q    Can you see it?

3   A    Yes.

4   Q    Okay.  And in total, it ends up being about $379,000.

5   correct?

6   A    I can't tell.  He's -- whatever it says.  I mean, I

7   can't see that.  Would you have your associate or partner

8   reduce the size?  Thank you.

9   Q    Yeah.  (Indiscernible) $379,000 and that's over a 13-

10   week period, correct?

11   A    Correct.

12   Q    Okay.  And if you translate $379,000 over a 13-week

13   period, that translates to about a salary of $1.5 million.

14   Do you understand that?

15   A    Well, I don't believe that's correct.  Mr. Jones --

16   this is a -- Mr. Jones has an appointment agreement for 1.3

17   million.  Some amount of it and I think it's about 8,000 of

18   (indiscernible) Patriot is paid through the payroll system.

19   This should be that difference.  So, you got 26 pay periods

20   in the year so you can do the math.  It will be -- should

21   add up to 1.3, those two components.

22   Q    Well, I did 379 -- 13 weeks is a quarter of a year,

23   right, 52 weeks --

24   A    Yeah, but we can't do -- you've got to do it by --

25   because we pay a biweekly, not semi-monthly.

1    Q    Okay.

2    A    So, that's -- something about the math in that

3    calculation -- you got to multiply that number by 26 to get

4    an annual rate.

5    Q    Okay.  So -- but your point is, $1.3 million salary.

6    A    Total -- his total is 1.3 million.

7    Q    Okay.

8            THE COURT:  I'm just going to tell everyone.

9    Judge -- math and don't claim to be -- (indiscernible) in

10   excel spreadsheet for you, but it's essentially treading a

11   $54,000 bimonthly, you know, but that -- if you take that

12   over 26 periods -- you multiply the 54,000 times -- you get

13   to like a $1.4 million number.

14           THE WITNESS:  That case, well --

15           THE COURT:  If you multiply it times 24, you get

16   to the 1.3.  It's --

17           THE WITNESS:  Oh, shoot.  I apologize, Your Honor.

18           THE COURT:  It's okay.

19           THE WITNESS:  Okay.

20   BY MR. MOSHENBERG:

21   Q    And that's salary separate from the draws that he's

22   taking out of the company, right?

23   A    Correct.

24   Q    Okay.  You understand that in the Free Speech Systems

25   corporate representative, that position, the document that

1    produced showed that he had an annual salary of about

2    $625,000.

3              MR. BATTAGLIA:  Objection, Your Honor.  The

4    question is about a deposition he was not present at and --

5              THE COURT:  Yeah.  I'm going to sustain that.  I

6    want you focused on the questions -- I've given you plenty

7    of room --

8              MR. MOSHENBERG:  Sure.

9              THE COURT:  -- and Mr. Brimmage is going to ask

10   questions too and I want him -- I want you all focused on --

11   you got questions about the budget, ask the budget.

12             MR. MOSHENBERG:  Well, what I'm trying to

13   understand is, if there were documents produced to us by

14   Free Speech showing that his salary was $625,000 a year, why

15   is he receiving a $1.3 million salary under this budget.

16             THE COURT:  Do you have those documents?

17             MR. MOSHENBERG:  Yes, Your Honor.  They were notes

18   provide as part of the deposition --

19             THE COURT:  No, I'm asking you are they on your

20   witness and exhibit list?

21             MR. MOSHENBERG:  They are, Your Honor.

22             THE COURT:  Why don't you show that then?

23             MR. MOSHENBERG:  It's Exhibit 12.

24   BY MR. MOSHENBERG:

25   Q    These were notes that were provided by the corporate

1   representative based on her review in preparing for her

2   30(b)(6) deposition.  They were admitted as part of the

3   deposition.  And if you look, about halfway down, it says,

4   AJ paid a salary of $625,000 a year.

5   A    As of what date?  Do you know?

6   Q    Well, this deposition occurred in -- February 15th of

7   2022, this year.

8   A    I'd have to look back and see the date of the

9   employment agreement that I was -- given to me that I have,

10   which is what the 1.3 is based on.

11   Q    Right.  And that employment agreement was created in

12   April of this year, correct?

13   A    You're probably -- you may be right.  I think you're

14   right.

15   Q    Right.  It was kind of about the same time as all the

16   bankruptcies with the InfoW started happening, right,

17   leading up to the Alex Jones trial that was first set in

18   April, 2022, right?

19   A    I don't know about the first setting of the Alex Jones

20   trial, but I do recall -- I'd have to look back and see when

21   I got involved with the InfoWars bankruptcy, if it was in

22   April or not or prior to -- after that.  I don't know when

23   they actually got started.  It was before I had -- the

24   planning for that started before I ever got involved.

25   Q    Okay.

 1   A    Sometime before I got involved.

 2   Q    But you relied on that $1.3 million based on an

 3   agreement that was created in April of 2022, correct?

 4   A    Right.  That's the contract I have (indiscernible) --

 5   Q    It wasn't based on prior pay that he was receiving?

 6   A    No.

 7   Q    So, in --

 8        THE COURT:  Okay.  Mr. Moshenberg, he's answered

 9   the question.  Why don't you ask another question?  He's

10   answered the question.  Why don't you ask another one?

11        MR. MOSHENBERG:  Okay.

12   BY MR. MOSHENBERG:

13   Q    You didn't do any sort of investigation to see if $1.3

14   million was the appropriate amount to give him?  You just

15   went off of that agreement it sounds like.

16        THE COURT:  He's answered that question, Mr.

17   Moshenberg.  Why don't you ask another question?

18   BY MR. MOSHENBERG:

19   Q    Do you have any reason to doubt that he gave himself a

20   -- basically a $600,000 raise?

21   A    No, because I know he hasn't been paid anything on the

22   1.3 and during 2022, he was paid about $8,000 every two

23   weeks, which is not 625 either.  So --

24   Q    And now you're deciding in this motion that he needs to

25   get paid.  He needs to starting getting $54,000 every other

1    PQPR executed a promissory note in the principal amount of

2    29,588,000 made payable to PQPR which memorialized their

3    accrued obligations of FSS to PQPR through December 31st,

4    2018.  Do you see that?

5    A    Yes.

6    Q    How do you know to put in your declaration under

7    penalty of perjury that this amount was memorialized with

8    the accrued obligations?

9    A    This is one where I said I saw the detail of the

10   calculation and some of the supporting documents in it.  It

11   identifies the transactions going back -- actually, it

12   should be from 12/31/2018.

13   Q    And you mentioned some supporting documents.  What are

14   some of those supporting documents?

15   A    These were schedules of billings, (indiscernible) PQPR

16   for inventory and credits, i.e., payments, applied to those

17   billings and they were developed out of the general ledger

18   system there, accounting transactions pulled out of the

19   general ledger system.  We didn't go beyond that.

20   Q    You didn't look at any -- have you -- did you seen any

21   invoices?

22   A    No.  We haven't done that.  It's --

23   Q    Have you seen any bank statements that show some

24   payments from PQPR?

25   A    Not in this time period.  We have not gone back that

```
 1   far yet.

 2   Q    Are there any bank statements?

 3   A    Well, that's good question.  Right now, there aren't.

 4   I've got to go back and check and make sure when we change

 5   banks, we don't lose access to those bank statements.

 6   Q    So, when you put in your disclosure this was the amount

 7   that was memorialized in accrued obligations, you don't know

 8   that for a fact.

 9   A    Well, I know for a fact and that they showed me -- I

10   have the calculation for the amount of the 29,588,000 and I

11   see from the source date that it is from invoices and

12   payments records.

13   Q    But you don't --

14   A    To me, as an accountant, that tells me that's what I'm

15   looking at.

16   Q    But you haven't seen the billings or the invoices or

17   the --

18   A    We have not vouched it yet to ensure it's actually

19   properly calculated.

20   Q    And in your declaration, you -- on the cash collateral,

21   you mentioned that there was extensive and difficult

22   negotiation with PQPR over the use of cash collateral.  Do

23   you recall that part of your declaration?

24   A    Yes.

25   Q    Who did you communicate with at the PQPR to extensively
```

1    the information available to them to do their jobs.  That

2    would be accounting's responsible to actually prepare

3    financial statements.  That's what -- that point there Is

4    what threw me.

5    Q    Fair enough.  You would agree with me that internal

6    accounting controls were inadequate, right?

7    A    Yes.

8    Q    There was a lack of segregation of duties?

9    A    Yes.

10   Q    Lack of supervisory review?

11   A    Yes.

12   Q    Including billings to PQPR Holdings, right?

13   A    Correct.

14   Q    When did you come on to FSS?

15   A    June 6th is when I was hired.

16   Q    And so, all these findings that we're talking about are

17   subsequent to June 6th, right?

18   A    Yes.

19   Q    Okay.

20   A    And well, let me step back.  I've been told by Mr. Roe

21   that the general ledgers were not up to speed.  I did not

22   realize the significance of that statement when he told it

23   to me.  That was prior to June 6th.

24   Q    Yeah.  You didn't realize just how bad all the

25   financials and accounting were until you got on the scene,

```
 1    right?

 2    A     Correct.

 3    Q     They were a mess, right?

 4    A     They were nonexistent.

 5    Q     That's worse than a mess.

 6    A     Yep.

 7    Q     All right.  You would agree with me that the --

 8    locating accurate financial records is a tedious task at

 9    FSS, right?

10    A     Locating accurate financial records?

11    Q     Is a tedious task at FSS, isn't it?

12    A     In general, yes.

13    Q     And specifically yes, right?

14    A     Well, I mean, some banks can -- you know, are

15    accessible.  But in general, don't expect them to be.

16             MR. BRIMMAGE:  Mr. Martin, can we pull up

17    Defendant's -- I'm sorry -- I think it's Exhibit 3, the

18    declaration of Mr. Schwartz in this case, and go to

19    Paragraph 94, please?

20    BY MR. BRIMMAGE:

21    Q     We'll blow it up for you, Mr. Schwartz.

22    A     Oh, I can probably read it.

23    Q     Okay.  If you'll just read it to yourself.  I'm not

24    going to attempt to impeach you.  I'm just going to ask the

25    question again and see if we can move it quickly.  Does that
```

1    were at least offering to put some money on the table to see

2    if there could be a deal that was worked out and that didn't

3    happen.  And I'm not saying it should have happened.  Again,

4    I'm just saying the fact it did not happen, so I'm not

5    saying there was not a good reason that it shouldn't have

6    happened.  Again, I'm just pointing to the fact that that

7    did not occur.

8         But Mr. Schwartz, you spoke with both third-party

9    contributors at the time, and at least what you're telling

10   me, Mr. Lee was involved as well at the time, then both

11   parties were representing the InfoW Debtors who were --

12   quite frankly, membership interests had been transferred to

13   a trust.  And so, I haven't fully thought through, but I'm

14   concerned that you still may represent the InfoW Debtors as

15   their CRO and how you're purporting to act as the CRO in

16   this case.  And I don't -- at some point, someone's going to

17   have to make some really hard decisions.  I'm -- quite

18   frankly, I'm a little surprised you hadn't read some of the

19   litigation because at least InfoW was involved in the

20   litigation for every one of these last time.  So -- and that

21   was supposedly the purpose of the litigation.

22        So, I'm a little surprised that the CRO is telling

23   me today that he hasn't read, at least, the -- or has a good

24   working knowledge of the lawsuits, including the fraudulent

25   transfer litigation.  I didn't know whether the fraudulent

```
 1                          CERTIFICATION

 2

 3    I certify that the foregoing is a correct transcript from

 4    the electronic sound recording of the proceedings in the

 5    above-entitled matter.

 6

 7

 8

 9

10    Sonya Ledanski Hyde

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  August 12, 2022
```

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | Case No. 22-60043 |
| | § | |
| FREE SPEECH SYSTEMS, LLC, | § | Chapter 11 (Subchapter V) |
| | § | |
| Debtor. | § | |

# EXHIBIT F

Alex E. Jones Volume II Confidential
April 06, 2022

NO. XO6-UWY-CV-18-6046436-S

_____
ERICA LAFFERTY, ET AL.,          )SUPERIOR COURT
                                 )COMPLEX LITIGATION
                                 )AT WATERBURY
v.                               )
                                 )
ALEX EMRIC JONES, ET AL.         )
_____  )
NO. X06-UWY-CV-18-6046437-S      )SUPERIOR COURT
                                 )COMPLEX LITIGATION
WILLIAM SHERLACH                 )DOCKET AT WATERBURY
                                 )
v.                               )
                                 )
ALEX EMRIC JONES, ET AL.         )
_____  )
NO. X06-UWY-CV-18-6046438-S      )SUPERIOR COURT
                                 )COMPLEX LITIGATION
WILLIAM SHERLACH, ET AL.         )DOCKET AT WATERBURY
                                 )
v.                               )
                                 )
ALEX EMRIC JONES, ET AL.         )
_____  )

            CONTINUED VIDEOTAPED DEPOSITION OF
                   ALEX EMRIC JONES
                      VOLUME II
                    (CONFIDENTIAL)

DATE:            April 6, 2022

TIME:            9:37 a.m.

HELD AT:         Koskoff Koskoff & Bieder
                 350 Fairfield Avenue
                 Bridgeport, Connecticut

    By:          Sarah J. Miner, RPR, LSR #238

Alex E. Jones Volume II Confidential
April 06, 2022

```
 1   A P P E A R A N C E S:

 2   For the Plaintiffs:

 3   Christopher M. Mattei, Esq.
     Matthew S. Blumenthal, Esq.
 4   Alinor C. Sterling, Esq.
     Koskoff Koskoff & Bieder
 5   350 Fairfield Avenue
     Bridgeport, Connecticut  06604
 6

 7   For Alex Emric Jones, Infowars, LLC, Free Speech
     Systems, LLC, Infowars Health, LLC and Prison
 8   Planet TV, LLC:

 9   Norman A. Pattis, Esq.
     Pattis & Smith, LLC
10   383 Orange Street, First Floor
     New Haven, Connecticut  06511
11

12   For Genesis Communications Network, Inc.:
      (Appearing via Zoom)
13
     Mario Kenneth Cerame, Esq.
14   Brignole & Bush LLC
     73 Wadsworth Street
15   Hartford, Connecticut  06106

16   Also Present:

17   Pritika Seshadri

18

19

20

21

22

23

24

25
```

Alex E. Jones Volume II Confidential
April 06, 2022

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
```

18  BY MR. MATTEI:

19      Q   And do you see here, Mr. Jones, on Column

20  A, it was 2015 and then in Column C it shows dates

21  of distributions paid out of PQPR.  Do you see

22  that?

23      A   Yes.

24      Q   And those distributions went to two other

25  entities JLJR and PLJR.  Correct?

Alex E. Jones Volume II Confidential
April 06, 2022

```
 1        A    I think so.

 2        Q    Are you familiar with this distribution

 3   scheme you have here where PQPR is making

 4   distributions of its proceeds to two corporate

 5   entities, one of which you control?

 6              MR. PATTIS:  Objection as to form.

 7              THE WITNESS:  I don't really follow

 8         all this.  The accountants and the CPA do

 9         it.

10   BY MR. MATTEI:

11        Q    Okay.  So is it your testimony that you

12   are unaware as you sit here that you were a

13   controlling member of PLJR?

14              MR. PATTIS:  In what period?

15              MR. CERAME:  Objection.

16   BY MR. MATTEI:

17        Q    2015.

18        A    You know, I had lawyers and accountants

19   set all this up and then I -- and you are welcome

20   to talk to them.  I don't want to get something

21   wrong.

22        Q    Who am I welcome to talk to?

23        A    I mean whoever you want to talk to.

24        Q    You just told me that you had lawyers and

25   accountants that you --
```

Alex E. Jones Volume II Confidential
April 06, 2022

```
1        A    Whoever.

2        Q    You just told me you had lawyers and

3   accountants set this up for you and that I would be

4   welcome to talk to them.  I appreciate that

5   invitation.  So who could I speak to about this?

6                   MR. PATTIS:  There is a point of

7             privilege I would like to speak to

8             Mr. Jones to -- whether he is, in fact,

9             waiving it.  My concern is that this part

10            of the transcript may be used to present a

11            waiver of a privilege claim.

12                  THE WITNESS:  I don't waive any

13            privilege claim.

14   BY MR. MATTEI:

15       Q    Put the lawyers aside, which accountants

16   did you use to put this together for you that you

17   said I would be welcome to speak with?

18       A    There was -- back at this time, like I

19   said, it would be Bill Love.

20       Q    You are willing to make Bill Love

21   available to me to talk about this?

22                  MR. PATTIS:  Objection.

23                  THE WITNESS:  I guess you could

24            subpoena him.

25   BY MR. MATTEI:
```

Alex E. Jones Volume II Confidential
April 06, 2022

```
 1        Q   Well, I mean, he's -- you pay him a whole
 2   bunch of money, right?
 3               MR. PATTIS:  Objection.
 4               THE WITNESS:  I don't understand.
 5   BY MR. MATTEI:
 6        Q   Would you request Bill Love sit for a
 7   deposition in this case so that I can ask him about
 8   this?
 9               MR. PATTIS:  Objection.
10               THE WITNESS:  I can't speak really
11          for him, but I wouldn't oppose it.
12   BY MR. MATTEI:
13        Q   Would you be actually willing to make that
14   call today to see if he could sit with us?
15               MR. PATTIS:  Objection.
16   BY MR. MATTEI:
17        Q   The reason I'm asking, Mr. Jones, is you
18   just said a minute ago that I'd be -- you would
19   welcome me speaking with him.  So I am just asking
20   if you want to give Bill Love a call and see if
21   he'll sit for a deposition and talk with me about
22   this?
23               MR. PATTIS:  Objection.
24               THE WITNESS:  I guess I can give him
25          a call, sure.
```

Alex E. Jones Volume II Confidential
April 06, 2022

```
 1

 2                    C E R T I F I C A T E

 3        I hereby certify that I am a Notary Public, in

 4   and for the State of Connecticut, duly commissioned

 5   and qualified to administer oaths.

 6        I further certify that the deponent named in

 7   the  foregoing deposition was by me duly sworn and

 8   thereupon testified as appears in the foregoing

 9   deposition; that said deposition was taken by me

10   stenographically in the presence of counsel and

11   reduced to typewriting under my direction, and the

12   foregoing is a true and accurate transcript of the

13   testimony.

14        I further certify that I am neither of counsel

15   nor related to either of the parties to said suit,

16   nor of either counsel in said suit, nor am I

17   interested in the outcome of said cause.

18        Witness my hand and seal as Notary Public the

19   10th day of April, 2022.

20        _____

21

22   Sarah J. Miner, RPR, LSR #238

23   Notary Public

24   My Commission Expires:

25   November 30, 2022
```

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

IN RE:                                    §          Case No. 22-60043
                                          §
FREE SPEECH SYSTEMS, LLC,                 §          Chapter 11 (Subchapter V)
                                          §
    Debtor.                              §

# EXHIBIT G

002490

Alex E. Jones Volume IV
July 21, 2022

SUPERIOR COURT
COMPLEX LITIGATION DOCKET
AT WATERBURY

ERICA LAFFERTY, ET AL        )
                            )
                            )   X06-UWY-CV-18-6046436-S
V.                          )
                            )
ALEX EMRIC JONES, ET AL      )
_____

WILLIAM SHERLACH            )
                            )
                            )   X06-UWY-CV-18-6046437-S
V.                          )
                            )
ALEX EMRIC JONES, ET AL      )
_____

WILLIAM SHERLACH, ET AL      )
                            )
                            )   X06-UWY-CV-18-6046438-S
V.                          )
                            )
ALEX EMRIC JONES, ET AL      )   JULY 21ST, 2022


************************************************************
  REMOTE VIDEOCONFERENCE AND VIDEOTAPED DEPOSITION OF
                  ALEX EMRIC JONES
                  JULY 21ST, 2022
                    VOLUME IV
************************************************************


REMOTE VIDEOCONFERENCE AND VIDEOTAPED DEPOSITION of ALEX
EMRIC JONES, produced as a witness at the instance of the
Plaintiffs and duly remotely sworn was taken remotely in
the above-styled and numbered cause on the 21st of July,
2022, from 10:04 a.m. to 10:39 a.m. Central Time, before
SUSAN L. GRAHAM, CSR in and for the State of Texas,
reported remotely by machine shorthand, in the City of
Houston, Harris County, Texas, pursuant to the
Connecticut Rules of Civil Procedure, Notice and the
provisions stated on the record or attached hereto.

```
 1                    A P P E A R A N C E S

 2
      FOR THE PLAINTIFFS:
 3         Christopher M. Mattei, Esq.
           Alinor Sterling, Esq.
 4         Koskoff Koskoff & Bieder, PC
           350 Fairfield Avenue, Suite 501
 5         Bridgeport, Connecticut  06604
           Phone:   203-336-4421
 6         E-mail:  cmattei@koskoff.com
                    asterling@koskoff.com
 7

 8    FOR THE DEFENDANTS ALEX EMRIC JONES AND FREE SPEECH
      SYSTEMS, LLC:
 9         Norman A. Pattis, Esq.
           Pattis & Smith, LLC
10         383 Orange Street, First Floor
           New Haven, Connecticut  06511
11         Phone:   203-393-3017
           E-mail:  npattis@pattisandsmith.com
12

13    ALSO PRESENT:
           Pritika Seshadri
14         Mark Hendrix, Videographer

15

16

17

18

19

20

21

22

23

24

25
```

Alex E. Jones Volume IV
July 21, 2022

```
 1   your right hand, please, sir?
 2                    ALEX EMRIC JONES
 3   having been first duly remotely sworn, testified as
 4   follows:
 5                    EXAMINATION
 6   QUESTIONS BY MR. MATTEI:
 7        Q.   Mr. Jones, you can't see me.  Ordinarily we
 8   would all be able to see each other on the Zoom but I can
 9   see you and your counsel.
10             MR. MATTEI:  Does everybody agree that we
11   can proceed without my video working so long as the
12   document sharing function is working fine?
13             MR. PATTIS:  Agreed, yes, sir.
14             MR. MATTEI:  All right.
15             MS. STERLING:  Chris, before you go on
16   just for the record this is Alinor Sterling also on.
17        Q.   (By Mr. Mattei)  All right.  Mr. Jones, the
18   reason that we're here today is because we had made
19   discovery requests for a number of materials to be
20   produced in connection with your deposition, including
21   any loan documents or other contracts between Free Speech
22   Systems and PQPR and other entities that you're
23   associated with.  After your deposition we received two
24   documents purporting to be promissory notes and one
25   document purporting to be a security agreement, which I
```

Alex E. Jones Volume IV
July 21, 2022

1   had not previously had a chance to question you about so

2   that's why we're here for your continued deposition is to

3   examine you on the issues raised by those documents.  Do

4   you understand that?

5        A.   I understand.

6        Q.   One of the documents that was produced to us

7   was a document captioned Promissory Note dated August

8   13th, 2020 between Free Speech Systems and PQPR Holdings

9   Limited, LLC.  Are you familiar with that document?

10       A.   No.

11       Q.   Have you reviewed it prior to today's

12  deposition?

13       A.   No.

14       Q.   Are you aware of having signed such a document

15  on behalf of Free Speech -- Free Speech Systems?

16       A.   Yes.

17       Q.   Okay.  And why is it that you say you're not

18  familiar with the document?

19       A.   I mean I haven't looked at it since whenever I

20  signed it.

21       Q.   Okay.  What's your understanding of what that

22  document purported to do?

23       A.   Can you show me the document?

24       Q.   Before I do that I want you to answer the

25  question I asked you.  What is your understanding of the

1    purpose of that promissory note that you entered in

2    August 13th, 2020 on behalf of Free Speech Systems?

3         A.    After deplatforming approximately four years

4    ago and legal bills from lawsuits, we began to have to

5    spend basically all the money from profits from PQPR to

6    build new infrastructure and pay legal bills and taxes

7    and when the, when the debt got so large we, we developed

8    a plan to start pay -- try to pay down that debt, at

9    least not have it grow, and so that's, that's what I

10   remember the reason it was done.

11        Q.    Okay.  So if I understand you correctly, your

12   testimony is that when you were deplatformed -- and when

13   you say deplatformed what are you referring to?

14        A.    It's like what happened in Nazi Germany but in

15   a modern sense where the Jews weren't allowed to have

16   businesses or operate and so it's when the corporations

17   and the system gangs up on you and then doesn't let you

18   bank, doesn't let you be on major platforms, doesn't let

19   you use software, basically attempts to put you into a

20   dic -- a non-digital ghetto.  So that's, that's what

21   deplatforming is, the first step in isolating and

22   impoverishing populus loyal Americans ahead of the

23   globalist takeover.

24        Q.    And so you -- it's, it's your testimony that

25   the -- what you describe as the deplatforming of Free

Alex E. Jones Volume IV
July 21, 2022

1   reset, corporate takeover of America, yes.

2        Q.   Okay.  And I want to ask you specifically

3   though -- by the way did -- about the debt and its

4   connection to what you claim was that deplatforming.  You

5   indicated that the debt started to accrue about four

6   years ago when this deplatforming took place and can, can

7   we agree that the, the approximate time frame we're

8   talking about is when the social media companies removed

9   you from their platforms, correct?

10       A.   And the banks and the software companies and,

11  and, and everyone else.

12       Q.   And you, you continue to have continuous

13  access to banking since 2018, correct?

14       A.   We, we have found alternate banking.

15       Q.   Right.  And the reason we know that is because

16  you produced at least some bank account information to us

17  in this case, correct?

18       A.   Yes.

19       Q.   All right.  So but if we're talking about the

20  deplatforming, you would peg that to about the time in

21  2018 where Twitter, Facebook, and YouTube removed your

22  content from its platforms, correct?

23       A.   There, there was the beginning of

24  deplatforming happening years before that but, but, but

25  that's, that's when the -- it kind of goes like this on

Alex E. Jones Volume IV
July 21, 2022

```
 1   build.  That was the number one thing and then there was

 2   taxes and then legal, yes.

 3        Q.   Okay.  So let's just figure out what these

 4   buckets are.  One is as a result of deplatforming in 2018

 5   Free Speech Systems needed to build out new

 6   infrastructure, correct?

 7        A.   Yes.

 8        Q.   Okay.  That was a new expense for which it did

 9   not have the funds and so PQPR lent it money in order to

10   meet those expenses, correct?

11             MR. PATTIS:  Objection, form.

12        A.   Yes.

13        Q.   (By Mr. Mattei)  Okay.  In addition, Free

14   Speech Systems had legal costs related to this lawsuit

15   and related litigation in Texas that it did not have the

16   funds to cover and so PQPR provided a loan in part to

17   fund those expenses, correct?

18             MR. PATTIS:  Object as to form.

19        A.   Yes.

20        Q.   (By Mr. Mattei)  All right.  And then beyond

21   that Free Speech Systems had tax obligations that it was

22   not able to fund and so it took a loan from PQPR in part

23   to satisfy those tax obligations, correct?

24        A.   It -- but -- but -- yes and so --

25             MR. PATTIS:  Objection, form.
```

Alex E. Jones Volume IV
July 21, 2022

```
 1        A.    -- you're asking for buckets.  Let me help you

 2   and give you the facts.  Actually --

 3        Q.    (By Mr. Mattei)  No, the -- no, no, I --

 4   there's no other question pending.  You answered my

 5   question.

 6        A.    But --

 7        Q.    You said yes.  All right.

 8        A.    Well, taxes first, then deplatforming, then

 9   legal but taxes was the big one now that I'm, I'm

10   thinking about this.

11        Q.    Thank you.  Any other components of increased

12   costs that Free Speech Systems wasn't able to meet for

13   which it took out a loan from PQPR?

14             MR. PATTIS:  Objection as to form.

15        A.    There was a lot of -- I -- I -- cases.  I

16   can't remember.  It's a lot of stuff.

17

18

19

20

21

22

23

24

25
```

```
 1   THE STATE OF TEXAS

 2   COUNTY  OF  HARRIS

 3           I, Susan L. Graham, Certified Shorthand

 4   Reporter in and for the State of Texas, hereby certify

 5   that at the time and place stated the witness, ALEX EMRIC

 6   JONES, personally appeared remotely before me and after

 7   being by me first duly sworn to tell the truth, was

 8   examined by counsel for the respective parties hereto;

 9   that the testimony of said witness was taken in shorthand

10   by me, and the foregoing pages are a true and correct

11   transcript of said testimony; that examination and

12   signature of the transcript was submitted to the witness

13   to read and sign;

14            That the amount of time used by each party at

15   the remote videoconference and videotaped is as follows:

16        Christopher M. Mattei - :27

17            GIVEN under my hand and seal of office on this

18   the 31st day of July, 2022.

19

20                      Susan L Graham
                        _____
21                      Susan L. Graham
                        Texas CSR No. 2534
                        Expires:  January 31, 2024
22                      Firm Registration No. 122
                        16825 Northchase Drive
23                      Suite 800
                        Houston, Texas  77060
24                      (713) 653-7100

25
```

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | **Chapter 11** |
| **Free Speech Systems LLC** | § | |
| | § | **Case No. 22–60043 (CML)** |
| **Debtor.** | § | |

## <u>EXHIBITS (PART 2)</u>

**THE SANDY HOOK FAMILIES' MOTION TO (I) APPOINT
TORT CLAIMANTS COMMITTEE AND (II) REMOVE THE
DEBTOR IN POSSESSION**

*(Related to ECF 102)*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | Case No. 22-60043 |
| | § | |
| FREE SPEECH SYSTEMS, LLC, | § | Chapter 11 (Subchapter V) |
| | § | |
| Debtor. | § | |

# EXHIBIT H

```
                 STATE OF CONNECTICUT
                   SUPERIOR COURT
              COMPLEX LITIGATION DOCKET
                 HELD AT WATERBURY
                    VOLUME III
- - - - - - - - - - - - - - - - -X

ERICA LAFFERTY, et al.,
                    PLAINTIFFS,

         vs.                 X06-UWY-CV18-6046436-S

ALEX EMRIC JONES, et al.,
                    DEFENDANTS.

- - - - - - - - - - - - - - - - -X

WILLIAM SHERLACH,
                    PLAINTIFF,

         vs.                 X06-UWY-CV18-6046437-S

ALEX EMRIC JONES, et al.,
                    DEFENDANTS.

- - - - - - - - - - - - - - - - -X

WILLIAM SHERLACH, et al.,
                    PLAINTIFFS,

         vs.                 X06-UWY-CV18-6046438-S

ALEX EMRIC JONES, et al.,
                    DEFENDANTS.
- - - - - - - - - - - - - - - - -X
```

        V I D E O T A P E D   D E P O S I T I O N

          The videotaped deposition of BRITTANY PAZ

was taken pursuant to notice at the offices of Koskoff

Koskoff & Bieder, PC, 350 Fairfield Avenue, Bridgeport,

Connecticut, before Viktoria V. Stockmal, RMR, CRR,

license #00251, a Notary Public in and for the State of

Connecticut, on Monday, June 27, 2022, at 10:11 a.m.

Brittany Paz Volume III
June 27, 2022

```
1   A P P E A R A N C E S:

2          ATTORNEYS FOR THE PLAINTIFFS:

3          KOSKOFF KOSKOFF & BIEDER, PC
           350 Fairfield Avenue
4          Bridgeport, CT 06604
           Tel:  203-336-4421
5          E-mail:  asterling@koskoff.com
                    cmattei@koskoff.com
6                   mblumenthal@koskoff.com

7          CHRISTOPHER M. MATTEI, ESQ.
           ALINOR STERLING, ESQ. (Appearing remotely)
8          PRITIKA SESHADRI

9
           ATTORNEYS FOR THE DEFENDANTS:
10
           FOR ALEX EMRIC JONES, INFOWARS, LLC, FREE SPEECH
11         SYSTEMS, LLC, INFOWARS HEALTH, LLC and PRISON
           PLANET TV, LLC:
12
           PATTIS & SMITH, LLC
13         383 Orange Street, First Floor
           New Haven, CT 06511
14         Tel:  203-393-3017
           E-mail:  npattis@pattisandsmith.com
15
           ZACHARY REILAND, ESQ.
16

17         FOR GENESIS COMMUNICATIONS NETWORK, INC.:

18         BRIGNOLE,BUSH, & LEWIS, LLC
           73 Wadsworth Street
19         Hartford, CT 06106
           Tel:  860-527-9973
20         E-mail:  mcerame@brignole.com

21         MARIO KENNETH CERAME, ESQ. (Appearing remotely)

22

23         ALSO PRESENT:

24              Joseph Raguso, Videographer

25
```

Brittany Paz Volume III
June 27, 2022

```
 1

 2

 3

 4

 5

 6    EXAMINATION BY MR. MATTEI:

 7         Q    Good morning, Ms. Paz.

 8         A    Good morning.

 9         Q    Welcome back.  We were last here for your

10    deposition on, I believe --

11         A    Back in March.

12         Q    -- March 16th.  And so, before we start today,

13    I observed that you had a set of typewritten notes before

14    you.  You've handed me a copy of those and these will be

15    marked as the next exhibit in sequence.  I don't know if

16    we know what that will be right now or if we can just do

17    that at the break.

18                    MS. SESHADRI:  126.

19                         (Plaintiff's Exhibit 126 was

20                    marked for identification:  Typewritten

21                    notes.)

22    BY MR. MATTEI:

23         Q    This will be Exhibit 126.

24              Ms. Paz, why don't you just explain to me what

25    these notes are?
```

Brittany Paz Volume III
June 27, 2022

1      A    Sure.  After the last day of deposition, I went

2   through the deposition notice that was going to be for

3   today, but I think the day got moved because Mr. Jones

4   took a date; and then I thought that I needed to speak to

5   some more people on the rest of the questions; so, I

6   spoke to Blake Roddy, who is in charge of the marketing

7   and advertising for Free Speech and I also had a couple

8   conversations with Bob Roe and Mark Schwartz, I think.

9   They are the accountants that work with Free Speech about

10   the financial aspects of it, and I took some notes about

11   my conversations with them.



1   cases.

2       Q    So, everything down until the part that says

3   Notes dash, that was all information that you obtained

4   either by virtue of your interview with Mr. Roddy or your

5   review of his deposition; correct?

6       A    Yes.

7       Q    Then you get to notes at the bottom which

8   starts with "to notes" and I'm assuming this refers to

9   the documents that were produced last week purporting to

10  be some sort of debt instrument between Free Speech

11  Systems and PQPR; correct?

12      A    That is correct, yes.

13      Q    Where did you obtain the information reflected

14  here at the very bottom?

15      A    These are based on a couple conversations I

16  had.  I had a video conversation with Mark Schwartz and

17  counsel.  I also had, I believe, one video conference

18  with Bob Roe and maybe two phone calls basically

19  explaining the spreadsheets that I believe were produced

20  as well as the notes.

21      Q    When did your conversation with Mr. Schwartz

22  and counsel take place?

23      A    Within the last couple weeks after we scheduled

24  this date.  So, within the last couple weeks.

25      Q    Was it last week?

Brittany Paz Volume III
June 27, 2022

1      A      It might have been the week before.

2      Q      Okay.

3             Is that your best recollection that it was

4      probably a week before?

5      A      Yeah, I don't remember the exact date of when

6      the conversation happened, but it was after this date was

7      scheduled and we knew that this date was happening.

8      Q      Well, this date's been scheduled for quite a

9      while, so I just want to make sure I understand what your

10     best recollection is of when your conversation with

11     Mr. Schwartz and counsel may have taken place.

12     A      Well, I wasn't --

13     Q      Let me just finish.

14     A      Oh, sure.

15     Q      So, you indicated earlier that you thought it

16     was within the last couple of weeks.  So, today is June

17     27th.  Do you believe it was during the week beginning

18     June -- Sunday, June 12th?

19     A      May I look at my calendar?

20     Q      Yeah, please.  Would that be a calendar entry?

21     A      I might have put it in my calendar because it

22     was a Zoom call, so it might be in my calendar.

23     Q      That would be great.

24     A      Just give me one second.

25             So, I have it on my calendar as Friday, June

Brittany Paz Volume III
June 27, 2022

1    17th?

2        Q    Okay.

3            And that's a Zoom call involving you, a

4    gentleman named Mark Schwartz and Attorney Pattis?

5        A    It was Attorney Reiland.

6        Q    Thank you.

7            Anybody else participate in that?

8        A    No, it was just the three of us.

9        Q    What's your understanding of who Mr. Schwartz

10   is?

11       A    I believe he's an accountant working for Free

12   Speech.

13       Q    Okay.

14           Where did you get that information?

15       A    Attorney Pattis indicated he was the best

16   person to speak to regarding the financial questions that

17   were going to be in this deposition; so, that is who I

18   contacted.

19       Q    Okay.

20           The financial questions, you're referring

21   specifically to the relationship between PQPR and Free

22   Speech Systems?

23       A    The questions that were noticed in the

24   deposition, those questions.

25       Q    What specific financial issues did you believe

1   he was going to be able to provide you information --

2        A    He was going to be able to explain to me, for

3   example, one of the noticed questions was about

4   advertising.  Who advertises, paid advertising to Free

5   Speech who -- and how we get paid for advertising.  So,

6   he was able to pull information from our general ledger

7   and create some spreadsheets and then he explained those

8   to me.  For example, one of the questions was questions

9   about Mr. Jones' compensation, he created a spreadsheet,

10  we had a conversation about the information that was in

11  there so I can cogently testify to it today.  That kind

12  of thing.

13       Q    You're referring to Mark Schwartz as having

14  been the individual who --

15       A    I had --

16       Q    Just let me finish my question.

17       A    Okay, sure.

18       Q    You collected that information and was in the

19  best position to talk about those issues on behalf of

20  Free Speech Systems?

21       A    I had also spoken to Mr. Roe about that

22  previously.

23       Q    I'm just specifically though talking about

24  Mr. Schwartz and the meeting you had with him on June

25  17th and what you were informed about his status with the

1   company, why he was in the position to give you

2   information concerning those issues.  I just want to make

3   clear that you're speaking specifically about

4   Mr. Schwartz there being the one who collected

5   spreadsheets concerning Mr. Jones's compensation and

6   spreadsheets and information concerning advertising

7   activity of Free Speech Systems; is that correct?

8        A    I don't know how to answer that question.  I

9   don't know if he created those spreadsheets.  All I know

10  is he was able to explain the spreadsheets to me.

11       Q    Those spreadsheets being the ones related to

12  Free Speech Systems' advertising and to Mr. Jones's

13  compensation?

14       A    If you would like to pull up the deposition

15  notice, I could indicate exactly which numbers I spoke to

16  him about.

17       Q    No, no, I'm asking you about the spreadsheets

18  you were just voluntarily testifying about.  So, I don't

19  want to present you -- I'm asking --

20       A    Well, you asked me a question.

21       Q    Just let me finish, Ms. Paz.

22       A    Sure.

23       Q    We have to do question and answer.  It's going

24  to go a lot quicker if you just let me finish my question

25  and then you answer; okay?

```
 1              Specifically, the spreadsheets that you were
 2    referring to that Mr. Schwartz described for you and was
 3    able to explain, you referred to them as being
 4    spreadsheets relating to Mr. Jones's compensation and
 5    advertising; is that correct?
 6         A    Yes.  Among others.
 7         Q    Okay, great.
 8              What other issues did he explain to you?
 9         A    If you would pull up the deposition notice, I
10    could tell you exactly which ones.
11         Q    Why don't we pull up the re-notice for today.
12              Do you have that in front of you, Ms. Paz?
13         A    Yes.
14         Q    So, you would like us just to advance to the
15    topic section?
16         A    Yes, that would be great.
17              If you could scroll down just a little bit
18    more.  Wait, wait, wait.  Too far, too far.
19              So, if you scroll up to No. 4.  So, one of
20    those spreadsheets was the identities of any third
21    parties who provide with you marketing service.  So, they
22    were able to -- when I say "they," I mean, Mark Schwartz
23    and Mr. Roe.  I'm not sure --
24         Q    I'm asking you specifically about Mr. Schwartz?
25         A    I don't know who created those spreadsheets,
```

Brittany Paz Volume III
June 27, 2022

```
 1   I'm not sure, so he was able to explain them to me.

 2        Q    Mr. Schwartz was?

 3        A    Yes.

 4        Q    And one of the spreadsheets Mr. Schwartz was

 5   able to explain to you pertained to the information

 6   described in item 4, third-party advertising services;

 7   correct?

 8        A    Yes.

 9        Q    Okay.  Continue.

10        A    Then for No. 5, any third parties who had paid

11   Free Speech for advertising and our marketing service.

12        Q    Mr. Schwartz described and explained those --

13   the information contained in those spreadsheets?

14        A    Yes.

15             Then for No. 8, the compensation to Mr. Jones,

16   David Jones and Kelly Jones?

17        Q    Mr. Schwartz explained that data to you?

18        A    Yes.  We discussed that one.

19

20

21

22

23

24

25
```

Brittany Paz Volume III
June 27, 2022

15    A    We did discuss item 10, the transactions

16   between the two companies, Free Speech and PQPR.  And if

17   you could scroll down -- I just want to make sure I have

18   everything.  I think that's it.

19    Q    And so, Mr. Schwartz was described to you as an

20   accountant working for Free Speech Systems?

21    A    Yes, I don't know exactly what his relationship

22   is to Free Speech.  It may be a consulting relationship,

23   I'm not sure.  But I was given his information and told

24   to contact him.

25    Q    But I just want to make sure that what you

1   understand is that he is an accountant who is -- has some

2   relationship with Free Speech Systems, it sounds like you

3   believe in a consulting capacity?

4        A    I don't know what capacity he's employed by

5   Free Speech, but that was the name of the person I was

6   told to contact, so I did.

7        Q    And so, let me then just confirm that what you

8   were informed was that he was an accountant?

9        A    I believe he's an accountant, yes.

10       Q    Based on information that Attorney Pattis

11  provided to you?

12       A    Yes.

13       Q    Do you have any understanding of Mr. Schwartz's

14  involvement in Mr. Jones's recent bankruptcy petition on

15  behalf of three companies that he controls?

16       A    No, I don't.

17       Q    Were you aware that he was involved in that at

18  all?

19       A    No, I'm not.

20       Q    Did he -- okay.

21            How long was that meeting with Mr. Schwartz?

22       A    I would say it was about an hour.

23       Q    Let's pull up the two notes that were produced

24  to us last week.

25            These are -- what are these numbered?

```
 1                   MS. SESHADRI:   117 and 118.
 2    BY MR. MATTEI:
 3        Q    Ms. Paz, do you have before you a document
 4    captioned Promissory Note, dated August 13, 2020?
 5        A    Yes.
 6        Q    Have you seen this document before?
 7        A    Yes.
 8        Q    Did you discuss this document with
 9    Mr. Schwartz?
10        A    Yes.  We did discuss the two notes and their
11    relationship to the payments that Free Speech makes to
12    PQPR.
13        Q    Let's look at 18, too, if you can just identify
14    that, Ms. Paz.  This is another document captioned as a
15    Promissory Note, dated November 10, 2021.  Have you seen
16    this document before?
17        A    Yes.
18        Q    Did you discuss this with Mr. Schwartz?
19        A    Yes.
20        Q    Did you discuss both these document with
21    Mr. Roe as well?
22        A    Yes.  I had had communications with Mr. Roe
23    about the promissory -- the debt from Free Speech to
24    PQPR.  I hadn't seen these, though, when I had those
25    conversations with him, so I didn't discuss the actual
```

Brittany Paz Volume III
June 27, 2022

1   documents with him.  But I did discuss the debt with him.

2        Q    Understood.

3             How did you first receive these two

4   documents?

5        A    I asked for them and they were e-mailed to me.

6        Q    When were they e-mailed to you?

7        A    In the last week.

8        Q    Who e-mailed them to you?

9        A    I think Mr. Roe e-mailed them to me.

10            MR. MATTEI:  I don't believe that we have

11            that e-mail, Zach.  I don't think it was

12            included in what you provided last week.

13            MR. REILAND:  That was probably sent after

14            that disclosure was gathered together, so we'll

15            start a new one.

16   BY MR. MATTEI:

17       Q    So, you asked to see them and you asked --

18       A    I asked for them, yes.

19       Q    You believe Mr. Roe sent them to you last week?

20       A    Yes.

21       Q    Mr. Roe sent them to you last week --

22       A    Well, within the last week.  I'm not sure.

23   Within the last week.

24       Q    So, when did you discuss them with

25   Mr. Schwartz?

1      A     I had a phone call with Mr. Schwartz after the

2   Zoom meeting.

3      Q     Okay.

4            So, in addition to your Zoom meeting, you had a

5   phone call with him and that was last week?

6      A     Well, yes.  It had to be last week because

7   today is Monday; so, yes.

8      Q     The purpose of that phone call specifically was

9   to discuss these two documents?

10      A     Yes, discuss the notes and any other questions

11   I had that were lingering, which weren't many.  It was a

12   short phone call.

13      Q     But you were aware during your initial

14   conversation with Mr. Schwartz on the 17th of the

15   existence of these notes which is what prompted you to

16   then ask him for them?

17      A     Right.

18      Q     We'll go over these in substance a little bit

19   later.

20            So, your notes at the very bottom, I take it

21   those notes are taken from your conversation with

22   Mr. Schwartz concerning the actual documents; correct?

23      A     Right.  So, these notes I didn't have the

24   actual document yet, we were talking about it in our Zoom

25   call.  So, these were the notes from the Zoom call.

Brittany Paz Volume III
June 27, 2022

```
1        A    Right.

2        Q    And Free Speech Systems isn't prepared to

3   testify today concerning any relationship it has with the

4   website preparetoday.com; correct?

5        A    Correct.  I don't know that website.

6        Q    And Free Speech Systems is not prepared to

7   testify today concerning any relationship it has with the

8   website preparewithalex.com; correct?

9        A    Right.  I don't know that website.

10       Q    Is Free Speech Systems -- well, although Free

11  Speech Systems cannot testify as to whether it owns

12  infowarsstore.com, infowarsshop.com, Free Speech Systems

13  is aware that sales of PQPR products are transacted over

14  those websites; correct?

15       A    Yes.

16       Q    And the -- during the time period 2012 through

17  2020, proceeds from sales transacted over those websites

18  were processed by Free Speech Systems not PQPR; correct?

19       A    No, I don't know that.

20       Q    Okay.

21            So, Free Speech Systems' testimony is it does

22  not know whether it was responsible for transacting the

23  sales conducted on those websites; correct?

24       A    No, I don't think, I don't know, I think that

25  PQPR transacts -- handles those transactions.
```

```
 1        Q     Okay.

 2        A     So, no, that's not correct.

 3        Q     So, Free Speech Systems' testimony is that PQPR

 4   conducts the transactions -- the sales transactions over

 5   InfoWars.com -- I'm sorry.  Strike that.  Let me begin

 6   again.

 7              Your testimony is that PQPR conducts the

 8   transactions occurring over infowarsstore.com and

 9   infowarsshop.com for the period 2012 through 2020?

10              MR. REILAND:  I'll object to the form.  I

11        think she said she didn't make the --

12   BY THE WITNESS:

13        A     I don't understand -- yeah, I don't understand

14   the question.

15        Q     Okay.

16        A     I'm sorry, can you just repeat it.

17        Q     Sure.

18              You testified that there are sales transactions

19   that occur on in for infowarsstore.com and

20   infowarsshop.com; right?

21        A     Right.

22        Q     When those sales occur during 2012 to 2020,

23   where were the sales proceeds routed?

24        A     So, PQPR handles all of the product sales.  If

25   you look at the spreadsheets, all of the product sales
```

1   websites, infowarsstore.com and infowarsshop.com, during

2   the period 2012 to 2019 [Verbatim], were any Free Speech

3   Systems' employees involved in processing those

4   transactions?

5       A    No, PQPR processes the transactions, so they

6   are PQPR employees.

7       Q    How many people does PQPR employ?

8       A    I don't know.

9       Q    Are any Free Speech Systems' employees, during

10  the time period 2012 through 2020, involved in any

11  activities on behalf of PQPR?

12      A    I'm sorry, can you repeat the question.

13      Q    Yeah.

14          For the time period 2012 through 2020, were any

15  Free Speech Systems' employees engaged in any activities

16  on behalf of PQPR?

17      A    I don't know.  I don't know how to answer that

18  question.  I don't know.

19      Q    Okay.

20          Well, let me ask it this way then:  You

21  testified earlier that PQPR handles all transactions of

22  its products, sales; correct?

23      A    Right, it does all the fulfillment of the

24  order, it houses all of the products and it, you know,

25  generally just fulfills all of the orders.

Brittany Paz Volume III
June 27, 2022

```
1        Q     Okay.  All right.

2              So, let's break that down.  So, you say that

3    PQPR handles all the fulfillment of its -- did you say

4    products?

5        A     Right, all the products that it sells and are

6    linked back from the website, from the Free Speech's

7    website via ads to the store.  It has a staff, it has a

8    warehouse.  They package everything.  They house it.

9    They fulfill the orders.  I did tour the warehouse, so

10   they have a whole process about how that happens.  And

11   PQPR handles that.

12       Q     Okay.  So --

13       A     It's --

14       Q     Free Speech Systems' testimony is that when it

15   comes to the sale of PQPR products, PQPR owns the

16   warehouse where those products are stored; correct?

17       A     I don't know if it owns it or rents it or

18   leases it.  I don't know.

19       Q     Okay.

20             PQPR staff, by which I assume mean employees,

21   handle the fulfillment of all those orders; correct?

22       A     That's correct.

23       Q     And PQPR employees handle all the accounting

24   for PQPR's books and records; is that right?

25       A     I mean, I don't know how they do their internal
```

1    things.  I don't represent PQPR.  So, however they do

2    that her internal business, I don't know.

3         Q    Okay.

4              But Free Speech Systems' employees don't

5    fulfill that function for PQPR, that is the accounting

6    function?

7         A    Right.  They have -- It's separate.  They are

8    two separate entities.

9         Q    And so, on the fulfillment piece, I take it

10   that your testimony is that that involves receiving

11   notice of any sale of a PQPR product, pulling that

12   product for shipment, shipping it; anything else?

13        A    I mean, like I said, I don't know how their

14   internal operations work there.  I mean, I did tour the

15   warehouse.  They showed me how they stock everything.

16   They showed me how they pulled an item, how it was

17   labeled then for packaging.  And then where it was

18   ultimately shipped out.  Aside from that, their internal

19   processes, I don't know.  I know they have some software

20   that helps them with that.  I don't know the name of it.

21   I don't know how it works.

22        Q    Basically, anything that goes into fulfilling

23   an order once it has been made by a customer, PQPR

24   employees handle; correct?

25        A    Right.

1        Q      Free Speech Systems' employees do not?

2        A      Correct.

3        Q      Who gave you a tour of the warehouse?

4        A      I went with Attorney Blott when he was down in

5    Austin.

6        Q      Okay.

7               And she's outside counsel retained by Free

8    Speech Systems to represent them in Texas; correct?

9        A      Right.   Although I don't know if she's involved

10   any longer, but she was when I was there and so she and I

11   went.

12       Q      Who were the PQPR employees who showed you kind

13   of the fulfillment process that you were just describing?

14       A      You know what, I'm so sorry, I don't remember

15   their name.   I don't remember.

16       Q      Okay.   Okay.

17               And it's your understanding that PQPR, whether

18   it owns or leases the warehouse, pays for that facility

19   in order to use that facility; correct?

20       A      I would assume so.

21       Q      Free Speech Systems does not?

22       A      I don't know.   I don't represent PQPR, so I

23   don't know what they do to handle their warehouse.

24       Q      Okay.

25               Free Speech Systems, though, has no involvement

Brittany Paz Volume III
June 27, 2022

1    in --

2         A     That's correct.

3         Q     -- sorry, just let me finish.

4               Free Speech Systems has no involvement in

5    paying for or managing that warehouse operation;

6    correct?

7         A     Right.

8         Q     And the information that you had just been

9    testifying to about PQPR -- PQPR's activities as distinct

10   from Free Speech Systems was who?

11        A     I'm sorry, who told me that they were distinct?

12        Q     Not just distinct, but who informed you that

13   PQPR employees and resources are responsible for the

14   fulfillment and administrative activities of PQPR as

15   opposed to Free Speech Systems' employees?

16        A     I think that would be based on my conversations

17   with Mr. Jones, with Mr. Roe while I was down there, my

18   conversations with counsel which I'm not going to go

19   into.  I think that would form the basis of that.

20        Q     What, specifically, did Mr. Jones tell you

21   about PQPR?

22        A     That Free Speech and PQPR are separate and that

23   they are -- they handle essentially the product sales and

24   he is engaged in the function of being on air.  So, in

25   his mind, his business is being on the air.

1    that there wasn't any crossover between employees;

2    because I'm not sure.  And I didn't ask that specific

3    question about whether in 2012, ten years ago, maybe,

4    free Speech employees were at PQPR.  I just don't know,

5    so I don't want to mislead you and say I know when I

6    don't.

7            Is that clear?

8        Q    It is except now I want to want to go back to

9    your earlier testimony.  I take it your testimony

10   concerning the fact that PQPR employees now run all PQPR

11   business activities has to do with how -- the current

12   situation at PQPR?

13       A    Well, no.  I mean, I don't think it's just the

14   current situation.  I mean, obviously the financial

15   situations currently there have been efforts made to make

16   sure that they're more separate, there's more delineated

17   payments between the two, everything is a little bit

18   more, you know, accounting-wise, up to speed.  But as far

19   as the process goes, you know, the relationship between

20   the employees there, I'm just not sure.  And I don't

21   think it's something that's recent that's happened; so I

22   don't think that's correct.  But I just don't want to say

23   that going back ten years whether any Free Speech

24   employees have never been employed at PQPR.  I just don't

25   know the answer to that.

```
 1      Q    So, at least -- I mean, is Free Speech Systems
 2   prepared to say that, at least as of the initiation of
 3   this lawsuit, the fulfillment that PQPR's maintained it's
 4   own employee work force for the purpose of fulfilling all
 5   of PQPR business activities?
 6      A    Right.  They have their own employees.  I think
 7   they always -- they've had their own employees.  I just
 8   don't want to say whether or not there's been people
 9   working at PQPR who've also worked for Free Speech.  I
10   just don't know the answer to that.  But they do maintain
11   their own work force.  Yes.
12      Q    Okay.  So -- and I totally understand that.
13   There might be somebody who, at one point, worked for
14   Free Speech Systems and then works fork PQPR.  But fair
15   to say that if somebody is working for PQPR they are
16   employed there; correct?
17      A    Right.
18      Q    And that has been the case as far as you know
19   going back until --
20      A    As far as I'm aware, yes.
21      Q    I would like to talk about PQPR ownership;
22   okay?
23      A    If I can help you with that --
24      Q    There's an alphabet soup.
25      A    Yes.  If I can help you there, I will do my
```

```
 1    best to do so.

 2         Q     You've testified about this in Texas; correct?

 3         A     I did, yes.

 4         Q     And when was PQPR formed, approximately?  You

 5    don't need to give me a specific date?

 6         A     You know what, I don't recall.

 7         Q     Okay.

 8               One of the reasons obviously that you're

 9    required to testify about this is because you're here to

10    testify in part about Mr. Jones's compensation;

11    correct?

12         A     Yes.

13         Q     And when -- just give me one second.

14               When PQPR was first formed, Mr. Jones exercised

15    a controlling interest in it through another corporate

16    entity; correct?

17         A     Yes.

18         Q     And what was that corporate entity called?

19         A     I think it's called PLJR.  Like you said,

20    alphabet soup.  So, I believe PLJR has a 80 percent

21    interest in PQPR.  PLJR is then owned by the AEJ Trust --

22         Q     Hold on a second.

23         A     You want --

24         Q     The AEJ Trust came on later; right?

25         A     Yes.
```

```
 1         A     Sure.

 2         Q     PLJR was owned 90 percent by Mr. Jones

 3    personally and 10 percent by Carol Jones; correct?

 4         A     Prior to 2018?

 5         Q     Yes.

 6         A     I think so.  I think that's what that document

 7    says, yes.

 8         Q     And then, as a result -- and then PLJR had an

 9    80 percent stake in PQPR; correct?

10         A     Right.

11         Q     And so, by virtue of his 90 percent stake in

12    PLJR and PLJR's ensuing 80 percent interest in PQPR,

13    Mr. Jones personally had, indirectly, 80 percent

14    ownership of PQPR; correct?

15         A     Of PQPR?

16         Q     Yes.

17         A     I believe the total effective number would have

18    been in the 70s.  It's, like, 72 percent effective;

19    because PQPR is owned 20 percent by Dr. and Mrs. Jones;

20    and then 80 percent by PLJR who also has a 10 percent

21    interest to Carol Jones.  So, when you average out those

22    numbers, it's something like 72 percent.

23         Q     Who did that math for you?

24         A     Mr. Roe did that math for me.  I am very bad at

25    math.
```

1    Q    That's okay.  I wouldn't expect you to have

2    done it.

3    A    Yes.

4    Q    So then, in 2018, I take it that your testimony

5    is that Mr. Jones transferred his personal ownership of

6    PLJR to the AEJ Trust; correct?

7    A    To the trust, right.

8    Q    And so, whereas Mr. Jones, prior to 2018, had a

9    72 some-odd percent indirect ownership interest in PQPR,

10   now the AEJ 2018 Trust does; correct?

11   A    Right.

12   Q    What instrument was -- have you seen any

13   documents reflecting that transfer of ownership?

14   A    I don't think so, no.

15   Q    Did you ask?

16   A    I don't remember if I asked or not to be

17   honest.

18   Q    So -- and Mr. Jones told you specifically that

19   that was done in order to benefit his children?

20   A    Right.  Because his children are remaindermen

21   in the trust.  So, yes.

22   Q    And what that means is that those children do

23   not receive any benefit from the AEJ Trust's ownership of

24   PQPR until Mr. Jones passes; correct?

25   A    Right.  They don't currently receive any income

1  from the trust.

2      Q    The trust does generate income; correct?

3      A    It is generating income, yes.

4      Q    How is it generating income?

5      A    It is generating income on the basis of the

6  notes that Free Speech pays to PQPR.

7      Q    Which started when?

8      A    So, those payments, I believe, started at the

9  end of last year, some time toward the end of last year,

10 maybe November.

11     Q    That is November of 2021?

12     A    Right.

13          So those payments are approximately $11,000 per

14 business day from Free Speech to PQPR.

15     Q    And the initiation of those payments of $11,000

16 from Free Speech Systems to PQPR was initiated why?

17     A    To pay down the debt between the two companies.

18     Q    Who authorized Free Speech Systems to begin

19 paying that purported debt?

20     A    I would assume Alex did.

21     Q    Are you --

22     A    I didn't ask, but there is a debt and it needed

23 to be paid.  There were efforts made to make sure that

24 there was, you know, all of this financial entanglement

25 between the two companies to separate everything and make

1   sure that everything was accounted for and paid.  So,

2   prior to that, I don't think that there was any clear

3   delineation.  And so, there have been efforts made over

4   the last year to do that.  And so, I would assume Alex

5   authorized it.

6       Q    Okay.

7            You're not aware -- Free Speech Systems isn't

8   aware of anybody else who could authorize Free Speech

9   Systems to make $11,000 daily payment to another

10  corporate entity; correct?

11      A    No, I think Alex would have to authorize it.

12  He owns Free Speech.

13      Q    And Free Speech's testimony here today is that

14  those payments, beginning in November of 2021, were

15  motivated solely to pay down a debt Free Speech Systems

16  purportedly owed to PQPR; is that your testimony?

17      A    That's my understanding of the purpose of the

18  notes, yes.

19      Q    And how did Free Speech Systems arrive at the

20  $11,000 number?

21      A    I think it's based on the terms of the note.

22      Q    Which note?

23      A    So, the first note is a 30-year note with a

24  balloon at the end.  But the second note is principal --

25  it delineates principal and interest.

1    Q    Why don't we pull them up.  Let's pull up

2   Exhibit 117, because I just saw you were referring to

3   your notes of your conversation with Mr. Schwartz;

4   correct?

5    A    Yes.  That's when he was explaining to me the

6   notes and the agreement between the two notes.

7    Q    All right.

8         So, we pulled up the first one.  This is dated

9   August 13th, 2020, and tell me what Free Speech Systems'

10  understanding is of the purpose of this document and

11  what, if any, obligations Free Speech Systems' undertakes

12  pursuant to it?

13   A    So, this looks like the first note for

14  approximately $29.5 million and it outlines the principal

15  balance, if you scroll down.

16   Q    Let's do that.  Yep.

17   A    It also --

18   Q    Hang on.

19        Can you just identify what that is when you say

20  principal balance; what is it you're referring to?

21   A    So, in Subsection B, it talks about the

22  principal balance, which is the 29.5 million and then

23  there's a percentage rate for interest on those days and

24  how they're calculated.

25   Q    Let me stop you right there.

1          A     Sure.

2          Q     In -- I'm sorry.  Go up to the stop, please,

3      I'm sorry.

4                On August 13th of 2020, Free Speech Systems

5      entered this note claiming to owe $29.5 million to PQPR;

6      correct?

7          A     Yes.

8          Q     And it agreed to pay an interest rate, can you

9      scroll back down, of 1.75 -- an annual interest rate of

10     1.75 percent on that principal; correct?

11         A     Right.

12         Q     All right.

13               And it agreed to do -- make monthly payments on

14     that principal and interest pursuant to this note?

15         A     I'm not sure if the monthly -- I'm sorry, daily

16     payments are outlined here.

17         Q     I said monthly -- I meant daily.

18         A     Yeah, it's daily.

19               So, I don't know if the daily payments of the

20     $11,000 per number is in here.

21         Q     Is it your understanding that the daily $11,000

22     payment equates to a principal and interest payment on

23     this balance and interest rate set forth in this note?

24         A     You mean when you divide it up, will it come up

25     to $11,000 a business day?

1    Q    Yeah.  Really, what I'm asking is how did

2    Mr. Jones arrive at the $11,000 per day number and is it

3    based on this note executed in August 2020?

4         A    I don't know how the $11,000 was arrived at.  I

5    don't know if you divide it up and it comes out to

6    $11,000 per day over the period of time.  Because --

7         Q    What's the term of this note?

8         A    Because the term of the note is 30 years.

9         Q    Okay.

10        A    Because it expires in 2050.

11        Q    Is Free Speech Systems' testimony that when it

12   entered this purported promissory note, that it was

13   agreeing to pay back the some $29.5 million with the 1.75

14   interest rate over 30 years?

15        A    Right.

16        Q    But you don't know whether the $11,000 daily

17   payment is toward the arrangement set out in this note?

18        A    No, it is.

19        Q    It is.

20        A    Those two notes total -- the $11,000 per

21   business day is for both notes.  Right.

22        Q    I see.

23             Well, then --

24        A    I just don't know how they arrived at that

25   figure.  If you are asking how they arrived at it, I'm

 1   not sure if you divide it up over 30 years at 1.5 percent

 2   it comes out $11,000 per business day.  I just -- I'm not

 3   sure.  So --

 4        Q    Did Free Speech Systems start making payments

 5   on this note in August of 2020, immediately?

 6        A    I don't know.

 7        Q    Okay.

 8        A    I'm not sure.

 9        Q    When did the $11,000 payments start?

10        A    I believe, based on my conversations with

11   Mr. Roe and Mr. Schwartz, those were happening towards

12   the end of last year.  So, in 2021.

13        Q    So, Free Speech Systems today is not prepared

14   to testify about any payments on this purported debt

15   prior to approximately November of 2021; correct?

16        A    Right.  I don't know if the payments had been

17   made prior to that.  I know they were definitely at the

18   end of last year.  But I don't know if they had been made

19   prior to that.

20        Q    All right.

21             So, you don't know then whether the AEJ Trust

22   2018 had any income prior to the initiation of $11,000

23   payments in November of 2021; correct?

24        A    Oh, you mean the income that's being -- that

25   would be thrown off by the $11,000 per day?

1    Q    Right.

2    A    So, I mean, there were payments being made

3  between PQPR and Free Speech.  So, PQPR was billing Free

4  Speech during this entire time period and they were

5  making payments, they just were not regular payments.

6    Q    We're talking about payments from Free Speech

7  Systems to PQPR?

8    A    Right.

9    Q    And we're talking about PQPR payments then to

10  the AEJ Trust?

11    A    Right.

12    Q    So, I'm focused right now just on paid income

13  generated by the trust as a result of it's new ownership

14  in PQPR debt.

15    A    Right.

16    Q    And what I hear you saying is that that income,

17  as far as Free Speech Systems is prepared to testify

18  today, commenced in about November of 2021; correct?

19    A    No.  Because Free Speech was still making

20  payments to PQPR.  They were just not the entire

21  payments; you understand?

22    Q    I do, but what --

23    A    So, those payments that Free Speech was making

24  to PQPR, they would still be going into the balance of

25  the trust; but you still have a debt on the note because

1    they're not paying the entire balance.  So, those

2    payments that Free Speech was making, although not the

3    entire payments, would still be going into the body of

4    the trust.  It was just not the $11,000.

5         Q    But the trust, as I understand it, doesn't own

6    any part of PQPR other than the debt; right?

7         A    I don't think that's accurate because PLJR is

8    owned 80 percent by AEJ Trust.

9         Q    But you understand if Free Speech Systems is

10   making payments to PQPR, just in the regular course of

11   business?

12        A    Mm-hm.

13        Q    That money -- is it your testimony that that

14   money, that is, money paid to PQPR in the regular course

15   of business, flows as income to the trust?

16        A    Well, if you just do it -- if you look at -- I

17   know you don't have the spreadsheet --

18        Q    I would tell you that the AEJ Trust -- I don't

19   have a spreadsheet, I don't think, that shows AEJ income.

20        A    A flowchart.

21             The flowchart -- I mean, we can try to pull it

22   up at a break --

23        Q    Why don't we do that.  But what I'm focused

24   specifically on right now is cash income flowing to the

25   trust.  And I understand one source of it to be the

1   $11,000 debt payments beginning in November of 2021?

2        A     That is one source, yes.

3        Q     Thank you.

4              What I am trying to understand is whether there

5   are -- there is any other income flowing to the trust;

6   and what you started to tell me was that regular payments

7   to PQPR, in the course of business, are also flowing to

8   the trust.  But I'm not aware of -- and that seemed odd

9   to me.  That's what I'm trying to question you on.

10       A     Maybe we can look at the flowchart at a break

11  and maybe that will answer the question.  Because it's

12  hard to do it without looking at it.  So, I -- you know,

13  if we could look at it.  I don't want to misstate

14  anything.  If we can look at the flowchart and just make

15  sure.  But my impression was -- and I could be wrong --

16  was that 80 percent of PLJR is owned by the trust.  So,

17  80 percent then or not 80 percent, but in the 70s --

18       Q     I don't want to you do, like -- I don't want to

19  you kind of sketch out here what you think might be --

20       A     Right, that's why I want to pull out -- I want

21  to pull up the --

22              MR. REILAND:  Chris, can we take five

23         and --

24              MR. MATTEI:  Yeah, we can take a break.

25         It's about time to take a break anyway.  But

1          let me just wrap this up, though.

2    BY MR. MATTEI:

3          Q    Whatever income the trust is generating,

4    whether it be the $11,000 daily payments beginning in

5    November 2021 or some additional income beyond that, none

6    of that income is being paid to any of Mr. Jones's

7    children; correct?

8          A    That's right.  Yes.

9          Q    It's being paid to Mr. Jones; correct?

10         A    Mr. Jones is an income beneficiary of the

11   trust, yes.

12         Q    Are there any other income beneficiaries?

13         A    I don't believe so, no.

14         Q    So, any income paid to the AEJ 2018 Trust as a

15   result of debt purportedly owed by Free Speech Systems or

16   any other income is directly for the benefit of

17   Mr. Jones; correct?

18         A    Mr. Jones is an income beneficiary of AEJ

19   Trust.

20         Q    So he is the sole beneficiary of any income

21   that flows to AEJ Trust as a result of its ownership of

22   PQPR's debt; correct?

23         A    Through the trust, yes.

24              MR. MATTEI:  Why don't we take a break.

25              THE VIDEOGRAPHER:  We are off the record.

1    when the debt started accruing; correct?

2         A    I don't know if I asked that specific question,

3    but these are the documents that were produced to me that

4    I reviewed.  It indicates that.  So, yes.

5         Q    And they were produced to us as well?

6         A    Yes.

7              MR. MATTEI:  Can you take that down.

8    BY MR. MATTEI:

9         Q    Who authorized Free Speech Systems to begin to

10   go into debt to PQPR at that time?

11        A    What do you mean who authorized it?  I don't

12   know that it was ever a conscious decision.  PQPR was

13   sending us bills or sending Free Speech bills and we were

14   not paying the entire of the bills -- the entirety of the

15   bills.  I'm not sure the reason why.  I'm not sure if it

16   was -- I don't think it was a conscious decision on

17   anyone's part; but -- I don't know if -- I don't think I

18   would use the word "authorized," but --

19        Q    Okay.

20             So, this is helpful.  So, in 2014, PQPR is

21   sending -- in December 2014 PQPR is sending Free Speech

22   Systems bills; right?

23        A    Yes.

24        Q    As it had been prior to that?

25        A    Sure.

1    Q    But in December of 2014, Free Speech Systems

2  stops paying those bills in their entirety; correct?

3    A    I don't know if they stopped, but most of the

4  bills were not being paid in their entirety.

5    Q    What were those -- how was Free Speech Systems

6  billed?  Was it by paper invoice, by electronic

7  submission?

8    A    They were being invoiced, yes.  They were being

9  invoiced.

10    Q    PQPR was causing invoices to be sent to Free

11  Speech Systems?

12    A    Right.

13    Q    Who was responsible for receiving and

14  processing those invoices at Free Speech Systems

15  beginning in December of 2014?

16    A    I don't know and I don't want to guess.

17    Q    And what were those -- at that time in December

18  2014 when this debt started accruing, what was Free

19  Speech Systems being invoiced for from PQPR?

20    A    For costs associated with the products, for

21  purchasing the products.  So, PQPR purchases the

22  products, costs associated with housing the products.

23  There also may have been some advertising costs in there.

24  I know a couple of years there were advertising costs.

25    Q    Hang on one second.  Hang on one second.

1     Q     Hang on a second.  Hang on a second.

2           I thought you said they were sold on

3     infowarsstore.com and infowarsshop.com and you didn't

4     know who own those websites?

5     A     I don't know who owns those websites, but

6     ultimately, all of those products are being sold via the

7     ads that link back to those websites.  I'm not sure who

8     owns them.  But -- so, when you visit a website on the

9     InfoWars.com website, you visit any article and there are

10    banners on those articles and it clicks and you can click

11    on that link to send you to the PQPR website to purchase

12    the products.

13    Q     Okay.

14          But that would be the advertising is money that

15    PQPR has to pay Free Speech Systems; right?

16    A     Right.  And if you watch -- if you read the

17    spreadsheets, they are being given credit.  So, Free

18    Speech is being given credits for those advertising.

19    Q     I'm just asking you right now what PQPR was

20    invoicing Free Speech Systems for?

21    A     For products.

22    Q     Hang on a second.

23          So, but is Free Speech Systems buying the

24    product from PQPR?  Because that I could understand,

25    right.  Hey, you're buying this product from us, we're

```
 1   selling it to you, Free Speech Systems, pay us.  But

 2   that's not what I understood you to be staying.  What I

 3   understood you to be saying is PQPR buys the products and

 4   sells the products; right?

 5        A    PQPR, I believe, buys the products and then

 6   stores the products and handles the sale end of the

 7   products and packaging the products.  But ultimately,

 8   Free Speech pays PQPR for the product.  So, it is billing

 9   Free Speech for the products.

10        Q    So, do you understand why this is a little bit

11   confusing -- might be a little confusing?  Because if

12   PQPR is being its product and then selling its product,

13   what is Free Speech Systems getting when it pays for the

14   product?  Isn't the product going to the third-party

15   customer?

16        A    Right, but the cost of the product is not the

17   same thing as what it is actually being sold for.

18        Q    So, why is Free Speech Systems paying for the

19   cost of the product, why wouldn't PQPR pay for that?

20        A    I don't know the answer to that.  I'm just here

21   to testify as to how it is.

22        Q    So, Free Speech Systems' testimony is that

23   beginning -- is that one of the things it was invoicing

24   PQ -- I'm sorry.  Let me start over.

25             Free Speech Systems' testimony is that one of
```

1    the things PQPR was billing it for was the cost of PQPR's

2    products; correct?

3          A     Right.

4          Q     And those bills were coming in on a monthly

5    basis to Free Speech Systems?

6          A     Yes.

7          Q     What else was PQPR invoicing Free Speech

8    Systems for in December 2014?

9          A     I don't remember off the top of my head.  It

10   may have been billing them for --

11         Q     I don't want you to guess.

12         A     Right.  I don't remember looking at it.  I

13   would -- there are documents there that could refresh my

14   recollection, more specifically the spreadsheets.

15         Q     You mean the spreadsheet we were just looking

16   at?

17         A     Mm-hm.

18         Q     Okay.

19               Bring that up.  Do you have it?  Okay.

20         A     So, if you could see the debits, the product

21   sales.  So, that's what I was saying that the -- that

22   PQPR is billing Free Speech for.  And then there are some

23   credits.  So --

24         Q     Hang on.

25               If we're just sitting on the debits column,

1  right, this would be, presumably, money that PQPR claims

2  it is owed by Free Speech Systems; right?

3       A    Yes.

4       Q    And the one source of that debt are product

5  sales.  At least listed here; correct?

6       A    Right.  At least listed here.

7       Q    And so, what I'm asking you is, beyond the

8  spreadsheet, is -- can Free Speech Systems testify as to

9  any other items for which PQPR was billing it or

10  invoicing it beginning in December of 2014?

11      A    PQPR billing Free Speech; right?

12      Q    Correct.

13      A    I can't tell by looking at this.

14      Q    Right.  Okay.

15           But beyond the spreadsheet, though?

16      A    Yeah, I don't know.

17      Q    Well, that's kind of important because one of

18  the issues you're here to discuss are the relationship

19  between the two entities and -- so, if we close the

20  deposition today, Free Speech Systems' testimony will be,

21  beginning in December of 2014, a debt started to accrue

22  to PQPR as a result of unpaid invoices for the cost of

23  products purchased by PQPR; correct?

24      A    Right.  Minus other things.  So, but yes.

25  Ultimately, yes.

1       Q      Amongst other things, but I'm just focused now

2    on the invoice piece.

3       A      Right.

4       Q      Beyond the debt associated with Free Speech

5    Systems not paying for the cost of products, Free Speech

6    Systems is not aware of any other source of any debt owed

7    by Free Speech Systems to PQPR; correct?

8       A      Right.

9       Q      Okay.

10             So, thank you.

11             Getting back to the question that started this

12   round then, I asked you who authorized Free Speech

13   Systems to start to accrue this debt and I want to go

14   back to that question.

15             Now, we know that PQPR is invoicing Free Speech

16   Systems for the cost of its products and Free Speech

17   Systems is not paying, or at least not paying in full;

18   right?

19      A      Right.

20      Q      So, who made the decision at Free Speech

21   Systems to stop paying?

22      A      I don't know if it was ever a conscious

23   decision.  So, I don't know if it -- I just -- I don't

24   subscribe to the word "authorized" or -- you know, I

25   don't know that it was ever a conscious decision on

Brittany Paz Volume III
June 27, 2022

1                              CERTIFICATE

2

    STATE OF CONNECTICUT  )
3                          )     SS     SOUTHBURY
    COUNTY OF NEW HAVEN    )
4

5

6           I, VIKTORIA V. STOCKMAL, a Notary Public duly
    commissioned and qualified in and for the county of
    Fairfield, State of Connecticut, do hereby certify that
7   pursuant to the notice of deposition, the said witness
    came before me at the aforementioned time and place and
8   was duly sworn by me to testify to the truth and nothing
    but the truth of his/her knowledge touching and
9   concerning the matters in controversy in this cause; and
    his/her testimony reduced to writing under my
10  supervision; and that the deposition is a true record of
    the testimony given by the witness.

11

12          I further certify that I am neither attorney of
    nor counsel for, nor related to or employed by any of the
    parties to the action in which this deposition is taken,
13  and further that I am not a relative or employee of any
    attorney or counsel employed by the parties thereto, or
14  financially interested in the action.

15          IN WITNESS WHEREOF, I have hereunto set my hand
    and affixed my notarial seal this 18th day of July, 2022.

16

17

18                  *Viktoria V. Stockmal*

19          VIKTORIA V. STOCKMAL, RMR, CRR
                      Notary Public
20                 CSR License #00251

21  My commission expires October 31, 2025

22

23

24

25

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | Case No. 22-60043 |
| | § | |
| FREE SPEECH SYSTEMS, LLC, | § | Chapter 11 (Subchapter V) |
| | § | |
| Debtor. | § | |

# EXHIBIT I

Alex Jones Volume III
June 21, 2022

NO. X-06-UWY-CV-18-6046436-S    :  SUPERIOR COURT

ERICA LAFFERTY, ET AL.           :  COMPLEX LITIGATION
                                        DOCKET
                                 :

V.                               :  AT WATERBURY

ALEX EMRIC JONES, ET AL.         :  OCTOBER 21, 2021
_____

NO. X-06-UWY-CV-18-6046437-S    :  SUPERIOR COURT

WILLIAM SHERLACH                 :  COMPLEX LITIGATION
                                        DOCKET
                                 :

V.                               :  AT WATERBURY

ALEX EMRIC JONES, ET AL.         :  OCTOBER 21, 2021

_____

NO. X-06-UWY-CV-18-6046438-S    :  SUPERIOR COURT

WILLIAM SHERLACH, ET AL,         :  COMPLEX LITIGATION
                                 :  DOCKET
                                 :

V.                               :  AT WATERBURY

ALEX EMRIC JONES, ET AL.         :  OCTOBER 21, 2021


****************************************

AMENDED ORAL AND VIDEOTAPED DEPOSITION

APPEARING REMOTELY FROM

AUSTIN, TEXAS

ALEX JONES

JUNE 21, 2022

****************************************

V O L U M E  III

```
 1          ANSWERS AND ORAL DEPOSITION OF ALEX JONES, a

 2     witness produced at the instance of the Plaintiff, was

 3     taken in the above-styled and numbered cause on the

 4     21ST day of JUNE 2022, from 9:11 a.m. to 3:13 p.m.,

 5     before VANESSA S. ROBERTSON, CSR in and for the State

 6     of Texas, reported by machine shorthand, appearing

 7     remotely from Parker County, Texas, pursuant to the

 8     Texas Federal Rules of Civil Procedure.

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1    REMOTE APPEARANCES:

 2
      FOR THE PLAINTIFF:
 3
          MR. CHRISTOPHER M. MATTEI
 4        MS. ALINOR STERLING
          MS. JESSICA HARTMAN
 5        KOSKOFF KOSKOFF & BIEDER, PC
          350 FAIRFIELD AVENUE
 6        BRIDGEPORT, CONNECTICUT 06604
          (203) 336-4421
 7        cmattei@koskoff.com

 8    FOR THE DEFENDANT:

 9        MR. CAMERON ATKINSON
          PATTIS & SMITH LLC
10        383 ORANGE STREET
          FIRST FLOOR
11        NEW HAVEN, CONNECTICUT 06511
          (203) 393-3017
12        catkinson@pattisandsmith.com

13    FOR THE DEFENDANT:

14        MR. MARIO KENNETH CERAME
          BRIGNOLE & BUSH, LLC
15        73 WADSWORTH STREET
          HARTFORD, CONNECTICUT 06106
16        (860) 527-9973
          mario@brignole.com
17

18
      ALSO PRESENT:
19
          MR. MARK HENDRIX, VIDEOGRAPHER
20

21

22

23

24

25
```

Alex Jones Volume III
June 21, 2022

```
 1
 2
```

```
 3       Q    How many cryptocurrency wallets are currently
 4   linked to the Infowars.com donation page?
 5       A    I don't -- I don't know the specifics.
 6   They're all linked right there.  It's all public.
 7       Q    Okay.  Who manages that for you?
 8       A    The IT department.
 9       Q    Okay.  Which is who?
10       A    I mean, right now, it's -- it's basically
11   myself and Zimmerman.  He's a consultant.  I don't
12   really understand it.  But I'm the person that manages
13   it because I'm -- I mean, I've told them to set it up
14   and -- that --
15       Q    Okay.  So you have access to those crypto
16   wallets, correct, personal access?
17       A    Yes.
18       Q    And so does Zimmerman, correct?
19       A    Yes.
20       Q    Anybody else?
21       A    I don't know the specifics of the technicals,
22   but it's like three people -- or you have to put like
23   three codes in.  I've only messed with it a few times.
24   It's -- all of the transactions are public, that's what
25   the blockchain does, I know that.  So it's all right
```

Alex Jones Volume III
June 21, 2022

 1    there.

 2         Q    The transactions are public, but who is

 3    authorized to execute the transactions are limited to

 4    people who have access to the wallets, correct?

 5         A    Yeah, so I have to -- I mean, I go in and I do

 6    it.

 7         Q    Okay.  So you personally execute the

 8    transactions within each of those wallets linked to the

 9    Infowars.com page, correct?

10         A    I mean, I -- I mean, I go in there and then

11    they explain it to me and I do it, yeah.

12         Q    Okay.  And you're in charge as to when to

13    withdraw any cryptocurrency from those wallets,

14    correct?

15         A    Yes.

16         Q    Okay.  Nobody else has authority to dispose of

17    the cryptocurrency assets in any of those wallets,

18    correct?

19         A    No.

20         Q    Beginning of -- on April 23rd of this year,

21    one of the wallets linked -- one of the cryptocurrency

22    wallets linked to Infowars.com started receiving large

23    donations of cryptocurrency from a single source,

24    correct?

25         A    Yes -- well, there were other donations,

```
 1    too.
 2         Q    I'm sorry?
 3         A    Can you ask your question again?
 4         Q    Sure.  Well, I think you've answered it.  I
 5    was asking what you said.
 6                        MR. ATKINSON:  Would it be helpful
 7    for the court reporter to read it back, Chris?
 8                        MR. MATTEI:  No, no, I think I have
 9    the answer.  I'm just -- oh, yeah, I'd be happy to have
10    her read back his answer.  Yes.  Thank you.
11                        THE WITNESS:  I don't need them to
12    do that.  The point is he said a single source.  We
13    got -- there was quite a few of Bitcoin donations.
14                        THE COURT REPORTER:  Do you want me
15    to read it back?
16                        MR. MATTEI:  Yeah, thank you.
17              (Requested portion was read back.)
18         Q    (By Mr. Mattei)  So you know that I'm
19    referring to the single donor who donated over a
20    million dollars in Bitcoin on April 23rd, correct?
21         A    Yes.
22         Q    Okay.  And then there was another donation of
23    just over a million dollars on April 30th from the same
24    donor, correct?
25         A    Yes.
```

Alex Jones Volume III
June 21, 2022

```
1        Q    And there was another donation on May 19th of
2   about $5.9 million worth of Bitcoin from that same
3   donor, correct?
4        A    We believe it's the same donor.  We don't
5   know.
6        Q    Okay.  Well, according to the identifying data
7   on the donor's wallet, it's the same wallet, correct?
8        A    I believe so.  I don't have it in front of
9   me.
10       Q    And your testimony is that you don't know the
11  identity of the individual responsible for those
12  donations?
13       A    I do not.
14       Q    Okay.  Do you know anybody who does?
15       A    No.
16       Q    Have you had any communication with anybody
17  representing themselves to be the donor?
18       A    No.
19       Q    And you cashed out about half of the Bitcoin
20  donated by that individual, correct?
21       A    Yes.
22       Q    And you did that personally, correct?
23       A    Yes.
24       Q    And where did those --
25       A    I don't have it in front of me, but it's more
```

1    than half.

2         Q    And what did you do with those proceeds once

3    you converted it to actual currency?

4         A    I put it into a personal bank account of mine

5    and then I've transferred most of it to -- and am still

6    transferring it to Free Speech Systems as a capital

7    injection.

8         Q    And so you -- you said you have transferred

9    and you are continuing to transfer those proceeds into

10   Free Speech Systems as a capital investment in Free

11   Speech Systems?

12        A    I don't know the technical term for it, but I

13   am -- I intend to -- to -- to spend it -- to continue

14   Free Speech's mission of promoting freedom and

15   populism, because that's what I have seen the donations

16   give as.  I don't know that -- I don't know why it was

17   given, but we were -- we've been asking for donations

18   to keep the company going.  So it's my intent to use

19   the lion share of it to continue the operation.

20        Q    And you have not yet done that, correct?

21        A    No, I -- I've begun to do it.  I -- it --

22   it's -- most of it is being transferred -- has been

23   transferred already into there.

24        Q    Okay.  Well, let's just be clear, okay?  Of

25   the money that you cashed out and directed to your

Alex Jones Volume III
June 21, 2022

```
 1    personal bank account, how much have you transferred

 2    into Free Speech Systems?

 3         A    I don't have the exact accounting in front of

 4    me, but an example is, some has gone directly into Free

 5    Speech Systems, other has gone directly into legal

 6    bills, but the things, generally, you know, dealing

 7    with the operation of the company.

 8         Q    Well, you testified that you took a little bit

 9    more than half, right?  So you would say over --

10         A    I think it's a lot -- I don't have the numbers

11    in front of me, but it's -- in fact, I was going to go

12    today after this and try to do the accounting on that

13    specifics, because I want to know that.  Unfortunately,

14    we didn't transfer all of it out of Bitcoin.  And

15    Bitcoin has crashed, so that's not good.

16         Q    All right.  So you transferred about $4

17    million out from the crypto wallet to your personal

18    account after these donations were received, correct?

19         A    I don't have the numbers in front of me, but I

20    think it's more than that.

21         Q    Okay.  Is it -- is it more than 5 million?

22         A    It had already gone down so --

23                   MR. ATKINSON:  Objection to form.

24    You can answer.

25         A    I don't have the specifics.
```

1        Q      (By Mr. Mattei)  Okay.  You're -- and I'm not

2    holding you to a precise amount here, Mr. Jones, but

3    your testimony is that you believe that following the

4    May 19th donation from what appears to be a single

5    crypto donor, you executed a transaction withdrawing

6    between 4 and $5 million from that wallet to your

7    personal bank account, correct?

8        A      Yes.

9        Q      Okay.  And now I'm asking you, how much of

10   that 4 to $5 million, roughly, have you transferred

11   into Free Speech Systems?

12       A      I don't have the numbers in front of me.

13       Q      So the answer is you don't know?

14       A      Well, do I have your permission to go

15   speculate here, like it won't be 100 percent.  I don't

16   have the exact numbers here in front of me.

17       Q      I'm just trying to get a sense of, to the

18   extent that you have a reasonable basis to estimate,

19   that's fine.  I don't want you to just pull a number

20   out of thin air and you have no idea.  If you have a

21   reasonable basis to estimate how much you have

22   reinvested in Free Speech Systems, please give that

23   answer.

24       A      Well, I don't know about the term reinvested.

25   It's just a capital, you know, injection to the

Alex Jones Volume III
June 21, 2022

```
 1    company.  It's -- it's -- some company bills have been
 2    directly out of my bank account, my private bank
 3    account, just for expediency.  Instead of just
 4    transferring it into Free Speech Systems and having
 5    that, but more than 2 million has been transferred into
 6    Free Speech Systems and paid out for back bills.  And
 7    then others has gone to legal bills.  And then other
 8    has gone to buy product so that we have product to
 9    sell.
10                        And it's my intent to do that with
11    basically all of the funds.  I may keep some to
12    reimburse myself for past -- because I'm paid
13    privately, but my intent is to currently spend about 90
14    percent of it in -- into keeping Free Speech afloat
15    and -- and --
16        Q    As it stands right now, I understand your
17    testimony to be that as of today you estimate that
18    about 2 million of the cryptocurrency proceeds that you
19    cashed out, you have injected into Free Speech Systems,
20    correct?
21        A    No.  If memory serves, over 2 million directly
22    into Free Speech Systems.  And then I've been paying
23    other substantive bills for Free Speech Systems
24    directly out of my private account.
25        Q    I'm -- I'm leaving out the bills for a minute.
```

Alex Jones Volume III
June 21, 2022

```
1    I'm just talking about direct transfer of money from

2    your personal account to Free Speech Systems comprised

3    of the cryptocurrency proceeds, that your testimony is

4    that that amounts to approximately $2 million,

5    correct?

6        A    I think it's approaching 3 million.

7        Q    Okay.  Fair enough.  And then you claim that

8    you also used cash within your personal account, since

9    May of this year, to pay Free Speech Systems' bills; is

10   that right?

11       A    Yeah, we paid a $344,000 bill for the

12   bankruptcy yesterday out of it, out of my personal

13   account, that's an example.

14       Q    Okay.  A $344,000 bill for the bankruptcy

15   associated with what?

16       A    I mean, I just do my show and you guys -- just

17   a big, long war you got going on, so...

18       Q    Okay.  Well, you just -- you just testified

19   that you paid $344,000 yesterday.  What did you think

20   you were paying for?

21       A    Paying for things associated with the

22   bankruptcy.

23       Q    Who was the payee?

24       A    It was a -- it was a long list.  It was a long

25   bill.
```

Alex Jones Volume III
June 21, 2022

```
 1    it again.
 2                       You'd agree with me that since
 3    PQPR's formation, you, either directly or indirectly,
 4    have had a controlling majority ownership stake,
 5    correct?
 6                       MR. ATKINSON:  Objection to form.
 7    You can answer.
 8         A    Yes.
 9         Q    (By Mr. Mattei)  Do you recall, Mr. Jones, in
10    connection with your divorce from Kelly Jones that you
11    had a valuation conducted of Free Speech Systems and
12    PQPR?
13                       MR. ATKINSON:  Objection to form.
14    You can answer.
15         A    I do.
16         Q    (By Mr. Mattei)  And that valuation was
17    conducted for use in connection with your divorce,
18    correct?
19         A    Yes.
20         Q    Do you know if that valuation was presented to
21    the court presiding over your divorce?
22         A    I think it was.
23         Q    Okay.  Mr. Jones, I'm going to show you what
24    we've marked as Exhibit 185.  And showing you Page 1.
25    Do you have before you the valuation that was conducted
```

Alex Jones Volume III
June 21, 2022

```
 1
 2
 3
 4
 5
 6
 7
 8
```

9        Q     (By Mr. Mattei)   Okay.  So your testimony is

10   that the majority of money that PQPR makes from the

11   sale of supplements, it then reverts back to Free

12   Speech Systems to pay for advertising, correct?

13        A     Yeah --

14                    MR. ATKINSON:  Objection to form.

15   You can answer.

16        Q     (By Mr. Mattei)  Is that correct?

17        A     Well, here's the thing.  I shouldn't even

18   speculate or try to be helpful.  It doesn't matter.

19   Just make up whatever you want.  Just keep going.

20        Q     (By Mr. Mattei)  Mr. Jones, you're the owner

21   of Free Speech Systems, correct?

22        A     Yes.

23        Q     Okay.  You just testified that the profits

24   made by PQPR are sent back to Free Speech Systems to

25   pay for advertising; did you not?

Alex Jones Volume III
June 21, 2022

15          I understand from your testimony

16    that you believe that David Jones is claiming that

17    under PQPR's agreement with Free Speech Systems, Free

18    Speech Systems was supposed to send a percentage of

19    sale proceeds to PQPR?

20         A    Yeah, I forget the exact agreement.  You'd

21    have to -- I forget the exact agreement.  The point is

22    is it's not being paid under what the agreement is.

23         Q    Right.  And I'm just trying to figure out

24    what's not being paid.  I take it that you -- it's a

25    percentage of the sale proceeds that PQPR claims it was

Alex Jones Volume III
June 21, 2022

```
1    owed --

2         A    I don't know.  It's something -- I don't

3    remember.  In fact, I shouldn't even -- I'm just trying

4    to be helpful, but I just don't remember.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Alex Jones Volume III
June 21, 2022

8                      Of Free Speech Systems' current

9    employees, your testimony is that you are the most

10   knowledgeable person to testify concerning the

11   relationship between Free Speech Systems and PQPR,

12   correct?

13       A    Yeah, because none of them even know anything.

14   They just run the radio and TV show.  And then

15   accounting just, under the agreement, pays -- pays

16   PQPR.

Alex Jones Volume III
June 21, 2022

```
 1   NO. X-06-UWY-CV-18-6046436-S   :  SUPERIOR COURT

 2   ERICA LAFFERTY, ET AL.         :  COMPLEX LITIGATION
                                           DOCKET
 3                                  :

 4   V.                             :  AT WATERBURY

 5   ALEX EMRIC JONES, ET AL.       :  OCTOBER 21, 2021

 6   _____

 7   NO. X-06-UWY-CV-18-6046437-S   :  SUPERIOR COURT

 8   WILLIAM SHERLACH               :  COMPLEX LITIGATION
                                           DOCKET
 9                                  :

10   V.                             :  AT WATERBURY

11   ALEX EMRIC JONES, ET AL.       :  OCTOBER 21, 2021

12   _____

13   NO. X-06-UWY-CV-18-6046438-S   :  SUPERIOR COURT

14   WILLIAM SHERLACH, ET AL.       :  COMPLEX LITIGATION
                                           DOCKET
15                                  :

16   V.                             :  AT WATERBURY

17   ALEX EMRIC JONES, ET AL.       :  OCTOBER 21, 2021

18

19

20         _____

                    REPORTER'S CERTIFICATION
21               DEPOSITION OF ALEX JONES
                         JUNE 21, 2022
22         _____

23

24

25        I, VANESSA S. ROBERTSON, Certified Shorthand
```

1    Reporter in and for the State of Texas, hereby certify

2    to the following:

3         That the witness, ALEX JONES, was duly sworn by

4    the officer remotely and that the transcript of the

5    oral deposition is a true record of the testimony given

6    by the witness;

7         That the deposition transcript was submitted on

8    _____, 2022 to MR. CAMERON ATKINSON, for

9    examination, signature and return to me by

10   _____, 2022.

11        That the amount of time used by each party at the

12   deposition is as follows:

13             MR. CHRISTOPHER MATTEI - 2 hours, 32 minutes

14             MR. MARIO CERAME - 15 minutes

15        That pursuant to information given to the

16   deposition officer at the time said testimony was

17   taken, the following includes counsel for all parties

18   of record:

19             MR. CHRISTOPHER M. MATTEI, Attorney for

20             Plaintiff.

21             MR. CAMERON ATKINSON, Attorney for Defendant.

22             MR. MARIO CERAME, Attorney for Defendant.

23        I further certify that I am neither counsel for,

24   related to, nor employed by any of the parties or

25   attorneys in the action in which this proceeding was

1   taken, and further that I am not financially or

2   otherwise interested in the outcome of the action.

3       Further certification requirements pursuant to

4   Rule 203 of TRCP will be certified to after they have

5   occurred.

6       Certified to by me this _____ day of _____,

7   A.D., 2022.

8

9

10

11

12

13   *Vanessa S. Robertson*

14

15   _____
     VANESSA S. ROBERTSON
16   TEXAS CSR 4930
     EXPIRATION Date: 04/30/2022
17   FIRM REGISTRATION No. 343

18   U.S. LEGAL SUPPORT
     8144 WALNUT HILL LANE
19   SUITE 350
     DALLAS, TEXAS 75231
20   (214) 741-6001

21

22

23

24

25

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | Case No. 22-60043 |
| | § | |
| FREE SPEECH SYSTEMS, LLC, | § | Chapter 11 (Subchapter V) |
| | § | |
| Debtor. | § | |

# EXHIBIT J

```
 1                    UNITED STATES BANKRUPTCY COURT
                           DISTRICT OF DELAWARE
 2

 3                                    .   Chapter 11
      IN RE:                           .
 4                                     .   Case No. 21-11001 (JTD)
      SHARITY MINISTRIES, INC.,        .
 5                                     .   Courtroom No. 5
                                       .   824 Market Street
 6                                     .   Wilmington, Delaware 19801
                                       .
 7                    Debtor.          .   August 9, 2021
      . . . . . . . . . . . . . . . . .   10:00 A.M.
 8
                      TRANSCRIPT OF TELEPHONIC HEARING
 9              BEFORE THE HONORABLE JOHN T. DORSEY
                    UNITED STATES BANKRUPTCY JUDGE
10

11
      TELEPHONIC APPEARANCES:
12
      For the Debtor:          Adam G. Landis, Esquire
13                             Matthew B. McGuire, Esquire
                               Nicolas E. Jenner, Esquire
14                             LANDIS RATH & COBB LLP
                               919 Market Street, Suite 1800
15                             Wilmington, Delaware 19801

16                             - and -

17                             Jorian L. Rose, Esquire
                               BAKER & HOSTETLER LLP
18                             45 Rockefeller Plaza
                               New York, New York 10111
19

20
      Audio Operator:          Lisa Brown, ECRO
21
      Transcription Company:    Reliable
22                             1007 N. Orange Street
                               Wilmington, Delaware 19801
23                             (302)654-8080
                               Email: gmatthews@reliable-co.com
24
      Proceedings recorded by electronic sound recording, transcript
25    produced by transcription service.
```

```
 1   TELEPHONIC APPEARANCES (Cont'd):

 2   For the U.S. Trustee:    Rosa Sierra, Esquire
                              UNITED STATES DEPARTMENT OF JUSTICE
 3                            OFFICE OF THE UNITED STATES TRUSTEE
                              844 King Street, Suite 2207
 4                            Lockbox 35
                              Wilmington, Delaware 19801
 5

 6   For the State of Texas:  Abigail Ryan, Esquire
                              TEXAS ATTORNEY GENERAL'S OFFICE
 7                            300 W. 15th Street
                              Floor 8, Bankruptcy & Collections
 8                            Austin, Texas 78701

 9   For State Attorneys      Karen Cordry, Esquire
     General:                 NATIONAL ASSOCIATION OF ATTORNEYS
10                              GENERAL
                              1850 M Street NW, 12th Floor
11                            Washington, DC 20036

12   For AlieraCare           Joseph Huston, Esquire
     Plaintiffs:              STEVENS & LEE, P.C.
13                            1105 North Market Street, Suite 700
                              Wilmington, Delaware 19801
14

15                            - and -

16                            Eleanor Hamburger, Esquire
                              SIRIANNI YOUTZ SPOONEMORE
17                              HAMBURGER PLLC
                              3101 Western Avenue, Suite 350
18                            Seattle, Washington 98121

19

20

21

22

23

24

25
```

002571

MATTER GOING FORWARD:

11.   United States Trustee's Motion to Remove the Debtor-In-Possession Pursuant to 11 U.S.C. Section 1185, or Alternatively, Motion to Authorize the Subchapter V Trustee to Investigate the Debtor's Financial Affairs Pursuant to 11 U.S.C. Section 1185 [D.I. 68; Filed on 7/22/21]

CLOSING ARGUMENTS:

    By Ms. Sierra          6

    By Ms. Hamburger       19

    By Ms. Ryan            24

    By Ms. Cordry          26

    By Mr. Rose            31


    **Ruling:   60**

60

 1  have Mrs. Miller in place, looking at any causes of action,

 2  looking at the members payments that came in and the share

 3  requests that need to be paid, I believe that is in the best

 4  interests of the members as this bankruptcy is winding down.

 5          And I am finished for now, Your Honor, unless you

 6  have any questions.

 7          THE COURT:  No questions.  Thank you, Ms. Ryan.

 8          All right, I'm going to take a short recess until

 9  noon and then I will come back and let you know what we're

10  going to do.  So we'll stand in recess until 12 o'clock.

11      (Recess taken at 11:43 a.m.)

12      (Proceedings resumed at 12:05 p.m.)

13          THE COURT:  Can everyone hear me okay?  All right.

14          COUNSEL:  Yes, Your Honor.

15          THE COURT:  We are back on the record.

16          Clearly, this case is highly unusual, to say the

17  least, and, as Mr. Luria stated during his testimony, it's a

18  mess.  The paramount issue for this case is clearly how the

19  members are going to be treated and I think it is important

20  that those members have a voice in how they are going to be

21  treated without individual members having to incur the costs

22  of doing so.

23          So, number one, I am going to direct the

24  appointment of a member committee.  Ms. Sierra, how long do

25  you think it would take to get that accomplished?

1      MS. SIERRA:  Your Honor, Rosa Sierra on behalf of

2 the U.S. Trustee.  I believe I have contact information from

3 various members that were present at the 341 meeting.

4 Without overpromising, I think a week just to contact them

5 and then to confer with my client.

6      THE COURT:  All right.  Well, we'll -- at the end

7 of this I'm going to say we're going to set a hearing for --

8 a further hearing on this.  I want to keep this on a tight

9 schedule, so I will have another hearing in very short order

10 here.

11      At this point in the case, I don't have concerns

12 that Mr. Luria, the CRO, is an independent professional

13 working to ensure that this case moves forward in an

14 expedited fashion.  I have some concerns that perhaps he was

15 not provided information by the debtors that he should have

16 received or that the debtors did not move quickly to try to

17 get that information from Aliera, as has been set forth in

18 the evidence during this hearing.  Mr. Luria has taken steps

19 to collect the debtor's data and to provide it in a usable

20 format, and I think it's important that we not lose that

21 knowledge or the time that he has spent in preparing to get

22 that data in a usable format.

23      Clearly, there's significant issues involving how

24 the company was managed prepetition and there's open

25 questions about how the case has progressed to date, but

1  while reasonable people might disagree with the way the case

2  has moved so far, I'm not yet prepared to remove the debtors

3  as debtor-in-possession.  I am going to -- I'm not going to

4  deny the motion at this point either, I'm going to hold that

5  motion in abeyance for now until we see how things move over

6  the next few weeks.

7          I am going to increase the powers of the

8  Subchapter V trustee to investigate the financial affairs of

9  the debtor.  That will include working closely with Mr. Luria

10  to see how the data migration is progressing.  And I would

11  expect Mr. Luria to keep the Sub V trustee fully informed on

12  that process, how it's working and how eventually that data

13  will be used by a liquidating trustee in the future.  She

14  will also have the power to investigate whether the debtors

15  are eligible for Subchapter V status and whether or not

16  current employees of the debtors, because I have a number of

17  employees but, frankly, I have no testimony about what they

18  do or why they're needed.  So I would ask Ms. Miller to

19  investigate as a part of the investigation of the financial

20  affairs of the company whether those employees are necessary

21  or not to the operations of the debtors at this point given

22  where this case is heading and whether we can save some money

23  by eliminating those positions if they're no longer needed.

24          She also -- I would also ask Ms. Miller to give me

25  some guidance once you've had the opportunity to conduct an

63

1    investigation and work with Mr. Luria to determine how long

2    Mr. Luria's services would be needed by the debtors, because

3    it is expensive at $50,000 a week with limited resources

4    available to the debtors.  So I would expect that as soon as

5    Mr. Luria's work is done and could be picked up by a

6    liquidating trustee that his services would be concluded.

7         I'm going to reserve a ruling on appointing the

8    Subchapter V trustee as the liquidating trustee because I've

9    appointed a member committee and that member committee should

10   have some say in that.  So I'm going to wait on that issue

11   until the member committee can have an opportunity to weigh

12   in.

13        At this point, I haven't seen the retention, as

14   it's been revised, Mr. Rose, for Mr. Luria giving him the

15   full powers to direct the debtors, so I would like to see an

16   order that gives Mr. Luria that power and that he cannot be

17   removed without permission of the Court --

18        MR. ROSE:  Yes, Your Honor.

19        THE COURT:  -- and I want to put that into a form

20   of order.

21        MR. ROSE:  Yes, Your Honor.

22        THE COURT:  So, with that, we need to schedule

23   another hearing.  And, as I said, I want to do this --

24   probably do this before the end of the month, given Ms.

25   Sierra's belief that she might be able to get a committee

1  appointed within a week.  Let's set a hearing for Monday,

2  August 30th, at 10:00 a.m.  That gives us three -- yes, three

3  weeks from now.  That will give Ms. Miller time to at least

4  get some of her investigation underway and I would expect a

5  full report on where that investigation is, whether or not

6  the employees are needed, and all the other issues that I

7  laid out.  And I would ask the parties to confer and come up

8  with a form of order.

9          MR. ROSE:  Thank you, Your Honor.

10          MR. MCGUIRE:  Your Honor, Matthew McGuire of

11  Landis Rath & Cobb on behalf of the debtors.  With respect to

12  the order expanding Mr. Luria's powers or ensuring that he

13  can't be removed without permission of the Court, I guess I

14  would just suggest that we could add provisions to the SOLIC

15  retention order, which I don't believe are now contested and

16  that we can work that language into that retention order and

17  submit that under a certification of counsel after conferring

18  with Ms. Sierra and the Subchapter V trustee.

19          THE COURT:  Yes, that's fine.  Thank you.

20          All right, anything else for today?

21          MR. MCGUIRE:  Your Honor, it's Matthew McGuire

22  again.  Your Honor, we did have a number of other items on

23  the agenda, believe it or not.  A vast majority of those

24  orders were submitted under a certification of counsel.  I'm

25  not sure if Your Honor wants to walk through those or has had

1                           CERTIFICATE

2

3        We certify that the foregoing is a correct transcript

4    from the electronic sound recording of the proceedings in the

5    above-entitled matter.

6
     /s/Mary Zajaczkowski          August 9, 2021
7    Mary Zajaczkowski, CET**D-531

8    /s/William J. Garling          August 9, 2021
9    William J. Garling, CE/T 543

10   /s/ Tracey J. Williams          August 9, 2021
     Tracey J. Williams, CET-914
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | Case No. 22-60043 |
| | § | |
| FREE SPEECH SYSTEMS, LLC, | § | Chapter 11 (Subchapter V) |
| | § | |
| Debtor. | § | |

# EXHIBIT K

| | | |
|---|---|---|
| Secretary of State<br>P.O. Box 13697<br>Austin, TX 78711-3697<br>FAX: 512/463-5709<br><br>Filing Fee: $300 | <br><br>**Certificate of Formation<br>Limited Liability Company** | **Filed in the Office of the<br>Secretary of State of Texas<br>Filing #: 804462512 03/07/2022<br>Document #: 1126599120004<br>Image Generated Electronically<br>for Web Filing** |

### Article 1 - Entity Name and Type

The filing entity being formed is a limited liability company. The name of the entity is:

## Blue Asension Logistics LLC

### Article 2 – Registered Agent and Registered Office

☑A. The initial registered agent is an organization (cannot be company named above) by the name of:

## Northwest Registered Agent, LLC

### OR

☐B. The initial registered agent is an individual resident of the state whose name is set forth below:

C. The business address of the registered agent and the registered office address is:

**Street Address:**
**5900 Balcones Drive STE 100    Austin  TX  78731**

### Consent of Registered Agent

☐A. A copy of the consent of registered agent is attached.

### OR

☑B. The consent of the registered agent is maintained by the entity.

### Article 3 - Governing Authority

☐A. The limited liability company is to be managed by managers.

### OR

☑B. The limited liability company will not have managers. Management of the company is reserved to the members.
The names and addresses of the governing persons are set forth below:

| Managing Member 1: **Patrick    Riley** | Title: **Managing Member** |
|---|---|

Address: **5900 Balcones Drive STE 100    Austin  TX, USA  78731**

### Article 4 - Purpose

The purpose for which the company is organized is for the transaction of any and all lawful business for which limited liability companies may be organized under the Texas Business Organizations Code.

**Supplemental Provisions / Information**

002580

[The attached addendum, if any, is incorporated herein by reference.]

### Initial Mailing Address

Address to be used by the Comptroller of Public Accounts for purposes of sending tax information.

The initial mailing address of the filing entity is:
**5900 Balcones Drive STE 100**
**Austin, TX 78731**
**USA**

### Organizer

The name and address of the organizer are set forth below.

**Morgan Noble**        **5900 Balcones Drive STE 100 Austin, TX US 78731**

### Effectiveness of Filing

☑ A. This document becomes effective when the document is filed by the secretary of state.

### OR

☐ B. This document becomes effective at a later date, which is not more than ninety (90) days from the date of its signing. The delayed effective date is:

### Execution

The undersigned affirms that the person designated as registered agent has consented to the appointment. The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

**Morgan Noble**

Signature of Organizer

FILING OFFICE COPY

002581

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | Case No. 22-60043 |
| | § | |
| FREE SPEECH SYSTEMS, LLC, | § | Chapter 11 (Subchapter V) |
| | § | |
| Debtor. | § | |

# EXHIBIT L

```
 1                  UNITED STATES BANKRUPTCY COURT
                     SOUTHERN DISTRICT OF TEXAS
 2                        HOUSTON DIVISION

 3                              )  CASE NO: 22-60043-cml
                                )
 4   FREE SPEECH SYSTEMS, LLC,   )  Houston, Texas
                                )
 5                   Debtor.     )  Friday, August 12, 2022
                                )
 6                              )  1:01 P.M. to 5:09 P.M.
                                )
 7   ----------------------------)

 8                        MOTION HEARING

 9        BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
                UNITED STATES BANKRUPTCY JUDGE
10

11   APPEARANCES:

12   For Debtor:           RAYMOND W. BATTAGLIA
                           R.J. SHANNON
13                         KYUNG SHIK LEE
                           Law Offices of Ray Battaglia, PLLC
14                         66 Granburg Circle
                           San Antonio, TX 78218
15
     For Texas Plaintiffs: MARTY BRIMMAGE
16                         Akin Gump
                           1111 Louisiana Street
17                         44th Floor
                           Houston, TX 77002
18
     For the Subchapter V
19   Trustee:              MELISSA A. HASELDEN
                           Haselden Farrow PLLC
20                         Pennzoil Place
                           700 Milam, Suite 1300
21                         Houston, TX 77002

22   For David Wheeler,
     et al.:               RYAN E. CHAPPLE
23                         Cain & Skarnulis, PLLC
                           303 Colorado Street, Suite 2850
24                         Austin, TX 78701

25
```

002583

```
 1   For U.S. Trustee:       HA MINH NGUYEN
                             Office of the United States Trustee
 2                           515 Rusk Street
                             Suite 3516
 3                           Houston, TX 77002

 4   Court Reporter:         ZILDE MARTINEZ

 5   Courtroom Deputy:       ZILDE MARTINEZ

 6   Transcribed by:         Veritext Legal Solutions
                             330 Old Country Road, Suite 300
 7                           Mineola, NY 11501
                             Tel: 800-727-6396
 8

 9

10   Proceedings recorded by electronic sound recording;
     Transcript produced by transcription service.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              THE WITNESS:  Well, I really have a question now
 2    based on his answer.  So when you say on the scene --
 3              THE COURT:  Well, you don't get to ask questions.
 4              THE WITNESS:  I don't know what he means.
 5              THE COURT:  Then just you don't know what he
 6    means.  I just want to make sure -- you don't get to ask
 7    questions.  He gets to ask them, and you get to answer them.
 8    And if you don't know the answer, then just say you can't
 9    answer the question.
10              THE WITNESS:  Okay.  I can't answer the question.
11              THE COURT:  Mr. Brimmage, why don't you ask
12    another question.
13    BY MR. BRIMMAGE:
14    Q    Mr. Schwartz -- Mr. Schwartz, when did Blue Ascension
15    start providing fulfillment services for FSS?
16    A    I don't have an exact date.  It was -- it was I believe
17    close to the day -- I take that back.  It was shortly prior
18    to my meeting with Blue Ascension.  So I asked to go over
19    the calculus of what happened.
20    Q    All right.  When was your meeting with Blue Ascension?
21    A    I believe July 18th.
22    Q    All right.  That's the date of the price sheet that we
23    looked at, right?
24    A    Correct.
25    Q    Okay.  Let's go backwards a little bit.  I'm just
```

```
 1    trying to make sure that we and the Court are crystal clear

 2    about what happened here.  Blue Ascension started providing

 3    fulfillment services shortly before your meeting on July

 4    18th, correct?

 5    A    That appears to be the date, yes.

 6    Q    And shortly before -- well, so they were already

 7    providing fulfillment services for FSS when you had your

 8    meeting; is that right?

 9    A    Yes.

10    Q    In fact you said you were caught flatfooted, right?

11    A    I believe that's what I said.

12    Q    You did.  And so I'm just trying to make sure I'm

13    clear.  When were the FSS employees terminated and rehired

14    by Blue Ascension, if you know?

15    A    The payroll we were working on, on July 18th, they had

16    been -- they had already been moved from the payroll at that

17    time.  So they were paid --

18    Q    Okay.

19    A    They were not paid on that payroll by FSS.

20    Q    So when were they terminated from FSS?

21    A    Like I said, all I know is they left the payroll.  They

22    had already been moved off the FSS payroll when we were

23    preparing to pay that payroll.  So (indiscernible) it would

24    have been effective the beginning of that payroll.

25    Q    All right.  Were they fired?
```

1    A    Yeah.  They would have been just, you know, terminated

2    and rehired, I believe, by Blue Ascension.

3    Q    Okay.  Is it fair to say that the name of their

4    employer just changed?

5    A    Well, their employer changed.  They no longer were on

6    the ADP payroll that we operate.  They're not an

7    intercompany charge or anything like that.

8    Q    But they're doing the same thing they were doing

9    before, right?

10   A    Well, the job (indiscernible) is essentially the same.

11   I don't know if they're doing it the same way.  I mean,

12   Patrick Riley, they have their own processes and procedures.

13   Q    Do you have personal knowledge of the different

14   processes and procedures that they brought in?

15   A    No.  That's why I said I don't know if they're doing

16   the same thing.

17   Q    Okay.  They're providing the same service to FSS that

18   they were providing to FSS before the name of their employer

19   changed, right?

20        MR. BATTAGLIA:  Your Honor, I'm going to object.

21   I'm going to object.  That question's been asked and

22   answered.

23        THE COURT:  I'll sustain.

24        MR. BRIMMAGE:  Okay.  Fair enough.

25   BY MR. BRIMMAGE:

1    Q    You weren't involved in terminating the employees,

2    right?

3    A    I'm sorry.  I didn't hear the earlier part.  Weren't

4    involved?

5    Q    You weren't involved in terminating the employees,

6    correct?

7    A    I was not involved, correct.

8    Q    You weren't involved in the employees being rehired by

9    Ascension, Blue Ascension, right?

10   A    Correct.

11   Q    And are the employees working in the same space that

12   they worked in before they left FSS?

13   A    Yes.  They would be in (indiscernible) --

14            THE COURT:  Mr. Schwartz, I think something broke

15   up.  Can you repeat that answer?

16            THE WITNESS:  They are working in the FSS

17   warehouse.

18            THE COURT:  Thank you.

19   BY MR. BRIMMAGE:

20   Q    All right, and so Blue Ascension operates out of the

21   FSS warehouse, right?

22   A    Well, when they're working for us, they do.

23   Q    Okay.

24   A    Working for FSS, I mean.

25   Q    Right.  Same warehouse that FSS employees worked in

1   before Blue Ascension came on, right?

2   A     And some FSS employees still work there.

3   Q     Okay.  Which warehouse is this?

4   A     It's the one on Strassman.

5   Q     Let me switch gears a little bit.  You said you did

6   some due diligence into Blue Ascension, right?

7   A     I described what I did.  Yes.

8   Q     And I just want to make sure the timeframe of that was

9   about the time of your meeting with Mr. Riley, right?

10  A     It was after my meeting with Mr. Riley.

11  Q     After the meeting with Mr. Riley.  Okay, and your

12  meeting with Mr. Riley was on July 18th, right?

13  A     Correct.

14  Q     Okay.  So you didn't do any due diligence on Blue

15  Ascension or Mr. Riley prior to that.  I just want to make

16  sure, right?

17  A     No, other than asking who he was.

18  Q     Okay.

19  A     But (indiscernible) --

20  Q     And I want to make sure we're clear on what your due

21  diligence was.  Your due diligence was you talked to Mr.

22  Riley, right?

23  A     Correct.

24  Q     You talked to Mr. Jones, Alex Jones, right?

25  A     Correct.

```
1    Q    You ran a background check, right?

2    A    Correct.

3    Q    Anything else?

4    A    Well, I mentioned I talked to Mr. Roddy.

5    Q    Anything else?

6    A    I may have spoken to Mr. Jones -- Dr. Jones, excuse me.

7    Q    Okay.  Anything else?

8    A    I believe that was essentially it.

9    Q    Okay.  Just for the Court, who is Mr. Roddy?

10   A    Blake Roddy is -- I believe he was the man in charge of

11   inventory and purchasing.

12   Q    For FSS?

13   A    Yes.

14   Q    Okay, and then the background check, what kind of

15   background check did you do?

16   A    I had a -- it's not a complete check.  I did criminal

17   and we did known associates, his employment history,

18   location history, property ownership, liens, litigation.

19   Q    Did you personally do this or you had someone do it?

20   A    I personally did it.  It didn't take five minutes.

21   Q    Okay.  So you spent five minutes on a background check

22   and you personally did it, right?

23   A    Correct.

24   Q    Okay.  All right.  So (indiscernible) --

25   A    Well (indiscernible) the report.  But I read it.  It
```

1    was a very extensive report.

2    Q    All right.  Let's go to -- you have seen the, is that

3    right, the Blue Ascension article of formation documents.

4    Do I have that right?

5    A    I have seen some things the secretary of state showing

6    the registration and organization of the LLC.  I've not seen

7    any member agreements, (indiscernible) agreement or articles

8    of association or organization, just the SOS filing.

9    Q    All right.  You haven't seen anything else other than

10   the SOS filing, right?

11   A    That's what I just said.

12   Q    Did you ask for any other documents regarding Blue

13   Ascension?

14   A    No.

15   Q    So part of your due diligence did not include for

16   asking for those.  Got it.  Blue Ascension, do you know how

17   to spell -- how it's spelled, ascension?

18   A    Probably not because it's A-S-E-N -- I mean, it's S-T-

19   I-O-N or not.

20   Q    Okay, and when did you look at the SOS document?

21   A    I don't recall.

22   Q    Where did you get it?

23   A    We probably pulled it down, I guess.  I'm trying to

24   think -- well, I don't remember.  But I know we had it

25   pulled down.

1    Q    Did you personally do that or did someone give it to

2    you?

3    A    I did not do it.  I had one of my staff would have

4    given it to me.  I didn't do that.

5    Q    Well, I mean, let's be clear.  Do you or do you not

6    know, under oath, where you got the SOS formation document

7    for Blue Ascension?

8    A    Well, I've gotten several recently from various filings

9    (indiscernible) but prior to that I don't know where I got

10   the one I remember seeing.

11   Q    All right.  You saw it was formed in March of 2022?

12   A    Correct.

13   Q    All right.  Any idea why it was formed when it was

14   formed?

15   A    That'd just be really conjecture on my part.

16   Q    You don't know, right?

17   A    (indiscernible) Alex Jones told me why it was

18   (indiscernible) --

19   Q    Okay.  All right, and you have not done any due

20   diligence into who might have an ownership interest in Blue

21   Ascension, right?

22   A    Other than, like I said, asking Mr. Riley and Mr. Jones

23   and possibly Dr. Jones.  But other than that, I've not

24   looked at any books and records on ownership.

25   Q    And you haven't asked for the organizational documents.

1    We just talked about that.  So you don't know one way or

2    another whether or not anybody other than Mr. Riley has an

3    ownership interest in Blue Ascension, correct?

4    A    I have no knowledge, personal knowledge of that.

5    Q    All right.  One way or another, right?

6    A    I just said I have no personal knowledge of it.

7    Q    Okay.  You do know that Mr. Riley has a history with

8    FSS, right?  He was employed by FSS, right?

9    A    Yes.  I'm aware of that.

10    Q    Yeah, and what kinds of jobs did he do for FSS?

11    A    From what I understand, he worked in fulfillment with

12    them for a number of years, in total up to six years.  I

13    know he -- well, I don't know.  I've heard -- I know he

14    trained, physically trained with Mr. Jones.  I don't know if

15    it was as a job or they liked to work out together.

16    Q    All right.  You say you understand he worked in

17    fulfilment.  Where is that understanding from, and do you

18    know that for a fact?

19    A    Again, I wasn't there then.  So I don't have any

20    personal knowledge of when he started work and when he left

21    work employed by FSS.  My understanding is based on what

22    I've been told.  I've been led to believe by Mr. Jones and I

23    think something I saw in connection with this hearing.

24    Q    Okay.  You know he used to work out or maybe still does

25    with Mr. Jones, right?

1    A    Well, I heard that he worked out with Mr. Jones.

2    Q    Okay.  Do you know that he also did other errands for

3    Mr. Jones?

4    A    I don't know.

5    Q    You don't know?

6    A    No.

7    Q    What was his title in -- what was his title in the

8    fulfillment group when he was with FSS?

9    A    I have no idea.  I don't know what anyone's title is

10   there.

11   Q    What were his job responsibilities when you think he

12   was in the fulfillment group at FSS?

13   A    Well the document (indiscernible) I'm sorry.

14   Q    I need to apologize.  I think I gave you two questions.

15   Let's start with what was his title in the fulfillment group

16   for FSS.

17   A    I don't know.

18   Q    What were his responsibilities in the fulfillment group

19   for FSS?

20   A    My understanding is he managed fulfillment which would

21   have been the same role in the process.

22   Q    When you say your understanding, what's your

23   understanding based on?

24   A    From talking to him about his knowledge of fulfillment

25   operations at FSS and the cost structure.

1    Q    Okay, and did you see any documents that identified him

2    actually doing any of those things at FSS?

3    A    No.  I have not seen any.

4    Q    You didn't see any documents that identified him as

5    actually having a title and working in the fulfillment

6    services group, did you?

7    A    Well, I haven't seen any documents that have titles for

8    anybody except maybe Alex Jones.  So it's very hard to find

9    out what people's titles are, if they have any.

10   Q    All right.  You don't know for a fact that he even

11   worked in the fulfillment services group, right?

12   A    No.  I've not researched if he actually was employed

13   there.

14   Q    Okay.  Let's look at a couple of emails, if we could.

15           MR. BRIMMAGE:  Your Honor, these are not those

16   emails.  These are these emails.  So let's look at Exhibit

17   2, if we could.

18           THE COURT:  So --

19           MR. BRIMMAGE:  And that would be -- I'm sorry.

20           THE COURT:  Go ahead, Mr. Brimmage.

21           MR. BRIMMAGE:  It's -- yeah, I'm messing up the

22   title of them, Your Honor.  It would be Document 60-2, which

23   --

24           THE COURT:  Okay.

25           MR. BRIMMAGE:  -- should be -- have we found it?

1    and I want to make sure that you're looking straight here.

2    Every time throughout the examination, Mr. Battaglia is

3    going to ask you some questions.  There might be some

4    parties who object.  I'm going to ask that you please give

5    me an opportunity to resolve the objection and then I'll let

6    you know if you can answer the question or if the attorneys

7    need to ask another one, okay?

8                    MR. RILEY:  Yes, Your Honor.

9                    THE COURT:  Okay.  Mr. Battaglia, you may proceed.

10                   DIRECT EXAMINATION OF PATRICK RILEY

11   BY MR. BATTAGLIA:

12   Q    Good afternoon, Mr. Riley.  I'm Ray Battaglia.  I

13   represent Free Speech Systems.  This is the first time the

14   Court has heard or seen from you.  Can you tell the judge a

15   little bit about you?

16   A    My name is Patrick Riley.  I live in Austin, Texas, and

17   I run and operate Blue Ascension Logistics, a third party

18   logistics company.

19   Q    And let's go back a little bit further.  Tell the Court

20   about your college and beyond education and work background.

21   A    I went to the University of Texas.  I studied

22   kinesiology and business.  I did the business foundations

23   degree.  It's essentially a business major.  I worked for

24   myself, self-employed, for a little over a decade running a

25   personal training health and wellness company.  In 2016, I

1    began work for Free Speech Systems as my employer.

2    Q    So let's back up and talk about your prior -- the

3    history of your relationship with Alex Jones.  Can you give

4    the Court a sense of when you met Alex, how you met him and

5    what your relationship has been?

6    A    Yes.  I met Alex in 2014 (indiscernible) amongst my

7    other clients.  We developed a good working relationship.

8    And he, in 2016, offered me a full-time job that I took the

9    opportunity to come onboard.

10   Q    So what were you originally brought onboard to do for

11   Free Speech Systems?

12   A    He wanted me to help him and his buyers maintain good

13   health and be a beacon of wellness (indiscernible) rather

14   and in addition to that he wanted me to come and just help

15   organize and handle problems if they came up.

16   Q    And did your role change from time to time with Free

17   Speech Systems?

18   A    I don't know if it was ever consistent at all.  But

19   yes, it's dramatically changed off and on.  There's a big

20   range of variability.

21   Q    Can you describe for the Court the range of things that

22   you did during your tenure at Free Speech Systems?

23   A    It's a lot of just kind of communicating, you know,

24   what he may have wanted, whether it be from one department

25   to another or ensuring that a process got done.  It could be

1    something, you know, on the personal side.  It could be

2    something on the work side.  It could be telling somebody to

3    change something that they did or to ensure that somebody

4    got a project done.  It changed dramatically in 2020 when

5    our operations manager left.  I assumed many more

6    responsibilities at that time.  But yeah, it varied over the

7    five-plus, almost six years.

8    Q    Can you describe for the Court what your relationship

9    historically has been with PQPR?  And you know who I'm

10   talking about when I say PQPR?

11   A    No.  I don't.

12   Q    PQPR Holdings, Limited.

13   A    Oh, yes.  PQPR.  Yeah.  Essentially it's a product

14   company that supplies products for Free Speech Systems.  And

15   my involvement essentially was, you know, somewhat similar

16   in the same regards of just facilitating --

17   Q    Go ahead.  I'm sorry.  I didn't mean to cut you off.

18   A    No.  Go ahead.

19   Q    Okay, and what about a prior relationship with David

20   Jones.  You know who Dr. David Jones is?

21   A    Yeah.  Same thing.  I try to help him in his health and

22   wellness capacity and, you know, similar to Alex.

23   Q    Let's talk about your current relationships.  Are you

24   on Free Speech Systems' payroll?

25   A    No.  I felt Free Speech Systems in February of this

1    year.

2    Q    Do you own any interest in Free Speech Systems?

3    A    No.

4    Q    What interest, if any, do you own in PQPR?

5    A    None.

6    Q    What interest do you own in any entity that you're

7    aware is owned in whole or in part by Alex Jones?

8    A    None.

9    Q    What background do you have in fulfillment with Free

10   Speech Systems?

11   A    I was around, you know, when I was in a variable state

12   of proximity to the warehouse.  Originally the warehouse was

13   by the production studio and then the late operations

14   manager ended up moving it and expanding the capacity of the

15   warehouse to provide larger abilities for fulfillment, just

16   kind of ramping things up in regard of being robust.  So

17   kind of learning as it expanded and learning the processes.

18   Q    And from time to time have you had a role in

19   fulfillment, a direct role in fulfillment?

20   A    Absolutely.  From, you know, obtaining product from the

21   fulfillment house to potentially handling whatever

22   logistical integration issues to now managing my own 3PL.

23   Q    That's a 3PL?

24   A    Third-party logistics.  It's essentially a company that

25   can warehouse, store, receive, pick, pack and ship products

1    that are linked up to the back end of an e-commerce store.

2    Q    What is Blue Ascension LLC?

3    A    Blue Ascension is my company, my logistics company.

4    Q    And as an LLC, it's owned by members.  Who are the

5    members of Blue Ascension LLC?

6    A    I'm the sole member.

7    Q    Who are the managers and/or officers of Blue Ascension

8    LLC?

9    A    I'm the only manager.

10   Q    When was it formed?

11   A    March of this year.

12   Q    Why was it formed?

13   A    Because there was a need for a fulfillment company to

14   take over (indiscernible) and fulfillment of shipments and

15   it was an opportunity to start a business.

16   Q    What was the impetus for starting Blue Ascension?

17   A    Free Speech Systems essentially getting out of the

18   fulfillment business.  It was not necessarily

19   (indiscernible) efficiencies in place, and to my

20   understanding it was something that they didn't want to do

21   anymore.

22   Q    What role did Alex Jones have in your formation and

23   startup of Blue Ascension?

24   A    He was willing to give me an opportunity to fulfill for

25   Free Speech Systems.

Page 102

1   Q    Did Alex Jones or Free Speech Systems provide you with
2   startup capital to form Blue Ascension?
3   A    No.  I provided my own.
4   Q    Where did -- okay.  So Blue Ascension, how many
5   employees does it have?
6   A    Currently we have 12 employees, including myself, and
7   anywhere from two to four temporary employees.  Currently we
8   have two temps.
9   Q    How many of those employees were formerly Free Speech
10  Systems employees?
11  A    The majority of employees, not all, but the majority of
12  employees were Free Speech Systems employees.
13  Q    And what experience generally do your topline employees
14  at Blue Ascension have in the fulfillment arena?
15  A    I mean, they're from the base floor of a pick packer
16  which is someone who just picks things off of a line
17  essentially and a packer that packs them into a box.
18  There's an integration manager that essentially deals with
19  the technical issues at hand, whether it be from the store
20  side or from the warehouse management system side.  We've
21  got team leads that help people on the floor and essentially
22  a daily manager or a floor manager as well.
23  Q    And this is -- I want to be real clear about this and I
24  want to talk about Blue Ascension's relationships with Alex.
25  What interest does Alex Jones have in Blue Ascension?

1    A    Zero.

2    Q    What agreements, written, unwritten, handshake is there

3    between you and/or Blue Ascension and Alex Jones to acquire

4    any interest in Blue Ascension?

5    A    There is none.

6    Q    What contractual agreements do you or Blue Ascension

7    have with Alex Jones?

8    A    What contractual obligations?  None, other than to

9    fulfill for Free Speech Systems.

10   Q    What compensation does Blue Ascension or you pay to

11   Alex Jones?

12   A    Zero.

13   Q    If I were to ask you the same series of questions about

14   PQPR, would your answers be different?

15   A    No.  They'd be the same.  They have no interest.  I

16   have not taken any money.

17   Q    How about Dr. David Jones?  Would your answers be

18   different?

19   A    They would be the exact same.

20   Q    How about any other Jones family member?

21   A    No.

22   Q    How many customers does Blue Ascension provide

23   fulfillment services for?

24   A    Seven or eight.

25   Q    And what are your intentions about growth of the

1    business to additional customers?

2    A    Since we started the company, we have been

3    (indiscernible) trying to bring in and onboard new vendors

4    to fulfill for.  We've been doing personal outreach, you

5    know, cold calls, knocking on people's doors, introducing

6    ourselves, going to fairs, you know, working with the

7    marketing team to try to specifically do some marketing in

8    our efforts to obtain new clients.

9    Q    Do you recall or can you tell the Court when it was

10   that Blue Ascension started providing fulfillment services

11   for FSS?  And when I say FSS, you know I'm speaking about

12   Free Speech Systems?

13   A    Yes.  Mid- to late July, sometime around there.

14   Q    What options are available to Free Speech Systems to

15   outsource fulfillment other than Blue Ascension?

16   A    I don't think they're --

17         MR. BRIMMAGE:  Your Honor, I'll object -- I'll

18   object as it lacks foundation, calls for speculation.  He

19   doesn't work for FSS anymore.

20         THE COURT:  Yeah.

21         MR. BATTAGLIA:  He's involved in the fulfillment

22   business, Your Honor, and he's actively pursuing clients and

23   he is aware and has information regarding this.

24         THE COURT:  I'll overrule it.  We'll see where it

25   goes.

1  A    Well, he says stuff on air all the time about filing

2  for bankruptcy and all kinds of things, so I'm not too sure.

3  There's always that comment of, you know, he might need to

4  do it.

5  Q    Okay.  So, when you left, you were aware that that was

6  a possibility, right?

7  A    Yeah, I think that was a (indiscernible) possibility

8  for some period of time.

9  Q    Had you had any direct conversations with Mr. Jones

10  about FSS filing bankruptcy at the time you left?

11  A    No, not really.

12  Q    Okay.  Now, you testified about your varying jobs and

13  varying responsibilities over the years, correct?

14  A    Yes.

15  Q    What was your title when you were there?

16  A    I had (indiscernible) different titles.  I'm not too

17  sure what, you know, my official title may have been.  I was

18  kind of just a loose manager of sorts, just to organize, but

19  I was not under any department or anything like that.

20  Q    Okay.  So, if we looked at an org chart, would you be

21  in the marketing department, would you know?

22  A    No, I was more of a fitness, wellness manager more than

23  any other form of manager.

24  Q    All right.  But you would agree with me we wouldn't

25  find you in the fulfillment services department of FSS

1    before you left, right?

2    A    You wouldn't find me in any department.  Again, I was

3    kind of an admin, to a certain degree.

4    Q    Okay.  Now, you said the operations manager left in

5    2020.  Do you remember that?

6    A    Yes, I believe it was in the end of 2020.

7    Q    Was that Mr. Fruze or Frood?  I may not be saying it

8    correctly.

9    A    Yes.

10   Q    All right.  And was he replaced by Mr. Roddy?

11   A    Again, I don't believe that he was necessarily

12   replaced.  I think it was an acquisition of

13   responsibilities, kind of in a totality sense.

14   Q    Was Mr. Roddy in charge of fulfilment services for FSS

15   after Mr. Fruze left?

16   A    I don't know if he was necessarily responsible for it.

17   He was away of fulfilment and what fulfilment may have

18   needed, but he was not managing fulfilment, to my

19   understanding, or --

20   Q    Who --

21   A    -- service.

22   Q    Who was managing fulfilment for FSS at the time you

23   left?

24   A    I mean, if you had to put somebody as a name in the

25   position, it was Kelly Hebert.

```
 1   Q    Kelly Hebert?

 2   A    Yes.

 3   Q    All right.  And did Kelly Hebert leave FSS and has now

 4   joined Blue Ascension?

 5   A    Yes.

 6   Q    Doing basically the same thing Kelly Hebert was doing

 7   before?

 8   A    Yes and no.

 9   Q    Okay.  And all the employees that are currently at Blue

10   Ascension were former FSS employees; is that right?

11   A    No.  Like I said earlier, the majority of employees

12   were Free Speech Systems employees, but not all.  We've had

13   to add to the roster.

14   Q    All right.  I'm going to try to get you to walk me

15   through this a little bit.  Let's go from a timeline

16   standpoint.  You organized this entity in March of 2022,

17   correct?

18   A    I formed the company in March of 2022.

19   Q    All right.  The operations of this company are in the

20   warehouse that FSS used to operate in its fulfilment

21   services, correct?

22   A    Correct.

23   Q    And that's -- Blue Ascension has never operated

24   fulfilment services in any other location, right?

25   A    Correct.
```

1    Q    All right.  When did you start operating, Blue

2    Ascension, that is, in the FSS warehouse?

3    A    It was mid-May, when we first began to sell the

4    services.

5    Q    All right.  But that wasn't for FSS at the time?

6    A    Correct.

7    Q    All right.  Where did the employees come from for mid-

8    May fulfilment services?

9    A    I hired the former Free Speech Systems employees to

10   work for Blue Ascension, initially as independent

11   contractors, and then moved them to W-2 employees.

12   Q    That's my next question.  How did the employees get

13   from FSS to Blue Ascension?  Can you walk me through that

14   process?  When and how did that work?

15   A    I offered them the job, and I told them that I was

16   starting a fulfilment company to do true 3PL, which is, you

17   know, third-party logistics, being able to fulfil for more

18   than just Free Speech Systems.

19   Q    Okay.  So, did they quit FSS and came and joined you,

20   or were they terminated by FSS, if you know?

21   A    I don't know.  I believe that they left Free Speech.

22   I'm not for sure if they were terminated.  I believe they

23   were terminated.

24   Q    Okay.  And so, did you coordinate with FSS when this

25   was going to happen and how it was going to happen?

```
 1    A    I don't know what you mean by coordinating.

 2    Q    Well, you didn't just walk into FSS's building and say,

 3    hey, I'm going to hire you guys, without communicating with

 4    FSS, did you?

 5    A    No, no, not at all.  But as I said earlier, you know, I

 6    did have an opportunity to begin fulfilment services.  There

 7    was essentially a plan to -- for me to hire who I needed to

 8    hire and take them, essentially, onto my payroll.

 9    Q    All right.  Who did you coordinate that with, that

10    plan?

11    A    I spoke to -- I spoke to Alex a little bit about it,

12    but I mean, I don't know if there was so much a dedicated

13    plan as a, I think, you know, we can make this -- I can make

14    a successful business out of this and I can bring you on as

15    a vendor.

16    Q    Okay.  And so, you --

17    A    A lot of us here that -- I'm so sorry.

18    Q    Go ahead.

19    A    No, go ahead.  I apologize.

20    Q    So you did speak to Alex Jones about this, right?

21    A    I mean, yes, a little bit.

22    Q    You wouldn't have taken over FSS's fulfilment services

23    without Alex's -- Jones' blessing, right?

24    A    Essentially.

25    Q    Okay.  So, when -- you transitioned the employees from
```

1   FSS to Blue Ascension in May.  Is that what I understand?

2   A    Yes.  I started -- I started pay them as contractors.

3   Q    When did you start fulfilling FSS orders?

4   A    Free Speech System wasn't fulfilled until mid/late

5   July, just recently.

6   Q    Who fulfilled FSS Systems' orders after you took the

7   employees over to Blue Ascension?

8   A    They were still employees, Free Speech Systems'

9   warehouse employees over there, like packers and such.

10  Q    All right.  How many employees did you -- well, how

11  many employees were in FSS's fulfilment services at the time

12  you took your first group?

13  A    Not many.  I mean, 10 or 12, possibly more.

14  Q    How many did you take in May?

15  A    (indiscernible).

16  Q    How many did you take in May?

17  A    I took my -- I took the original crew, minus,

18  essentially everybody that we have now, back in May.  So,

19  everybody that came back in May -- there hasn't really been

20  any Free Speech employees hired on after the first lot of

21  Free Speech employees that were starting to be employed by

22  Blue Ascension.

23  Q    Okay.  So, is it fair to say that between the time you

24  started fulfilling Blue -- FSS inventory orders, nobody was

25  fulfilling them in that interim gap because you had taken

```
 1                        CERTIFICATION

 2

 3   I certify that the foregoing is a correct transcript from

 4   the electronic sound recording of the proceedings in the

 5   above-entitled matter.

 6

 7   Sonya M. Ledanski Hyde

 8

 9

10   Sonya Ledanski Hyde

11

12

13

14

15

16

17

18

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25   Date:  August 19, 2022
```

002610

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | **Chapter 11** |
| **Free Speech Systems LLC** | § | |
| | § | **Case No. 22–60043 (CML)** |
| Debtor. | § | |

---

## THE SANDY HOOK FAMILIES' MOTION TO EXPEDITE MOTION TO (I) APPOINT TORT CLAIMANTS COMMITTEE AND (II) REMOVE THE DEBTOR IN POSSESSION

---

> **This motion seeks an order that may adversely affect you. If you oppose the motion, you should immediately contact the moving party to resolve the dispute. If you and the moving party cannot agree, you must file a response and send a copy to the moving party. You must file and serve your response within 21 days of the date this was served on you. Your response must state why the motion should not be granted. If you do not file a timely response, the relief may be granted without further notice to you. If you oppose the motion and have not reached an agreement, you must attend the hearing. Unless the parties agree otherwise, the court may consider evidence at the hearing and may decide the motion at the hearing.**
>
> Expedited relief has been requested. If the Court considers the motion on an expedited basis, then you will have less than 21 days to answer. If you object to the requested relief or if you believe that the expedited consideration is not warranted, you should file an immediate response.
>
> **Represented parties should act through their attorney.**

TO THE HONORABLE CHRISTOPHER LOPEZ, UNITED STATES BANKRUPTCY JUDGE:

Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and Marcel Fontaine ( the "**Texas Plaintiffs**") and David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino, William Aldenberg, William Sherlach, and Robert Parker (the "**Connecticut**

**Plaintiffs**") (together the "**Sandy Hook Families**"),[1] creditors and parties-in-interest moved to appoint a tort claimants' committee and remove Free Speech Systems, LLC ("**FSS**" or "**Debtor**") as debtor in possession. The Sandy Hook Families seek to expedite the motion filed at Docket No. 102 for the following reasons:

## <u>EXPEDITED RELIEF</u>

1.      A hearing is scheduled for September 14, 2022 at 1:00 p.m. to determine the use of cash collateral on a final basis. Many factual issues overlap between the cash collateral objections and the Sandy Hook Families' request to appoint a committee and remove the Debtor in Possession.  In light of the Court's setting in September and in the interest of judicial economy, the Sandy Hook Families' request expedited consideration and a hearing on September 14, 2022 at 1:00 p.m.

Date: August 26, 2022

Respectfully submitted,

**McDowell Hetherington LLP**

Avi Moshenberg
Texas Bar No. 24083532
1001 Fannin Street, Suite 2700
Houston, Texas 77002
D: 713-337-5580
F: 713-337-8850
E: Avi.Moshenberg@mhllp.com

***Counsel for the Texas Plaintiffs***

and

---

[1] Marcel Fontaine was not defamed as to the Sandy Hook mass-shooting but as to the Parkland mass-shooting. For ease of reference, however, this objection refers to all tort claimants as the Sandy Hook Families.

**CHAMBERLAIN, HRDLICKA, WHITE,**
**WILLIAMS & AUGHTRY, PC**

By: */s/Jarrod B. Martin*
Jarrod B. Martin
Texas Bar No. 24070221
1200 Smith Street, Suite 1400
Houston, Texas 77002
D: 713.356.1280
F: 713.658.2553
E: jarrod.martin@chamberlainlaw.com

*Bankruptcy Counsel for the Texas Plaintiffs*


By: */s/ Ryan Chapple*
Ryan E. Chapple
State Bar No. 24036354
Email: rchapple@cstrial.com
**CAIN & SKARNULIS PLLC**
303 Colorado Street, Suite 2850
Austin, Texas 78701
512-477-5000
512-477-5011—Facsimile

and

Randy W. Williams
State Bar No. 21566850
Email: rww@bymanlaw.com
**BYMAN & ASSOCIATES PLLC**
7924 Broadway, Suite 104
Pearland, Texas 77581
281-884-9262

*Bankruptcy Counsel for Connecticut Plaintiffs*

## CERTIFICATE OF SERVICE

The undersigned certifies that on August 26, 2022, a true and correct copy of the foregoing Motion was served electronically on all parties registered to receive electronic notice of filings in this case via this Court's ECF notification system.

*/s/ Jarrod B. Martin*
Jarrod B. Martin

## BLR 9013-1(i) CERTIFICATE

Pursuant to BLR 9013-1(i), I hereby certify that the information contained in the foregoing document with respect to the need for emergency relief is accurate, true, and correct to the best of my knowledge.

*/s/ Jarrod B. Martin*
Jarrod B. Martin

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | **Chapter 11** |
| **Free Speech Systems LLC** | § | |
| | § | **Case No. 22–60043 (CML)** |
| **Debtor.** | § | |
| | § | |

**ORDER APPROVING THE SANDY HOOK FAMILIES' MOTION TO EXPEDITE**
**MOTION TO (I) APPOINT TORT CLAIMANTS COMMITTEE AND**
**(II) REMOVE THE DEBTOR IN POSSESSION**

*(Related to ECF No. ___ )*

On August 25, 2022, the Sandy Hook Families (as defined in the Motion) filed their Motion to (I) Appoint Tort Claimants Committee and (II) Remove the Debtor in Possession ("**Motion**").[1] Then on August 26, 2022, the Sandy Hook Families filed a Motion to Expedite ("**Motion to Expedite**") the Motion. The Court finds and concludes that cause exists grant the Motion to Expedite. Accordingly, it is

**ORDERED** that the Motion to Expedite is granted and hearing is scheduled on the Motion for September 14, 2022 at 1:00 p.m.; and it is further

**ORDERED** that The Sandy Hook Families shall provide Notice to all parties within three days.

**Signed this ___ day of _____, 2022**

_____
**CHRISTOPHER M. LOPEZ**
**UNITED STATES BANKRUPTCY JUDGE**

---

[1] ECF No. 102.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | **Chapter 11** |
| **Free Speech Systems LLC** | § | |
| | § | **Case No. 22–60043 (CML)** |
| **Debtor.** | § | |

---

**THE SANDY HOOK FAMILIES' <u>CORRECTED</u> MOTION TO EXPEDITE MOTION TO (I) APPOINT TORT CLAIMANTS COMMITTEE AND (II) REMOVE THE DEBTOR IN POSSESSION**

---

> **This motion seeks an order that may adversely affect you. If you oppose the motion, you should immediately contact the moving party to resolve the dispute. If you and the moving party cannot agree, you must file a response and send a copy to the moving party. You must file and serve your response within 21 days of the date this was served on you. Your response must state why the motion should not be granted. If you do not file a timely response, the relief may be granted without further notice to you. If you oppose the motion and have not reached an agreement, you must attend the hearing. Unless the parties agree otherwise, the court may consider evidence at the hearing and may decide the motion at the hearing.**
>
> Expedited relief has been requested. If the Court considers the motion on an expedited basis, then you will have less than 21 days to answer. If you object to the requested relief or if you believe that the expedited consideration is not warranted, you should file an immediate response.
>
> **Represented parties should act through their attorney.**

**TO THE HONORABLE CHRISTOPHER LOPEZ, UNITED STATES BANKRUPTCY JUDGE:**

Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and Marcel Fontaine ( the "**Texas Plaintiffs**") and David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino, William Aldenberg, William Sherlach, and Robert Parker (the "**Connecticut**

Plaintiffs") (together the "**Sandy Hook Families**"),[1] creditors and parties-in-interest moved to appoint a tort claimants' committee and remove Free Speech Systems, LLC ("**FSS**" or "**Debtor**") as debtor in possession. The Sandy Hook Families seek to expedite the motion filed at Docket No. 102 for the following reasons:

## **EXPEDITED RELIEF**

1.      A hearing is scheduled for September 13, 2022 at 1:00 p.m. to determine the use of cash collateral on a final basis. Many factual issues overlap between the cash collateral objections and the Sandy Hook Families' request to appoint a committee and remove the Debtor in Possession.  In light of the Court's setting in September and in the interest of judicial economy, the Sandy Hook Families' request expedited consideration and a hearing on September 13, 2022 at 1:00 p.m.

Date: August 26, 2022

Respectfully submitted,

**MCDOWELL HETHERINGTON LLP**

Avi Moshenberg
Texas Bar No. 24083532
1001 Fannin Street, Suite 2700
Houston, Texas 77002
D: 713-337-5580
F: 713-337-8850
E: Avi.Moshenberg@mhllp.com

***Counsel for the Texas Plaintiffs***

and

---

[1] Marcel Fontaine was not defamed as to the Sandy Hook mass-shooting but as to the Parkland mass-shooting. For ease of reference, however, this objection refers to all tort claimants as the Sandy Hook Families.

CHAMBERLAIN, HRDLICKA, WHITE,
WILLIAMS & AUGHTRY, PC

By: */s/Jarrod B. Martin*
Jarrod B. Martin
Texas Bar No. 24070221
1200 Smith Street, Suite 1400
Houston, Texas 77002
D: 713.356.1280
F: 713.658.2553
E: jarrod.martin@chamberlainlaw.com

*Bankruptcy Counsel for the Texas Plaintiffs*


By: */s/ Ryan Chapple*
Ryan E. Chapple
State Bar No. 24036354
Email: rchapple@cstrial.com
CAIN & SKARNULIS PLLC
303 Colorado Street, Suite 2850
Austin, Texas 78701
512-477-5000
512-477-5011—Facsimile

and

Randy W. Williams
State Bar No. 21566850
Email: rww@bymanlaw.com
BYMAN & ASSOCIATES PLLC
7924 Broadway, Suite 104
Pearland, Texas 77581
281-884-9262

*Bankruptcy Counsel for Connecticut Plaintiffs*

## CERTIFICATE OF SERVICE

The undersigned certifies that on August 26, 2022, a true and correct copy of the foregoing Motion was served electronically on all parties registered to receive electronic notice of filings in this case via this Court's ECF notification system.

*/s/ Jarrod B. Martin*
Jarrod B. Martin

## BLR 9013-1(i) CERTIFICATE

Pursuant to BLR 9013-1(i), I hereby certify that the information contained in the foregoing document with respect to the need for emergency relief is accurate, true, and correct to the best of my knowledge.

*/s/ Jarrod B. Martin*
Jarrod B. Martin

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | **Chapter 11** |
| **Free Speech Systems LLC** | § | |
| | § | **Case No. 22–60043 (CML)** |
| Debtor. | § | |

---

**ORDER APPROVING THE SANDY HOOK FAMILIES' MOTION TO EXPEDITE
MOTION TO (I) APPOINT TORT CLAIMANTS COMMITTEE AND
(II) REMOVE THE DEBTOR IN POSSESSION**

*(Related to ECF No. ___)*

---

On August 25, 2022, the Sandy Hook Families (as defined in the Motion) filed their Motion to (I) Appoint Tort Claimants Committee and (II) Remove the Debtor in Possession ("**Motion**").[1]  Then on August 26, 2022, the Sandy Hook Families filed a Motion to Expedite ("**Motion to Expedite**") the Motion. The Court finds and concludes that cause exists grant the Motion to Expedite.  Accordingly, it is

**ORDERED** that the Motion to Expedite is granted and hearing is scheduled on the Motion for September 13, 2022 at 1:00 p.m.; and it is further

**ORDERED** that The Sandy Hook Families shall provide Notice to all parties within three days.

**Signed this ___ day of _____, 2022**

_____
**CHRISTOPHER M. LOPEZ**
**UNITED STATES BANKRUPTCY JUDGE**

---

[1] ECF No. 102.

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | Case No. 22-60043 |
| | § | |
| FREE SPEECH SYSTEMS, LLC, | § | Chapter 11 (Subchapter V) |
| | § | |
| Debtor. | § | |

**THE CONNECTICUT PLAINTIFFS'
WITNESS AND EXHIBIT LIST FOR EMERGENCY HEARING**

| | |
|---|---|
| Judge | Hon. Christopher M. Lopez |
| Hearing Date | Monday, August 29, 2022 |
| Hearing Time | 1:00 p.m. (CST) |
| Party's Name | David Wheeler, et al. |
| Attorney's Names | Ryan Chapple, Randy Williams |
| Attorney's Phone | 512-477-5000 |
| Nature of Proceeding | Hearing on Emergency Motion for Relief from the Automatic Stay [Dkt. 15] |

**WITNESS AND EXHIBIT LIST**

David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino, William Aldenberg, William Sherlach, and Robert Parker (collectively, the Connecticut Plaintiffs) hereby submit this Witness and Exhibit List in connection with the hearing on their *Emergency Motion for Relief from the Automatic Stay* (the Emergency Motion) [Dkt. 15] to be held on Monday, August 29, 2022 at 1:00 p.m. (Central Standard Time):

Counsel for the Connecticut Plaintiffs reserves the right to supplement, amend, or delete any witnesses or exhibits prior to the hearing. Counsel for the Connecticut Plaintiffs reserves the right to supplement the Witness and Exhibit List with new

002621

witnesses and additional exhibits.  Further, counsel reserves the right to use any exhibits presented by any other party and to ask the Court to take judicial notice of any document. Counsel for the Connecticut Plaintiffs further reserves the right to introduce exhibits previously admitted.

### WITNESS LIST

- Alinor Sterling, Trial Counsel for Connecticut Plaintiffs;
- W. Marc Schwartz, Chief Restructuring Officer of Debtor;
- Any witness necessary to establish notice of the hearing on the Emergency Motion has been provided;
- Any witness necessary to rebut the testimony of any witness called or designated by any other parties;
- Any witness listed or called by any other party.

### EXHIBIT LIST

**IF YOU SEEK A COPY OF THE EXHIBITS, YOU CAN ACCESS THEM BY SUBMITTING A WRITTEN REQUEST TO ARLANA PRENTICE AT APRENTICE@CSTRIAL.COM.**

Counsel for the Connecticut Plaintiffs may offer for admission into evidence any of the following exhibits at the hearing:

| No. | Description | Offer | Obj | Date Admit | Disposition after trial |
|---|---|---|---|---|---|
| 1. | *Erica Lafferty, et al. v. Alex Jones, et al.* Complaint | | | | |
| 2. | *William Sherlach v. Alex Jones, et al.* Complaint | | | | |
| 3. | *William Sherlach and Robert Parker v. Alex Jones, et al.* Complaint | | | | |
| 4. | Connecticut State Court Nov. 15, 2021 Default Ruling | | | | |
| 5. | Connecticut State Court Dec. 24, 2021 Order Striking Notice of Defenses | | | | |

| 6. | Supreme Court of Connecticut July 23, 2020 Decision | | | | |
|----|----|----|----|----|----|
| 7. | Jones Defendants' Oct. 19, 2020 Motion to Recuse | | | | |
| 8. | Connecticut State Court Dec. 24, 2021 Order Denying Motion to Recuse | | | | |
| 9. | Jan. 24, 2019 Sworn Interrogatories of Alex Jones | | | | |
| 10. | FSS Deposition Excerpts, Jun. 24, 2021 | | | | |
| 11. | Jones Deposition Excerpts, Apr. 5, 2022 | | | | |
| 12. | Jones Deposition Excerpts, Apr. 6, 2022 | | | | |
| 13. | *Heslin, et al., v Alex Jones, et al.* Complaint | | | | |
| | Any exhibits designated by other parties | | | | |
| | Any exhibits necessary for rebuttal | | | | |

Respectfully submitted this 26th day of August 2022.

_____/s/ Ryan E. Chapple_____

Ryan E. Chapple
State Bar No. 24036354
Email:rchapple@cstrial.com
**CAIN & SKARNULIS PLLC**
303 Colorado Street, Suite 2850
Austin, Texas 78701
512-477-5000
512-477-5011—Facsimile

and

Randy W. Williams
State Bar No. 21566850
Email: rww@bymanlaw.com
**BYMAN & ASSOCIATES PLLC**
7924 Broadway, Suite 104
Pearland, Texas 77581
281-884-9262
**ATTORNEYS FOR
THE CONNECTICUT PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Witness and Exhibit List has been served on counsel for Debtor, Debtor, and all parties receiving or entitled to notice through CM/ECF on this 26th day of August 2022.

_____*/s/ Ryan E. Chapple*_____
Ryan E. Chapple

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | Case No. 22-60043 |
| | § | |
| FREE SPEECH SYSTEMS, LLC, | § | Chapter 11 (Subchapter V) |
| | § | |
| Debtor. | § | |

# EXHIBIT 1

002625

| | | |
|---|---|---|
| RETURN DATE: JUNE 26, 2018 | : | JUDICIAL DISTRICT |
| | : | |
| ERICA LAFFERTY, ET AL, | : | OF FAIRFIELD |
| | : | |
| v. | : | AT BRIDGEPORT |
| | : | |
| ALEX JONES, ET AL. | : | MAY 23, 2018 |

## COMPLAINT

## INTRODUCTION

1.     This is a civil action for damages leading from the mass shooting that happened at Sandy Hook Elementary School on December 14, 2012.

2.     Just before 9:30 AM that morning, Adam Lanza shot his way into the locked school with a Bushmaster XM15-E2S.

3.     In less than five minutes, he shot and killed 20 first-grade children and 6 adults. Two others were wounded.

4.     That tragic day left behind 26 families that will never be whole again.

5.     Every day since, those families have struggled to reconcile themselves with the irrevocable loss of their beloved sons, daughters, sisters, brothers, and mothers.

6.     Even though overwhelming—and indisputable—evidence exists showing exactly what happened at Sandy Hook Elementary School on December 14, 2012, certain individuals have persistently perpetuated a monstrous, unspeakable lie: that the Sandy Hook shooting was staged, and that the families who lost loved ones that day are actors who faked their relatives' deaths.

7.     Defendant Alex Jones is a conspiracy-theorist radio and internet personality who holds himself out as a journalist. He is the most prolific among those fabricators. But he does not work alone: along with his various business entities, Jones is the chief amplifier for a group that has worked in concert to create and propagate loathsome, false narratives about the Sandy Hook shooting and its victims, and promote their harassment and abuse.

8.     Jones, along with these others, has persisted in the perpetuation and propagation of this outrageous, deeply painful, and defamatory lie in the face of a mountain of evidence to the contrary, and with no supporting evidence.

9.     Alex Jones does not in fact believe that the Sandy Hook Shooting was a hoax—and he never has.

1

002626

10.     Nevertheless, time and again, Jones has accused Sandy Hook families, who are readily identifiable, of faking their loved ones' deaths, and insisted that the children killed that day are actually alive.

11.     Jones has deliberately employed these false narratives about the Sandy Hook shooting, the victims, and their families as part of a marketing scheme that has brought him and his business entities tens of millions of dollars per year.[1]

12.     Jones has an audience of millions. He has repeatedly urged them to "investigate" the Sandy Hook shooting. He has purposely published statements by other people who falsely assert that the Sandy Hook shooting was a hoax.

13.     As a result of Jones's campaign, the families and survivors of the Sandy Hook shooting have been forced to endure malicious and cruel abuse at the hands of ruthless and unscrupulous people.

14.     On a regular basis, the families and survivors have faced physical confrontation and harassment, death threats, and a sustained barrage of harassment and verbal assault on social media.

15.     They have confronted strange individuals videotaping them and their children.

16.     Some of them have moved to undisclosed locations to avoid this harassment.

17.     The plaintiffs bring this action in defense of the values protected by the First Amendment to the U.S. Constitution, not in derogation of it.

18.     Like any marketplace, the marketplace of ideas that the First Amendment was meant to protect cannot function properly without accountability for reprehensible conduct like the defendants'. In fact, the defendants themselves have proven this to be so by their successful propagation of the blatantly false and harmful aspersions described in this Complaint.

19.     The First Amendment has never protected demonstrably false, malicious statements like the defendants'. This is because "there is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances society's interest in 'uninhibited, robust and wide-open' debate on public issues."[2]

---

[1] See Seth Brown, *Alex Jones's Media Empire Is a Machine Built to Sell Snake-Oil Diet Supplements*, N.Y. MAG. (May 4, 2017), http://nymag.com/selectall/2017/05/how-does-alex-jones-make-money.html; Alex Seitz-Wald, *Alex Jones: Conspiracy, Inc.*, SALON (May 2, 2013), https://www.salon.com/2013/05/02/alex_jones_conspiracy_inc/.

[2] *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340 (1974) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)). While the Supreme Court has afforded "a measure of strategic protection" to certain kinds of falsehoods to ensure that speech protected by the First Amendment has "the breathing space to survive," it has never wavered in its determination that falsehoods have no First Amendment value. *Id.* at 342. None of the Court's protective doctrines interfere with the plaintiffs' claims in this case.

2

20.     This lawsuit is about holding Jones and the other defendants accountable for the effects of their outrageous, malicious, and deeply hurtful lies.

## PARTIES

21.     The plaintiffs are the immediate family of four children and two educators killed at Sandy Hook Elementary School, in Newtown, Connecticut, on December 14, 2012, as well as one first-responder to the scene.

22.     Plaintiffs Jacqueline Barden and Mark Barden are the parents of murdered first-grader Daniel Barden, who was seven years old at his death on December 14, 2012. They reside in Fairfield County, Connecticut.

23.     Plaintiffs Nicole Hockley and Ian Hockley are the parents of murdered first-grader Dylan Hockley, who was six years old at his death on December 14, 2012. They reside in Fairfield County, Connecticut.

24.     Plaintiffs Francine Wheeler and David Wheeler are the parents of murdered first-grader Benjamin Wheeler, who was six years old at his death on December 14, 2012. They reside in Fairfield County, Connecticut.

25.     Plaintiffs Jennifer Hensel and Jeremy Richman are the parents of murdered first-grader Avielle Richman, who was six years old at her death on December 14, 2012. They reside in Fairfield County, Connecticut.

26.     Plaintiffs Donna Soto is the mother, and Carlee Soto-Parisi, Carlos M. Soto, and Jillian Soto are the siblings, of murdered first-grade teacher Victoria Leigh Soto, who was 27 years old when she died shielding her students from Adam Lanza's murderous rampage at Sandy Hook Elementary School on December 14, 2012. They reside in Fairfield County, Connecticut.

27.     Plaintiff Erica Lafferty is the daughter of Dawn Hochsprung, the principal of Sandy Hook Elementary School on December 14, 2012. Dawn died that day trying to save her students from Adam Lanza's murderous rampage. Erica resides in Litchfield County, Connecticut.

28.     Plaintiff William Aldenberg was a first responder to Sandy Hook Elementary School on December 14, 2012, and was depicted in iconic photographs and video footage from those events. He has been antagonized by some of the defendants and their followers, who claim that he is a crisis actor. He resides in Worcester County, Massachusetts.

29.     The defendants are out-of-state business entities and individuals residing in Connecticut, Texas, and Florida.

30.     Defendant Alex Emric Jones ("Alex Jones" or "Jones") is a radio and internet personality who holds himself out as a journalist and is a resident of Austin, Texas. He is the host of shows including "The Alex Jones Show," and owns and operates the websites Infowars.com

3

002628

and PrisonPlanet.com. Jones's shows have millions of weekly listeners and are syndicated on approximately 60 radio stations.

31.     Defendant Infowars, LLC ("Infowars") is a Texas limited liability company that produces and broadcasts Alex Jones' Infowars, which holds itself out as a news and journalism platform. Its principal offices are located at 100 Congress Avenue, 22nd Floor, Austin, Texas 78701.

32.     Defendant Free Speech Systems, LLC is a Texas limited liability company. It owns Infowars.com. Its principal offices are located at 100 Congress Avenue, 22nd Floor, Austin, Texas 78701.

33.     Defendant Infowars Health LLC is a Texas limited liability company. Its principal offices are located at 100 Congress Avenue, 22nd Floor, Austin, Texas 78701.

34.     Defendant Prison Planet TV LLC is a Texas limited liability company. Its principal offices are located at 100 Congress Avenue, 22nd Floor, Austin, Texas 78701.

35.     All the above-mentioned Texas business-entity defendants are owned, controlled, and/or operated by defendant Alex Jones and are employed to hold and generate revenue for him. They and Jones shall hereinafter be referred to collectively as "the Jones defendants."

36.     Defendant Wolfgang Halbig holds himself out as a journalist and investigator and resides in Sorrento, Florida. He is the creator and operator of the defamatory and predatory websites SandyHookJustice.com and MonteFrank.com.

37.     Defendant Cory T. Sklanka holds himself out as a journalist and investigator and resides in Meriden, Connecticut. He has worked closely with Halbig in Halbig's Sandy Hook "investigative" work, including acting as driver and camera operator when Halbig has visited Connecticut to conduct those activities, and, on information and belief, participating in the operation of SandyHookJustice.com and co-hosting Sandy Hook Justice broadcasts.

38.     Defendant Genesis Communications Network, Inc., is a privately held company incorporated in Minnesota. It distributes radio programs produced by Alex Jones and Infowars, and was founded by Ted Anderson, who has appeared many times on Jones's shows, to promote his other business, defendant Midas Resources.[3] Its principal offices are located at 190 Cobblestone Lane, Burnsville, Minnesota, 55337.

39.     Defendant Midas Resources, Inc., is a privately held company incorporated in Minnesota. Its principal offices are located at 190 Cobblestone Lane, Burnsville, Minnesota, 55337. It has sold precious metals, dietary supplements, and other items as advertised by and in cooperation with defendant Genesis Communications and the Jones defendants.[4]

---

[3] https://www.youtube.com/watch?v=M-aQntV8meQ;  Nate Blakeslee, *Alex Jones Is About to Explode*, TEX. MONTHLY (Mar. 2010)  https://www.texasmonthly.com/politics/alex-jones-is-about-to-explode/.
[4] *Id.*

4

## THE DEFENDANTS' KNOWLEDGE, ASPIRATIONS, AND INFLUENCE

40.     Jones has a radio audience of more than two million people. The Alex Jones Show is syndicated on more than 60 radio stations. On the internet, Jones and Infowars reach millions more. Jones's YouTube channel has more than 2.3 million subscribers.

41.     Jones has repeatedly expressly stated that he aspires to spur his followers to action, and has acknowledged that his exhortations have that effect. This is especially true with regard to the Sandy Hook shooting.

42.     For instance, on June 12, 2017, The Alex Jones Channel posted a video. Speaking of his interview with Megyn Kelly on NBC and specifically about Sandy Hook, Jones stated, "That's why you keep missing the main calculation. I am a precision-guided heavy munition coming in on top of you . . . . So I hit the barbed wire, and everyone comes in over me. Have you seen what we've done how talk radio now sounds just like me . . . . Have you seen how the whole paradigm is globally shifting and you can't hold it back?"

43.     Later in the video, Jones stated, "I'm making it safe for everyone else to speak out just like Trump's doing, on a much bigger scale."

44.     Jones has not just attempted to give his followers permission to question reality. He also has specifically urged them to action.

45.     His followers have shown themselves ready to comply.

46.     On November 27, 2016, for instance, Jones spoke at length about "Pizzagate," a baseless conspiracy theory alleging that Democratic operatives were running a child-sex ring out of a Washington, D.C. pizza restaurant. He urged his followers to "investigate" the matter.

47.     "You have to go investigate it for yourself," he told them. "But I will warn you, this story that's been the biggest thing on the internet for several weeks, Pizzagate as it's called, is a rabbit hole that is horrifying to go down . . . . Something's going on. Something's being covered up. This needs to be investigated."

48.     Jones's followers came running to his call, as he knew they would.

49.     The pizzeria received hundreds of threats. Its owner told *The New York Times*, "[W]e've come under constant assault. I've done nothing for days but try to clean this up and protect my staff and friends from being terrorized."

50.     The owner and staff, along with some of their families, were harassed on social media websites. The owner received death threats. Even musical groups that had performed at the pizzeria and nearby businesses were harassed.

002630

51.     On December 4, 2016, Edgar Maddison Welch, a self-described Alex Jones follower, drove from Salisbury, North Carolina, to Washington, D.C., and fired three rounds into the pizzeria with an AR-15-style rifle.

52.     Welch told police that his objective was to "self-investigate" the Pizzagate conspiracy theory. In fact, just days before embarking on his violent "self-investigation," Welch urged a friend to watch "PIZZAGATE: The Bigger Picture," an Infowars video.

53.     Shortly thereafter, Jones removed his November 27, 2016 video and scrubbed references to his advocacy of the Pizzagate conspiracy theory.

54.     Similarly, many of the persons who have directly harassed or abused Sandy Hook families have been motivated by Jones's urging that his listeners "investigate."

55.     In 2017, a Florida woman was sentenced to prison for threatening the father of a child killed at Sandy Hook.

56.     She made four voicemail and email threats to the father, with statements like "you gonna die, death is coming to you real soon" and "LOOK BEHIND YOU IT IS DEATH."

57.     The woman's defense lawyer stated that she was primarily motivated by what she had read and seen on Infowars.com, Jones's website.

58.     On numerous occasions, Jones has hosted on his show Wolfgang Halbig, a self-styled investigator who is amongst the most prominent of those people who falsely claim that the Sandy Hook shooting was a hoax.

59.     Halbig is a 70-year-old former police officer and school administrator living in Florida. He has made more than 22 trips to Connecticut relating to the allegations of this Complaint, including delivering highly confrontational testimony before the Newtown Board of Education, and was warned by police that he would be charged with harassment unless he ceased contacting Newtown residents.

60.     Defendant Sklanka has facilitated Halbig's harassing and defamatory activities in Connecticut. He has acted as Halbig's driver, camera operator, helped Halbig operate his website, and co-hosted broadcasts asserting that the Sandy Hook shooting was a hoax. On information and belief, Sklanka assisted and was present with Halbig when he filmed and harassed children families at the St. Rose of Lima church in Newtown, Connecticut on June 2, 2015.

61.     Kevin Laprade, an Infowars videographer, accompanied Halbig on at least some of his "investigative" trips to Connecticut.[5]

---

[5] https://www.facebook.com/mert.melfa/videos/539807396217619/.

002631

62.     Halbig has filed numerous Freedom of Information Act requests over the years since the shooting, seeking police documents, insurance claims, portable toilet orders, and other types of information.

63.     Halbig has raised more than $100,000, largely on GoFundMe.com, for his activities.

64.     Tiffany Moser helped Halbig search Newtown Board of Education documents for evidence that the school was closed before the shooting. When she reported that all the evidence indicated that the school had been open, Halbig dismissed her.

65.     Halbig was banned from St. Rose of Lima, a Newtown church, after he and others were seen videotaping children entering and exiting the building. On information and belief, Sklanka participated in this venture.

66.     In May 2014, Halbig spoke at a public meeting of the Newtown Board of Education, in Newtown, Connecticut.

67.     After the meeting, Leonard Pozner emailed Halbig, seeking to persuade him to leave the Sandy Hook families alone. Halbig never responded, but another person did. He stated: "Wolfgang does not wish to speak with you unless you exhume Noah's body and prove to the world you lost your son."

68.     Halbig's activities were well known when he first appeared on the Alex Jones Radio Show, and throughout the times during which Jones hosted his appearances; in fact, Jones invited and hosted him on his show, time and again, precisely because of his activities.

69.     On his show, Jones expressly encouraged Halbig to continue these activities on numerous occasions.

70.     During that broadcast of the Alex Jones Radio Show, Jones repeatedly advertised Halbig's website, sandyhookjustice.com.

71.     Halbig's website made numerous false, outrageous, and defamatory statements about the plaintiffs.

A. For instance, the website accused Jeremy Richman, father of Avielle Richman, who was murdered at Sandy Hook Elementary School on December 14, 2012, of having fabricated his daughter's identity and faked her death "to steal money from hard-working Americans." Those false and outrageous accusations were accompanied by pictures of Jeremy, Avielle, and an unrelated Newtown child.

B. Halbig's website further stated that "Jeremy Richman & Jennifer Hensel continue to deceive and defraud the American public and collect donations for The Avielle Foundation, for Avielle Richman claiming she is dead, when in

7

reality, she is alive and was never their daughter." It further stated: "The corruption, fraud, and treason must stop, especially at the Bridgeport, Connecticut Law Firm of Pullman & Comley LLC, managers of the My Sandy Hook Family Fund, actively engaging in FRAUD by soliciting donations from the public for a murder victim who is still alive."[6]

C. Halbig's website contained links to numerous Infowars and/or Alex Jones videos claiming that the Sandy Hook shooting was a hoax, as well as videos that contained imagery and the names of some of the plaintiffs' children.[7]

D. It also published images, text, and video asserting that plaintiffs William Aldenberg and David Wheeler are in fact the same person, who is a crisis actor.

E. Faced with invasion-of-privacy lawsuits, Halbig took down his website in August 2016. However, he has continued to publish false, malicious, and defamatory statements regarding the Sandy Hook shooting and its victims continually through Facebook, email, and various radio and internet media outlets.

72.    Halbig has also published Facebook posts containing images and text asserting that plaintiffs William Aldenberg and David Wheeler are in fact the same person, and that person is a crisis actor.[8] His Facebook page continues to display those publications.

73.    Jones was aware that Halbig had published such statements through his website and other outlets. In fact, Jones brought Halbig onto his shows for the very purpose of eliciting and publishing such statements.

74.    In addition to hosting Halbig on his show time and again, Jones specifically directed and encouraged Halbig to continue his Sandy-Hook-related activities in Connecticut. Jones and other Infowars personnel specifically solicited that their audience contribute funds to Halbig so that he could continue his efforts.

75.    In fact, Jones and Infowars sent Infowars personnel to Connecticut to conduct live "reporting" on Halbig's activities and publish his false, defamatory, and outrageous accusations about the plaintiffs.

---

[6] https://web.archive.org/web/20160322115755/http://sandyhookjusticereport.com:80/monte-frank/avielle-richman-1-20-students-supposedly-died-sandy-hook-school-shooting-verified-28-year-veteran-forensic-expert-witness-girl-photos-lenie-urbina/.
[7] https://web.archive.org/web/20150731014342/http://www.sandyhookjustice.com:80/.
[8] See, e.g., https://www.facebook.com/wolfgang.halbig.1/posts/196562527355324; https://www.facebook.com/wolfgang.halbig.1/posts/195439914134252. https://www.facebook.com/photo.php?fbid=196561627355414&set=pb.100010047343967.-2207520000.1526661423.&type=3&theater.

002633

76.     For instance, on May 29, 2015, The Alex Jones Channel published an Infowars video, now posted on YouTube with the title "School Administrator Exposes Sandy Hook Stonewall."[9]

77.     The video was introduced by David Knight. The video then cut to Dan Bidondi, an Infowars reporter, who was reporting from Halbig's Freedom of Information Act hearing in Hartford, Connecticut.

78.     Infowars reporter Dan Bidondi had traveled to Hartford, CT to "report" on this hearing on behalf of Infowars and Alex Jones.

79.     On information and belief, other Infowars employees, apparent agents, and/or agents, including videographer Kevin Laprade,[10] traveled to and were located in Hartford, Connecticut, for the creation of this video.

80.     Sklanka acted as Halbig's driver, and actively facilitated his appearance on Infowars.[11]

81.     On July 7, 2015, The Alex Jones Show broadcast a video now posted on YouTube with the title "Retired FBI Agent Investigates Sandy Hook: MEGA MASSIVE COVER UP."[12]

82.     Jones noted, referring to the May 29, 2015 video, "I knew that we'd sent a reporter, Dan Bidondi, there for days, to cover the city council hearings about it, the fact that they're sealing everything."[13]

83.     Jones and Infowars purposefully sought to direct their message and spur "investigation" of the Sandy Hook families and the Newtown, Connecticut community in other ways, as well. For example, Jones took calls from listeners who called claiming to live close to Newtown, Connecticut, and encouraged them to continue their "investigations."[14]

84.     Jones and the rest of the Jones defendants acted together to develop, disseminate, and propagate the false statements described in this Complaint.

85.     Similarly, Sklanka and Halbig acted together, and they both acted together with the Jones defendants, to develop, disseminate, and propagate many of the false statements described in this Complaint.

---

[9] https://www.youtube.com/watch?v=SO8Xb-t4nT4.
[10] https://www.facebook.com/photo.php?fbid=10209638407182257&set=a.3495510351748.2134051.1391267684&type=3&theater.
[11] https://www.youtube.com/watch?v=4_2FznkfcBU.
[12] https://www.mediamatters.org/embed/clips/2016/11/29/51284/gcn-alexjones-20150707-shooting; https://www.youtube.com/watch?v=8YV1eWq8YSc.
[13] https://www.youtube.com/watch?v=jCOe3qIgyFA.
[14] https://www.youtube.com/watch?v=TGCfi_ot0CU.

002634

86.    Jones and other Infowars personnel mentioned in this Complaint were at all relevant times servants, agents, apparent agents, employees, and/or joint venturers of the Jones defendants.

87.    Defendant Halbig was at all relevant times a servant, agent, apparent agent, employee, and/or joint venturer of the Jones defendants.

88.    Defendant Sklanka was at all relevant times a servant, agent, apparent agent, employee, and/or joint venturer of Halbig and the Jones defendants.

89.    Defendants GENESIS COMMUNICATIONS and MIDAS RESOURCES both participated in this conspiracy and independently distributed the publications contained in this Complaint.

## THE DEFENDANTS' SANDY-HOOK-BASED BUSINESS MODEL

90.    The Jones defendants and their co-conspirators' conduct is based on a simple motive: greed. The defendants' business model is based on their fabrication, propagation, and amplification of conspiracy-minded falsehoods like those about Sandy Hook. It is a very lucrative business model.

91.    The Jones defendants have developed and cultivated an audience through the propagation of narratives revolving around paranoia, social anxiety, and political discord, a known motivator for some people.[15]

92.    The false claim that the Sandy Hook shooting was a government-sponsored hoax designed to lead to gun control was therefore a prime narrative for attracting, augmenting, and agitating Jones's audience.

93.    Jones and his subordinates hold themselves out as trusted newsmen, assiduously assuming the paraphernalia and symbology of television and radio journalism. This is obvious to anyone watching or listening to Infowars content: the consciously deepened voice; the news-anchor's huge Lucite desk; the shuffling of papers; the clipped news-anchor's diction and regular tone modulation; the title-and-picture callouts by story; the breaking-news broadcast opening and transition graphics using Infowars logos; the regular references to Infowars "reporters" and "investigations."

94.    Once he has their attention and trust, Jones exploits his audience by selling them products in line with the paranoid worldview he promotes. In his internet-based and broadcast radio shows, the Jones defendants hawk "open currency" precious metals, pre-packaged food and dietary supplements, "male enhancement" elixirs and radiation-defeating iodine tablets, gas

---

[15] *See generally* Richard J. Hofstatdler, *The Paranoid Style in American Politics, and Other Essays* (1964).

masks and body armor, and various customized AR-15 "lower receivers" (the extruded metal frame that encloses the breach, ammunition feed and firing mechanism of the rifle).[16]

95.     According to non-parties Bankrate LLC and Celebrity Net Worth, in mid-2017, Alex Jones himself had a personal net worth of approximately $10,000,000. According to non-party Worth of the Web, an Internet-based clearinghouse that brokers sales among existing websites and web-based businesses, Infowars.com is worth approximately $68,000,000.

96.     In May 2013, just six months after the Sandy Hook shootings, when his false narrative about those events was beginning to crescendo, an investigative reporter estimated that Alex Jones was making approximately $10,000,000 annually, which excluded any additional revenue attributable to book and DVD sales, remunerated speaking engagements and on-line merchandise sales, promotional tie-ins and royalties.[17]

97.     In other words, the Jones defendants concoct elaborate and false paranoia-tinged conspiracy theories because it moves product and they make money. Jones and his subordinates say what they say not because they are eager to educate or even to entertain their audience. Rather, they deliberately stoke social anxiety and political discord in their listeners, because distrust in government and cultural tribalism motivate those listeners to buy their products.

98.     News reports confirm that Jones and his business entities engage in the kind of conduct described in this Complaint not because they truly believe what they are saying, but rather because it increases profits.

99.     Former employees described "money-bomb fundraisers" that raised $100,000 in a day (for a for-profit entity), and programming being chosen based on its "being sensational and making money." "People were just so taken by the information we'd been pushing they'd do anything," one said.[18]

100.     In fact, during the legal proceedings in which Jones sought custody of his three children, Jones's own attorney argued that Jones's two decades of activities were mere "performance art" and that "he's playing a character."[19]

---

[16] https://www.INFOWARSstore.com/gear/personal-protective-gear/victory-series-2-minuteman-limited-edition-80-lower-ar-receiver.html.

[17] Alex Seitz-Wald, *Alex Jones: Conspiracy, Inc.*, Salon (May 2, 2013).

[18] Charlie Warzel, Alex Jones Will Never Stop Being Alex Jones, *Buzzfeed* (May 3, 2017), https://www.buzzfeed.com/charliewarzel/alex-jones-will-never-stop-being-alex-jones?utm_term=.yqXeXzdLEZ#.qewdqoN0m2.

[19] Corky Siemaszko, *InfoWars'Alex Jones Is a 'Performance Artist,' His Lawyer Says in Divorce Hearing*, NBCNews (Apr. 17, 2017), https://www.nbcnews.com/news/us-news/not-fake-news-infowars-alex-jones-performance-artist-n747491.

11

## THE CAMPAIGN OF ABUSE

101.    Jones's and Infowars's campaign of abuse began only days after the plaintiffs lost their loved ones to Adam Lanza's murderous rampage.

102.    On December 19, 2012, Infowars.com published an article entitled "FATHER OF SANDY HOOK VICTIM ASKS 'READ THE CARD?' SECONDS BEFORE TEAR-JERKING PRESS CONFERENCE."[20]

103.    That article alleges that Robbie Parker, father of six-year-old Emilie Parker, read off a card at a press conference the day after his daughter was killed. The article asked, "Is the establishment media trying to steer the victims' reactions?"

104.    An embedded video was entitled: "Sandy Hook Shooting Exposed As a Fraud."

105.    At the bottom of the article, a "Statement from Alex Jones" said, "It appears that members of the media or government have given him a card and are telling him what to say as they steer reaction to this event, so this needs to be looked into."

106.    On January 8, 2013, Infowars.com published an article entitled: "COLLEGE PROFESSOR SAYS 'CRISIS ACTORS' MAY HAVE PLAYED PART IF SANDY HOOK WAS INDEED A HOAX."[21]

107.    The article quoted James Tracy, a former Professor at Florida Atlantic University who has since been fired: "After such a harrowing event why are select would-be family members and students lingering in the area and repeatedly offering themselves for interviews? . . . A possible reason is that they are trained actors working under the direction of state and federal authorities and in coordination with cable and broadcast network talent to provide tailor-made crisis acting that realistically drives home the event's tragic features."

108.    In the narratives and parlance of mass-shooting conspiracy theorists, "crisis actors" are actors employed by government agencies or other powerful actors to stage shootings, in which they play victims, witnesses, and bystanders.

109.    The article is accompanied by an embedded video with the title "Sandy Hook Mass Media Psyop: Outtakes and Bloopers."

110.    A reasonable person would understand these statements, including the title of the embedded video, to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

---

[20] Infowars.com, *Father of Sandy Hook Victim Asks 'Read the Card?' Seconds Before Tear Jerking Press Conference*, Infowars (Dec. 19, 2012), https://www.infowars.com/father-of-sandy-hook-victim-asks-read-the-card-seconds-before-tear-jerking-press-conference/.

[21] Infowars.com, *College Professor says 'Crisis Actors' May Have Played Part if Sandy Hook was Indeed a Hoax*, Infowars (Jan. 8, 2013), https://www.infowars.com/college-professor-says-crisis-actors-may-have-played-part-if-sandy-hook-was-indeed-a-hoax/.

002637

## January 27, 2013

111.    On January 27, 2013, the Alex Jones Channel posted a video now advertised on YouTube under the title: "Why People Think Sandy Hook is A Hoax."[22] Just over a month had passed since the shooting at Sandy Hook.

112.    Jones appeared in that video. During the video, he stated, "Now again, in the last month and a half, I have not come out and clearly said that this was a staged event. Unfortunately, evidence is beginning to come out that points more and more in that direction, and we're going to show you that evidence in the moment. Now a lot of the tens of millions of video views on YouTube concerning the Sandy Hook hoax surround CNN, and what appears to be people who've been coached, people who have been given cue cards, people who are behaving like actors."

113.    Later in the video, Jones stated, "One of the big issues out there that has people asking questions is Robby Parker, who reportedly lost one of his daughters. And people see the photos out there where it looks like Obama's meeting with all three of his children, and things like that. And, when you watch the footage, I know grieving parents do strange things, but it looks like he's saying, 'Okay, do I read off the card,' he's laughing, and then he goes over, and starts, um, breaking down and crying."

114.    Jones then played a video of Robby Parker making a statement the day after the shooting. Parker lost his daughter, Emilie, in the Sandy Hook shooting.

115.    Under the video was a chyron with the words "Odd Parent Reaction from SandyHook [sic]."

116.    As the video of Parker played, Jones commented over it. "I haven't touched this," he said. "All I know is they're seizing on it. They staged fast and furious . . . . that killed thousands, our government, to blame the Second Amendment, they'd stage anything."

117.    Later in the broadcast, Jones said, "This needs to be investigated. They're clearly using this to go after our guns . . . . Something though, really, is starting to get suspicious here . . . . But the fact that this whole thing could be staged, it's just mindblowing. Tell us what you think. Great job to all the people out there with the crowdsourcing, that are resourcing all these clips."

118.    A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

119.    The audience for this broadcast has included hundreds of thousands, if not millions, of people.

## March 2013

---

[22] https://www.youtube.com/watch?v=tM5ZdO-IgEE.

13

120.     On March 14, 2014, Jones stated, "We've clearly got people where it's actors playing different parts of different people."

121.     He continued, "I've looked at it and undoubtedly there's a cover up, there's actors, they're manipulating, they've been caught lying, and they were pre-planning before it and rolled out with it."

122.     The audience for these broadcasts has included hundreds of thousands, if not millions, of people.

## May 27, 2013

123.     On May 27, 2013, Dr. Steve Pieczenik appeared on the Alex Jones Radio Show in an episode advertised on YouTube under the title "Sandy Hook was A Total False Flag!"[23]

124.     During that appearance, Pieczenik stated, "Sandy Hook was a total false flag. There was no individual involved; there was no Asperger's; there was no 24 kids who were killed."

125.     In the parlance and narratives of mass-shooting conspiracy theorists, "false flag" is the idea that a shooting or other attack was staged by the government or other powerful forces.

126.     A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

127.     On information and belief, this episode was also broadcast through Jones's radio affiliates.

128.     The audience for this broadcast has included hundreds of thousands, if not millions, of people.

## May 13, 2014

129.     On May 13, 2014, The Alex Jones Radio Show broadcast an episode advertised on YouTube under the title "Bombshell: Sandy Hook Massacre Was A DHS Illusion Says School Safety Expert."[24]

130.     That day, Jones hosted Wolfgang Halbig.

131.     During this video, Halbig stated: "I think the reason they're not answering those questions 'cause I think it's going to expose their whole scam."

---

[23] The Alex Jones Channel, *Dr. Steve Pieczenik: Sandy Hook was A Total False Flag!*, YouTube (Mar. 27, 2013), https://www.youtube.com/watch?v=5EfyD7Wu5fQ&t=18s.

[24] Alex Jones Channel, *Bombshell: Sandy Hook Massacre Was A DHS Illusion Says School Safety Expert*, YouTube (May 13, 2014), https://www.youtube.com/watch?v=x2a1FwYEZS4.

002639

132.    Jones asked Halbig, "What are the big smoking guns . . . what are the big red flags?"

133.    Halbig responded, "The red flags is that you're looking at $29 million . . . and there are 39 other community nonprofit organizations within Newtown that received a lot of funds."

134.    Jones interjected: "You're saying a motive for the locals to go along with the fraud is money."

135.    Later, Jones prompted Halbig, "What about the kids going in circles, back and forth, the same people, into the school for the helicopters; it looked like a fake drill . . . just go through those points."

136.    Jones summarized, stating, "The cover up is the prima facie proof of the larger crime, and that we're being lied to."

137.    He continued, "The whole thing, you've got 'em jumping gun . . . that Bloomberg was saying get ready the day before, get ready to fundraise on mass shootings . . . had a false start, didn't you, Bloomy."

138.    Jones was asserting that former Mayor of New York City Michael Bloomberg knew about the shooting beforehand. The clear implication of this statement is that the shooting was "staged" and a hoax.

139.    Halbig understood Jones. He responded, "Children did not die, teachers did not die, on December 14, 2012."

140.    Halbig further stated, "Alex, we've never had a time in our history, where Sandy Hook, a school massacre, the biggest illusion ever portrayed by Homeland Security and FEMA . . . ."

141.    During that show, Jones stated, in reference to the Sandy Hook shooting, "I mean it's fake . . . it's fake . . . you've got parents acting . . . it just is the fakest thing since the three-dollar bill."

142.    A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

143.    On information and belief, this episode was also broadcast through Jones's radio affiliates.

144.    The audience for this broadcast has included hundreds of thousands, if not millions, of people.

15

002640

**September 25, 2014**

145.   On September 25, 2014, the Alex Jones Radio Show broadcast an episode advertised on YouTube under the title "FBI Says Nobody Killed at Sandy Hook Massacre."[25]

146.   This assertion was a complete fabrication: the FBI had made no such statement.

147.   During the September 25, 2014 broadcast of the Alex Jones Radio Show, Jones and Halbig asserted that FBI crime statistics showed that no one was killed at Sandy Hook.

148.   This was a false statement. FBI crime statistics showed no such thing.

149.   Jones stated that video from the day of the shooting showed that the same children were cycled in and out of the school and that no emergency helicopters were sent to the school, and were "clearly staged."

150.   Jones stated that two supposed former high-level national-defense officials had declared that Sandy Hook and the Boston bombing were faked.

151.   Halbig asserted that "there were no trauma helicopters" sent to Newtown, that the other 600 children at the school could not be found, and that Sandy Hook Elementary School was "a toxic waste dump . . . . the filthiest, most deplorable school . . . that I have ever seen."

152.   Jones asserted that the school was "a cut-out" used as a stage for the event.

153.   Jones and Halbig both stated "I wish it was real instead of fake."

154.   Halbig stated that Connecticut state troopers "used they [sic] script," that "it's nothing but corruption in Connecticut," and that 16 Connecticut state troopers lied under oath.

155.   Halbig accused a company called Obsidian, located in Washington, D.C., of scripting well-known crises around the world, including Sandy Hook.

156.   Halbig stated that "nobody died" at Sandy Hook. He stated that "they never allowed the paramedics or EMTs ever inside the school."

157.   The audience for this broadcast has included hundreds of thousands, if not millions, of people.

158.   On September 26, 2014, Infowars.com published an article by Adan Salazar entitled "SANDY HOOK INVESTIGATOR: CONNECTICUT PD HAD FBI FALSIFY CRIME STATISTICS."

---

[25] https://www.youtube.com/watch?v=N1RlzXvGy2s. This video has since been removed "for violating YouTube's policy on harassment and bullying," but is now available at https://www.youtube.com/watch?v=eqVqmFy4KW0.

002641

159.   The article repeatedly quoted Wolfgang Halbig, who alleged that he had "discovered various anomalies which have led him to believe the entire incident was a contrived event."

160.   The article contained the following quote: "The American people need to wake up and listen to what these exercises are," says Halbig. "A Homeland Security FEMA Capstone Exercise, it starts at the White House, at the president's desk, goes all the way through Congress, through the Attorney General, down through the FBI, all the way down to the local government. It is a whole community event, and that's what I think happened at Sandy Hook."

161.   The article quoted Halbig as saying that there was "a 'script' followed during the event."

162.   It quoted him again, saying, "I'm telling you nobody died [at Sandy Hook] . . . I've been a school administrator for 30 some odd years. When I have a child with a broken arm, or I've got a fight on the school bus, or a child's been stabbed or shot, the first thing we get ready for are lawsuits. Alex, if there would have been just 2 or 3 lawsuits filed by the parents or loved ones who lost someone that day at Sandy Hook, I'd go away."

163.   A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

164.   On information and belief, the article has been viewed by hundreds of thousands of persons.

### December 12, 2014

165.   On December 12, 2014, Infowars Nightly News broadcast an episode now advertised on YouTube under the title "The Ultimate Sandy Hook Debate As The 2nd Anniversary Looms."[26]

166.   The episode consisted of a debate between Keith Johnson (a self-described conspiracy theorist with americanfreepress.net) and Halbig, about Sandy Hook, moderated by an Infowars personality named Rob Dew.

167.   During that broadcast, Halbig asserted that Sandy Hook Elementary School had been used as a toxic waste dump before December 14, 2012, and therefore no shooting took place there.

168.   Halbig stated, "On behalf of Dawn Hochsprung, who supposedly was the principal and was shot [in the massacre] . . . I can tell you this with certainty: Dawn Hochsprung would never, ever, in her life, have allowed her school . . . to look so filthy and so deplorable . . . . she would have never . . . allowed her school to become a toxic waste dump exposing every one

---

[26] The Alex Jones Channel, *The Ultimate Sandy Hook Debate As The 2nd Anniversary Looms*, YouTube (Dec. 12, 2014), https://www.youtube.com/watch?v=6aK0P-WxjU8.

002642

of her children and school staff members to serious lifelong health risks . . . . The doors are rotten, they're filthy . . . there's mildew."

169.    A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

170.    The audience for this broadcast has included hundreds of thousands, if not millions, of people.

### December 28, 2014

171.    On December 28, 2014, during The Alex Jones Radio Show, Jones took a call from Kevin, a listener who called in claiming to live close to Newtown, Connecticut.[27]

172.    Kevin said, "I'm calling about Sandy Hook. My take on it is . . . The whole thing is pretty much the next step in reality TV, because with other false flags, like 9/11 or Oklahoma City, or the Boston bombing, at least something happened. With Sandy Hook, there's no there there. You've got a bunch of people walking around a parking lot, pretty much what it comes down to."

173.    Jones interrupted Kevin. "No, no, I've had the investigators on, the state police have gone public, you name it," he said. "The whole thing is a giant hoax. And the problem is, how do you deal with a total hoax? How do you even convince the public something's a total hoax?"

174.    Kevin responded, "I always tell people the same thing: go out and prove the official story. And . . . I know the millisecond this happened, with that now-fake picture of the kids being led out of the school, that there's nothing that's going to sell this agenda like dead elementary school kids."

175.    Jones interrupted Kevin again. "The general public doesn't know the school was actually closed the year before," he said. "They don't know they've sealed it all, demolished the building. They don't know that they had the kids going in circles in and out of the building as a photo-op. Blue screen, green screens, they got caught using."

176.    Jones continued, "People just instinctively know that there's a lot of fraud going on. But it took me about a year with Sandy Hook to come to grips with the fact that the whole thing was fake. I mean, even I couldn't believe it. I knew they jumped on it, used the crisis, hyped it up. But then I did deep research—and my gosh, it just pretty much didn't happen."

177.    A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

178.    On information and belief, this episode was also broadcast through Jones's radio affiliates.

---

[27] https://www.youtube.com/watch?v=TGCfi_ot0CU.

002643

179.    The audience for this broadcast has included hundreds of thousands, if not millions, of people.

### January 2, 2015

180.    On January 2, 2015, Infowars.com published an article by Adan Salazar entitled "MYSTERY: SANDY HOOK VICTIM DIES (AGAIN) IN PAKISTAN."

181.    The article alleged that the "face . . . one of the children supposedly killed in the December 2012 Sandy Hook shooting in Newtown, Connecticut" had "without explanation . . . appeared in multiple photos and reports" related to an attack conducted by the Pakistani Taliban on a Pakistan Army school on December 16, 2015.

182.    "Can the photo's misuse simply be brushed off as another bumbling Google image search mistake?" the article stated. "Or could it be willful subterfuge aimed at poking fun at those who question the validity of the Sandy Hook event?"

183.    The pictures used were images of Noah Pozner.

184.    Upon information and belief, hundreds of thousands of people have viewed this article.

### January 13, 2015

185.    On January 13, 2015, during a broadcast of The Alex Jones Radio Show, Jones said, "Yeah, so, Sandy Hook is a synthetic completely fake with actors, in my view, manufactured. I couldn't believe it at first. I knew they had actors there, clearly, but I thought they killed some real kids. And it just shows how bold they are, that they clearly used actors. I mean they even ended up using photos of kids killed in mass shootings here in a fake mass shooting in Turkey—so yeah, or Pakistan. The sky is now the limit. I appreciate your call."[28]

186.    A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

187.    On information and belief, this episode was also broadcast through Jones's radio affiliates.

188.    The audience for this broadcast has included hundreds of thousands, if not millions, of people.

---

[28] https://www.youtube.com/watch?v=Ap-DvMoiMOY.

002644

**March 4, 2015**

189.    On March 4, 2015, The Alex Jones Radio Show broadcast an episode now advertised on YouTube under the title "New Bombshell Sandy Hook Information In-Bound."[29]

190.    Jones hosted Halbig on that episode.

191.    During the broadcast, Jones asked Halbig to explain why Sandy Hook was "completely phony."

192.    Halbig stated the school was not in operation at the time of the shooting.

193.    Jones stated that the school was suddenly reopened, received a "falling report" [sic], and did not look like a real school.

194.    Halbig stated that it was the "most filthiest [sic] most deplorable school" and "loaded with lead paint . . . asbestos . . . PCP."

195.    Halbig stated that trauma helicopters were not called and that paramedics were not allowed to enter the school.

196.    Jones stated, "I'm saying it was a drill, a giant piece of theater, did they really kill some kids? I don't know."

197.    Referring to video of parents of children killed in the shooting, Jones stated that "they . . . bring in actors to break down and cry. . . used the same actors as different people."

198.    Both Jones and Halbig stated that Connecticut police ate lunch inside the school the day of the shooting.

199.    Halbig encouraged listeners to contact the Newtown school board and ask them his questions.

200.    A reasonable person would understand Jones's and Halbig's statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

201.    On information and belief, this episode was also broadcast through Jones's radio affiliates.

202.    The audience for this broadcast has included hundreds of thousands, if not millions, of people.

---

[29] https://www.youtube.com/watch?v=_7ib5WkULBY.

002645

**May 28, 2015**

203.    On May 28, 2015, Infowars Nightly News broadcast an episode now advertised on YouTube under the title: "Sandy Hook: The Lies Keep Growing."[30]

204.    David Knight hosted Halbig on Infowars Nightly News.

205.    Halbig accused Newtown police chief Mike Kehoe of committing perjury.

206.    Halbig once again appeared, and stated that the school was unsanitary and unsafe.

207.    Halbig's website was repeatedly advertised and listeners were encouraged to support him financially.

208.    A reasonable person would understand Halbig's statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

209.    On information and belief, this episode was also broadcast through Jones's radio affiliates.

210.    The audience for this broadcast has included hundreds of thousands, if not millions, of people.

**May 29, 2015**

211.    On May 29, 2015, The Alex Jones Channel published an Infowars video, now posted on YouTube with the title "School Administrator Exposes Sandy Hook Stonewall."[31]

212.    The video was introduced by David Knight. The video then cut to Dan Bidondi, an Infowars reporter, who was reporting from Wolfgang's Freedom of Information Act hearing in Hartford, Connecticut.

213.    The video cut back and forth between excerpts from the hearing and interviews of Halbig by Bidondi in the hallway outside the hearing room.

214.    Infowars reporter Dan Bidondi traveled to Hartford, CT to report on this hearing on behalf of Infowars and Alex Jones.

215.    On information and belief, other Infowars agents, including the person doing the video recording, traveled to and were located in Hartford, Connecticut, for the creation of this video.

---

[30] https://www.youtube.com/watch?v=Ml3KVj2nVRA.
[31] https://www.youtube.com/watch?v=SO8Xb-t4nT4.

002646

216.     Later on May 29, 2015, the Alex Jones Channel published another Infowars video on YouTube, entitled "New Sandy Hook Questions Arise from FOIA Hearing."[32] The video featured David Knight interviewing Wolfgang Halbig by streaming video.

217.     During the interview, Halbig stated that Sandy Hook Elementary School was "a toxic waste dump . . . . and yet, we have parents who would allow their children to attend that type of a school? I don't believe so. And if they did, those parents are negligent for putting their children at risk."

218.     Halbig was clearly suggesting that the school was empty on the day of the shooting, and therefore that the shooting did not happen—and that the Sandy Hook parents are lying about their children's deaths.

219.     On information and belief, these statements were heard by hundreds of thousands, if not millions, of people.

## July 7, 2015

220.     On July 7, 2015, The Alex Jones Radio Show broadcast a video now posted on YouTube with the title "Retired FBI Agent Investigates Sandy Hook: MEGA MASSIVE COVER UP."[33]

221.     Jones noted, referring to the May 29, 2015 video, "I knew that we'd sent a reporter Dan Bidondi there for days, to cover the city council hearings about it, the fact that they're sealing everything."[34]

222.     "[T]he more we look at Sandy Hook," he said, "I don't want to believe it's a false flag. I don't know if kids really got killed, but you've got green screen with Anderson Cooper . . . and then his nose disappears. It's fake! The whole thing, it's—I don't know what happened."

223.     He continued, "It's kind of, you see a hologram at Disney World in the haunted house, I don't know how they do it, it's not real. When you take your kids to the haunted house and there are ghosts flying around, it's not real, it's staged . . . I don't know what the trick is here, I got a good suspicion. But when you've got Wolfgang Halbig . . . . he went and investigated, no paperwork, no nothing, it's bull."

224.     Later, Jones stated, "But what about how for a mass shooting in Pakistan, they got photos of Sandy Hook kids," and referring to an Infowars article, stated, "it's like the same P.R. company is running this . . . . and then they try to hit us with fake copyright deals whenever we show this."

---

[32] https://www.youtube.com/watch?v=5cll79t7Mrw.

[33] https://www.mediamatters.org/embed/clips/2016/11/29/51284/gcn-alexjones-20150707-shooting; https://www.youtube.com/watch?v=8YV1eWq8YSc.

[34] https://www.youtube.com/watch?v=jCOe3qIgyFA.

002647

225.    Jones put the article on the screen and read the headline: "Mystery: Sandy Hook Victim Dies (Again) in Pakistan."

226.    A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

227.    On information and belief, this episode was also broadcast through Jones's radio affiliates.

228.    The audience for this broadcast has included hundreds of thousands, if not millions, of people.

## November 17, 2016

229.    On November 17, 2016, the Alex Jones Show broadcast an episode in which Alex Jones claimed that he had never claimed that Sandy Hook was a hoax. Almost immediately thereafter, he rehearsed a number of his common arguments that Sandy Hook was a hoax.

230.    These included that "Anderson Cooper is using a green screen, his nose disappears"; "they have kids going in circles back into the buildings"; "the building was closed years before"; "it was filthy"; "no emergency helicopters were launched"; and "they're sealing the death certificates and everything."

231.    Jones continued, "we've sent reporters up there, man, and that place is like *Children of the Corn* or something. I mean it is freaking weird."

232.    Jones further referenced "weird videos of reported parents of kids laughing and then all of a sudden they do the hyperventilating to cry to go on TV," suggesting that parents of children killed at Sandy Hook were acting.[35]

233.    A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

234.    On information and belief, this episode was also broadcast through Jones's radio affiliates.

235.    The audience for this broadcast has included hundreds of thousands, if not millions, of people.

## November 18, 2016

236.    On November 18, 2016, Jones broadcast a video now advertised on YouTube under the title, "Alex Jones Final Statement on Sandy Hook."[36]

---

[35] https://www.youtube.com/watch?v=KxwnPqwxeag; https://www.mediamatters.org/blog/2016/11/17/trump-ally-alex-jones-doubles-down-sandy-hook-conspiracy-theories/214524.
[36] https://www.youtube.com/watch?v=MwudDfz1yAk.

23

237.    During that video, Jones stated, "I want to reach out to my listeners as well and just clarify where I stand on the reported tragedy at Sandy Hook that took place at that elementary school."

238.    He continued: "For the last three or four years, it's been mainstream media's number-one attack against me to say that I said there was never anyone that actually died there. I've hosted debates against both sides, and I've been criticized by both sides—people that say that no one died there and people who say that the official story is exactly as we've been told. And I've always said that I'm not sure about what really happened, that there's a lot of anomalies and there has been a cover-up of whatever did happen there."

239.    He stated: "There's a few clips Hillary used in her campaign of me out of context saying I can see how people that look at all this evidence say no kids died there and this whole thing is a giant hoax, but at the same time there is some evidence that people died there. They take that out of context and misrepresent it. That's why they're the deceptive corporate media. But for those who do have an attention span for, say, 10 minutes or so, I will present to you the questions. And I'm going to be quite frank, I don't know what really happened. I know there are real mass shootings. I know people lose children. I'm a father. It hurts my heart. So I don't know what the truth is. All I know is the official story of Sandy Hook has more holes in it than Swiss cheese."

240.    Jones rehearsed several of his most commonly employed arguments that the Sandy Hook shooting was staged, including that Anderson Cooper was standing in front of "a blue screen or a green screen," that video was "looped," and that "one of the reported fathers of the victims . . . [was] doing classic acting training."

241.    In closing, Jones said, "This is a tragedy. I wish it never would have happened. But quite frankly, I wish that the official story was true because that's a lot less scary than them staging something like this. But when you think about how they staged [weapons of mass destruction] to kill over a million Iraqis, when you think about all the other hoaxes, all the other lies, all the other rigging, and the way they're freaking out about it and trying to cover up every level of it, it just makes me ask what really happened there?"

242.    The clear implication of these statements is that the accepted account of Sandy Hook—that the plaintiffs lost their loved ones in the shooting—is false, and that the plaintiffs have fabricated their loved ones' deaths.

243.    On information and belief, this episode was also broadcast through Jones's radio affiliates.

244.    The audience for this broadcast has included hundreds of thousands, if not millions, of people.

002649

**November 28, 2016**

245.    On November 11, 2016, plaintiff Erica Lafferty published an op-ed in USA Today asking President-Elect Trump to disavow Alex Jones and other people who falsely assert that the Sandy Hook shooting was a hoax.[37]

246.    In response to the open letter, Infowars broadcasted a five-minute rant by Owen Shroyer, an Infowars "reporter," defending Jones and attacking Lafferty.[38]

247.    Shroyer directly addressed Lafferty, stating, "Your logic [about gun control] failed your mother."

248.    Shroyer directly addressed Lafferty, accusing her of saying, "without any proof," that Alex Jones had said that Sandy Hook was a hoax.

249.    Shroyer stated, "[Jones is] not the one who's denying Sandy Hook ever happened."

250.    These statements were obviously untrue: Alex Jones has denied many times that Sandy Hook ever happened.

251.    Shroyer stated falsely that Lafferty had asserted that then-President-Elect Trump needed to face the death of a loved one.

252.    This statement falsely described Lafferty's appeal to sympathy as if it were a threat on the family of the President-Elect of the United States.

253.    Shroyer repeatedly cited Halbig, saying that he has "done the best reporting" on the Sandy Hook shooting.

254.    He stated to Lafferty, "Why are you butting heads with people [Jones and Halbig] that want to find out the truth of what happened to your mother?"

255.    The truth about Lafferty's mother, Dawn Hochsprung, is that she is dead.

256.    Dawn Hochsprung is dead because, on the morning of December 14, 2012, she sacrificed her life trying to save her students from Adam Lanza's murderous rampage at Sandy Hook Elementary School.

---

[37] Erica Lafferty, *Mr. Trump, denounce Alex Jones : Sandy Hook Principal's Daughter*, USA Today (Nov. 25, 2016), https://www.usatoday.com/story/opinion/2016/11/25/donald-trump-sandy-hook-alex-jones-column/94335420/.
[38] https://www.youtube.com/watch?v=9PdrlrSCLu0.

002650

**March 8, 2017**

257.   On the March 8, 2017 edition of The Alex Jones Show, Jones hosted Eddie Bravo.

258.   During the interview, Bravo stated, "Dr. Steve Pieczenik, and you got some heat for this, this is kind of changing the subject a little bit. Dr. Steve Pieczenik, on your show, said that no kids died at Sandy Hook, that it was a homeland security drill that they passed off as a real—"

259.   Jones stated, "He says that. And I've been hit really hard with it. I can't prove it one way or the other. I know Anderson Cooper is standing up there and turns and his whole nose disappears. I work in TV, I know what a blue screen is, bro."

260.   A reasonable person would understand Jones and Bravo to have been stating that the Sandy Hook massacre was faked, and that the plaintiffs participated in a fraud that was based on lying about the deaths of their loved ones.

261.   On information and belief, this episode was also broadcast through Jones's radio affiliates.

262.   The audience for this broadcast has included hundreds of thousands, if not millions, of people.

**April 22, 2017**

263.   On April 22, 2017, the Alex Jones Show broadcast an episode, also released on YouTube, entitled "Sandy Hook Vampires Exposed."[39]

264.   During that episode, Jones showed video footage of an interview between one of the Sandy Hook parents and Anderson Cooper. Over this footage, Mr. Jones stated: "And then we've got Anderson Cooper, famously, not just with the flowers blowing and a fake, but when he turns, his nose disappears repeatedly because the green-screen isn't set right. And they don't like to do live feeds because somebody might run up. CNN did that in the Gulf War and admitted it. They just got caught two weeks ago doing it in supposedly Syria. And all we're saying is, if these are known liars that lied about WMDs, and lied to get us in all these wars, and backed the Arab Spring, and Libya, and Syria, and Egypt, and everywhere else to overthrow governments, and put in radical Islamicists [sic], if they do that and have blood on their hands, and lied about the Iraq War, and were for the sanctions that killed half a million kids, and let the Islamicists [sic] attack Serbia, and lied about Serbia launching the attack, when it all came out later that Serbia didn't do it, how could you believe any of it if you have a memory? If you're not Dory from 'Finding Dory,' you know, the Disney movie. Thank god you're so stupid, thank god you have no memory. It all goes back to that."

265.   Jones told his audience that they should not "believe any of it."

---

[39] https://www.youtube.com/watch?v=rUn1jKhWTXI.

266.    As discussed throughout this complaint, the "faked" Anderson Cooper interview is one of Jones's favorite arguments that the entire Sandy Hook massacre was fabricated and that the plaintiffs were actors who faked their loved ones' deaths.

267.    During the April 22, 2017 broadcast, Jones and an Infowars producer made other statements rehearsing familiar themes from the defendants' campaign of lies and abuse.

268.    In conversation with the producer, Jones stated: "And that's on helicopter footage, and then they say it never existed, and later admit it does, and the school was closed until that year, in the videos it's all rotting and falling apart and nobody is even in it, and the kids are going in circles, in and out of the building with their hands up, and they never called rescue choppers. I mean, exactly."

269.    The Infowars producer responded: "There's some supposed dash footage where the people are smiling and getting their lunches ready, police officers. You think you're going to have smiling police officers at a time when they're supposedly bringing out twenty dead kids? And they're smiling and getting their lunches ready."

270.    Mr. Jones responded: "And they had Port-A-Potties being delivered an hour after it happened, for the big media event."

271.    The Infowars producer responded: "We've never seen, there was never been any even blurred photos of any bodies or anything . . . . We didn't even get blurred images with the dead kids in Syria. We got crisp photos."

272.    Especially knowing the defendants' previous statements, a reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones. A reasonable person would also understand the defendants to be stating that the plaintiffs were "Sandy Hook Vampires."

### April 28, 2017

273.    On April 28, 2017, Jones held a press conference in which he was asked if he believes that Sandy Hook was a "false flag." Jones stated: "I think we should investigate everything because the government has staged so much stuff, and then they lie and say that I said the whole thing was totally fake when I was playing devil's advocate in a debate. I said maybe the whole thing is real, maybe the whole thing is fake. They were using blue screens out there . . . . Yes, governments stage things."[40]

274.    Especially knowing the defendants' previous statements, a reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

---

[40] https://www.youtube.com/watch?v=StOyqyt0fkY.

27

002652

## June 13, 2017

275.    On June 13, 2017, Jones posted a video to the InfoWars Facebook page in which he once again rehearsed his lie about the "faked" CNN interview. Jones stated: "But there's been a cover-up. Anderson Cooper got caught, faking where his location was with blue-screen. I mean, it's all there."[41]

276.    Especially knowing the defendants' previous statements, a reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

### The Megyn Kelly Interview

#### *The Preview*

277.    On June 11, 2017, television news personality Megyn Kelly interviewed Jones for her weekly news magazine on NBC News.

278.    NBC released a preview of the interview on the internet on the following day.

279.    In footage contained in the preview, Jones stated, "Well, Sandy Hook's complex because I have had debates where, we devil's advocates have said the whole story is true, and then I have had debates where I have said that none of it is true."

280.    Later, Kelly stated, "When you say parents faked their children's deaths, people get very angry."

281.    In response, Jones asserted that people do not get angry about the deaths that resulted from the sanctions against Iraq or other tragedies in the world, and complained about the media's coverage of such events. He did not deny claiming that the plaintiff parents faked their children's deaths.

282.    Kelly stated, "That doesn't excuse what you did and said about Newtown, and you know it."

283.    Jones stated, "Here's the difference. I looked at all the angles of Newtown, and I made my statements long before the media even picked up on it."

284.    The most reasonable interpretation of this statement is that Jones was saying that his account—in which he repeatedly stated that the shooting was staged, that parents were actors, and that no children were killed—was more reliable than the established media account, and true.

285.    These statements were heard by millions of people.

---

[41] https://www.facebook.com/80256732576/videos/10155465593882577/.

002653

*June 15, 2017 – Infowars*

286.   During a video released on Infowars on June 15, 2017, Jones stated the following about his interview with Megyn Kelly: "She said things like, 'Oh, you talked about Newtown not happening and hurt people's feelings,' and I explained, 'No I looked at all different angles, [unintelligible] could have happened, but they staged the WMDs in Iraq and they staged the babies in the incubators, so they've lied about babies before . . . I said, they've staged babies in incubators in Bush I, and then they did it again . . . so it could've been staged, because they stage things.'"

287.   Especially knowing the defendants' previous statements, a reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

288.   The audience for this broadcast has included hundreds of thousands, if not millions, of people.

### Alex Jones's June 18, 2017 Pre-NBC-Broadcast Programming

289.   The final version of Jones's interview with Megyn Kelly aired on NBC News on June 18, 2017.

290.   Before the interview aired that day, Jones published several pre-show videos on Infowars.

291.   During those videos, he made repeated statements suggesting that the Sandy Hook shooting did not happen and/or that the plaintiffs' loved ones did not die there.

A.   In one, he said, "But I'm looking at it I think Newtown did happen. But I'm not the creator of people questioning Newtown and Sandy Hook. My guests covered it, I've covered it."

B.   Later, he said, "My intel is that I've seen the parents and it looked real to me. If I can't prove something one hundred percent I'm not going to go there. We know governments have staged things and you have a right to question it."

C.   He continued, "But you have the total right to question Sandy Hook. You know, I'm tempted to make a documentary about it, just for my own hellish experience. It's like the babies in the incubators . . . none of it was true."

D.   He added, "No, I've been saying since it happened that I don't know whether the official story's true or not. And now you can't prove it one way or the other there's some anomalies. But the parents look pretty legitimate to me."

E.   While interspersed with vacillations, Jones's statements convey a clear message: that the accepted account of the Sandy Hook shooting—that the

29

plaintiffs lost their loved ones there—is untrue, and that the plaintiffs fabricated the deaths of their loved ones. Of special note was his abnormal and "official" tone, which a reasonable person knowing Jones's show would interpret as a "wink" at his audience.

292.    Later that day, Jones hosted Dr. Steve Pieczenik as a guest on his program.

293.    As discussed in paragraphs 123 through 128 of this complaint, Pieczenik had stated in a previous appearance on Jones's show that no children died at Sandy Hook and that the parents were actors.

294.    In introducing Pieczenik on this occasion, Jones stated, "He's a smart guy, he doesn't buy into what happened, reportedly there in Newtown I personally can't prove it one way or the other so I'm just going to say that my heart goes out to the families and I believe it happened."

295.    During his appearance on the show, Pieczenik said, "All the hedge fund owners . . . left down to Miami thanks to Dan Malloy and Sandy Hook. So every one of these paid [Sandy Hook] parents, whoever they may be, are totally, totally disingenuous."

296.    In response to Pieczenik's statement, Jones said, in his abnormal, "official" tone, "All I know is that they've staged fake things before."

297.    A reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

298.    These statements were heard by hundreds of thousands, if not millions of people.

### The June 18, 2017 NBC Broadcast

299.    During the interview with Kelly that aired on NBC, Jones made several additional statements suggesting that the shooting never happened.

300.    At one point, Kelly read Jones's previous statement describing the Sandy Hook shooting as a hoax, recounted in paragraphs 171 through 179 of this complaint.

301.    In response, Jones stated, "At that point—and I do think there was some cover up and some manipulation—that is pretty much what I believed. But then I was also going into devil's advocate, but then we know there's mass shootings and these things happen. So again—"

302.    Later, Kelly said, "If you wrongly went out there and said it was a hoax. That's wrong."

303.    In response, Jones said, "But what I already answered your question was—listeners and other people are covering this—I didn't create that story."

30

304.     Later, Kelly stated, "But Alex, the parents—one after the other—devastated. The dead bodies that the coroner autopsied."

305.     In response, Jones said, "And they blocked all that and they won't release any of it. That's unprecedented—"

306.     Later, Kelly asked Jones if he was playing "devil's advocate" when he said "the whole thing is a giant hoax."

307.     Jones responded, "Yes, because I remember in, even that day— I will go back for memory—them saying but then some of it looks like it's real. But what do you do when they got the kids going in circles in and out of the building with their hands up. I've watched the footage and it looks like a drill."

308.     Even in that statement, while claiming—falsely—that he was playing "devil's advocate" when making those previous statements, Jones again asserted that the Sandy Hook shooting did not happen.

309.     Next, Kelly said, "When you say parents faked their children's deaths, people get very angry."

310.     Jones responded, "Oh, I know—but they don't get angry about the half million that Iraq from the sanctions or the don't get angry about all the legal—"

311.     Later, Kelly said, "That doesn't excuse what you did and said about Newtown, you know it."

312.     Jones responded, "Here's the difference, here's the difference—I looked at all the angles of Newtown and I made my statements long before the media even picked up on it."

313.     In a voiceover, Kelly than noted that Jones, despite being "asked . . . numerous times what he now believes . . . never completely disavowed his previous statements."

314.     It then played clip of Jones saying, "I tend to believe that children probably did die there, but then you look at all the evidence on the other side, I can see how other people believe nobody died there."

315.     There is no evidence "on the other side."

316.     A reasonable person would understand Jones's statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

317.     More than three million people saw and heard these statements by Jones.

002656

*Alex Jones's June 18, 2017 Counter-Programming*

318.     Meanwhile, as the interview played on NBC, Jones himself was broadcasting a live play-by-play video commentary on Infowars.

319.     The Sandy Hook segment of the NBC interview began with a Megyn Kelly voiceover describing Jones's statements that Sandy Hook was a hoax. As the voiceover played, Jones said, "Babies in the incubators."

320.     As evidenced by statements recounted previously in this complaint, "babies in the incubators" is a well-established Alex Jones metonym for a staged event.

321.     This statement is properly interpreted as a reiteration and reaffirmation of Jones's previous statements that the Sandy Hook shooting was staged and that no children died there.

322.     Later, as his statement that he "looked at all the angles of Newtown" in the NBC interview played in the background, Jones said, "I said I thought it happened before they were picked up. They never showed my final analysis."

323.     This statement appears to be an admission that Jones never actually believed that Sandy Hook was a hoax, even as he maintained unequivocally that it was.

324.     On information and belief, these statements were also broadcast on Alex Jones's radio affiliates.

325.     Hundreds of thousands, if not millions, of people heard these statements.

*June 26, 2017*

326.     During the June 18, 2017 profile of Jones for her NBC show Sunday Night with Megyn Kelly, Ms. Kelly interviewed one of the Sandy Hook parents, Neil Heslin, about the claims made by Jones, including that "the whole thing was fake" and "a giant hoax." Addressing Jones's lies, Heslin told Kelly, "I lost my son. I buried my son. I held my son with a bullet hole through his head."

327.     On June 26, 2017, Infowars broadcast a segment hosted by "reporter" Owen Shroyer in which Shroyer claimed to have reviewed evidence showing it was impossible for Mr. Heslin to have held his son and seen his injury. This broadcast was meant to reinforce and support the underlying lie that the Sandy Hook parents are fakes.[42]

328.     Shroyer stated: "The statement [Heslin] made, fact-checkers on this have said cannot be accurate. He's claiming that he held his son and saw the bullet hole in his head. That is his claim. Now, according to a timeline of events and a coroner's testimony, that is not possible."

---

[42] https://www.infowars.com/zero-hedge-discovers-anomaly-in-alex-jones-hit-piece/.

002657

329.    Shroyer's support for this statement was video footage in which the local medical examiner informed reporters that the slain students were initially identified using photographs rather than in person. However, the Sandy Hook parents were permitted to see and hold their children soon thereafter.

330.    Shroyer stated: "You would remember if you held your dead kid in your hands with a bullet hole. That's not something you would just misspeak on." He continued, noting that Heslin was "making a pretty extreme claim that would be a very thing vivid in your memory, holding his dead child."

331.    Shroyer then stated: "The conspiracy theorists on the internet out there have a lot of questions that are yet to be answered. You say whatever you want about the event, that's just a fact."

332.    In concluding his report, Shroyer stated: "Will there be a clarification from Heslin or Megyn Kelly? I wouldn't hold your breath. [Laugh]. So now they're fueling the conspiracy theory claims. Unbelievable."

333.    A reasonable person would understand these statements, including the title of the embedded video, to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones.

334.    These statements were heard by at least tens of thousands, if not millions, of people.

335.    On information and belief, the defendants have published other similar statements of which the plaintiffs do not know at this time, but would obtain with reasonable discovery.

## COUNT ONE – Invasion of Privacy by False Light; Civil Conspiracy
**(Jacqueline Barden, Mark Barden, Jennifer Hensel, Ian Hockley, Nicole Hockley, Erica Lafferty, Jeremy Richman, Carlos M. Soto, Donna Soto, Jillian Soto, Carlee Soto-Parisi, David Wheeler, Francine Wheeler, & William Aldenberg v. All Defendants)**

336.    All previous allegations in this complaint are incorporated as if fully set forth herein.

337.    The defendants, as part of a campaign of harassment and abuse, broadcast numerous outrageous lies about the plaintiffs that represented such major misrepresentations of the plaintiffs' character, history, activities or beliefs that serious offense may reasonably be expected to be taken by a reasonable person in their position.

338.    The false light in which the defendants' statements placed the plaintiffs would be highly offensive to a reasonable person.

339.    The defendants had knowledge that their statements were lies, or acted with reckless disregard as to the falsity of their statements and the false light in which the plaintiffs

002658

would be placed.

340.     These false publications have caused the plaintiffs actual and substantial damages.

341.     In light of their prior experience with similar sorts of reckless and false statements, the defendants knew that their publications could cause the plaintiffs to suffer harassment and potential violence.

342.     The plaintiffs are private individuals and are neither public officials nor public figures.

343.     The defendants broadcast their outrageous, cruel, and malicious lies about the plaintiffs with knowledge that the statements were false or with reckless disregard as to whether or not they were true.

344.     The defendants combined to conduct their campaign of harassment and abuse, which included numerous unlawful acts or lawful acts by unlawful means.

345.     The defendants combined to perform these unlawful acts pursuant to their scheme to harass and abuse the plaintiffs and in furtherance of that scheme.

346.     These acts of the defendants resulted in damage to the plaintiffs.

### COUNT TWO – Defamation and Defamation *per se*; Civil Conspiracy
**(Jacqueline Barden, Mark Barden, Jennifer Hensel, Ian Hockley, Nicole Hockley, Erica Lafferty, Jeremy Richman, Carlos M. Soto, Donna Soto, Jillian Soto, Carlee Soto-Parisi, David Wheeler, Francine Wheeler, & William Aldenberg v. All Defendants)**

347.     All previous allegations in this complaint are incorporated as if fully set forth herein.

348.     In repeatedly publishing false statements asserting or reasonably understood to be asserting that the plaintiffs' loved ones did not die; and/or that the episode in which they were killed was staged or their loved ones were still alive; and/or the plaintiffs were actors who faked their loved ones' deaths; the defendants published numerous defamatory statements.

349.     These publications were not only individually defamatory, but part of a continuous campaign of statements, starting in 2013 and continuing through at least 2017, stating, asserting, implying and suggesting that the plaintiffs faked their loved ones' deaths and/or are actors lying about the deaths of their loved ones.

350.     The statements contained in the defendants' campaign of harassment and abuse constitute defamation *per se*. The harmful nature of the defamatory statements is self-evident. The defamatory statements implicate the Plaintiffs in heinous criminal conduct. False implications of criminal conduct represent classic defamation *per se*.

002659

351.    The defendants' defamatory publications readily identified the plaintiffs to millions of people.

352.    The defendants' defamatory publications were broadcast to millions of people.

353.    The defendants' defamatory publications have injured the plaintiffs' reputations and images, and they have exposed the plaintiffs to public and private hatred, contempt, and ridicule. These false publications have caused the plaintiffs actual and substantial damages.

354.    In light of their prior experience with similar sorts of reckless and false statements, the defendants knew that their publications could cause the plaintiffs to suffer harassment and potential violence.

355.    The plaintiffs are private individuals and are neither public officials nor public figures.

356.    The defendants broadcast their outrageous, cruel, and malicious lies about the plaintiffs with knowledge that the statements were false or with reckless disregard as to whether or not they were true.

357.    The defendants combined to conduct their campaign of harassment and abuse, which included numerous unlawful acts or lawful acts by unlawful means.

358.    The defendants combined to perform these unlawful acts pursuant to their scheme to harass and abuse the plaintiffs and in furtherance of that scheme.

359.    These acts of the defendants resulted in damage to the plaintiffs.

**COUNT THREE – Intentional Infliction of Emotional Distress; Civil Conspiracy**
**(Jacqueline Barden, Mark Barden, Jennifer Hensel, Ian Hockley, Nicole Hockley, Erica Lafferty, Jeremy Richman, Carlos M. Soto, Donna Soto, Jillian Soto, Carlee Soto-Parisi, David Wheeler, Francine Wheeler, & William Aldenberg v. All Defendants)**

360.    All previous allegations in this complaint are incorporated as if fully set forth herein.

361.    In broadcasting their campaign of outrageous and false statements about the plaintiffs, the defendants intended to inflict emotional distress or knew, or should have known, that emotional distress was the likely result of their conduct.

362.    The defendants' conduct was extreme and outrageous.

363.    The defendants' conduct was the cause of the plaintiffs' distress.

364.    The emotional distress sustained by the plaintiffs was severe.

002660

365.     The defendants' conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

366.     In light of their prior experience with similar sorts of false and reckless statements, the defendants knew that their publications could cause the plaintiffs to suffer harassment and potential violence.

367.     The plaintiffs have suffered actual and substantial damages.

368.     The plaintiffs are private individuals and are neither public officials nor public figures.

369.     The defendants broadcast their outrageous, cruel, and malicious lies about the plaintiffs with knowledge that the statements were false or with reckless disregard as to whether or not they were true.

370.     The defendants combined to conduct their campaign of harassment and abuse, which included numerous unlawful acts or lawful acts by unlawful means.

371.     The defendants combined to perform these unlawful acts pursuant to their scheme to harass and abuse the plaintiffs and in furtherance of that scheme.

372.     These acts of the defendants resulted in damage to the plaintiffs.

### COUNT FOUR – Negligent Infliction of Emotional Distress; Civil Conspiracy
**(Jacqueline Barden, Mark Barden, Jennifer Hensel, Ian Hockley, Nicole Hockley, Erica Lafferty, Jeremy Richman, Carlos M. Soto, Donna Soto, Jillian Soto, Carlee Soto-Parisi, David Wheeler, Francine Wheeler, & William Aldenberg v. All Defendants)**

373.     All previous allegations in this complaint are incorporated as if fully set forth herein.

374.     The defendants' campaign of outrageous, cruel, and malicious lies created an unreasonable risk of causing the plaintiffs emotional distress.

375.     The plaintiffs' distress was foreseeable.

376.     The plaintiffs' emotional distress was severe enough that it might result in illness or bodily harm.

377.     The defendants' outrageous, cruel, and malicious conduct was the cause of the plaintiff's distress.

378.     The plaintiffs have suffered actual and substantial damages.

002661

379.   In light of their prior experience with similar sorts of reckless and false statements, the defendants knew that their publications could cause the plaintiffs to suffer harassment and potential violence.

380.   The plaintiffs are private individuals and are neither public officials nor public figures.

381.   The defendants broadcast their outrageous, cruel, and malicious lies about the plaintiffs with knowledge that the statements were false or with reckless disregard as to whether or not they were true.

382.   The defendants combined to conduct their campaign of harassment and abuse, which included numerous unlawful acts or lawful acts by unlawful means.

383.   The defendants combined to perform these unlawful acts pursuant to their scheme to harass and abuse the plaintiffs and in furtherance of that scheme.

384.   These acts of the defendants resulted in damage to the plaintiffs.

## COUNT FIVE: Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a *et seq.* (Jacqueline Barden, Mark Barden, Jennifer Hensel, Ian Hockley, Nicole Hockley, Erica Lafferty, Jeremy Richman, Carlos M. Soto, Donna Soto, Jillian Soto, Carlee Soto-Parisi, David Wheeler, Francine Wheeler, & William Aldenberg v. All Defendants)

385.   All previous allegations in this complaint are incorporated as if fully set forth herein.

386.   The defendants unethically, oppressively, immorally, and unscrupulously developed, propagated, and disseminated outrageous and malicious lies about the plaintiffs and their family members, and they did so for profit.

387.   This campaign of lies, abuse, and harassment was a deceptive practice and offended public policy.

388.   The defendants' reprehensible conduct caused substantial injury to the plaintiffs and other consumers that is not outweighed by any countervailing benefits to anyone, and that the plaintiffs themselves could not have reasonably avoided.

389.   The defendants' conduct was a foreseeable cause of and a substantial factor causing the plaintiffs' injury.

390.   The plaintiffs are private individuals and are neither public officials nor public figures.

391.   The defendants broadcast their outrageous, cruel, and malicious lies about the plaintiffs with knowledge that the statements were false or with reckless disregard as to whether

002662

or not they were true.

392.   The defendants combined to conduct their campaign of harassment and abuse, which included numerous unlawful acts or lawful acts by unlawful means.

393.   The defendants combined to perform these unlawful acts pursuant to their scheme to harass and abuse the plaintiffs and in furtherance of that scheme.

394.   These acts of the defendants resulted in damage to the plaintiffs.

WHEREFORE, THE PLAINTIFFS CLAIM DAMAGES IN EXCESS OF FIFTEEN THOUSAND DOLLARS AND THE FOLLOWING RELIEF AS FURTHER SET FORTH BELOW:

Plaintiffs seek relief as follows:

A.   Monetary damages;

B.   Punitive damages;

C.   Attorneys' fees;

D.   Costs;

E.   Declarative relief;

This matter is within the jurisdiction of this court.

002663

Of this writ, with your doings thereon, make due service and return.

Dated at Bridgeport, Connecticut this 23rd day of May, 2018.

THE PLAINTIFFS,

By     _____

WILLIAM M. BLOSS
MATTHEW S. BLUMENTHAL
KOSKOFF KOSKOFF & BIEDER
350 FAIRFIELD AVENUE
BRIDGEPORT, CT  06604
PHONE: (203) 336-4421
FAX:   (203) 368-3244
wbloss@koskoff.com
mblumenthal@koskoff.com
JURIS #32250

002664

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

IN RE:                                             §                    Case No. 22-60043
                                                       §
FREE SPEECH SYSTEMS, LLC,             §                    Chapter 11 (Subchapter V)
                                                       §
         Debtor.                                  §

# EXHIBIT 2

RETURN DATE: JULY 24, 2018          :          JUDICIAL DISTRICT
                                    :
WILLIAM SHERLACH                    :          OF FAIRFIELD
                                    :
v.                                  :          AT BRIDGEPORT
                                    :
ALEX JONES, ET AL.                  :          JULY 2, 2018

## COMPLAINT

## INTRODUCTION

1.      This is a civil action for damages leading from the mass shooting that happened at Sandy Hook Elementary School on December 14, 2012.

2.      Just before 9:30 AM that morning, Adam Lanza shot his way into the locked school with a Bushmaster XM15-E2S.

3.      In less than five minutes, he shot and killed 20 first-grade children and 6 adults. Two others were wounded.

4.      That tragic day left behind 26 families that will never be whole again.

5.      Every day since, those families have struggled to reconcile themselves with the irrevocable loss of their beloved sons, daughters, sisters, brothers, and mothers.

6.      Even though overwhelming—and indisputable—evidence exists showing exactly what happened at Sandy Hook Elementary School on December 14, 2012, certain individuals have persistently perpetuated a monstrous, unspeakable lie: that the Sandy Hook shooting was staged, and that the families who lost loved ones that day are actors who faked their relatives' deaths.

7.      Defendant Alex Jones is a conspiracy-theorist radio and internet personality who holds himself out as a journalist. He is the most prolific among those fabricators. But he does not work alone: along with his various business entities, Jones is the chief amplifier for a group that has worked in concert to create and propagate loathsome, false narratives about the Sandy Hook shooting and its victims, and promote their harassment and abuse.

8.      Jones, along with these others, has persisted in the perpetuation and propagation of this outrageous, deeply painful, and defamatory lie in the face of a mountain of evidence to the contrary, and with no supporting evidence.

9.      Alex Jones does not in fact believe that the Sandy Hook Shooting was a hoax—and he never has.

1

002666

10. Nevertheless, time and again, Jones has accused Sandy Hook families, who are readily identifiable, of faking their loved ones' deaths, and insisted that the children killed that day are actually alive.

11. Jones has deliberately employed these false narratives about the Sandy Hook shooting, the victims, and their families as part of a marketing scheme that has brought him and his business entities tens of millions of dollars per year.[1]

12. Jones has an audience of millions. He has repeatedly urged them to "investigate" the Sandy Hook shooting. He has purposely published statements by other people who falsely assert that the Sandy Hook shooting was a hoax.

13. As a result of Jones's campaign, the families and survivors of the Sandy Hook shooting have been forced to endure malicious and cruel abuse at the hands of ruthless and unscrupulous people.

14. On a regular basis, the families and survivors have faced physical confrontation and harassment, death threats, and a sustained barrage of harassment and verbal assault on social media.

15. They have confronted strange individuals videotaping them and their children.

16. Some of them have moved to undisclosed locations to avoid this harassment.

17. The plaintiff brings this action in defense of the values protected by the First Amendment to the U.S. Constitution, not in derogation of it.

18. Like any marketplace, the marketplace of ideas that the First Amendment was meant to protect cannot function properly without accountability for reprehensible conduct like the defendants'. In fact, the defendants themselves have proven this to be so by their successful propagation of the blatantly false and harmful aspersions described in this Complaint.

19. The First Amendment has never protected demonstrably false, malicious statements like the defendants'. This is because "there is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances society's interest in 'uninhibited, robust and wide-open' debate on public issues."[2]

---

[1] See Seth Brown, *Alex Jones's Media Empire Is a Machine Built to Sell Snake-Oil Diet Supplements*, N.Y. MAG. (May 4, 2017), http://nymag.com/selectall/2017/05/how-does-alex-jones-make-money.html; Alex Seitz-Wald, *Alex Jones: Conspiracy, Inc.*, SALON (May 2, 2013), https://www.salon.com/2013/05/02/alex_jones_conspiracy_inc/.

[2] *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340 (1974) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)). While the Supreme Court has afforded "a measure of strategic protection" to certain kinds of falsehoods to ensure that speech protected by the First Amendment has "the breathing space to survive," it has never wavered in its determination that falsehoods have no First Amendment value. *Id.* at 342. None of the Court's protective doctrines interfere with the plaintiff's claims in this case.

2

002667

20.     This lawsuit is about holding Jones and the other defendants accountable for the effects of their outrageous, malicious, and deeply hurtful lies.

## PARTIES

21.     The plaintiff, William Sherlach, is the spouse of Mary Sherlach, who was a 56 year old school psychologist killed at Sandy Hook Elementary School, in Newtown, Connecticut, on December 14, 2012. He resides in Fairfield County, Connecticut.

22.     The defendants are out-of-state business entities and individuals residing in Connecticut, Texas, and Florida.

23.     Defendant Alex Emric Jones ("Alex Jones" or "Jones") is a radio and internet personality who holds himself out as a journalist and is a resident of Austin, Texas. He is the host of shows including "The Alex Jones Show," and owns and operates the websites Infowars.com and PrisonPlanet.com. Jones's shows have millions of weekly listeners and are syndicated on approximately 60 radio stations.

24.     Defendant Infowars, LLC ("Infowars") is a Texas limited liability company that produces and broadcasts Alex Jones' Infowars, which holds itself out as a news and journalism platform. Its principal offices are located at 100 Congress Avenue, 22nd Floor, Austin, Texas 78701.

25.     Defendant Free Speech Systems, LLC is a Texas limited liability company. It owns Infowars.com. Its principal offices are located at 100 Congress Avenue, 22nd Floor, Austin, Texas 78701.

26.     Defendant Infowars Health LLC is a Texas limited liability company. Its principal offices are located at 100 Congress Avenue, 22nd Floor, Austin, Texas 78701.

27.     Defendant Prison Planet TV LLC is a Texas limited liability company. Its principal offices are located at 100 Congress Avenue, 22nd Floor, Austin, Texas 78701.

28.     All the above-mentioned Texas business-entity defendants are owned, controlled, and/or operated by defendant Alex Jones and are employed to hold and generate revenue for him. They and Jones shall hereinafter be referred to collectively as "the Jones defendants."

29.     Defendant Wolfgang Halbig holds himself out as a journalist and investigator and resides in Sorrento, Florida. He is the creator and operator of the defamatory and predatory websites SandyHookJustice.com and MonteFrank.com.

30.     Defendant Cory T. Sklanka holds himself out as a journalist and investigator and resides in Meriden, Connecticut. He has worked closely with Halbig in Halbig's Sandy Hook "investigative" work, including acting as driver and camera operator when Halbig has visited Connecticut to conduct those activities, and, on information and belief, participating in the operation of SandyHookJustice.com and co-hosting Sandy Hook Justice broadcasts.

002668

31.     Defendant Genesis Communications Network, Inc., is a privately held company incorporated in Minnesota. It distributes radio programs produced by Alex Jones and Infowars, and was founded by Ted Anderson, who has appeared many times on Jones's shows, to promote his other business, defendant Midas Resources.[3] Its principal offices are located at 190 Cobblestone Lane, Burnsville, Minnesota, 55337.

32.     Defendant Midas Resources, Inc., is a privately held company incorporated in Minnesota. Its principal offices are located at 190 Cobblestone Lane, Burnsville, Minnesota, 55337. It has sold precious metals, dietary supplements, and other items as advertised by and in cooperation with defendant Genesis Communications and the Jones defendants.[4]

### THE DEFENDANTS' KNOWLEDGE, ASPIRATIONS, AND INFLUENCE

33.     Jones has a radio audience of more than two million people. The Alex Jones Show is syndicated on more than 60 radio stations. On the internet, Jones and Infowars reach millions more. Jones's YouTube channel has more than 2.3 million subscribers.

34.     Jones has repeatedly expressly stated that he aspires to spur his followers to action, and has acknowledged that his exhortations have that effect. This is especially true with regard to the Sandy Hook shooting.

35.     For instance, on June 12, 2017, The Alex Jones Channel posted a video. Speaking of his interview with Megyn Kelly on NBC and specifically about Sandy Hook, Jones stated, "That's why you keep missing the main calculation. I am a precision-guided heavy munition coming in on top of you . . . . So I hit the barbed wire, and everyone comes in over me. Have you seen what we've done how talk radio now sounds just like me . . . . Have you seen how the whole paradigm is globally shifting and you can't hold it back?"

36.     Later in the video, Jones stated, "I'm making it safe for everyone else to speak out just like Trump's doing, on a much bigger scale."

37.     Jones has not just attempted to give his followers permission to question reality. He also has specifically urged them to action.

38.     His followers have shown themselves ready to comply.

39.     On November 27, 2016, for instance, Jones spoke at length about "Pizzagate," a baseless conspiracy theory alleging that Democratic operatives were running a child-sex ring out of a Washington, D.C. pizza restaurant. He urged his followers to "investigate" the matter.

40.     "You have to go investigate it for yourself," he told them. "But I will warn you, this story that's been the biggest thing on the internet for several weeks, Pizzagate as it's called, is

---

[3] https://www.youtube.com/watch?v=M-aQntV8meQ; Nate Blakeslee, *Alex Jones Is About to Explode*, TEX. MONTHLY (Mar. 2010) https://www.texasmonthly.com/politics/alex-jones-is-about-to-explode/.
[4] *Id.*

4

a rabbit hole that is horrifying to go down . . . . Something's going on. Something's being covered up. This needs to be investigated."

41.   Jones's followers came running to his call, as he knew they would.

42.   The pizzeria received hundreds of threats. Its owner told *The New York Times*, "[W]e've come under constant assault. I've done nothing for days but try to clean this up and protect my staff and friends from being terrorized."

43.   The owner and staff, along with some of their families, were harassed on social media websites. The owner received death threats. Even musical groups that had performed at the pizzeria and nearby businesses were harassed.

44.   On December 4, 2016, Edgar Maddison Welch, a self-described Alex Jones follower, drove from Salisbury, North Carolina, to Washington, D.C., and fired three rounds into the pizzeria with an AR-15-style rifle.

45.   Welch told police that his objective was to "self-investigate" the Pizzagate conspiracy theory. In fact, just days before embarking on his violent "self-investigation," Welch urged a friend to watch "PIZZAGATE: The Bigger Picture," an Infowars video.

46.   Shortly thereafter, Jones removed his November 27, 2016 video and scrubbed references to his advocacy of the Pizzagate conspiracy theory.

47.   Similarly, many of the persons who have directly harassed or abused Sandy Hook families have been motivated by Jones's urging that his listeners "investigate."

48.   In 2017, a Florida woman was sentenced to prison for threatening the father of a child killed at Sandy Hook.

49.   She made four voicemail and email threats to the father, with statements like "you gonna die, death is coming to you real soon" and "LOOK BEHIND YOU IT IS DEATH."

50.   The woman's defense lawyer stated that she was primarily motivated by what she had read and seen on Infowars.com, Jones's website.

51.   On numerous occasions, Jones has hosted on his show Wolfgang Halbig, a self-styled investigator who is amongst the most prominent of those people who falsely claim that the Sandy Hook shooting was a hoax.

52.   Halbig is a 70-year-old former police officer and school administrator living in Florida. He has made more than 22 trips to Connecticut relating to the allegations of this Complaint, including delivering highly confrontational testimony before the Newtown Board of Education, and was warned by police that he would be charged with harassment unless he ceased contacting Newtown residents.

002670

53.     Defendant Sklanka has facilitated Halbig's harassing and defamatory activities in Connecticut. He has acted as Halbig's driver, camera operator, helped Halbig operate his website, and co-hosted broadcasts asserting that the Sandy Hook shooting was a hoax. On information and belief, Sklanka assisted and was present with Halbig when he filmed and harassed children families at the St. Rose of Lima church in Newtown, Connecticut on June 2, 2015.

54.     Kevin Laprade, an Infowars videographer, accompanied Halbig on at least some of his "investigative" trips to Connecticut.[5]

55.     Halbig has filed numerous Freedom of Information Act requests over the years since the shooting, seeking police documents, insurance claims, portable toilet orders, and other types of information.

56.     Halbig has raised more than $100,000, largely on GoFundMe.com, for his activities.

57.     Tiffany Moser helped Halbig search Newtown Board of Education documents for evidence that the school was closed before the shooting. When she reported that all the evidence indicated that the school had been open, Halbig dismissed her.

58.     Halbig was banned from St. Rose of Lima, a Newtown church, after he and others were seen videotaping children entering and exiting the building. On information and belief, Sklanka participated in this venture.

59.     In May 2014, Halbig spoke at a public meeting of the Newtown Board of Education, in Newtown, Connecticut.

60.     After the meeting, Leonard Pozner emailed Halbig, seeking to persuade him to leave the Sandy Hook families alone. Halbig never responded, but another person did. He stated: "Wolfgang does not wish to speak with you unless you exhume Noah's body and prove to the world you lost your son."

61.     Halbig's activities were well known when he first appeared on the Alex Jones Radio Show, and throughout the times during which Jones hosted his appearances; in fact, Jones invited and hosted him on his show, time and again, precisely because of his activities.

62.     On his show, Jones expressly encouraged Halbig to continue these activities on numerous occasions.

63.     During that broadcast of the Alex Jones Radio Show, Jones repeatedly advertised Halbig's website, sandyhookjustice.com.

64.     Halbig's website made numerous false, outrageous, and defamatory statements about the Sandy Hook families.

---

[5] https://www.facebook.com/mert.melfa/videos/539807396217619/.

002671

A. For instance, the website accused Jeremy Richman, father of Avielle Richman, who was murdered at Sandy Hook Elementary School on December 14, 2012, of having fabricated his daughter's identity and faked her death "to steal money from hard-working Americans." Those false and outrageous accusations were accompanied by pictures of Jeremy, Avielle, and an unrelated Newtown child.

B. Halbig's website further stated that "Jeremy Richman & Jennifer Hensel continue to deceive and defraud the American public and collect donations for The Avielle Foundation, for Avielle Richman claiming she is dead, when in reality, she is alive and was never their daughter." It further stated: "The corruption, fraud, and treason must stop, especially at the Bridgeport, Connecticut Law Firm of Pullman & Comley LLC, managers of the My Sandy Hook Family Fund, actively engaging in FRAUD by soliciting donations from the public for a murder victim who is still alive." [6]

C. Halbig's website contained links to numerous Infowars and/or Alex Jones videos claiming that the Sandy Hook shooting was a hoax, as well as videos that contained imagery and the names of some of the children. [7]

D. It also published images, text, and video asserting that William Aldenberg and David Wheeler are in fact the same person, who is a crisis actor.

E. Faced with invasion-of-privacy lawsuits, Halbig took down his website in August 2016. However, he has continued to publish false, malicious, and defamatory statements regarding the Sandy Hook shooting and its victims continually through Facebook, email, and various radio and internet media outlets.

65.    Halbig has also published Facebook posts containing images and text asserting that William Aldenberg and David Wheeler are in fact the same person, and that person is a crisis actor. [8] His Facebook page continues to display those publications.

66.    Jones was aware that Halbig had published such statements through his website and other outlets. In fact, Jones brought Halbig onto his shows for the very purpose of eliciting and publishing such statements.

---

[6] https://web.archive.org/web/20160322115755/http://sandyhookjusticereport.com:80/monte-frank/avielle-richman-1-20-students-supposedly-died-sandy-hook-school-shooting-verified-28-year-veteran-forensic-expert-witness-girl-photos-lenie-urbina/.

[7] https://web.archive.org/web/20150731014342/http://www.sandyhookjustice.com:80/.

[8] *See, e.g.*, https://www.facebook.com/wolfgang.halbig.1/posts/196562527355324; https://www.facebook.com/wolfgang.halbig.1/posts/195439914134252.
https://www.facebook.com/photo.php?fbid=196561627355414&set=pb.100010047343967.-2207520000.1526661423.&type=3&theater.

002672

67. In addition to hosting Halbig on his show time and again, Jones specifically directed and encouraged Halbig to continue his Sandy-Hook-related activities in Connecticut. Jones and other Infowars personnel specifically solicited that their audience contribute funds to Halbig so that he could continue his efforts.

68. In fact, Jones and Infowars sent Infowars personnel to Connecticut to conduct live "reporting" on Halbig's activities and publish his false, defamatory, and outrageous accusations about the plaintiff.

69. For instance, on May 29, 2015, The Alex Jones Channel published an Infowars video, now posted on YouTube with the title "School Administrator Exposes Sandy Hook Stonewall."[9]

70. The video was introduced by David Knight. The video then cut to Dan Bidondi, an Infowars reporter, who was reporting from Halbig's Freedom of Information Act hearing in Hartford, Connecticut.

71. Infowars reporter Dan Bidondi had traveled to Hartford, CT to "report" on this hearing on behalf of Infowars and Alex Jones.

72. On information and belief, other Infowars employees, apparent agents, and/or agents, including videographer Kevin Laprade,[10] traveled to and were located in Hartford, Connecticut, for the creation of this video.

73. Sklanka acted as Halbig's driver, and actively facilitated his appearance on Infowars.[11]

74. On July 7, 2015, The Alex Jones Show broadcast a video now posted on YouTube with the title "Retired FBI Agent Investigates Sandy Hook: MEGA MASSIVE COVER UP."[12]

75. Jones noted, referring to the May 29, 2015 video, "I knew that we'd sent a reporter, Dan Bidondi, there for days, to cover the city council hearings about it, the fact that they're sealing everything."[13]

76. Jones and Infowars purposefully sought to direct their message and spur "investigation" of the Sandy Hook families and the Newtown, Connecticut community in other ways, as well. For example, Jones took calls from listeners who called claiming to live close to Newtown, Connecticut, and encouraged them to continue their "investigations."[14]

---

[9] https://www.youtube.com/watch?v=SO8Xb-t4nT4.
[10] https://www.facebook.com/photo.php?fbid=10209638407182257&set=a.3495510351748.2134051.1391267684&type=3&theater.
[11] https://www.youtube.com/watch?v=4_2FznkfcBU.
[12] https://www.mediamatters.org/embed/clips/2016/11/29/51284/gcn-alexjones-20150707-shooting; https://www.youtube.com/watch?v=8YV1eWq8YSc.
[13] https://www.youtube.com/watch?v=jCOe3qIgvFA.
[14] https://www.youtube.com/watch?v=TGCfi_ot0CU.

8

002673