# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **FREE SPEECH SYSTEMS, LLC,** | § | **Case No. 22 - 60043** |
| | § | |
| **DEBTOR.** | § | |
| | § | **Chapter 11 (Subchapter V)** |

### DEBTOR'S REPLY TO UNITED STATES TRUSTEE'S AMENDED OBJECTION TO THE APPLICATION OF DEBTOR FOR AN ORDER (A) AUHTORIZING EMPLOYMENT OF SHANNON & LEE LLP AS BANKRUPTCY CO-COUNSEL FOR THE DEBTOR, AND (B) GRANTING RELATED RELIEF

Free Speech Systems, LLC (the "Debtor" or "FSS"), the debtor and debtor-in-possession in the above-captioned chapter 11 case, replies to the U.S. Trustee's amended objection [ECF. No. 154] (the "Objection") to the Application of Debtor for an Order (A) Authorizing Employment of Shannon & Lee LLP as Bankruptcy Co-Counsel for the Debtor and (B) Granting Related Relief [ECF No. 85] (the "S&L Application") as follows:

### PRELIMINARY STATEMENT

1.       The U.S. Trustee does not dispute any of the allegations in the S&L Application or contend that S&L does not meet the requirement to be employed under Bankruptcy Code § 327(a). There is no disagreement that (a) S&L does not hold or represent any disqualifying adverse interest and is a "disinterested person" as that term is defined in Bankruptcy Code § 101(14) (Application ¶¶ 21 & 26); (b) the FSS Lee Declaration disclosed all relevant connections in this case (Application ¶ 29); (c) S&L is well qualified and uniquely able to represent FSS in its chapter 11 case in an efficient and timely manner (Application ¶ 11); (d) the familiarity of S&L professionals with the Sandy Hook Litigation was particularly important to the Debtor as debtor in possession in the early parts of the case (Application ¶ 8); or (e) S&L's agreed terms of reimbursement,

compensation, and hourly rates are reasonable (Application ¶ 14). Nor does the U.S. Trustee assert that denial of the S&L Application would benefit the Debtor's estate or aid administration of the case.

2.      Instead, the basis for the Objection is that Kyung Lee did not supplement his declaration (the "IW Lee Declaration") in support of the IW Debtors' application to employ Kyung S. Lee PLLC ("KSLPLLC") in Case No. 22-60022 (the "IW Cases") in the four (4) business days between May 24, 2022, when Mr. Lee met with FSS regarding its potential restructuring, and June 1, 2022, when the U.S. Trustee and the IW Debtors agreed to the dismissal of the IW Cases.[1] The U.S. Trustee wants this Court to not only find that Mr. Lee's disclosure violated Bankruptcy Rule 2014, but also that the violation was so severe that it warrants what is in effect imposing a sanction in a *different* case by denying the application of a *different* Debtor to employ a *different* law firm. The U.S. Trustee's position is not supported by the law or facts.

3.      Bankruptcy Rule 2014 requires a verified statement disclosing connections to accompany an application to employ, and courts have held that Bankruptcy Code 327(a) implies that the obligation continues for professionals that are employed by or are seeking employment by the estate. But Mr. Lee and KSLPLLC were no longer seeking to be employed in the IW Debtors' cases when he began providing services to FSS on May 24, 2022.[2] After reaching agreements resolving the claims of the Connecticut Plaintiffs (on May 13, 2022) and the Texas Plaintiffs (on May 18, 2022), the IW Debtors decided to agree to dismiss their cases as demanded by the U.S.

---

[1] Of the seven (7) total days the trustee takes issue with, May 28-30, 2022, comprised the Memorial Day weekend. On May 25, Mr. Lee informed the U.S. Trustee and the Subchapter V Trustee by email that the IW Debtors intended to dismiss their case. A copy of this email is attached as Exhibit A hereto. On May 26, Mr. Lee attended the section 341 meeting of creditors for the IW Debtors, at which he informed the parties in attendance that the IW Debtors had decided to agree to the dismissal of their cases, as requested by the U.S. Trustee, and would work to effectuating such dismissal. On May 27, 2022, Mr. Lee was negotiating the stipulation of dismissal with the U.S. Trustee that was ultimately filed with the Court on June 1.

[2] Mr. Lee was not formally retained by FSS until June 6, 2022. The services provided by Mr. Lee in May 2022 were related to becoming familiar with FSS and its financial condition.

2

Trustee. By May 23, 2022, Mr. Lee had drafted a motion to dismiss the IW Cases. Mr. Lee was not at that time seeking to be retained as an estate professional in any meaningful way. IW Debtors had already decided not to employ Mr. Lee or any other professionals.

4.      Further, even if Mr. Lee was required by Bankruptcy Rule 2014 and Bankruptcy Code 327(a) to supplement his disclosure of connections despite the IW Debtors' decision to dismiss, that oversight would not justify denying *this* Debtor's application to employ Shannon & Lee LLP in *this* chapter 11 case. None of the authorities cited in the Objection support that position and the relief would be entirely unprecedented.[3] While the Court has discretion to consider factors beyond just compliance with Bankruptcy Code 327(a), that discretion should be reasonably applied. What matters is whether employing S&L benefits the Debtor's estate and furthers administration of its chapter 11 case. The U.S. Trustee does not dispute these issues favor approving the employment of S&L.

5.      Whether Mr. Lee's disclosures in the IW Cases were sufficient should be addressed separately from the Application. The procedurally proper way for the U.S. Trustee to raise the issue would be to reopen the IW Cases and seek sanctions against Mr. Lee. Inflicting collateral damage on the Debtor, its estate, and the administration of this chapter 11 case by denying the Application is entirely unjustified.

## **ARGUMENT**

### **A.  Mr. Lee's Disclosures in the IW Cases Complied with Bankruptcy Rule 2014.**

6.      Bankruptcy Rule 2014 requires applications to employ professionals to "be accompanied by a verified statement of the person to be employed setting forth the person's

---

[3] While this might seem like hyperbole, it is not. Attached as <u>Exhibit B</u> hereto is a summary and analysis of each of the twenty-seven cases cited in the Objection. Not a *single* case cited in the Objection supports what the U.S. Trustee asks the Court to do here.

004619

connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee." As the U.S. Trustee states in the Objection, the "one primary purpose" of these disclosures is "to facilitate strict compliance with section 327." Objection ¶ 45.

7.      Although the text of Bankruptcy Rule 2014 does not require continuing disclosures, courts have held that Bankruptcy Code § 327 implies this obligation. *See, e.g.*, *In re C & C Demo, Inc.*, 273 B.R. 502, 507 (Bankr. E.D. Tex 2001) (holding that although Rule 2014(a) does not expressly require supplemental or continuing disclosure, duty is implied pursuant to § 327); *In re Keller Fin. Serv. of Florida*, 243 B.R. 806, 813 (Bankr. M.D.Fla. 1999) (duty of continuing disclosure under Rule 2014(a) is implied by requirements of § 327); *In re Granite Partners, L.P.*, 219 B.R. 22, 35 (Bankr. S.D.N.Y. 1998) (Section 327(a) implies a duty of continuing disclosure and requires professionals to reveal connections that arise after their retention.). The reasoning is that ongoing disclosures are necessary to ensure that the professionals that have been retained remain conflict free. The Fifth Circuit Court of Appeals has adopted this reasoning and held that professionals employed or seeking employment as estate professionals must "to promptly notify the court if any potential for conflict arises." *I.G. Petroleum, L.L.C. v. Fenasci (In re W. Delta Oil Co.)*, 432 F.3d 347, 355 (5th Cir. 2005).

8.      No court has held that Bankruptcy Rule 2014 requires ongoing disclosure by persons that are *not* seeking to be employed as an estate professional, such as when a case has been That makes sense—the "one primary purpose" of the disclosures required under Bankruptcy Rule 2014 no longer exists when the professional will not be employed under Bankruptcy Code § 327. The U.S. Trustee is asking for the Court to create law, not apply it.

4

9.      When Mr. Lee met with FSS on May 24, 2022, the IW Debtors had already determined to dismiss their chapter 11 cases when Mr. Lee first provided services to FSS.  At that time the IW Debtors were no longer seeking to employ KSPLLC or any other party in interest as an estate professional. By May 18, 2022, the IW Debtors had effectively resolved all the claims of the Texas Plaintiffs [*see* Case No. 22-60020, Dkt No. 96] and the Connecticut Plaintiffs [*see* Case No. 22-60020, Dkt. No. 98]. Soon after the IW Debtors determined that continuing their cases in the face of the U.S. Trustee's continued opposition did not benefit the IW Debtors or their remaining creditors. By Monday, May 23, 2022, Mr. Lee had drafted a motion to dismiss the IW Debtors' bankruptcy cases.[4] And Mr. Lee promptly informed the U.S. Trustee by email on May 25, 2022, and other parties in interest at the 341 meeting on Thursday, May 26, 2022, that the IW Debtors intended to seek dismissal of their cases. Mr. Lee then promptly negotiated a stipulation of dismissal with the U.S. Trustee that was finalized and filed with the Court on June 1, 2022.

10.      Under these circumstances, Mr. Lee did not have an obligation to supplement his disclosures related to the IW Debtors' application to employ KSLPLLC. On May 24, the IW Debtors were no longer seeking to employ KSLPPC or Mr. Lee under Bankruptcy Code § 327(a). The statute therefore did not imply a duty to provide further disclosures at that time. The Objection presents cites no authority to the contrary.

11.      If the U.S. Trustee believed that ongoing disclosure of connections in the IW Cases was necessary to maintain the integrity of the bankruptcy process, the motion to dismiss those cases should have been withdrawn. The thrust of the U.S. Trustee's motion to dismiss—that the IW Cases were a litigation tactic—no longer applied because the Texas Plaintiffs and the Connecticut Plaintiffs no longer asserted claims against the IW Debtors. Supplemental disclosures

---

[4] A copy of an email from Mr. Lee to Marc Schwartz, Christian Schwartz, and Harold Lee of Schwartz & Associates LLC reflecting that Mr. Lee had drafted a motion to dismiss the IW Cases is attached as <u>Exhibit C</u> hereto.

004621

would have of course been necessary if the IW Cases had continued and the IW Debtors sought to employ KSLPLLC. But the U.S. Trustee opposed the IW Debtors remaining in bankruptcy the cases and the IW Debtors believed that the expense of that fight would outweigh any benefit. Ultimately, the U.S. Trustee's demands are the reason that a supplemental disclosure by Mr. Lee was not necessary.[5]

**B. Even _if_ Mr. Lee Should Have Supplemented His Disclosures in the IW Cases, the Debtor's Application to Employ Shannon & Lee LLP in this Case Should Be Approved.**

12.     Of course, the sufficiency of Mr. Lee's disclosure of KSLPLLC's connections related to the IW Debtors' application to employ KSLPLLC in their cases is not the issue that the Court has to decide in the Application. The issue before the Court is whether it should authorize FSS to employ Shannon & Lee LLP as bankruptcy co-counsel in this chapter 11 case. The Court should reject the U.S. Trustee's improper request to indirectly punish Mr. Lee through this contested matter and grant the Application.

13.     The U.S. Trustee does not dispute that the Application and S&L meet all the requirements of Bankruptcy Code 327(a) and Bankruptcy Rule 2014 for employment in the Debtor's chapter 11 case. Nor does the U.S. Trustee dispute the allegations in the Application that (a) S&L does not hold or represent any disqualifying adverse interest and is a "disinterested person" as that term is defined in Bankruptcy Code § 101(14) (Application ¶¶ 21 & 26); (b) Mr. Lee's declaration in this chapter 11 case disclosed all relevant connections in this case (Application ¶ 29); (c) S&L is well qualified and uniquely able to represent FSS in its chapter 11 case in an

---

[5] As indicated in the May 17, 2022, email from Jayson Ruff to Mr. Lee, attached hereto as <u>Exhibit D</u>, the U.S. Trustee's took the position in the IW Cases was that the remaining creditors—including holders of administrative claims—should be paid outside of the bankruptcy process from FSS and/or Alex Jones. That the U.S. Trustee now complains that "the Court never had the opportunity to rule on [KSLPLLC's] employment application in the InfoW Cases" is nothing but hypocrisy.

efficient and timely manner (Application ¶ 11); (d) the familiarity of S&L professionals with the Sandy Hook Litigation was particularly important to the Debtor as debtor in possession in the early parts of the case (Application ¶ 8); or (e) S&L's agreed terms of reimbursement, compensation, and hourly rates are reasonable (Application ¶ 14). Most importantly, the U.S. Trustee does not contend that Debtor's employment of S&L is not the best interests of the Debtor's bankruptcy estate or useful to administration of the chapter 11 case.

14.     *Every* decision that the U.S. Trustee cites in the objection that is relevant to the topic indicates that the effect on the bankruptcy estate and administration of the case are the proper considerations that should guide the Court's discretion. The most clearly relevant include:

a.   *In re LTHM Houston-Operations, LLC*, 2014 WL 5449737 (Bankr. S.D. Tex. 2014)—In *LTHM*, the U.S. Bankruptcy Court for the Southern District of Texas held that it "is instructed to exercise its discretion by taking into account the facts of a particular bankruptcy case and the overall objectives of the bankruptcy system. Section 327(a) acknowledges that the purpose of the professional's employment is to represent or assist the trustee in carrying out the trustee's duties under this title. Accordingly, the Court must consider whether the benefits of employing [the professional] exceed the potential impact it may have on the trustee's ability to fulfill his duties to the estate." *Id.* at *5 (internal citations and quotation marks omitted).

b.   *In re Bigler, LP*, 422 B.R. 638 (Bankr. S.D. Tex. 2010)—In *Bigler*, the U.S. Bankruptcy Court for the Southern District of Texas considered an application to employ an investment bankruptcy firm that included a "tail period" provision under which the proposed professional would receive compensation even if the debtors consummated a transaction after terminating the employment agreement. The court held that in exercising its broad discretion, the court "focuses on whether the proposed terms are reasonable." *Id.* at 643.

c.   *In re Smith*, 507 F.3d 64 (2d Cir. 2007)— As directly quoted in the Objection, the Second Circuit Court of Appeals reasoned in *Smith* that "[i]n exercising its approval function, however, the bankruptcy court should interfere with the trustee's choice of counsel only in the rarest cases, such as when the proposed attorney has a conflict of interest, or when it is clear that the best interest of the estate would not be served by the trustee's choice." *Id.* at 71.

d.   *Harold & Williams Dev. Co.*, 977 F.2d 906 (4th Cir. 1992)—The Fourth Circuit Court of Appeals was even more clear in *Harold & Williams*, instructing that "once the trustee meets the burden of demonstrating that an applicant for professional employment is qualified under § 327 . . . the discretion of the bankruptcy court must be exercised in a

way that it believes best serves the objectives of the bankruptcy system. Among the ultimate considerations for the bankruptcy courts in making these decisions must be the protection of the interests of the bankruptcy estate and its creditors, and the efficient, expeditious, and economical resolution of the bankruptcy proceeding." *Id.* at 910 (internal citations omitted).

The U.S. Trustee does not present a single case that even *suggests* that the Court should exercise its discretion to deny an application to employ a professional that meets the requirements of Bankruptcy Code § 327 because the circumstances created by the U.S. Trustee's demand for immediate dismissal in a previous case is contrary to his new-found appreciation and desire for the disclosures that would have been required absent such dismissal.[6]

15.     Denying the Debtor's Application to employ Shannon & Lee LLP would harm the Debtor's bankruptcy estate and hinder administration of this chapter 11 case. Although Mr. Battaglia is an excellent bankruptcy attorney—as he has demonstrated several times in this case— this matter is not a one-man job. And retaining any other attorney would not possess the significant knowledge and experience of the Debtor and the relevant litigation for which the Debtor retained S&L in this case. Again, the U.S. Trustee does not assert otherwise in the Objection.

**C. If the Court Determines that Some Action Should Be Taken in this Chapter 11 Case to Address Mr. Lee's Disclosures in the IW Cases, the Debtor Submits that the Court Should Limit Shannon & Lee LLP's Compensation in this Case by an Appropriate Amount Considering the Novelty of the Issue.**

16.     The U.S. Trustee is in effect seeking a sanction against Mr. Lee for actions related to a different case, for a different client, and for a different law firm with the Debtor as collateral damage. *See, e.g.*, *In re EBW Laser, Inc.*, 333 B.R. 351, 359-60 (Bankr. M.D.N.C. 2005) ("The Bankruptcy Court may, in its discretion, disqualify counsel, or deny compensation, as a sanction for failure to make the disclosure required by Rule 2014.") (quoted by the U.S. Trustee); *In re*

---

[6] The U.S. Trustee has not filed any motion to enforce Bankruptcy Rule 2019 in these cases, so disclosure and transparency appear to be important to the U.S. Trustee only sometimes.

004624

*Granite Partners, L.P.*, 219 B.R. 22, 41 (Bankr. S.D.N.Y. 1998) (analyzing disqualification for failure to disclose connections as a sanction). That request is inappropriate, is not supported by applicable law, and should be denied.

17.     However, if the Court concludes that Mr. Lee's disclosure in the IW Cases was deficient and that some action should be taken in *this* chapter 11 case, the Debtor submits that a reasonable action would be that the compensation for S&L allowed in this case should be reduced by the compensation received by KSLPLLC received from FSS prior to June 1, 2022. These amounts total $24,409.09.[7]

18.     In the alternative, *In re Byington*, 454 B.R. 648 (Bankr. W.D. Va. 2011), may present a framework for an appropriate way to address any failure by Mr. Lee to disclose connections in the IW Cases. In *Byington*, the attorney for two individual chapter 11 debtors did not disclose payments from the debtors' son—against whom the estate had potential avoidance action claims—that were used to pay the debtors' filing fee. *Id.* at 660. Although the court determined that the attorney's disclosures were insufficient, it declined to deny the debtors' application to employ the attorney because of the apparent novelty of the issue and instead ruled that compensation would not be approved for the attorney's services relating to correcting the deficiency or in asserting that the disclosure was not required. *Id.* Here, the U.S. Trustee's assertions are entirely unprecedented.

19.     While not justified, either of these options would better proportioned to the conduct that the U.S. Trustee asserts violated Bankruptcy Rule 2014—Mr. Lee not disclosing his meeting with FSS in the four (4) business days that elapsed before the filing of the stipulation of dismissal

---

[7] A copy of KSLPLLC's invoice for the period from May 24, 2022, to May 31, 2022, is attached hereto as <u>Exhibit E</u>.

004625

in the IW Cases—than denying the Application and derailing the Debtor's chapter 11 case. If the Court takes any action, it should be a measured one.

## **CONCLUSION**

20.     If the U.S. Trustee believes that Bankruptcy Rule 2014 required Mr. Lee to disclose his meeting with FSS in the IW Cases, even though the IW Debtors had at that time agreed to the U.S. Trustee's own motion to dismiss, there is a way to raise that issue. But it is not in objecting to the employment of a different law firm, by a different debtor, in a different case.  There is no dispute that S&L meets the requirements for employment or that its employment will benefit the estate and administration of this chapter 11 case. The Application should therefore be granted.

*[Remainder of Page Intentionally Left Blank]*

004626

Dated: September 16, 2022

**LAW OFFICES OF RAY BATTAGLIA, PLLC**

/s/*Raymond W. Battaglia*
Raymond W. Battaglia
State Bar No. 01918055
rbattaglialaw@outlook.com
66 Granburg Circle
San Antonio, Texas 78218
Tel. (210) 601-9405

*Proposed Co-Counsel to the Debtor and Debtor-In-Possession*

-and-

**SHANNON & LEE LLP**

/s/*R. J. Shannon*
Kyung S. Lee
State Bar No. 12128400
klee@shannonleellp.com
R. J. Shannon
State Bar No. 24108062
rshannon@shannonleellp.com
700 Milam Street, STE 1300
Houston, Texas 77002
Tel. (713) 714-5770

*Proposed Co-Counsel to the Debtor and Debtor-in-Possession*

004627

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served (a) at the time of filing, by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas on all parties registered to receive such service and (b) within one hour of filing, by email on the following parties:

Ha Nguyn
OFFICE OF THE U.S. TRUSTEE
515 Rusk Ave,  STE 3516
Houston, TX 77002
Ha.Nguyen@usdoj.gov

Melissa Haselden
SUBCHAPTER V TRUSTEE
700 Milam, Suite 1300
Houston, TX
mhaselden@haseldenfarrow.com

Randy W. Williams
BYMAN & ASSOCIATES PLLC
7924 Broadway, Suite 104
Pearland, TX 77581
rww@bymanlaw.com

Elizabeth Freeman
JACKSON WALKER LLP
1401 McKinney St., Suite 1900
Houston, TX 77010
efeeman@jw.com

Ryan Chapple
CAIN & SKARNULIS PLLC
303 Colorado Street, Suite 2850
Austin, TX 78701
rchapple@cstrial.com

Avi Moshenberg
MCDOWELL HETHERINGTON LLP
1001 Fannin Street, Suite 2700
Houston, TX 77002
avi.moshenberg@mhllp.com

Jarrod B. Martin
CHAMBERLAIN, HRDLICKA, WHITE,
WILLIAMS, & AUGHTRY, PC
1200 Smith Street, Suite 1400
Houston, Texas 77002
jarrod.martin@chamberalinlaw.com

*/s/R. J. Shannon*
R. J. Shannon

12

004628

# **EXHIBIT A**

Tuesday, September 13, 2022 at 19:47:34 Central Daylight Time

**Subject:** InfoW\Update

**Date:** Wednesday, May 25, 2022 at 12:29:13 PM Central Daylight Time

**From:** Kyung S. Lee <klee@kslpllc.com>

**To:** Ruff, Jayson B. (USTP) <Jayson.B.Ruff@usdoj.gov>, Nguyen, Ha (USTP) <Ha.Nguyen@usdoj.gov>, Melissa Haselden <mhaselden@haseldenfarrow.com>

**CC:** Marc Schwartz <mschwartz@schwartzassociates.us>, Christian Schwartz <cschwartz@schwartzassociates.us>, Harold Lee <hlee@schwartzassociates.us>, Cameron Atkinson <catkinson@pattisandsmith.com>

Marc Schwartz and I wanted to report to the group as follows:

1. The Texas Plaintiffs and Debtors agreed on Stipulations of Dismissals last week. Judge Lopez approved them last Thursday. Judge Mott signed orders remanding cases earlier this week. The Texas Plaintiffs are no longer creditors or hold claims against the Debtors.
2. The removal Connecticut Bankruptcy Court held a status conference yesterday. Connecticut Plaintiffs are to submit orders of dismissal by Thursday 5.26.22. Judge Manning said she would sign them Friday 5.27.22. Debtors are to submit dismissals of motions to remove by Monday 5.30.22.
3. Marc has instructed me to file Motions to Dismiss the Chapter 11 Cases on Tuesday 5.31.22 and eliminate any continuing administrative expenses.
4. We have a conflict as to the 341 Meeting of Creditors for tomorrow and the Debtors will not have a representative attend.

Thanks.

**Kyung S. Lee**
Kyung S. Lee PLLC
Cell: 713-301-4751
klee@kslpllc.com

# **EXHIBIT B**

004631

### Summary and Analysis of Cases Cited by the U.S. Trustee in the Objection

| No. | Cases Cited in the Objection | Summary and Analysis |
|---|---|---|
| 1 | *United States v. Rodgers*, 461 U.S. 677, 706 (1983). | Overview:<br><br>*Rodgers* involved an appeal of a decision holding that government could seek a sale, under the Internal Revenue Code of 1954, 26 U.S.C.S. § 7403, of only the respondent delinquent taxpayers' interests in their property and not the entire property.<br><br>Analysis:<br><br>The U.S. Trustee cites this case for the proposition that courts have entirely unbound discretion to approve or decline to approve an application of a chapter 11 debtor in possession to employ a professional that meets the statutory requirements and quotes in a parenthetical that " 'the word 'may,' when used in a statute, usually implies some degree of discretion[.]" (Objection ¶ 41).<br><br>The Court should ignore the U.S. Trustee's spin on the Supreme Court's language. As the immediately following sentence in Rodgers indicates, "[t]his common-sense principle of statutory construction is by no means invariable, however, . . . and can be defeated by indications of legislative intent to the contrary or by obvious inferences from the structure and purpose of the statute. . . ." While bankruptcy courts do have *some* discretion to consider factors beyond technical compliance with Bankruptcy Code § 327 that are germane to the purposes of Bankruptcy Code § 327, the discretion is not unlimited and should be guided by precedent. Precedent indicates that it is the interests of the estate and administration of the bankruptcy case that are relevant to that discretion. |
| 2 | *In re Jackson*, 484 B.R. 141, 154 (Bankr. S.D. Tex. 2012). | Overview:<br><br>*Jackson* involved the request by a chapter 7 trustee to employ his law firm under Bankruptcy Code § 327(a) to represent him in his role as trustee of the bankruptcy estate and, in particular prosecuting potential patent infringement actions. The court denied the application without prejudice because (a) the description of the need for retention of the particular attorney on this matter was insufficient, (b) the disclosure of connections did not describe any search of potential defendants in the patent matters, and (c) the application was not adequate for the Court to determine that the attorney selected was in the best interests of the estate as required for a trustee to retain his own firm.<br><br>Analysis:<br><br>The U.S. Trustee cites this case for the proposition that "[m]any decisions hold that bankruptcy courts have broad discretion in deciding whether to approve an application to employ an estate professional under section 327(a)." (Objection ¶ 42). However, *Jackson* held that the application at issue did not meet the requirements |

004632

| | | under Bankruptcy Code § 327 or Bankruptcy Rule 2014. The Trustee does *not* assert that the Debtor's Application to employ S&L fails to meet this requirement. |
|---|---|---|
| 3 | *In re Bigler, LP*, 422 B.R. 638, 643 (Bankr. S.D. Tex. 2010). | <u>Overview:</u><br><br>*Bigler* involved an application to employ an investment banking firm that included a "tail period" provision under which the firm would receive compensation if the debtors consummated a transaction within 12 months after termination of the agreement. The court approved the application to employ the investment banker despite the because of the testimony of the debtors' CRO that the terms were negotiated and because compensation was subject to approval under section 330.<br><br><u>Analysis:</u><br><br>The U.S. Trustee cites this case for the proposition that "[m]any decisions hold that bankruptcy courts have broad discretion in deciding whether to approve an application to employ an estate professional under section 327(a)." (Objection ¶ 42). While this decision does support such discretion, the court specifically states that "[i]n exercising this discretion, this Court focuses on whether the proposed terms are reasonable." |
| 4 | *Miller v. United States Trustee*, 197 F.3d 13, 17 (1st Cir. 1999). | <u>Overview:</u><br><br>*Miller* was an appeal of a bankruptcy court's order disqualifying debtor's counsel and disgorging retainers and fees after the debtor's counsel violated the retention order by drawing against the retainer and receiving post-petition payments in violation of the court's order. The attorney argued on appeal that drawing against the retainer was proper and that the bankruptcy court abused its discretion by ordering disgorgement of all fees. The First Circuit Court Appeals affirmed the bankruptcy court's ruling.<br><br><u>Analysis:</u><br><br>The U.S. Trustee cites this case for the proposition that "[m]any decisions hold that bankruptcy courts have broad discretion in deciding whether to approve an application to employ an estate professional under section 327(a)." (Objection ¶ 42). The First Circuit Court of Appeals did reason that "[b]ankruptcy courts historically been accorded wide discretion to oversee the terms and conditions of a debtor's engagement . . . ." However, the reasoning of the Court of Appeals was also based on the bankruptcy court's "continuing authority to revisit an order employing a particular attorney to represent a debtor." The facts are also entirely inapposite. |
| 5 | *Interwest Bus. Equip. v. United States Trustee*, 23 F.3d 311, 315 (10th Cir. 1994). | <u>Overview:</u><br><br>*Interwest* involved an appeal of a bankruptcy court's denial of an application to employ debtor's counsel. The bankruptcy court denied the application to employ the attorney because of a conflict of interest arising from the attorney's representation multiple debtors who held claims against one another. The bankruptcy court had determined that there was an actual conflict of interest that required representation by separate counsel. The Tenth Circuit Court of Appeals affirmed the decision of the bankruptcy court.<br><br><u>Analysis:</u> |

004633

| | | |
|---|---|---|
| | | The U.S. Trustee cites this case for the proposition that "[m]any decisions hold that bankruptcy courts have broad discretion in deciding whether to approve an application to employ an estate professional under section 327(a)." (Objection ¶ 42). The Tenth Circuit Court of Appeals did conclude that it would not "second guess" a decision not to approve professionals under section 327 "unless it exhibits a clear abuse of discretion, circumstances not present in the case at hand." However, the discretion that the bankruptcy court in *Interwest* exercised was regarding whether the representation of multiple debtors created an *actual* conflict. Further, the Tenth Circuit also reasoned that the discretion was "to ensure professionals are disinterested and do not represent interests adverse to the estate" rather than the unprincipled discretion the U.S. Trustee seeks in the Objection. |
| 6 | *Harold & Williams Dev. Co.*, 977 F.2d 906, 909 (4th Cir. 1992). | Overview:<br><br>*Harold* involved an appeal of a bankruptcy court's decision to deny the application of a single person to serve as both lawyer and accountant for the estate. The bankruptcy court ruled that there was a per se rule against the employment of a single person in both rules. The district court rejected the imposition of the per se rule but held that the bankruptcy court did not abuse its discretion. The Fourth Circuit Court of Appeals reversed the lower decisions, holding that there was no per se rule and that the bankruptcy court abused its discretion.<br><br>Analysis:<br><br>The U.S. Trustee cites this case for the proposition that "[m]any decisions hold that bankruptcy courts have broad discretion in deciding whether to approve an application to employ an estate professional under section 327(a)." (Objection ¶ 42). The Fourth Circuit Court of Appeals did conclude that bankruptcy courts had discretion but further stated that:<br><br>Thus, once the trustee meets the burden of demonstrating that an applicant for professional employment is qualified under § 327, *see* Bankr. Rule 2014(a), the discretion of the bankruptcy court must be exercised in a way that it believes best serves the objectives of the bankruptcy system. Among the ultimate considerations for the bankruptcy courts in making these decisions must be the protection of the interests of the bankruptcy estate and its creditors, and the efficient, expeditious, and economical resolution of the bankruptcy proceeding. *Cf. In re BH & P*, 949 F.2d at 1316.<br><br>*Harold* stands for the proposition that what matters is the interests of the bankruptcy estate and its creditors. The U.S. Trustee does not dispute that employment of S&L is in best interest of the debtor and its estate. That is directly contrary to the U.S. Trustee's position in the Objection. |

004634

| 7 | *In re Martin*, 817 F.2d 175, 182 (1st Cir. 1987). | Overview:<br><br>*Martin* involved a novel factual situation. To pay for their legal services pre-petition, the debtors delivered a note secured by a second lien on the debtors real property. The note was outstanding when the debtors filed for chapter 11 relief. The case was converted to chapter 7 and there was an objection to the attorney's fees because it was not a disinterested party by way of the secured note. The bankruptcy court allowed the attorney's compensation (subject to non-allowable compensation) but invalidated the note and lien. The First Circuit Court of Appeals determined that there was no per se rule that applied and remanded the matter to the bankruptcy court to determine whether the attorney's security interest was allowable under the particular facts.<br><br>Analysis:<br><br>The U.S. Trustee cites this case for the proposition that "[m]any decisions hold that bankruptcy courts have broad discretion in deciding whether to approve an application to employ an estate professional under section 327(a)." *See* Objection ¶ 42.  The First Circuit Court of Appeals stated—as partially quoted by the U.S. Trustee—that "[h]istorically, bankruptcy courts have been accorded wide discretion in connection with fact-intensive matters, and in regard to the terms and conditions of the engagement of professionals." The Court of Appeals also noted that "horrible imaginings alone cannot be allowed to carry the day."<br><br>*Martin* does not support the U.S. Trustee's overall position in the Objection. The discretion at issue in Martin was with respect to the factual determination of whether the attorney was a disinterested person. The U.S. Trustee does not dispute that S&L is disinterested. |
| 8 | *Elias v. Lisowski Law Firm (In re Elias)*, 215 B.R. 600, 603 (B.A.P. 9th 1997). | Overview:<br><br>*Elias* involved a post-bankruptcy fee dispute in which an attorney employed in a bankruptcy case sought to enforce its rights in state court after dismissal of the debtor's bankruptcy case. The Ninth Circuit BAP summarized the facts as follows:<br><br>After the debtor's chapter 11 case was dismissed, her bankruptcy attorney filed a state-court lawsuit against her for $ 10,000.00 of unpaid chapter 11 attorney's fees. The debtor filed a motion for summary judgment in the state-court action, arguing that her former attorney was not entitled to any fees because he had secured his employment in the bankruptcy case fraudulently by failing to disclose his prior connection with the debtor, the fee he received for the bankruptcy retainer, or his receipt of a potential $ 3,000.00 preference from the debtor on the eve of filing.<br><br>Prior to ruling on the motion for summary judgment, the state court requested that the bankruptcy court rule upon the viability of the attorney's lien, the status of the attorney's employment in the bankruptcy case, and whether a preference claim against the attorney could affect his ability to collect a fee. |

| | | |
|---|---|---|
| | | Pursuant to the state court's request, the debtor filed a motion in the bankruptcy court seeking to vacate the order authorizing counsel's employment, cancel the attorney's lien, and determine that counsel was not entitled to any fees. |
| | | Exercising its discretion, the bankruptcy court denied the debtor's motion. The bankruptcy court also found that it had no jurisdiction to enter further orders concerning the disputed fees. The debtor appealed. |
| | | The Ninth Circuit BAP affirmed the decision of the bankruptcy court. |
| | | Analysis: |
| | | The U.S. Trustee cites this case for the proposition that "[m]any decisions hold that bankruptcy courts have broad discretion in deciding whether to approve an application to employ an estate professional under section 327(a)." *See* Objection ¶ 42.  While the Ninth Circuit Court of Appeals stated in dicta that the appellate standard of review for a bankruptcy court decision with respect to an application to employ, its holding was that the bankruptcy court lacked jurisdiction: |
| | | We are not satisfied either that the bankruptcy court had jurisdiction to grant the relief requested by the Debtor, or that there has been a showing that the bankruptcy court abused its discretion in refusing to reopen the dismissed case in order to review pending state-court issues concerning disputed attorneys' fees. We therefore AFFIRM the decision of the bankruptcy court. |
| | | *Elias* does not support the U.S. Trustee's overall position in the Objection. |
| 9 | *In re LTHM Houston-Operations, LLC*, 2014 WL 5449737, at *5 (Bankr. S.D. Tex. 2014).<br><br>2014 Bankr. LEXIS 4495, at *1 (Bankr. S.D. Tex. Oct. 24, 2014). | Overview:<br><br>The issue presented in *LTHM* was wither Bankruptcy Code § 327(a) & (d) necessarily precluded the employment of a consulting firm with which the chapter 7 trustee had a significant professional relationship. The chapter 7 trustee sought to hire his firm as his financial advisor and accountant. The court ultimately re-set the hearing on the application to focus on the benefits and risks created by the firm's employment.<br><br>Analysis:<br><br>The U.S. Trustee quotes the following language from *LTHM*:<br><br>• "Even if the technical requirements of disinterestedness and not holding or representing an interest adverse to the estate are met, the Court has the discretion to deny the application." (Objection ¶ 43).<br>• In the exercise of its discretion under Section 327, the Court is instructed "into taking account the facts of a particular bankruptcy case and the overall objectives of the bankruptcy system." (Objection ¶ 44).<br><br>However, the U.S. Trustee leaves out the following paragraph of the opinion that indicates the considerations that guide the exercise of that discretion: |

004636

|   |   | The Court is instructed to exercise its discretion by taking into account "the facts of a particular bankruptcy case and the overall objectives of the bankruptcy system." *Id.* at 10. **Section 327(a) acknowledges that the purpose of the professional's employment is "to represent or assist the trustee in carrying out the trustee's duties under this title." 327(a). Accordingly, the Court must consider whether the benefits of employing Claro exceed the potential impact it may have on the trustee's ability to fulfill his duties to the estate.**<br><br>(emphasis added).<br><br>*LTHM* does not support the U.S. Trustee's position in the Objection. As that case indicates, the discretion of the court to consider issues beyond technical compliance with Bankruptcy Code § 327 are about the benefit to the estate. The U.S. Trustee does not dispute that employment of S&L is in the best interests of the Debtor's estate or administration of its chapter 11 case. |
|---|---|---|
| 10 | *In re Kurtzman*, 220 B.R. 538, 542 (S.D.N.Y. 1998). | Overview:<br><br>*Kurtzman* involved appeals related to a chapter 7 trustee's applications to (a) employ his law firm in several cases because the court determined that employment of the trustee's firm was not in the best interest of the estates based on the court's prior dealings with the firm and (b) an unrelated firm because the rates it charged were too high. The U.S. District Court for the Southern District of New York affirmed the decisions.<br><br>Analysis:<br><br>The U.S. Trustee quotes the following language from *Kurtzman:*<br><br>• Additionally, "while disinterestedness and the absence of conflicts may be central to the inquiry, they are by no means exclusive. Indeed, section 327(a) vests the authority for 'approval' within the sound discretion of the court. That authority would be eviscerated were the Court required to approve counsel who met the technical test for disinterest but was ill-suited for other reasons…" (Objection ¶ 43).<br>• . . . finding that the bankruptcy court did not abuse its discretion when it denied the retention of counsel based on "prior problems involving time records, billing errors, professional conduct, and overall costs of legal services that had led to its conclusion of loss of confidence in the firm") (Objection ¶ 44).<br><br>However, the U.S. Trustee conspicuously leaves out the example of the "other reasons" that *Kurtzman* identifies are proper to guide the bankruptcy court's discretion and breezes over the facts at issue in that case. The full sentence that the U.S. Trustee partially quotes in paragraph 43 of the Objection is: "That authority would be eviscerated were the Court required to approve counsel who met the technical test for disinterest but was ill-suited for other reasons **such as, for example, inexperience.**" (emphasis added). Further, *Kurtzman*, like |

004637

<table>
<tr><td></td><td></td><td>

every other case, makes clear that the other factors that courts should consider in exercising of discretion relate to what was in the best interests of the bankruptcy estate:

> By its very nature, the "best interest of the estate" under § 327(d) is a concept that affords the court considerable discretion in making evaluations and comparisons regarding the performance of counsel. In light of this discretion, the Court below was entitled to rely on its own first-hand observations and, based on those observations, to draw its own conclusions regarding professional performance. Here, the presiding judge was in a unique position to observe the conduct of counsel over a significant period of time, and to compare counsel's performance with that of other attorneys performing similar work. The Court articulated and specified its concerns, which admittedly were of a conclusory nature, and afforded Appellant an opportunity to respond. Since the "right" that Appellant seeks to vindicate rests in the final analysis with the discretion of the Court, we cannot conclude that the hearing afforded Appellant failed to meet constitutional standards.

*Kurtzman* does not support the U.S. Trustee's position in the Objection. There is no dispute that it is in the best interests of the Debtor's bankruptcy estate to retain S&L and that doing so will further administration of the Debtor's chapter 11 case.

</td></tr>
<tr><td>11</td><td>

*Official Comm. of Unsecured Creditors v. Harris (In re Southwest Food Distribs., LLC)*, 561 F.3d 1106, 1112-13 (10th Cir. 2009).

</td><td>

<u>Overview:</u>

*Harris* involved the denial of an official committee's application to employ counsel. The bankruptcy court denied the retention of counsel because the rates that were significantly higher than the prevailing local rates and there was no evidence that the case required national counsel. The committee appealed. The Tenth Circuit Court of Appeals affirmed the Bankruptcy Court's decision.

<u>Analysis:</u>

The U.S. Trustee cites *Harris* with a parenthetical that the case stands for the proposition that consideration of compensation terms was not reversible error. That is an accurate representation of the holding in *Harris* but it is inapposite to the Debtor's chapter 11 case here. The U.S. Trustee does not dispute that S&L's fees are reasonable.

</td></tr>
</table>

7

| | | |
|---|---|---|
| | *In re Downs*, 103 F.3d. 472, 480 (6th Cir. 1996). | Overview:<br><br>Among other issues, *Downs* involved an appeal of a bankruptcy court's order imposing sanctions on an attorney for failing to disclose his fee arrangement with the debtor, which was paid by a creditor, as required by Bankruptcy Code § 329 and Bankruptcy Rule 2016. The Sixth Circuit Court of Appeals affirmed the sanctions.<br><br>Analysis:<br><br>The U.S. Trustee quotes the following language from *Downs*: "Thus, the fulfillment of the duties imposed under these provisions are crucial to the administration and disposition of proceedings before the bankruptcy courts." (Objection ¶¶ 44 & 47). But *Downs* does not deal with Bankruptcy Code § 327 or Bankruptcy Rule 2014. The case is inapplicable to the issue in the Application. |
| 12 | *In re Doors & More Inc.*, 126 B.R. 43, 45 (Bankr. E.D. Mich. 1991). | Overview:<br><br>In *Doors & More*, the bankruptcy court denied an application to employ counsel. The application to employ the attorney contained numerous problems, including it was not signed by the Debtor, did not state the reasons for the attorney's section, and did not indicate whether the attorney had any present connections with any of the creditors. Based on those and other issues, the bankruptcy court determined that (a) the attorney could not provide competent representation to the estate, (b) it would not be in the best interest of the estate for the court to approve the attorney's appointment, and (c) the attorney's appointment would not aid in administration of the case.<br><br>Analysis:<br><br>The U.S. Trustee quotes the following language from *Doors & More*:<br>• "Plainly, the Court will not approve the employment of counsel that does not comport with the applicable ethical and disciplinary regulations." (Objection ¶ 44).<br>• "In a Chapter 11 case, it is fundamental that a debtor in possession or a trustee is obligated to act not in his or her own best interest, but rather in the best interest of the entire estate, including the creditors and owners of the debtor estate." (Objection ¶ 44, n.5).<br><br>The ethical issues presented in *Doors & More* was where the attorney could provide competent representation. According to the bankruptcy court:<br><br>Both the Michigan Rules of Professional Conduct and the best interest of a bankruptcy estate require that the attorney selected to represent the estate must be able to provide competent representation. In a Chapter 11 case, an attorney can provide competent representation to the estate only if the attorney is thoroughly familiar with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules. Bankruptcy, and especially Chapter 11 bankruptcy, is a highly specialized area of law. An attorney for a debtor in possession must have expert knowledge of bankruptcy law in order to achieve a successful result. Experience indicates that a business that files a Chapter 11 case, by definition, is already in |

8

004639

| | | trouble. Although competent counsel can by no means insure a successful reorganization, incompetent counsel will almost certainly insure failure. Only an attorney with expert knowledge of bankruptcy law can properly aid in the administration of the case.

The U.S. Trustee does not dispute that S&L is familiar with bankruptcy and competent to represent the Debtor in its chapter 11 case. |
|---|---|---|
| 13 | *In re Smith*, 507 F.3d 64, 71 (2d Cir. 2007). | Overview:

In *Smith*, the chapter 7 trustee obtained an order to remove the debtor's preferred choice of special personal injury counsel and denied the debtor's motion to dismiss the chapter 7 case. The district court and the Second Circuit Court of Appeals affirmed the bankruptcy court's ruling.

Analysis:

The U.S. Trustee quotes the following language from *Smith*: "[T]he bankruptcy court should interfere with the trustee's choice of counsel only in the rarest cases, such as when the proposed attorney has a conflict of interest, or when it is clear that the best interest of the estate would not be served by the trustee's choice." (Objection ¶ 44, n.5). *Smith* is ***directly*** contrary to the U.S. Trustee's position in the Objection.

Indeed, *Smith* is also instructive on the considerations beyond simply compliance with Bankruptcy § Code 327 that are appropriate to guide the Court's discretion:

> Thus, section 327(a) does not give a bankruptcy court authority to reject a trustee's choice of counsel solely because of an objection by the debtor. Rather, the debtor's objection is relevant only to a bankruptcy court's consideration of the best interest of the estate, or of whether the chosen special counsel is conflicted.

> Applying these principles here, we find no error in the Bankruptcy Court's determination that there were "no circumstances" that would give it reason to interfere with Geltzer's decision to remove Schwartz as special personal injury counsel. There was no indication or allegation that the attorney with whom Geltzer chose to replace Schwartz was conflicted or unqualified to litigate the personal injury action, and ample evidence supported the Bankruptcy Court's conclusion that the best interest of the estate would not be served by requiring Geltzer to continue to be represented by Schwartz, including, inter alia, Schwartz's delay in amending the state court caption and his transferring the personal injury file to Ginsberg without court or trustee approval. Indeed, the only factor weighing in favor of rejecting Geltzer's motion was Smith's preference to have Schwartz and Ginsberg prosecute the personal injury action. But that preference alone is insufficient to turn this into one of the "rarest cases" in which interference with the trustee's choice could be justified. |

9

004640

| | | |
|---|---|---|
| | | As *Smith* indicates, the relevant factors guiding courts' discretion are (a) the best interest of the estate, (b) the qualifications of the proposed attorney, and (c) and whether the chosen counsel has a conflict. The U.S. Trustee does object to S&L's employment on any of those grounds. |
| 14 | *In re Leslie Fay Companies, Inc.*, 175 B.R. 525, 536 (Bankr. S.D.N.Y. 1994). | Overview:<br><br>*Leslie Fay* involved the failure of the chapter 11 debtor's counsel to disclose connections with potential targets of litigation by the debtor and the debtor's seventh largest creditor. The bankruptcy court appointed an examiner and the examiner determined that the attorney was not disinterested in the matter. The United States trustee for the district sought to disqualify the attorney on the grounds of failure to disclose the connections under Bankruptcy Rule 2014 and because the attorney was not disinterested. The bankruptcy court found that the attorney represented interests that were materially adverse at the time of its retention and failed to properly disclose its connections under Bankruptcy Rule 2014. The bankruptcy court determined that the best interests of the estate warranted (a) allowing the attorney to complete the services it had begun and see the case through reorganization and finish the pending contested matters and adversary proceedings, while requiring replacement counsel to handle new matters and (b) imposing an economic sanction in the amount of the costs of the examiner's investigation and the failure to disclose.<br><br>Analysis:<br><br>The U.S. Trustee quotes the following language from *Leslie Fay*: "[T]he requirements of Fed. R. Bankr. P. 2014 are more encompassing than those governing disinterestedness inquiry under section 327. For while retention under section 327 is only limited by interests that are 'materially adverse,' under Rule 2014, 'all connections' that are not so remote as to be de minimis must be disclosed." (Objection ¶ 46). As set out in the Reply, however, this disclosure is required of professionals who are employed by the bankruptcy estate or seeking to be employed by the bankruptcy estate. The attorney at issue in *Leslie Fay* was employed by the debtor pursuant to Bankruptcy Code § 327(a). The facts are not the same as those present here and the case does not support the U.S. Trustee's position. |
| 15 | *In re Woodcraft Studios, Inc.*, 464 B.R. 1, 8 (N.D. Cal. 2011). | Overview:<br><br>In *Woodcraft Studios*, the bankruptcy court denied a fee application filed by the attorney to a chapter 11 debtor after the case was converted to chapter 7 and ordered the disgorgement of the prepetition retainer. The attorney affirmatively stated in the application to employ and Bankruptcy Rule 2014 disclosure that the attorney did not represent the debtor prior to the petition date or have any connections to parties in interest in the case. After conversion, the bankruptcy court determined that the attorney represented and received fees from the debtor prior to the petition date. On appeal, the U.S. District Court for the Northern District of California affirmed the bankruptcy court's ruling |

004641

| | | |
|---|---|---|
| | | Analysis:<br><br>The U.S. Trustee quotes the following language from *Woodcraft Studios*: The applicant has the duty to disclose all relevant information to the court and "may not exercise any discretion to withhold information." (Objection ¶ 46). However, the opinion goes on the state the following:<br><br>    "The purpose of such disclosure is to permit the Court and parties in interest to determine whether the connection disqualifies the applicant from the employment sought, or whether further inquiry should be made before deciding whether to approve the employment. This decision should not be left to counsel, whose judgment may be clouded by the benefits of the potential employment." *In re Lee*, 94 B.R. 172, 176 (Bankr. C.D. Cal.1988).<br><br>*Woodcraft Studios* does not stand for the proposition that Bankruptcy Rule 2014 imposes a duty to supplement disclosures of connections after the professional is no longer seeking to be retained in the bankruptcy case. It does not support the U.S. Trustee's position in the Objection that Mr. Lee's disclosures were deficient. |
| 16 | *U.S. v. Gallene*, 182 F.3d 578, 588 (7th Cir. 1999). | Overview:<br><br>*Gallene* involved a criminal case in which the district court entered convictions and sentences against a bankruptcy attorney for knowingly and fraudulently making a false material declaration in a bankruptcy case. A jury returned verdicts finding that attorney for a chapter 11 debtor failed to disclose connections of his firm to a debtor's senior secured creditor and related parties. The issue was raised among the attorney's firm two months before the debtor filed bankruptcy and the bankruptcy court held hearings about other connections that were disclosed in the attorney's 2014 declaration. When the court ordered the attorney to file a supplemental declaration, the connection with the senior secured creditor were still not disclosed.<br><br>Analysis:<br><br>The U.S. Trustee quotes the following language from *Gallene*: "Thus, 'professionals "cannot pick or choose which connections are irrelevant or trivial."'" (Objection ¶ 46). However, other portions of the same paragraph from which the U.S. Trustee draws its quotation indicates that the obligation to disclose connections is limited:<br><br>    The Bankruptcy Code requires that attorneys ***who seek to be employed as counsel for a debtor*** apply for the bankruptcy court's approval of that employment. See In re Crivello, 134 F.3d 831, 835-36 (7th Cir. 1998). ***Bankruptcy Rule 2014 requires the potential attorney for the debtor*** to set forth under oath any "connections with the debtor, creditors, [and] any other party in interest." Fed. R. Bankr. P. 2014(a).<br><br>*Gallene* does not support the U.S. Trustee's position in the Objection. |

004642

| 17 | *In re The Harris Agency*, 462 B.R. 514, 524 (E.D. Pa. 2011). | Overview:<br><br>In *Harris Agency* the attorney for a chapter 11 debtor failed to disclose that a creditor had agreed to pay the attorney's fees for representing the debtor and that the debtor had agreed to repay the amounts advanced by that creditor. The bankruptcy court entered an order disqualifying the attorney from further representation of the debtor in the chapter 11 case but did not disqualify the attorney from the beginning of the case. In connection with a subsequent fee application, the court found that the attorney had also previously entered an appearance for a non-debtor affiliate of the debtor prior to disqualification. The bankruptcy court entered a second order disqualifying the attorney as of the date of the conflicting representation, partially disallowing fees and expenses, and mandating disgorgement of fees received in excess of the amount allowed. The U.S. District Court for the Eastern District of Pennsylvania affirmed the bankruptcy court's rulings.<br><br>Analysis:<br><br>The U.S. Trustee quotes the following language from *Harris Agency*: "The duty to disclose under Bankruptcy Rule 2014 is ongoing, continues throughout the case, and 'requires 'spontaneous, timely, and complete disclosure.'" (Objection ¶ 46). A more complete quote is as follows:<br><br>*Attorneys who seek approval by the court to represent a debtor, pursuant to § 327(a),* must file an application for employment that complies with the disclosure requirements of Rule 2014. Rule 2014(a) requires that "[t]he application shall state . . . to the best of the applicant's knowledge, all of the person's connections with the debtor, creditors, any other party in interest," and "shall be accompanied by a verified statement . . . setting forth the person's connections with the debtor, creditors, [and] any other party in interest . . . ." The duty to disclose under Rule 2014 *continues throughout an attorney's representation of the debtor*, and requires "spontaneous, timely, and complete disclosure . . . ." Rome v. Braunstein, 19 F.3d 54, 59 (1st Cir. 1994).<br><br>Again, the U.S. Trustee cherry-picks quotes to arrive at a misleading result. *Harris Agency* does not support the U.S. Trustee's position. |
| 18 | *In re Granite Partners, L.P.*, 219 B.R. 22, 35 (Bankr. S.D.N.Y. 1998). | Overview:<br><br>In *Granite Partners*, the attorney retained by a chapter 11 trustee retained the attorney to represent the estate represented a larger creditor that was an investigation target in five open matters that were not disclosed in the attorney's Bankruptcy Rule 2014 disclosures. During the course of the attorney's representation of the chapter 11 trustee, the attorney opened approximately 400 additional matters for the creditor resulting in $9 million in fees that it did not disclose. The matter was not disclosed until the attorney filed its final fee application and the bankruptcy court appointed a fee examiner who determined that the attorney represented interests adverse to the estate. The bankruptcy court denied all of the attorney's fees related to investigative services and reduced the fee award by 15% for non-investigative disclosures. |

12

| | | |
|---|---|---|
| | | Analysis: |
| | | The U.S. Trustee cites *Granite Partners* for the proposition that "[t]he duty to disclose under Bankruptcy Rule 2014 is ongoing, continues throughout the case, and requires spontaneous, timely, and complete disclosure" and the parenthetical that "court[s] should not have to 'rummage through files or conduct independent fact-finding investigations' to determine whether the professional should be disqualified." (Objection ¶ 46). |
| | | However, the *Granite Partners* makes clear that the purpose of Bankruptcy Rule 2014 disclosures is "***to determine qualification under section 327***." The attorney in *Granite Partners* was employed as an estate professional and further was sanctioned only to the extent necessary to prevent compensation for matters on which the attorney could not be retained under section 327.  Nothing in *Granite Partners* supports sanctioning a *different* law firm in a *different* case for the actions of an attorney that was not, at the time of the asserted non-disclosure, seeking to be retained by the bankruptcy estate. The case does not support the U.S. Trustee's position in the Objection. |
| 19 | *In re Griffin*, 313 B.R. 757, 763 (Bankr. N.D. Ill. 2004). | Overview: |
| | | In *Griffin*, the attorney to a chapter 7 debtor sought payment from the estate for post-petition services provided to the debtor. The attorney was never retained by the chapter 7 trustee. Additionally, the debtors took a post-petition loan to pay the attorney's fees for work related to redeeming the debtor's vehicle (pursuant to a prepetition retainer agreement). The bankruptcy court held that the fees were not allowable, were not properly disclosed pursuant to Bankruptcy Code § 329 or Bankruptcy Rule 2016, and had to be disgorged if already paid. |
| | | Analysis: |
| | | The U.S. Trustee quotes the following language from *Griffin*: "The disclosure requirements in Rule 2014 are 'rooted in the fiduciary relationship between courts and attorneys.'" (Objection ¶ 47). The U.S. Trustee appears to misrepresent the following language from *Griffin* in the Objection: |
| | | > Section 329 of the Code and Rule 2016(b) are rooted in the fiduciary relationship between courts and attorneys. |
| | | In any event, as important as Bankruptcy Rule 2014 may be, that is not a reason to use the important requirement as a club against this Debtor as requested by the U.S. Trustee. |
| 20 | *In re Am. Int'l Refinery, Inc.*, 676 F.3d 455, 465 (5th Cir. 2012). | Overview: |
| | | In *American International Refinery*, the liquidating trustee in a chapter 11 case brought an adversary proceeding against the chapter 11 debtors' former attorneys seeking disgorgement of fees during the bankruptcy. The bankruptcy court ordered a sanction of $135,000 for the attorney's failure to adequately |

004644

| | | |
|---|---|---|
| | | disclose various connections it had to the debtors and creditors, but found that the attorney did not have a disqualifying adverse interest and did not disgorge the remaining $607,000 that the attorney received in the case. The liquidating trustee appealed. The Fifth Circuit Court of Appeals affirmed the decision of the bankruptcy court.<br><br>Analysis:<br><br>The U.S. Trustee quotes the following language from *American International Refinery*: "Applicants 'who fail to disclose timely and completely their connections proceed at their own risk because failure to disclose is sufficient grounds to revoke an employment order and deny compensation.'" (Objection ¶ 47).<br><br>Again, considering the broader language from which the U.S. Trustee derived its quotation is necessary to understand what the case actually said:<br><br>    Courts may deny all compensation to professionals who fail to make adequate disclosure, and "counsel who fail to disclose timely and completely their connections proceed at their own risk because failure to disclose is sufficient grounds to revoke an employment order and deny compensation." *West Delta Oil*, 432 F.3d at 355 (quotation marks omitted); *see also Rome v. Braunstein*, 19 F.3d 54, 59-60 (1st Cir. 1994) ("Absent the spontaneous, timely and complete disclosure required by section 327(a) and [Rule] 2014(a), court-appointed counsel proceed at their own risk."). In determining an appropriate sanction, an important consideration is whether the failure was intentional. *Crivello*, 134 F.3d at 839 (stating that "a bankruptcy court should punish a willful failure to disclose the connections . . . as severely as an attempt to put forth a fraud on the court.").<br><br>*American International Refinery* supports the proposition that *if* Mr. Lee had failed to disclose his connections with FSS in the IW Cases, been employed by the IW Debtors' bankruptcy, and sought compensation, the Court would have discretion to deny such requested fees. Because of the U.S. Trustee's insistence on dismissing the IW Cases, that never happened. The Fifth Circuit's decision does not support for the U.S. Trustee's position in the Objection. |
| 21 | *In re Midway Indus. Contractors, Inc.*, 272 B.R. 651, 664 (Bankr. N.D. Ill. 2001). | Overview:<br><br>In *Midway*, in connection with a final fee application after conversion of a case from chapter 11 to chapter 7, counsel for a chapter 11 debtor sought compensation that included amounts due under an undisclosed contingency fee arrangement, and attorney lien claim. The U.S. trustee and certain creditors objected to the fee application because of the failure to disclose the connections under Bankruptcy Rule 2014 and the waiver implied thereby. The bankruptcy court allowed only approximately 55% of the attorney's fees, considering, among other things, the period of time it took the attorney to make the disclosure and the certain prejudice to the estate caused by such non-disclosure. The bankruptcy court disallowed the attorney lien claim. |

004645

| | | |
|---|---|---|
| | | Analysis:<br><br>The U.S. Trustee quotes the following language from *Midway*: "'[L]ack of disclosure in and of itself is sufficient to warrant disqualification, even if in the end there was no prejudice.'" (Objection ¶ 47). The context of the quote is as follows:<br><br>    Trippo argues that the lack of disclosure has not caused any prejudice to the estate in general. This argument ignores the objective of requiring disclosure. The objective of requiring disclosure is not so much to protect against prejudice to the estate, but to ensure undivided loyalty and untainted advice from professionals. *Crivello*, 134 F.3d at 836. That is why lack of disclosure in and of itself is sufficient to warrant disqualification, even if in the end there was no prejudice. *Filene's Basement*, 239 B.R. at 849. Trippo's lack of prejudice argument is relevant, however, in assessing the amount of disallowance, which is discussed below. *See Diamond Mortgage*, 135 B.R. at 96.<br><br>*Midway* does not support the U.S. Trustee's position in the Objection. There is no dispute that S&L has disclosed relevant connections in the Debtor's chapter 11 case. The decision does not indicate that a professional who is no longer seeking to be retained as an estate professional has an obligation to supplement disclosures. Nor does the decision indicate that a failure of an attorney in a previous case, for a different client, at a different law firm, should be disqualifying. |
| 22 | *In re Rabex Amuru of N.C., Inc.*, 198 B.R. 892, 897 (Bankr. M.D.N.C. 1996). | Overview:<br><br>*Rabex* involved an application by a chapter 11 debtor to employ an attorney. There was a dispute about the ownership of the equity interests in the debtor between to potential parent companies and the debtor was a named defendant in related state court litigation. One of these parent companies paid the retainer for the debtor's proposed attorney, was continuing to make the attorney's payment during the chapter 11 case, and authorized the bankruptcy filing. The bankruptcy court determined that these facts created the appearance of a conflict of interest sufficient that the attorney was not a disinterested person despite the lack of any wrongdoing by the attorney.<br><br>Analysis:<br><br>The U.S. Trustee cites *Rabex* for the proposition that "[l]ack of disclosure in and of itself is sufficient to warrant disqualification, even if in the end there was no prejudice" and indicates in the parenthetical that "attorneys for debtor removed because of the appearance of impropriety, even though no harm done to the debtor[.]'" (Objection ¶ 47). That is not an accurate representation of what the case stands for—there was no issue with disclosure in Rabex and the bankruptcy court held that being paid by one of the disputed owners of the debtor amounted to attorney no longer being a disinterested person.<br><br>In any event, the facts of *Rabex* are not relevant to the Trustee's position in the Objection. |

004646

| 23 | *In re Byington*, 454 B.R. 648, 657 (Bankr. W.D. Va. 2011). | Overview: |
|---|---|---|

Overview:

The relevant issue in *Byington* was whether there was an obligation to disclose a pre-filing transfer by the debtors' son for the filing fee for the chapter 11 case. The bankruptcy court held that the pre-filing transfer from the debtors' son should have been disclosed. Because of the novelty of the issue, however, the bankruptcy court held that the failure to disclose the payment was not sufficient to deny the application to employ the attorney but that the attorney would not be entitled to compensation for correcting the deficiency or in asserting that the disclosure was not required.

Analysis:

The U.S. Trustee quotes the following language from *Byington*: "Professionals must 'be meticulous in disclosing 'all connections' with the debtor and other parties in interest, the failure to do so justifying a court's taking significant punitive or corrective action." (Objection ¶ 47)

Again, looking at the context of the language quoted by the U.S. Trustee makes clear that this obligation only applies to professionals who are actively seeking to be employed by the estate:

> Published bankruptcy court decisions are quite consistent in requiring that debtors-in-possession and their attorneys, ***whose employment is sought to be approved***, be meticulous in disclosing "all connections" with the debtor and other parties in interest, the failure to do so justifying a court's taking significant punitive or corrective action.

*Byington* does not support the U.S. Trustee's position that Mr. Lee was required to supplement his disclosure for KSLPLLC after the IW Debtors had decided to dismiss their cases, as demanded by the U.S. Trustee, and no longer intended to pursue Mr. Lee's employment as an estate professional. It certainly does not support the U.S. Trustee's position that this should be imputed on *this* Debtor seeking to employ S&L in *this* chapter 11 case.

Moreover, *Byington* suggests what would be an appropriate action for the Court to take here if it determines that Mr. Lee's disclosure of connections in the IW Cases was deficient: Like the bankruptcy court in *Byington* did, the Court should simply not allow Mr. Lee compensation for asserting the disclosure was not required. Denial of the Debtor's application to employ S&L and harm to the Debtor's estate and administration if its chapter 11 case is not called for here.

| 24 | *In re EBW Laser Inc.*, 333 B.R. 351, 359 (Bankr. M.D.N.C. 2005). | Overview: |
|---|---|---|

Overview:

In EBW Laser, an attorney was retained as special counsel to a chapter 11 debtor on a contingency fee basis to pursue litigation against a third-party. The chapter 11 case was converted to a case under chapter 7 and the chapter 7 trustee, acting as his own counsel, negotiated a settlement with the defendant in which the bankruptcy estate received a cash payment. The attorney submitted an application for compensation based on the

16

contingency fee agreement under which he was retained in the chapter 11 case. The bankruptcy court rejected the attorney's argument for contingency fees but held that the attorney was entitled to reasonable compensation for the post-petition, pre-conversion services provided as a chapter 11 administrative expense claim.

Among the issues raised by the chapter 7 trustee in his objection to the attorney's fee application was that the attorney inadequately disclosed the terms of the prepetition engagement of the attorney by the debtor. The attorney claimed that there was a side agreement that was essential to the chapter 7 trustee's ultimate settlement but that side agreement was not disclosed. Although the bankruptcy court held that the attorney's affidavit provided largely met the requirements of Bankruptcy Rule 2014, the court reduced the compensation awarded to the attorney by $3,000 (10%) because of the failure to disclose the side agreement.

Analysis:

The U.S. Trustee quotes the following language from *EBW Laser*: "The Bankruptcy Court may, in its discretion, disqualify counsel, or deny compensation, as a sanction for failure to make the disclosure required." (Objection ¶ 47). While the quoted language was contained in the opinion, that is not what the bankruptcy court did.

*EBW Laser* also demonstrates that what the U.S. Trustee is seeking through the Objection is in fact a sanction. The Application in *this* case by *this* Debtor is not the appropriate place for the U.S. Trustee to seek or the Court to impose that sanction.

| 25 | *In re eToys, Inc.*, 331 B.R. 176, 189 (Bankr. D. Del. 2005). | Overview:<br><br>In *eToys*, a shareholder and administrative claimant of a chapter 11 debtor, and the U.S. trustee filed motions seeking various relief against attorneys and consultants for the debtor and committee, including disgorgement of fees. Certain of the motions were settled or addressed for procedural reasons while others were decided on the merits. Among other things, the bankruptcy court found that the debtor's attorney had a disqualifying conflict and failed to adequately disclose that connection. The bankruptcy court ordered the attorney's fees paid in the case for matters related to that conflict to be disgorged.<br><br>Analysis:<br><br>The U.S. Trustee quotes the following language from *eToys* in the Objection:<br><br>It "goes to the heart of the integrity of the bankruptcy system." *In re eToys, Inc.*, 331 B.R. 176, 189 (Bankr. D. Del. 2005). "[T]he duty to disclose under Bankruptcy Rule 2014 is considered sacrosanct because the complete and candid disclosure **by an attorney seeking employment** is indispensable to the court's discharge of its duty to **assure the attorney's eligibility for employment under section 327(a)** and to make an informed decision on whether the engagement is in the best interest of the estate." *Id.* |

17

| | | |
|---|---|---|
| | | (Objection ¶ 48) (emphasis added). The very language quoted by the U.S. Trustee in the Objection indicates that the reasoning does not apply to Mr. Lee under the facts present here. *eToys* does not support the U.S. Trustee's position in the Objection. |
| 26 | *In re Matco Elec. Group, Inc.*, 383 B.R. 848, 853-54 (Bankr. N.D.N.Y. 2008). | Overview: |
| | | In *Matco*, the U.S. trustee field a motion seeking to disallow and disgorge fees paid to former counsel to the an official committee in a chapter 11 case. In its Bankruptcy 2014 declaration accompanying the application to employ the attorney, it disclosed that one of the members of its firm was related to an officer and shareholder of one of the debtor's significant creditors. The U.S. trustee asserted that the disclosure was insufficient. The bankruptcy court agreed that the disclosure of the connection was purposely vague and reduced the attorney's final fees by one-half of the amount of holdback of interim fees awarded in the case. |
| | | Analysis: |
| | | The U.S. Trustee quotes the following language from *Matco*: |
| | | > As noted, Rule 2014 "is not intended to condone a game of cat and mouse where the ***professional seeking appointment*** provides only enough disclosure to whet the appetite of the UST, the court, and other parties in interest, and the burden shifts to those entities to make inquiry in an effort to expand the disclosure." |
| | | (Objection ¶ 48). Again, the language that the U.S. Trustee decided to quote in the Objection indicates that the obligation to make disclosures only applies to professionals that are seeking to be employed as estate professionals. *Matco* does not support the U.S. Trustee's position that a professional is obligated to supplement disclosures under Bankruptcy Rule 2014 after the debtor has decided to agree with the U.S. trustee to dismiss its case and the professional is no longer seeking employment (or compensation) in the case. |
| 27 | *In re Bradley*, 495 B.R. 747, 786 (Bankr. S.D. Tex. 2013). | Overview: |
| | | In *Bradley* the bankruptcy court imposed on an attorney, his firm, and the attorney's assistant because (a) the attorney allowing his non-lawyer assistant to prepare conversion schedules and statement of financial affairs and file such documents without requiring the debtors to review and sign them and (b) the attorney allowed an unprepared appearance attorney to represent the debtors at section 341 meetings without disclosing the amount paid to such attorney. |
| | | Analysis: |
| | | The U.S. Trustee cites *Bradly* for the proposition that "[b]y remaining whether in pleadings, at hearings, or by failing to amend the InfoW Lee Declaration, Attorney Lee misrepresented his connections to the Court and violated the ethical duties of candor and diligence" with the parenthetical explanation that an "[a]ttorney's failure to correct misstatements demonstrated a lock of candor and respect to the Court). (Objection ¶ 50). |

With such a bold statement one might think that the U.S. Trustee would have equally bold support. But the facts at issue in *Bradley* are just as inapposite as every other authority cited by the U.S. Trustee in the Objection. The conduct that the bankruptcy court found violated ethical duties in *Bradley* were as follows:

> [Attorney] breached Guideline D in at least the following respects: (1) he filed the Defective Pleadings without obtaining the Debtors' signatures, [Finding of Fact Nos. 25(a), 32(b), 35(b)]; (2) he allowed his legal assistant (i.e., Gutierrez) to forge the Debtors' original signatures on the Defective Pleadings, [Finding of Fact Nos. 25, 31, 32(b), 34]; (3) he instructed Gutierrez to file the Initial Conversion Schedules, the Initial Conversion SOFA, the Amended Conversion Schedules, and the Amended Conversion SOFA despite knowing that those documents contained inaccuracies or knowing that he had not checked to confirm that the information contained therein was entirely accurate, [Finding of Fact Nos. 32(c), 36]; (4) he failed to inform the Debtors that Carter would represent them at their meetings of creditors, [Finding of Fact No. 38(d)]; (5) he did not prepare Carter for either of the Debtors' meetings of creditors, [Finding of Fact Nos., 38, 53]; (6) he filed, or allowed to be filed, an incorrect Rule 2016 Disclosure, [Finding of Fact No. 37]; and (7) he failed to own up to these transgressions until after the Chapter 7 Trustee brought them to the attention of the Court. Each of these actions alone is cause for concern; taken together, they seriously undermine Aduwa's personal integrity and professional reputation.

In turn, Mr. Lee did not amend his Bankruptcy Rule 2014 disclosures in the three (3) business days after first meeting with FSS because the IW Debtors had decided to agree with the U.S. Trustee to dismiss their cases and were no longer seeking to retain Mr. Lee as an estate professional.

# **EXHIBIT C**

004651

| **Subject:** | InfoW\Motion to Dismiss Chapter 11 Cases |
| **Date:** | Monday, May 23, 2022 at 8:25:59 PM Central Daylight Time |
| **From:** | Kyung S. Lee <klee@kslpllc.com> |
| **To:** | Marc Schwartz <mschwartz@schwartzassociates.us>, Christian Schwartz <cschwartz@schwartzassociates.us>, Harold Lee <hlee@schwartzassociates.us> |

**Attachments:** InfoW_MotiontoDismissChapter11Cases_5_23_22_8PM.docx

Everyone: Here is a first draft of the Motion to Dismiss the Chapter 11 Cases. Please review and provide me your comments. I would like to at least have in my mind know that we have done what we were supposed to have done as fiduciaries for the 3 debtors and have concluded with the CRO that dismissal is the route to go and is in the best interest of the Debtors, their estates and creditors.

I would like to file this Motion to Dismiss by Wednesday and skip the 341 Meeting of Creditors on Thursday, which will be more waste of fees and expenses of these 3 debtors for the CRO and his professionals.

**Kyung S. Lee**
Kyung S. Lee PLLC
**Pennzoil Place**
**700 Milam-Suite 1300**
**Houston, Texas 77002**
Email: klee@kslpllc.com
**Cell: (713) 301-4751**
Alternate Email: kslee50@gmail.com

Confidentiality Notice: The information contained in this communication is strictly limited to the recipient intended by the sender of this communication. This email, and any attachments, may contain confidential attorney-client privileged information and attorney work product. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email and destroy this communication and all copies thereof, including all attachments. ***DISCLAIMER*** Per Treasury Department Circular 230: Any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

004652

# **EXHIBIT D**

004653

Thursday, June 16, 2022 at 13:51:07 Central Daylight Time

**Subject:**  InfoW

**Date:**  Tuesday, May 17, 2022 at 8:34:29 AM Central Daylight Time

**From:**  Ruff, Jayson B. (USTP)

**To:**  kslee50@gmail.com

**Attachments:** image001.png

***Settlement Communication Subject to FRE 408***

Kyung,

Following on our conversation yesterday, please let me know when you have had a chance to discuss these matters with Marc.  As I mentioned yesterday, the UST still believes that the best option is for these cases to be dismissed and we intend to push forward with our motion.  That will include getting discovery from your client.  I have been holding off on doing that at your request, but time is running very short so we will need to resolve these matters very soon or you will need to give me a date early next week for a deposition of Marc.  As set forth in our pleadings, these cases have the badges of a bad faith filing.  Even with all of the Sandy Hook Plaintiffs "leaving the party" so to speak, that does not change how these cases arrived.  I understand that there are a few creditors that remain, but each of those can be paid following dismissal and payment agreements could be made outside of bankruptcy.

A few things to consider:

- I would note that according to the schedules filed by these Debtors, Mr. Jones and FSS (the "Jones Parties") are co-liable for all of the Debtors' remaining debts.  Given that the Jones Parties are also the primary source of funding for these Debtors' cases, they can agree to fund payment of these claims outside of bankruptcy as well.
- Inside of bankruptcy, it would appear that because Mr. Jones was taking royalty payments that belonged to IWHealth prepetition, that Debtors' estates would have claims against Mr. Jones for the return of those funds anyway.  Another reason for the Jones Parties to agree to pay the Debtors' remaining creditors outside of bankruptcy.  I am sure the royalty payments he received exceeds the amount of the Debtors' remaining debts.
- The Jones Parties are the primary funding sources for Debtors inside of and outside of bankruptcy.  They have already committed $725k toward resolving the claims of these Debtors.  Is there any reason why those funds could not be used to pay the remaining creditors of the Debtor following dismissal?  Seems like that amount may be more than enough.  Continuing in the bankruptcy will likely require significantly more funding.
- Based on the declarations filed with the petitions and statements made in court, it appears these Debtors are simply holding companies with no operations to speak of.  What is there to even reorganize?  Seems that dismissal or possibly conversion even are the better options for these Debtors.  Although, I understand that conversion would mean that the Jones Parties ability to use the IP held by the Debtors may then be at risk.  Another reason for them to agree to pay those creditors outside of bankruptcy.
- Dismissal is the more efficient and cheaper option for these Debtors as it will save from administrative and litigation costs and will still allow Debtors options to resolve their claims.

More can be said, but I believe the foregoing is enough.  I am hopeful that we can come to an agreement soon.  Please let me know when you believe you will be in a position to discuss these matters further.

Kinds regards,

*Jayson B. Ruff*

Trial Attorney
Office of the United States Trustee
515 Rusk St., Suite 3516
Houston, Texas 77002
713-718-4650 Ext 252 (office)
202-573-6960 (mobile)
jayson.b.ruff@usdoj.gov



PLEASE DO NOT read, copy or disseminate this Internet E-mail if you are not the intended addressee. This E-mail may contain privileged information intended only for the addressee. If you have received this E-mail in error, please call us immediately at (713) 718-4650 and ask to speak to the sender of the communication.  Also, please notify the sender immediately, by E-mail, that you have received this E-mail in error and have deleted it.

# **EXHIBIT E**

004656

# Kyung S. Lee PLLC

700 Milam, Suite 1300
Houston, Texas 77002

# INVOICE

Invoice # 2
Date: 06/07/2022
Due On: 07/07/2022

W. Marc Schwartz
Free Speech Systems, LLC
712 Main Street-Suite 1830
HOUSTON, Texas 77002

## 00003-Free Speech Systems, LLC

## Represent FSS in connection with preparation of FSS for potential filing of bankruptcy as a Subchapter v Debtor.

| Type | Date | Notes | Quantity | Rate | Total |
|------|------|-------|----------|------|-------|
| Service | 05/24/2022 | Research and email RJ Shannon on background research of FSS so as to be prepared for discussion in Austin (1.5); travel to and from Austin, Texas and not working (charged at 1/2 time of 6 hours)(3); extended conference with client, Schwartz Associates, B. Roe, S. Jordan, and RJ Shannon to discuss options and issues with FSS restructuring (5.0) | 9.50 | $850.00 | $8,075.00 |
| Service | 05/25/2022 | Follow-up with research on background facts relating to how FSS came about, operational history and litigation history of same for purposes of drafting First Day Declaration of Marc Schwartz (3.0) | 3.00 | $850.00 | $2,550.00 |
| Service | 05/25/2022 | Follow-up on data received at meeting, new data gathered and research for prose on historical operations of FSS (2.0) | 2.00 | $850.00 | $1,700.00 |
| Service | 05/26/2022 | Review and analyze 2 Valuation Reports for PQPR and FSS, analyze same for background information on FSS for pleadings and determine status of case information in both (2.0) | 2.00 | $850.00 | $1,700.00 |
| Service | 05/27/2022 | Coordinate with State Court counsel on sanctions issues and explain approach to handling same (.5); numerous conferences with S. Lemmon, counsel for PQPR (1.0); locate critical documents for S. Lemmon and forward (.5) | 2.00 | $850.00 | $1,700.00 |
| Service | 05/28/2022 | Analyze State Court litigation production to determine data produced to opposing counsel in state court and collect key documents to share with parties (2.0) | 2.00 | $850.00 | $1,700.00 |
| Service | 05/29/2022 | Continue to review financial data discovered during search of State Court litigation production and analyze same (2.0) | 2.00 | $850.00 | $1,700.00 |

004657

| Service | 05/30/2022 | Review and analyze background corporate documents and additional documents discovered from reviewing State Court production in DropBox files (2.0) | 2.00 | $850.00 | $1,700.00 |
| Service | 05/31/2022 | Work on Declaration for Marc Schwartz as CRO for FSS and incorporate facts learned through investigation (4.0) | 4.00 | $850.00 | $3,400.00 |

| | | | | **Total** | **$24,225.00** |

## Detailed Statement of Account

### Other Invoices

| Invoice Number | Due On | Amount Due | Payments Received | Balance Due |
|---|---|---|---|---|
| 7 | 07/07/2022 | $184.09 | $0.00 | $184.09 |

### Current Invoice

| Invoice Number | Due On | Amount Due | Payments Received | Balance Due |
|---|---|---|---|---|
| 2 | 07/07/2022 | $24,225.00 | $0.00 | $24,225.00 |
| | | | **Outstanding Balance** | **$24,409.09** |
| | | | **Total Amount Outstanding** | **$24,409.09** |

Please make all amounts payable to: Kyung S. Lee PLLC

Please pay within 30 days.

004658

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | **Chapter 11** |
| **Free Speech Systems LLC** | § | |
| | § | **Case No. 22-60043 (CML)** |
| **Debtor.** | § | |
| | § | |

## NOTICE OF APPEARANCE AND REQUEST FOR SERVICE

**PLEASE TAKE NOTICE** that Richard A. Cochrane of Akin Gump Strauss Hauer & Feld

LLP is appearing on behalf of Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa,

and Marcel Fontaine (collectively, the "Texas Plaintiffs") and David Wheeler, Francine Wheeler,

Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto,

Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino, William Aldenberg, William Sherlach,

and Robert Parker (collectively, the "Connecticut Plaintiffs," together with the Texas Plaintiffs, the

"Sandy Hook Families"),[1] creditors and parties-in-interest in the above-captioned case, pursuant

to section 1109(b) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 9010(b)

of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and respectfully requests,

pursuant to Bankruptcy Rules 2002, 3017, and 9007 and Bankruptcy Code sections 342 and

1109(b), that copies of all notices given or required to be given in the above captioned cases and

all papers served or required to be served in such cases be served upon the following:

---

[1] Marcel Fontaine was not defamed relating to the Sandy Hook tragedy.  Instead, he was defamed relating to the Parkland shooting.  For ease of reference, however, all tort claimants shall be referred to as the Sandy Hook Families.

004659

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Richard A. Cochrane
Texas State Bar No. 24116209
2300 N. Field Street, Suite 1800
Dallas, TX 75201
Telephone: (214) 969-2800
Facsimile: (214) 969-4343
email: rcochrane@akingump.com

**PLEASE TAKE FURTHER NOTICE** that, pursuant to Bankruptcy Code section 1109(b), the foregoing request includes not only the notices and papers referred to in the Bankruptcy Rules specified above, but also includes, without limitation, notices of any application, complaint, demand, hearing, motion, petition, order, pleading, or other request, whether formal or informal, whether written or oral and whether transmitted or conveyed by mail, hand delivery, telephone, electronic mail, or otherwise, that is filed or given in connection with the above-captioned cases.

**PLEASE TAKE FURTHER NOTICE** that neither this Notice of Appearance nor any subsequent appearance, pleading, claim, or suit is intended or shall be deemed or construed to be a waiver of any substantive or procedural rights of this request shall not be deemed or construed to be a waiver of any substantive or procedural rights of the Sandy Hook Families, including, without limitation: (i) to have final orders in non-core matters entered only after *de novo* review by the United States District Court for the Southern District of Texas (the "District Court"); (ii) to have a trial by jury in any proceeding related to these cases or any case, controversy or proceeding related to these cases; (iii) to have the District Court withdraw the reference in any matter subject to mandatory or discretionary withdrawal; and (iv) any other rights, claims, actions or defenses to which the Sandy Hook Families may be entitled in law, in equity, or otherwise, all of which rights, claims, actions and defenses are expressly reserved.

2

**PLEASE TAKE FURTHER NOTICE** that the aforementioned attorney requests that he be added to the official service list for notice of all contested matters, adversary proceedings, and other proceedings in these cases.

Dated: September 16, 2022                Respectfully Submitted,

                                                    **AKIN GUMP STRAUSS HAUER & FELD LLP**

                                                    */s/  Richard A. Cochrane*
                                                    Richard A. Cochrane
                                                    Texas State Bar No. 24116209
                                                    2300 N. Field Street, Suite 1800
                                                    Dallas, TX  75201-2481
                                                    Telephone: (214) 969-2800
                                                    Facsimile:  (214) 969-4343
                                                    email: rcochrane@akingump.com

                                                    ***Counsel to the Sandy Hook Families***

004661

## <u>CERTIFICATE OF SERVICE</u>

I certify that on September 16, 2022, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.


*/s/   Richard A. Cochrane*
Richard A. Cochrane

004662

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | **Chapter 11** |
| **Free Speech Systems LLC** | § | |
| | § | **Case No. 22-60043 (CML)** |
| Debtor. | § | |
| | § | |

## NOTICE OF APPEARANCE AND REQUEST FOR SERVICE

**PLEASE TAKE NOTICE** that Nicholas R. Lombardi of Akin Gump Strauss Hauer & Feld LLP is appearing on behalf of Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and Marcel Fontaine (collectively, the "Texas Plaintiffs") and David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino, William Aldenberg, William Sherlach, and Robert Parker (collectively, the "Connecticut Plaintiffs," together with the Texas Plaintiffs, the "Sandy Hook Families"),[1] creditors and parties-in-interest in the above-captioned case, pursuant to section 1109(b) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 9010(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and respectfully requests, pursuant to Bankruptcy Rules 2002, 3017, and 9007 and Bankruptcy Code sections 342 and 1109(b), that copies of all notices given or required to be given in the above captioned cases and all papers served or required to be served in such cases be served upon the following:

---

[1] Marcel Fontaine was not defamed relating to the Sandy Hook tragedy.  Instead, he was defamed relating to the Parkland shooting.  For ease of reference, however, all tort claimants shall be referred to as the Sandy Hook Families.

1

004663

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Nicholas R. Lombardi
Texas State Bar No. 24128023
2300 N. Field Street, Suite 1800
Dallas, TX  75201
Telephone:  (214) 969-2800
Facsimile:  (214) 969-4343
email:  nlombardi@akingump.com

**PLEASE TAKE FURTHER NOTICE** that, pursuant to Bankruptcy Code section 1109(b), the foregoing request includes not only the notices and papers referred to in the Bankruptcy Rules specified above, but also includes, without limitation, notices of any application, complaint, demand, hearing, motion, petition, order, pleading, or other request, whether formal or informal, whether written or oral and whether transmitted or conveyed by mail, hand delivery, telephone, electronic mail, or otherwise, that is filed or given in connection with the above-captioned cases.

**PLEASE TAKE FURTHER NOTICE** that neither this Notice of Appearance nor any subsequent appearance, pleading, claim, or suit is intended or shall be deemed or construed to be a waiver of any substantive or procedural rights of this request shall not be deemed or construed to be a waiver of any substantive or procedural rights of the Sandy Hook Families, including, without limitation:  (i) to have final orders in non-core matters entered only after *de novo* review by the United States District Court for the Southern District of Texas (the "District Court"); (ii) to have a trial by jury in any proceeding related to these cases or any case, controversy or proceeding related to these cases; (iii) to have the District Court withdraw the reference in any matter subject to mandatory or discretionary withdrawal; and (iv) any other rights, claims, actions or defenses to which the Sandy Hook Families may be entitled in law, in equity, or otherwise, all of which rights, claims, actions and defenses are expressly reserved.

2

**PLEASE TAKE FURTHER NOTICE** that the aforementioned attorney requests that he be added to the official service list for notice of all contested matters, adversary proceedings, and other proceedings in these cases.

Dated: September 16, 2022                                  Respectfully Submitted,

                                                          **AKIN GUMP STRAUSS HAUER & FELD LLP**


                                                          */s/  Nicholas R. Lombardi*
                                                          Nicholas R. Lombardi
                                                          Texas State Bar No. 24128023
                                                          2300 N. Field Street, Suite 1800
                                                          Dallas, TX  75201-2481
                                                          Telephone: (214) 969-2800
                                                          Facsimile:  (214) 969-4343
                                                          email: nlombardi@akingump.com



                                                          ***Counsel to the Sandy Hook Families***

004665

## CERTIFICATE OF SERVICE

I certify that on September 16, 2022, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.


*/s/   Nicholas R. Lombardi*
Nicholas R. Lombardi

4

UNITED STATES BANKRUPTCY COURT          SOUTHERN DISTRICT OF TEXAS

MOTION AND ORDER
FOR ADMISSION *PRO HAC VICE*

| Division | Houston | Main Case Number | 22-60043 |
|---|---|---|---|
| Debtor | In Re: | Free Speech Systems LLC | |

This lawyer, who is admitted to the State Bar of _____ New York _____ :

| | |
|---|---|
| Name<br>Firm<br>Street<br>City & Zip Code<br>Telephone<br>Licensed: State & Number | David M. Zensky<br>Akin Gump Strauss Hauer & Feld LLP<br>One Bryant Park, 41st Floor<br>New York, NY 10036<br>(212) 872-1000<br>NY 2176691 |

Seeks to appear as the attorney for this party:

| The Sandy Hook Families,** creditors and parties-in-interest |
|---|
| Dated: 9/16/2022          Signed: /s/ David M. Zensky |

| COURT USE ONLY: The applicant's state bar reports their status as: _____. |
|---|
| Dated:          Signed: _____<br>                    Deputy Clerk |

Order

This lawyer is admitted *pro hac vice*.

Dated: _____          _____
                              United States Bankruptcy Judge

**Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and Marcel Fontaine (collectively, the "Texas Plaintiffs") and David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino, William Aldenberg, William Sherlach, and Robert Parker (collectively, the "Connecticut Plaintiffs", together with the Texas Plaintiffs, the "Sandy Hook Families").

UNITED STATES BANKRUPTCY COURT          SOUTHERN DISTRICT OF TEXAS

MOTION AND ORDER
FOR ADMISSION *PRO HAC VICE*

| Division | Houston | Main Case Number | 22-60043 |
|---|---|---|---|
| Debtor | In Re: | Free Speech Systems LLC | |

This lawyer, who is admitted to the State Bar of _____ New York _____ :

| | |
|---|---|
| Name<br>Firm<br>Street<br>City & Zip Code<br>Telephone<br>Licensed: State & Number | Melanie Miller<br>Akin Gump Strauss Hauer & Feld LLP<br>One Bryant Park, 43rd Floor<br>New York, NY 10036<br>(212) 872-1000<br>NY 5604202 |

Seeks to appear as the attorney for this party:

| The Sandy Hook Families,** creditors and parties-in-interest | |
|---|---|
| Dated: 9/16/2022 | Signed: /s/ Melanie Miller |

| COURT USE ONLY: The applicant's state bar reports their status as: _____. | |
|---|---|
| Dated: | Signed: _____<br>Deputy Clerk |

Order

This lawyer is admitted *pro hac vice*.

Dated: _____          _____
United States Bankruptcy Judge

**Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and Marcel Fontaine
(collectively, the "Texas Plaintiffs") and David Wheeler, Francine Wheeler, Jacqueline Barden,
Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi,
Carlos M. Soto, Jillian Soto-Marino, William Aldenberg, William Sherlach, and Robert Parker
(collectively, the "Connecticut Plaintiffs", together with the Texas Plaintiffs, the "Sandy Hook
Families").

004668

IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 22–60043 |
| | § | |
| FREE SPEECH SYSTEMS, LLC, | § | Chapter 11 |
| | § | Subchapter V |
| Debtor. | § | |

---

**THE TEXAS PLAINTIFFS' NOTICE OF DEPOSITION TO FREE SPEECH SYSTEMS, LLC PURSUANT TO FED. R. CIV. P. 30(b)(6)**

---

TO:   **Free Speech Systems, LLC, Debtor**
  **3019 Alvin Devane Boulevard, Suite 300**
  **Austin, TX 78741**

PLEASE TAKE NOTICE that, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, applicable to this proceeding under Rules 7030 and 9014 of the Federal Rules of Bankruptcy Procedure, Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and Marcel Fontaine ("**Texas Plaintiffs**") will conduct the oral deposition of one or more officers, directors, agents or other representatives of Free Speech Systems, LLC ("**FSS**") on **September 23, 2022 at 10:00 a.m., prevailing central time, at the law offices of Akin, Gump, Strauss, Hauer & Feld, LLP, 1111 Louisiana St., 44th Floor, Houston, TX 77002.**

FSS shall produce one or more officers, directors, agents or other representatives most knowledgeable and prepared to testify regarding the topics described in **Exhibit A**. The Texas Plaintiffs request that FSS provide written notice at least five (5) business days before the deposition of the name(s) and employment position(s) of the individual(s) designated to testify on FSS's behalf.

---

004669

The deposition shall be taken before a person duly authorized by law to administer oaths, and may be recorded by stenographic, audiographic, and/or videotaped means. The deposition shall continue from day to day thereafter or as otherwise agreed by the parties, until completed.

Dated: September 16, 2022

Respectfully submitted,

**MCDOWELL HETHERINGTON LLP**

Avi Moshenberg
Texas Bar No. 24083532
1001 Fannin Street, Suite 2700
Houston, Texas 77002
D: 713-337-5580
F: 713-337-8850
E: Avi.Moshenberg@mhllp.com

***Counsel for the Texas Plaintiffs***

and

**CHAMBERLAIN, HRDLICKA, WHITE, WILLIAMS & AUGHTRY, P.C.**

By: */s/ Jarrod B. Martin*
Jarrod B. Martin
Texas Bar No. 24070221
Tara T. LeDay
Texas Bar No. 24083068
1200 Smith Street, Suite 1400
Houston, Texas 77002
D: 713.356.1280
F: 713.658.2553
E: jarrod.martin@chamberlainlaw.com
E: tara.leday@chamberlainlaw.com

***Bankruptcy Counsel for Texas Plaintiffs***

## <u>CERTIFICATE OF SERVICE</u>

This will certify that on September 16, 2022, a true and correct copy of the foregoing document was served via electronic transmission to all registered ECF users appearing in the case and will be sent via first-class, postage prepaid, United States mail on September 19, 2022 as follows:

Free Speech Systems, LLC, Debtor
3019 Alvin Devane Boulevard, Suite 300
Austin, TX 78741

Raymond William Battaglia
Law Offices of Ray Battaglia, PLLC
66 Granburg Circle
San Antonio, TX 78218

Kyung Shik Lee
Shannon & Lee LLP
Pennzoil Place – 13th Floor
700 Milam
Houston, TX 77002

R.J. Shannon
Shannon & Lee LLP
Pennzoil Place – 13th Floor
700 Milam
Houston, TX 77002

*/s/ Jarrod B. Martin*
Jarrod B. Martin

## EXHIBIT A

In accordance with Fed. R. Civ. P. 30(b)(6), Texas Plaintiffs designate the matters identified below for examination.

1.      Communications and documents FSS exchanged with Blue Asension.

2.      FSS's internal communications and documents about outsourcing Free Speech Systems' product-fulfillment services.

3.      Communications and documents exchanged with PQPR Holdings Limited, LLC ("**PQPR**") regarding any debts, agreements, contracts, promissory notes, invoices, product orders, product sales, and forbearance agreements—including any negotiations regarding these items.

4.      Communications between W. Marc Schwartz ("**Mr. Schwartz**") and PQPR relating to FSS's alleged debt to PQPR.

5.      The items budgeted for in the Debtor's proposed 13-week budget in support of its cash-collateral motion.

6.      Alex Jones's annual compensation, including salaries and draws and any other form of payment, from FSS since the company's inception.

7.      Declarations of Mr. Schwartz in connection with this bankruptcy case.

8.      Communications and documents produced by FSS in response to discovery requests in this bankruptcy.

9.      Deposition testimony of FSS in any of the cases brought by the Texas or Connecticut Plaintiffs as it relates to PQPR, product fulfillment, and any items in Free Speech Systems' proposed 13-week budget in support of its cash-collateral motion.

10.      Communications and documents exchanged between Free Speech Systems and Alex Jones regarding Jones's compensation from FSS (including draws, salary, and any other compensation).

11.      Communications and documents exchanged between FSS and David Jones since January 1, 2018 as it relates to PQPR, product fulfillment, and any items in FSS's proposed 13-week budget in support of its cash-collateral motion.

12.      Communications and documents exchanged between FSS and Carol Jones since January 1, 2018 as it relates to PQPR, product fulfillment, and any items in FSS's proposed 13-week budget in support of its cash-collateral motion.

13. Communications and documents exchanged between FSS and Alex Jones regarding donations (including cryptocurrency) that FSS has received since January 1, 2018.

14. Internal communications and documents regarding donations (including cryptocurrency) that FSS has received since January 1, 2018.

15. FSS's accounting and bookkeeping since January 1, 2012—including (1) who was responsible for or helped with its accounting and bookkeeping; (2) what systems and software were used for accounting and bookkeeping; and (3) how accounting and bookkeeping records were created and kept in the ordinary course of business.

16. The offices and facilities FSS owns, leases, or operates since January 1, 2012.

17. The claimed debt FSS owes PQPR and any investigation by Schwartz regarding the validity of that debt.

18. Any filed or contemplated objection or response by FSS or any other party in interest to the Motion by the Sandy Hook Families to (i) Appoint Tort Claimants Committee and (ii) Remove the Debtor in Possession.

19. The selection and role of Mr. Schwartz and Schwartz Associates, LLC to act as Restructuring Advisors, including the identity of the party that employed Mr. Schwartz and any communications.

20. All Communications between any owner, manager, board member, or employee of Schwartz Associates, LLC and Alex Jones or anyone acting on Alex Jones's behalf.

21. Any agreements between FSS and Mr. Schwartz and Schwartz Associates, LLC concerning compensation.

22. Any discussions with any advisors between Mr. Schwartz and Schwartz Associates, LLC, including any attorneys retained and advice sought.

23. All work performed by Mr. Schwartz and Schwartz Associates LLC on behalf of the bankruptcy estate and any efforts taken to obtain FSS's prepetition financial records.

24. Any evaluation or analysis of any claims that FSS believes it holds against other entities arising out of its chapter 11 case, including claims that Mr. Schwartz evaluated and the merits of pursuing those claims.

25. Any common interest agreement between PQPR and FSS.

26. Any confidentiality agreements between PQPR and FSS.

27. Communications between FSS and Auriam, including Auriam's relationship with FSS.

28.     The memorandum of understanding between FSS, PQPR, and Auriam.

29.     The relationship between FSS and any credit card processor or financial institution it does business with.

30.     FSS's bank accounts and accounts with any financial institution pre-petition.

31.     The Debtors' impressions and evaluations of the trustworthiness of any person with whom its done business or employed, including Alex Jones.

32.     All documents, communications, and evidence concerning the accrual of debt to PQPR memorialized by the notes between PQPR and the Debtor.

33.     The timing and circumstances of the reasons that FSS sought Chapter 11 bankruptcy.

34.     Factual statements FSS agrees with and disagrees with in the Motion by the Sandy Hook Families to (i) Appoint Tort Claimants Committee and (ii) Remove the Debtor in Possession.

*****

# IN THE UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| **In re:** | § | **Case No. 22–60043** |
| | § | |
| **FREE SPEECH SYSTEMS, LLC,** | § | |
| | § | **Chapter 11** |
| **Debtor.** | § | **Subchapter V** |
| | § | |

---

**THE TEXAS PLAINTIFFS' NOTICE OF DEPOSITION TO PQPR HOLDINGS LIMITED, LLC PURSUANT TO FED. R. CIV. P. 30(B)(6)**

---

**TO:   PQPR Holdings Limited, LLC**
   **2621 Ridgepoint Drive**
   **Austin, TX 78754**

PLEASE TAKE NOTICE that, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, applicable to this proceeding under Rules 7030 and 9014 of the Federal Rules of Bankruptcy Procedure, Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and Marcel Fontaine ("**Texas Plaintiffs**") will conduct the oral deposition of one or more officers, directors, agents or other representatives of PQPR Holdings Limited, LLC ("**PQPR**") on **October 4, 2022 at 10:00 a.m., prevailing central time, at the law offices of Akin, Gump, Strauss, Hauer & Feld, LLP, 1111 Louisiana St., 44th Floor, Houston, TX 77002.**  PQPR shall produce one or more officers, directors, agents or representatives most knowledgeable and prepared to testify regarding the topics described in **Exhibit A**. The Texas Plaintiffs request that PQPR provide written notice at least five (5) business days before the deposition of the name(s) and employment position(s) of the individual(s) designated to testify on PQPR's behalf.

---

The deposition shall be taken before a person duly authorized by law to administer oaths, and may be recorded by stenographic, audiographic, and/or videotaped means. The deposition shall continue from day to day thereafter or as otherwise agreed by the parties, until completed.

Dated: September 16, 2022

Respectfully submitted,

MCDOWELL HETHERINGTON LLP

Avi Moshenberg
Texas Bar No. 24083532
1001 Fannin Street, Suite 2700
Houston, Texas 77002
D: 713-337-5580
F: 713-337-8850
E: Avi.Moshenberg@mhllp.com

*Counsel for the Texas Plaintiffs*

and

CHAMBERLAIN, HRDLICKA, WHITE,
    WILLIAMS & AUGHTRY, P.C.

By: */s/ Jarrod B. Martin*
Jarrod B. Martin
Texas Bar No. 24070221
Tara T. LeDay
Texas Bar No. 24083068
1200 Smith Street, Suite 1400
Houston, Texas 77002
D: 713.356.1280
F: 713.658.2553
E: jarrod.martin@chamberlainlaw.com
E: tara.leday@chamberlainlaw.com

*Bankruptcy Counsel for Texas Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

This will certify that on September 16, 2022, a true and correct copy of the foregoing document was served via electronic transmission to all registered ECF users appearing in the case and will be sent via first-class, postage prepaid, United States mail on September 19, 2022 as follows:

PQPR Holdings Limited, LLC
2621 Ridgepoint Drive
Austin, TX 78754

Stephen W. Lemmon
Streusand, Landon, Ozburn & Lemmon, LLP
1801 S. MoPac Expressway
Suite 320
Austin, Texas 78746


*/s/ Jarrod B. Martin*
Jarrod B. Martin

## EXHIBIT A

In accordance with Fed. R. Civ. P. 30(b)(6), Texas Plaintiffs designate the matters identified below for examination.

1.      Payments to Alex Jones (directly or indirectly through entities he controls or has an ownership interest in) since PQPR's inception.

2.      Payments to David Jones (directly or indirectly through entities he controls or has an ownership interest in) since PQPR's inception.

3.      Payments to Carol Jones (directly or indirectly through entities she controls or has an ownership interest in) since PQPR's inception.

4.      Communications and documents PQPR exchanged with Blue Asension.

5.      PQPR's communications and documents about its product-fulfillment services or the product fulfillment of Free Speech Systems, LLC ("**FSS**").

6.      Communications and documents exchanged with FSS regarding any debts, agreements, contracts, promissory notes, invoices, product orders, product sales, and forbearance agreements—including any negotiations regarding these items.

7.      Communications between W. Marc Schwartz and PQPR relating to FSS's alleged debt to PQPR.

8.      The item pertaining to PQPR budgeted for in FSS's proposed 13-week budget in support of its cash-collateral motion.

9.      Documents and communications exchanged with FSS regarding FSS's petition for bankruptcy.

10.     Internal documents and communications regarding FSS's petition for bankruptcy.

11.     Communications and documents produced by PQPR in response to discovery requests in this bankruptcy.

12.     Communications and documents exchanged between PQRP and Alex Jones regarding Jones's compensation (including draws, salary, and any other compensation).

13.     Communications and documents exchanged between PQPR and David Jones since January 1, 2018.

14.     Communications and documents exchanged between PQPR and Carol Jones since January 1, 2018.

15.     PQPR's accounting and bookkeeping since January 1, 2012—including (i) who was responsible for or helped with its accounting and bookkeeping; (ii) what systems and software were used for accounting and bookkeeping; and (iii) how accounting and bookkeeping records were created and kept in the ordinary course of business.

16.     All employees of PQPR since January 1, 2012.

17.     The offices and facilities PQPR owns, leases, or operates since January 1, 2012.

*****

004679

**IN THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Case No. 22–60043** |
| | § | |
| **FREE SPEECH SYSTEMS, LLC,** | § | |
| | § | **Chapter 11** |
| **Debtor.** | § | **Subchapter V** |
| | § | |

---

### NOTICE OF DEPOSITION TO W. MARC SCHWARTZ

---

**TO:**   **W. Marc Schwartz**
 **c/o Shannon & Lee LLP**
 **Pennzoil Place – 13th Floor**
 **700 Milam**
 **Houston, TX 77002**

PLEASE TAKE NOTICE that, pursuant to Rules 26 and 30(b)(1) of the Federal Rules of Civil Procedure, applicable to this proceeding under Rules 7030 and 9014 of the Federal Rules of Bankruptcy Procedure, Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and Marcel Fontaine ("**Texas Plaintiffs**") will conduct the oral deposition of W. Marc Schwartz ("**Mr. Schwartz**") on <u>September 23, 2022 at 10:00 a.m.</u>**, prevailing central time, at the law offices of Akin, Gump, Strauss, Hauer & Feld, LLP, 1111 Louisiana St., 44th Floor, Houston, TX 77002.** The deposition shall be taken before a person duly authorized by law to administer oaths, and may be recorded by stenographic, audiographic, and/or videotaped means. The deposition shall continue from day to day thereafter or as otherwise agreed by the parties, until completed.

Dated: September 16, 2022

---

004680

Respectfully submitted,

**MCDOWELL HETHERINGTON LLP**

Avi Moshenberg
Texas Bar No. 24083532
1001 Fannin Street, Suite 2700
Houston, Texas 77002
D: 713-337-5580
F: 713-337-8850
E: Avi.Moshenberg@mhllp.com

*Counsel for the Texas Plaintiffs*

and

**CHAMBERLAIN, HRDLICKA, WHITE,
    WILLIAMS & AUGHTRY, P.C.**

By:  */s/ Jarrod B. Martin*
Jarrod B. Martin
Texas Bar No. 24070221
Tara T. LeDay
Texas Bar No. 24083068
1200 Smith Street, Suite 1400
Houston, Texas 77002
D: 713.356.1280
F: 713.658.2553
E: jarrod.martin@chamberlainlaw.com
E: tara.leday@chamberlainlaw.com

*Bankruptcy Counsel for the Texas Plaintiffs*

004681

## <u>CERTIFICATE OF SERVICE</u>

This will certify that on September 16, 2022, a true and correct copy of the foregoing document was served via electronic transmission to all registered ECF users appearing in the case and will be sent via first-class, postage prepaid, United States mail on September 19, 2022 as follows:

W. Marc Schwartz
c/o Shannon & Lee LLP
Pennzoil Place – 13th Floor
700 Milam
Houston, TX 77002

Raymond William Battaglia
Law Offices of Ray Battaglia, PLLC
66 Granburg Circle
San Antonio, TX 78218

Kyung Shik Lee
Shannon & Lee LLP
Pennzoil Place – 13th Floor
700 Milam
Houston, TX 77002

R.J. Shannon
Shannon & Lee LLP
Pennzoil Place – 13th Floor
700 Milam
Houston, TX 77002

*/s/ Jarrod B. Martin*
Jarrod B. Martin

004682

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

September 17, 2022

Nathan Ochsner, Clerk

UNITED STATES BANKRUPTCY COURT          SOUTHERN DISTRICT OF TEXAS

## MOTION AND ORDER
## FOR ADMISSION *PRO HAC VICE*

| Division | Houston | Main Case Number | 22-60043 |
|---|---|---|---|
| Debtor | In Re: | **Free Speech Systems LLC** | |

This lawyer, who is admitted to the State Bar of _____ New York _____ :

| Name<br>Firm<br>Street<br>City & Zip Code<br>Telephone<br>Licensed: State & Number | David M. Zensky<br>Akin Gump Strauss Hauer & Feld LLP<br>One Bryant Park, 41st Floor<br>New York, NY 10036<br>(212) 872-1000<br>NY 2176691 |
|---|---|

Seeks to appear as the attorney for this party:

| The Sandy Hook Families,** creditors and parties-in-interest |
|---|
| Dated: 9/16/2022          Signed: /s/ David M. Zensky _____ |

| COURT USE ONLY: The applicant's state bar reports their status as: _____. |
|---|
| Dated:          Signed: _____<br>Deputy Clerk |

Signed: September 17, 2022

Christopher Lopez
United States Bankruptcy Judge

**Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and Marcel Fontaine (collectively, the "Texas Plaintiffs") and David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino, William Aldenberg, William Sherlach, and Robert Parker (collectively, the "Connecticut Plaintiffs", together with the Texas Plaintiffs, the "Sandy Hook Families").

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

September 17, 2022

Nathan Ochsner, Clerk

UNITED STATES BANKRUPTCY COURT                SOUTHERN DISTRICT OF TEXAS

## MOTION AND ORDER
## FOR ADMISSION *PRO HAC VICE*

| Division | Houston | Main Case Number | 22-60043 |
|---|---|---|---|
| Debtor | In Re: | Free Speech Systems LLC | |

This lawyer, who is admitted to the State Bar of _____ New York _____ :

| Name<br>Firm<br>Street<br>City & Zip Code<br>Telephone<br>Licensed: State & Number | Melanie Miller<br>Akin Gump Strauss Hauer & Feld LLP<br>One Bryant Park, 43rd Floor<br>New York, NY 10036<br>(212) 872-1000<br>NY 5604202 |
|---|---|

Seeks to appear as the attorney for this party:

| The Sandy Hook Families,** creditors and parties-in-interest | |
|---|---|
| Dated: 9/16/2022 | Signed: /s/ Melanie Miller |

| COURT USE ONLY: The applicant's state bar reports their status as: _____. | |
|---|---|
| Dated: | Signed: _____<br>Deputy Clerk |

Signed: September 17, 2022

Christopher Lopez
United States Bankruptcy Judge

**Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and Marcel Fontaine (collectively, the "Texas Plaintiffs") and David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino, William Aldenberg, William Sherlach, and Robert Parker (collectively, the "Connecticut Plaintiffs", together with the Texas Plaintiffs, the "Sandy Hook Families").

004684

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| FREE SPEECH SYSTEMS, LLC, | § | Case No. 22 - 60043 |
| | § | |
| DEBTOR. | § | |
| | § | Chapter 11 (Subchapter V) |

**DEBTOR'S REPLY TO UNITED STATES TRUSTEE'S OBJECTION TO THE
APPLICATION OF DEBTOR FOR AN ORDER (A) AUTHORIZING EMPLOYMENT
OF W. MARC SCHWARTZ AS CHIEF RESTRUCTURING OFFICER, (B)
AUTHORIZING EMPLOYMENT OF STAFF OF SCHWARTZ ASSOCIATES, LLC IN
DISCHARGE OF HIS DUTIES AS CHIEF RESTRUCTURING OFFICER, AND (C)
GRANTING RELATED RELIEF**

Free Speech Systems, LLC (the "Debtor" or "FSS"), the debtor and debtor-in-possession

in the above-captioned chapter 11 case, replies to the U.S. Trustee's objection [ECF. No. 145] (the

"Objection") to the Application of Debtor for an Order (A) Authorizing Employment of W. Marc

Schwartz as Chief Restructuring Officer, (B) Authorizing Employment of Staff of Schwartz

Associates, LLC In Discharge of His Duties as Chief Restructuring Officer, and (B) Granting

Related Relief [ECF No. 83] (the "Application") as follows:

**LIES, FABRICATIONS AND MISREPRESENTATIONS BY THE U.S. TRUSTEE**

1.      In the 22-page Objection, the U.S. Trustee never once questions, disputes, or

contests any of the representations in the Schwartz Application or otherwise contends that Marc

Schwartz (the "Proposed CRO" or "Schwartz") and Schwartz Associates LLC (the "Schwartz

Firm") the firm selected to assist him (the Proposed CRO and the Schwartz Firm, collectively, the

"Applicant") (a) do not hold or represent any disqualifying adverse interest and is a "disinterested

person" as that term is defined in Bankruptcy Code § 101(14) (Application ¶¶ 38, 48 & 52); (b)

disclosed all relevant connections in this case (Application ¶¶ 45 & 53); (c) are well qualified to

1

004685

provide management services that will assist and enhance the Debtor's efforts to maximize value to creditors (Application ¶¶ 30 & 31). The U. S. Trustee also does not challenge the proposed terms of reimbursement, compensation, and hourly rates of the Applicant and that they are reasonable (Application ¶ 35). Finally, the U.S. Trustee does not claim that denial of the Application would benefit the Debtor's estate.

2.      Instead, the *sole* basis for the Objection is that "Schwartz failed to disclose his connections to FSS in the bankruptcy cases of InfoW, LLC, IWHealth, LLC and Prison Planet TV, LLC (collectively, "<u>InfoW Debtors</u>")" in Case No. 22-60022 (the "<u>InfoW Bankruptcy Cases</u>"). (Objection ¶1). To support the Objection, the U.S Trustee sprinkles his 22-page missive with fake-tabloid headlines, fabrications, and misrepresentation without any credible evidence.[1] The fabrications of the U.S Trustee in the Objection are glaring and unethical.

3.      For the sake of denying the Schwartz Application here, the U.S. Trustee simply grabs out of thin air the idea that one case is a continuation of the other without any evidence. Paragraph 2 of the Objection begins by trying to tie the FSS case as a "continuation" of the InfoW Debtor cases, when in fact they have no such relationship.  "The Court should address the issue in this case, which is, in many ways, a continuation of the previous case."[2] Objection ¶ 2. The FSS case is not a continuation of the InfoW Bankruptcy Cases. The Plaintiffs all dismissed their claims against those three debtors. Those three debtors are not involved in any of the Sandy Hook

---

[1] Applicant and the Debtor reserve the right to request that costs in replying to the Objection be taxed against the U.S. Trustee or other appropriate relief pursuant to Rule 11 of the Federal Rules of Civil Procedure, made applicable to this contested matter by Bankruptcy Rule 9011, or the Court's inherent power to sanction vexatious conduct. The U.S. Trustee, despite the name, is just another party in bankruptcy proceedings and must comply with Rule 11 and other requirements when filing pleadings and making representations to the Court.

[2] US Trustee repeats without any evidence with mantra that "the current case is related to the prior cases and includes substantially all the same players" Objection ¶ 39. There are *many* more creditors involved in the Debtor's chapter 11 case than were involved in the InfoW bankruptcy Cases.

2

Litigation in Texas and Connecticut. Those three companies are out of bankruptcy and do not face the same claims faced by FSS.  Making this headline grabbing argument without any evidence is especially heinous for a party who has been intimately involved in both cases and knows that it is not true.

4.      In a bold contradiction that the U. S. Trustee hoped no one would catch, he plainly contradicts his own statements in his Objection. Paragraphs 14 and 15 of the Objection describe the disclosures Schwartz make about Free Speech Systems, LLC in the InfoW Bankruptcy Cases. The U.S. Trustee describes that as of April 18, 2022, Schwartz disclosed in a declaration in support of his application in the InfoW Bankruptcy Cases that he was aware of FSS, and made all "disclosable connections".  Objection ¶¶ 14, 15. Yet without batting an eye, the U.S. Trustee then writes 34-35 paragraphs later in paragraph 49 of the Objection, "***Schwartz did not disclose his connections to FSS or Jones during the InfoW Cases***." That is not true—the Applicant *did* disclose his connections to FSS and Jones in his April 18, 2022, declaration. There were no connections to disclose on April 18, 2022. What the U.S. Trustee takes issue with is that the Applicant did not make a supplemental disclosure after the InfoW Debtors had decided to agree to the U.S. Trustee's motion to dismiss their cases and Applicant was taking actions to effectuate that dismissal.

5.      The U.S. Trustee also mischaracterizes the timing of events (which is critical to this matter). In paragraph 50 of the Objection, the U.S. Trustee claims that "[e]ven after the InfoW Debtors reached agreement with the Sandy Hook Plaintiffs, the InfoW Debtors, taking their direction from Schwartz, did not agree to dismiss the InfoW Cases until ***June 1, 2022***." Objection ¶ 50. Yet the very same attorney signing the Objection was a recipient of an email on May 25, 2022, in which he was told by Attorney Lee that the CRO of the InfoW Debtors had made his

3

decision to dismiss and instructed him to file a motion to dismiss the InfoW Bankruptcy Cases. A subsequent email by his colleague that same day suggests that the dismissal be done by stipulation. Attached as <u>Exhibit A</u> hereto is a true and correct copy of the May 25, 2022, email to attorneys Jayson Ruff and Ha Nguyen of the U.S. Trustee's Office and the subsequent discussion with Attorney Ruff regarding the dismissal.

6.     The recitation in paragraph 50 of the Objection is an intentional misrepresentation to this Court, plain and simple. The U.S. Trustee's attorneys are in possession of their own emails which could have been—and should have been—checked before making that false statement to malign the Applicant, instead of attempting to tell the Court the truth of what took place to the Court. The attorney for the U.S. Trustee who signed the Objection had personal knowledge that the representation was not true. While always inappropriate, it is nothing short of shocking that an attorney signing a pleading accusing others of ethical violations would attempt to mislead the Court in this way.

7.     Not being content just ignoring (or, more accurately, failing to disclose) the facts easily discovered by a quick look through an email inbox, the U.S. Trustee then broadcasts falsely in paragraph 54 of the Objection that "***When FSS was represented to be on the opposite side of the negotiations with the InfoW Debtors, Schwartz was employed by FSS while pleadings filed and statements made to the Court at the time indicated that all estate professionals, including himself and Attorney Lee, were independent and without outside influences***." Objection ¶ 54.

8.     <u>First</u>, Applicant and Attorney Lee had no outside influences or connection to FSS when InfoW Debtors participated in negotiations with FSS. The negotiations by Applicant and Attorney Lee occurred prior to and at the beginning of the InfoW Bankruptcy Cases and led to the Plan Support Agreement having the consideration of $750,000 cash for professionals, $2,000,000

4

of cash on the Effective Date of the Plan, and quarterly dividends to be made available to the Trusts for a total distribution of up to $10,000,000 during the duration of a confirmed plan. Second, Applicant and Attorney Lee did not represent FSS when the Plan Support Agreement underwent revisions during the InfoW Bankruptcy Cases and the amended agreements were filed with the Court on April 29, 2022 [Case No. 22-60020, Dkt. No. 48]. Third, Schwartz did not engage in negotiations with FSS or Jones over additional funding under the Plan Support Agreement because Schwartz exercised his judgment that it did not make good business sense for the InfoW Debtors' estates to incur the cost of litigating with the U.S. Trustee over its motion to dismiss the InfoW Bankruptcy Cases (the "Motion to Dismiss"). There were no negotiations with FSS or Jones, and, therefore, it was impossible for Applicant and Attorney Lee to be on both sides of the negotiation. This myth has been perpetuated by the U.S. Trustee by pointing the lynching mob to the May 19 date of the FSS engagement letter, rather than any other fact associated with the retention of Applicant by FSS.

9.      Just as problematic is that the U.S. Trustee appears to think that full candor is not required to this Court when discussing the applicable law. An example is found in paragraph 53 of the Objection wherein the U.S. Trustee relies on *Delta Oil* for the proposition that "'Although this provision does not explicitly require ongoing disclosure case law has uniformly held that under Rule 2014(a)(1), full disclosure is a *continuing responsibility*, and (2) [the professional] is under a duty to promptly notify the court if any potential for conflict arises.' *In re W. Delta Oil Co. Inc.*, 432 F.3d 347, 355 (5th Cir. 2005) (emphasis added)." But the U.S. Trustee fails to point out to the Court the sentences before and after the quoted language that is critical to the instant matter:

> In addition, Federal Rule of Bankruptcy Procedure 2014(a) requires ***any professional applying for employment*** to set forth "to the best of the applicant's knowledge" all known connections of the applicant with the "debtor, creditors, or any other party in interest,

5

their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee." Although this provision does not explicitly require ongoing disclosure, "case law has uniformly held that under Rule 2014(a), (1) full disclosure is a continuing responsibility, and (2) an attorney is under a duty to promptly notify the court if any potential for conflict arises." Although this provision does not explicitly require ongoing disclosure, "case law has uniformly held that under Rule 2014(a), (1) full disclosure is a continuing responsibility, and (2) an attorney is under a duty to promptly notify the court if any potential for conflict arises." "Though this provision allows the fox to guard the proverbial hen house, counsel who fail to disclose timely and completely their connections proceed at their own risk ***because failure to disclose is sufficient grounds to revoke an employment order and deny compensation.***

*Id.* (citations omitted). At the U.S. Trustee's insistence, no employment order was entered or compensation requested in the InfoW Bankruptcy Cases.[3]

10.     After May 19, 2022, the only party that opposed the continuation of the InfoW Bankruptcy Cases with an active motion to dismiss was the U.S. Trustee. The Applicant made the business decision to dismiss the InfoW Bankruptcy Cases within four (4) days after May 19 and prior to meeting with FSS on May 24. That decision was not just wholly supported by the U.S. Trustee, but *demanded* but the U.S. Trustee. At that point in time, Applicant was not seeking employment as a CRO in the InfoW Bankruptcy Cases. The Debtor submits that distinction is important, especially when the U.S. Trustee actively negotiated for a resolution of the InfoW bankruptcy Cases where the Applicant would **NOT** to be retained by the estate.

11.     The Applicant exercised business judgment during a compressed period, wherein its attention was focused on (1) making sure the estate did not have lingering claims from the Texas and Connecticut Plaintiffs after their dismissals and (2) minimizing the administrative cost of

---

[3] If the U.S. Trustee was focused on the integrity of the bankruptcy process—rather than sound bites—he would have acknowledged this contrary language in the authority he cited in the Objection and argued why his position was nevertheless correct. Instead, he attempted to mislead the Court about the applicable law.

6

determining how to handle the estate after eliminating the Texas and Connecticut Plaintiffs' claims. The period in which these events took place was between May 19 and June 1, and Applicant did not believe during that period of time that it was still seeking to be retained under section 327 of the Bankruptcy Code as an estate professional.[4] In fact, the Applicant was specifically told by the U.S. Trustee's counsel that he would oppose any consideration of the pending application to employ in the InfoW Bankruptcy Cases until after the Court considered the U.S. Trustee's Motion to Dismiss.

## THE U.S. TRUSTEE MISUSES VALID QUESTIONS RAISED BY THE COURT AND FAILS TO CONDUCT ANY INVESTIGATION OR PROVIDE CONTEXT

12.     Not being satisfied besmirching Applicant and Attorney Lee with innuendos, lies, and misrepresentations, the U.S. Trustee decided to pour gasoline on an ember by quoting the concerns expressed by the Bankruptcy Court without providing useful context or information from any investigation or the evidence within the U.S. Trustee's possession. Instead, the U.S. Trustee attempts to use the Court's questions as evidence of wrongdoing, even though the information in the U.S. Trustee's own possession would resolve the Courts' concerns.

---

[4] The U.S. Trustee specifically demanded that the InfoW Debtor's application to employ not be considered until after the U.S. Trustee's Motion to Dismiss was considered. As the U.S. Trustee's attorney Jayson Ruff stated to the Court at the May 19, 2022, status conference in the InfoW Bankruptcy Cases:

> The only other comment I would say is to the extent that the Court does push that out, assuming these cases are dismissed, then we don't think that any of the other pending motions applications should be heard until that same date after that time.

May 29, 2022, Hrg. Tr. at 14:9-13. Attorney Ruff further represented to the Court:

> If these cases aren't to continue, then none of that is really necessary. The cases can get dismissed. You know, the debtors can go ahead and pay their creditors, ***including their professionals*** however they want to. The only thing we probably would want to have some treatment for in the dismissal order, again, assuming that's the route that we end up toing, is to allow for Ms. Hazelton to apply for her fees and make sure that this Court retains jurisdiction for the payment of her fees.

*Id.* at at 15:1-9 (emphasis added). While it is now clear that taking the U.S. Trustee's statements to this Court as true and accurate is pure folly, the Applicant's belief was reasonable at that time, even if the Court determines that Attorney Ruff misrepresented the situation to the Court at the May 19, 2022, status conference and the Applicant's the belief based on Attorney Ruff's misrepresentation was incorrect.

7

13.     The U.S. Trustee recites in paragraphs 32, 33 and 34 of its Objection the concerns raised by the Court. The Applicant and the Debtor shall addresses these below.

14.     In paragraph 32 of the Objection, the U.S Trustee writes:

32. On August 1, 2022, at the consent of FSS and the Texas Plaintiffs, the Court entered an order lifting the automatic stay and allowing the trial in Austin to proceed to judgment. Further, at this hearing, the Court expressed concerns about transparency in the bankruptcy process, specifically the May 19th engagement between Schwartz and FSS while the InfoW Cases were pending. The Court asked the following:

*I need to understand as well, on May 19th, you were representing three debtors who are on the opposite side of a proposed plan support agreement. We never took action, but you were also seeking retention from Free Speech at the same time? I don't think I ever knew about that.*

15.     As will be demonstrated in Court at the September 20 hearing on the Application, the following is the timeline of events, of which the U.S. Trustee was aware:

i.   On May 3, 2022, both the Texas and Connecticut Plaintiffs gave notice of their intent to dismiss the InfoW Debtors from their lawsuits and not be creditors of the InfoW Debtors. Therefore, all the documents and agreements, including the Amended Plan Support Agreement [Case No. 22-60020, Dkt. No. 48] negotiated and filed with the Court on April 28, 2022, only 5 days before, essentially became unsustainable, as the major condition for funding could not possibly occur.

ii.  By May 19, 2022, both the Texas and Connecticut Plaintiffs, comprising what was estimated to be the large majority of the creditors of the InfoW Debtors, had released or taken action to dismiss with prejudice their claims against the Debtors.

iii. On May 19, 2022, FSS had **NOT** retained Applicant in any capacity. The Applicant prepared a proposed engagement letter on May 19, 2022, but an approved representative of FSS did not sign and engage Applicant for FSS until June 6, 2022.

iv.  Assuming May 19, 2022, is the operative date (which the Debtor and Applicant do not concede), the Plan Support Agreement had expired under its terms and did not have any support from FSS or Alex Jones to renegotiate the Plan Support Agreement. The whole purpose of the Plan Support Agreement—to have the Plaintiffs be part of the settling group—disappeared between May 3, 2022, when the Plaintiffs informed the Court that they intended to dispose of their claims against the InfoW Debtors, and May 18,

8

2022, when the Connecticut Plaintiffs filed their notice of dismissals with prejudice and the Texas Plaintiffs entered into the stipulation resolving their claims.

16.     It is true that Attorney Lee said on May 19 that he would need to consider re-negotiating the PSA but, as all responsible bankruptcy lawyers understand, he was obligated to explore all alternatives with his clients (whether they turned out to be feasible or not) and explain the risks and benefits of the available options.[5] Attorney Lee's statements did not mean that the InfoW Debtors thought that it made business sense to undertake those negotiations or to continue the InfoW Bankruptcy Cases with further funding. Based on advice of his professionals and exercise of his business judgment, including the cost of litigation with the U.S. Trustee over its Motion to Dismiss, Applicant made an independent determination that the InfoW Debtors should dismiss their case rather than attempt to secure additional funding just so they could afford a fight with the U.S. Trustee. After the announcements in open court on May 19, the InfoW Debtors,

---

[5] Attorney Lee also noted that InfoW Debtors might decide to instead dismiss their cases and address the remaining claims outside of bankruptcy. Attorney Lee's representation to the Court was:

> And again, Mr. Schwartz and I are going to evaluation whether after the dismissals [with] prejudice [of] the Texas and Connecticut Plaintiffs, whether these debtors need to proceed with trying to confirm a plan with an amended plan support agreement or whether we are able to handle these creditors, the remaining creditors, outside of bankruptcy.

May 29, 2022, Hrg. Tr. at 8:16-21. What Attorney Lee said to the Court was entirely true.

At that same hearing, attorney Jayson Ruff, on behalf of the U.S. Trustee, represented to the Court:

> If these cases aren't to continue, then none of that is really necessary. The cases can get dismissed. You know, the debtors can go ahead and pay their creditors, ***including their professionals*** however they want to. The only thing we probably would want to have some treatment for in the dismissal order, again, assuming that's the route that we end up going, is to allow for Ms. Hazelton to apply for her fees and make sure that this Court retains jurisdiction for the payment of her fees.

*Id.* at 15:1-9 (emphasis added). The U.S. Trustee's position in the Objection is entirely contrary to the one represented to the Court on May 19, 2022, by Attorney Ruff.

9

through Attorney Lee, informed the U.S. Trustee on May 25, 2022 (6 days later) that the InfoW Debtors would agree with the U.S. Trustee's demand that their bankruptcy cases be dismissed.

17.     Finally, Schwartz never addressed or discussed the issues regarding the InfoW Debtors when he attended the meetings with FSS starting on May 24, 2022—other than to confirm the InfoW Debtors intent to obtain dismissal of their cases—or at any time thereafter for FSS. Applicant never sat on both sides of negotiations regarding the Plan Support Agreement. Any negotiations with FSS regarding any matters under the Plan Support Agreement on behalf of the InfoW Debtors occurred prior to (a) the filing of the InfoW Debtors' cases on April 17, 2022, (b) the filing of Notice of Amended and Restated Declaration of Trust and Plan Support Agreement [ECF. 48], and (c) the April 29, 2022, status conference.

18.     In paragraphs 33 and 34 of the Objection, the U.S. Trustee writes:

> 33.     On August 3, 2022, the Court conducted a cash collateral hearing (the "August 3rd     hearing"). At the hearing, Schwartz, who was now acting as the CRO for FSS, testified for several hours. Again, a point of concern raised by the Court was the nondisclosure of connections between the estate professionals[4] in the InfoW Cases and FSS and Jones. The Court asked the following:
>
> > *Let me get the question – I might as well ask it now because it's a good spot...I just need to understand it. On May 19th, there was a hearing before me where on May 18th, there was a request for a continuation on a motion to dismiss...and in this case, there is a letter dated by you to Free Speech dated the same day. I may be reading much into this, but it seems to me that you – either you wrote the letter that day or you had been in conversation with Free Speech before you wrote that – before that day you sent the letter. And I just need to understand – none of this was ever disclosed to me in connection with the case and the cases were dismissed on June the 10th officially, which tells me that Mr. Jones signed a retention letter. So, you were actively retained before these cases were dismissed – the last cases were dismissed – and I just need to understand, one, why that was never disclosed to me, and two, when did you begin to start soliciting or having conversations about representing Free Speech Systems.*

10

Tr. August 3, 2022, at 147-148, 21:19.

In response to the Court's questions, Schwartz stated that he could not recall the date but assured the Court that conversations concerning the FSS engagement only occurred "after we had been substantially convinced that we were going to be terminating the InfoWars bankruptcy." Tr. August 3, 2022, at 149, 4-8.

34.     After listening to several hours of testimony at the August 3rd Hearing and upon the Sandy Hook Families' oral request for the formation of a tort claimant committee, the Court stated the following

> *There's been oral request for the appointment of a committee, and that can be done by the Court for cause. I'm not going to grant that today, but I am going to express some real concerns about what I heard, and I'll express what they are. You know, whether you realize it or not, Mr. Schwartz was negotiating on both sides of a deal.*

Tr. August 3, 2022, at 239, 9:17.

19.     First, FSS did not sign the Applicant's engagement letter on May 19, 2022. On May 24, 2022, the Schwartz attended a meeting with FSS where he obtained information about FSS and its financial condition. From May 24 through June 6, 2022, Applicant started work on FSS matters, even though FSS had not signed the agreement.[6] But no one made any promises to Applicant that Applicant would be retained without question. Alex Jones finally signed the Applicant's engagement letter on June 6, 2022.

20.     Second, Schwartz did not even know about the potential for his engagement by FSS assignment until after nearly all of the claims against InfoW Debtors were released or about to be

---

[6] The services provided to FSS  by the Applicant prior to June 1, 2022, when the stipulation agreeing to dismissal of the InfoW Cases was filed consisted of the following:

- May 24, 2022—7.25 hours related to travel to Austin, TX and meeting regarding the potential representation and background information on FSS.

- May 25, 2022—1.0 hour related to call with Axos bank re potential for DIP accounts and merchant services for FSS.

dismissed with prejudice. On or about May 19, 2022, a FSS representative contacted Attorney Lee and asked whether he and Schwartz could work with FSS on its restructuring. Attorney Lee did not mention or discuss this possible new assignment to Schwartz until *AFTER* the 2:00 p.m. hearing on Thursday May 19, 2022, wherein the Bankruptcy Court approved the dismissal with prejudice of claims held by the Texas Plaintiffs. On May 13, 2022, the Connecticut Plaintiffs had already filed their Motions to Dismiss with Prejudice their Claims Against the InfoW Debtors in Connecticut. When he did mention the new assignment, Attorney Lee requested Schwartz to carefully evaluate whether the InfoW Debtors should fight with the U.S. Trustee to continue their cases and only take on further representation if he came to that conclusion. Prior to providing any services to FSS, Schwartz determined that the InfoW Bankruptcy Cases should be dismissed.

21.     Third, Attorney Lee and Schwartz engaged in the good faith analysis of whether any (1) further work required the Applicant's attention in the InfoW Bankruptcy Case, and (2) whether there were any other issues to cover before embarking on a new project, and (3) whether the work for FSS would create a conflict of interest for Applicant, *to wit*, did it make Schwartz no longer disinterested. The InfoW Debtors had been dismissed by the Plaintiffs and therefore no longer had any claims of contribution or indemnity between each other. Second, the license agreement between the two entities was in place and no breach or dispute existed between the two parties (even if such a dispute occurred, Schwartz and Attorney Lee recognized that conflict counsel for FSS would have to handle such a matter).

22.     Fourth, FSS and the InfoW Debtors companies had 3 or 4 creditors to which they were jointly liable, and, hence, a reorganization of FSS would benefit the InfoW companies as FSS had more cash flow and assets to satisfy the creditors than did the InfoW Debtors after dismissal

004696

of their bankruptcy cases. While not memorialized, the following are the topics that were considered and discussed between Schwartz and Attorney Lee, and the actions taken to enact their conclusions.

   a. To save costs and reduce administrative expenses, Attorney Lee immediately started drafting a motion to dismiss the InfoW Bankruptcy Cases.  By May 23, 2022, Schwartz had determined that it was best to dismiss the cases and Attorney Lee had completed a draft of the motion to dismiss.

   b. On Wednesday May 25, 2022, Attorney Lee relayed Schwartz's decision to the U.S. Trustee. Both parties then worked in earnest to document that dismissal of the InfoW Bankruptcy Cases.

   c. From May 26, 2022, through May 31, 2022, Applicant spent zero hours working on matters for FSS matters and 1.33 hours working on matters for the InfoW Debtors. The matters for the InfoW Debtors comprised review of the stipulation dismissing the InfoW Bankruptcy Cases.

   d. On June 1, 2022, InfoW Debtors and U. S. Trustee filed Stipulation to Dismiss the InfoW Bankruptcy Cases [Case No. 22-60020, Dkt. No. 110].

   e. On June 10, 2022, the Bankruptcy Court approved the Stipulation and dismissed the IW Bankruptcy cases [Case No. 22-60020, Dkt. No. 114].

23.     The InfoW Bankruptcy Cases lasted from April 17, 2022, through June 10, 2022: a total of 55 days and 40 business days. The duration between the dismissal of the Texas Plaintiffs' claims on May 19 and the decision to dismiss the InfoW Cases on May 23 was 4 days total and 1 business day. It took 9 total days and 6 business days from the decision to dismiss the InfoW Bankruptcy Cases and the filing of the stipulation of dismissal agreed with the U.S. Trustee.

24.     Applicant and the Debtor do not contend or suggest that the short duration of the InfoW Bankruptcy Cases excuses any requirement to disclose under Bankruptcy Rule 2014. The recitation is set out to demonstrate that (1) the Applicant knew (and  will testify about) that he **_could not_** "negotiate on both sides of a deal", (2) the Applicant made a business decision that it was not in the best interest of the estate to even re-negotiate a revised PSA after May 19, 2022,

004697

and (3) that his failure to amend his Rule 2014 at that time was because, for all practical purposes the InfoW Bankruptcy Cases had concluded, especially with the U.S. Trustee wanting to have the bankruptcy cases dismissed, opposing the retention of any professionals by the estate, and asserting that the remaining claims could be handled outside of the bankruptcy process.

25.     While the Court's comments were absolutely an appropriate basis for the U.S. Trustee to investigate, that is not what happened. The U.S. Trustee took no action for 42 days after he heard the concerns of the Court. Debtor's counsel was not called. No letter was sent. A Rule 2004 exam was never held. An informal interview to explain the facts was never requested. While the Court's valid questions went uninvestigated by the very agency responsible for overseeing the integrity of the bankruptcy process, the U.S. Trustee did not hesitate to use them to carelessly lob serious allegations against a well-qualified Applicant in the Objection, along with other material misrepresentations, and without providing the Court any context or additional information. The U.S. Trustee had information that would have addressed the Court's concerns but the Objection fails to provide any context, including that the U.S. Trustee played a direct role and advocated for the very circumstances with which the U.S. Trustee now take issue.

## THE APPLICATION SHOULD BE GRANTED

26.     The U.S. Trustee wants this Court to not only find that Schwartz' disclosure violated Bankruptcy Rule 2014 in the InfoW Bankruptcy Cases, but that the violation was so severe that it warrants what is in effect a sanction against Schwartz in against Schwartz in a *different* case for a *different* debtor. The U.S. Trustee's position is not supported by the law or the facts and is inconsistent with the role the U.S. Trustee Program is supposed to fill in the bankruptcy process.

14

27.     Bankruptcy Rule 2014 requires a verified statement disclosing connections to accompany an application to employ and courts have held that Bankruptcy Code 327(a) implies that the obligation continues for professionals that *are employed by* or *are seeking employment by* the estate. After reaching agreements resolving the claims of the Connecticut Plaintiffs (on May 13, 2022) and the Texas Plaintiffs (on May 18, 2022), the InfoW Debtors decided to agree to dismiss their cases as demanded by the U.S. Trustee. By May 23, 2022, the InfoW Debtors had decided to agree to the U.S. Trustee's demands to dismiss their cases and Attorney Lee had drafted a motion to dismiss the InfoW Bankruptcy Cases. Schwartz was no longer seeking to be employed as an estate professional on May 24, 2022, when he attended the meeting with FSS.

28.     Further, even if Schwartz was required by Bankruptcy Rule 2014 and Bankruptcy Code 327(a) to supplement his disclosure of connections despite the InfoW Debtors' decision to dismiss, that oversight would not justify denying *this* Debtor's application to employ Applicant in *this* chapter 11 case. None of the authorities cited in the Objection support that position and the relief would be entirely unprecedented.[7] While the Court has discretion to consider factors beyond just technical compliance with Bankruptcy Code 327(a), that discretion should be reasonably applied. What matters is whether employing Applicant benefits the Debtor's estate and furthers administration of its chapter 11 case. The U.S. Trustee does not dispute these issues favor approving the employment of Applicant.

29.     The U.S. Trustee does not dispute that the Application and Applicant meet all the requirements of Bankruptcy Code 327(a) and Bankruptcy Rule 2014 for employment in the

---

[7] Attached as Exhibit B to the reply to the U.S. Trustee's objection to the Debtor's application to employ Shannon & Lee LLP is an analysis of the cases cited in the Objection. Not a *single* case cited in the Objection supports what the U.S. Trustee asks the Court to do here.

15

Debtor's chapter 11 case. Nor does the U.S. Trustee dispute the allegations in the Application that the Applicant (a) does not hold or represent any disqualifying adverse interest and is a "disinterested person" as that term is defined in Bankruptcy Code § 101(14) (Application ¶¶ 38, 48 & 52); (b) disclosed all relevant connections in this case (Application ¶¶ 45 & 53); (c) is well qualified to provide management services that will assist the an enhance the Debtor's efforts to maximize value to creditors (Application ¶¶ 30 & 31). The U. S. Trustee also does not challenge the proposed terms of reimbursement, compensation, and hourly rates of the Applicant are reasonable (Application ¶ 35). Most importantly, the U.S. Trustee does not dispute that Debtor's employment of Applicant is in the best interests of the Debtor's bankruptcy estate.

30.     The Applicant's work for the Debtors was and continues to be critical to the Debtor's ability to operate in chapter 11 and administer this case. Among other things the Applicant:

a. Obtained a bank account with an approved depository when the Debtor's previous efforts to find banking failed;

b.  Worked to get the Debtor's books for 2021 and so far in 2022 posted and closed;

c. Renegotiated the Debtor's credit card processing to reduce the cost by 6% of the Debtor's gross revenue;

d. Found and hired a business manager for the Debtor;

e. Developed a plan to finance a significant increase in inventory without risking the Debtor's current assets or incur debt obligation through a consignment agreement with an unrelated party and is working to effectuate such plan;

f. Is working to obtain further reductions to the Debtor's cost of processing credit card charges;

g. Replaced the Debtor's health insurance program, reducing the Debtor's annual cost by an estimated $80,000 while also decreasing costs to employees;

h. Employed an operations manager and new bookkeeper;

16

    i.   Continues to be involved in formulating a plan of reorganization and directing other aspects of the Debtor's chapter 11 case.

Based on this, the Court should approve the Application so the Applicant can continue to provide these services to the Debtor and lead this chapter 11 case to a confirmed plan of reorganization.

31.    As the arguments and the legal authorities relied on by the U.S. Trustee in his Objection to the Applicant are substantially the same as the ones asserted by the U.S. Trustee in his objection to the Debtor's application to employ Shannon & Lee LLP, Applicant and the Debtor adopt and incorporate by reference the additional responses, arguments, and authorities set forth in the Debtor's reply to such objection [ECF No. 166].

## **<u>CONCLUSION</u>**

32.    If the U.S. Trustee believes that Bankruptcy Rule 2014 required the Applicant to submit a supplemental disclosure in the InfoW Bankruptcy Cases despite that the InfoW Debtors had agreed to the U.S. Trustee's own Motion to Dismiss prior to obtaining authority to employ any professionals, there is a way to raise that issue. But it is not in objecting to the employment of the Applicant in a different case by a different Debtor. There is no dispute that Applicant meets the requirements for employment and that its employment will benefit the estate and administration of these bankruptcy cases. The Application should therefore be granted.

*[Remainder of Page Intentionally Left Blank]*

004701

Dated: September 18, 2022                    **LAW OFFICES OF RAY BATTAGLIA, PLLC**
                                             Raymond W. Battaglia
                                             State Bar No. 01918055
                                             rbattaglialaw@outlook.com
                                             66 Granburg Circle
                                             San Antonio, Texas 78218
                                             Tel. (210) 601-9405

                                             *Proposed Co-Counsel to the Debtor and Debtor-*
                                             *In-Possession*

                                             -and-

                                             **SHANNON & LEE LLP**

                                             /s/*Kyung S. Lee*
                                             Kyung S. Lee
                                             State Bar No. 12128400
                                             klee@shannonleellp.com
                                             R. J. Shannon
                                             State Bar No. 24108062
                                             rshannon@shannonleellp.com
                                             700 Milam Street, STE 1300
                                             Houston, Texas 77002
                                             Tel. (713) 714-5770

                                             *Proposed Co-Counsel to the Debtor and Debtor-*
                                             *in-Possession*

004702

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document was served (a) at the time of filing, by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas on all parties registered to receive such service and (b) within one hour of filing, by email on the following parties:

Ha Nguyn
OFFICE OF THE U.S. TRUSTEE
515 Rusk Ave, Suite 3516
Houston, TX 77002
Ha.Nguyen@usdoj.gov

Randy W. Williams
BYMAN & ASSOCIATES PLLC
7924 Broadway, Suite 104
Pearland, Texas 77581
rww@bymanlaw.com

Ryan Chapple
CAIN & SKARNULIS PLLC
303 Colorado Street, Suite 2850
Austin, Texas 78701
rchapple@cstrial.com

Melissa Haselden
SUBCHAPTER V TRUSTEE
700 Milam, Suite 1300
Houston, TX
mhaselden@haseldenfarrow.com

Elizabeth Freeman
JACKSON WALKER LLP
1401 McKinney St., Suite 1900
Houston, TX 77010
efreeman@jw.com

Avi Moshenberg
MCDOWELL HETHERINGTON LLP
1001 Fannin Street, Suite 2700
Houston, TX 77002
avi.moshenberg@mhllp.com

Jarrod B. Martin
CHAMBERLAIN, HRDLICKA, WHITE,
WILLIAMS, & AUGHTRY, PC
1200 Smith Street, Suite 1400
Houston, Texas 77002
jarrod.martin@chamberalinlaw.com

*/s/Kyung S. Lee*
Kyung S. Lee

19

004703

**<u>EXHIBIT A</u>**

**Emails Among Kyung Lee and Jayson Ruff from May 25, 2022, to June 1, 2022**

**Subject:**  RE: InfoW\Update

**Date:**  Wednesday, June 1, 2022 at 10:28:55 AM Central Daylight Time

**From:**  Ruff, Jayson B. (USTP)

**To:**  Kyung S. Lee, Nguyen, Ha (USTP), Melissa Haselden

**CC:**  Marc Schwartz, Christian Schwartz, Harold Lee

**Attachments:** image001.png, image002.png, image003.png, UST Revisions to InfoWars_KSLDraftNo.1_Proposed Stipulated Order for Dismissal 5.31.22@3PM.docx

Kyung,

Attached is a markup of your proposed stipulation showing our comments.  So long as Melissa is ok with the changes you have made concerning payment of her fees, then we are too.  I have left those sections unchanged and will let Melissa indicated if she has any comments.

I removed the references to the CT and TX Plaintiffs' Motions to Dismiss from the related to reference near the top.  We cannot stipulate concerning relief sought by other parties (i.e. the TX and CT Plaintiffs).  If you want the references to their motions and dismissals in recitations in for context, that is ok, but this order is not a resolution of their motions to dismiss. Their motions may be moot already and will certainly be moot once the court actually dismisses these cases.

In paragraph 1, I did not understand the references to 105 and 305, so I removed them.  We are agreeing that there is cause to dismiss pursuant to 1112 and not any of the other sections of the code.

Also, given the retention of jurisdiction in the last paragraph of the order I removed the reference at the end of paragraph 1 as it seemed duplicative.

Finally, we cannot and will not stipulate to exculpation.  So that has been removed as well.

Please review these revisions with your client and advise if acceptable.  If so, then we can file with the court and email chambers advising that the stipulation has been filed and that the hearing on June 10, 2022 won't be necessary.  We can also offer to make ourselves available for a status conference should the court have any questions concerning the proposed stipulation.  Otherwise I think we would be all set.

I am hoping we can get this resolved today.  I will be in a hearing for the bulk of the afternoon, but will make myself available as soon as possible thereafter to address any open issues on this.  Assuming we can get this on file today, then I intend to continue the 341 again to a date beyond June 10, 2022.  However, if this is still ongoing then we will need to go forward with the 341 tomorrow.

Kind regards,

*Jayson B. Ruff*
Trial Attorney
Office of the United States Trustee
515 Rusk St., Suite 3516
Houston, Texas 77002
713-718-4650 Ext 252 (office)
202-573-6960 (mobile)
jayson.b.ruff@usdoj.gov



PLEASE DO NOT read, copy or disseminate this Internet E-mail if you are not the intended addressee. This E-mail may contain privileged information intended only for the addressee. If you have received this E-mail in error, please call us immediately at (713) 718-4650 and ask to speak to the sender of the communication.  Also, please notify the sender immediately, by E-mail, that you have received this E-mail in error and have deleted it.

---

**From:** Kyung S. Lee <klee@kslpllc.com>
**Sent:** Tuesday, May 31, 2022 4:41 PM
**To:** Ruff, Jayson B. (USTP) <Jayson.B.Ruff@usdoj.gov>; Nguyen, Ha (USTP) <Ha.Nguyen@usdoj.gov>; Melissa Haselden <mhaselden@haseldenfarrow.com>
**Cc:** Marc Schwartz <mschwartz@schwartzassociates.us>; Christian Schwartz <cschwartz@schwartzassociates.us>; Harold Lee <hlee@schwartzassociates.us>
**Subject:** [EXTERNAL] Re: InfoW\Update

Jayson, Ha and Melissa, please see the form of Stipulation and Order for Dismissal of the Chapter 11 Cases. Please review and see if we can finalize. We can then go together to Judge Lopez and ask him to approve at a Status Conference before Thursday or on Thursday. I think with the Texas and Connecticut Plaintiffs having dismissed the three debtors and no longer holding claims against the Debtors, we should be good to go and minimize administrative expenses.

**Kyung S. Lee**
**Kyung S. Lee PLLC**
Cell: 713-301-4751
klee@kslpllc.com

---

**From:** Ruff, Jayson B. (USTP) <Jayson.B.Ruff@usdoj.gov>
**Date:** Friday, May 27, 2022 at 3:16 PM
**To:** Kyung S. Lee <klee@kslpllc.com>, Nguyen, Ha (USTP) <Ha.Nguyen@usdoj.gov>, Melissa Haselden <mhaselden@haseldenfarrow.com>
**Cc:** Marc Schwartz <mschwartz@schwartzassociates.us>, Christian Schwartz <cschwartz@schwartzassociates.us>, Harold Lee <hlee@schwartzassociates.us>, Cameron Atkinson <catkinson@pattisandsmith.com>
**Subject:** RE: InfoWUpdate

Kyung,

Attached is a proposed stipulated dismissal.  Please review with your client and let me know if this is acceptable.

Kind regards,

*Jayson B. Ruff*
Trial Attorney
Office of the United States Trustee

515 Rusk St., Suite 3516
Houston, Texas 77002
713-718-4650 Ext 252 (office)
202-573-6960 (mobile)
jayson.b.ruff@usdoj.gov



PLEASE DO NOT read, copy or disseminate this Internet E-mail if you are not the intended addressee. This E-mail may contain privileged information intended only for the addressee. If you have received this E-mail in error, please call us immediately at (713) 718-4650 and ask to speak to the sender of the communication.  Also, please notify the sender immediately, by E-mail, that you have received this E-mail in error and have deleted it.

**From:** Kyung S. Lee <klee@kslpllc.com>
**Sent:** Wednesday, May 25, 2022 2:06 PM
**To:** Ruff, Jayson B. (USTP) <Jayson.B.Ruff@usdoj.gov>; Nguyen, Ha (USTP) <Ha.Nguyen@usdoj.gov>; Melissa Haselden <mhaselden@haseldenfarrow.com>
**Cc:** Marc Schwartz <mschwartz@schwartzassociates.us>; Christian Schwartz <cschwartz@schwartzassociates.us>; Harold Lee <hlee@schwartzassociates.us>; Cameron Atkinson <catkinson@pattisandsmith.com>
**Subject:** [EXTERNAL] Re: InfoW\Update

1. Yes, I can get on if you would give me a dial in number and time. I have it at 10AM.
2. We can stipulate to a dismissal and so you know the basis of why Marc is dismissing, we no longer have a need for chapter 11 because we have no creditors to resolve except for the few that will be handled by the Debtors outside of bankruptcy and the balance of the administrative expense claimants will also be handled outside of bankruptcy, which has always been your suggestions.
3. Provisions are being made to escrow $25,000 for Melissa, again subject to fee application and allowance of her fees.
4. I am giving you answers as counsel, and, I need to make sure Marc has had a chance to review and approve, which I will ask him to do.

**Kyung S. Lee**
**Kyung S. Lee PLLC**
Cell: 713-301-4751
klee@kslpllc.com

**From:** Ruff, Jayson B. (USTP) <Jayson.B.Ruff@usdoj.gov>
**Date:** Wednesday, May 25, 2022 at 1:36 PM
**To:** Kyung S. Lee <klee@kslpllc.com>, Nguyen, Ha (USTP) <Ha.Nguyen@usdoj.gov>, Melissa Haselden <mhaselden@haseldenfarrow.com>
**Cc:** Marc Schwartz <mschwartz@schwartzassociates.us>, Christian Schwartz <cschwartz@schwartzassociates.us>, Harold Lee <hlee@schwartzassociates.us>, Cameron Atkinson <catkinson@pattisandsmith.com>
**Subject:** RE: InfoWUpdate

Kyung,

Appreciate the report.  Couple of questions.  First, I do intend to open the line up tomorrow in case any creditors call in.  Is it possible that you can get on the line briefly to provide this update on behalf of the debtors?  Second, since we already have a pending motion to dismiss, is there any reason we can't just stipulate to dismissal?  That would save some time and the necessity of Debtors having to have a motion drafted.  It could be just be a simple stipulation that dismisses the cases and allows some time for Melissa to file for and be paid her fees.  Let me know your thoughts and I can discuss dismissing via stipulation with my client as well.

*Jayson B. Ruff*
Trial Attorney
Office of the United States Trustee
515 Rusk St., Suite 3516
Houston, Texas 77002
713-718-4650 Ext 252 (office)
202-573-6960 (mobile)
jayson.b.ruff@usdoj.gov



PLEASE DO NOT read, copy or disseminate this Internet E-mail if you are not the intended addressee. This E-mail may contain privileged information intended only for the addressee. If you have received this E-mail in error, please call us immediately at (713) 718-4650 and ask to speak to the sender of the communication.  Also, please notify the sender immediately, by E-mail, that you have received this E-mail in error and have deleted it.

**From:** Kyung S. Lee <klee@kslpllc.com>
**Sent:** Wednesday, May 25, 2022 12:29 PM
**To:** Ruff, Jayson B. (USTP) <Jayson.B.Ruff@usdoj.gov>; Nguyen, Ha (USTP) <Ha.Nguyen@usdoj.gov>; Melissa Haselden <mhaselden@haseldenfarrow.com>
**Cc:** Marc Schwartz <mschwartz@schwartzassociates.us>; Christian Schwartz <cschwartz@schwartzassociates.us>; Harold Lee <hlee@schwartzassociates.us>; Cameron Atkinson <catkinson@pattisandsmith.com>
**Subject:** [EXTERNAL] InfoW\Update

Marc Schwartz and I wanted to report to the group as follows:

1. The Texas Plaintiffs and Debtors agreed on Stipulations of Dismissals last week. Judge Lopez approved them last Thursday. Judge Mott signed orders remanding cases earlier this week. The Texas Plaintiffs are no longer creditors or hold claims against the Debtors.
2. The removal Connecticut Bankruptcy Court held a status conference yesterday. Connecticut Plaintiffs are to submit orders of dismissal by Thursday 5.26.22. Judge Manning said she would sign them Friday 5.27.22. Debtors are to submit dismissals of motions to remove by Monday

5.30.22.

3. Marc has instructed me to file Motions to Dismiss the Chapter 11 Cases on Tuesday 5.31.22 and eliminate any continuing administrative expenses.

4. We have a conflict as to the 341 Meeting of Creditors for tomorrow and the Debtors will not have a representative attend.

Thanks.

**Kyung S. Lee**
**Kyung S. Lee PLLC**
Cell: 713-301-4751
klee@kslpllc.com

AO 435
(Rev. 04/18)

ADMINISTRATIVE OFFICE OF THE UNITED STATES COURTS

**FOR COURT USE ONLY**

**DUE DATE:**

**TRANSCRIPT ORDER**

*Please Read Instructions:*

| 1. NAME Anush Khatri | 2. PHONE NUMBER (609) 206-9588 | 3. DATE 9/19/2022 |
|---|---|---|

| 4. DELIVERY ADDRESS OR EMAIL akhatri@reorg.com | 5. CITY New York | 6. STATE NY | 7. ZIP CODE 10010 |
|---|---|---|---|

| 8. CASE NUMBER 22-60043 | 9. JUDGE Christopher M. Lopez | DATES OF PROCEEDINGS |
|---|---|---|
| | | 10. FROM 9/13/2022    11. TO 9/13/2022 |

| 12. CASE NAME Free Speech Systems | LOCATION OF PROCEEDINGS |
|---|---|
| | 13. CITY Houston    14. STATE Texas |

**15. ORDER FOR**

| ☐ APPEAL | ☐ CRIMINAL | ☐ CRIMINAL JUSTICE ACT | ☒ BANKRUPTCY |
|---|---|---|---|
| ☐ NON-APPEAL | ☐ CIVIL | ☐ IN FORMA PAUPERIS | ☐ OTHER |

**16. TRANSCRIPT REQUESTED** (Specify portion(s) and date(s) of proceeding(s) for which transcript is requested)

| | PORTIONS | DATE(S) | | PORTION(S) | DATE(S) |
|---|---|---|---|---|---|
| ☐ | VOIR DIRE | | ☐ | TESTIMONY (Specify Witness) | |
| ☐ | OPENING STATEMENT (Plaintiff) | | | | |
| ☐ | OPENING STATEMENT (Defendant) | | | | |
| ☐ | CLOSING ARGUMENT (Plaintiff) | | ☐ | PRE-TRIAL PROCEEDING (Spcy) | |
| ☐ | CLOSING ARGUMENT (Defendant) | | | | |
| ☐ | OPINION OF COURT | | | | |
| ☐ | JURY INSTRUCTIONS | | ☐ | OTHER (Specify) | |
| ☐ | SENTENCING | | | | |
| ☐ | BAIL HEARING | | | | |

**17. ORDER**

| CATEGORY | ORIGINAL (Includes Certified Copy to Clerk for Records of the Court) | FIRST COPY | ADDITIONAL COPIES | NO. OF PAGES ESTIMATE | COSTS |
|---|---|---|---|---|---|
| ORDINARY | ☐ | ☐ | NO. OF COPIES | | |
| 14-Day | ☐ | ☐ | NO. OF COPIES | | |
| EXPEDITED | ☐ | ☐ | NO. OF COPIES | | |
| 3-Day | ☐ | ☐ | NO. OF COPIES | | |
| DAILY | ☒ | ☒ | NO. OF COPIES 1 | | |
| HOURLY | ☐ | ☐ | NO. OF COPIES | | |
| REALTIME | | | | | |

**CERTIFICATION (18. & 19.)**
By signing below, I certify that I will pay all charges
(deposit plus additional).

ESTIMATE TOTAL    0.00

| 18. SIGNATURE Anush Khatri | PROCESSED BY |
|---|---|
| 19. DATE 9/15/2022 | PHONE NUMBER |

| TRANSCRIPT TO BE PREPARED BY Veritext Legal Solutions Houston, TX 800-789-4576 (Option 4) | COURT ADDRESS |
|---|---|

| | DATE | BY |
|---|---|---|
| ORDER RECEIVED | | |

| DEPOSIT PAID | | DEPOSIT PAID | |
|---|---|---|---|
| TRANSCRIPT ORDERED | | TOTAL CHARGES | 0.00 |
| TRANSCRIPT RECEIVED | | LESS DEPOSIT | 0.00 |
| ORDERING PARTY NOTIFIED TO PICK UP TRANSCRIPT | | TOTAL REFUNDED | |
| PARTY RECEIVED TRANSCRIPT | | TOTAL DUE | 0.00 |

004710

**DISTRIBUTION:**    COURT COPY    TRANSCRIPTION COPY    ORDER RECEIPT    ORDER COPY

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | **Case No. 22--60043** |
| **FREE SPEECH SYSTEMS, LLC,** | § | |
| | § | |
| DEBTOR. | § | **Chapter 11 (Subchapter V)** |
| | § | |

**SUPPLEMENTAL EXHIBIT LIST**

| | |
|---|---|
| Judge: | Hon. Christopher M. Lopez |
| Hearing Date: | Tuesday, September 20, 2022 |
| Hearing Time: | 1:00 p.m. (Central Standard Time) |
| Party's Name: | Free Speech Systems, LLC |
| Attorney's Name: | Ray Battaglia; Kyung S. Lee; RJ Shannon |
| Attorney's Phone: | (713) 714-5770 |
| Nature of Proceeding: | Hearing on:<br>• Application of Debtor for an Order (A) Authorizing Employment of Shannon & Lee LLP as Bankruptcy Co-Counsel for the Debtor, and (B) Granting Related [ECF No. 85] (the "S&L Application")<br>• Application of Debtor for an Order (A) Authorizing Employment of W. Marc Schwartz as Chief Restructuring Officer, (B) Authorizing Employment of Staff of Schwartz Associates, LLC In Discharge of Duties as Chief Restructuring Officer, and (C) Granting Related [ECF No. 83] (the "CRO Application") |

Free Speech Systems, LLC, the debtor and debtor in possession in the above captioned chapter 11 case (the "Debtor"), hereby submits this supplemental exhibit list in connection with the hearing to be held on Tuesday, September 20, 2022, at 1:00 p.m. (Central Standard Time) (the "Hearing") on the S&L Application and the CRO Application.

## SUPPLEMENTAL EXHIBITS

In addition to the exhibits designated by the Debtor on September 16, 2022 [ECF No. 163], the Debtor may offer for admission into evidence any of the following exhibits, and any exhibit designated by any other party, at the Hearing:

| Ex. | Description | Offered | Objection | Admitted /Not Admitted | Disposition |
|-----|-------------|---------|-----------|------------------------|-------------|
| 35 | Emails dated June 5, 2022, among Kyung Lee and Marc Schwartz re Schwartz Engagement Letter. | | | | |
| 36 | Kyung Lee comments to Marc Schwartz draft of Engagement Letter on June 5, 2022 | | | | |
| 37 | Additional Emails dated June 5, 2022, among Kyung Lee and Marc Schwartz re Schwartz Engagement Letter. | | | | |

The Debtor reserves the right to supplement, amend or delete any witness and exhibits prior to the hearing.  The Debtor also reserves the right to use any exhibits presented by any other party and to ask the Court to take judicial notice of any document.  The Debtor finally reserves the right to introduce exhibits previously admitted.

[*Remainder of Page Intentionally Left Blank*]

2

Dated: September 20, 2022

LAW OFFICES OF RAY BATTAGLIA, PLLC

Raymond W. Battaglia
State Bar No. 01918055
rbattaglialaw@outlook.com
66 Granburg Circle
San Antonio, Texas 78218
Tel. (210) 601-9405

*Proposed Co-Counsel to the Debtor and Debtor-In-Possession*

-and-

SHANNON & LEE LLP

/s/ *R. J. Shannon*
Kyung S. Lee
State Bar No. 12128400
klee@shannonleellp.com
R. J. Shannon
State Bar No. 24108062
rshannon@shannonleellp.com
700 Milam Street, STE 1300
Houston, Texas 77002
Tel. (713) 714-5770

*Proposed Co-Counsel to the Debtor and Debtor-in-Possession*

3

**Subject:**    Re: Schwartz as CRO for FSS

**Date:**      Sunday, June 5, 2022 at 3:04:47 PM Central Daylight Time

**From:**     Kyung S. Lee <klee@kslpllc.com>

**To:**        Marc Schwartz <mschwartz@schwartzassociates.us>

**CC:**        rshannon@shannonpllc.com <rshannon@shannonpllc.com>, 'rbattaglialaw@outlook.com' <rbattaglialaw@outlook.com>

**Attachments:** FSS_KSLREDLINE_Schwartz Retention Agreement_6.5.223PM.docx

These revisions are based on my review of FSS's Company Agreement.

**Kyung S. Lee**

# Kyung S. Lee PLLC

Cell: 713-301-4751

**klee@kslpllc.com**

---

**From:** Marc Schwartz <MSchwartz@schwartzassociates.us>
**Date:** Sunday, June 5, 2022 at 9:16 AM
**To:** Kyung S. Lee <klee@kslpllc.com>
**Subject:** RE: Schwartz as CRO for FSS

Attached

---

**From:** Kyung S. Lee <klee@kslpllc.com>
**Sent:** Sunday, June 5, 2022 7:29 AM
**To:** Marc Schwartz <MSchwartz@schwartzassociates.us>
**Cc:** rshannon@shannonpllc.com
**Subject:** Schwartz as CRO for FSS

Marc, can you send me your proposed engagement letter for FSS? I am revieing the FSS Company Agreement and would like to better your letter than the one we did at InfoW.

**Kyung S. Lee**

# Kyung S. Lee PLLC

**Pennzoil Place**

**700 Milam-Suite 1300**

**Houston, Texas 77002**

**Email: klee@kslpllc.com**

**Cell: (713) 301-4751**

**Alternate Email: kslee50@gmail.com**

Confidentiality Notice: The information contained in this communication is strictly limited to the recipient intended by the sender of this communication. This email, and any attachments, may contain confidential attorney-client privileged information and attorney work product. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email and destroy this communication and all copies thereof, including all attachments. ***DISCLAIMER*** Per Treasury Department Circular 230: Any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii)

promoting, marketing or recommending to another party any transaction or matter addressed herein.



712 Main Street, Suite 1830, Houston, TX 77002

May    ,2022   KSL REDLINE 6.5.22

**VIA EMAIL**

Free Speech Systems, LLC

VIA EMAIL: rbattaglialaw@outlook.com

**Re: Engagement of Chief Restructuring Officer**

Gentlemen:

This letter confirms that Alex E. Jones has delegated to ~~Free Speech Systems, LLC ("FSS") has engaged~~ W. Marc Schwartz ~~("Consultant")~~ of Schwartz Associates, LLC ("SALLC") those managerial duties under ¶ 8.01 of the Free Speech System, LLC's ("FSS") Company Agreement to act as its Chief Restructuring Officer (the "CRO"), as defined in this letter to advise and lead its restructuring efforts involving the scope described herein, potentially including a filing under the United States Bankruptcy Code (the "Bankrutpcy Code"). This letter also confirms that FSS shall retain SALLC as its financial advisor ("FA") in connection with the restructuring efforts. ~~Chapter 7 or Chapter 11 proceeding.~~

SALLC understands that the purpose of the engagement is to continue stable operations while maximizing the values of FSS' assets, including negotiations with creditors of FSS and affiliates of FSS to assure that creditors of FSS have the best chance of recoveries on their claims. ~~Consultant~~CRO will work to maximize return~~s~~ and to assure a fair pro rata distribution to all unsecured creditors.

**I.    Scope of Engagement**

~~Consultant~~CRO will lead FSS' management and personnel through the restructuring process. It is agreed that ~~Consultant~~CRO's authority may include, but not be limited to, the following:

1. Provide business and debt restructuring advice, including as it relates to business strategy and other key elements of the business;
2. Assist FSS with managing due diligence requests and other items that may be requested by its various constituents as part of the restructuring process;
3. Prepare cash flow forecasts and related financial and business models;
4. Identify and implement short and long-term liquidity initiatives;
5. Prepare Statements of Financial Affairs and Schedules, Monthly Operating Reports, and other similar regular Chapter 11 administrative, financial, and

1

004716



712 Main Street, Suite 1830, Houston, TX 77002

accounting reports required by the United States Bankruptcy Court ("Bankruptcy Court") as well as providing necessary testimony before the Bankruptcy Court on matters within ~~Consultant~~CRO's areas of expertise;

6. Review inventory marketability and provide monetization alternatives as deemed appropriate;

7. Make operational decisions, with advice of current ownership, directed to maximizing the value of FSS;

8. Implement cost containment measures;

9. Negotiate with creditors, prospective purchasers, equity holders, equity committees, official committee of unsecured creditors, and all other parties-in-interest;

10. Be in charge of all business decisions on behalf of FSS as necessary or required, utilizing ~~Consultant~~CRO's business judgment in aid of the restructuring.

11. Execute all documents and take all other actions necessary to effectuate restructuring of FSS, including in any case before the Bankruptcy Court, subject to review and oversight by current ownership.

## II.    Indemnification

FSS agrees to indemnify, defend, and hold harmless ~~Consultant~~CRO, individually, and SALLC, its subsidiaries or affiliates, the respective partners, directors, officers, agents, contractors, and employees of SALLC and each other person, if any, controlling SALLC or its affiliates (individually or collectively) from and against any and all losses, claims, damages, liabilities, or costs, as and when incurred, to which such party may become subject to or which are asserted against any party, directly or indirectly, in any way related to party while acting for FSS under this agreement including, without limitation, in connection with i) any act or omission by party related to engagement as FA or CRO under the Agreement or ii) Party's acceptance, performance or non-performance of obligations under said Agreement.

FSS will advance to the party amounts paid by the party for reasonable and documented legal or other expenses incurred by them, as and when incurred, in connection with investigating, preparing or defending any such losses, claims, damages, or liabilities or any action in respect thereof, whether or not in connection with existing, pending or threatened litigation against the party; provided, however, that FSS shall not be liable under the foregoing indemnity agreement in respect of any liability to the extent that such liability is found to have resulted from party's gross negligence, bad faith, willful misconduct, or a breach of this agreement and party shall no later than ten days after a determination of gross negligence, bad faith, willful misconduct, or breach of this agreement refund such amounts previously advanced by FSS. If, in the opinion of counsel, representing both parties in this matter covered by this indemnification creates a

004717



712 Main Street, Suite 1830, Houston, TX 77002

potential conflict of interest, the party may engage separate counsel to represent them at FSS' expense.

### III.    Materials Provided

FSS agrees to provide SALLC with such financial and other available information as is reasonably required for SALLC to render the services performed or to be performed hereunder. SALLC agrees to review the information and identify any inaccuracies or omissions that are reasonably apparent on the face of the information provided.

### IV.    Work Product

SALLC shall not disclose any confidential or privileged information to any third party, subject to the following exceptions: (a) to SALLC's affiliates, vendors, or agents who provide services in connection with this engagement; (b) with Client's written consent; (c) when legally required to do so; or (d) if such information is available from public sources.

Any and all records of FSS obtained by SALLC will be promptly returned to FSS at the end of this Engagement.

### V.    Disclosures

FSS shall not disclose any work or analyses of SALLC or ~~Consultant~~CRO to any third party (other than any direct or indirect equity holder of FSS) without prior written consent of ~~Consultant~~CRO, which shall not be unreasonably withheld. Neither SALLC nor ~~Consultant~~CRO shall disclose any information respecting the business, properties, books, and records of FSS except to professionals hired by FSS for purposes of this Engagement, unless subpoenaed by a court of ~~c~~Competent ~~j~~Jurisdiction.

SALLC cannot assure that, following the completion of our internal conflict search, an engagement for or involving your creditors or other parties-in-interest or their respective attorneys and accountants will not be accepted by SALLS, its subsidiaries or affiliates. Should any potential conflict come to the attention of SALLC, we will endeavor to resolve such potential conflict and will determine what action needs to be taken. You agree that you will comprehensively inform us of the parties-in-interest to this matter of or additions to, or name changes for, those parties-in-interest whose names you provided.

SALLC may have provided, currently provide, or provided in the future, services to FSS' creditors, other parties-in-interest, and their respective attorneys and accountants in matters or engagements unrelated to this Engagement. You agree that party shall not have responsibility to FSS relating to such professional services, nor any responsibility to use or disclose information SALL~~C~~Cs possess by reason of such services, whether such information might, by itself or others, be considered material to FSS.

3



712 Main Street, Suite 1830, Houston, TX 77002

SALLC has performed an internal search for any such conflict of interest with respect to FSS, its officers, directors, creditors, and other parties and has found no conflicts of interest.

## VI.    Term & Termination

This agreement shall remain in effect until the earlier of i. T~~t~~he completion of the winddown of FSS, ii. Execution of a comprehensive debt restructuring agreement, iii. Confirmation and completion of a liquidating Chapter 11 plan of reorganization, iv. SALLC or ~~Consultant~~CRO's resignation, or vi. Termination of the agreement by either party upon seven (7) calendar days' written notice.

SALLC may terminate this agreement without notice if FSS fail~~s~~ to make payments when due hereunder.

## VII.    Compensation

For ~~provided~~ services provided described herein, SALLC shall be compensated for the services of ~~Consultant~~CRO on an hourly fee basis of $690.00 per hour.

If, in ~~consultant~~CRO's sole judgment, it is determined that additional services are required to assist with the scope of this ~~e~~Engagements as outlined by this Agreement, ~~consultant~~CRO may employ SALLC, which shall be compensated at the following hourly rates

| | |
|---|---|
| M. Christian Schwartz: | $470 per hour |
| Managers: | $350 per hour |
| Associates: | $280 per hour |
| Analysts: | $210 per hour |
| Administrative Staff | $95 per hour |

FSS shall be responsible for ~~Consultant~~CRO's and SALLC's reasonable and necessary documented out-of-pocket costs and expenses incurred in connection with this engagement. SALLC will provide to FSS detailed documentation of all expenses incurred.

SALLC acknowledges that, should FSS seek relief under ~~Title 11 of the United States Code~~the Bankruptcy Code, and FSS apply for authorization to retain and employ ~~Consultant~~CRO and SALLC, FSS' payment of ~~consultant~~CRO's and SALLC's fees and expenses shall be subject to Bankruptcy Court approval. The provisions of this paragraph shall not limit nor restrict the indemnification and contribution provisions set forth in this Agreement.

## A.  Retainer

4



712 Main Street, Suite 1830, Houston, TX 77002

In order to commence the engagement, SALLC requires a retainer payment in the amount of $75,000.00 for the representation of FSS.  SALLC must receive the retainer payment as well as the signed copy of this letter before the firm will take any action or be deemed to represent you. In the event that this agreement is terminated prior to incurring fees and expenses in excess of retainer amount, the balance shall be refunded to FSS within thirty days.

### B. Invoicing

Prior to filing bankruptcy, invoices reflecting the services of SALLC, including the services of ~~Consultant~~CRO, shall be prepared and submitted monthly and paid no later than seven (7) business days thereafter. In the event that any portion of the retainer is used prior to the filing of bankruptcy, FSS shall replenish the retainer prior to filing bankruptcy. In case of a disputed invoice, Client agrees to pay undisputed portion of ~~f~~Fees. Expense charges shall be submitted to FSS no later than 30 days after expense was incurred or immediately upon approval of Bankruptcy Court. For any recurring monthly charges, payment is to be made on the first day of each month.  Upon filing bankruptcy, invoices shall be submitted and paid in accordance with the orders of the Bankruptcy Court.

### VIII.   CRO's Counsel

Prior to commencing this engagement, FSS will fund a $20,000 retainer to be paid to SALLC so that SALLC can engage Michael Ridulfo of Kane, Russell Coleman Logan PC to serve as legal counsel to the CRO.

### IX.   Authorization

FSS represents that this Agreement outlines the engagement and has been approved by its Board of Directors or managers (as appropriate) and that the individual that signs this Agreement on behalf of FSS has been duly authorized to do so, including express consent of the Board of Directors or Managers.

Further, it is acknowledged that future economic, operational performance or the confirmation success of a Chapter 11 plan of reorganization or Chapter 7 liquidation plan cannot be guaranteed. The monthly fees and related expenses to be paid by FSS to ~~Consultant~~CRO and SALLC are not contingent upon the results of this engagement and neither ~~consultant~~CRO nor SALLC warrant or predict results or developments during the term of this engagement.

SALLC's maximum liability relating to services rendered under this letter (regardless of form of action, whether in contract, negligence, or otherwise) will be limited to the charges paid to SALLC for the portion of its services or work products giving rise to liability. In no event shall SALLC be liable for consequential, special,

004720



712 Main Street, Suite 1830, Houston, TX 77002

incidental, or punitive loss, damage or expense (including, without limitation, lost profits, opportunity costs, etc.) even if it has been advised of their possible existence.

Please acknowledge your agreement with the terms of this engagement letter and have your client do the same by signing and dating below. Once executed and the retainer is funded, a copy will be delivered to you via email. If you have any questions regarding this engagements letter, please call me at (832) 583-7021.


Very truly yours,


W. Marc Schwartz


**CONFIRMED AND AGREED**

Free Speech Systems, LLC                           Invoices should be sent to:

By: _____            Name: _____

Date: _____            Email: _____

6

004721

**Subject:** Re: Schwartz as CRO for FSS
**Date:** Sunday, June 5, 2022 at 5:06:19 PM Central Daylight Time
**From:** Kyung S. Lee <klee@kslpllc.com>
**To:** Marc Schwartz <mschwartz@schwartzassociates.us>

I want you to make the changes, and bring both redline and clean, to Austin tomorrow, so we can show it to Ray and client and have it signed. It is too difficult and confusing to do it otherwise. Do u see what I am saying? .

Kyung S. Lee
Kyung S. Lee PLLC
Partner
Pennzoil Place
700 Milam, Suite 1300
Houston, Texas 77002
Mobile (713) 301-4751
Klee@kslpllc.com
www.kslpllc.com

---

**From:** Marc Schwartz <MSchwartz@schwartzassociates.us>
**Sent:** Sunday, June 5, 2022 4:20:54 PM
**To:** Kyung S. Lee <klee@kslpllc.com>
**Subject:** RE: Schwartz as CRO for FSS

I am fine with the changes, do you want me to PDF, sign and then do you send it to Ray or me?

I need to read para 8.01 of the Company Agreement.

---

**From:** Kyung S. Lee <klee@kslpllc.com>
**Sent:** Sunday, June 5, 2022 3:05 PM
**To:** Marc Schwartz <MSchwartz@schwartzassociates.us>
**Cc:** rshannon@shannonpllc.com; 'rbattaglialaw@outlook.com' <rbattaglialaw@outlook.com>
**Subject:** Re: Schwartz as CRO for FSS

These revisions are based on my review of FSS's Company Agreement.

**Kyung S. Lee**

**Kyung S. Lee PLLC**
Cell: 713-301-4751
klee@kslpllc.com

---

**From:** Marc Schwartz <MSchwartz@schwartzassociates.us>
**Date:** Sunday, June 5, 2022 at 9:16 AM
**To:** Kyung S. Lee <klee@kslpllc.com>
**Subject:** RE: Schwartz as CRO for FSS

Attached

---

**From:** Kyung S. Lee <klee@kslpllc.com>
**Sent:** Sunday, June 5, 2022 7:29 AM
**To:** Marc Schwartz <MSchwartz@schwartzassociates.us>
**Cc:** rshannon@shannonpllc.com
**Subject:** Schwartz as CRO for FSS

Marc, can you send me your proposed engagement letter for FSS? I am revieing the FSS Company Agreement and would like to better your letter than the one we did at InfoW.

**Kyung S. Lee**
**Kyung S. Lee PLLC**
**Pennzoil Place**
**700 Milam-Suite 1300**
**Houston, Texas 77002**
**Email: klee@kslpllc.com**
**Cell: (713) 301-4751**
**Alternate Email: kslee50@gmail.com**

Confidentiality Notice: The information contained in this communication is strictly limited to the recipient intended by the sender of this communication. This email, and any attachments, may contain confidential attorney-client privileged information and attorney work product. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email and destroy this communication and all copies thereof, including all attachments. ***DISCLAIMER*** Per Treasury Department Circular 230: Any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

```
 1                    UNITED STATES BANKRUPTCY COURT
                      SOUTHERN DISTRICT OF TEXAS
 2                         HOUSTON DIVISION

 3                                 )  CASE NO: 22-60043-cml
                                   )
 4   FREE SPEECH SYSTEMS, LLC,     )  Houston, Texas
                                   )
 5            Debtor.              )  Tuesday, September 13, 2022
                                   )
 6                                 )  1:03 p.m. - 1:49 p.m.
     ------------------------------)
 7

 8                               TRIAL

 9           BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
                  UNITED STATES BANKRUPTCY JUDGE
10

11   APPEARANCES:

12   For Free Speech Systems, R.J. SHANNON
                              Shannon & Lee LLP
13                            700 Milam Street, Suite 1300
                              Houston, TX 77002
14
                              RAYMOND WILLIAM BATTAGLIA
15                            Law Offices of Ray Battaglia, PLLC
                              66 Granburg Circle
16                            San Antonio, TX 78218

17   For Veronique De La      AVI MOSHENBERG
     Rosa, et al.:            McDowell Hetherington, LLP
18                            1001 Fannin, Suite 2700
                              Houston, TX 77002
19
                              JARROD B. MARTIN
20                            Chamberlain, Hrdlicka, White,
                              Williams & Aughtry P.C.
21                            1200 Smith Street, Suite 1400
                              Houston, TX 77002
22
     For David Wheeler,       RYAN E. CHAPPLE
23   et al.:                  Cain & Skarnulis PLLC
                              303 Colorado Street, Suite 2850
24                            Austin, TX 78701

25
```

```
 1   For the U.S. Trustee:     HA MINH NGUYEN
                               Office of the United States Trustee
 2                             515 Rusk Street, Suite 3516
                               Houston, TX 77002
 3
     For PQPR:                 STEPHEN LEMMON
 4                             Streusand Landon Ozburn and Lemmon
                               1801 S Mopac Expressway, Suite 320
 5                             Austin, TX 78746

 6   For the SubChapter V      MELISSA ANNE HASELDEN
     Trustee:                  Haselden Farrow, PLLC
 7                             Pennzoil Place
                               700 Milam, Suite 1300
 8                             Houston, TX 77002

 9   Court Reporter:           ZILDE MARTINEZ

10   Courtroom Deputy:         ZILDE MARTINEZ

11   Transcribed by:           Veritext Legal Solutions
                               330 Old Country Road, Suite 300
12                             Mineola, NY 11501
                               Tel: 800-727-6396
13

14

15   Proceedings recorded by electronic sound recording;
     Transcript produced by transcription service.
16

17

18

19

20

21

22

23

24

25
```

```
1          HOUSTON, TEXAS; TUESDAY, SEPTEMBER 13, 2022; 1:03 PM

2                         (Call to Order)

3          CLERK:  All rise.

4          MAN 1:  I was actually -- my door was shut because

5     I was in the restroom when they came by.  I saw them walk

6     past --

7          THE COURT:  This is Judge Lopez.

8          MAN 1:  (indiscernible).

9          THE COURT:  Might want to put your phone on mute.

10         WOMAN 1:  -- like it scared me because we came

11    around the corner (indiscernible) and like --

12         MAN 1:  Yeah, it --

13         WOMAN 1:  You had the door shut.

14         THE COURT:  Folks, this is Judge Lopez.  I can

15    hear everything.  Yes.  I'll do it.

16         This is Judge Lopez, folks.  Good afternoon.  It

17    is now 1:03.  I'm going to call Free Speech here on

18    September 13th, one o'clock docket.  Something just got

19    filed.  My understanding is we're going to take up cash

20    collateral and then we will also take up -- talk about

21    emergency motion to compel.  So why don't I take

22    appearances.  Why don't I start in the courtroom.

23         MR. MOSHENBERG:  Good afternoon, Your Honor.  Avi

24    Moshenberg and Jarrod Martin here on behalf of the Texas

25    plaintiffs, Your Honor.
```

1          THE COURT:  Okay.

2          MR. MOSHENBERG:  Jarrod Martin has a hearing at

3    1:30, so he may be stepping out in regard to that matter.

4    And then just so the Court understands, I'm going to be

5    handling the motion to compel issue and Jarrod Martin is

6    spearheading the discussions with the other side about cash

7    collateral, so let him speak to those issues.

8          THE COURT:  Why don't we take -- well, we'll see

9    where this goes.  Okay, thank you.

10          MR. MOSHENBERG:  Thank you, Your Honor.

11          MR. NGUYEN:  Good afternoon, Your Honor.  Ha

12    Nguyen for the U.S. Trustee.  I also have Millie Sall from

13    the U.S. Trustee's office here with me.

14          THE COURT:  Good afternoon.

15          MR. LEMMON:  Your Honor, Steve Lemmon on behalf of

16    PQPR.

17          THE COURT:  Good afternoon.

18          MR. SHANNON:  Good afternoon, Your Honor.  RJ

19    Shannon on behalf of the Debtor, Free Speech Systems LLC.

20          THE COURT:  Okay.  Good afternoon.

21          MR. SHANNON:  And believe on the telephone or on

22    the -- electronically Ray Battaglia may be on as well.

23          THE COURT:  Okay.

24          MR. SHANNON:  Thank you.

25          THE COURT:  Sounds great.  Good afternoon.  Ms.

1    Haselden, good afternoon.

2          MS. HASELDEN:  Good afternoon, Your Honor.

3    Melissa Haselden and I also have with me Elizabeth Freeman,

4    proposed counsel for Subchapter V Trustee.

5          THE COURT:  Okay.  Good afternoon.  Okay.  We have

6    covered the courtroom.  Let me just open it up.  Does anyone

7    wish to make an appearance who's on video.  Mr. Chapple, I

8    see you there.  Do you wish to make an appearance?

9          MR. CHAPPLE:  Yes, Your Honor.  Thank you for

10   recognizing me.  Ryan Chapple on behalf of the Connecticut

11   plaintiffs.

12         THE COURT:  Okay.  Folks the line is completely

13   unmuted.  I'm going to try to keep it completely unmuted so

14   I don't have to -- I can focus on the arguments and -- but

15   anyone else wish to make an appearance?

16         MR. BATTAGLIA:  Yes, Your Honor.  Good afternoon.

17   This is Ray Battaglia.  On behalf of Free Speech Systems.

18         THE COURT:  Good afternoon, Mr. Battaglia.  Anyone

19   else?  Okay.  Might be easier for me if we talked about cash

20   collateral first and then took up the motions to compel.  So

21   why don't we start there.  I did see that something got

22   filed.  Read it briefly and I'm still reading it.  Maybe you

23   can give me the high points.

24         MR. MARTIN:  I can give you high points, Your

25   Honor, and Mr. Battaglia can chime in as well.  We are able

```
 1    to reach another agreement on interim use of cash
 2    collateral.  The only material changes are the PQPR payment
 3    provisions from before regarding the clawback, those were
 4    removed and instead there's a language in there that
 5    preserves the clawback rights in the previous interim
 6    orders.  To date, out of that $750,000, $250,000 has been
 7    paid.  The other $500,000 has not yet been paid so you have
 8    one clock kind of ticking on that.
 9              Obviously, that's reserving all rights relating
10    to, you know, broader litigation, but specifically as to
11    those payments as to whether they were proper in this course
12    of business.  That's --
13              THE COURT:  Okay,
14              MR. MARTIN:  -- what the clock is ticking as far
15    as -- and then there's an updated budget as well and Mr.
16    Battaglia can speak to that.
17              THE COURT:  I did see that you all need a final
18    cash collateral hearing as well, right?
19              MR. MARTIN:  Correct, Your Honor.
20              THE COURT:  Or a time, I should say.
21              MR. MARTIN:  And we had proposed having that heard
22    at the same time as the tort committee hearing.
23              THE COURT:  Okay.  Do you think 10 a.m. would work
24    for everyone, if we're going to work through the day on
25    that?  I don't think there's a lot of hearings that are
```

1   going to go on at the same time there.  Would 10 a.m. work

2   for October 12th?

3            MR. MARTIN:  It's okay for the Texas plaintiffs,

4   Your Honor.

5            THE COURT:  Okay.  Mr. Battaglia, would that work

6   for you?

7            MR. BATTAGLIA:  Yes, Your Honor, and I've had

8   conversations with Mr. Martin -- this is Ray Battaglia, for

9   FSS -- about frankly at the end of the day probably doing

10  another interim at that time.

11           THE COURT:  Okay.

12           MR. BATTAGLIA:  Just -- I think we're fine running

13  on that basis, but yes.  That'd be fine.

14           THE COURT:  Okay.  Is there anything you wish to

15  tell me about --

16           MR. BATTAGLIA:  And I guess one more thing, Your

17  Honor, I should point out is that Ms. Freeman had asked for

18  a couple of -- minor modification to the proposed order

19  regarding payments to insiders and that the words directly

20  or indirectly were inserted, and I don't think that does

21  injustice to anyone who had previously signed off on the

22  proposed order, but I wanted to at least mention it.

23           THE COURT:  Okay.  I looked at the budget.  There

24  were two items that I just want somebody to clarify for me.

25  One of them says Alex Jones trial cost, what is that, for

1    $80,000?

2              MR. BATTAGLIA:  Your Honor, Mr. Jones is -- has

3    required to appear at trial in Connecticut and he's unable

4    to travel, like perhaps your or I can in the sense he does

5    require security when he goes somewhere and he doesn't stay

6    in a hotel.

7              THE COURT:  Why is the Debtor paying that?

8              MR. BATTAGLIA:  I don't think that we're providing

9    --

10             THE COURT:  He's a defendant.

11             MR. BATTAGLIA:  Because --

12             THE COURT:  Isn't he -- Mr. Battaglia, isn't he a

13   defendant in the same lawsuit?

14             MR. BATTAGLIA:  He is a defendant as well as FSS.

15   Yes, Your Honor, and we had provisions in the lift stay

16   order that we could include a budget for his travel

17   expenses.  And I think some of his travel expenses really

18   relate to his being there on behalf of FSS.

19             THE COURT:  I received this 15 minutes ago.  We're

20   not going to do that.  You all can come back and ask for it,

21   but we're not paying for travel expenses for co-defendant on

22   15 minutes' notice to the Court about that.  Never seen that

23   before.  I'm not aware of it.  Somebody wants to come back

24   on additional notice, you're more than happy to do so.  It's

25   not a no, but it's not a today.  I need more information on

1    that.  So I'm just telling -- what are the other witness

2    expenses and trial costs?  What does that relate to?  Does

3    that relate to specifically to FSS or something else?

4         MR. BATTAGLIA:  They are employees of FSS that

5    plaintiffs have requested to be present or alternatively

6    FSS' counsel has requested to be present.

7         THE COURT:  Okay.

8         MR. BATTAGLIA:  At trial.

9         THE COURT:  Okay.

10        MR. BATTAGLIA:  And also was included in the lift

11   stay order that those expenses would be allowed to be

12   reimbursed.

13        THE COURT:  Relates to the FSS' defense.  I think

14   lifting the automatic stay makes perfect -- I entered an

15   order lifting the stay.  You're going to have to provide

16   some additional information, if somebody -- provide the

17   evidence today, we can take is up.  But if you want me to

18   sign an order today providing expenses for co-defendant in

19   litigation, I'm going to need more than just the parties'

20   agreement on that.  I think I have an independent duty to

21   take a look at this and I don't understand it.

22        But that's -- that just means somebody can come

23   back and ask for it.  It just means that literally this got

24   filed 15 minutes before the hearing and I've reviewed it and

25   you want me to sign it today.  That's what I'm wanting to

1    do.

2            Mr. Lemmon, let me ask you.  You're the -- far as

3    I know.  It sounds like there's agreement between the tort

4    plaintiffs and the Debtors.  You're still listed as a

5    secured party.

6            MR. LEMMON:  Yes, Your Honor.

7            THE COURT:  Your client is still listed as a

8    secured party.  I just need to make sure that you're okay

9    with this order.  It says an agreed cash collateral order.

10           MR. LEMMON:  Yes, Your Honor.  I reviewed the form

11   of order and my client has no objection.

12           THE COURT:  Okay.  Thank you.  So I know you got a

13   1:30 and Mr. Battaglia, you can tell me otherwise, but I'm

14   willing to sign the order today extending the use of cash

15   collateral to October the 12th at a hearing on the budget.

16   The rest of the budget looks fine to me.  Actually had one

17   more question.  And there was an increased cost to the

18   fulfillment expert.  What is that?  I did -- or who is that?

19           MR. BATTAGLIA:  It's Blue Ascension, Your Honor,

20   and this was the subject of the modification to the cash

21   collateral order.  It -- really travels based on estimated

22   sales for the period.

23           THE COURT:  Okay.

24           MR. BATTAGLIA:  And they're not completely

25   connected because of course the sales are presented to you

1    and all these expenses on an approval basis, but they don't

2    track day-to-day the shipping.  They happen a week later or

3    several days later, but it's an estimate of what's expected

4    to pay for both the shipping and the fulfillment cost that

5    has been presented or discussed in front of the Court

6    before.

7              THE COURT:  And that's different than the

8    fulfillment services line?  There's a line --

9              MR. BATTAGLIA:  Your Honor, I'm afraid I don't --

10             THE COURT:  There's a line item for fulfillment

11   services.

12             MR. BATTAGLIA:  I need to --

13             THE COURT:  There's a line item for fulfillment

14   services and then I see one for a fulfillment expert.  It

15   was there last time.  It just went up this time around.  I

16   just --

17             MR. BATTAGLIA:  I'm sorry --

18             THE COURT:  -- need to make sure --

19             MR. BATTAGLIA:  I'm sorry, Your Honor.  The

20   fulfillment expert is after the hearing in which Blue

21   Ascension became something of an issue.  Mr. Schwartz, in

22   trying to fulfill his obligations and resolve the questions

23   that had been presented, has hired someone to come in and

24   evaluate the fulfillment operations of Blue Ascension and to

25   evaluate the cost structure.

```
1              THE COURT:  I remember that.

2              MR. BATTAGLIA:  And under --

3              THE COURT:  I remember that.

4              MR. BATTAGLIA:  So.

5              THE COURT:  I remember that.  Yeah.

6              MR. BATTAGLIA:  That's what that line item is for.

7              THE COURT:  Got it.  Got it.  Got it.  Yeah, I

8    remember that and I do remember Mr. Schwartz talking about

9    that at the last interim hearing on August 24.  So that

10   makes sense to me.  I have no additional questions.

11             Mr. Nguyen, Ms. Haselden, are you all okay with --

12   if I sign this order with the provisions that I've set

13   forth?

14             MR. NGUYEN:  Yes, Your Honor.  We have no

15   objections to the cash collateral.  It was the deal that was

16   struck and we were involved.  I've taken a look at it.

17             THE COURT:  Okay.

18             MR. NGUYEN:  I'm fine with the order.  Thank you.

19             THE COURT:  Thank you.

20             MS. HASELDEN:  Yes, Your Honor.  We have no

21   objection with the changes that are --

22             THE COURT:  Okay.

23             MS. HASELDEN:  -- Ms. Freeman --

24             THE COURT:  And again, with the other part, people

25   -- I just, I don't have any evidence as to why that's
```

```
 1   necessary or how it's -- why FSS should pay for it.  I'm

 2   happy to hear evidence on it, if there is any.  If not,

 3   we're all going to --

 4             MR. BATTAGLIA:  Your Honor --

 5             THE COURT:  We're all going to come back in a

 6   couple weeks.  It's just -- I haven't, I'm not comfortable

 7   doing it today.

 8             MR. BATTAGLIA:  Your Honor, this is Ray Battaglia

 9   again.  I understand.  I'll -- if you would like, I'll

10   revise the budget accordingly or with the Court, made their

11   --

12             THE COURT:  No.

13             MR. BATTAGLIA:  -- certainly says if the budget

14   doesn't, so I'll -- whatever the Court --

15             THE COURT:  I can --

16             MR. BATTAGLIA:  -- favors and then we'll come back

17   and ask the Court for --

18             THE COURT:  Okay.  I can --

19             MR. BATTAGLIA:  -- those expenses with more

20   explanation.

21             THE COURT:  I can figure it out on my end and I

22   think it's just a short line or something, either in the

23   order or just striking it --

24             MR. BATTAGLIA:  Yes, sir.

25             THE COURT:  -- from the budget, but I can sign it.
```

1    Mr. Lemmon, if you can just confirm you're okay with me

2    signing the order as provided.

3            MR. LEMMON:  Yes, Your Honor.  My client has no

4    objection.

5            THE COURT:  Okay.  Okay.  Thank you.  And I've

6    heard from the United States Trustee.  I've heard from

7    Subchapter V Trustee.  I will sign that order.  Looks like

8    sales are still doing really well, which is good for FSS.

9            So, okay.  I will now turn things over to, guess

10   Mr. Moshenberg, you filed the motion.  Turn it over to you,

11   sir.

12           MR. MOSHENBERG:  Thank you, Your Honor.

13           THE COURT:  You can move that mic closer to you.

14           MR. MOSHENBERG:  Sure.

15           THE COURT:  No problem.

16           MR. MOSHENBERG:  Can you hear me all right, Your

17   Honor?

18           THE COURT:  Just fine.  Thank you.

19           MR. MOSHENBERG:  Thank you very much and thank you

20   for hearing this issue so quickly, Your Honor.  So as the

21   Court is well aware, this cash collateral issue is something

22   the parties are continuing to debate and do discovery on and

23   we're preparing for that cash collateral hearing, looks like

24   on October 12th.

25           One of the issues in that cash collateral motion

1    has to do with the nature of the PQPR debt, as the Court

2    knows.  It's not only the nature of the debt but also how

3    that debt was arrived at and the actual amount of the debt

4    itself.  As the Court knows, we've worked together with Free

5    Speech Systems in terms of reaching interim cash collateral

6    orders, same thing with PQPR, and that's something we've

7    been very proud of, the fact that we've been able to work

8    with them when needed.

9         And one of the agreements that the parties reached

10   and the Court entered an order on was Document 98 which is

11   the second cash collateral order.  And Paragraph No. 14,

12   Your Honor, really codifies the agreement that the Court

13   blessed that the parties to do discovery as it relates to

14   the cash collateral order and what it says is it provides

15   that PQPR as well as FSS, but really we're focused on PQPR

16   today, PQPR was supposed to provide documents in response to

17   document -- to discovery requests and provide other

18   discovery responses by certain date.  Then after that date,

19   the parties were going to have a deposition of PQPR's

20   corporate representative.

21        Paragraph 14 of Document 98 also says that if

22   there's some sort of dispute relating to the discovery, then

23   that the parties can move on an emergency basis.  Now, that

24   being agreed to, the parties did issue discovery requests

25   and the Texas plaintiffs served discovery requests that were

1    focused on this targeted issue about the nature of the PQPR

2    debt and the amount of the PQPR debt.

3            And just so the Court understands, Exhibits 1, 2,

4    and 3 to the motion to compel, I've conferred with opposing

5    counsel and their finding that admitted.  That way Jarrod

6    can leave a little sooner without having to get those

7    documents in.

8            THE COURT:  Let's make him stay.  Just fine.

9    Thank you.

10           MR. MOSHENBERG:  But Documents 1, 2, and 3 in

11   support of that motion or exhibits, rather, it's the

12   discovery request, the responses, and then the attempt to

13   meet and confer.  Now, the cash collateral motion, you know,

14   of course the underlying notes, the cash collateral here

15   that PQPR has with Free Speech Systems, it's not an ordinary

16   note that you would find, for instance, when a bank is

17   giving out a secured loan for a promissory note.

18           What you have here is you've got promissory notes

19   that are basically memorializing 50-some million dollars,

20   $53 million in past obligations owed.  So it's not future

21   money being paid out under a security arrangement.  It's

22   supposedly some legal obligation to pay a debt that was

23   incurred in the past.

24           And so a lot of our discovery requests were

25   focused on figuring out what's the nature of that underlying

1    debt that preceded the promissory notes.  And that's why we

2    just served those discovery responses that are in Exhibit 1

3    and the responses that are in Exhibit 2.  The problem is --

4    and this is in Exhibit 2 -- is that the responses PQPR

5    provided list a bunch of boilerplate objections and then it

6    just states what documents PQPR has decided to produce.

7         What we have a problem with their responses is

8    first of all, there's really two issues.  The first one is,

9    we don't really know whether responsive documents are being

10   withheld on the basis of an objection.  They just provide

11   these boilerplate objections saying we object to this

12   request, here's what we'll produce.  It's unclear from the

13   responses, are there other responsive documents out there

14   that are responsive to that request that are being withheld.

15        THE COURT:  Have the parties conferred?

16        MR. MOSHENBERG:  We have tried to.  We did speak

17   this morning, Your Honor.  So we tried to confer for several

18   days, as Exhibit 3 shows to our motion.  We didn't hear

19   anything for a long time, Your Honor.  Finally, yesterday,

20   after they filed their response, there was a brief

21   communication where they sort of invited us to send another

22   email and explain what we want, and we did that.

23        We sent a long email detailing the documents we

24   want and why we want them, and they responded and they

25   basically said the effect of well, you don't need to have

1    these documents.  First, take the deposition and then see if

2    you need the documents.  Obviously, that's not what the

3    discovery rules contemplate.  If there's responsive

4    documents out there and they're discoverable, then we have a

5    right to receive them.

6          Of course, in practice, you need the documents in

7    order to take a meaningful deposition.  So legally, I don't

8    really understand why that's a reason to not turn over a

9    responsive document.  Doesn't make any sense in normal

10   practice of law, but especially doesn't make sense given

11   that the parties already agreed that they were going to turn

12   over responsive documents before the deposition, and that's

13   what Document 98, Paragraph 14 shows.  So I don't really

14   understand the basis for that.

15         The other issue that they mention is they sort of

16   indicate there might be some responsive documents.  There

17   may not be other ones.  They don't exist.  If -- and this

18   really is a big part of the issue.  We don't want responsive

19   documents being held on the basis of an objection.  If there

20   are no responsive documents, they're required under Rule 34

21   to say so.  We just want to know that there's no documents

22   out there that are being withheld.  And it seems like for

23   some of these discovery requests, that may be the case.

24         What they need to do is withdraw their improper

25   objections and just say, there's no responsive documents in

1    --

2              THE COURT:  Do you think some of these requests

3    are overly broad?

4              MR. MOSHENBERG:  I don't, Your Honor.  I'm happy

5    to handle any specific --

6              THE COURT:  Let's start.

7              MR. MOSHENBERG:  Sure.

8              THE COURT:  We're talking about cash collateral.

9              MR. MOSHENBERG:  Yes, Your Honor.

10             THE COURT:  Produce all agreements, contracts, and

11   -- all agreements between FSS and PQPR.  What purpose does

12   that serve with cash collateral --

13             MR. MOSHENBERG:  It's --

14             THE COURT:  -- unrelated to the debt?

15             MR. MOSHENBERG:  Well -- and so when we --

16             THE COURT:  I'll give you a few.  Produce all

17   documents evidencing any agreements between FSS and PQPR.

18   Right?  Regardless if it relates to the debt.  Say there's

19   an agreement -- what do you mean by agreements, right?

20   That's different from contracts and promissory notes.  All

21   of them.  Produce -- let's see.  Produce all employee lists

22   for PQPR from September 1st, 2013 to the present.  Why do

23   you need to know who works at PQPR in 2013 to determine

24   whether the debt is owed at that amount or not?  I'm just

25   asking.  It's the kind of -- all documents and

1    communications evidencing, so every communication evidencing

2    the ownership of PQPR from its inception.  You don't find

3    that to be a little overly broad?

4            MR. MOSHENBERG:  No, I --

5            THE COURT:  Documents just saying, we formed PQPR

6    in 2013, so I'm going to have to go back in 30 days' notice

7    and file -- and find every email that shows every time that

8    they say that they're the owner from 2013 in connection with

9    a cash collateral hearing that was schedule to occur today?

10           MR. MOSHENBERG:  Well, not necessarily, Your

11   Honor.  But to be clear, we detailed in an email yesterday,

12   we talked to them about what we were specifically looking --

13           THE COURT:  -- not what you said.  You said you

14   didn't think some of these were overly broad.

15           MR. MOSHENBERG:  Sure.  And let me be clear, and

16   we can always -- of course, the rules allow us to narrow it

17   to the extent it is discoverable and I want to be --

18           THE COURT:  Taking you up on your first statement.

19           MR. MOSHENBERG:  Sure, Your Honor.  I don't think

20   the way that you read the question, Your Honor, the request

21   --

22           THE COURT:  I read it the way you wrote it.

23           MR. MOSHENBERG:  Sure.  And I want to be clear.  I

24   didn't perceive it that way.  When we as a group circulated

25   these drafts, what we're referring to, the draft contracts,

1   agreements, however they want to call it, between Free

2   Speech Systems and PQPR.

3           THE COURT:  -- I'm going.

4           MR. MOSHENBERG:  Sure.

5           THE COURT:  I think some of these are really

6   broad, but it could be narrowed to address what you need and

7   then I think Mr. Lemmon is going to have to tell me if these

8   -- some of these requests were narrowly tailored towards

9   cash collateral and the debt that exists, I understand your

10  initial -- his initial response, but maybe he was jammed for

11  time.  But now we're a couple of weeks out now and we're

12  going to go further, even further out.  I don't understand.

13  I think some of these requests can be narrowly tailored in a

14  way to specifically address the issue and I would need to

15  understand from PQPR whether they would still have an

16  objection to that.

17          But I -- you're asking me whether I think an

18  organizational chart is appropriate.  I do.  If you're

19  asking me whether they need to identify all facilities and

20  offices used by them, I don't know.  You'll have to tell me

21  whether that's appropriate or not, but I do think that the

22  parties could talk and narrowly tailor this in a way that

23  really gets to the heart.  I do understand the issue.

24          There were -- there was a large amount of debt

25  that was -- this is different.  This is not just a loan

1    agreement where money was advanced, a loan agreement was

2    signed and then funds were advanced on a loan and there was

3    security taken on that.  This seems to be a little different

4    and you're -- I think you're entitled to get documents that

5    are based on that.

6         MR. MOSHENBERG:  Sure.

7         THE COURT:  I just want -- I just think things can

8    be narrowly tailored in a way that really addresses what

9    you're doing that relates to cash collateral, and I'm happy

10   to do that, but I think the parties could really sit down

11   and see if that could get done, with my guidance.

12        I think there's a difference between seeking

13   documents for other purposes, and I'm not saying that's what

14   you did.  I just -- if we're going to limit it to cash

15   collateral, which is what's going on, then I think you can

16   get the docs and I think there are.  And I agree with you,

17   if all you are receiving is the underlying loan documents

18   and some worksheets, I think Mr. Lemmon is going to have to

19   tell me if there's more or admit that there's more or not.

20        But I think some of these can be more narrowly

21   tailored to address the debt, but that's a simple thing.

22        MR. MOSHENBERG:  I totally agree, Your Honor, and

23   candidly, my normal practice, I usually am able to meet and

24   confer and reach some sort of deal.  The reason the motion

25   was filed is because we just heard nothing for about a week

1    and we tried our best and, you know, it turns out Mr. Lemmon

2    was busy meeting with Ms. Haselden and trying to promote his

3    motion to investigate instead of doing the discovery he

4    promised to do under our agreement.

5         THE COURT:  That's right.  The motion to

6    investigate is still out there as well.

7         MR. MOSHENBERG:  Yes, Your Honor.  And we totally

8    agree.  You know, if there's room to narrow it, absolutely.

9    We're not looking for every document under the sun, so I

10   agree with you and I think we'll be able to work it out.

11   But I do want to be clear and I would love some guidance

12   from the Court.  I mean, our wish list is essentially to

13   make sure that if there are no responsive documents that

14   they withdraw their objections and say there's no responsive

15   documents, assuming that it's been tailored as the Court has

16   discussed.

17        And then if there are responsive documents that

18   are tailored as was discussed, that absolutely produce them.

19   And I'm happy to work with Mr. Lemmon on that.  I think we

20   could probably do that, and if not, we can come back to the

21   Court soon if that works.

22        THE COURT:  Okay.  That's perfect.  Thank you.

23   Let me hear from Mr. Lemmon.

24        MR. LEMMON:  Judge, I'm chagrined to be here on a

25   discovery motion.  I don't think I've appeared on a

1    contested discovery motion in federal court in 20 years, but

2    part of this is on me, and that is that Mr. Martin reached

3    out to me on Labor Day by email and I read his briefly.  It

4    was to me and to Mr. Battaglia and I believe --

5         AUTOMATED VOICE:  Conference muted.

6         MR. LEMMON:  -- the first part of it dealt with a

7    privilege log, right, which I didn't really find applicable

8    and I did not give his email, when I read it on my iPhone

9    when I got off the golf course, the -- in the way that I

10   should have.

11        The follow-up email again came to me and I read it

12   on my iPhone the day before the creditors meeting and it was

13   Mr. Martin's suggestion we visit after the creditors

14   meeting.  I completely zoned on those.  Just didn't see

15   them.  So I was surprised when I got the emergency motion.

16   I called Mr. Martin because the Court will recall I'm the

17   person that offered discovery informally at the time of the

18   August -- I think it was -- 3rd hearing.  And -- because I

19   was going on vacation.

20        I wanted everybody to be able to get what we had

21   and we have somebody who did the forensic accounting

22   relating to the underlying debt and was instrumental in the

23   -- knows about the execution of the notes and that's the

24   person I've offered and whose work papers I've sent.  And

25   we've offered him repeatedly for deposition.  That

 1    deposition is currently set for October 4th and I suppose

 2    that the plaintiffs will go forward taking it this time.

 3          I had talked originally with Mr. Martin and I

 4    thought we had an agreement that I was going to produce the

 5    documents related to the existence of the debt which I

 6    viewed as the key issue related to cash collateral.  And we

 7    will.  We will absolutely produce everything related to the

 8    existence of the debt or reasonably related to the existence

 9    of the debt, Your Honor, and I don't have a problem with

10    that.

11          THE COURT:  You think that includes negotiations

12    surrounding the formulation of the debt?

13          MR. LEMMON:  I believe that there are no documents

14    regarding the negotiations regarding the formation of the

15    debt.  The way the debt occurred, Your Honor, was that PQPR

16    sold to FSS on open account and they kept a ledger, right.

17    And so those accounting issue -- entries are all, of course,

18    relevant, right.  My problem is that -- and when we got the

19    document requests while I was on vacation, it demanded a

20    response in eight days at that time.

21          We weren't able to do that.  My problem is that

22    that ledger has a lot of other things in it, right, such as

23    every purchase my client's ever made.  Right, it's my

24    client's general ledger and we don't find that to be germane

25    to any of the discussions.  So what we have is we have a

1   compilation done by the forensic accountant of all of those

2   and we can work with everybody to get them what they need

3   regarding the existence of the debt.  I don't have a problem

4   with that, Your Honor.

5           Just want to say one other thing, and that is

6   yesterday I called Mr. Martin and I said, what is it that

7   you guys really want.  And he said well, we need your

8   spreadsheets in native format and I agreed immediately.  I

9   said, they won't be Bates labeled that way, but we'll give

10  them to you.  And he said Mr. Moshenberg may want something

11  different.  I got an extensive email from him last night.  I

12  responded.  I called him.  Finally reached him this morning.

13          I said, what is it that you really want on an

14  emergency basis.  He said, I need you to withdraw every

15  single one of your objections and produce every single

16  document.  Judge, we will absolutely work with him.

17          Let me just mention one other thing, Your Honor,

18  that's a concern to us and that is we have asked for a

19  protective order in this case and we've circulated.  We

20  think we have agreement on the protective order, but there

21  are parties that are downloading our documents that we sent

22  to them and I don't know who those parties are exactly.

23          And so I've asked for them to tell us who has

24  signed off on the protective order but this illustrates one

25  of the problems in this case and that is, you know, this is

1    my client's proprietary information and we do not want it

2    traveling around the world.  So -- and so the protective

3    order that everybody has agreed to is just the standard

4    Southern District protective order with no changes

5    whatsoever.  But for that reason, we have concerns about

6    production in this case and we do need the signed signature

7    pages on the protective order before people are downloading

8    our documents.

9         So with all that said, Your Honor, we absolutely

10   will produce all of the documents relating to the debt.  You

11   know, we just need this tailored a little bit and we'll get

12   them all of that.

13        THE COURT:  Let me -- what I'm thinking about

14   doing, a couple of things and Mr. Lemmon, (indiscernible)

15   stand here, I want you to -- give the opportunity to react

16   to what I'm saying.  I'm going to deny your request for

17   emergency consideration to appoint the Subchapter V Trustee.

18   I'm going to -- expand the powers of the Subchapter V

19   Trustee.  I want to take everything up at one time.  I want

20   to take everything up on the 12th.  I want to think about

21   everything and I'm going to make a decision about

22   everybody's requests at that time.

23        That doesn't mean that the Subchapter V Trustee

24   can't, if she's doing whatever work she has, I'm not here to

25   impede whatever she's doing.  I'm just saying I want to take

1    up the consideration and sign whatever I'm going to sign

2    because what I don't want to do is, quite frankly, limit her

3    or limit myself in any way.  I want to have the full range

4    of options to -- based on evidence that I hear as to what I

5    think the Subchapter V may or may not be doing.  May want to

6    do more.  May want to do a little bit less.  Just -- I just

7    need to hear what the evidence is and I want to take it up

8    all at the same time.

9           I'm also going to say I don't think I need to rule

10   on anything today, but everybody reserves the right to come

11   back and tell me.  I am asking all of the professionals in

12   this case -- I understand the history here.  Understand that

13   there's a lot of tension between clients but I expect the

14   professionals to work together and to do it, so I think I'm

15   really reaching out to both sides, asking everyone to really

16   consider the rhetoric in the papers and the -- what gets

17   presented at the hearing.

18          I just am asking all the professionals to really

19   talk about what they want in connection with this hearing

20   and what you need in connection with cash collateral.  And

21   if the parties can't work it out, then come back to me but -

22   - I'll leave it there.

23          I think there's a way for you -- comes to

24   questions about protective orders, I think that's standard.

25   I think professionals should be able to work through that

1    really easy.  So I hope no one is downloading information

2    and taking advantage of information without protection, if

3    that's what folks are looking for.  At the same, Mr. Lemmon,

4    when it comes to PQPR, if there are additional documents

5    that are responsive, at some point someone's going to have

6    to say I do agree with Mr. Moshenberg; here's all I've got

7    and I've got nothing else, and I think that representation

8    is standard.

9         I don't think you need to remove your objection,

10    quite frankly, but I do think at some point people need to

11    know, you know, this is all you've got so that when they

12    show up to a hearing, they know that they've received all

13    responsive documents -- responsive nonprivileged documents.

14    So -- and I know the professionals here.  I'm talking very

15    basic standard things here, so I'll leave it there.

16         MR. LEMMON:  And Judge, just so I'm clear, and we

17    will produce everything related to the debt.  We would

18    produce an org chart.  I'm told there is not one.  But we

19    don't have a problem at all with that and we'll take all

20    these things up on the 12th, I suppose.

21         THE COURT:  That's when I want to take it up.  If

22    parties have different views on all this, they can certainly

23    take it up, but I don't want to take it up.  I don't know

24    what I'm going to hear on the 12th.

25         MR. LEMMON:  Sure.

```
 1              THE COURT:  And regardless of how I rule on the

 2     12th, I think the Subchapter V Trustee has to do her job and

 3     do her job the way she sees fit, so that's not for me to --

 4              MR. LEMMON:  May --

 5              THE COURT:  -- up now.

 6              MR. LEMMON:  May I say one thing, Your Honor?

 7              THE COURT:  Sure.

 8              MR. LEMMON:  And -- the meeting we had yesterday

 9     with the Subchapter V Trustee and counsel was characterized

10     as some sort of sales job.  Would that I was such a great

11     advocate that I could put a sales job over on Ms. Freeman or

12     --

13              THE COURT:  I don't want to get into it.

14              MR. LEMMON:  -- you know, Ms. Haselden and it's --

15     it was informational.  We're happy to cooperate to the

16     fullest extent with the Sub V Trustee, so.

17              MR. MOSHENBERG:  (indiscernible).

18              THE COURT:  Yeah, absolutely.

19              MR. MOSHENBERG:  I am confident we're going to be

20     able to work together and figure out the scope of what is

21     discoverable, but I do want to make sure we're on the same

22     page about timing, Your Honor.  We have a deposition on the

23     4th.  His position has been that you can get the documents

24     after the deposition.  We think we're entitled to them

25     beforehand.  That was what was agreed to.
```

1          THE COURT:  I feel really confident that that's

2     probably not going to be the case after today.

3          MR. MOSHENBERG:  That -- I'm sorry.

4          THE COURT:  That you will receive the documents in

5     time to take a deposition.

6          MR. MOSHENBERG:  That we will?

7          THE COURT:  Yeah.

8          MR. MOSHENBERG:  Okay.

9          THE COURT:  I feel pretty confident about that,

10    without me having to get involved.

11         MR. MOSHENBERG:  I appreciate that, Your Honor,

12    and --

13         THE COURT:  I feel really confident that you're

14    not going to get them, like, October 1st, either.  You know,

15    that you'll get them in due course as quickly as possible on

16    a rolling basis.

17         MR. MOSHENBERG:  I appreciate that.

18         THE COURT:  That sounds right to me.

19         MR. MOSHENBERG:  I appreciate that, Your Honor.

20         THE COURT:  And look, I'm here on 24 hours'

21    notice, so if you get nervous, if things are getting tight

22    and you don't think things are going the way they are, I can

23    -- you know, it's just an email to my case manager, right,

24    and we can get on the phone in less than 24 hours we can

25    have a hearing, or the same day.  So this isn't saying I'm

1    continuing everything, right, and maybe the issue become

2    moot.  Maybe it doesn't.  But I'm here and I'm just hoping

3    that the professionals can -- I'm asking the professionals

4    to get in a room and have a serious meeting about what's

5    needed.  I think you're probably entitled to a lot of what

6    you've asked for but maybe it just needs to be narrowed in a

7    way that would make sense in light of the timing in terms of

8    where we are, and I think that can be accomplished in fairly

9    short order.  The documents either exist or they don't.  Mr.

10   Lemmon either can produce them or not and we'll see where it

11   goes.

12            MR. MOSHENBERG:  That's fair, Your Honor.

13            THE COURT:  And everybody's rights are reserved.

14   Everybody's rights are reserved, U.S. Trustee's rights, any

15   other creditors' rights, Subchapter V Trustee's rights,

16   Debtor's rights, everybody's rights are reserved on these

17   issues.  I think we've just got to get to the 12th and then

18   see where things go, right, and if this gets -- we'll see

19   where things are at that time.  But I'm really, really

20   asking the professionals to hear what I'm saying and I don't

21   think anyone has to agree on anything.

22            I do think it makes sense to be civil and work

23   through these issues as the professionals, take care and do

24   it.

25            Is there anything -- I'm going to sign that order,

 1   cash collateral extension order today.  Let me ask the U.S.

 2   Trustee, since I've got you here.  Is there anything -- I

 3   saw that you filed objections to certain retention

 4   applications.  Two of those individuals aren't here, so I

 5   don't want to pick a date to take that up.  I don't want to

 6   take it up on the 12th.  That seems like a lot --

 7            MR. NGUYEN:  Understood, Your Honor.  Mr. Shannon

 8   --

 9            THE COURT:  -- in one day.  Mr. Shannon, I just --

10   but maybe you all can get together and we can pick a date

11   and just reach out to my case manager at that time.  I don't

12   need to comment.  I haven't read them -- haven't read

13   anything.

14            MR. NGUYEN:  Sure --

15            THE COURT:  I just say that it got filed, but

16   maybe we can pick a date.  There's a lot, I think, scheduled

17   for the 12th and I think there's -- has to be a day where we

18   can do retentions on a separate track.

19            MR. SHANNON:  Yeah.  Your Honor, one thing that --

20   there is a status hearing set in this case for September

21   20th.

22            THE COURT:  Yes, that's --

23            MR. SHANNON:  And I think that's probably about

24   the -- you know, it's quick, but still has some time for

25   gathering the required information.  So Your Honor, we would

1    request setting those applications to employ the CRO and

2    Shannon and Lee LLP on that date, if possible.

3              THE COURT:  You want to take it up at that hearing

4    on the 20th?

5              MR. SHANNON:  Yes, on September 20th.

6              MR. NGUYEN:  Your Honor, I have no problem with

7    that.  I understand Mr. Shannon doesn't want to put his

8    employment at risk.  He doesn't want to work longer than,

9    you know, Your Honor's --

10             THE COURT:  No, no, no.

11             MR. NGUYEN:  I'm certainly -- you know, we'll work

12   with the schedule.  I told Mr. Shannon this morning,

13   whenever he wants to do it, we'll be ready.  We'll raise our

14   objections and go forward with it.

15             THE COURT:  Let me just take a look at something.

16   Scheduled at one o'clock for the 20th?  Is that right?

17             MR. SHANNON:  I believe so, Your Honor.

18             THE COURT:  Okay.  Okay.  Yeah, let's take it up

19   at one.  Okay.  That works for me, September 20th at 1 p.m.

20             MR. NGUYEN:  And just for clarity, Your Honor, Mr.

21   Shannon and I spoke this morning.  He requested a little bit

22   more clarity on my objection.  I use an entity instead of an

23   individual.  I normally do that to tone down the rhetoric,

24   but Mr. Shannon asked me to be more clear in terms of when I

25   make the --

```
 1              THE COURT:  I understand.

 2              MR. NGUYEN:  I'm going to file a corrected motion.

 3   If he wants me to be clear, I'm happy to do it and I'm not -

 4   - I just want to make sure the record's clear.  That

 5   corrected motion is going to be filed sometime this

 6   afternoon or by the end of the day.

 7              And then the second thing is, we talked about some

 8   limited discovery.  It's very limited in terms of the scope

 9   of the employment -- the scope of the engagement that

10   occurred between May 24th through May 31st, and Mr. Lee in

11   his declaration, there was about $21,000 of services.  I

12   asked Mr. Shannon to explain what those services are and we

13   just need some records of that to go forward with twenty --

14   other than that, I don't intend at the hearing on the 20th

15   it's going to go long.

16              THE COURT:  Okay.  No, no.  I'll give it as much

17   time as we need.  It's important, but I appreciate it so

18   that -- really appreciate you thinking about that.  So can

19   we -- do you think, Mr. Schwartz, we can take that up on the

20   20th as well?

21              MR. SHANNON:  I believe Mr. Schwartz will be here

22   anyway.

23              THE COURT:  For the status report?

24              MR. SHANNON:  For the status report.

25              THE COURT:  Okay.
```

1        MR. SHANNON:  And again, Your Honor, I do believe

2    that the U.S. Trustee's primary objection is about the

3    disclosures in the InfoW case.  That's really the crux of

4    the objection and what will need to be investigated, so it's

5    not -- I don't think it goes beyond that.

6        MR. NGUYEN:  That's correct.  There was a prior

7    nondisclosure that occurred before you.  There's going to be

8    some legal arguments on how you should address that, but

9    that's where we are with the objection.

10        THE COURT:  I can -- we'll take it up on the 20th

11    and if Mr. Schwartz, you can just -- I will assume Mr.

12    Schwartz will be here, but if anything changes just reach

13    out to Ms. Saldana and let her know, but I will -- we will

14    set Schwartz' application as CRO and Shannon and Lee and

15    take it up at -- on the 20th.

16        Ms. Haselden, anything we need to talk about?

17    Anything from your perspective before the 20th?

18        MS. HASELDEN:  (indiscernible).

19        THE COURT:  All right.  I do note -- and this is a

20    hyper technical point and I want to -- well, you're telling

21    me.  If there's anything you want to talk about, I'll take a

22    look at something.

23        MS. HASELDEN:  Your Honor knows this case is very

24    unusual and because of the motions that have been filed by

25    both the parties in the case, the Debtor and the plaintiffs,

1    seeking to expand my role, I mean, I've found it necessary

2    first to go ahead and engage counsel.  And then, you know,

3    Mr. Lemmon had requested that we meet with his client and

4    because of the nature and the posture of the case, we went

5    ahead and set the meeting.  I think, you know, at some point

6    we will need a little clarification on exactly what I need

7    to do.

8            Normally, some of this investigatory work, you

9    know, is not necessary, so I guess between now and the 12th,

10   I'll try to figure out --

11           THE COURT:  Yeah, look, I mean, I'm interested to

12   know your thoughts as well on -- you know.  That's why I

13   don't want to -- I don't want to take anything up on a rush.

14   I don't know what the evidence is.  I don't know what the

15   evidence is going to show.  May show something, may show

16   nothing.

17           I think I'd want to know if, you know, as I

18   consider expanding the role of the Subchapter V Trustee,

19   what you would see that role to be and what you think it

20   should be as well, if anything.  I don't want to put any

21   words or thoughts in your -- in you.  I just want to know

22   that I -- you're an important part of the Subchapter V

23   process and I want to know what you think.  Okay?

24           MS. HASELDEN:  Thank you, Your Honor.  Yes.  We're

25   learning and the parties are all at this point cooperating

1    and providing information.

2              THE COURT:  So Mr. Shannon, the only hyper

3    technical point is 1188(c) requires the report get filed on

4    the docket before the meeting, 14 days before.

5              MR. SHANNON:  Yes, Your Honor.  I believe you --

6              THE COURT:  The hearing.

7              MR. SHANNON:  I believe you filed an order that

8    set the date that the --

9              THE COURT:  I did.

10              MR. SHANNON:  -- status report needs to be filed.

11              THE COURT:  I did.

12              MR. SHANNON:  And I believe it's today, is what

13    that order says.

14              THE COURT:  No.  That's what I was trying to --

15              MR. SHANNON:  I'm sorry.  I don't remember the

16    docket number, unfortunately.

17              THE COURT:  Yeah.

18              MR. SHANNON:  Around 50 or so.

19              THE COURT:  That makes two of us.  Let's see.  If

20    today's the day, I just want to make sure something gets

21    filed so we comply with the code.  That's where I was going.

22    It wasn't to -- anything other than that.  I just want to

23    make sure that we're complying with -- that a status report

24    gets filed so that we're compliant with the Bankruptcy Code.

25              MR. SHANNON:  Yes, Your Honor.  And I just went,

1    what your order said rather than --

2            THE COURT:  No, no, no, you should.  You should.

3            MR. SHANNON:  Okay.

4            THE COURT:  No, no, no.  You absolutely should.

5    No, I -- we set them for a reason on that date and I

6    remember and I just want to make sure that we're all on the

7    same page.  Yeah, it's Docket 65, so --

8            MR. SHANNON:  Yes, Your Honor.  I believe

9    originally the status report, the idea was to actually have

10   it a week after that.  Mr. Schwartz will be out of the

11   country during that week, so I believe that the date for the

12   status conference got pushed back a week and the report did

13   move as well.

14           THE COURT:  No, no, no.  I think we're all on the

15   same page.  Think we're all on the same -- yeah.  Today's

16   your day.

17           MR. SHANNON:  All right.  Thank you, Your Honor.

18           THE COURT:  Sounds like you're having some fun

19   this afternoon.  All right, folks.  Anything else we need to

20   talk about?  All right.  Thank you, everyone.

21           CLERK:  All rise.

22

23       (Proceedings adjourned at 1:49 p.m.)

24

25

```
1                          CERTIFICATION

2

3    I certify that the foregoing is a correct transcript from

4    the electronic sound recording of the proceedings in the

5    above-entitled matter.

6

7    Sonya M. Ledanski Hyde

8

9

10   Sonya Ledanski Hyde

11

12

13

14

15

16

17

18

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25   Date:  September 20, 2022
```

004763

United States Bankruptcy Court
Southern District of Texas
**ENTERED**
September 20, 2022
Nathan Ochsner, Clerk

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **FREE SPEECH SYSTEMS, LLC,** | § | **Case No. 22--60043** |
| | § | |
| **DEBTOR.** | § | **Chapter 11 (Subchapter V)** |
| | § | |

### ORDER APPROVING DEBTOR'S APPLICATION TO EMPLOY
### THE LAW OFFICES OF RAY BATTAGLIA, PLLC
### <u>AS BANKRUPTCY COUNSEL COMMNECING ON JULY 29, 2022</u>

Upon the application (the "<u>Application</u>")[1] filed by the Debtor to employ the Law Offices of

Ray Battaglia, PLLC ("<u>the Firm</u>") as bankruptcy co-counsel commencing on July 29, 2022,

pursuant to Bankruptcy Code §§ 327(a) and 330 and Bankruptcy Local Rule 2014-1, as more fully set

forth in the Application and all exhibits and attachments to the Application; and upon the Court's

finding that (i) the Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334;(ii) this is a

core proceeding pursuant to 28 U.S.C. § 157(b); (iii) venue is proper in this Court pursuant to 28

U.S.C. §§ 1408 and 1409; (iv) the Application and the Battaglia Declaration are in full compliance

with all applicable provisions of the Bankruptcy Code, Bankruptcy Rules, Bankruptcy Local Rules,

and Orders and procedures of this Court; (v) the Firm does not represent an interest adverse to the

Debtor's estate with respect to the matters upon which it is to be engaged and is a "disinterested

person" within the meaning of that term under § 101(14) of the Bankruptcy Code; (vi) the Firm is

qualified to represent the Debtor's estate under § 327 of the Bankruptcy Code; (vii) the terms of the

Firm's employment have been disclosed and are reasonable under the circumstances; (viii) proper

and adequate notice of the Application, the deadline to file any objections to the Application, and the

hearing thereon was given, and no other or further notice is necessary; (ix) the legal and factual bases

---

[1] Capitalized terms not defined herein have the meaning set forth in the Application

set forth in the Application establish just cause for the relief granted herein; (x) the relief sought in the Application is in the best interests of the Debtor's estate; (xi) any timely objection to the Application having been withdrawn or overruled for the reasons stated on the record at any hearing on the Application; and after due deliberation and sufficient cause appearing therefor, it is hereby ORDERED THAT:

1.      In accordance with Bankruptcy Code §§ 327(a) and 330 and Bankruptcy Local Rule 2014-1, the Debtor is authorized to employ and retain the Firm commencing on July 29, 2022, as bankruptcy co-counsel, under the terms and conditions set forth in the Application and the Engagement Letter attached to the Application as Exhibit B.

2.      The Firm is authorized to perform any and all legal services for the Debtor that are necessary or appropriate in connection with the Chapter 11 Case.

3.      The Firm shall be compensated for its services and reimbursed for related expenses in accordance with the terms and conditions of the Engagement Agreement, as set forth in the Application and subject to the procedures Bankruptcy Code §§ 330 and 331 of the Bankruptcy Code, and in accordance with applicable Federal Rules of Bankruptcy Procedure, Local Rules, and any orders of this Court.

4.      The Firm shall continue to hold the Retainer (as defined in the Application) in trust on behalf of the Debtor, until further order of the Court.

5.      All compensation for services rendered and reimbursement for expenses incurred in connection with the above-captioned Chapter 11 Case shall be paid after further application to and order of this Court, in accordance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, the Guidelines, and any orders of this Court.

004765

6.      The Firm shall provide ten-business-days' notice to the Debtor and the U.S. Trustee before any increases in the rates set forth in the Application or the Engagement Agreement are implemented and shall file such notice with the Court. The U.S. Trustee retains all rights to object to any rate increase on all grounds, including the reasonableness standard set forth in § 330 of the Bankruptcy Code, and the Court retains the right to review any rate increase pursuant to § 330 of the Bankruptcy Code.

7.      The Firm shall use its reasonable efforts to avoid any duplication of services provided by any of the Debtor's other retained professionals.

8.      The Firm will review its files periodically during the pendency of this Chapter 11 case to ensure that no conflicts or other disqualifying circumstances exist or arise. If any new relevant facts or relationships are discovered or arise, the Firm will use reasonable efforts to identify such further developments and will promptly file a supplemental declaration as required by FED. R. BANKR. P. 2014(a).

9.      This order shall be immediately effective and enforceable upon entry.

10.      This order, and all acts taken in furtherance or reliance thereon, shall be effective notwithstanding any objection until further order of this Court.

11.      The Debtor and the Firm are authorized to take all actions necessary to effectuate the relief granted pursuant to this order in accordance with the Application.

12.       This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation of this order.

Signed:  September 20, 2022

Christopher Lopez
United States Bankruptcy Judge

3

United States Bankruptcy Court
Southern District of Texas
**ENTERED**
September 20, 2022
Nathan Ochsner, Clerk

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **FREE SPEECH SYSTEMS, LLC,** | § | **Case No. 22--60043** |
| | § | |
| **DEBTOR.** | § | **(Subchapter V Debtor)** |
| | § | **Chapter 11** |

**ORDER (A) DENYING EMPLOYMENT OF W. MARC SCHWARTZ AS CHIEF
RESTRUCTURING OFFICER, (B) DENYING EMPLOYMENT OF STAFF OF
SCHWARTZ ASSOCIATES, LLC IN DISCHARGE OF DUTIES AS CHIEF
RESTRUCTURING OFFICER, AND (C) GRANTING RELATED RELIEF**

This application is denied for the reasons stated on the record at the
September 20, 2022 hearing.

Signed: September 20, 2022

Christopher Lopez
United States Bankruptcy Judge

004767

United States Bankruptcy Court
Southern District of Texas
**ENTERED**
September 20, 2022
Nathan Ochsner, Clerk

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **FREE SPEECH SYSTEMS, LLC,** | § | **Case No. 22—60043** |
| | § | |
| **DEBTOR.** | § | |
| | § | **Chapter 11 (Subchapter V)** |

**ORDER DENYING DEBTOR'S APPLICATION**
**TO EMPLOY BANKRUPTCY CO-COUNSEL**

The application to employ co-counsel at Docket 85 is denied for the reasons stated on the record at the September 20, 2022 hearing.

Signed:  September 20, 2022

Christopher Lopez
United States Bankruptcy Judge

004768

United States Bankruptcy Court
Southern District of Texas
**ENTERED**
September 20, 2022
Nathan Ochsner, Clerk

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **FREE SPEECH SYSTEMS, LLC,** | § | **Case No. 22—60043** |
| | § | |
| **DEBTOR.** | § | |
| | § | **Chapter 11 (Subchapter V)** |

### ORDER EXPANDING THE SUBCHAPTER V TRUSTEE'S DUTIES
### PURSUANT TO 11 U.S.C. § 1183(b)(2) OF THE BANKRUPTCY CODE

For the reasons stated on the record at the September 20, 2022 hearing, the Subchapter V Trustee's duties in this bankruptcy case are expanded under 11 U.S.C. § 1183(b)(2). The Subchapter V Trustee is directed to investigate the Debtor and file a report pursuant to 11 U.S.C. §§ 1106(a)(3) & (4) as soon as practicable.

Signed: September 20, 2022

Christopher Lopez
United States Bankruptcy Judge

```
 1                   UNITED STATES BANKRUPTCY COURT
                     SOUTHERN DISTRICT OF TEXAS
 2                        HOUSTON DIVISION

 3                              )  CASE NO: 22-60043-cml
                                )
 4   FREE SPEECH SYSTEMS, LLC,  )  Houston, Texas
                                )
 5           Debtor.            )  Tuesday, September 20, 2022
                                )
 6                              )  1:03 p.m. – 7:30 p.m.
     -----------------------------)
 7

 8                              TRIAL

 9        BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
                UNITED STATES BANKRUPTCY JUDGE
10

11   APPEARANCES:

12   For Free Speech Systems: R.J. SHANNON
                              Shannon & Lee LLP
13                            700 Milam Street, Suite 1300
                              Houston, TX 77002
14
                              RAYMOND WILLIAM BATTAGLIA
15                            Law Offices of Ray Battaglia, PLLC
                              66 Granburg Circle
16                            San Antonio, TX 78218

17                            KYUNG SHIK LEE
                              Kyung S. Lee PLLC
18                            4723 Oakshire Drive, Apt. B
                              Houston, TX 77027
19
     For Veronique De La      JARROD B. MARTIN
20   Rosa, et al.:           Chamberlain, Hrdlicka, White,
                              Williams & Aughtry P.C.
21                            1200 Smith Street, Suite 1400
                              Houston, TX 77002
22
     For David Wheeler,       RYAN E. CHAPPLE
23   et al.:                 Cain & Skarnulis PLLC
                              303 Colorado Street, Suite 2850
24                            Austin, TX 78701

25
```

```
 1    For the U.S. Trustee:    HA MINH NGUYEN
                               JAYSON B. RUFF
 2                             Office of the United States Trustee
                               515 Rusk Street, Suite 3516
 3                             Houston, TX 77002

 4    For PQPR:                STEPHEN LEMMON
                               Streusand Landon Ozburn and Lemmon
 5                             1801 S Mopac Expressway, Suite 320
                               Austin, TX 78746
 6
      For the SubChapter V     MELISSA ANNE HASELDEN
 7    Trustee:                 Haselden Farrow, PLLC
                               Pennzoil Place
 8                             700 Milam, Suite 1300
                               Houston, TX 77002
 9
      Court Reporter:          ZILDE MARTINEZ
10
      Courtroom Deputy:        ZILDE MARTINEZ
11
      Transcribed by:          Veritext Legal Solutions
12                             330 Old Country Road, Suite 300
                               Mineola, NY 11501
13                             Tel: 800-727-6396

14


15
      Proceedings recorded by electronic sound recording;
16    Transcript produced by transcription service.

17

18

19

20

21

22

23

24

25
```

1                                 INDEX

2     PLAINTIFFS' WITNESSES    DIRECT    CROSS    REDIRECT    RECROSS

3     KYUNG LEE

4     MARC SCHWARTZ

5

6     GOVERNMENT'S WITNESSES    DIRECT    CROSS    REDIRECT    RECROSS

7

8

9

10

11    PLAINTIFFS' EXHIBITS                                RECEIVED

12

13

14

15    GOVERNMENT'S EXHIBITS                               RECEIVED

16

17

18

19

20

21

22

23

24

25

```
 1        HOUSTON, TEXAS; TUESDAY, SEPTEMBER 20, 2022; 1:03 PM

 2                         (Call to Order)

 3        THE COURT:  Okay.  Good afternoon, everyone.  This

 4   is Judge Lopez.  Today is September 20th.  We are here in

 5   Free Speech Systems here at the Subchapter V status

 6   conference and also to take up a few retention applications,

 7   one for Mark Schwartz and Schwartz & Associates as financial

 8   advisors, Shannon & Lee as counsel to the Debtor, and also

 9   Mr. Battaglia as counsel to you and the Debtors.

10        So let me go ahead and take appearances, first in

11   the courtroom and then we'll see where this goes.

12        Good morning.  I should say good afternoon.

13        MR. SHANNON:  Good afternoon, Your Honor.  R.J. of

14   Shannon & Lee LLP, on behalf of the Debtor.  Also in the

15   courtroom is Mr. Lee here and Mr. Battaglia is here also on

16   behalf of the Debtor.

17        One correction, Your Honor, at least there was no

18   objection to Mr. Battaglia.

19        THE COURT:  I still have an independent duty to

20   take it up.  Just because nobody objects doesn't mean we

21   don't take it up.

22        MR. SHANNON:  Yes, Your Honor.  I will say that

23   there are -- you know, the witness and exhibit list did not

24   contemplate this, but Mr. Battaglia is here.

25        THE COURT:  I'm not saying we're going to spend a
```

```
1   lot of time on it, but we have to take it up.

2          MR. SHANNON:  Got you.

3          THE COURT:  Okay.

4          MR. NGUYEN:  Good afternoon.  Ha Hguyen for the

5   U.S. Trustee.  Also from my office is Jayson Ruff and also

6   Christopher Roth Travis.

7          THE COURT:  Okay, good afternoon.

8          MR. MARTIN:  Good afternoon, Your Honor.  Jarrod

9   Martin for Texas plaintiffs.

10          THE COURT:  Okay, good afternoon.

11          MR. CHAPPLE:  Good afternoon, Your Honor.  Ryan

12   Chapple for the Connecticut plaintiffs.

13          THE COURT:  Good afternoon, sir.

14          MS. HASELDEN:  Good afternoon, Your Honor.

15   Elizabeth Haselden, Subchapter 5 Trustee, and I have with me

16   Elizabeth Freeman.

17          THE COURT:  Okay, good afternoon.  Anyone else in

18   the courtroom wish to make an appearance?  Okay.  I've muted

19   the line.  If you wish to make an appearance, you'll need to

20   hit 5 star.  There are a number of people on the line, and I

21   think it's just easier to go that route.  Anyone else wish

22   to make an appearance at this time, just hit 5 star.

23          Okay, going with a 512375.

24          MR. LEMMON:  Your Honor, Steve Lemmon for PQPR.

25          THE COURT:  Good afternoon, Mr. Lemmon.  Mr.
```

1  Lemmon, I'm going to leave your unmuted, okay?  Just please

2  keep your phone on mute.

3          MR. LEMMON:  Yes, sir.

4          THE COURT:  Okay, thank you.  Anyone else?  Seems

5  to be it on the line.  Why don't we, I guess, the status

6  conference that is required under the Bankruptcy Code.  I'd

7  like to start with that to satisfy the statutory duty of the

8  Debtor and make sure that we comply with the Bankruptcy Code

9  and get a status update as to where these cases are, and

10  then let's take up the retentions.

11          But before we do that, that's the order.  If

12  there's anything anyone wishes to tell me at a high level

13  picture for purposes of today and where things stand, now's

14  the time to tell me or we can take it up in due course.

15          Okay.  If we can start with the status conference,

16  that'd be great.  Thank you.

17          Good afternoon, Mr. Battaglia.  Good to see you.

18          MR. BATTAGLIA:  Good afternoon, Your Honor.  Ray

19  Battaglia for the Debtors.  The Debtor filed its status

20  report at the time dictated by the Court's prior order.

21  It's a relatively brief status report.  Obviously, things

22  have happened in front of this Court and the parties are

23  well aware of.

24          THE COURT:  Can you just get that mic just a

25  little bit closer to you or just curve it a little bit, make

1    sure the folks on the line can hear you.

2              MR. BATTAGLIA:  Is that better, Judge.

3              THE COURT:  Oh, much better.  Thank you.

4              MR. BATTAGLIA:  Thank you.  Many things have

5    happened in the Court that primarily relate to operating

6    issues, and I'll not belabor the record with a recitation of

7    those.  If the Court wants to ask regarding developments in

8    those, I'll be happy to discuss them.

9              Obviously, we have hearings set on a number of

10   matters on October 12th, and I don't think there's a need to

11   belabor where we are on those.  There is discovery, the

12   deposition of Mr. Schwartz that will happen Friday.  Mr.

13   Rowe's deposition is set for October 4th.

14             THE COURT:  Who's Mr. Rowe?

15             MR. BATTAGLIA:  Mr. Rowe was a consultant that was

16   retained to assist in evaluating the numbers that formed the

17   PQPR debt.

18             THE COURT:  Okay.

19             MR. BATTAGLIA:  So he was instrumental in that

20   effort and, therefore, he's someone with knowledge and

21   information that is requested.  And ultimately, currently

22   he's an employee or he's employed by, at least as a

23   consultant on a contract basis, by PQPR.

24             THE COURT:  Okay.

25             MR. BATTAGLIA:  With respect to really the

 1   fundamental push of this case, the plan of reorganization,

 2   we have a draft of a plan of reorganization that we're fine

 3   tuning a little bit.  I've had conceptual conversations with

 4   Mr. Lemmon on behalf of PQPR, Mr. Jordan on behalf of Alex

 5   Jones, the Sub V Trustee and her counsel, we've had a more

 6   thorough conversation.  And this morning, Mr. Martin and I

 7   had a conversation.  I haven't had a time to circle back to

 8   the Texas plaintiffs, but, hopefully, those discussions have

 9   been shared.

10          Our goal, as opposed to filing it, just filing it

11   when we think we're ready, is to share it with the other

12   parties.  I have no allusions that we'll come to a

13   consensual plan, but I'm certainly willing to try.  The

14   conversations with Mr. Martin were fruitful.  I've had

15   conversations in the past that I've sort of equated it to

16   Lucy was holding the football today.  Whether that football

17   will be there when I kick, I don't know.  But in the past,

18   Lucy didn't even have the football, so that's progress in my

19   mind, and I hope we can do something.

20          Because at the end of the day, my charge and the

21   Debtors' charge in this case as I see it is to maximize the

22   asset value and pay creditors who are owed money with a lot

23   of claims, and that's all I'm here to do.  And if that's the

24   goal of the plaintiffs is to maximize the return on account

25   of their claims, then we have common ground to discuss.

```
 1                And conceptually, of course, the timing of the

 2      allowance of those claims of plaintiffs is going to be,

 3      without settlement, will be a longer road because there will

 4      be appeals and that process will take whatever time it

 5      takes.  But the Debtor does generate, we anticipate will

 6      continue to generate, net disposable income that can be

 7      dedicated to a plan.  Obviously, proceeding under a Sub V

 8      changes the confirmation dynamic tremendously for this Court

 9      and the burden's on the Debtor to prove are certainly

10      smaller.

11                Mr. Martin and I discussed today possibilities.

12      I'm not saying anybody's agreed to any of this at this

13      point, but perhaps once the plan is shared, that it might be

14      fruitful to seek a mediation in front of perhaps Judge

15      Isgur.  I know he's got a docket now that's been a little

16      more burdened lately, but that's a possibility.

17                And whether it would be more fruitful to proceed

18      to negotiate the plan, as opposed to October 12th hearings.

19      Again, nobody's agreed, nobody's suggesting that's tenable

20      at all.  But ultimately, in my mind as Debtors' counsel, if

21      the plaintiffs were successful in removing the Debtor, the

22      Debtor is still the only party who can propose a plan of

23      reorganization.  And the plan as proposed and confirmed, the

24      Debtor's back in, what are we doing here, so I don't know.

25      We'll see where that goes.  I know Mr. Martin has to circle
```

1   back to a number of people to see whether anything that we

2   discuss this morning germinates and it may or may not, but

3   our goal is to file a plan of reorganization in the next

4   week to two weeks, and that's where we are, Judge.

5           THE COURT:  Okay.

6           MR. BATTAGLIA:  Happy to answer any questions the

7   Court may have.

8           THE COURT:  I had a couple of questions.  Mr.

9   Schwartz wasn't here last time.  They were kind of financial

10  questions.  And here as we kind of proceeded along, I had a

11  couple of real technical questions, and I can lay them out

12  and anyone can answer them.

13          One was, and I still was looking for a little bit

14  of clarity.  In connection with the last proposed cash

15  collateral order, there was an $80,000 or so request for --

16  I think it was labeled, like, Alex Jones trial travel or

17  something.

18          MR. BATTAGLIA:  Yes, sir.

19          THE COURT:  What did that relate to?

20          MR. BATTAGLIA:  Your Honor, I can answer that.

21  The lift stay order that we presented to you to allow the

22  Connecticut litigation to proceed, part of the agreement

23  that was encompassed in that order was that the Connecticut

24  plaintiffs would not object to the travel expenses for Mr.

25  Jones or for employees.

1          THE COURT:  I understand they didn't object.  I

2     just want to know what it related to.

3          MR. BATTAGLIA:  I understand.

4          THE COURT:  No one told me.

5          MR. BATTAGLIA:  So the budget item there, $34,000

6     of the $80,000 related to just security expenses.  Mr. Jones

7     does not travel freely without security in this world that

8     we're in today and particularly, I guess, being in the

9     backyard of the Sandy Hook disaster.

10          THE COURT:  Why is the estate paying for that?

11          MR. BATTAGLIA:  Well, he is an estate witness as

12     well.  His appearance is just as vital for us as it is for

13     Alex Jones.

14          THE COURT:  Was he paying for any of his travel?

15          MR. BATTAGLIA:  He was not, and you suggested that

16     we needed to come back to you with -- and my conversation

17     with Mr. Jones's counsel was he proceeds, and we'll go back

18     to the Court and ask what the Court thinks is appropriate to

19     pay.

20          THE COURT:  And I'm being honest, I don't know

21     what to do with every time there's a motion filed that we

22     start off with 100 percent we pay for the owner's personal

23     expenses.  And then, like, if the Court has to find it,

24     identify it, notify parties that he's noticed it, and then

25     people come back with their requests.

1          I don't -- who's negotiating this on behalf of the

2     estate?  Like, why am I finding issues that are 100 percent

3     in a case where there's two defendants.  I just want to

4     understand what's happening.

5          MR. BATTAGLIA:  Your Honor, the last item in the

6     budget that we were waiting on to be able to present to

7     parties was the cost of the travel related to the trial.

8          THE COURT:  The 34,000 was for?

9          MR. BATTAGLIA:  Was for security.

10         THE COURT:  And what was the remaining, I don't

11    know, 36,000 or 46,000?

12         MR. BATTAGLIA:  So there's obviously airline fees,

13    which we've priced based at a premium economy rate, not a

14    first class rate, for the security personnel and for Mr.

15    Jones.  There was lodging, there were food and other typical

16    expenses associated with travel, vehicles.  And, again, this

17    is for, you know, not just Mr. Jones, but the security

18    personnel who are attending.

19         THE COURT:  Okay.

20         MR. BATTAGLIA:  So we heard you.  We'll accumulate

21    receipts and come back to the Court with an appropriate...

22         THE COURT:  I thought folks heard me when I said I

23    had issues with Mr. Andino and other counsel when that was

24    100 to zero.  I just want to know exactly what's being on

25    the table.  It feels like I'm finding these things, because

004781

 1    I asked everyone at the last hearing is there anything I

 2    should know about this cash collateral budget, and everyone

 3    stayed quiet.

 4         MR. BATTAGLIA:  It came together, again, at the

 5    last minute.  I submitted the budget, along with the draft

 6    revised order on the Sunday prior to that hearing, which was

 7    on a Tuesday as I recall.

 8         THE COURT:  Okay.

 9         MR. BATTAGLIA:  You know, it --

10         THE COURT:  I got it.

11         MR. BATTAGLIA:  -- came together rather quickly,

12    Judge.

13         THE COURT:  I appreciate that.  And if that's the

14    answer, that's the answer.

15         I had another question that just related to the

16    schedules.  I saw in the schedules -- and normally, this is

17    what happens at a status conference.  The Debtors filed

18    schedules and the Court asks questions about things like

19    that.

20         There was a payment of about a million dollars to

21    American Express, and if I remember correctly, American

22    Express related to personal expenses.  I'll show it on my

23    screen.  I just want to make sure and maybe it related to

24    something different.  I just wanted to understand.  Let me

25    share my screen here.  Excuse me in the SOFAs, not in the

1    schedules, but in the SOFAs.

2            There were three payments totaling a million

3    dollars, like, leading up to this case to American Express,

4    but I'll let Mr. Schwartz in connection with the first day

5    hearings and cash collateral.  That related to personal

6    expenses.  Are those personal expenses that million dollars?

7            MR. BATTAGLIA:  No, sir.  I'm not going to suggest

8    to the Court that there are no personal expenses in and

9    amongst the million dollars.  But the Debtor had, under

10   prior operations, had a bad habit of using the AmEx card to

11   pay for everything.

12           THE COURT:  Okay, business expense.  Okay, that

13   makes sense to me.

14           MR. BATTAGLIA:  And consequently, a lot of vendors

15   didn't even show up on the accounts payable list because

16   they were paid through AmEx.

17           THE COURT:  Okay.

18           MR. BATTAGLIA:  I would venture to guess a

19   significant, substantial portion of that million related to

20   technical purchases or vendors or suppliers related to the

21   business itself.

22           THE COURT:  Okay.

23           MR. BATTAGLIA:  But I won't tell the Court

24   standing here today that all of it is.

25           MR. BATTAGLIA:  And the $3.1 million to PQPR, who

1    authorized that; was that Mr. Schwartz?

2            MR. BATTAGLIA:  That would have been payments to

3    insiders over a one-year period.  It was under an agreement

4    that --

5            THE COURT:  This looks like it was done over the

6    last 30 days before the case filed.  It's happened before,

7    don't get me wrong.  I'm just trying to understand who

8    authorized these payments.

9            MR. BATTAGLIA:  I'm not aware of the 3 million.

10    There was the prior deal that existed before Mr. Schwartz

11    came into place that paid $11,000 per business day in

12    service of the debt.  But it's not entirely impossible that

13    this also relates to inventory purchases.  PQPR was the

14    primary source of inventory.

15            THE COURT:  That's why I seen that it was in

16    combination of the --

17            MR. BATTAGLIA:  So it maybe a combination of the

18    two and it does say both.

19            THE COURT:  Okay.

20            MR. BATTAGLIA:  No payments in advances.

21            THE COURT:  Okay.  No one is seeing my screen,

22    right?  Somebody needs to talk to me.  No one's been seeing

23    anything I've been looking at.  All righty, that's helpful.

24    Let me share my screen right this time.  That's helpful, now

25    we're looking at stuff.  Miss Santos, you all stop me if you

1    think I'm doing something wrong.

2          That was the $3.1 million.  A million-dollar

3    payment was here on AmEx, $150,000.  Was Mr. Jones an

4    employee, Mr. David Jones an employee?

5          MR. BATTAGLIA:  At certain times, he had been, but

6    he is obviously the Debtors' principal's father.  He's Alex

7    Jones's father.

8          THE COURT:  Okay.  And I know this is October of

9    2021, so that was a while back.  I just want to make sure I

10   understand.

11         MR. SCHWARTZ:  He was not an employee --

12         THE COURT:  At the time?

13         MR. SCHWARTZ:  -- at that time.  That was an

14   advance.

15         THE COURT:  Okay.  Okay, payment on advance.  I

16   couldn't tell if it related to the PQPR.

17         MR. SCHWARTZ:  He just got $150,000.

18         THE COURT:  Okay.  Those were my questions and

19   some of that stuff we covered last time, so I think I have

20   what I need.  Does anyone have any statements or any

21   questions that anybody wants to talk about in connection

22   with the status conference?

23         Oh, I forgot to ask, is assuming the Connecticut

24   litigation has started --

25         MR. BATTAGLIA:  It has, Your Honor.

1          THE COURT:  -- or is ongoing.  Is there a time --

2          MR. BATTAGLIA:  I think Mr. Jones is on the stand.

3          THE COURT:  Does anyone know, like, when it's

4   supposed to end?

5          MR. LEE:  Your Honor, this is Kyung Lee for the

6   record.

7          THE COURT:  Yes, sir.

8          MR. CHAPPLE:  Your Honor, Ryan Chapple for the --

9          THE COURT:  I don't want any commentary or spin on

10   it.  I just want to know, like, if there's any timetable.

11          MR. CHAPPLE:  Absolutely.  I believe

12   conservatively, maybe a week and a half or two more weeks is

13   my general understanding, but that answer changes daily.

14          THE COURT:  No, no, no, I understand.

15          MR. CHAPPLE:  So that's the last I  heard.

16          THE COURT:  Okay, but it has started and it's

17   proceeding.  Is it still in the -- it sounds like it's

18   started started, not just jury selection.

19          MR. LEE:  That's correct, Your Honor.

20          MR. CHAPPLE:  There are witnesses.  They're taking

21   witnesses, live witnesses.

22          THE COURT:  Okay.

23          MR. CHAPPLE:  And I heard previously longer time

24   estimates, so I mean...

25          THE COURT:  Okay, yeah, and I got it.  I got it,

```
 1   okay.  Does anyone have any statements they wish to make at
 2   this time in connection with the status report?  Okay.  Then
 3   the easiest thing to do maybe -- I know Mr. Battaglia's
 4   retention is up as well.  I saw no objections.  I looked it,
 5   I reviewed, and I'm comfortable with the representations
 6   there.  Anyone object to the retention of Mr. Ray Battaglia?
 7             May I ask the U.S. Trustee on this, so you're okay
 8   with the proposed form of order that was filed?
 9             MR. NGUYEN:  Yes, Your Honor.  I have no problem
10   with Mr. Battaglia's order.
11             THE COURT:  Okay.  Mr. Battaglia, I'm going to
12   note that for the record, there was an application to retain
13   you as counsel for FSS.  I'm going to find that there's been
14   proper notice of today's hearing on it and service of the
15   application.  It's also been proper.  The Court has reviewed
16   the standards under 327 and finds that they've been
17   satisfied.  I also note that there's been no objection and
18   the U.S. Trustee has also approved the proposed form of
19   order.
20             Miss Haselden, I will ask you as well, and you can
21   give me a thumbs up if you're there.  Are you okay with the
22   proposed form of order?  Okay, okay.
23             Then, Mr. Battaglia, I will approve that retention
24   application and I'll get it signed and on the docket this
25   afternoon.
```

1           MR. BATTAGLIA:  Thank you, Your Honor.  Your

2     Honor, I would note one thing is that I was retained as co-

3     counsel, and obviously what happens today will be a --

4           THE COURT:  No, no, no, no, I understand that, and

5     I didn't mean to imply anything.  I just -- you were

6     employed as co-counsel and I guess what I meant to say is

7     I'm approving your retention application.

8           MR. BATTAGLIA:  And I appreciate it, Your Honor.

9           THE COURT:  Maybe that's the easiest way of saying

10    it.  I got it.

11          Okay, let's see.  FSS filed the remaining

12    applications.  I'll let you take lead.

13          MR. SHANNON:  Thank you, Your Honor.  As the Court

14    has noted, we're here on two applications.  They are

15    applications by the Debtor, Free Speech Systems LLC, to

16    employ Marc Schwartz as its CRO, and Schwartz & Associates

17    LLC to help him with that; that is Docket No. 83.  We're

18    also here on an application by the Debtor to employ Shannon

19    & Lee LLP as bankruptcy co-counsel; that's Docket No. 85.

20          The U.S. Trustee has objected to both

21    applications; they're at Docket No. 145 and Docket No. 154.

22    The plaintiffs have joined those objections, filed by

23    joinders.

24          And, Your Honor, there's no dispute that Mr.

25    Schwartz and Shannon & Lee LLP meet the requirements for

1    employment under Section 327(a).  That's not what the

2    objection is about.  There's no dispute that the CRO,

3    proposed CRO and Shannon & Lee are disinterested in this

4    case.  There's no dispute that the retention of these

5    applicants is in the best interests of the Debtors'

6    bankruptcy estate.  That's not what the U.S. Trustee is

7    objecting about.

8              There's no dispute that administration of these

9    Chapter 11 cases will be furthered by the retention of the

10   applicants.  There's really no contention on anything about

11   this case -- that's Case No. 22-643 -- will be furthered by

12   denying the application of the Debtor to employ these

13   applicants.

14             The U.S. Trustee's contention is that the

15   applications to employ should be denied because Mr. Schwartz

16   and Mr. Lee did not amend and supplement their disclosures

17   in the InfoW bankruptcy cases, and that's the entire basis

18   for the objection.

19             And I believe that the U.S. Trustee's position is

20   that after Mr. Schwartz and Mr. Lee met with FSS on May

21   24th, that they should have done a supplemental disclosure

22   in the InfoW cases.

23             THE COURT:  What do you think?

24             MR. SHANNON:  Well, Judge --

25             THE COURT:  You were there.  What do you think?

1          MR. SHANNON:  Well, and actually on May 19th, I

2     was not there, but I was at the May 24th meeting.

3          THE COURT:  You were at the May 19th hearing.  You

4     understand, you were involved in the last cases.  What do

5     you think?

6          MR. SHANNON:  Well, Judge, I don't think that's

7     what Bankruptcy Rule 2014 requires.

8          THE COURT:  Okay.

9          MR. SHANNON:  It's not in the text of the rule.

10    The cases that have looked at it and said there is a

11    continuing duty to disclosure, they all say it's because of

12    Section 327(a).  In 327(a), you can only be employed as an

13    estate professional if you're a disinterested party.

14    Section 328 also says you can only be compensated if you're

15    a disinterested professional.

16          At that time, at the time of the May 24th meeting,

17    the InfoW debtors had already decided to dismiss their

18    cases.  They had -- that decision was made, you know, around

19    the May 19th hearing, sometime between then.  By May 23rd,

20    Mr. Lee had put together a motion to dismiss and he had

21    advised Mr. Schwartz that the cases should be dismissed;

22    that was his analysis.  On May 23rd, he had a draft motion

23    to dismiss prepared and they informed the U.S. Trustee of

24    that decision on May 25th.

25          At that point, Your Honor, neither Mr. Schwartz

1    nor Mr. Lee were seeking to be employed by the bankruptcy

2    estate.  They never were employed by the bankruptcy estate,

3    but they also at that point were not seeking to be employed

4    by the bankruptcy estate.

5            And when you look at the cases that talk about

6    this, that is what is important.  It's whether the

7    professional is seeking to be employed or has been employed

8    by an order of the Court.

9            Judge, I'll give you just a timeline of events,

10   just a little bit of a broader one.

11           THE COURT:  Okay.

12           MR. SHANNON:  The InfoW cases were filed on April

13   17th and April 18th.  April 29th, the Debtor files an

14   amended trust agreement and plan and support agreement.  And

15   that agreement was never signed by the parties and the

16   reason why was because that same day, the U.S. Trustee filed

17   a motion to dismiss.

18           And then on May 3rd, the plaintiffs came and said,

19   look, we just to release our claims against these InfoW

20   debtors.  We don't want to be involved in this bankruptcy

21   case; we don't want to deal with it.  And that took a little

22   while to effectuate.  So between May 3rd -- by May 13th, the

23   Connecticut plaintiffs had filed pleadings to dismiss the IW

24   debtors from their actions, again, because they didn't want

25   to be involved in the IW debtors' bankruptcy cases.

1           By May 18th, the Texas plaintiffs and the IW

2     debtors had reached a stipulation resolving their claims;

3     that was filed with the Court.  And then on May 19th at 2:00

4     p.m., the IW debtors or this Court entered that stipulation

5     resolving the claims of the Texas plaintiffs against the IW

6     debtors, not this debtor; there's no argument there.

7           Now that same day earlier, Mr. Lee files his

8     application to employ or filed the IW debtors application to

9     employ Kyung S. Lee PLLC.  Now at that time, there was

10    nothing to disclose.  Later that day, FSS contacted Mr. Lee

11    about a potential meeting in Austin the following Tuesday.

12    It was very clear to everyone that the PSA was dead, that

13    that wasn't going to be the way to go.  And Mr. Lee told

14    this Court that the IW debtors were considering to try to

15    get more funding from somewhere else, to try to go with a

16    plan without that, or to just dismiss the cases as the U.S.

17    Trustee demanded.

18          May 21st -- and this will be all in the evidence -

19    - on May 21st, Mr. Lee sent an email to Marc Schwartz, and I

20    believe May 21st was a Saturday.  In that email, Mr. Lee

21    outlined the reasons why the IW debtors should agree with

22    the U.S. Trustee and dismiss their cases, and in particular,

23    it was because it wasn't worth the expense of litigating

24    with the U.S. Trustee over those cases.  There were only, at

25    the time, I think they believed there were four creditors

1    remaining; turns out there were actually only three.  Mr.

2    Gilmore, one of the creditors that was remaining in the IW

3    cases actually had been paid, or at least I believe had been

4    paid at that time, definitely been paid by now.

5             On May 23rd, as I said, Mr. Lee had drafted a

6    motion to dismiss for the IW debtors and had circulated it

7    to Mr. Schwartz.  May 24th was the meeting in Austin where

8    they talked about the potential representation of FSS.  May

9    25th, Mr. Lee informed the U.S. Trustee of the IW debtors'

10   intent to dismiss their cases; that had been decided

11   previously.

12            As part of those communications, the U.S.

13   Trustee's attorney informed Mr. Lee, don't file a motion to

14   dismiss; just stipulate and agree to our motion to dismiss

15   that's already pending.

16            On May 26th, Mr. Lee attended the 341 meeting for

17   the IW debtors.  At that 341 meeting, Mr. Lee announced that

18   the IW debtors had decided to dismiss their cases.

19            THE COURT:  What date was that?  What date was

20   that?

21            MR. SHANNON:  That was May 26th.

22            THE COURT:  Thank you.

23            MR. SHANNON:  On June 1st, the stipulation of

24   dismissal agreed to between the IW debtors and the U.S.

25   Trustee was filed.  And it wasn't until June 5th that Mr.

1    Schwartz had finalized an application -- or finalized a

2    draft engagement letter.  They had sent it to Mr. Lee.  Mr.

3    Lee commented on it, sent it back to him with these

4    comments.  And that June 5th engagement letter is the

5    engagement letter that ultimately continues and that

6    ultimately that FSS seeks to retain Mr. Schwartz under the

7    debt.

8         On June 6th, both the engagement letter by Mr. Lee

9    and Mr. Schwartz were signed, and then on June 10th, the

10   Court entered the order dismissing the IW cases.

11        That's also the date that FSS is actually, you

12   know, paid retainers to Lee and Schwartz.  I believe in the

13   application, Shannon & Lee had said it was on or about June

14   7th.  There is an email saying it was going to be paid on

15   June 7th, and we actually looked at the bank and confirmed

16   that; it wasn't actually until June 10th.

17        THE COURT:  Okay.

18        MR. SHANNON:  And again, Your Honor, I just -- at

19   the May 24th meeting, which is the first time there was a

20   disclosable connection, a connection that meant something,

21   the IW debtors had decided to dismiss their case.

22        But I don't think that's even the whole argument

23   here, Your Honor, because even if Mr. Lee and Mr. Schwartz,

24   you know, should have disclosed that connection to the

25   Court, even though the case had been decided to be

1    dismissed, even though they were no longer seeking to be

2    employed, that's not really what we're here for.  What we're

3    here for is whether FSS should be allowed to retain these

4    two parties.

5           Judge, you could -- the U.S. Trustee could go

6    back, could reopen the IW cases and seek sanctions, and

7    that's what the Courts call the proper solution to a, you

8    know, failure to disclose under Rule 2014; they call it

9    sanctions.  And I don't think that those sanctions are

10   appropriate to be imposed on the Debtor FSS, and that's

11   really what the U.S. Trustee is asking you to do.  There are

12   no cases that say that's an appropriate sanction, none, none

13   that I could find.

14          THE COURT:  I'm not sure there's many cases where

15   a debtor's professional started working for another plan

16   support party either, so I don't know if you're going to

17   find facts like that either.  So I understand what you mean,

18   but I read that argument and you got to -- it's not just

19   that easy.  There aren't many cases where two parties to a

20   plan, a debtor was working for one plan support party under

21   a trust taking direction from a trust and then starts

22   working for another plan support party and never discloses

23   it to the Court.  I'm not sure you're going to find many

24   cases like that.

25          MR. SHANNON:  That's true, Your Honor, but there's

1    also --

2            THE COURT:  I can promise you every case is

3    distinguishable, right?

4            MR. SHANNON:  But, you know --

5            THE COURT:  The question is what's the legal

6    principle that apples.

7            MR. SHANNON:  Sure.  The legal principle that

8    applies is about who is getting punished here, and they're

9    trying to see get punished essentially FSS.  I mean, what

10   this is and what the effect would be, would be to decapitate

11   this debtor.

12           THE COURT:  And I'm going to tell you something

13   because I want you to engage in a dialogue with me.  The

14   concern, when you really boil it down, I think you're

15   looking at this too -- you know, looking at this kind of

16   through a check the box perspective, right?  If the

17   behavior, the non-disclosures began in one case and it there

18   are potential conflicts through acts that Mr. Schwartz and

19   Mr. Lee have taken that continue into this case, then the

20   history is important.

21           For example, if, for example, you know, Mr. Lee or

22   Mr. Schwartz's relationship with Mr. Jones or PQPR is

23   concerning, it raises an issue as to whether either one of

24   them can provide sound legal advice to the estate or sound

25   financial advice to the estate, then the history is

```
 1   important, right?

 2             So you can't just -- I understand your point that

 3   if there's a lack of disclosure in one case, you should look

 4   at it as that case and it shouldn't essentially carry

 5   forward as a penalty into the new case.  The question is, is

 6   there a throughline essentially; that's the question that

 7   you've got to answer today, at least that's where I'm

 8   focused on.

 9             If you're asking me, you know, how I --

10             MR. SHANNON:  Yes, Your Honor.  I'll just state --

11             THE COURT:  -- think about it, that's the way I

12   think about it.  So, for example, so when Mr. Lee is working

13   -- I think you described in May, and Mr. Schwartz are

14   working in late May and have decided that there's no hope

15   for InfoW, what do I do with the fact that there's a

16   pleading filed with me in this case that says on June 2nd,

17   the Debtor is still considering all options, right?

18             How then do I view that, right?  That's the real

19   question, right, and whether that, the changing of the

20   jersey in essence, you know, whether that had already

21   occurred, but no one told me, right.  And so, that's the,

22   hey, we're still considering all options, hey, as a

23   fiduciary, we're thinking about everything, and five days

24   later, you're in a meeting in Austin, you know, with the two

25   plan funding sources in the current case.
```

1          MR. SHANNON:  And Judge --

2          THE COURT:  The question is does that carry,

3   right, into FSS and into this case and it should be judged

4   into FSS.  And I know that that's where the evidence is; I'm

5   just telling you the way I'm thinking about this now.  So as

6   arguments get made, that's the way I -- that's what I'm

7   thinking about.

8          MR. SHANNON:  Sorry, Judge.  And I'll just say

9   that there is no allegation in the objection of anything

10  that you just said, and I agree that that would be something

11  to consider.

12         THE COURT:  I have an independent duty, though.

13  That's my concern, so you're going to have to address that.

14         MR. SHANNON:  I understand.  I understand, Your

15  Honor.

16         THE COURT:  They do mention the June 2nd pleading,

17  though, right?

18         MR. SHANNON:  I believe in the June 2nd pleading,

19  there had already been this stipulation.

20         THE COURT:  Not being disclosed to me, that's what

21  I'm saying.  Everybody may have known.  It's what was

22  represented to me and whether that continues into this case

23  is that's the question I've got to figure out.

24         So let me ask you, Mr. Shannon, did you work on

25  the responses to the objections?

```
1              MR. SHANNON:  I did, Your Honor.

2              THE COURT:  Okay.  I'm going to hand you a copy.

3    I want to take this up now before we take up the evidence.

4    That's a copy of what was filed, and there are serious

5    allegations in here.  And I can't avoid not paying attention

6    to them because if they're true, then we're going to have to

7    deal with them, okay.

8              I'm going to turn you to Paragraph 2.

9              MR. LEE:  Your Honor, can I interject?  This is

10   the Schwartz response?

11             THE COURT:  Yeah, yeah.  It's what was filed.

12             MR. LEE:  This is my work, Your Honor.

13             THE COURT:  Anyone can answer.  I asked if you

14   worked on them.

15             MR. LEE:  I'll take care of these, Your Honor.

16             THE COURT:  Okay.  So on Page 2, Paragraph 2.

17             MR. LEE:  Yes, Your Honor.

18             THE COURT:  You say that the U.S. Trustee

19   sprinkled, right, tabloid headlines, fabrications, and

20   misrepresentations.

21             MR. LEE:  Yes, Your Honor.

22             THE COURT:  And that their fabrications are

23   unethical.

24             MR. LEE:  Yes, Your Honor.

25             THE COURT:  I want you to point me to the language
```

1    in the -- I'm going to want you to -- and I'm going to print

2    you a copy of the objection.  I want you to tell me what

3    they are.

4              MR. LEE:  And, in fact, I do that in the pleading

5    in my view.

6              THE COURT:  I don't think you do.  This is real

7    serious.  I want to know what's unethical.

8              MR. LEE:  First of all, on Paragraph 4 --

9              THE COURT:  Okay.

10             MR. LEE:  -- where the U.S. Trustee argues that

11   Schwartz did not disclose -- on objection Paragraph 49 that

12   Schwartz did not disclose his connections to FSS or Jones

13   during the InfoW cases; that is a statement in the

14   objection.  And previously in Paragraphs 14 and 15 of the

15   objection, the U.S. Trustee says Schwartz made these

16   declarations in the beginning.

17             THE COURT:  Did he make them to me?

18             MR. LEE:  They were in the pleading filed with the

19   Bankruptcy Court, Your Honor.  That's what I'm saying.  They

20   made the representations in a pleading filed with the Court,

21   and then he changes them --

22             THE COURT:  Schwartz disclosed his connections to

23   me during the InfoWar cases?

24             MR. LEE:  Yes, Your Honor.

25             THE COURT:  When?

1              MR. LEE:  In the application that he filed with

2     the Court.

3              THE COURT:  In the InfoW cases?

4              MR. LEE:  Yes, Your Honor, absolutely.

5              THE COURT:  What did he disclose?

6              MR. LEE:  He disclosed that he -- if I may, Your

7     Honor, may I turn to the exhibits?

8              THE COURT:  Mm hmm.  What did he disclose?  Did he

9     tell me he was working for them?

10             MR. LEE:  No.  He filed an application at the very

11    beginning of the case which was Exhibit No. -- I believe one

12    of the early exhibits that got postponed.

13             THE COURT:  Their argument is that nothing was

14    supplemented.  Was there ever a disclosure to the Court that

15    Mr. Schwartz started working for FSS during the InfoWars

16    cases?

17             MR. LEE:  The answer is no, you're not.

18             THE COURT:  So that's not a lie.  Can you tell me

19    what's unethical here?

20             MR. LEE:  But, Your Honor, if I may --

21             THE COURT:  Point me out to what's unethical.  No,

22    because that's serious allegations, right.  You're saying

23    that a branch of the Department of Justice is conducting

24    unethical behavior; that's real serious.  So point me to the

25    unethical behavior that you're describing in this objection.

Page 33

1          MR. LEE:  Well, that's number one in my view, Your

2     Honor.

3          THE COURT:  You think that's unethical?

4          MR. LEE:  Well, I think that if you say something

5     that's untrue on one page and then you say something else

6     different on another page, then I think that --

7          THE COURT:  Just established that it wasn't --

8     that what you're saying, Schwartz did not disclose his

9     connections to FSS or Jones during the InfoWars.  I never

10    knew about that, so that's a true statement to me.  It's

11    true to me.  It's absolutely true to me, and you just

12    confirmed that I never knew about that, no one never told

13    me, so how is that unethical?

14         I think their whole argument is that no one ever

15    described anything to the Court.

16         MR. LEE:  Your Honor, my statement in Paragraph 4

17    was pointing that in the earlier paragraphs, he pointed out

18    that he made the disclosures at the beginning of the

19    bankruptcy case, which he did in the application.

20         THE COURT:  And he never updated them.

21         MR. LEE:  And, Your Honor, there's no dispute that

22    from May 19th on, neither Lee nor Schwartz made a

23    supplemental disclosure.

24         THE COURT:  That's what they're arguing, though.

25    That's what I read the objection to say is that, Judge, that

```
 1    should have weight.  Tell me where the fact -- where the
 2    unethical behavior is.
 3              MR. LEE:  Well --
 4              THE COURT:  I can print you a copy of their
 5    objection because I want you to point me out.
 6              MR. LEE:  No, Your Honor.  I apologize if you took
 7    it that way, but my percept- --
 8              THE COURT:  I'm just going to interrupt you.  So
 9    let's go to Page 5.
10              MR. LEE:  Yes, Your Honor.
11              THE COURT:  Last paragraph, last in Paragraph 8,
12    okay, "The myth has been perpetuated by the United States
13    Trustee by pointing to the lynching mob at the May 19th," --
14    who is the, what is this mob that you're describing?
15              MR. LEE:  The mob that I'm describing is the fact
16    that everyone knew this --
17              THE COURT:  That's how dangerous that language is?
18              MR. LEE:  Well, Your Honor, one of the reasons why
19    is because, in fact, every time an event takes place in this
20    case, every conduct that we're subject to is somehow
21    misconstrued, misinterpreted.  And no one comes to this
22    Court and tells you the context in which certain things
23    occur.
24              THE COURT:  Well, I'm asking you.  We're going to
25    put you on the stand.
```

```
 1              MR. LEE:  Yes, Your Honor.

 2              THE COURT:  But tell me what's the -- who are

 3    these people that constitute this mob?

 4              MR. LEE:  Well, in the case of --

 5              THE COURT:  No, in accordance with your statement;

 6    who are you describing in this?

 7              MR. LEE:  I think in this instance, I'm describing

 8    the U.S. Trustee's office.

 9              THE COURT:  That's the mob?

10              MR. LEE:  Yes, Your Honor.

11              THE COURT:  I understand, okay.  Let's go then to

12    Page 7, Paragraph 12.  I'm assuming that there are -- you're

13    saying you're being besmirched with lies.

14              MR. LEE:  Yes, Your Honor.

15              THE COURT:  And that the U.S. Trustee decided to

16    pour gasoline on an ember.

17              MR. LEE:  Yes, Your Honor.

18              THE COURT:  And quoting my concerns.

19              MR. LEE:  Yes, Your Honor.

20              THE COURT:  Has anyone addressed my concerns in

21    any of these pleadings?  Has anybody told me about -- has

22    anyone addressed in any of the pleadings in here why the

23    Court was never informed?  Is there a sentence in your

24    response or the response to Mr. Schwartz that addresses the

25    concern that I raised at the beginning of the case; that no
```

1    one informed me about anything that happened in the InfoW

2    cases.

3              MR. LEE:  The point is precisely that, you know.

4              THE COURT:  Can you tell me a sentence where my

5    concern was addressed?

6              MR. LEE:  Your Honor --

7              THE COURT:  In your response, can you tell me --

8    can you point me to a sentence anywhere in this here that

9    you describe where the gasoline is being drawn on because of

10   the comments that I made.

11             MR. LEE:  No, Your Honor.  It's not the fact that

12   your comments were creating the fire.  It's the fact --

13             THE COURT:  No, no, no.  They poured gasoline on

14   my comment.

15             MR. LEE:  Your comments --

16             THE COURT:  Tell me where the gasoline is.

17             MR. LEE:  The gasoline is the suggestion that

18   there was some type of unethical conduct when, if they had

19   asked about the sequence and they should have investigated

20   it after you made those comments to us, we could have told

21   them the sequence of events that took place here.

22             THE COURT:  I'm going to tell you, the question

23   I'm going to ask is why didn't you tell me.  Why did you

24   stand up and tell me that -- why did you stand up on May

25   19th --

 1          MR. LEE:  Yes, Your Honor.

 2          THE COURT:  -- and tell me that you all were

 3   pursuing other options, and then five days later, you're in

 4   a meeting and you're drafting first day declarations a week

 5   later; that's what's going to come out.  And I'm just

 6   telling you those are the questions that I'm going to ask

 7   you, but I want it under oath.

 8          MR. LEE:  Your Honor, I'm happy to go under oath

 9   and tell you that.

10          THE COURT:  No, no.  I think you're going to have

11   to because I think there's been an objection.  So why don't

12   we just -- I'm just telling you where this is going.

13          MR. LEE:  Your Honor, I'm --

14          THE COURT:  I'm just concerned about the inflamm-

15   -- I asked, and Mr. Shannon was here.  I asked all parties

16   to really -- this is an emotional case and I get it.  And

17   I'm not one to -- I think people should defend themselves

18   vigorously, especially with what's at stake, and I think

19   there's strong emotions on both sides.  I asked everyone to

20   really consider the rhetoric that was here.  In one matter,

21   I had to seal something because of inflammatory language.

22   I've even stopped exhibits from being shown.

23          So when I start hearing that the U.S. Trustee has

24   engaged in unethical behavior, I take those things really

25   seriously.  I'm going to tell you, maybe you can point me

1    out to something, but as of right now, I would have an

2    ethical duty to report any such behavior, and I find none.

3    So I'm satisfied that I've taken care of my duties to

4    investigate whether there was anything in this -- anywhere

5    in this response that really displayed unethical behavior or

6    whether there were flat out lies in these statements, and I

7    find none.

8          That doesn't mean, and I want the U.S. Trustee to

9    understand, I don't mean I don't approve the application.

10   It just means that the reporting obligation that I would

11   have if I found some unproper behavior on behalf of the

12   United States Trustee, I believe has been satisfied.

13         So, Mr. Shannon, how do you want to proceed?

14         MR. SHANNON:  Thank you, Your Honor.

15         THE COURT:  You can take them up at the same time,

16   however you want.  How do you feel comfortable proceeding

17   with Mr. Schwartz and Mr. Lee.  I want you to put on your

18   presentation.  I had to take care of that first because I

19   can't deal with that in the middle of a hearing where there

20   are allegations that go beyond the scope of what we're

21   talking about today.  I had to address that.

22         MR. SHANNON:  Understood, Your Honor.  Your Honor,

23   you basically heard my argument.  But to respond to what you

24   were raising before, there are --

25         THE COURT:  Which portion of it?

1          MR. SHANNON:  I'm sorry.

2          THE COURT:  I apologize.

3          MR. SHANNON:  The Court had raised the issue that,

4    well, if there was something that affected this case, if

5    there was a connection or some kind of conflict in this

6    case.  The evidence will show that there is none.

7          THE COURT:  Okay.

8          MR. SHANNON:  And ready to have evidence unless

9    you have any questions for me.

10          THE COURT:  No, no.  I want to give the United

11    States Trustee an opportunity to just kind of make a brief

12    opening if that's what they choose to do.

13          And, Mr. Hguyen, I see it.  I just want to make

14    sure -- got a lot of people listening in.  I want to make

15    sure everybody has an opportunity to hear everything.

16          MR. NGUYEN:  Understood, Your Honor.

17          THE COURT:  Just get close to a mic whenever you

18    do speak.

19          MR. NGUYEN:  Your Honor, we filed two objections

20    in this case, and we don't take these objections lightly.

21    You know, the matter before the Court is primarily focused

22    on disclosure.  Disclosure is looked at most important.  And

23    I remember the first day we were in here and I told the

24    Court, you know, we're going to look at this case with fresh

25    eyes, but as long as everyone operated with complete

1   transparency and if there is any lack of transparency, we

2   would be bringing it before the Court.

3          And, Your Honor, during Mr. Shannon's

4   presentation, I don't -- he didn't say, but he seems to

5   suggest that somehow we knew about the connections in the

6   InfoW cases.  I can tell the Court that none of that was

7   told to us.  We found out the same time you found out.

8          So, Your Honor, since transparency in bankruptcy

9   cases in general, you know, plays a very important role.

10  The Debtor has to be transparent, creditors have to be

11  transparent when they file proof of claim, and there's a

12  high standard of transparency that's imposed to almost all

13  the professionals that appear in front of you.

14         The professionals need to come out and lay bare

15  all of their connections.  There's discussions of

16  disclosable connections, material connections, or

17  disqualifying connections.  That's not the standard under

18  Rule 2014.  You disclose all your connections.  You don't

19  pick and choose which connections to disclose and not

20  disclose and, quite frankly, that's what happened in the

21  InfoW case.

22         They decided on May 24th in a room up in Austin to

23  not proceed with the bankruptcy case.  You know, the Court

24  wasn't in that room and understanding (sound glitch)

25  plaintiffs were in that room.  So based on that decision,

1    they made the determination not to disclose to Your Honor

2    their connection with FSS beginning May 24th.

3            And, Your Honor, I think the connection actually

4    began on May 19th when Mr. Lee picked up that phone call and

5    he acted as the recruiter for FSS and asked Mr. Schwartz,

6    who was the CRO, the guy who is in the driver's seat for

7    InfoW cases, to pretty much change his jersey and then work

8    for FSS.  You know that day, May 19th, was when the

9    connection occurred.  And that's under the rule, under Rule

10   2014, that is when they needed to disclose that connection.

11           I know there's discussion about, well, you know,

12   it was May 24th, maybe it was June 6th when we executed

13   agreement.  The date seems to fluctuate, but it all comes

14   down to that May 19th, as far as we know, because the

15   conversation could have occurred before, but we know there

16   was a phone call on May 19th.

17           And remember on May 19th, we were all in this

18   courtroom and there were discussions about Mr. Schwartz

19   needed to -- he needed a month, I think that's what the

20   original request was, to handle the remaining creditors.

21   But all of a sudden within that afternoon, Mr. Schwartz was

22   ready to send that engagement letter to FSS to change his

23   role.

24           And FSS, no matter we're not -- you know, under

25   the rules, all connection, but the connection to FSS was so

 1    central to the InfoW case.  This is not talking about your

 2    neighbor's mailman's sister.  This is the counterparty that

 3    was sitting at a negotiation table in the FSS case.

 4         THE COURT:  Mr. Nguyen, let me ask you.  The

 5    argument raised by Mr. Shannon is, look, that's we're

 6    rehashing InfoW issues, and you have your rights as to

 7    whatever it is in the InfoW case.  But when we look at the

 8    FSS case, it's different and you should look at FSS.  And

 9    what you're seeking to do is inject, you know, potential

10    non-disclosure issues in the InfoW case and infect them into

11    this case.  What's your response to that?

12         MR. NGUYEN:  Your Honor, we're obligated, we are

13    obligated to bring this objection in this case.  Remember,

14    FSS was the connection that they did not tell you in the

15    InfoW case.

16         Now, they're coming into this case asking you to

17    approve -- you're actually -- if you approve these

18    applications, you're actually compounding the disclosure

19    failures in the other case, because FSS is the connection

20    that was not disclosed to you from May 19th all the way to

21    June 10th.  It wasn't disclosed to the Sandy Hook family, it

22    wasn't disclosed to the U.S. Trustee.  I don't believe the

23    Subchapter V Trustee knew about it.

24         The reason why we're objecting is this is the very

25    connection.  The Court is a witness to this.  The Court was

1    not told about any of this.  And you say, oh, now it's

2    improper for us to raise this objection while you're asking

3    the Court to bless a connection that wasn't disclosed?  It's

4    relevant here, Your Honor.  They didn't disclose the

5    connection to FSS.  This is the client, the same -- I mean,

6    there are some -- I call them distractions.  There are some

7    distractions saying, oh well, it was a different law firm.

8          Well, you know, when we were talking about 327,

9    we're talking about professionals.  Change your letterhead,

10   doesn't matter, we're talking about professionals.  We're

11   talking about the same people, we're talking about the same

12   connection that was not disclosed to you.

13         And it's, in many ways, a continuation of the

14   previous case because this is the connection that -- I don't

15   want to -- I'm trying to use my words carefully.  There was

16   an non-disclosure of this connection and they're asking you

17   to bless this connection, so that's my response to that.

18         And I'm not obligated to object to this.  I'm

19   obligated to bring this before the Court and I'm not doing

20   this for any unethical reasons.

21         And, you know, I'm glad Your Honor went through

22   that reply.  I wasn't going to do it, but that -- I wasn't

23   going to address it, but I think it's important that there

24   were a serious attacks on my character and also Mr. Ruff's

25   character.  And all I got to say about that is, you know,

1    Mr. Ruff and myself appear in front of Your Honor all the

2    time.  You know what type of lawyers we are, and I will just

3    leave it at that, Your Honor.  I won't address the language

4    that was in the reply.

5         But, Your Honor, all we're saying here is there

6    was a serious non-disclosure that occurred with this very

7    connection.  I think under Rule 2014, there is a proverbial

8    fox that guards the henhouse.  What we're asking is harsh,

9    but, you know, disclosure violations when they occur, you

10   know, sometimes the consequences are harsh.  A lot of cases,

11   you might get disqualified.  A lot of cases, you lose all

12   your fees.  But sometimes, that's what it takes to uphold

13   the integrity of the bankruptcy system and that's why we're

14   asking for Your Honor to deny the two applications that are

15   before you.

16        THE COURT:  Thank you.  Is there anyone else who

17   wishes to make any form of an opening if you will.  Mr.

18   Battaglia.

19        MR. BATTAGLIA:  Yes, Your Honor.  Ray Battaglia

20   for Free Speech Systems.  I was Free Speech Systems' counsel

21   in the IW bankruptcy cases.  I guess ultimately my

22   perspective on this, since I've been --

23        THE COURT:  Can you just get closer to the mic?  I

24   want to make sure folks can hear you.

25        MR. BATTAGLIA:  All right.  The continuity I have

1    with this is I am the representative, legal representative

2    of FSS in both cases.  And obviously, there was a certain

3    logic to retaining counsel that had some familiarity with

4    the players and the baseline issues existing here with

5    litigation and the like.

6         So it can't be extraordinary to anybody that prior

7    counsel and prior CRO would be logical selections, not the

8    least of which is the number of people who are willing to

9    take representation of an Alex Jones-related entity is

10   small.  It's a very small universe of professionals.

11        But my perspective on this is did they meet the

12   standard of disinterestedness.  I can't comment on the

13   disclosure issues in the IW case, but my perspective on it

14   is were they disinterested at the time that communication

15   was established about them coming to provide services to

16   FSS.

17        By, I believe it was May 19th, if not before, the

18   litigation claims against the IW debtors had been dismissed

19   with prejudice, and, therefore, as of that date or slightly

20   before then, IW and FSS were ships passing in the night.

21   They did not have common ownership; they did not have common

22   creditors.  There just was no connection at that point in

23   that they'd been disconnected by the dismissals with

24   prejudice, a decision that the plaintiffs themselves decided

25   to make.  Texas plaintiffs actually made that decision the

1    day of or just prior to the filing of the IW cases.

2    Connecticut plaintiffs took a little bit longer and filed

3    their dismissal pleadings in the Connecticut cases.

4            So as far as I could tell from my perspective,

5    they were disinterested; they met the standard.  They didn't

6    represent common shareholders, they didn't represent parties

7    who had common claims against themselves.  And the PSA,

8    which I know is important to you -- and you raised this

9    before when we talked about how it terminated in its own

10   terms and you had asked would there be an extension, and I

11   told you we would agree to extend it and we submitted the

12   draft that was negotiated with the litigation trustees with

13   a new date.

14           It was never executed because by the time it came

15   up, there was no purpose to be served anymore by a PSA.  The

16   PSA was exclusively designed to pay the Connecticut and

17   Texas plaintiffs' claims.  They didn't exist against IW, so

18   there was no purpose served by the PSA at that point.  It

19   was a dead document.  The relationships between the

20   entities, the IW and the FSS entities had ceased to exist by

21   the dismissals.

22           And so, from the Debtors' perspective in selecting

23   counsel and selecting a CRO, we found someone who we believe

24   to be completely disinterested at the time that we engaged

25   them.

```
 1                THE COURT:  Thank you.  Anyone else?  Mr. Chapple.

 2                MR. CHAPPLE:  Thank you, Your Honor.  Ryan Chapple

 3     again on behalf of the Connecticut plaintiffs.

 4                Your Honor, we did, along with the Texas

 5     plaintiffs, filed a joinder to the objections to the

 6     employment objections.  The only note that I would make here

 7     is that candor and disclosure are important with the

 8     parties.  It's always of the utmost importance, especially

 9     in this context, especially when we have these two cases

10     abutting back to back.

11                And when the latter case was filed under

12     Subchapter V, which by statute does not have all of the

13     components relating to oversight and there's typically no

14     committee.  There's typically the creditors who do

15     participate are not as sophisticated as the creditors you

16     see in a typical large Chapter 11.

17                So I believe the only point that the Connecticut

18     plaintiffs, and I believe the Texas plaintiffs as well,

19     would make is that candor and disclosure is absolutely of

20     the utmost importance here, and that's why we filed our

21     joinder to the Trustee's objections.

22                That's all I have right now, Your Honor.

23                THE COURT:  Thank you.  Okay, Mr. Shannon.  The

24     only request I'm going to make is anytime anyone speaks, I

25     just want to make sure -- just get as close as you can to
```

1    one of the mics.  If you've got a booming voice, you're

2    good; if you have a soft voice, I just ask that you get a

3    little closer.  I want to make sure that we have a good

4    record.  And obviously, the hearing's being recorded, so I

5    want to make sure that we have a good record for today.

6              Mr. Shannon, I apologize.

7              MR. SHANNON:  Yes, thank you, Your Honor.  I guess

8    first before the hearing --

9              THE COURT:  Actually, I want to talk -- before you

10   get into any argument, exhibits.  Was there any agreement on

11   exhibits as to what the parties could agree to up front?

12             MR. SHANNON:  Yes, Your Honor.  I believe that all

13   of the exhibits are agreed, and those would be --

14             THE COURT:  Hold on.  Let me just make sure we

15   have a good record.  I just want to pull docket numbers and

16   make sure that we're all good on that.  So I see one at 163,

17   Mr. Shannon, where you have exhibits --

18             MR. SHANNON:  One through 34.

19             THE COURT:  -- 1 through 34.  Any objection to

20   that?

21             MR. NGUYEN:  No objection, Your Honor.  We've

22   agreed for all the exhibits.

23             THE COURT:  Okay, let me just go one by one then.

24   So what about 165; that's the U.S. Trustee's, I believe.

25             MR. SHANNON:  No objection, Your Honor, from the

1    debtor.

2              THE COURT:  Okay, so that is Exhibits 1 through

3    16?

4              MR. SHANNON:  Yes, Your Honor.  I do believe that

5    on Exhibit 16 is a --

6              THE COURT:  Demonstrative?

7              MR. SHANNON:  -- demonstrative.

8              MR. NGUYEN:  One through 15, Your Honor, so 16

9    doesn't need to go in.

10             THE COURT:  Okay, 1 through 15 at Docket No. 165.

11   You filed one, an additional one today, Mr. Shannon.  Is

12   there any objection to that?

13             MR. NGUYEN:  No, Your Honor.  We discussed it, no

14   objection.

15             THE COURT:  Okay, so then that would be at 178,

16   Exhibits 35 through 37?

17             MR. NGUYEN:  That's correct, Your Honor.

18             THE COURT:  Okay.  So then we have essentially 1

19   through 37 on behalf of Free Speech and U.S. Trustee

20   Exhibits 1 through 15.  Did I get that right?

21             MR. NGUYEN:  Yes, Your Honor.

22             THE COURT:  Okay.  All right, that was the last

23   housekeeping piece.

24             Mr. Shannon, I'm really going to stay quiet this

25   time.  I apologize.

1          MR. SHANNON:  Yes, Your Honor.  I mean, I don't

2     know if you would like to hear a response from me or we

3     could just start evidence.

4          THE COURT:  I want you to proceed.

5          MR. SHANNON:  Great.  You know, Your Honor, my

6     understanding from what I hear is that what this Court is

7     interested in hearing is whether there is anything that

8     creates a conflict that does not allow Shannon & Lee LLP or

9     Mr. Schwartz to exercise their fiduciary duties.

10          THE COURT:  I think it's a factor for sure.  I

11     mean, it's the test, right.

12          MR. SHANNON:  So, Your Honor, with that, I would

13     just --

14          THE COURT:  But I want you to put on whatever

15     presentation you want.  I put out that thought because, you

16     know, obviously, I think there could be a connection between

17     the two cases, but you're free to tell me there is none,

18     one, but I just inquire as to that.  But I want you to put

19     on your full presentation.

20          MR. SHANNON:  Your Honor, I would just like to go

21     to evidence and call Mr. Lee.

22          THE COURT:  Okay.  Mr. Lee, please take the stand.

23     I'll get you close to a mic.  There is a binder on the

24     stand.  Who's binder?

25          MR. SHANNON:  Both of those are the Debtors, Your

1    Honor.  The large binder would be Exhibits 1 through 35, and

2    the small binder is Exhibits -- or 1 through 34, I'm sorry.

3              THE COURT:  And then 35 through 37?

4              MR. SHANNON:  That's correct.

5              THE COURT:  Okay.

6              MR. LEE:  Your Honor, I have in my possession a

7    blank calendar for 2022.

8              THE COURT:  Okay.

9              MR. LEE:  Because the dates are -- I'm just...

10             THE COURT:  Understood.  Raise your right hand.

11   Do you swear to tell the truth, the whole truth, and nothing

12   but the truth.

13             MR. LEE:  I do.

14             THE COURT:  Okay.  You may be seated, sir.

15                  DIRECT EXAMINATION OF KYUNG LEE

16   BY MR. SHANNON:

17   Q    Good afternoon, Mr. Lee.  Can you state your full name

18   for the record.

19   A    Kyung, K-Y-U-N-G, middle name Shik, S-H-I-K, last name

20   Lee, L-E-E.

21   Q    And do you understand that you're here for the

22   consideration of the application for the CRO and Shannon &

23   Lee LLP by the Debtor, Free Speech Systems?

24   A    I am.

25   Q    What is your role in this bankruptcy cases?

1    A    In the FSS bankruptcy case, I am a partner with Shannon

2    & Lee, and I'm being put up as a co-counsel for the Debtor,

3    FSS.

4    Q    And, Mr. Lee, when was Shannon & Lee LLP founded?

5    A    In June 1, 2022.

6    Q    Mr. Lee, are you a licensed attorney?

7    A    I am.

8    Q    How long have you been a licensed attorney?

9    A    Since September of 1984.

10    Q    And can you describe your practice for the Court?

11    A    My focus is on corporate bankruptcy work, either for

12    the debtor, committees, or creditors, and I've been doing it

13    since 1984.  Practiced with Sheinfeld Maley & Kay for a

14    number of years and went off for the group in 1993 with

15    Verner Kiipfert and practiced with them as their bankruptcy

16    group for 10 years, and then went off with a small group to

17    join a boutique called Diamond McCarthy, was their

18    bankruptcy group for a number of years until 2018.

19            And then I left to work for Kasowitz Benson for

20    one year, and then formed my own firm as of 2019 and

21    practiced for about six months by myself and then partnered

22    up with my former partner, Mr. Leonard Parkins and Charles

23    Rubio, as of August 1, 2020, and practiced with them two

24    years until May 15th, 2022, when I departed and practiced

25    law with myself for 15 days, from May 15, 2022 to June 1,

1    2022, and then I formed a partnership with you to form

2    Shannon & Lee LLP as of June 1, 2022.

3    Q    Thank you, Mr. Lee.  Are you involved in any

4    professional groups related to your practice?

5    A    I am.  I'm a member of the American Bar Association.

6    I'm a member of the American Bankruptcy Institute.  I belong

7    to the TMA organization here in Houston.  I'm an active

8    member of the American Bar Association Business Bankruptcy

9    Committee, serve on the subcommittee on government powers.

10   I also have acted in the past with the Texas Disciplinary

11   Committee in sanctioning and disciplining attorneys who are

12   in violation of ethical obligations and served on that

13   committee for about five years in the last 1980s, and also

14   serve on several other committees in connection with

15   minority attorneys.

16   Q    Thank you.  If you could turn in the large exhibit book

17   there to Tab No. 1.

18   A    Yes, sir.

19   Q    Take a look at that exhibit and let me know if you're

20   familiar with this document.

21   A    I am.

22   Q    Can you explain what this document is?

23   A    Exhibit No. 1 is an application of Shannon & Lee to be

24   retained as bankruptcy co-counsel in the FSS bankruptcy

25   case.

1    Q    Mr. Lee, when you say co-counsel, what is your

2    understanding of what Shannon & Lee LLPs role would be if

3    the application to employ is granted?

4    A    Shannon & Lee will work together with the Law Offices

5    of Ray Battaglia to represent Debtor FSS in the bankruptcy

6    case.  The division of responsibility will be like in a

7    large law firm where Mr. Battaglia would have certain

8    responsibilities because he's technically the lead counsel

9    and have overall strategy, global kind of responsibility

10   about the case.

11          And it's contemplated that Shannon & Lee will take

12   over a lot of the issues relating to the daily operations of

13   the business and assist Mr. Schwartz in implementing many of

14   the operational issues, as well as assisting Mr. Battaglia

15   in all the work that has to be done in the case.

16   Q    And to date, what kind of things have you been involved

17   in with the Debtor, what matters?

18   A    Since the filing of the bankruptcy case, I've been

19   involved in most of the daily operational issues that have

20   confronted the company, in drafting pleadings with you.  I

21   guess primarily my work has been investigating sort of the

22   capital structure of the company, understanding its business

23   background so as to be able to draft the declaration for Mr.

24   Schwartz in connection with the filing of the bankruptcy

25   case.

1           Number two, understanding the finances of the

2     company so as to be able to determine what would be an

3     acceptable disposable net income for the next three years

4     for a plan of reorganization, as well as understanding the

5     company's capital structure in order to be able to complete

6     the financials and also the schedules and the monthly

7     operating reports, and strategize with respect to the plan

8     of reorganization.

9     Q     Mr. Lee, do you have familiarity with the Debtors'

10    corporate structure?

11    A     I do.

12    Q     How did you get that familiarity?

13    A     It started on May 24th, 2022, when we were invited to

14    come to a meeting in Austin, Texas, and we started the data

15    gathering process at that point in time with Mr. Schwartz

16    and with the company people that were available at that

17    time.  It was an arduous task because the company's books

18    and records were not in the best shape.  And so, by the time

19    we got through June 5th or June 6th at that time, we

20    gathered very few documents and were still looking for

21    documents regarding what the company's capital structure

22    looked like, and we're still gathering those document.

23           To this day, we have some of the documents.  But

24    for example, as a major secured creditor, Security Bank of

25    Crawford, we have a proof of claim that still doesn't make

1  sense and we still don't have their corporate documents as

2  to their secured claim, so we're still missing documents.

3  Q    Mr. Lee, do you have familiarity with the litigation

4  against the Debtors?

5  A    I do.

6  Q    How did you get that familiarity?

7  A    I got the familiarity by studying the state court

8  lawsuits that have been filed.  The state court litigators

9  in Texas made available to me their state court discovery,

10  and so, I studied the thousands of pages of documents that

11  were produced and went through those files to understand

12  what the issues were, as well as what had been produced in

13  the last four years of litigation, in order to determine

14  what documents had been produced relating to the financial

15  aspects of the company, so as to understand what had been

16  represented to the state court litigators so as to

17  understand what will be presented against us in a bankruptcy

18  case.

19  Q    And, Mr. Lee, to date, have you been involved at all in

20  preparing the proposed plan of reorganization that will come

21  in this case?

22  A    I have.

23  Q    And about how much time would you say you've spent on

24  that?

25  A    I've spent, I would say, I can't give you quite a

1    number, but I can tell you that I've been involving staying

2    up quite late in drafting a plan of reorganization

3    internally.  I've had strategy sessions with the company

4    internally with you, as well as Mr. Schwartz and Mr.

5    Battaglia, over the classification of various claims, as

6    well as the treatment of various creditors and the concepts

7    of how to put disposable net income and calculate those and

8    had discussions with how to proceed to confirmation on such

9    a plan, and also how to dedicate the avoidance actions and

10   to whom they should be dedicated.

11   Q    Thank you, Mr. Lee.  When was Shannon & Lee LLP first

12   retained by the Debtor, Free Speech Systems LLC?

13   A    My recollection is that the engagement letter was

14   executed on June 6, 2022, when Mr. Alex Jones signed the

15   engagement letter when we were in Austin, Texas.

16   Q    Did Shannon & Lee LLP receive a retainer?

17   A    We did.

18   Q    And when was that retainer received?

19   A    To my knowledge, the retainer was received on June 10,

20   2022, and was sent to us by FSS.

21   Q    Thank you.  If you could look at this Exhibit 1 and

22   turn to Paragraph 15.

23   A    I'm there.

24   Q    You beat me there.  If you could just review Paragraph

25   15.

```
 1    A    I have.

 2    Q    And let me know if anything in that needs to be

 3    changed.

 4    A    It does.  The last sentence where it says that the

 5    retainer was received on or about June 7, 2022 was

 6    incorrect.  We received an email saying that it was sent on

 7    June 7th, but it turns out that our bank records show that

 8    the receipt was on June 10, 2022.

 9    Q    Thank you, Mr. Lee.  If you could turn in your exhibit

10    book to Exhibit 3.

11    A    Yes, sir.  I'm there.

12    Q    Could you tell me what this -- or are you familiar with

13    this document?

14    A    I am.

15    Q    Can you tell me what this document is?

16    A    It's the engagement letter we prepared for FSS that was

17    prepared on or about June 5, 2022, and executed by Mr. Jones

18    on June 6, 2022, retaining Shannon & Lee for the company

19    FSS.

20              THE COURT:  Mr. Shannon, is there any objection to

21    me showing this on the screen, just so --

22              MR. SHANNON:  No, Your Honor.

23              THE COURT:  I want to make sure because normally,

24    our local rules require that exhibits get filed on the

25    docket.  I don't mind waiving it today, but I just want to
```

1    make sure we can all follow along.

2              MR. SHANNON:  Yes.  And, Your Honor, the exhibits

3    were filed on the docket.

4              THE COURT:  Oh, I know, and just no one's -- we're

5    not putting them up.  I just want to make sure that

6    everybody who may be watching or in the courtroom can follow

7    along, if it's okay, but I'm only going to go to the pages

8    that you point to.

9              MR. SHANNON:  Okay.  Thank you, Your Honor.

10             THE COURT:  Okay, thank you.

11   BY MR. SHANNON:

12   Q    Okay, Mr. Lee, if you could turn to Exhibit 4 in that

13   book.

14   A    Yes.

15   Q    Are you familiar with this document?

16   A    I am.

17   Q    Can you describe what this document is?

18   A    This is the declaration that I prepared in connection

19   with the filing of our application in the FSS bankruptcy

20   case, and it recites the declaration of disinterestedness

21   that we're required to file in connection with our

22   application.

23   Q    And did you review this document before coming to court

24   today?

25   A    I did.  And, in fact, I'm responsible for having

1    drafted this document in the first place.

2    Q    And are there any corrections that need to be made to

3    this document?

4    A    I don't believe so.

5    Q    Thank you.  Could you turn to Tab No. 5 and take a look

6    through that.  Are you familiar with this document?

7    A    I'm generally familiar with this document.  It's a

8    conflicts check.  Yes, I'm generally familiar with it.

9    Q    What is this document?

10   A    The document is a conflicts check that you ran in

11   connection with our Clio software program showing the

12   conflicts check that you performed in connection with the

13   potential representation of FSS in this bankruptcy case,

14   which is also Document Nos. 5 and 6.  It shows the hits that

15   we received, if any, in doing the conflicts check before we

16   undertook the representation.

17   Q    And can you tell based on this document on or about

18   what date it was created?

19   A    Performed, it looks like one was performed on August

20   16, 2022, and the other one, Exhibit No. 6, was performed on

21   or about September 16, 2022 if that's correct.

22   Q    Well, okay, let's turn to Exhibit 6 then.  You kind of

23   jumped ahead of me there.

24   A    Sure, sorry about that.

25   Q    Are you familiar with this document and, if so, what is

1    it?

2    A     It's another conflicts check performed by you.

3    Q     Okay.  And you had just said that this one was

4    performed on 9/16.

5    A     That's correct.

6    Q     Okay.  If there were any conflicts -- let me retract

7    that.  What does this document show; what does it determine?

8    A     It determines that there are no conflicts that we're

9    aware of within our firm system that are creditors of the

10   FSS corporation that would create any kind of issue for the

11   firm being able to undertake the representation or that

12   would create a problem of disinterestedness for us.

13   Q     And do you know how this document is -- how it runs,

14   how it's created?

15   A     I have a general idea of it, but it looks like it does

16   kind of a computer search and then it hits on these words

17   that are within our computer system, and if there's a hit,

18   it hits it.  But that's about the best way I know -- I'm not

19   a -- even though I'm not a science major.

20   Q     That's fine.  Let me just ask you, and I'm not asking

21   whether it's in these documents.

22   A     Right.

23   Q     Does Shannon & Lee LLP have any connection to PQPR?

24   A     No.

25   Q     Did it ever represent PQPR?

1    A    We have never represented PQPR.  And again...

2    Q    What connections does Shannon & Lee have to Alex Jones.

3    A    Well, before you -- I want to answer the question about

4    PQPR.  Counsel to PQPR, Mr. Steve Lemmon, was a former

5    partner of mine at Sheinfeld Maley & Kay between 1984 and

6    1993.  Again, I haven't disclosed that, but that's one

7    connection that is there.  Another connection is that Millie

8    Saul was an associate that I trained for four years between

9    1998 and 1992, which I also did not disclose.  But those are

10    as a result of practicing in the bankruptcy area, you tend

11    to have a lot of connections.  And those are the two that I

12    guess, depending upon the day, maybe I should have

13    disclosed; I didn't.  But I didn't disclose them because I

14    don't think they have any impact on my ability to be fair

15    and unbiased in this estate.

16    Q    Thank you, Mr. Lee.  So now a question about Alex

17    Jones.

18    A    Yes, sir.

19    Q    Does Shannon & Lee LLP represent Alex Jones?

20    A    We do not.

21    Q    Has -- strike that question.  Has the Debtor, Free

22    Speech Systems LLC, in this bankruptcy case ever taken any

23    position contrary to Alex Jones?

24    A    Yes.

25    Q    And could you describe one of them?

1   A     In this bankruptcy case, as an example?

2   Q     Yes.

3   A     We've taken lots of adverse positions to Alex Jones.

4   One, there's been a request by Mr. Jones to extend the

5   automatic stay to him; we've told him we can't do that.

6   Number two, he's asked us to bear 100 percent of the costs

7   of all these things, including legal, in connection with

8   these lawsuits; we've told him we're not going to do that,

9   and we've had to fight him on that.

10          THE COURT:  Mr. Lee.

11          THE WITNESS:  Yes, Your Honor.

12          THE COURT:  On the state court litigation, isn't

13   that what FSS filed originally was a request to pay for 100

14   percent of the legal expenses for Mr. -- the two counsels

15   that are in the litigation in Connecticut?

16          THE WITNESS:  We did, Your Honor.  And then once

17   you told us that we couldn't do that, when we filed the

18   retention pleadings for Mr. Martin, the appellate lawyer, we

19   already told them that we could only bear either 50 to 60

20   percent of those costs.

21          THE COURT:  But I'm saying that you said that you

22   went against Mr. Jones on that.  That was at the request of

23   the United States Trustee and the Court that said that they

24   weren't going to approve without paying their fair share.

25   How did Shannon & Lee take a contrary position?  The

1    application was filed requesting 100 percent of the fees on

2    an emergency basis.

3              THE WITNESS:  Your Honor, that is correct.  We did

4    file an emergency basis saying -- to bear the 100 percent

5    and then negotiations subsequently took place.  And, you're

6    right, I need to correct my testimony.

7              THE COURT:  You're talking about after?

8              THE WITNESS:  Yes, Your Honor.

9              THE COURT:  Okay.

10             THE WITNESS:  Yes, Your Honor, absolutely.

11             THE COURT:  Thank you.  Thank you.

12             THE WITNESS:  We did file it as 100 percent, and

13   then subsequently, there were negotiations that resulted in

14   the reduction to 50 and 40 percent, I believe -- 60 percent.

15   Yes, Your Honor, absolutely.

16   BY MR. SHANNON:

17   Q    And, Mr. Lee, just to clarify.  So in the most recent

18   application to employ litigation counsel, the appellate

19   counsel.

20   A    Yes.

21   Q    In that one, there was not a request to pay the full

22   amount.

23   A    That's correct.  We already made -- we already told Mr.

24   Jones's counsel that Mr. Jones would have to bear a

25   proportionate share and they've agreed to bear 40 percent

1    and we agreed to bear 60 percent.  And the arguments were

2    that Mr. Jones has already been cut back on some of his

3    regular salary and we had an arm's length negotiations over

4    that issue and came down to a 40/60 split.

5    Q    And what about PQPR; were there any, you know, contrary

6    positions taken?

7    A    To be blunt about it, there were almost fistfights over

8    the negotiations between PQPR and FSS and Mr. Jones, so to

9    suggest that we're all in bed together is just nonsense.

10   We've had many disputes over all the terms of the

11   relationship among us, and there's not been one group of

12   people getting into bed together and arranging something

13   secret.  It has been very hardily fought.  It's been very

14   hardily -- it's been negotiated very hard and there have

15   been terms that had to require lots of negotiations to get

16   to a final resolution.

17   Q    Thank you, Mr. Lee.  If you could turn in the exhibit

18   book to Exhibit 7.

19   A    I'm there.

20   Q    Are you familiar with this document?

21   A    I am.

22   Q    And if so, what is it?

23   A    It's the invoice for Shannon & Lee for the month of

24   June 2022 for FSS and the time records for what we did for

25   them during the month of June 2022.

```
 1   Q    If you could look through this document and see if you

 2   can determine how many hours Shannon & Lee LLP professionals

 3   worked on this matter in that month.

 4   A    On Page 6 of 7 on Exhibit No. 7, it says that the total

 5   was 127 hours and 95 minutes for the month of June 2022.

 6   Q    It's .95 hours.

 7   A    I'm sorry, .95.  127 hours and .95 whatever hours.

 8   Q    Could you turn to Exhibit 8.  Are you familiar with

 9   this document and what is it?

10   A    I am.  This is the July invoice that Shannon & Lee

11   supplied to the client, FSS, for the work we did in the

12   month of July 2022.

13   Q    And same question, how many hours does this reflect

14   spent on the matter?

15   A    On Page 5 of 7, it reflects it looks like 140 -- I'm

16   sorry -- I think it's 140.85 hours.

17   Q    Thank you, Mr. Lee.

18            THE COURT:  I have a question on this page and I'm

19   going to ask you anyway.  So on Page 1, you attended a focus

20   group hosted by someone and participated on a jury

21   perception of Alex Jones.  That was work for FSS?

22            THE WITNESS:  Yes, Your Honor.  We're co-

23   defendant.

24            THE COURT:  Okay.

25            THE WITNESS:  We're co-defendant.
```

1          THE COURT:  I understand.  Thank you.

2    BY MR. SHANNON:

3    Q    And, Mr. Lee, let's actually talk about that particular

4    time.  What was that time entry the Judge just brought up

5    about the focus group?  Can you describe what you did during

6    that time?

7    A    Yes.  I was asked by Andino Reynal, and I spelled this

8    wrong here, who was our state court litigator who was

9    conducting focus groups to come in at 10:00 and listen to

10   what the group was saying and how they reacted, and I ended

11   up participating and listening and watching it to determine

12   how the group was reacting to some of the questions and

13   issues that were being brought up about the soon-to-be tried

14   case and getting a sense of the various ranges of jury

15   verdicts that they would give for certain claims.

16          And I was asked to listen to those and get a sense

17   of this so that I could have an idea of the kind of range of

18   estimation of claims that we could kind of get an idea of.

19   Again, just a way of approximating a range of claims for

20   purposes of getting ready for the bankruptcy.

21   Q    And you said the case that was soon to be tried.  Do

22   you know what case that you were talking about?

23   A    I believe it was the Texas case called the Heslin/Lewis

24   suits that went to trial in Texas.

25   Q    And did that case play -- that state court litigation

004836

1   have anything that was filed in the bankruptcy case about

2   that?  Was anything filed in the bankruptcy case about it?

3   A    In this case or in the last --

4   Q    In this case.

5   A    The Heslin/Lewis suit, yes.  In fact, that was the

6   motion that was filed on the first day of the FSS bankruptcy

7   case in which the Debtor, FSS, agreed to lift the automatic

8   stay so that that lawsuit could proceed to trial to

9   judgment.  And we filed the motion to lift stay on the very

10  first day and we went and came before Judge Lopez to get

11  relief so that that lawsuit could proceed to judgment before

12  Judge Gamble.

13  Q    And, Mr. Lee, do you remember who argued that motion on

14  behalf of the Debtor?

15  A    It was either you or Mr. Battaglia, I believe; that's

16  my best recollection.  I apologize, but I just don't -- I

17  don't have a good recollection of that day.

18  Q    That's fine, Mr. Lee.  If you could turn in the exhibit

19  book to Tab 9.

20  A    I'm there.

21  Q    What is this document?

22  A    This is an invoice that I submitted to Mr. Schwartz for

23  work that I did on behalf of Free Speech between the period

24  of 5/24 and June 1, when I was practicing alone as Kyung S.

25  Lee PLLC, and that was the invoice I sent to Mr. Schwartz

1    for the work I was doing during that period of time.

2    Q    Okay.  And now why is this for -- you know, why does it

3    say Kyung S. Lee PLLC and not Shannon & Lee LLP?

4    A    Because I was asked to depart at Parkins Lee & Rubio

5    because of a positional conflict that my partners, Parkins &

6    Rubio, discovered on a case that we had brought together in

7    the LTL bankruptcy case.  So when I left the firm on May

8    15th, I did not have another shop to go to, so I went back

9    to my own and practiced by myself for 15 days.

10          And then you and I ended up practicing law

11   together starting on June 1, so I practiced law by myself

12   under Kyung S. Lee PLLC.  And at that point in time, InfoW

13   debtors did not have counsel and so, I thought it was

14   important for me to get myself situation so that I could

15   help Mr. Schwartz finish up the InfoW case, and I did it

16   under the rubric of Kyung S. Lee PLLC, which is a PLLC which

17   I had set up after I left Kasowitz Benson in 2018.

18   Q    Mr. Lee, if you could just summarize the work you did,

19   how would you do that?

20   A    I think the best way to say it is what I've already

21   said before.  These were organizational and informational

22   gathering meetings that we were invited to come to Austin to

23   discuss FSS.  And as you can see by my time entries there

24   starting on May 24th, we were gathering documents and data

25   to understand the company, what it did, what its capital

1    structure was, what its history was, and to gather documents

2    to understand and verify what its corporate and capital

3    structure was and to understand, moreover, what had been

4    produced in the state court system because there had been

5    four years of litigation and my concern was to make sure

6    that I understood what had been produced there so as to be

7    able to manage what we would be -- what would be used

8    against us in the bankruptcy court once...

9             If the company had to go into bankruptcy, I wanted

10   to find out what financial data had been produced so that we

11   wouldn't be contradicting what we'd be saying in the

12   bankruptcy court versus what had been produced previously.

13   Q    And was there ever an engagement letter with Kyung S.

14   Lee PLLC and FSS?

15   A    I think there must have been one.  I just don't

16   remember right now off the top of my head whether there was

17   one or not, but...

18   Q    You don't remember whether --

19   A    I just don't remember it because I remember there was

20   so many things going on and it was for a 15-day period, and

21   I just don't remember.  Most likely, there would have been

22   one, but I just don't know.  I can't answer you accurately

23   right now off the top of my head, but I'm happy to go look

24   in my records and see if there was one.

25   Q    Well, I don't think we need to do that.  Could you turn

1    back to Exhibit 3 for me.

2    A    Sure.

3    Q    And if you could go to the second page of that

4    document.

5    A    I'm there.

6    Q    And if you could read that Footnote 1 and let me know

7    if that refreshes your recollection.

8    A    Footnote 1 says, "As S&L was formed on June --

9    Q    I don't need you to read it.

10   A    Okay.

11   Q    Does it refresh your recollection?

12   A    It does not refresh my recollection as to whether there

13   was a written engagement letter.  But I put the client on

14   notice that I have been practicing by myself May 15th and

15   June 1 and that to the extent the fees were paid, that they

16   would be allocated to my PLLC for that period of time to

17   make sure the client knew that there was a separation of

18   entities.

19   Q    Okay.  All right, and so, Mr. Lee, what is your

20   understanding of what the U.S. Trustee's objection is in

21   this case?

22   A    The U.S. Trustee's objection, as I understand it, is

23   that Kyung S. Lee, Mr. Lee I guess, that I failed to make

24   the appropriate disclosures when I was getting involved with

25   FSS as of May 24, 2022.  And more accurately, that I failed

1   to disclose to them and to the Court and to the creditors my

2   involvement starting as of May 19, 2022 with FSS and going

3   through the June 10th period of time.

4   Q    Okay, thank you.  I'm going to skip quite a number of

5   these exhibits, but if you could just tell me briefly what

6   your involvement in the InfoW cases was.

7   A    My involvement in the InfoW case was I was the primary

8   partner in charge of representing the three debtors, along

9   with you as my primary associate at Parkins Lee & Rubio, and

10  we were the primary bankruptcy counsel for the three

11  debtors.

12  Q    And what was the -- what was trying to be accomplished

13  in those InfoW cases?

14  A    Prior to the filing of the bankruptcy case, Alex Jones

15  and FSS and the debtors had agreed to a plan structure in

16  which, number one, Mr. Jones dedicated the equity interest

17  in the three debtors into a trust agreement so that he would

18  have no interest in the three companies, first of all, so

19  that he would lose all interest in that.

20        Number two, the trust would be manned by two

21  former bankruptcy judges, Judges Nelms and Schmidt, who

22  would basically be the trustees over the three entities

23  during the bankruptcy case, as well as on a post-

24  confirmation basis.

25        Number three, the plan contemplated that the trust

1    would oversee a plan of reorganization whereby the plan

2    contributors -- that would be FSS and Alex Jones -- would

3    contribute the following things upon confirmation of the

4    plan: (a) $2 million on the effective date of the plan; (b)

5    approximately, I believe, some amount of money each quarter

6    -- I think it was either $200,000 or $500,000 a quarter,

7    such that for the next X number of years, the total

8    consideration was going to be $10 million to the total group

9    of tort and contingent unsecured claimants at that time.

10          And then number three, the trust had been funded

11    with approximately $725,000 of cash, which would be enough

12    funds to fund the Chapter 11 administrative process so that

13    the InfoW debtors could get the plan confirmed with these

14    elements in it: the LST trust, the plan support agreement,

15    as well as funding during the Chapter 11 case, which all was

16    predicated on the idea of getting the Connecticut plaintiffs

17    and the Texas plaintiffs under one roof so they could all be

18    adjudicated and handled in one roof under the bankruptcy

19    Court.

20    Q   Okay.

21    A   Was that clear? I just want to make sure.

22    Q   It was clear. It was clear. If you could turn to Tab

23    No. 12.

24    A   I'm there.

25    Q   Are you familiar with this document and, if so, what is

1    it?

2    A     This is the emergency application that the debtor

3    drafted in order to --

4    Q     You said the debtor.  Who do you mean?

5    A     Oh, I apologize.  This is the application or emergency

6    application submitted by the InfoW debtors to put in place

7    the two liquidation trustees, former Judge Nelms and former

8    Judge Schmidt, so they could oversee the trust that would

9    essentially be supervising the plan of reorganization, as

10   well as the Chapter 11 process when they were in place to

11   further negotiate the plan support agreement.

12   Q     And just from your memory without looking at the

13   exhibit, do you remember if the plan support agreement you

14   just talked about had a termination date?

15   A     Yes.

16   Q     Do you remember what that date was?

17   A     There were several: April 30, 2022, I believe was one.

18   Number two, there were other conditions, including I believe

19   Paragraph 8 of the plan support agreement contains several

20   termination provisions, including the necessity for filing a

21   plan of reorganization by April 30th.  There was also a

22   provision requiring that the LST trustees be appointed by

23   the bankruptcy court by April 30th.  And those are the two

24   ones that I remember specifically which were contained in

25   Paragraph 8 of the plan support agreement that I remember

1    reading.

2    Q    Okay.  And what was -- under the plan support

3    agreement, there were other parties that were funding this,

4    not the IW debtors, correct?

5    A    That is correct.

6    Q    And why were they doing that?

7    A    The whole idea was that Mr. Jones and FSS would be

8    funding the trust in order to get what they called a full

9    release.  In other words, there would never be a release

10   like in the Purdue or these Boy Scouts cases.  The idea was

11   that they would get a full release only and only -- if and

12   only when the creditors in the trust got paid in full.  And

13   the idea was that they would dedicate the amount of monies

14   into the plan over the period of the plan so that only when

15   those creditors in the plan got paid in full would they get

16   a release.

17   Q    And was that agreement you just talked about ever

18   renegotiated in the IW cases?

19   A    It was.

20   Q    Can you describe that renegotiation?

21   A    I can give you only just general terms because I myself

22   and Mr. Schwartz, we were not involved in it intimately

23   because we were on the operational side.  The major

24   negotiations took place between the potential trustee's

25   counsel, which was Mr. Okin for Mr. Nelms and Mr. Schmidt,

1    and I believe the counsel for Mr. Jones, which was Shelby

2    Jordan, and counsel for FSS, which was Mr. Battaglia, and I

3    believe you were involved in looking at the documents.

4            They all got renegotiated so as to take in the

5    concerns of this Court and the creditors and they got filed

6    on the Court as Document ECF No. 48 on April 29, 2022, and

7    they were redlined to reflect all the changes that were made

8    by the parties and also a clean copy was filed at ECF No.

9    48.

10   Q    If you could turn in the exhibit binder to Tab 14.

11   A    Yes, sir.

12   Q    Take a look at this exhibit and, I guess, first, are

13   you familiar with it?

14   A    I am.

15   Q    And what is this document?

16   A    This is ECF 48 on InfoW case.  This is a document

17   that's the notice that was filed attaching both the clean

18   and the redline copies of the trust, as well as the PSA, the

19   plan support agreement, that was renegotiated between April

20   17th, the petition date, and April 29, 2022, among the

21   parties and filed with the Court to reflect the changes that

22   the parties were making as the case progressed.

23   Q    Okay.  Who negotiated this agreement on behalf of Free

24   Speech Systems?

25   A    Ray Battaglia as I remember.

1    Q    Okay.  Who did you represent in the limited

2    negotiations you just testified?

3    A    The three debtors, InfoW debtors.

4    Q    And what about Mr. Schwartz.

5    A    InfoW debtors.

6    Q    Okay.  And I guess just to ask, who did I represent in

7    that?

8    A    InfoW debtors.

9    Q    Were the amended PSA reflected in here ever executed?

10   A    No.

11   Q    And why not?

12   A    Number one, the emergency motion to appoint the

13   trustees, Exhibit No. 5 or the one that we just talked

14   about.  I'm going to go back to it, just a minute, one

15   second to be clear.  Exhibit No. 12, which was the emergency

16   motion to appoint the trustees; that was never approved by

17   the Court, and it kept on being passed and continued, so

18   that was never done.

19          Number two, the documents that were renegotiated

20   that the people worked on day in and day out that got filed

21   on April 29th.  The role changed completely on May 3rd when

22   the Connecticut plaintiffs and the Texas plaintiffs filed a

23   notice with this Court saying, Your Honor, we need a status

24   conference with you because we have some news that we want

25   to tell you about certain things we have done in our

1   respective state court, which was specifically we're going

2   to dismiss InfoW debtors from our respective state court

3   litigation, and that's the notice they sent.

4           So the Court set a hearing, I believe, on or about

5   May 6, 2022, in which they came to Court and said, Your

6   Honor, we think this case -- we don't want to be part of

7   this case anymore and here are the pleadings we're filing in

8   the respective state courts to show that we're dismissing

9   the three InfoW debtors from both the Connecticut and the

10  Texas state courts in the Sandy Hook lawsuits.

11  Q    Well, when you say state courts, were those litigations

12  removed through the Federal Bankruptcy Court at that time?

13  A    I apologize for not clarifying that.  On the day that

14  we had filed bankruptcy for the three debtors, InfoW debtors

15  on April 17 and 18, 2022.

16  Q    Is that a yes?

17  A    Yes, I'm sorry.  Yes, I apologize.

18  Q    And so, is that what you meant when you said state

19  court litigation, the removed state court litigation?

20  A    I did.  I'm getting ahead of myself.

21  Q    If you could turn to Tab 16.

22  A    Yes.

23  Q    Are you familiar with this document and, if so, what is

24  it?

25  A    This is the -- let me just look at the date.  This is

1    the filing made by the, I believe the Connecticut plaintiffs

2    on May 2nd in which they're requesting an expedited status

3    conference with Judge Lopez in which they want to announce

4    to the Court that they had basically filed motions to

5    dismiss their claims against the InfoW debtors in

6    Connecticut state court litigation.

7    Q    Okay.  And so, when you referenced May 3rd, is this one

8    of the documents you were --

9    A    I am, that's correct.  I apologize for the mistaken

10   date.

11   Q    No need to apologize.  If you could turn to Tab 17.

12   A    Yes.

13   Q    Same questions.  Are you familiar with this and, if so,

14   what is it?

15   A    This is the same document.  This is a document that was

16   filed by the Texas plaintiffs stating that on May 6, 2022,

17   they want to join in the request by the Connecticut

18   plaintiffs for a status conference with Judge Lopez, also

19   wanting to say we're dismissing the InfoW debtors from their

20   respective lawsuits in Texas.

21   Q    And this is the other one that you had just talked

22   about as affecting the PSA.

23   A    Correct.

24   Q    Okay.  If you could turn to Tab 18.

25   A    Yes, I'm there.

1    Q    What is this -- are you familiar with this document

2    and, if so, what is it?

3    A    The document is an email from Mr. Ruff from the U.S.

4    Trustee's office on May 17th in which memorializes our

5    discussion that we've had regarding the direction of the

6    case.  It's a memorialization of our conversation he and I

7    have had, which we've had many of during the case regarding

8    the direction of the case, and he's setting forth his

9    arguments of why, at least from his perspective, he believes

10   that the cases should be dismissed as soon as possible.

11   Q    And if you could look down that and read that last

12   bullet point there out loud.

13   A    The last bullet points says from Mr. Ruff, "Dismissal

14   is the more efficient and cheaper option for these debtors

15   as it will save from administrative and litigation costs and

16   will still allow debtors options to resolve their claims."

17   Q    And, Mr. Lee, did you -- you received this email,

18   correct?

19   A    I did.

20   Q    Did you evaluate it?

21   A    I did, and I also evaluated it with Mr. Schwartz.

22   Every time one of these came, Mr. Schwartz and I discussed

23   it, we evaluated all the things that Mr. Ruff was saying and

24   considered it with all the other factors that we had to deal

25   with in the bankruptcy case, in the InfoW bankruptcy case.

1   Q    Okay.  If you could turn to Tab No. 19.

2   A    Yes, I'm there.

3   Q    Are you familiar with this document and, if so, what is

4   it?

5   A    It is, 19 is a copy of my application for Kyung S. Lee

6   PLLC.  It's the application to be retained in the bankruptcy

7   case of InfoW, which I filed on May 19, 2022.  And my

8   recollection is that I filed this application probably first

9   thing or early in the morning on May 19th because we had the

10  status conference with Judge Lopez at 2:00 p.m. that day in

11  which we were going to the Court and tell the Judge that we

12  had reached final agreement with the Texas plaintiffs about

13  the stipulation regarding their dismissal of their claims

14  against the debtors with prejudice.

15  Q    And, Mr. Lee, did you have any connection with FSS when

16  this was filed?

17  A    Absolutely none, other than the fact that they were

18  counterparties to the PSA when we first started the

19  bankruptcy case.  And, in fact, that's a point that I want

20  to clarify for this Court, and that is not until after I

21  finished the status conference with Judge Lopez on that

22  date, May 19th, that I received a call from Mr. Battaglia to

23  come to Austin and that's the point that I've been trying to

24  tell everyone since.  And that's the reason why, even if I

25  were able to make that disclosure, I couldn't make the

1    disclosure to Judge Lopez at 2:00 p.m. because I didn't

2    receive the call from FSS about coming to a meeting before

3    2:00 p.m.

4    Q    Okay, thank you.  If you could turn to Tab 20.

5    A    Yes.

6    Q    Are you familiar with this document and, if so, what is

7    it?

8    A    This is the document, as I recall, that the Connecticut

9    plaintiffs filed on or about May 19th before the hearing in

10   which they gave notice that in Connecticut that they had

11   filed their motions to dismiss with prejudice their claims

12   against the debtors, InfoW debtors, by motion.  There had

13   been a mistrust by the Connecticut plaintiffs to do any kind

14   of stipulations with the debtors because they thought that

15   it would be used later against them by one of the co-

16   defendants to say something that it didn't say, so they

17   proceeded by motion, while the Texas plaintiffs did

18   stipulations with the InfoW debtors that Mr. Battaglia and I

19   worked on that we presented to Judge Lopez on May 19th at

20   2:00 p.m.

21   Q    If you can talk about that stipulation, if you could

22   turn to Tab 21.

23   A    Yes.

24   Q    Are you familiar with this document and, if so, what is

25   it?

```
 1    A    I am.  Exhibit No. 21 is the stipulation that the Texas

 2    plaintiffs and I worked on behalf of the debtor InfoW, Mr.

 3    Battaglia and I negotiated this during the week before May

 4    19th and we filed this either the day before on the Court's

 5    docket and then we came to Court on May 19th and asked Judge

 6    Lopez to approve it.  And then Mr. Battaglia, I believe,

 7    took it and he filed it in the Western District of Texas so

 8    that Judge Mott and others could rule on their motions to

 9    remand.

10    Q    Mr. Lee, I have a question.  How did this benefit FSS,

11    this stipulation and order?

12    A    This stipulation had nothing to do with FSS.  I was not

13    thinking about FSS.  This was for the benefit of the debtor.

14    It was for the fact that they were dismissing the claims.

15    And my charge from Mr. Schwartz, ever since we were told

16    that the plaintiffs in both Connecticut and Texas were

17    dismissing us, my charge from Mr. Schwartz to me was make

18    sure that they dismiss us with prejudice, that there are no

19    longer creditors, and make sure that those dismissals are

20    absolutely clean and that they are gone forever from these

21    estates.

22          That was my duty and he told me to go implement

23    that and that's what I was told to do from May 19th until

24    these things got done -- from May 3rd until May 19th; that

25    was my charge, that's what I worked on.
```

1    Q    And you said the debtor and you said the estates.  You

2    mean the InfoW debtors?

3    A    InfoW debtors, yes.

4    Q    I want you to turn to Tab 26.

5    A    I'm there.

6    Q    I want you to read through it and it goes on for a

7    couple of pages and tell me what this document or if you're

8    familiar with this document and, if so, what it is.

9    A    I'm familiar with the document.  This is an email which

10   starts the string on May 25, 2022, if you go back to Page 5

11   of 5 on Exhibit No. 26.  This is a document in which after I

12   had evaluated -- let me just start.  May 19th is when we go

13   to Court and tell Judge Lopez that the Texas plaintiffs have

14   stipulated to dismissal with prejudice.  Judge Lopez signs

15   the stipulation and we file it.

16            Thereafter, we start working.  Mr. Schwartz and I

17   start evaluating whether or not the company should proceed

18   to Chapter 11 or dismiss.  We make an evaluation, which

19   we'll talk about in some of these other emails.  But Mr.

20   Schwartz tells me, we've concluded, that we're going to

21   dismiss the case, and we make the announcement to the U.S.

22   Trustee on May 25th -- that's the first email that you see

23   at the very beginning on Page 5 of 5 -- at which point in

24   time, Mr. Ruff and I begin discussions on how to get the

25   dismissals done.

```
 1              I'm telling Mr. Ruff I need some more time because
 2    I want to do it right because I may take more time to get
 3    some of these things done because I've been pressured to do
 4    it so quickly, I don't want to make any mistakes.  He says,
 5    Kyung, get it done quickly.  You can do it through a
 6    stipulation of dismissal of our motion to dismiss.  So we
 7    look at that idea and we start drafting a stipulation of
 8    dismissal.  We go back and forth and --
 9              MR. NGUYEN:  Objection, Your Honor.  I don't think
10    hearsay testimony.
11              THE WITNESS:  He's a party.
12              MR. NGUYEN:  He's explaining what Mr. Russ was
13    saying.  Mr. Ruff (indiscernible)
14              THE COURT:  There's an objection, a hearsay
15    objection.  What's your response?
16              MR. SHANNON:  Your Honor, he's talking about the
17    status of negotiations that are really the crux of the U.S.
18    Trustee's objection to the applications to employ.
19              THE COURT:  Overruled.  He can answer.
20              THE WITNESS:  So basically, this chain of emails
21    starts on May 25th, and then the next thing you see is Mr.
22    Ruff send us on May 27th a proposed stipulated dismissal on
23    May 27th.  The problem I had with the May 27th draft that he
24    sent me was it starts off by saying, "The motion to dismiss
25    by the U.S. Trustee is granted," and that wasn't our deal.
```

1    That wasn't what the agreement was.  The agreement was we're

2    going to dismiss the case because we had no further need for

3    the case.  And so, I had to then go and redraft the entire

4    thing and work with Mr. Schwartz and go get that process

5    too, so that's what I worked on so that took another day.

6           And then as you can see, we marked that, and by

7    June 1, we've gotten it back to Mr. Ruff and he's going

8    through it and he's eliminated a lot of things that I've

9    asked for, but we've now come to an agreement by June 1 on

10   that dismissal order or stipulation.

11          So this is what it reflects, but from May 25th to

12   June 1, only thing we're working on between me and him was

13   getting that document correct.

14   BY MR. SHANNON:

15   Q    Thank you, Mr. Lee.  And I actually got a little bit

16   out of order.  I jumped ahead of myself there.

17   A    Sorry about that.

18   Q    If you could go back to Tab 23.

19   A    Sure.

20   Q    Are you familiar with this document and, if so, what is

21   it?

22   A    It is.  This is an email I sent to Mr. Schwartz on May

23   24th -- or on May 19th at 5:24 p.m.  Recall we came to Court

24   on May 19th at 2:00 p.m. and the hearing before Judge Lopez

25   lasted from 2:00 to 2:28 p.m., in which we announced the

1    stipulation of dismissal and Judge Lopez signed the

2    stipulation.  I got the call from Mr. Battaglia afterwards

3    and he said, please come to Austin next Tuesday.  I had not

4    mentioned any of this to Mr. Schwartz because of all this

5    other work we were still doing.  And it was only at 5:24

6    that I sent him this email saying, hey, we've been invited

7    to come to Austin to talk about FSS, so let's -- I just want

8    you to know that's when the meeting is going to be.

9           And I didn't mention any of this stuff to him

10    until the hearing was over, until we had dismissed all the

11    claims and, at least in my mind, knew there was no

12    relationship between FSS and InfoW debtors at that point in

13    time because there were no claims that existed between the

14    litigation claimants and FSS, at least at one datapoint that

15    I had.

16    Q    Okay.  And if you could go to Tab 24.

17    A    Yes.

18    Q    Same questions.  Are you familiar with this document

19    and, if so, what is it?

20    A    I am.  This is a document that I prepared after I sent

21    the email on Thursday, May 19th.  I took time on Friday, May

22    20th, Saturday, May 21 to evaluate my InfoW file.  Because

23    one of the things I did not want to do is create this very

24    same problem that we're having right now, which is I did not

25    want the Court, the creditors, or anyone to think that we

1    were running from one project to go into another one

2    thinking that we had all these little issues.

3            So I took it upon myself to study the problem and

4    say, Marc, do we have a problem here, do we need to analyze

5    this, and I took it upon myself for two days to study this

6    and this was the conclusion that I reached, and it was sent

7    to him on Saturday, May 21 at 10:52 in the morning.  And I

8    said I've been evaluating these things and I said, here, I

9    started the evaluation ever since we saw Judge Lopez on

10   Thursday about the dismissals and whether we need to

11   evaluate any of these other things.

12           I said, I've continued to evaluate those issues

13   and reaching the conclusion that the cost to prosecute the

14   Subchapter V bankruptcies for the three debtors to

15   confirmation, especially with opposition from the U.S.

16   Trustee, the fact that the remaining claims or obligations

17   also jointly (indiscernible) by Free Speech Systems; (c) the

18   debtor should have sufficient funds; (d) debtor's reserve

19   and that there should be enough money for the Subchapter V

20   Trustee and that the most efficient way to administer the

21   debtors is to file as soon as possible a motion to dismiss

22   the bankruptcy case.  The motion to dismiss the bankruptcy

23   will be on 21 days' notice to all creditors.

24           I think it would behoove all of us to all agree

25   that this is the right conclusion, that we're moving to

1    implementation of dismissal as the goal.

2    Q    Okay.  So I just want to know, you testified earlier

3    about an email from Mr. Ruff.  Did what Mr. Ruff tell you

4    have any, you know, bearing on your decision here; did you

5    consider what he said in that?

6    A    Absolutely.  As of May 17th, Mr. Ruff had taken the

7    position that no applications for employment of

8    professionals would ever come before a hearing on a motion

9    to dismiss.  He had said that in his email on May 17th and

10   he had continued to take that position throughout any

11   discussions that we've had.

12          So in order for us to get our applications

13   approved in the InfoW case, the estate would have had to

14   spend monies to beat the U.S. Trustee on his motion to

15   dismiss to have the case approved as a Subchapter 11(sic)

16   only to feather our own nests at that point in time to get

17   our applications approved so that we could have final fee

18   applications.

19   Q    Okay.  Let's see, and if we could just go to Tab 25

20   now.

21          THE COURT:  Mr. Lee, hold on.  I'm going to ask

22   you a question about that.

23          THE WITNESS:  Yes, sir.

24          THE COURT:  Are you saying that if you would have

25   requested a hearing date in front of me about an application

1    that I wouldn't have considered it because of what the

2    United States Trustee was arguing?

3          THE WITNESS:  No, Your Honor.  I'm not suggesting

4    that at all.  What I'm suggesting is that the way that the

5    case had already been set, it was clear to me that the U.S.

6    Trustee had already set the motion to dismiss in front of

7    all the applications first.

8          And, number two, that in order to get the

9    applications heard, at least it was my perception, that the

10   U.S. Trustee would oppose that because he was saying that

11   the bankruptcy case was an improper bankruptcy case, and he

12   was saying that it would be improper to have professionals

13   employed in an improper bankruptcy case and, therefore, he

14   wasn't going to let that happen.

15         He wanted the case dismissed without the stamp of

16   a bankruptcy court allowing a professional to be employed.

17   That's the position I think took.  And so, I have to

18   evaluate those facts with Mr. Schwartz and say, was it worth

19   it for us to have that fight to get the fee apps approved.

20   Because as you will see, I again on May 30th, Mr. Schwartz,

21   should we have that fight just to get the protections for

22   us, the professionals, and Mr. Schwartz said to me again,

23   no, Kyung, that's stupid.  Why would you spend more estate

24   monies just to feather our own nest to get bulletproof

25   protection for our fee applications?

1          THE COURT:  Okay.

2          THE WITNESS:  That's just not worth it.  That's

3   the dialogue we were having internally.

4          THE COURT:  Thank you.

5          THE WITNESS:  Okay.

6   BY MR. SHANNON:

7   Q    Okay.  So, Mr. Lee, then let's go to Tab 25.

8   A    Yes, sir.

9   Q    Are you familiar with this document and, if so, what is

10  it?

11  A    This document is the email I sent to Marc Schwartz,

12  Chris Schwartz, and Harold on Monday, May 23rd.  Recall, May

13  19th, we have the hearing with the Court.  May 21, I give

14  the analysis.  And to make sure the estate is run lean, I've

15  drafted a motion to dismiss by May 23rd.

16  Q    Okay.  And so, it's after that that then the

17  conversation with the U.S. Trustee you talked about before

18  happened.

19  A    Takes place starting on May 25.

20  Q    Okay.  And on May 24 was the meeting with FSS --

21  A    Correct.

22  Q    -- that is at issue.

23  A    That's correct.

24  Q    Go to Exhibit 27.

25  A    Yes, sir.

1    Q    Same questions.  Are you familiar and, if so, what is

2    it briefly?

3    A    This is the stipulation that Mr. Ruff and I worked on

4    from May 25th until June 1, and then we filed it with the

5    Court.  And then it was on, I believe, 10 days' notice and

6    Judge Lopez signed it on June 10th.

7    Q    Okay.  Let me just ask you, was -- well, I guess it's

8    already clear.  Is it correct that KSL PLLC, Kyung S. Lee

9    PLLC, it was never employed in the IW bankruptcy case.

10   A    We were not.

11   Q    At what point did you believe that the IW debtors had

12   determined they were not going forward with that employment?

13   A    May 21.

14   Q    Okay.  And why did you believe that?

15   A    Because I had recommended to Mr. Schwartz that the case

16   be dismissed, and Mr. Schwartz had agreed with me.  And by

17   the time we were going to dismiss the case, there wasn't

18   going to be further need for retaining professionals.  And

19   then that was supplemented by my continuing dialogue with

20   Mr. Ruff from the U.S. Trustee's office, who said let's be

21   efficient in how we administer this Chapter 11 case.  You

22   can pay your professionals outside of bankruptcy and let's

23   dismiss the case and be done with it so that the only thing

24   we should be worrying about is Miss Haselden, Melissa

25   Haselden, the Subchapter V Trustee, and make sure that she

1    has enough -- that the estate has enough money to pay her

2    fees and let's get the case dismissed.

3    Q    And do you remember when you might have heard that from

4    Mr. Ruff?

5    A    It started with the email on May 17th, which we've

6    talked about already, and was repeated throughout the entire

7    negotiations process.  When I was asking for more time, he

8    was asking for dismissal and handle all your administrative

9    fees outside of the bankruptcy.

10   Q    Okay.  I'm just going to ask you straight up, Mr. Lee,

11   why was there never a supplemental Rule 2014 disclosure for

12   Kyung S. Lee PLLC?

13   A    Number one, as we've talked about in our papers, we

14   didn't move -- the idea of seeking employment disappeared as

15   far as the applicant was concerned when the case was going

16   to be dismissed shortly, number one.

17          Number two, if I didn't disclose this to the

18   Court, I apologize, but I think the only time I saw the

19   Court was on May 19th and then June 10th, I believe.  I

20   don't think there was a time between those two periods that

21   I saw the Court.  And as I indicated, I did not know about

22   the FSS meeting until after the May 19th hearing.

23          Number three, I just need to let people know there

24   was not a certainty when we went to this meeting on May 24

25   that Kyung Lee or Marc Schwartz was going to be retained.

1    The idea that there was a letter that Mr. Schwartz sent to

2    me on May 19th, got signed on May 19th, and he got engaged,

3    it's just not true; that's not what happened.  He sent the

4    letter, and it got lost in the ether and neither of our

5    engagement letters got signed until June 6, and we were just

6    there to see if we were going to be retained.

7             And again, I did my best to, on May 21, to

8    evaluate the situation internally with the client and the

9    client said, look, we're done with this case, there's

10   nothing more to do here, and there's no adversary between

11   FSS and InfoW debtors because there's no conflict, and we

12   didn't deal with any of these issues between the two

13   companies between that period of time.

14            And there was a lot of uncertainty because on the

15   other hand, especially for a professional like me, I have

16   client confidences I have to keep.  And so, there were a lot

17   of factors that were going in my mind, and I felt very

18   confident that, from my perspective, there was nothing

19   impinging on the estate because we weren't dealing with any

20   FSS issues at that point in time and had nothing to do with

21   them.

22            And again, if I erred, it's my fault.

23   Q    Okay.  I want you now to go to the small book.

24   A    Sure.

25   Q    And turn to Tab 1.  We're going to switch gears a

1    little bit and now we're going to talk about Mr. Schwartz

2    very briefly.

3    A     Sure.

4    Q     Same questions as always.  Are you familiar with this

5    document behind Tab 1?

6    A     I am.

7    Q     And, if so, what is it?

8    A     This is an email that I located last night at midnight

9    in searching through my outbox and it is an email that I

10   sent to Mr. Schwartz on June 5.

11          THE COURT:  Is this Docket 178?

12          MR. SHANNON:  Yes.

13          THE COURT:  Okay.  I just want to make sure.

14          THE WITNESS:  178-1.  It's an email that I found

15   last night at around midnight.  And what it is it's an email

16   that I sent to Mr. Schwartz on June 5, okay, and if you look

17   on your calendar, June 5 is a Sunday.  And it's an email I

18   sent to him saying, hey, I've made some revisions to your

19   engagement agreement, and I've done it based upon looking at

20   the company agreement of FSS.

21          And the reason why I was doing that was because

22   all the creditors were complaining mightily about, oh, Mr.

23   Schwartz is just the lackey in InfoW; he doesn't have any

24   authority.  So I took the company agreement of FSS, and I

25   tightened up the provisions about his authority, and I

1   redlined it, and I sent it to him on June 5th.

2           And when I looked at last night, I said, you know

3   what, this looks kind of funny, it looks very familiar.  So

4   when I looked at the redline which is attached and I took

5   the engagement letter that everyone's been saying was dated

6   May 19th and it's attached to his application, I took that,

7   and I looked at it and I compared it word for word, and I

8   realized that my redline is the engagement letter.

9   BY MR. SHANNON:

10  Q    Well, let's talk about the redline.  Let's go to Tab 2.

11  A    Sure.

12  Q    Is this the redline that you're talking about?

13  A    It is the redline I'm talking about.  And as you can

14  see, it's a redline that I did for Mr. Schwartz on June 5,

15  2022, in which I tightened up all these things and give him

16  really good powers I think.  And so, all these changes are

17  made, and if you look at the application letter that is

18  attached to his letter, the engagement letter, you will see

19  that every one of these changes are incorporated into it.

20          And so, it was impossible for Mr. Schwartz to have

21  given this letter, the one that he got signed to the company

22  FSS on May 19th.  It's impossible because I hadn't given him

23  these comments until June 5.  And you could see it because

24  at the top of this letter, you see the comma 2022; there's

25  no space between the two letters.  When you see the final

1    engagement letter, it still has that same mistake on it.

2    And I don't know why somebody put May 19th on the top as the

3    final one, but it's got the same error.

4          THE COURT:  Can I ask you a question, Mr. Lee.  I

5    want you to take a look at the screen.  Take a look at the

6    screen there.  It's a supplemental declaration filed by Mr.

7    Reynal.  I'll stipulate that he filed this -- we'll get the

8    date on it -- and that's special counsel.

9          Here's what he said.  Do you consider this to be a

10   true and accurate statement -- I've got to deal with that

11   too -- to your knowledge?  He's saying that FSS retained

12   Schwartz on May 19th and that Schwartz asked him, who's a

13   criminal defense lawyer, whether Mr. Schwartz knew of any

14   financial executive.

15         So I understand what you're saying.  I'm also

16   looking at this and here's another statement filed by

17   someone under -- this was filed on September 12th --

18         THE WITNESS:  Yes.

19         THE COURT:  -- under penalty of perjury.

20         THE WITNESS:  Right.

21         THE COURT:  And it's speaking of an additional

22   relationship on May 19th.  And I will stipulate to you --

23   I'm just trying to see if I can put all the pieces together.

24         THE WITNESS:  Your Honor, I have an answer for

25   you.

```
 1                THE COURT:  If you don't know it and you filed it.

 2                THE WITNESS:  I drafted it.

 3                THE COURT:  Oh, okay.

 4                THE WITNESS:  I drafted it.  So until I discovered

 5      this issue last night, I was also under the mistaken

 6      impression that the letter was dated May 19th is what I'm

 7      trying to tell you.

 8                THE COURT: So do you think Mr. Reynal is -- do

 9      you think the statement that he's making here under penalty

10      of perjury is untrue?

11                THE WITNESS:  It is untrue because I wrote it for

12      him, and so it was my mistake too.

13                MR. SHANNON:  Judge, if I could --

14                THE COURT:  No, no, no.  We take witnesses.  You

15      get to ask questions and so do I.  I'm just trying to put

16      all the pieces together.

17                THE WITNESS:  Yes, Your Honor.

18                THE COURT:  Thank you.

19                THE WITNESS:  It's my fault.

20                THE COURT:  No, no, no.

21                THE WITNESS:  It's my fault.

22      BY MR. SHANNON:

23      Q    All right.  Let's go to Tab -- actually, let's answer

24      that real quick.  If you go back to the big book.

25      A    Sure.
```

```
 1   Q    And we'll go to towards the end here.

 2            THE COURT:  Mr. Lee, I've got more questions.  So

 3   in the previous exhibits that were shown, Mr. Schwartz is

 4   attending meetings on May 24th.  So even if I accept that

 5   the work was not -- maybe that the retention letter that Mr.

 6   Schwartz is indicating, you know, was filed later, he's

 7   certainly attending meetings in May in connection with a

 8   potential FSS restructuring, right, because he was at the

 9   May 25th meeting.

10            THE WITNESS:  May 24th.  Yes, Your Honor, he was.

11            THE COURT:  Okay.

12            THE WITNESS:  Yes.

13            THE COURT:  Okay.

14            THE WITNESS:  No disagreement on that point.

15            THE COURT:  Okay.  I just wanted to understand.

16            THE WITNESS:  Yes, Your Honor.

17            THE COURT:  I understand your point though.

18            THE WITNESS:  Yes, Your Honor.

19            THE COURT:  Thank you.

20            MR. SHANNON:  Sorry, I'm going to take one second.

21            THE WITNESS:  Sure.

22            THE COURT:  Take your time.  So let me ask you

23   this as well, and I'm just trying to put all the pieces

24   together.  Here is Mr. Schwartz's declaration that he filed

25   in connection with the first day case, and he says May 19th
```

1    as well.  Are you telling me that Mr. Schwartz got it wrong

2    too?

3              THE WITNESS:  Your Honor, the reason why everyone

4    got it wrong is because I'm the person drafting all of

5    these, and I got --

6              THE COURT:  I'm assuming somebody's reading it

7    before they sign it.

8              THE WITNESS:  Your Honor, that's correct.  I can't

9    deny your sentence, what you just said.  But I'm the one

10   who's drafting these, and I did not know -- I did not

11   remember this until last night is what I'm trying to tell

12   Your Honor.

13             THE COURT:  I know, I understand.  It sounds like

14   Mr. Schwartz didn't either.

15             THE WITNESS:  No, no one did.  I apologize.  I

16   apologize.

17             THE COURT:  Okay.  I don't think you remembered it

18   when we first talked about it at the first hearing.

19             THE WITNESS:  That's correct.

20             THE COURT:  Okay.

21             THE WITNESS:  No one did, and I didn't remember it

22   until last night when I came across the email.

23             THE COURT:  Okay.

24   BY MR. SHANNON:

25   Q    Okay.  Well, Mr. Lee, can you go back to that big book

1    and go to Tab 30.

2    A    Sure.

3    Q    If you could go back to the big book and go to Tab 30.

4    A    Sure.

5    Q    Are you familiar with that document?

6    A    Yes, I am.

7    Q    Can you tell me what it is?

8    A    That is the attachment to Mr. Schwartz's application in

9    the FSS bankruptcy case.  It is a copy of his engagement

10   letter to FSS signed on or about June 6, 2022 by Mr. Jones.

11   Q    And what was this letter dated?

12   A    It's dated at the top as May 19, 2022.

13   Q    Okay, no further questions about that.  Okay, now back

14   to the small binder.  I'm sorry, wanted to clarify that.

15   All right, now if you could just go to Tab 3 in that small

16   binder.  Are you familiar with this document?

17   A    It is -- I am.  I am.

18   Q    Please describe to me what this is in relation to the

19   other (sound drops).

20   A    If you look from the bottom up, you will see that this

21   is the email that I sent to Mr. Schwartz on Sunday, where I

22   ask him for his Word document of the engagement letter so

23   that I could make the changes based upon my review of the

24   company engagement letter -- company agreement of FSS.  And

25   then I sent him at 3:05 p.m. certain revisions that we

1   looked at are behind Exhibit No. 2.

2        And then at 4:20, he says to me, I'm fine with

3   these changes, and he says you want me to make them, and

4   then he says, I need to read Paragraph 8.01 of the company

5   agreement.  And I tell him I want you to make -- he tells me

6   I want -- I tell him, please make the changes and bring both

7   the redline and the clean to Austin so we can show it to

8   Ray, meaning Ray Battaglia, and client and have it signed.

9   It is too difficult and confusing to do it otherwise.  Do

10  you see what I'm saying?

11       And so, it's concluding our discussion about the

12  changes that need to be made to his engagement letter that

13  he needs to bring to Austin on June 6, the Monday, the next

14  day.

15  Q   So that's when the Schwartz engagement letter was

16  actually signed, irrespective of when the letter was dated.

17  A   That's correct.

18  Q   Okay.

19       MR. SHANNON:  Well, no further questions from me,

20  Your Honor.

21       THE COURT:  I just have one question.

22       THE WITNESS:  Yes, Your Honor.

23       THE COURT:  So here is the Schwartz declaration

24  submitted in connection with his application.

25       THE WITNESS:  Yes, Your Honor.

1          THE COURT:  Paragraph 19 and 20, he's referring to

2     May 19th again.  Is it your understanding that Mr. Schwartz

3     got that wrong too?

4          THE WITNESS:  Yes, Your Honor, because again --

5     (reads to himself) -- on this sentence, it's correct because

6     I called him after our hearing with you to come to Austin,

7     and that's what he's referring to there.

8          THE COURT:  Okay.  But is it possible that your

9     draft -- there was a draft on May 19th that was submitted,

10    and Mr. Schwartz started working for FSS around May 19th.

11    It's just the final draft of the document was dated -- with

12    the additional language and it was still dated May 19th

13    because that's when the work was done.  Happens all the time

14    in Chapter 11 cases.

15         THE WITNESS:  No, I understand what you're saying.

16    The answer is that Mr. Schwartz probably submitted something

17    to me, and I submitted something to Mr. Battaglia, but it

18    got lost in the paperwork and neither Shannon & Lee nor

19    Schwartz Associates or the CRO had an engagement letter

20    signed until June 6th.

21         THE COURT:  Okay.

22         THE WITNESS:  That's what happened.

23         THE COURT:  Completely understand.

24         THE WITNESS:  So whatever recitations I made about

25    May 19th, it was based upon an erroneous statement or

```
 1    assumption that I made and all those were written by me with

 2    that erroneous statement until I found this last night.

 3                THE COURT:  Okay.

 4                THE WITNESS:  That's my error.

 5                MR. SHANNON:  I don't know if this would be a

 6    redirect because I did say I pass the witness, Your Honor.

 7                THE COURT:  You did.  You did.

 8                MR. SHANNON:  I can wait.

 9                THE COURT:  Okay.  So why don't we take five

10    minutes and let everybody just take a moment, let everyone

11    stretch their legs out.  Why don't we -- it's 3:17, why

12    don't we come back at 3:25.

13                THE WITNESS:  Okay.

14                THE COURT:  Okay, thank you.

15                CLERK:  All rise.

16                (Recess)

17                CLERK:  All rise.

18                THE COURT:  Okay, we are back on the record in

19    Free Speech.  Mr. Lee, I'll remind you that you're still

20    under oath.

21                THE WITNESS:  Yes, Your Honor.

22                THE COURT:  Okay.  Mr. Nguyen, you may proceed

23    with cross examination and just get close to a mic.  I want

24    to make sure we can hear you.

25                MR. NGUYEN:  I will do my best, Your Honor.
```

1          THE COURT:  Thank you.

2          MR. NGUYEN:  Sometimes I forget.  Your Honor, I

3   got some assistance from Mr. Travis who will be --

4          THE COURT:  Okay.

5          MR. NGUYEN:  -- if I can ask Your Honor to give

6   him control, he's going to be -- I didn't, I was trying to

7   save paper.

8          THE COURT:  Okay.

9          MR. NGUYEN:  So he's going to be showing the

10  exhibits on the screen.  I can't see Mr. Lee's computer, but

11  is the screen --

12         THE COURT:  I think once I -- I think mister --

13  okay, you're good.  You should be --

14         MR. NGUYEN:  Okay.

15         THE COURT:  Okay.

16         MR. NGUYEN:  Great, and Mr. Travis, if you can

17  just go to 163-18 and we'll just start out with that email.

18  Maybe you can just make it a little bit bigger.

19              CROSS EXAMINATION OF KYUNG LEE

20  BY MR. NGUYEN:

21  Q    Mr. Lee -- nice to see you, Mr. Lee.

22  A    How are you, Mr. Nguyen?

23  Q    I'm doing well.  Thank you for asking.

24  A    Thank you.

25  Q    I just want to jump to this one before I forget.  This

1   was an email that you were discussing with Mr. Shannon about

2   -- I think the way you described it was this email was a

3   memorialization of a discussion between yourself and Mr.

4   Ruff.  Was that the testimony?

5   A    Based upon the first sentence.  "Following on our

6   conversation yesterday, please let me know when you've had a

7   chance to discuss these matters with Marc."

8   Q    Okay.  And did you respond to this email?

9   A    I don't know.

10  Q    You've attached Mr. Ruff's email, but -- and I think

11  you said he made some good points about the administrative

12  cost and the dismissal, but were you on board with

13  dismissing the InfoW cases on May 17th, when this email was

14  sent to you?

15  A    The answer is I don't think I made any kind of

16  decisions because I hadn't discussed it with Mr. Schwartz on

17  May 17th yet.

18  Q    So you think the Court should have the benefit of

19  seeing your response to this email just to determine your

20  mental state as of May 17th?

21          THE COURT:  (indiscernible).  Just curl the mic

22  down.  I want to make sure we can hear you.

23  BY MR. NGUYEN:

24  Q    You didn't attach your responses to the exhibit, right?

25  A    I didn't know what exhibits you're going to attach, so

1   no, I don't -- I didn't attach anything if that's what --

2   that's your question.

3           MR. NGUYEN:  Your Honor, I have a rebuttal

4   exhibit, if I can just hand it up to the party.

5           THE COURT:  Sure.

6           MR. NGUYEN:  And Your Honor, may I approach?

7           THE COURT:  Okay.

8           MR. NGUYEN:  I'm going to ask Mr. Shannon

9   (indiscernible).

10          MR. SHANNON:  Yeah, I'm not sure what this is in

11   rebuttal to that --

12          MR. NGUYEN:  Your Honor, the testimony was on May

13   17th.  There was a decision to dismiss the case based on --

14          MR. SHANNON:  I don't believe that was the

15   testimony, Your Honor.

16          THE COURT:  What's the --

17          MR. NGUYEN:  Your Honor, the use of this exhibit

18   without the response, they were making arguments that all

19   these were good points.  I'm just rebutting the fact that

20   they weren't on board at this time.

21          THE COURT:  If you want to impeach the testimony,

22   then --

23          MR. NGUYEN:  Sure.

24          THE COURT:  Then do that.

25          MR. NGUYEN:  Thank you, Your Honor.

```
 1   BY MR. NGUYEN:

 2   Q    Mr. Lee, did you respond to this email?

 3   A    Looks like I responded to, based upon what you showed

 4   me, looks like I did on 4:45 p.m.

 5   Q    And did you describe the email that I believe is on

 6   165-18 as a diatribe?

 7   A    Yes.

 8   Q    And you also told Mr. Ruff to send notice of

 9   depositions for Mr. Schwartz?

10   A    Right.

11   Q    And at this time, you hadn't made the decision to

12   dismiss the case, right?

13   A    That's correct.

14   Q    And --

15   A    We're fighting with the U.S. Trustee on May 17th.  That

16   is correct.

17   Q    Yeah, and you also sent the DOJ legal manual to Mr.

18   Ruff and you told Mr. Ruff to read the DOJ manual, is --

19   A    That's correct.  I was very upset with him.

20   Q    Did Mr. Ruff ever tell you not to amend your

21   declaration in the InfoW case?

22   A    We never discussed my declaration in InfoW case.  No.

23   Q    Okay. And earlier, you mentioned that you've been

24   practicing bankruptcy law since September of 1984, right?

25   A    That's correct.
```

```
 1   Q    Thank you.  And you file a lot of bankruptcy cases?

 2   A    I filed cases.

 3   Q    Okay.  And you're familiar with Rule 2014, correct?

 4   A    Generally, I am.

 5   Q    Okay.  And earlier, we went through the little history

 6   with the law firms that you were with and just so I can get

 7   it clear as it relates to the InfoW case, at this time,

 8   you're currently with Shannon & Lee LLP, correct?

 9   A    I am.

10   Q    And that started on June 1st, 2022, correct?

11   A    That is correct.

12   Q    And prior to Shannon & Lee LLP, you were with Kyung S.

13   Lee PLLC; is that correct?

14   A    That is correct, for 15 days.

15   Q    And that started May 15 to May 31st, 2022?

16   A    May 16th, 2022 through May 31.  I think May has 31

17   days.

18   Q    Okay.  And prior to -- I'm going to call it KSL PLLC --

19   you were with Perkins, Lee, and Rubio LLC, correct?

20   A    From August 1, 2022 through May 15th, 2022.

21   Q    Okay, so when the InfoW cases were filed on April 17th

22   and -- it was a midnight filling, so there's some cases in

23   April 17th and there was some cases on April -- one case on

24   April 18th, you filed with the firm Perkins, Lee, and Rubio.

25   A    That is correct.
```

1    Q    Okay.  And prior to the filing -- prior to the filing

2    of the InfoW cases -- and when I talk about InfoW case, I'm

3    talking about InfoW, IWHealth, and Prison Planet, those

4    cases --

5    A    Yes, sir.

6    Q    You were involved in the negotiation of the plan

7    support agreement?

8    A    Yes.

9    Q    Okay.  And you were representing these three entities

10   in the negotiation of those plan -- in the negotiation of

11   the plan support agreement, correct?

12   A    Yes.

13   Q    Okay.  And when you were negotiating on behalf of the

14   InfoW Debtors, you were -- well, who were you negotiating

15   with on the plan support --

16   A    Against or with?

17   Q    Who were the parties to the plan support agreement?

18   A    There was -- Ray Battaglia was representing Free Speech

19   Systems and Mr. Jordan was representing Alex Jones.

20   Q    So it was Alex Jones, Free Speech Systems, and the

21   InfoW Debtor.

22   A    That's right.  We were the party that was going to be

23   the recipient of the funds from Free Speech Systems as well

24   as Alex Jones under the plan support agreement.

25   Q    So there was Alex Jones, Free Speech Systems, and InfoW

1    Debtors, correct?

2    A    That's correct.

3    Q    Okay, thank you.  And then after the bankruptcy case

4    was filed, there was, I believe -- it's a restated and

5    amended plan support agreement that was filed with the Court

6    on April 29th --

7    A    Incorrect.  There was a restated and amended trust

8    agreement, but only an amended plan support agreement.

9    Q    Got it.  So there was an amended plan support agreement

10   filed with the Court on April 29 --

11   A    Correct.

12        THE COURT:  And Nguyen, I want you to take the

13   microphone and just take it -- just turn it down a little a

14   bit.  (indiscernible).

15        MR. NGUYEN:  I'm going to leave it right here.

16        THE COURT:  Well -- that's perfect.  Thank you.

17   And I apologize.

18        MR. NGUYEN:  I apologize, Your Honor.  Sometimes I

19   -- zoned in and I forget.  I'll be more mindful.

20   BY MR. NGUYEN:

21   Q    And Mr. Lee, the parties -- I'm stepping away.  The

22   parties to the negotiation under the amended plan support

23   agreement were the InfoW Debtors, Alex Jones, and Free

24   Speech Systems.  Correct?

25   A    Incorrect.

1    Q    Who else?

2    A    The trust lawyers.  LST.

3    Q    Mr. Okin

4    A    Mr. Okin and he represented the trust Trustees which

5    were former Judge Nelms and former Judge Schmidt.  They were

6    the primary ones involved in the negotiations because they

7    were the ones who were going to take over direction of the

8    case insofar as negotiations with the parties.

9    Q    Mr. Lee, are you familiar with the U.S. Trustee's

10   motion to dismiss in the InfoW cases?

11   A    I am.

12   Q    Thank you.  And we'll get back to that in a little bit.

13   And before the U.S. Trustee filed a motion to dismiss, the

14   Connecticut plaintiff and Texas plaintiff also filed motion

15   to dismiss -- motions to dismiss in the InfoW cases,

16   correct?

17   A    That is correct.

18   Q    Yeah.  And if I remember correctly, the Court set a May

19   27th hearing date for all three motions; is that correct?

20   A    That is correct.

21   Q    Okay.  And then there were deadlines for yourself in

22   representing the InfoWars Debtors (indiscernible) to respond

23   to three motions by May 230th, 2022?

24   A    I can't remember the exact day, but there were certain

25   deadlines set for us to respond to.

1    Q    All right.  You had to respond to all three motions,

2    correct?

3    A    That is correct.

4    Q    And earlier, you mentioned -- on May 3rd, you described

5    it as the world changed on May 3rd, right?

6    A    I think that's correct.

7    Q    Okay.  So as we got closer to the May -- I'll just say

8    May 20th deadline for you to respond, your objective at the

9    time was not to take care of the motion to dismiss but to

10   dismiss the plaintiff's claims with prejudice; is that a

11   correct statement?

12   A    I don't understand your question.

13   Q    Okay.  So there's two competing tasks that you have to

14   do, right?  One is to respond to our motion to dismiss and

15   the other task is to make sure that the claims against the

16   InfoW Debtors were dismissed with prejudice and you were

17   more focused on the second task as opposed to responding to

18   our motion to dismiss --

19   A    That's a fair statement.

20   Q    Okay, thank you.  So on May 18th, 2022, you filed a

21   document with the Court and in that document you were

22   requesting additional time to -- you were requesting

23   additional time to -- especially kicking out the deadlines,

24   right, the May 27th deadline to June and then extending your

25   deadline to respond to the U.S. Trustee's motions; is that

1   correct?

2   A    That motion asked for several things and it was subject

3   of negotiation between Mr. Ruff and me to kick out the

4   deadlines, discovery deadlines and everything else until I

5   had sufficient time to finish up the negotiations and the

6   stipulations with the dismissing creditors.

7           MR. NGUYEN:  Okay.  And Mr. Travis, can you pull

8   up Exhibit 165-6?

9   BY MR. NGUYEN:

10  Q    And Mr. Lee, are you familiar with this document?

11  A    Can I see the whole thing?

12  Q    Sure.

13          MR. NGUYEN:  Can you please scroll down to Mr. Lee

14  can see the whole thing?

15  BY MR. NGUYEN:

16  A    Yes, generally I'm familiar with this.  This is the one

17  that we sought some more time.  Yes.

18  Q    And is this a document that you drafted?

19  A    Yes, it is.

20  Q    Okay.  And in this motion, you were asking the Court to

21  continue the May 27th date to June 24th, 2022; is that

22  correct?

23  A    I can't read it right now, but --

24  Q    Okay.

25  A    If you say, if you represent that to be the case --

1   Q    Well --

2   A    -- then that's true.

3   Q    Well, let's let you see it.

4        MR. NGUYEN:  Can you scroll to Paragraph 18, Mr.

5   Travis?  And then if you just go to Page 6 a little bit, Mr.

6   Travis.

7   BY MR. NGUYEN:

8   Q    June 24th, 2022.  You see that?

9   A    Yes.

10  Q    So in your motion, the basis for that is restated in

11  Paragraph 21.

12       MR. NGUYEN:  Can you scroll down to Paragraph 21?

13  BY MR. NGUYEN:

14  Q    Mr. Lee, can you read Paragraph 21?

15  A    Sure.  "Continuing the original hearing date until June

16  will also permit a CRO who has been engulfed in evaluating

17  dismissals with prejudice issues to now focus on the

18  remaining creditors of the Debtors.  The CRO will be able to

19  evaluate either before or by the June hearing date whether

20  he should proceed with trying to confirm a subchapter plan

21  of reorganization or handle these claims outside of

22  bankruptcy.  Again, such efforts would be wise use of the

23  limited financial resources.  Such an approach will also

24  save valuable judicial resources."

25  Q    Okay.  And the question is, on May 18th, why do you

1    need an entire month for the CRO to accomplish this?

2    A    Because one, I had not known what else needed to be

3    done with respect to the rest of the dismissals.  For

4    example, we had a Connecticut hearing to dismiss the actual

5    cases up in Connecticut.  That was number one.  That was

6    supposed to take place the week after May 17th.

7         And number two, I needed time to evaluate all the

8    things that Mr. Schwartz hadn't been focusing in on and I

9    was just asking for time in order to be able to do that and

10   that was just my best guess as to what we needed to be able

11   to calmly evaluate because we hadn't had one second of time

12   since April 17th because we had filed the bankruptcy on

13   April 17th and we'd been working around the clock to figure

14   out everything and things had changed very quickly.  And so

15   I was trying to get as much time as possible for the Trustee

16   and for the law firm -- for the lawyers on our side to

17   evaluate which way we should go.

18   Q    Thank you, Mr. Lee.  Did any of the InfoW Debtors have

19   any claims against Alex Jones or Free Speech Systems?

20   A    Not to my knowledge.

21   Q    Did you check?

22   A    Well, sure.  We --

23   Q    Okay.

24   A    -- checked in our schedules, et cetera.

25   Q    Right.  That's good.  So IWHealth LLC had royalty

004885

1    payments, correct?

2    A    That is correct.

3    Q    Was it Longevity or Yongevity?  I always mess it up?

4    A    It starts with a Y.  Yongevity.

5    Q    Okay.  And at a certain point, the royalty payments

6    were deposited into the InfoW Debtors' accounts, correct?

7    A    IWHealth's account.

8    Q    IWHealth account.  But --

9    A    That's correct.

10   Q    But prior to that, where were the funds for the royalty

11   payments --

12   A    They may have been diverted prior to the time -- some

13   of them may have been gone to somebody else rather than to

14   IWHealth.

15   Q    When you say somebody else, could've gone to Alex

16   Jones.

17   A    That is correct.  It could've gone to Alex Jones.

18   Q    Okay.  And how many of those payments went to Alex

19   Jones?

20   A    We don't know.

21   Q    Did you check?

22   A    No, we did not.  Not to my -- I did not check.

23   Q    So if payments that are supposed to go to IWHealth is

24   going to Alex Jones, you think IWHealth has a claim against

25   Alex Jones for those payments?

1    A    Sure.

2    Q    Okay, thank you.  Let's get back to that motion.  So

3    you filed on the 18th.  It was an emergency motion and the

4    Court, as always, gave you a hearing the very next day, May

5    19th.  Correct?

6    A    If you say so.

7    Q    Okay.  Well, May 19th is an important date, right?  We

8    were in Court on May 19th?

9    A    It was an important date, because that's when we went

10   to go get the stipulations approved.  That's when all the

11   parties wanted to get the Texas stipulations approved.

12   Q    Were we in Court on May 19th?

13   A    Yes.

14   Q    Okay, thank you.  And May 19th was also important

15   because that morning you file your application to be

16   employed for the InfoW Debtors with your new law firm, Kyung

17   S. Lee PLLC, correct?

18   A    That is the day I filed my application.  That is

19   correct.

20   Q    And the application requested retention as effective of

21   May 16th?

22   A    That is correct.

23   Q    Great.  And since 1984, I'm assuming you've encountered

24   the word connections far as it relates to a bankruptcy case;

25   is that correct?

1   A    I have.

2   Q    Great.  So let's talk about your application on -- that

3   was filed on -- I believe it was filed on May 19th.

4        MR. NGUYEN:  And Mr. Travis, can you go to Docket

5   No. 165-3 which is, I believe, Mr. Lee's application in the

6   InfoW case.  And if you can just scroll down to Paragraph

7   22.

8   BY MR. NGUYEN:

9   Q    Do you see Paragraph 22, Subparagraph C on the screen,

10  Mr. Lee?

11  A    Yes.

12  Q    And Paragraph C is actually just a restatement of

13  Bankruptcy Rule 2014, correct?

14  A    Yes.

15  Q    And do you see the word person's connections there on

16  Subparagraph C on the second line?

17  A    I do.

18  Q    Is there any qualifier in front of the word connections

19  besides the person's connection?  Does it say material

20  connection?

21  A    No.

22  Q    Okay.  It's just connection, right?

23  A    That's correct way to read that sentence.  Yes.

24  Q    Okay.  And let's flip over to your declaration which is

25  on same exhibit.  If you can just go to 13 of 30.  Scroll

1    down to Paragraph 10.  Do you see Paragraph 10 right there

2    on the screen, Mr. Lee?

3    A    I do.  I've got it also on paper here.

4    Q    Okay, great.  So the second line in Paragraph 10 talks

5    about disclosable connections.

6    A    That's correct.

7    Q    What is the difference between a disclosable connection

8    and just a regular connection?

9    A    From my perspective if it's, for example, if you have a

10   conflict that should be a disclosable connection.  If you

11   have a connection that could mean something like, you know,

12   somewhat remote like come connection -- like you work with

13   somebody in the U.S. Trustee's office or you know somebody

14   in the Court system.  Again, you know, as I said on the

15   direct testimony, I look at it as whether or not such a

16   connection could bias you in a case or create some kind of a

17   adverse problem for you as a lawyer in a case.  That's how I

18   look at it.  So it's my own version of what I think should

19   be disclosed as -- if it adversely impacts you is the way I

20   think about it.

21   Q    Well, let's look at Paragraph 11 down there.

22   A    Sure.

23   Q    It talks about disqualifying connections.

24   A    Right.

25   Q    What is the difference between a disclosable

1    connection, a disqualifying connection?  What's the

2    difference between the two?

3    A    I think the --

4         MR. BATTAGLIA:  Your Honor, I'm going to object.

5    He's asking legal conclusions.  Mr. Lee is a lawyer, but

6    he's here right now as a witness.

7         THE COURT:  We're just asking what he meant, I

8    think.  I'm going to overrule that.  I think the question is

9    just trying to clarify what he meant in his declaration, not

10   whether it's a legal conclusion or not, just trying to make

11   an understanding as to what he meant.

12   BY MR. NGUYEN:

13   A    I think what I meant in the (indiscernible)

14   disqualifying connections is it's not a connection such that

15   it disqualified me from being counsel by virtue of having

16   that connection under Rule 2014.  It's not a conflict, as an

17   example.  I don't have any -- I didn't have a conflict in

18   being able to represent this Debtor, is my statement there.

19   Q    Is it your understanding that Rule 2014 requires you to

20   disclose all connection, not just only disclosable

21   connection or disqualifying connection?

22   A    Well, from my perspective?

23   Q    Yeah, I'm asking for your understanding.

24   A    My understanding is is that there has to be some limit

25   as to what connections you should disclose because if you

1    took the word literally, connections literally, you'd have

2    to disclose everything under the world, especially if you've

3    been a bankruptcy lawyer or professional forever.  That's

4    why you have language in it that says, you know, I've been

5    practicing the law for many years and so you may have come

6    across certain parties, et cetera.

7        That's why you have all those caveats, so the purpose

8    of, in my view, of a 2014 disclosure is to let Courts know,

9    for example, you have a connection that could adversely

10   affect you in doing your job.  That's how I looked at it.

11   That's how I look at it when I do my 2014 disclosures.

12   That's the way I think about it, like I did on my May 21

13   email to my client saying, do we have an issue here that we

14   need to think about.

15   Q    Okay.  Thank you.

16           MR. NGUYEN:  And Mr. Travis, can you turn to Page

17   18 of 30?  And when I say 18 of 30, I'm talking about the

18   Bates stamp on top.

19   BY MR. NGUYEN:

20   Q    You see the third paragraph down there, Mr. Lee?  It

21   says retainer.

22   A    Yes.

23   Q    The firm there is capitalized and when it says the

24   firm, right, that's KSL PLLC; is that correct?

25   A    Yes.  If that engagement letter is with KSL PLLC.

1   Q    Yeah, we're in the same document.

2   A    Okay.

3   Q    So, and then client is capitalized there.  You see down

4   there, the firm has not requested a retainer from the

5   client?

6   A    Right.

7   Q    Client is the InfoW Debtors, correct?

8   A    Can you scroll up?  I just want to make sure if that's

9   the same letter.  If the client is defined as the InfoW

10  Debtors, yes.

11  Q    Okay, great.

12  A    That's correct.

13  Q    So from reading this paragraph on the retainer, is it

14  fair to say that KSL PLLC did not request a retainer from

15  the InfoW Debtors; is that correct?

16  A    That is correct.

17  Q    Okay.  And if we can just turn back to the declaration

18  at Page 13 of 30.  You see Paragraph 9 there, Mr. Lee?  It

19  says, KSL PLLC has requested a retainer.  I'm just going to

20  stop it there.

21  A    Yes.

22  Q    Who -- if you didn't request a retainer from Mr.

23  Schwartz who was representing InfoW Debtors, who did you

24  request a retainer from?

25  A    It's again -- the fault is mine.  It's -- number one, I

1    never requested a retainer.  The language in Paragraph 9 is

2    incorrect.

3    Q    Did you read the declaration before you filed --

4    A    I did and the language there saying as requested

5    retainer is incorrect.  What the -- statement in the

6    engagement letter is the correct one, that I never got one

7    and I never requested one.

8    Q    Okay.  So next time, I should rely on the engagement

9    letter, but not the declaration?

10   A    Mr. Nguyen, I told you, I made mistakes and I'm telling

11   you this is a mistake and I'm owning up to it, so you know,

12   that's my mistake.

13   Q    That's fine.  So you didn't request a retainer from

14   anyone else?  You didn't ask any of the third party funders

15   to pay your retainer?

16   A    No.  First of all, it was a post-petition matter and I

17   thought it was going to very hard to get a retainer and so I

18   didn't ask one for InfoW.

19   Q    That's --

20   A    That's the major reason.

21   Q    So just to recap, so May 18th, the motion to extend a

22   bunch deadlines was filed.  On May 19th, the morning of, you

23   file the KSL PLLC application and then there was a hearing

24   scheduled for the afternoon on May 19th; is that correct?

25   A    That is correct.

1    Q    And on the afternoon of May 19th, you were requesting

2    additional time.  I think you were asking for a month, but

3    Mr. Ruff had an issue with a month.  He thought it was too

4    long; is that correct?

5    A    Yes, I believe that's correct.

6    Q    Okay.  And one of the reasons -- and we can pull the

7    transcript if need be -- you told the Court that you needed

8    this additional time because if the InfoW Debtors were going

9    to remain in Subchapter V, you might have to renegotiate the

10   plan support agreement, correct?

11   A    Well, I may have said that, but --

12   Q    Thank you.

13   A    Wait, wait, wait --

14   Q    He -- Mr. Shannon can bring you on redirect.  That's

15   all I needed.

16   A    But that's not what I said.

17   Q    So -- and then also before the hearing adjourned on May

18   19th, you also told the Court Mr. Schwartz in his fiduciary

19   capacity is evaluating alternative.  Do you recall telling

20   the Court that?

21   A    I did.

22   Q    Okay.  And when you say fiduciary capacity, fiduciary

23   capacity to who?

24   A    To InfoW Debtors.

25   Q    Okay.  Was one of the alternatives that you were

1    thinking at the time that Mr. Schwartz would be the chief

2    restructuring officer for Free Speech Systems?

3    A    When I made that statement, I was addressing a

4    different issue raised by the Court.

5    Q    Great.  The consideration of whether Mr. Schwartz

6    should be the CRO for Free Speech Systems actually occurred

7    on May 19th, correct?

8    A    No.

9    Q    There was no consideration on May 19th?

10   A    No.

11   Q    Okay.  After the hearing on May 19th, did you receive a

12   phone call from someone at Free Speech Systems?

13   A    From Ray Battaglia.

14   Q    Okay.  And Mr. Battaglia was representing Free Speech

15   Systems at the time, correct?

16   A    That is correct.

17   Q    Were you still in the courthouse when you received this

18   phone call?

19   A    No.

20   Q    How long was the conversation?

21   A    Very short, I believe.

22   Q    During the call, were there any discussions regarding

23   your potential engagement with FSS?

24   A    No.  It was a call basically saying please come to

25   Austin.

1    Q    Okay.  Was there any discussion of Mr. Schwartz'

2    potential engagement with FSS on May 19th?

3    A    No.  In fact, the discussion really revolved around the

4    need for somebody with a contact with a commercial bank,

5    Axos Bank, that needed a commercial banking relationship.

6    Q    After the phone call on May 19th with Mr. Battaglia,

7    you contact Mr. Schwartz and you said that on May 24th, you

8    were going to meet with -- I'm not sure who -- well, let's

9    step back.  There is an email from you on May 19th to Mr.

10   Schwartz telling Mr. Schwartz that you were going to make it

11   up to Austin on May 24th, correct?

12   A    Well, let's be real clear.  The email that I sent him

13   was what I sent him, at 5:24 p.m.  It's --

14   Q    Well --

15   A    -- three-line sentence email that says, "We are asked

16   to come to a meeting in Austin on May 24th."

17   Q    So the meeting on May 24th was scheduled on May 19th;

18   is that a fair statement?

19   A    It says, "I told Ray we can be there by 11:30 and see

20   if he can set up a meeting to start then.  We can do

21   Connecticut status hearing at 1 p.m. and continue with FSS

22   meeting thereafter in Austin."

23   Q    So --

24   A    That was at 5:24 p.m.

25   Q    So is it fair to say that on May 19th, there was a

1    meeting scheduled for May 24th in Austin?

2    A    Yes.

3    Q    Okay.

4    A    Yes.

5    Q    And excuse my ignorance.  I'm a northerner from Chicago

6    and I moved down here it's very cold in Chicago and I'm not

7    familiar with distances.  How long does it take to get from

8    Houston to Austin?

9    A    Three hours.  Or two-and-a-half hours, depending how

10   fast you drive.

11   Q    And does Mr. Battaglia live in Austin?

12   A    San Antonio.

13   Q    So how long does it take to drive from San Antonio to

14   Austin?

15   A    One-and-a-half hours or one hour, depending on how Ray

16   drives.

17   Q    Fair enough.

18          THE COURT:  Sorry.

19   BY MR. NGUYEN:

20   Q    The meeting on May twenty -- well, let me ask --

21          MR. BATTAGLIA:  To be fair, it's more traffic.

22   BY MR. NGUYEN:

23   Q    So the meeting that was scheduled on May 24, that

24   wasn't a meeting to renegotiate a plan support agreement,

25   was it?

1    A    Absolutely not.

2    Q    Okay.  Fair enough.  It was a meeting to discuss

3    potential restructuring for FSS; is that correct?

4    A    It was a meeting to discuss FSS generally and it was

5    just walking about the state of FSS condition and for people

6    to get background documentation on FSS.

7    Q    Where did you meet on May 24th?

8    A    At the offices of FSS.

9    Q    In Alvin Devane?  Is that how you --

10   A    That's correct, it's on Alvin Devane with all the

11   shaded windows and studios.  That's correct.

12   Q    And earlier we -- when we were going through the KSL

13   PLLC and we were going through connections and disqualifying

14   connection and disclosable connection, you think this was a

15   connection that needed to be disclosed?

16   A    The answer is, from my perspective, I didn't know yet

17   what it was because I didn't know what they wanted.  I

18   didn't know if they were going to retain me.  I didn't know

19   what was going on.  I just had an idea that we had -- we

20   were asked to come to a meeting.  We were going to discuss

21   things and I knew that insofar as it could involve that

22   representation, but nobody had promised me anything except

23   come to a meeting.

24   Q    And normally, do you drive three hours just to get

25   information from a potential client?

1    A     As a debtor counsel, I fly on airplanes to go to

2    meetings.  Yes.  Prospective clients.  Yes, I do.

3    Q     So let me understand.  So you don't think the

4    connection should've been disclosed on May 19th?

5    A     Well, here's the reason why.

6    Q     Well --

7    A     There was nothing I could disclose when I was here in

8    Court at 2 p.m., is what I'm trying to tell you, because I

9    didn't get the call until after I left the Court.

10   Q     So after you got the phone call after Court from Mr.

11   Battaglia and after you sent the email to Mr. Schwartz, you

12   -- at that point, there was a connection that was required

13   to be disclosed?

14   A     The answer is, I had -- I don't think I had a

15   connection that I could disclose because I didn't know what

16   that connection was.

17   Q     Who was at the meeting on May 24th?

18   A     Mr. Battaglia, Mr. Schwartz, I think Mr. Jordan showed

19   up for -- on behalf of -- and Mr. Jones.  I believe Mr.

20   Shannon showed up for the meeting.  And then at some point

21   in time, I believe Mr. Jones attended the meeting to give us

22   his views on things and also sign some of the agreements.

23   And I believe there may have been some other participants,

24   but those are the ones that I remember primarily.  Mr.

25   Schwartz was there and Mr. Battaglia and -- yeah, those are

1    the primary people.

2         MR. NGUYEN:   And Mr. Travis, can you go to 165-10?

3    BY MR. NGUYEN:

4    Q    So prior to coming to the meeting, you did some

5    research on FSS and then you emailed background research to

6    Mr. Shannon; is that correct?

7    A    Yes.

8    Q    Okay.  Thank you. And you see on the bottom there, it

9    says "Extended conference with client, Schwartz Associates,

10   B. Rowe, S. Jordan, and RJ Shannon to discuss options and

11   issues with FSS restructuring."  You see that?

12   A    Yes, I do.

13   Q    You see it says five hours there?

14   A    Yes.

15   Q    It says client there.  Who's the client?

16   A    I guess I was referring to FSS at that point in time.

17   Q    Was it Mr. Jones?

18   A    No.

19   Q    Mr. Jones, the owner of the company wasn't the client

20   at the time?

21   A    Mr. Nguyen, we've never represented Mr. Jones.  I've

22   never represented Mr. Jones.

23   Q    So who are you referring to client?  Because you list

24   everyone else.

25   A    Well, the memo, the invoice is being sent to FSS and

1   therefore I'm making it to FSS.  If I'd represented Mr.

2   Jones, I wouldn't be sitting here representing FSS today.

3   Q    Let me ask you.  Mr. Jordan.  Mr. Jordan was at that

4   meeting.  Who does Mr. Jordan represent?

5   A    Represents Mr. Jones.

6   Q    And on May 25th, you spent about three hours driving,

7   depending how fast you drive, and about five hours actually

8   meeting people at the facilities at FSS; is that correct?

9   A    You mean on May 24th, not 25th?

10  Q    I'm sorry, May 24th.

11  A    Yes.

12  Q    And --

13  A    That's right.

14  Q    And at that point -- and earlier, we talked about

15  connections and I won't go to -- you think there was a

16  connection on May 24th that needed to be disclosed?

17  A    No.

18  Q    No connection that needed to be disclosed to the Court?

19  A    No.

20  Q    You start billing for FSS on May 24th and you don't

21  think there's a connection that needed to be disclosed to

22  the Court?

23  A    I did not.

24  Q    Okay.  You think it's a problem that in your

25  declaration on -- in the KSL PLLC that there's a pending

1    declaration with the Court that says that you had no

2    connections to FSS and Alex Jones, you think that's an

3    issue?

4    A    Well, to me it was not, because the case was going to

5    be dismissed and we were not seeking employment anymore.

6    Q    And Mr. Schwartz was at this meeting, correct?

7    A    That's correct.

8    Q    Did Mr. Schwartz billed for this meeting?

9    A    I don't know.

10   Q    Does Mr. Schwartz generally do stuff without billing?

11   A    Lots of times he does.

12   Q    Good.  And the meeting as you notate on the entry, it

13   was to discuss options and issues with FSS restructuring,

14   correct?

15   A    Correct.

16   Q    Okay.  And I'm sure there's going to be an attorney-

17   client privilege.  I won't ask about the conversation, so

18   we'll just move on.  Prior to June 10th, did you tell any of

19   the Sandy Hook plaintiff or their attorneys that you were

20   doing work for FSS on May 24th?

21   A    No.

22   Q    Prior to June 10th, you didn't tell anyone at the U.S.

23   Trustee's office that you were working for FSS on May 24th;

24   is that correct?

25   A    That is correct.

1   Q    Prior to June 10th, you didn't tell the Court that you

2   were working for FSS on May 24th; is that correct?

3   A    That is correct.

4   Q    As a matter of fact, your trip to Austin on May 24th

5   was not disclosed to the Court until August 20th when you

6   filed your declaration in the Shannon & Lee application; is

7   that correct?

8   A    That's accurate.

9   Q    That's the first time you ever told any -- either the

10  Court, the U.S. Trustee, or the creditors that you made the

11  trip up to Austin on May 24th; is that correct?

12  A    That is accurate.

13  Q    And on May 24th, just to be clear, you were still

14  representing the InfoW Debtors, correct?

15  A    That is correct.

16  Q    So I just want to go back to -- if you go back to 165-

17  3.  So on May -- I believe May 19th, in your declaration at

18  Paragraph 19, if you can just go there.

19        MR. NGUYEN:  Paragraph 19, Mr. Travis.  Give me

20  one second.  I apologize.  Paragraph 19 on the motion.

21  BY MR. NGUYEN:

22  Q    Mr. Lee, can you read Paragraph 19 to me?

23  A    "The Debtors believe that KSL PLLC neither holds nor

24  represents a disqualifying interest that is adverse to the

25  estate and is a disinterested person.  If any new relevant

1    facts or relationships are discovered, KSL PLLC will

2    supplement its disclosure to the Court."

3    Q    But you told the Court this statement on May 19th,

4    correct?

5    A    That is correct.

6    Q    But you didn't supplement it, correct?

7    A    That's correct.

8         MR. NGUYEN:  Okay.  And let's go back to 165-10.

9    I apologize, Mr. Travis.  I'm jumping around a little bit.

10   BY MR. NGUYEN:

11   Q    Let's go through some of these time entries and just

12   make sure I understand what you were doing for FSS during

13   this time.  So on May 26, you were still representing the

14   InfoW Debtors, but you were looking at valuation reports for

15   PQPR on behalf of FSS; is that correct?

16   A    I was reviewing two reports that I found out about that

17   were historical regarding PQPR and FSS that had been

18   discovered that were like basically 2012, 2013 reports.

19   Q    So is that a yes to my question, sir?

20   A    Yes, it is.

21   Q    Okay, thank you.  And on May 28th and May 29th, you

22   were analyzing data from the state court counsel; you see

23   that?

24   A    Yes.

25   Q    Is that what you did on May 28th and May 29th?

1    A    Yes.

2    Q    Okay.  And when we think about state court litigation,

3    we're really thinking about the Texas litigation and the

4    Connecticut litigation, correct?

5    A    Well, what I'm referring to there is just merely the

6    Texas state court litigation, because I didn't have access

7    to the discovery in the Connecticut litigation.

8    Q    Who gave you the state court litigation production that

9    you were analyzing on May 28th?

10   A    I'm trying to think.  It must've been the Reynal firm.

11   Q    And it wasn't any documents from Connecticut, correct?

12   A    No.  It was not.

13   Q    Okay.  And towards the end of this, so from May -- I

14   believe May 24th to May 31st, you billed for a total amount

15   of $24,409.09; is that correct?

16   A    That is correct.

17   Q    Were you paid this amount?

18   A    Yes, I was.

19           MR. NGUYEN:  Okay.  If we can just go back to

20   Exhibit 165-9.  And if you go to Page 5 on the motion, Mr.

21   Travis.

22   BY MR. NGUYEN:

23   Q    Mr. Lee, do you see the footnote there on Page 5?  And

24   I'm going to read it to you.  "KSL PLLC received payment

25   from the Debtor of $21,986.59 for services provided to FSS

1    from May 24th, 2022 through May 31st, 2022."  And the

2    question is, did I read that correctly?

3    A    You did read that correctly.

4    Q    Okay.  Thank you.  And when were you paid for the legal

5    services for KSL PLLC?

6    A    I don't know it off the top of my head, but it's

7    something I could give you -- to you if you need that.  I

8    just don't know, but I think it was sometime in June or

9    July.  June.

10   Q    Okay.

11   A    I just don't know the answer off the top of my head.

12   Q    And you assisted Mr. Schwartz in the preparation of the

13   schedules and Statement of Financial Affairs in the FSS

14   case?

15   A    Yes.

16   Q    And you've been doing this for a while.  You know in

17   the Statement of Financial Affairs, there's a section that

18   requires disclosure of payments related to bankruptcy

19   services.  Are you familiar with that section?

20   A    I am.

21   Q    Okay.

22        MR. NGUYEN:  Let's -- if you can go to 165-2, Mr.

23   Travis.  And if you can turn to Page 9 of 28, right.

24   BY MR. NGUYEN:

25   Q    Do you see any payments disclosed to KSL PLLC on Line

1    11?

2    A    I think that we addressed that in the global head

3    notes, in the global notes with respect to the fact that

4    there were certain payments made and they were distributed

5    to the -- Schwartz Associates.  I think we were going to

6    supplement that also with the Ray Battaglia PLLC.

7    Q    You see how the payment to Shannon & Lee was disclosed

8    --

9    A    Yes.

10   Q    -- through the SA LLC Trust?

11   A    Yes.

12   Q    But the question is, do you see the KSL PLLC payments

13   here?

14   A    I do not.

15   Q    Okay, thank you.

16   A    I do not.

17   Q    And the Statement of Financial Affairs is signed under

18   penalty of perjury by Mr. Schwartz, correct?

19   A    That is correct.

20   Q    Okay.  And --

21   A    That is correct.

22   Q    And did you know, did Mr. Schwartz, do you know if he

23   looked over the Statement of Financial Affairs before it was

24   filed with the bankruptcy court?

25   A    He did, because --

1    Q    Okay.

2    A    He did.

3    Q    Would you agree with me that the payment to KSL PLLC

4    should be listed on the Statement of Financial Affairs?

5    A    Most likely.

6    Q    Is that a yes?

7    A    It is a yes.

8    Q    Thank you.

9    A    Yeah.

10   Q    So let's just talk about the InfoW cases and the

11   stipulations.  Beginning May 27th, you and -- and tell me if

12   it's before May 27 -- you and Mr. Ruff, you actually began

13   exchanging draft of a stipulated dismissal on May 27.

14   That's when the actual change of language happened, correct?

15   A    If you tell me that's what happened.  All I know is I

16   told him it was May 25th.  He sent me something based upon

17   the emails that I have, was -- I believe the first one he

18   sent me was probably on May 27th.

19   Q    Yeah. Don't look at the document --

20   A    Okay.

21   Q    -- ask you.  If you don't know the answer --

22   A    I don't know the answer to -- off the top of my head.

23   I have to look at a document.

24   Q    Fair enough.

25        MR. NGUYEN:  Mr. Travis, can you go to 163-26?  If

1    you scroll to -- can you scroll up a little bit, Mr. Travis,

2    please?  See the dates here.  Scroll all the way to the

3    bottom of this email chain.  If you scroll up one more to

4    the next email by Mr. Ruff.  If you can go to --

5    BY MR. NGUYEN:

6    Q    On May 27th, at about 3:16 p.m., Mr. Ruff sent you a

7    draft of the proposed stipulated dismissal, correct?

8    A    This email says that.  That's correct.

9    Q    Okay.  And on May 31st, if we scroll up, you circulated

10   some comments to the draft.

11   A    It's a rewrite.

12   Q    Right, and one of the issue you took with the

13   stipulated dismissal order that Mr. Ruff draft was, it says,

14   the motion to dismiss is granted.

15   A    That's correct.

16   Q    Okay.  And so we were exchanging language as of May

17   31st, but there wasn't no agreement to dismiss the case,

18   correct?

19   A    Mr. Nguyen --

20   Q    Was there signatures on --

21   A    The answer to your question about the signatures is

22   there was no --

23   Q    Okay.

24   A    -- the concept of this agreement --

25   Q    And --

1    A    -- authority in place.

2    Q    And then on June 1st, there's an email from Mr. Ruff.

3    Do you see that?  It's a long email in response to your

4    draft of the stipulated dismissal.  Mr. Ruff had some issues

5    with how your draft was drafted, correct?

6    A    Yes, sir.

7    Q    And one of the issues he took was there were

8    exculpations on your draft of the stipulated dismissal,

9    correct?

10   A    That is correct.

11   Q    Okay.  Why did you feel the need to include an

12   exculpation clause?

13   A    Well, in light of the fact that the Trustee was

14   opposing the professionals from getting retained and that if

15   we would -- gotten retained and gotten final fee

16   applications approved, we would've had the protections of

17   the bankruptcy court, so since the Trustee was saying they

18   wanted the cases dismissed and did not want the

19   professionals to be retained, we thought at least that we

20   should ask for exculpation in light of the fact that the

21   Trustee was standing in the way of us getting retained.  I

22   thought that was a reasonable ask.

23   Q    And so after this email, we cleaned up the stipulated

24   dismissal order and the stipulation was actually filed with

25   the Court on June 1st, correct?

1    A    That is correct.

2    Q    Okay.  And prior -- well, let me strike that.  And you

3    understand on June 1st, even though my office and yourself

4    agreed to dismissal via our stipulation, the cases weren't

5    dismissed until Judge Lopez put his signature on that

6    stipulation, correct?

7    A    I do agree with that.

8    Q    Okay.  So on June 1st, the representations of the InfoW

9    Debtors was not over.

10   A    That is correct.

11   Q    And so the stipulation was filed on June 1st and then

12   on June 2nd, you file on behalf of InfoW, Debtors' omnibus

13   response to motion to dismiss.  Is that correct?

14   A    That's correct.

15   Q    Okay.  You drafted this response?

16   A    Mr. Shannon and I both worked on it.

17   Q    Okay.  What was the point of filing a response to the

18   motion to dismiss if the parties already stipulated?

19   A    There were several reasons for it.  Number one, there

20   were allegations that were outstanding that people were

21   going to use against the InfoW Debtors in a negative way and

22   so we felt as a fiduciary it was it was incumbent upon us to

23   set the record straight as to what happened in the case.

24   That was number one.  Number two, everybody thought that the

25   case had been filed in bad faith and made those allegations

1    as the central core of any pleading they filed, and I

2    thought it was important for the Debtor to set the record

3    straight before the case was dismissed so that things like

4    this wouldn't happen again.

5    Q    Okay.

6    A    So it was incumbent upon us to file that as a fiduciary

7    to set the record straight.  And number three, we didn't

8    want pleadings that were filed that didn't go unchallenged

9    in that case because of the publicity and all the issues

10   that surrounded it.  So we thought it was incumbent upon the

11   Debtors to set the record straight before the cases got

12   dismissed completely.

13   Q    And it was setting the record straight as to

14   allegations against the InfoW Debtors.  The purpose of the

15   response was not to defend Alex Jones and Free Speech

16   Systems, the client you were representing on the day that

17   you filed the response, correct?

18   A    Mr. Nguyen, we were representing the InfoW Debtors.  As

19   you will read in the response, it was a response by the

20   three Debtors.

21   Q    Okay.  Let me ask -- so the purpose of the response was

22   not to defend Alex Jones and Free Speech Systems, correct?

23   A    There is not one word in that response, docket number

24   whatever it is, that defends FSS or Alex Jones.  It defends

25   the rationale for filing the InfoW Debtors' bankruptcy cases

1   and it defends the allegations that made by the U.S. Trustee

2   and the plaintiff saying it was a bad faith filing.

3   Q    And in your response on June 2nd, you used the word

4   independent to describe the CRO.  Isn't it a little bit

5   misleading to describe the CRO as independent when the CRO

6   is working for Free Speech Systems?  It's a yes or no

7   question.  Is it misleading to --

8   A    It is not misleading, Mr. Nguyen.

9   Q    Thank you.  And earlier you testified I think around

10  May 24, you were no longer seeking to be employed by the

11  InfoW Debtors, correct?

12  A    That is an incorrect statement of what I testified to.

13  I testified that as of May 21, I'd already decided based

14  upon the position you had -- your office had taken and the

15  analysis that I'd done that we were no longer seeking to be

16  retained as of Saturday, May 21 when I finished my memo and

17  analysis.

18  Q    Okay.

19        MR. NGUYEN:  (indiscernible) just pull up -- if

20  you can pull up 165-7.

21  BY MR. NGUYEN:

22  Q    Let me ask you this.  On June 2nd, did you still have

23  fiduciary duties to the InfoW Debtors?

24  A    I did.

25  Q    Even though you were not seeking employment?

1    A    I did.

2    Q    Okay.  And isn't it a little bit misleading to say that

3    the fiduciary duties were clear and unwavering when you were

4    employed by FSS at that time?

5    A    No.  The duties that I had to InfoW Debtors were

6    unwavering and they were fulfilled to 1,000 percent on June

7    2nd through June 10th.

8    Q    Okay, so -- but on June 2nd, you were drafting the

9    first day declaration for FSS, correct?

10   A    What has that got to do with the fiduciary duty

11   obligations that I had to InfoW Debtors?  I fulfilled every

12   one of them.

13   Q    Again, on June 2nd, you were drafting the first day

14   declaration for Mr. Schwartz for the FSS --

15   A    The answer is, Mr. Nguyen, I was putting together a

16   draft declaration for Mr. Schwartz as CRO for FSS, which had

17   nothing to do with InfoW Debtors.  The three Debtors had

18   been dismissed by the plaintiffs.  They had no relationship

19   with FSS at that time except for one relationship which was

20   stable and no dispute between them.

21   Q    So in that June 2nd filing, nowhere in that filing did

22   you mention you started working for FSS; is that correct?

23   A    That is accurate.  That's correct.

24   Q    Nowhere in that filing did you mention that Mr.

25   Schwartz was at this time working for FSS; is that correct?

1    A    That is also accurate.

2    Q    And earlier, you mentioned that by the time you filed

3    this, I guess it's a response on June 2nd, you were no

4    longer seeking employment from the InfoW Debtors.

5         MR. NGUYEN:  Mr. Travis, can you scroll down to

6    the signature line?  Go up one, to the motion, the signature

7    line on the motion.  All the way at the bottom.  At the

8    bottom of the motion.

9    BY MR. NGUYEN:

10   Q    You see where it says proposed counsel for the Debtor?

11   Who were you proposing to be counsel to the Debtor when you

12   signed that signature?

13   A    The Debtors, the InfoW Debtors.

14   Q    And you were proposing to the Court to be the Debtor,

15   right, when you signed that signature?

16   A    That's how I called myself.  That is correct.

17   Q    Okay.

18   A    And so I call myself that the entire time between May

19   19th through June 10th.

20   Q    And until the end of June 10th, you didn't resolve the

21   KSL PLLC application, correct?

22   A    That is also correct, Mr. Nguyen.

23   Q    Mr. Schwartz didn't withdraw his application as of June

24   10th, correct?

25   A    That is also correct.

1    Q    And there was no amendment, no supplements to any of --

2    to either of the applications in the InfoW case, correct?

3    A    That is correct.

4    Q    And on June 10th, the Court conducted a hearing on the

5    stipulated dismissal, correct?

6    A    I think the Court really conduct -- took up the

7    stipulation.  I don't know if it conducted a hearing, but

8    basically took up the stipulation.

9    Q    Fair enough.  And you appeared at the June 10th hearing

10   but you were on video.  I believe at the time, you were with

11   your mother in California?

12   A    I was at my niece's high school graduation.

13   Q    Right.

14   A    So Mr. Shannon was here in person and I appeared via

15   video.

16   Q    Okay.  So Mr. Shannon was here and was -- Mr. Schwartz

17   was here as well?

18   A    I don't recall whether he attended or not.

19   Q    And do you recall Mr. Shannon making the announcement

20   that there was a new firm, Shannon & Lee LLP at the time?

21   A    I believe so.

22   Q    Okay.  But there was no announcement of any connections

23   to FSS on June 10th; is that correct?

24   A    That is -- I don't recall any.

25   Q    Okay.  And let me ask you this.  Like, when did the

1    representation of the InfoW Debtors end?  Did it end with

2    the stipulated dismissal?

3    A    In my view, it ended -- it terminated really all for

4    practical purposes when the case was dismissed, because

5    there was no longer need for counsel to aid them in their

6    restructuring which was the scope of our engagement.

7    Q    Okay.

8    A    And so that's how I viewed it, because the scope of our

9    engagement was, the matter was to help them in their

10   restructuring.  When the case got dismissed as of June 10th,

11   the purpose of our engagement and the scope of our matter

12   disappeared.

13   Q    Okay.  Give me one second --

14   A    Sure.

15        THE COURT:  I think he meant me, Mr. Lee.

16        THE WITNESS:  I'm sorry.  I apologize.  I'm sorry,

17   Your Honor.  You know, when you get sitting up here, you

18   kind of fade away.  I apologize.

19   BY MR. NGUYEN:

20   Q    Mr. Lee, when the Texas plaintiff and the Connecticut

21   plaintiff dismissed their claims against the InfoW Debtors,

22   were there remaining claims?

23   A    Yes.

24   Q    About $140,000 in claims?  Is that --

25   A    I think there were closed to $190,000 of claims and

1   then there were still unknown facts, but there were about

2   four claimants and it turns out that maybe one of them had

3   been paid and -- so, but there was uncertainty about them,

4   but there was about four claims remaining.

5   Q    And was FSS a joint Debtor to those claims?

6   A    Yes, they were.

7   Q    Thank you.

8        MR. NGUYEN:  No further questions, Your Honor.

9   Thank you for --

10       THE COURT:  Okay.

11       MR. NGUYEN:  -- opportunity.

12       THE COURT:  Mr. Shannon -- well, let me, before

13  you go there, let me ask, does any other party who opposes

14  the retention of either Mr. Lee or Ms. Schwartz have any

15  questions?  Okay.  Mr. Shannon, any redirect?

16       MR. SHANNON:  Yes, Your Honor, just a couple

17  questions.

18       THE COURT:  Okay.  Before you begin, I'm going to

19  take back the power of the screen, just so -- yep.  Perfect.

20  Thank you.  Mr. Shannon, please proceed.

21            REDIRECT EXAMINATION OF KYUNG LEE

22  BY MR. SHANNON:

23  Q    Mr. Lee, I just want to clarify something.  Who does

24  Shannon & Lee LLP propose to represent in this case?

25  A    Free Speech Systems LLC, the Debtor.

1    Q    Has Shannon & Lee LLP ever represented Alex Jones?

2    A    We have never represented Alex Jones.

3    Q    Have you ever represented Alex Jones?

4    A    I have never represented Alex Jones.

5    Q    Mr. Lee, did you sign the Debtor's schedules and

6    Statement of Financial Affairs?

7    A    I did not.

8    Q    I want to talk a little bit about the request for

9    exculpation and the reason for the response.  Has there

10   been, in these cases or -- rewind that.  In the InfoW cases

11   and the surrounding litigation, has there been a history of

12   sanctions sought?

13   A    Yes.

14   Q    Has there been sanctions that were sought against the

15   attorney who removed those cases?

16   A    Absolutely.

17   Q    And the bankruptcy court -- I'm actually talking about

18   particularly the cases, the Texas cases that were removed

19   from Austin State District Court to the Texas Bankruptcy

20   Court -- Western District of Texas Bankruptcy Court.  Were

21   there requests for sanctions against the attorneys who

22   provided services to the InfoW Debtors in that?

23   A    Yes.

24   Q    Now, where those sanctions against Shannon & Lee LLP?

25   A    Not necessarily.  Some of them could be, but they were

1   asserted against state court counsel and we didn't know how

2   far they could reach.

3   Q    And those are attorneys who provided services to the

4   InfoW Debtors, correct?

5   A    That's correct.

6   Q    Okay.

7            MR. SHANNON:  No further questions, Your Honor.

8            THE COURT:  Okay.  Any further redirect?  Okay.

9   Mr. Lee, thank you for your time.

10           THE WITNESS:  Thank you, Your Honor.

11           THE COURT:  Mr. Shannon, do you have any other

12   witnesses or any other evidence?

13           MR. SHANNON:  Yes, Your Honor.  If it's okay with

14   the Court, Mr. Lee was going to now handle questions of Mr.

15   Schwartz.

16           THE COURT:  Okay.

17           MR. LEE:  Call Mr. Schwartz.

18           THE COURT:  Okay.

19           MR. NGUYEN:  Your Honor (indiscernible).

20           THE COURT:  All right.  Good to see you, again.

21   Do you swear to tell the truth, the whole truth, and nothing

22   but the truth?

23           THE WITNESS:  I do.

24           THE COURT:  Okay.  Please have a seat.  And if you

25   can pull that microphone close to you.  Just want to make

```
 1   sure that we can all hear each other.  Mr. Lee, just from --
 2   I want you to take as much time as you want.  I'm just
 3   thinking from a timing standpoint, we can -- we're going to
 4   go until we're done today.
 5           MR. LEE:  Thirty minutes?
 6           THE COURT:  Okay.  No, no, no, I just -- so why
 7   don't we then do a direct, take a short break, and then
 8   we'll come back and do cross like we did before.  Okay?
 9           MR. LEE:  Okay.
10           THE COURT:  Okay.  Thank you.
11               DIRECT EXAMINATION OF MARC SCHWARTZ
12   BY MR. LEE:
13   Q    State your name for the record.
14   A    Marc Schwartz.
15   Q    And how many years have you been in the financial
16   restructuring business?
17   A    Since around 1984.
18   Q    And during that period of time, have you generally been
19   keeping up with your ethical requirements of practicing in
20   the bankruptcy court?
21   A    Trying to.
22   Q    What does that mean?
23   A    Well, I have to meet ethical requirements.  I'm a CPA.
24   Specific requirements are laid out every two years.  In the
25   bankruptcy arena, I don't have that formality, but I am
```

 1    trying to stay aware of the issues as -- what's come up.  I

 2    do (indiscernible) the AICPA's code of ethics usually works

 3    pretty well.

 4    Q    Now, you've testified before this Court in this case,

 5    correct?

 6    A    Yes.

 7    Q    And you've also appeared before this Court in the InfoW

 8    bankruptcy case, correct?

 9    A    Yes.

10    Q    So could you tell the Court generally just your

11    educational background and we'll talk about your other

12    background after that, but tell the Court where you went to

13    school -- college.

14    A    College.  I had bachelor of economics from Princeton

15    University, master in accounting and finance from University

16    of Chicago's Booth School of Business.

17    Q    And you finished your MBA in how many years?

18    A    One-and-a-half.

19    Q    All right.  And how were you able to do that?

20    A    Well, I went summer school and I (indiscernible)

21    economics (indiscernible) Princeton.  I placed out of a lot

22    of courses, so I was able to (indiscernible) prior hours

23    with -- you know, (indiscernible) classes.

24    Q    So after you graduated from University of Chicago, what

25    did you do in your career?

1    A    I went to work as a junior accountant for firm of --

2    became PriceWaterhouseCoopers in its Chicago office.

3    Q    And how long did you stay there?

4    A    I was with (indiscernible) Coopers and Lybrand for 20

5    years.

6    Q    And were you working in the restructuring financial

7    advisory space at that point in time?

8    A    Yeah.  I was technically still in the audit practice

9    and I had significant audit clients, but I was in charge of

10   the forensic evaluation services practice in Houston, which

11   included -- I started doing my bankruptcy work with them in

12   '84 and continued that, doing that bankruptcy work here.

13   Q    Have you been working in the bankruptcy field since

14   '84?

15   A    Yes.

16   Q    And in that time period, what type of work have you

17   been doing in the bankruptcy field?

18   A    Well, '84 we started doing work for Chapter 7 Trustees

19   in the area of compliance work, i.e., tax compliance.  In

20   addition in connection with litigation, we got involved

21   working with -- for the Trustees on some of the larger

22   litigation projects.  I mean, (indiscernible) I had 1,100

23   Chapter 7 cases open.

24   Q    How about your experience in the Chapter 11 arena?

25   A    I worked in Chapter 11, really, that in 1993, for me.

1    I did some Chapter 11 work prior to that, doing some

2    committee work in the '80s, '90s, doing some debtor --

3    assistant counsel for debtors, preparing companies' filing

4    and then serving during the bankruptcy itself.  And in '93,

5    when I left Coopers and U.S. Trustee's office called me and

6    asked me to get involved in a Chapter 11 as Trustee and

7    that's when I started doing trustee work which expanded to

8    trusteeships, examiners, examiners with expanded powers.  I

9    still do get some debtor-creditor work as well.

10    Q    Now, do you also do receiver work?

11    A    Yes.

12    Q    Now, do you understand the concept of being a

13    fiduciary?

14    A    I believe I do, yes.

15    Q    Can you tell the Court and the parties here what your

16    understanding of what a fiduciary means?

17    A    Being a fiduciary means that (indiscernible) a

18    fiduciary, you owe a duty to the party whose assets, whose

19    business, whose -- you've been placed in responsibility

20    over.  And that means that that duty is their interest

21    supersedes your interest.

22    Q    Since you've been involved in this area of

23    restructuring and financial advisory, have you ever been

24    reported for violations of any of your ethical obligations

25    to a client or to a party?

```
 1   A     No.

 2   Q     Mr. Schwartz, I want to first turn your attention to

 3   the topic of your May 19th letter and if you'll take a look

 4   at the small binder that's in front of you.  First of all,

 5   before you go into this binder and look at these two

 6   exhibits or three exhibits, can you explain to the Court the

 7   controversy that you're aware of regarding the -- your

 8   engagement letter of May 19th, 2022?  Are you familiar with

 9   the various allegations and challenges to that letter?

10   A     Well, I'm (indiscernible) the fact there's -- that the

11   (indiscernible) of the letter has brought a lot of attention

12   and I will right now tell you (indiscernible) what you said,

13   I'm the one who put the May 19 on there.

14   Q     Let's talk about -- let's give the judge and the

15   parties exactly the reasons why the confusion was first

16   created.  Because as I read the objection, you were asked

17   certain questions at a previous court hearing and you seemed

18   to indicate that you sent this letter on or about May 19th.

19   A     I did.  I sent the letter to you.  (indiscernible)

20   asked me to get a draft of an engagement letter.

21   Q     All right.

22   A     I sent you all a draft.  I (indiscernible) had

23   everything.

24   Q     Now, did that letter that you sent to me as you now

25   discover turn out to be the letter that was signed by the
```

1    client FSS on June 6, 2022?

2    A    No.  It was not my draft.

3    Q    Okay.  Now let's turn to Exhibit No. 178-1, 178-2, 178-

4    3.  That's in front of you, that little binder.

5    A    Okay.  I'm sorry.

6    Q    Okay?  Mr. Schwartz, take a look at it and I don't know

7    if --

8            MR. LEE:  Have these been admitted, Mr. Nguyen?

9            THE COURT:  Yes, they have.

10   BY MR. LEE:

11   Q    Can you tell the Court, first of all, when I showed you

12   these emails regarding these letters, this exchange?

13   A    Well, recently, like yesterday, yeah.  I mean, because

14   I'd forgotten about this exchange.

15   Q    And so tell the Court what happened here that -- and

16   summarize it for the Court on Exhibits 1, 2, and 3 and how

17   the engagement letter that was ultimately signed and

18   attached to your application came about.

19   A    Well, May 19th, as I said, I believe I sent it to you.

20   You asked me to re-send it to you on Sunday, June 5th which

21   fits with (indiscernible) kind of got lost somewhere.

22   (indiscernible) modifications to it and sent me back those

23   revisions on Sunday, June 5th at 3:40 in the afternoon.  I

24   accepted those revisions and had -- where it is -- yeah.

25   Yeah, I accepted those revisions at 4:20 that day

1   (indiscernible) asked me to go ahead and print out.  When I

2   did that, I went ahead and put the date of May 19th on it

3   because that's when I originally drafted it.  May 24th, a

4   few business days later is when we -- I visited Austin with

5   you.

6   Q    Okay.

7   A    (indiscernible).  I think, Judge, you mentioned it

8   happens in bankruptcy.  I sit there and with all this is

9   because I did not put in front of this, as of May 19th, this

10  letter.  That was what my thinking was.

11  Q    so the engagement letter that you sent on May 19th was

12  never executed, correct?

13  A    Correct.

14          MR. CHAPPLE:  (indiscernible).

15          THE COURT:  Sustained.

16  BY MR. LEE:

17  Q    Which engagement letter was executed by the client on

18  June 6, 2022?

19  A    The one that (indiscernible) took to Austin on

20  (indiscernible) on June 5th is my -- yeah, I would've

21  prepared it on June 5th.

22          THE COURT:  Overruled.

23  BY MR. LEE:

24  Q    Mr. Schwartz, I want you to turn to Exhibit 23 in your

25  big binder, please.

1    A    I have it.

2    Q    Do you recognize the Exhibit No. 23?

3    A    (indiscernible) be related to the Austin visit starting

4    at 11:30.

5    Q    To the best of your recollection, do you recall whether

6    or not I or anyone else from any other party mentioned to

7    you to come to a meeting regarding FSS prior to my sending

8    you this email on May 19th, 2022 -- 5:24?

9         MR. CHAPPLE:  Objection (indiscernible).

10        THE COURT:  Sustained.

11   BY MR. LEE:

12   Q    Mr. Schwartz, do you recall reading this email at 5:24

13   on that date?

14   A    Yes.

15   Q    Was this the first time you read this email?

16   A    Yeah, five -- yes.  That date at 5/24 was the first

17   time I read it.

18   Q    And was this the first time the subject matter came up

19   that's contained in this email?

20   A    Yes.

21   Q    Had you ever had this subject come up before this time?

22   A    No.

23   Q    And what did you do in response to this email?

24   A    What did I do in response?

25   Q    Yes, sir.  If anything.

1   A    Okay, I looked at my calendar to see if I could be in

2   Austin with you on the 24th.

3   Q    Now turn to -- looking to Exhibit No. 24.

4        THE COURT:  Before you go there.  So the email

5   says, "I told Ray we can be there by 11:30."  What did you

6   understand that, if the topic had never come up?

7        THE WITNESS:  The 11:30?

8        THE COURT:  It said --

9        THE WITNESS:  (indiscernible).

10       THE COURT:  It said, "I told Ray we can be there

11  by 11:30."  The question before you was that before this

12  email the topic had never come up and I'm just trying to

13  understand then what did you understand that you were going

14  -- be there by 11:30.  What did you understand at that time?

15       THE WITNESS:  My typical experience is when

16  someone asks, like a lawyer or someone asks me to a meeting,

17  they have a project in mind.

18       THE COURT:  So you knew at some point before this

19  email that you were going to be asked to go to a meeting?

20       THE WITNESS:  No.  I didn't know until I -- that I

21  was going to be asked.

22       THE COURT:  That's what confusing.  The email

23  starts and says, "I told Ray we can be there by 11:30."  So

24  --

25       THE WITNESS:  (indiscernible), Mr. Lee told me

1    that Ray had said can you come to Austin for a meeting.

2              THE COURT:  That's what I was trying to --

3              THE WITNESS:  -- on the 24th.

4              THE COURT:  -- understand.  And that was -- was

5    that before this email?

6              THE WITNESS:  Yeah, because then this is the

7    confirming the time.

8              THE COURT:  Do you recall when that --

9              THE WITNESS:  That would've been -- this is --

10   well, it had to have been after the hearing because we

11   didn't know about it before the hearing.  So (indiscernible)

12   --

13             THE COURT:  Okay.

14             THE WITNESS:  -- five or 4:30.

15             THE COURT:  Thank you.

16   BY MR. LEE:

17   Q    All right.  Mr. Schwartz, I asked you to take a look at

18   Exhibit No. 24 and see if you recognize that document.

19   A    Yes.

20   Q    Can you describe that document to the Court?

21   A    (indiscernible) a summary I prepared and sent of

22   (indiscernible) evaluation of the situation we were in with

23   the three debtors and possible approaches and, quite

24   frankly, look at the economics of various alternatives we

25   had.

1   Q   Okay.  Mr. Schwartz, had you been thinking about how to

2   proceed with the InfoW cases before I wrote you this email

3   on May 21?

4   A   I'd been thinking about it since we got the first word

5   that they wanted to dismiss us at the time without

6   prejudice.  So I knew, okay, if they're smart they're going

7   to (indiscernible) dismiss us with prejudice and we need to

8   think about what happens then.

9   Q   So tell the Court what you did in response to the --

10   once you read this email from me on Saturday, May 21.  What

11   type of actions or response, if any, you did in reaction to

12   my email that I sent you.

13   A   I told you we have to stop this through -- get this

14   case dismissed.  We can't afford to keep us working on this

15   when there's (indiscernible) benefit to the estate of us

16   doing that, nor economic benefit.

17   Q   And what kind of analysis did you do in order to come

18   to that conclusion?

19   A   My analysis (indiscernible) whole lot.  I -- you know,

20   what's, you know, we don't have any assets to recover.  We

21   can incur fees.  We had seventy-something thousand dollars

22   in the bank (indiscernible) I'm going to blow this $70,000

23   and what do we have to show for it.  Nothing.  And if we get

24   out of here there's still $50,000 in the estate.

25   Q   Now, was there at some point in time -- look at Exhibit

1    No. 25.  Do you recognize Exhibit No. 25?

2    A    Yes.

3    Q    And what is that document?

4    A    This is an email you sent me attaching a draft of the

5    motion to dismiss, the 5/23/22 draft telling me about that

6    and also telling me we're going to skip the 341 meeting.

7    Q    And was the -- what was the rationale for us moving as

8    quickly as we did to try to get these cases dismissed at

9    that point in time?

10   A    Because it's just costing money.  You know, it's

11   costing expensive professional time.

12   Q    So do you recall also that I had attended a hearing on

13   May 19th with the bankruptcy court?

14   A    Yes.

15   Q    And that I explained to the Court that we had to

16   evaluate alternatives; do you recall that?

17            MR. CHAPPLE:  (indiscernible).

18            THE COURT:  Sustained.

19   BY MR. LEE:

20   Q    Do you recall what I told the Court on May 19th

21   regarding the future of the bankruptcy case?

22   A    Yes.

23   Q    And what -- do you recall what I had told the Court?

24   A    You just said, we're looking at alternatives.  I went,

25   okay, fine.  He (indiscernible) lawyer.  I said, dismiss it.

1    Q    All right.  Now, one of the things that's been asked of

2    you or alleged against you is that you had apparently been

3    on both sides of the transaction.  Are you aware of that

4    allegation?

5    A    I'm aware of the allegation.

6    Q    Mr. Schwartz, in your job over the last 40 years in the

7    bankruptcy arena as a financial advisor, do you understand

8    the term being on both sides of a transaction?

9    A    Yes.

10   Q    Tell everyone here what that means to you.

11   A    What it means to me is quite literally wearing two

12   hats, your hats are negotiating with each other and you're -

13   - so you're really negotiating with yourself.  Or some

14   portion of it's yourself.

15   Q    So let's talk about the plan support agreement.  Before

16   the bankruptcy was filed, tell the Court what role you

17   played on behalf of InfoWar debtors with respect to the

18   negotiation of the plan support agreement, if any.  And I

19   remember you came on the scene, so tell the Court what role

20   you played in formulating that document before the petition

21   date of April 17th.

22   A    In formulating, I'm almost none -- none other than, I

23   mean, the last (indiscernible) I had to review, but the

24   substantive economics were established before I came along.

25   The concept of the trust, the concept of the trustees, the

```
 1    concept of the (indiscernible) judges preexisted

 2    (indiscernible).  I always (indiscernible) to look for

 3    implications that I could (indiscernible) for the Debtors

 4    that (indiscernible) may not like but -- and just generally

 5    doesn't make sense to me or is there anything confusing in

 6    it, but it --

 7    Q    And then do you recall so far the testimony that those

 8    agreements, the declaration of trust as well as the plan

 9    support agreement went -- underwent revision from April 17th

10    to April 29th?  Do you recall that testimony?

11              MR. CHAPPLE:  Objection.

12              THE COURT:  Overruled.

13    BY MR. LEE:

14    A    (indiscernible) those revisions.

15    Q    What role did you play in those discussions and

16    negotiations?

17    A    None.

18    Q    And why was that?

19    A    That was because the judges had their counsel looking

20    at it and they basically went away and looked at it and

21    worked on it and worked on it and worked on it, and then all

22    of a sudden, there was the product.

23    Q    And do you recall that it was on, what, April 29th,

24    2022 as ECF 48 which got filed on the record?

25    A    Yes.
```

1    Q    Would it still be -- would it be fair to say that the

2    world changed for InfoW Debtors on June 3rd or 6th when the

3    plaintiffs decided to dismiss the claims against the Debtor?

4    A    June 3rd --

5    Q    Third.

6    A    (indiscernible).

7    Q    I'm sorry, May 3rd.

8    A    Yeah.  Yes.

9    Q    And tell the Court why that was.

10   A    Well, the PSA, plan support agreement, and the trust

11   were structured in order to bring the Texas and the

12   Connecticut plaintiffs into the Court for the process of

13   hopefully efficiently and fairly getting their claims

14   liquidated for an amount that they would be paid by the

15   trust.  With the plaintiffs moving to dismiss us from the

16   cases, we -- there would be no standing for us that the

17   trust, the Debtors and the trust -- the Debtors wouldn't be

18   there, so there would be no standing to (indiscernible)

19   plaintiffs' claims into the (indiscernible) offices of the

20   bankruptcy court.

21   Q    Now, before we reach the May 19th hearing date, do you

22   recall the direction that you gave me with respect to what I

23   needed to do for the InfoW Debtors' bankruptcy case as to

24   those stipulations?

25   A    Stipulations of the Texas (indiscernible), I said

```
1   absolutely (indiscernible).  Can't dismiss it

2   (indiscernible) out of there, (indiscernible) unless we get

3   (indiscernible) with prejudice.  I was (indiscernible) that.

4   Q    So your focus to me was to make sure those got done

5   correctly; is that accurate?

6   A    yes.

7   Q    And do you also recall that with respect to the

8   Connecticut plaintiffs, they decided to proceed by way of

9   motion, not by stipulation, correct?

10  A    Right --

11            MR. RUFF:  There was an objection, Your Honor.

12            THE COURT:  Overruled.

13            MR. RUFF:  Thank you.

14  BY MR. LEE:

15  Q    You also recall whether or not there was tension

16  between the Debtor, especially counsel for the Debtor, Mr.

17  Lee -- me -- and Mr. Ruff before May 19th with respect to

18  the speed at which we wanted to get -- both parties wanted

19  to get the --

20            MR. RUFF:  Objection, Your Honor.  Calls for

21  speculation.

22            THE COURT:  Sustained.

23            MR. LEE:  I haven't even finished my question,

24  Your Honor.

25            THE COURT:  Really obvious.
```

1          MR. LEE:  I apologize.

2          THE COURT:  No worries.

3     BY MR. LEE:

4     Q    Do you know whether or not there were -- based on

5     reviewing the emails between me and Mr. Ruff where there was

6     tension between the Debtors' counsel and the U.S. Trustee's

7     counsel before May 19th as to the disposition of this case?

8     A    Yes.

9     Q    What was that dispute?

10    A    That -- I recall it was whether or not dismiss -- our

11    filing was legitimate should've been allowed.  I mean

12    (indiscernible) from the very beginning.

13    Q    Okay.  And do you recall where your application to

14    retain was placed insofar as being heard by the Court?

15    A    I don't think it had a date.

16    Q    Do you recall my reporting to you as to the results of

17    the hearing on May 19th, 2022 after the dismissal of the

18    Texas and the Connecticut plaintiffs?

19    A    Yes.

20    Q    And do you recall my telling you the conversations I

21    had with respect to the dismissal of the cases by the U.S.

22    Trustee and their position about the case?

23    A    I remember you discussing with me their position.  I

24    don't think at that time it had significantly changed in

25    terms of our view (indiscernible) accomplished.

1    Q    So going back to Exhibit No. 24 in front of you, as of

2    May 21, 2022, had you made a decision or -- had you made a

3    decision as to whether or not the InfoW Debtors' cases would

4    continue in Chapter 11 or be dismissed?

5    A    By this date, I was convinced it was not -- they were

6    not going to continue.

7    Q    And by May 23rd, 2022, when I had forwarded to you a

8    draft of the motion to dismiss Chapter 11 cases, had your

9    views in any way changed about dismissing the cases?

10   A    No.

11   Q    And so did you direct me then on May 25, 2022 to advise

12   the U.S. Trustee that the Debtors were dismissing their

13   cases?

14   A    Yeah, we talked about that, somewhere (indiscernible)

15   May 25 that I told do it.

16   Q    So as of at least May 25, was there any expectation

17   that you as a CRO or Schwartz & Associates would be retained

18   as an estate professional in the InfoW Debtors bankruptcy

19   cases?

20   A    No expectation, no.  I figured at that point, it wasn't

21   going to happen.

22   Q    And in fact, did you learn from me through the emails I

23   forwarded to you that the U.S. Trustee did not want you to

24   be retained as an estate professional?

25   A    Yes, I did.

```
 1   Q    And that included any other professionals including
 2   lawyers; is that correct?
 3   A    Right.  That's what I understood.
 4   Q    Would it have made business sense for you as a chief
 5   restructuring officer to have spent the monies and the
 6   administrative claim to fight the U.S. Trustee and get the
 7   case in place in order to have our applications heard and
 8   our fee applications then blessed by this Bankruptcy Court
 9   in the InfoW bankruptcy case?
10   A    In my opinion, if I had done that, then I would've been
11   guilty of violating my fiduciary responsibilities.
12   Q    Mr. Schwartz, in your work since -- prior to April
13   17th, the petition date of InfoW Debtors to now, have you
14   ever worked directly for Mr. Alex Jones?
15   A    No.
16   Q    All right.  And insofar as your present duties today as
17   the chief restructuring officer or proposed chief
18   restructuring officer of FSS, tell the Court the kind of
19   interaction you had with Mr. Jones in your capacity as the
20   CRO.  How does -- how do you interact with him?
21   A    Well, it's pleasant.  We speak frequently.  He
22   sometimes will call me two or three times a day, sometimes
23   in 30 minutes.  Usually, he has problems.  He needs my
24   (indiscernible) help him resolve or he's asking permission
25   to do something.  They're cordial.  And that or I call him
```

1    to (indiscernible) focus on something.

2    Q    Does he get to direct what you do and how you operate

3    your business at FSS as a CRO?

4    A    No.  I operate the business and I direct the business.

5    I -- no.

6    Q    So what role, if any, does he -- is he involved in your

7    business decision making at FSS?

8    A    Well, first off, he is the leading key sales guy.

9    Nothing really gets sold of any substance but by him, so he

10   is (indiscernible) component to the business.  He also has -

11   - because of that and his tremendous understanding and

12   knowledge of the products that we sell, particularly in the

13   supplements and compounds or -- (indiscernible) say

14   compounds, the chemical products that we sell and the market

15   demand for them.  He's (indiscernible) very well and

16   (indiscernible) the suppliers to a great extent, so he's an

17   important from the standpoint of (indiscernible) important

18   as a source of information and to help me (indiscernible) we

19   should be doing on the product side.

20   Q    Now, because of these things he does, have you given

21   him any preferential treatment insofar as paying his claims

22   or treating him differently because of his role in this

23   bankruptcy case in any way?

24   A    I don't think so.

25   Q    Insofar as wages are concerned that he's entitled to,

1   has he been afforded his full wages under the cash

2   collateral order to date?

3   A    The amount has been allowed.  He's been paid.

4   Q    Is that the full amount that he's entitled to under his

5   employment contract that he was with FSS today?

6   A    It is not the amount.

7   Q    How much is it lower by?

8   A    (indiscernible) a million-three annual salary, if you

9   will, the employment agreement.  We're currently paying him

10  $20,000 a pay period so that's about $480,000 at that rate.

11  And prior to this, we paid him $10,000 or $20,000 a pay -- a

12  month -- $40,000 a month, $20,000 a month.  So he's getting

13  less than half of his -- what his agreement calls for.

14  Q    Mr. Schwartz, you've also highlighted in your

15  declaration and previous testimony some of the issues that

16  you discovered at FSS when you came on the scene.  Do you

17  remember that?

18  A    Yes.

19  Q    And can you tell the Court in a brief summary some of

20  the, I guess, problems you encountered and found and what

21  you've done about them to date?

22  A    Well, we -- the time the declaration we had

23  substantially brought the books current (indiscernible) on

24  the bookkeeping (indiscernible).  The inventory has been a

25  continuing problem, having the right inventory.  We don't

1    have a good system yet for inventory management in the sense

2    of information flow.  (indiscernible) working on that.  We -

3    - our cost of processing of credit cards was extremely high,

4    about 14, 15 percent, extremely high.  I got it down to 4

5    percent.  Negotiated that and we're currently

6    (indiscernible) to try to reduce that cost.

7         We're looking at alternative sources of inventory

8    financing which will get us more inventory (indiscernible)

9    for the Christmas holiday sales and sustain our company

10   going forward.  What have I missed?  I've hired a CRO --

11   excuse me, an operating manager and I've hired

12   (indiscernible) bookkeeper, keeping operations

13   (indiscernible) bringing someone on board in the offices at

14   FSS as an employee of FSS and in contracting with the

15   bookkeeping services.  Matter of fact, I have meetings with

16   them tomorrow.  So it's a few of the things we -- you know,

17   we're facing.  You know (indiscernible) a chapter in the

18   book but we're (indiscernible) that under control and we are

19   close to getting prepaid credit cards.  We've been in -- we

20   had a couple of (indiscernible), but I think we've got a

21   vendor now who's not afraid.

22   Q    Let's talk about the schedules that Mr. --

23   A    Yeah.

24   Q    -- asked me about and some of the omissions he alluded

25   to.  Tell the Court what is the stage of amending the

```
 1    schedules after the Debtor submitted them last week.  Can

 2    you talk -- tell the Court what is going on there?

 3    A    The specific (indiscernible) and I discussed that at

 4    the 341 meeting that if you noticed where there's no mention

 5    of Shannon & Lee, there's Schwartz & Associates.  That's

 6    like a $380,000 payment.  What happened is (indiscernible)

 7    was wired to me to my trust account and then we distributed

 8    it to Shannon & Lee and Kyung S. Lee PLLC and I think even

 9    some to Mr. Battaglia, so I (indiscernible) that schedule

10    was -- I've got it on (indiscernible) for that page where I

11    have the tale.  (indiscernible) got what laid out there so

12    it -- but it was for prepetition fees or retainers and so

13    we're working on that.

14        I just learned Friday of a transaction that was booked

15    as other income which was actually a contribution of capital

16    by (indiscernible).  That will change the schedules with

17    that booked right.  That was done in July prepetition.

18    There are the -- there's a question of why on the payments

19    to creditors there was no (indiscernible).  That was asked

20    and that has been -- actually what happened is the

21    (indiscernible) report to July 22nd, not July 29th so we've

22    added seven more days of payments on there.

23        So it's come forward.  I'm going to go back through and

24    see, okay, what else have we got in here.  We've got at

25    least one unsecured creditor who's told me, I'm not owed
```

1   anything.  I owe you people money.  So --

2   Q    So would it be fair to say that you're still drinking

3   from a fire hose?

4   A    It's a smaller fire hose, but it's still a fire hose.

5   Q    And would it still be accurate to say that you are

6   constantly correcting, amending, updating data in order to

7   make them as accurate as possible and not hiding things from

8   creditors or the Court?

9   A    Yeah, we're not trying to hide anything.

10   Q    So let's go back to talking about the issue of being on

11   both sides of the transaction.  Do you recall us talking

12   about that.  Did you ever end up being on both sides of the

13   transaction after May 19th, 2022 when I left this Court and

14   told the Court we would either evaluate dismissing the case

15   or having to go back and negotiate either an amendment to

16   the PSA or a new funding agreement, did you, while you were

17   going up and sitting at FSS' office end up negotiating for

18   InfoW for more money or trying to do that?

19   A    No.

20   Q    And tell the Court why not.

21   A    Well, again, I mean, let me put it this way.  The

22   description of the situation we were in after that date, we

23   were trying to decide do we continue or do we dismiss.  At

24   that point in time, we -- I think all the professionals

25   involved -- were in that position where it would've been

1   more beneficial for us financially to keep going.

2   Q    For the professionals?

3   A    For the professionals.  So we were in that -- that

4   happens. Regularly in bankruptcy and receiverships.  You get

5   to a point where, hey, keep going or stop?  And I can make

6   more money if I keep going.  That was -- that's exactly that

7   situation.  I did not go out of turn to negotiate more money

8   for the plan sponsors.  First off, I couldn't give a -- I

9   can't come up with a reason why they should give us money.

10  And two, there is no benefit to doing it.

11  Q    Now, another criticism that's been leveled against you

12  and me is that we came here and we told the Court that we're

13  going to do our fiduciary duty.  Do you recall that

14  criticism?

15  A    I remember very strongly the judge's words on that.

16  Q    Do you recall that one of the issues that came up when

17  the plaintiffs dismissed their claims, that one of the

18  concerns that the parties had is that the Debtor, InfoW

19  Debtors, would not accept their dismissal and would try to

20  perpetuate the bankruptcy cases?  Do you recall that, sir?

21               MR. CHAPPLE:  Objection.

22               THE COURT:  Sustained.

23  BY MR. LEE:

24  Q    Do you recall one of the objectives that the plaintiffs

25  were saying that the InfoW Debtors would be trying to do

1    after the plaintiffs trying to dismiss their cases?

2    A    I recall that they didn't trust us and were trying to

3    figure out what were we up to.  That's what made it so hard

4    to get -- and actually, I thought it would be, you know,

5    what's so hard about with prejudice in a dismissal and it

6    actually became an issue.  But it was because of the

7    distrust out there.

8              MR. CHAPPLE:  Objection.

9              THE COURT:  I'll overrule.  He can --

10   BY MR. LEE:

11   Q    And so Mr. Schwartz, at the end of the day, did you

12   conclude that dismissal of the bankruptcy cases as of May

13   21, '22, when I sent you the email was in the best interest

14   of this estate?

15   A    Yes.

16             THE COURT:  Okay.  Overruled.

17   BY MR. LEE:

18   Q    During the time between May 19th through June 10th,

19   were you ever involved in discussions with any party, any

20   part, in which you took an adverse position to InfoW Debtors

21   on any topic?

22             MR. LEE:  Pass the witness, Your Honor.

23             THE COURT:  Okay.  Before we take a break, there

24   are two questions I've been -- forgot to ask you earlier

25   (indiscernible) relevant now.  What is (indiscernible)

```
 1    prepared like a budget to actual, just comparing essentially
 2    the cash collateral budgets to what has been actually spent?
 3    I've only seen estimated budgets in the cash collateral.
 4    I'd love to see kind of a reconciliation of budget to
 5    actual.  What I mean for that -- by that, I'm just
 6    (indiscernible) explaining in general if cash collateral
 7    budget would budget a million dollars in potential gross
 8    receipts over a period of time.  Maybe you took in a
 9    million.  Maybe you took in a million-five.  Maybe you took
10    in a half a million.  Has there been any reconciliation of
11    budget to actual?
12              THE WITNESS:  What we did is every -- except for
13    today because today is Tuesday, the day it's due, we do a
14    budget to actual.  What I actually do now is -- and we've
15    done this every week -- is budget this is week seven, I
16    think.  Last week is week seven.  So we budget -- the budget
17    we had for cash collateral, the actuals, the variance, and
18    then the bankruptcy to date where you can see the whole
19    picture.
20              THE COURT:  Okay.
21              THE WITNESS:  That's done every week.
22              THE COURT:  Okay.  I was just curious.  Just -- I
23    hadn't seen it, but I know that sometimes it gets filed with
24    an MOR or --
25              THE WITNESS:  I didn't even --
```

1          THE COURT:  Just a question.

2          THE WITNESS:  I don't think it's getting filed.

3          THE COURT:  It may not.  Just something I, at some

4    point, I'd mention.  I'd like to see just to understand the

5    true financials.  There's something else and -- apologize.

6    And if you look at your screen, whenever it decides to load.

7    The dot, dot, dots make it look like it's -- it's your first

8    day declaration with the exhibits.  See if I can get this to

9    load up in a faster way, what I'm looking for.  Always meant

10   to ask you this question.

11         It's always when you want something to load

12   quickly.  All right.  So you recall there were the -- those

13   exhibits you filed, the comparative profit -- P&L

14   statements.

15         THE WITNESS:  Yes, sir.

16         THE COURT:  So here's something I've always meant

17   to ask you.  So in 2021, InfoWars Health and Prison Planet

18   paid -- looks like FSS book income from InfoWars Health and

19   Prison Planet in 2021, but in -- they didn't in 2022.  Do

20   you know what the income was attributed to in 2021 for

21   InfoWars Health or Prison Planet?

22         THE WITNESS:  I may have to go back and look, Your

23   Honor.  I mean, I -- InfoWars Health is tone one who owns --

24   that monthly royalty is about $38,000 and so, and Prison

25   Planet, I --

1          THE COURT:  But InfoWars Health had paid FSS, is

2     that -- was that the correct way to book it?

3          THE WITNESS:  It'd all depend on what the -- that

4     relationship is actually controlled by Dr. David Jones and

5     sometimes they move these around.

6          THE COURT:  So in 2022, would InfoWars Health have

7     owed FSS any funds?

8          THE WITNESS:  No.  No, that funds -- my

9     understanding, those -- 2022, those funds, we were told,

10    that royalty relation actually belongs to Health, to Health.

11         THE COURT:  Got it.

12         THE WITNESS:  And that that's when I said --

13    actually the one who said no, I need that money --

14         THE COURT:  You need that money.

15         THE WITNESS:  -- right now.

16         THE COURT:  I remember.  That's why I was

17    wondering.  I know at some point, it turned and you turned

18    it around to start receiving it.

19         THE WITNESS:  Once it -- I actually don't know

20    where it is now because --

21         THE COURT:  Okay.

22         THE WITNESS:  I hadn't (indiscernible) signer on

23    the bank account for IWHealth.  Haven't found a way to

24    unravel that mess.

25         THE COURT:  Okay.

1          THE WITNESS:  And haven't seen any more money come

2     in.

3          THE COURT:  And for Prison Planet, do you know

4     what that 5,000 --

5          THE WITNESS:  No.

6          THE COURT:  Okay.  Okay.  Those are my only

7     questions.  I just been meaning to ask you.  I needed to

8     understand just the relationship.  Why don't we -- who's

9     going to ask questions on cross?  Mr. Ruff?  Mr. Chapple,

10    are you going to have any examination?  Okay.  So why don't

11    we -- it's 5:15.  Why don't we come back on in five minutes,

12    let everyone take a break and then we'll come back in five

13    minutes and we'll continue with cross.

14         CLERK:  All rise.

15         (Recess)

16         THE COURT:  We are back on the record in Free

17    Speech.  Mr. Schwartz, I remind you are still under oath and

18    Mr. Ruff, I have one more question and I'm going to take the

19    liberty.

20         MR. RUFF:  Go ahead, Your Honor.

21         THE COURT:  And it was a question that I asked Mr.

22    Lee and I wanted to -- you're the better person to ask just

23    to understand it.  I'm trying to -- again, just trying to

24    put the timing together and I put it up on the screen

25    earlier and I'm going to see if I can find it again.  Just

```
 1    give me a second.  This is just the docket entry.  This is
 2    what I meant to ask you.  Well, I'll take the drama out.
 3    The question had to do with the declaration that was filed
 4    by Mr. Andino Reynal saying in that -- here we go.
 5              That statement -- I just want you to look at
 6    paragraphs 5 and 6.  It says that in May of -- May 19th, FSS
 7    retained you as a CRO and that you contacted Mr. Reynal if
 8    you knew of any financial executive that was able to come
 9    and work at FSS, and that criminal defense lawyer
10    recommended Mr. Jeffrey Schultz and -- with essentially the
11    -- with his recommendation that FSS hire Mr. Schultz.  Can
12    you confirm the accuracy of statements in paragraph 5 or 6
13    is there anything that you would clarify?
14              THE WITNESS:  Well, the only thing I want --
15              THE COURT:  You didn't sign this so I'm just -- so
16    I want to be very clear about that.   You didn't sign this.
17    This is saying something about what happened in May
18    regarding -- including, as it pertains to you and I'm just
19    trying to understand what your understanding was.
20              THE WITNESS:  Well, in terms of the hiring of Jeff
21    Schultz --
22              THE COURT:  Maybe I can ask it this --
23              THE WITNESS:  There's more to the process than
24    just me recommending Schultz.
25              THE COURT:  But was it in May of 2022 that you --
```

004951

```
 1              THE WITNESS:  Oh, yeah.  I think so.  I'd have to
 2    go back and look at my calendar.
 3              THE COURT:  But did you -- this --
 4              THE WITNESS:  No, wait a minute.  May?  I'm sorry.
 5    I don't know if that's right.
 6              THE COURT:  Okay.  This also -- you think it was
 7    May or sometime after May?
 8              THE WITNESS:  I know it was after May because I've
 9    been -- my engagement letter wasn't signed until June 7th
10    (indiscernible) as of May 19th and that's where he got a
11    date, but he's wrong on the month of May because I can tell
12    you right off the bat -- I mean, we didn't do much of
13    anything until the retainer came in because under my
14    agreement, I had to get the retainer too for the engagement
15    to be effective.  So June 10th, we're working.  Now June
16    10th I'm screaming, I need somebody.  So it would have been
17    in June.
18              THE COURT:  Did you contact Mr. Reynal and ask if
19    he knew of --
20              THE WITNESS:  Yes, I asked all -- everybody.  So
21    it was kind of a blanket request.  Nobody -- and he --
22    Andino called me up and said, I got somebody but let me tell
23    you the situation.
24              THE COURT:  May I just ask a silly question.
25    You're a professional with over 40 years of experience.  Why
```

 1    did you contact a criminal defense lawyer about someone to

 2    hire as a potential accountant in a business?

 3              THE WITNESS:  I actually -- just let all the

 4    lawyers know -- I mean, he was, you know, just in the room

 5    because he defends -- he's defending the Texas cases.

 6              THE COURT:  Right.

 7              THE WITNESS:  So he was there and I said, you

 8    know, I'm looking for somebody.

 9              THE COURT:  Oh, I understand.  Thank you for the

10    clarification, sir.  Thank you.

11                                    EXAMINATION

12    BY MR. RUFF:

13    Q    Good afternoon, Mr. Schwartz.

14    A    Mr. Ruff, you have a halo around you now.

15    Q    Do I?  Don't be deceived.

16    A    Believe me, I'm not.

17    Q    Now Mr. Schwartz, you have more than 40 years of

18    experience in the restructuring business.  Correct?

19              THE COURT:  That's my line.

20              MR. RUFF:  Oh.

21              THE WITNESS:  So it must be right.

22              THE COURT:  I'm sorry.  Go ahead.

23    BY MR. RUFF:

24    Q    And during these 40-plus years, you have frequently

25    served as a chief restructuring officer or CRO.  Is that

1    correct?

2    A    Not that frequently.  That's a relatively new concept

3    to me anyway.  I mean, back then, the owner in charge --

4    Chapter 11 trustee -- only in (indiscernible) years have we

5    -- have I been doing CROs.  But I distinguish between the

6    trustee and the CRO, though -- the concept of the -- you

7    know, the trustee, I get paid less but I also have more

8    protection from the court.  CRO, I get paid more.  I still

9    have to do the same work.

10            MR. RUFF:  Can you -- Mr. Ross is going to be --

11            THE COURT:  All right.

12            MR. RUFF:  Then if you could go to Page 9.  It

13    will be Paragraph 26 (indiscernible).

14    BY MR. RUFF:

15    Q    Mr. Schwartz, would you mind reading the second

16    sentence in Paragraph 26 for me?

17    A    Yes.  He frequently serves as a chief restructuring

18    officer, as a federal and state court appointed receiver in

19    bankruptcy and non-bankruptcy and -- what happened --

20    proceedings, and that he's -- do you want me to read the

21    rest?

22    Q    No, that's all I needed you to read.  So this was your

23    application for employment and it -- in there, it

24    represented that you frequently served as a chief

25    restructuring officer.

1    A    Wait a minute.  I think -- I says -- could you go back

2    to that page?  Frequently serves as a chief restructuring

3    officer, as a federal and state court appointed receiver, in

4    bankruptcy.  So I frequently serve in those capacities, as a

5    receiver and as a CRO and probably what I should say is --

6    well, as an examiner also, but that's kind of gone passe.

7    Q    Would it be accurate to say that you frequently have

8    served as a professional in bankruptcy?

9    A    That's accurate.

10   Q    Okay.  Very good.  And so you are familiar with the

11   need to disclose connections when seeking employment in a

12   bankruptcy case.  Is that correct?

13   A    Yes.

14   Q    Okay.  And, Mr. Schwartz, you were the chief

15   restructuring officer in the -- what I will refer to as the

16   Info W cases.  Is that correct?

17   A    Yes.

18   Q    All right.  Now in the Info W cases, there was a plan

19   support agreement and a litigation settlement trust.  Is

20   that correct?

21   A    Correct.

22   Q    All right.  Now those agreements were negotiated prior

23   to your being retained as the chief restructuring officer or

24   after?

25   A    Substantively, prior.  Like I said, the -- do you have

1    -- well -- the structure of what was being planned, i.e.,

2    the structure of the trust and the proposed trustees, the

3    litigation of the PSA, extensively had been developed.  The

4    financing had all been negotiated prior to my arrival.  That

5    was pretty well known.  I mean, if there was any question,

6    that was minor on that so there was -- the agreements

7    themselves were still being -- going through the editing

8    stages, but the -- substantially, you know, the car was

9    designed and chassis built and they were just finishing off

10   the waxing.

11   Q    Now -- and again, in the Info W cases under those

12   agreements, Alex Jones and Free Speech Systems -- FSS --

13   were the third-party funders who were going to contribute

14   funds under the litigation settlement trust to pay the

15   creditors in the Info W cases.  Is that correct?

16   A    Well, they were contributing funds to the trust and

17   they were setting aside funds for the professional costs.

18   Q    So there was no -- under those agreements, there was no

19   consideration or funds being given for the creditors of the

20   Info W debtors?

21   A    Well, I said there's funds -- there are funds being set

22   aside in the trust for the benefit of the creditors and

23   there were funds being set aside -- I think they were

24   actually held in an (indiscernible) account to pay the

25   professionals.  That money all came from -- was coming from

1   Mr. Jones and FSS.

2   Q   Is it your recollection that there was approximately or

3   maybe $10 million to be funded under those agreements?

4   A   Well, the estimation of the amount that would

5   ultimately be funded is 10 million.  There was $2 million,

6   as I recall, of cash up front.  There was another amount --

7   $40,000 -- 500,000 -- $480,000 a year for five years.  That

8   was coming from another source, and then FSS itself would

9   devote its net income to the trust as well.  (indiscernible)

10  But some of that depending on which estimate you use for

11  FSS, is 10, 12, $15 million.

12  Q   And you were the -- as the chief restructuring officer,

13  you were the party designated to represent the interest of

14  the Info W Debtors under those agreements.  Correct?

15  A   Yes.

16  Q   And that's in the negotiation of those agreements?

17  Correct?

18  A   Well, yes, once I came on board.

19  Q   Okay.  And there was testimony earlier about an amended

20  plan support agreement and a litigation settlement trust

21  being filed with the court on April 19th.  Do you recall

22  that?

23  A   Yes.

24  Q   Okay.  So the parties were in negotiation again,

25  yourself on behalf on the Info W Debtors, Alex Jones for

1   himself, FSS for itself, and the proposed trustees under the

2   litigation settlement trust.  Is that correct?

3   A    (No audible response)

4   Q    So those were -- let me rephrase.  Yeah.  So the

5   parties that were negotiating at the time were the Info W

6   Debtors, Alex Jones, Free Speech Systems, and the litigation

7   -- proposed litigation -- settlement trustees.  Is that

8   correct?

9   A    Yes.

10   Q    All right.  And more negotiations were required because

11   the trustees or the proposed trustees of the litigation

12   settlement trust had not agreed to that document yet.  Is

13   that correct?

14   A    Correct.  They had not signed off on it.

15   Q    So as of April 29th when that was filed, you were on

16   opposite sides of the table from FSS.  Is that correct?

17   A    Well, I guess that's one way to look at it.  Yeah, we

18   were -- they were negotiating -- well --

19   Q    I'll take your answer.  If yes is the answer -- yes or

20   no and you said yes.  I'll take it.

21   A    Well, I (indiscernible) opposite sides because we're

22   not fighting.  But, yes, we're not -- we're each looking for

23   our own interest or our own constituents' interest.

24   Q    Very well.  I'll take that as well too.  So you were

25   there for the interest of the Info W Debtors.  Correct?  You

1    were not there for the interest of FSS at that time.

2    A     Correct.  And then -- you say Debtors and the primary

3    responsibility is to the Debtor's creditors, obviously.  So

4    that's what I'm mostly concerned about.

5    Q     Now moving on, on April 18th, 2022, the Info W Debtors

6    filed an application to request authority to employ you as

7    their chief restructuring officer in the Info W cases.

8    Correct?

9    A     Okay.  Sorry.  I don't recall the date but --

10   Q     Does that sound correct to you?

11   A     Yes, that sounds correct.

12   Q     Now prior to the application being filed on April 18th,

13   you reviewed the application.  Correct?

14   A     Yes.

15   Q     Okay.  And you also reviewed your declaration before it

16   was filed.  Correct?

17   A     Yes.

18   Q     Okay.  Who drafted your declaration?

19   A     (indiscernible), I believe.

20   Q     Okay.  But ultimately, since the declaration was signed

21   by you -- correct -- the declaration was signed by you.

22   Correct?

23   A     Yes.

24   Q     Okay.  And do you understand that you're responsible

25   for the content within the declaration?

1    A    Yes.

2    Q    Okay.  And the declaration was signed under penalty of

3    perjury.  Correct?

4    A    That's what I remember.

5    Q    Okay.  And when you sign a document under penalty of

6    perjury, you're signed attesting to the fact that it's true

7    and accurate.  Correct?

8              MR. LEE:  Objection.  He's asking the witness for

9    a legal conclusion.

10              THE COURT:  I think he's just testifying to what

11    the words say at the bottom of the declaration.

12              MR. LEE:  As long as that's the case.

13              THE COURT:  Yeah.  I'll overrule.  To your

14    knowledge.

15              THE WITNESS:  To my -- okay.  That it's true and

16    correct?  Yes, to the best of my knowledge -- the best of my

17    knowledge, it's true and correct.

18              MR. RUFF:  Okay.

19    BY MR. RUFF:

20    Q    Do you recall who filed the employment application in

21    the Info W cases?  Which attorney?

22    A    The employment applications?

23    Q    For yourself.  Yeah, who filed that?

24    A    I believe Mr. Lee did as counsel for the Debtor --

25    Debtors.

1    Q    All right.  Prior to them filing it, they got your

2    authorization to file that application.  Is that correct?

3    A    Yes.

4    Q    Okay.  Now attached to the application, was an

5    engagement letter.  Do you recall who signed the engagement

6    on behalf on the Info W Debtors?

7    A    No, I do not.

8    Q    All right.  I think you're on the same exhibit.  It

9    will be I think Page 32.  Scroll down.  There you go.  No,

10   back down where the signatures are.  All right.  Do you

11   recall this document, Mr. Schwartz?

12   A    Yes.

13   Q    All right.  What is this document to your recollection?

14   A    This appears to be our engagement letter.

15   Q    With the Info W Debtors?  Is that correct?

16   A    Yes.

17   Q    Okay.  And do you see who signed on behalf of --

18   A    Yes.

19   Q    Who signed that?

20   A    Alex Jones.

21   Q    Okay.  Thank you.  Now on the declaration filed on the

22   Info W cases, you affirmatively stated that there was no

23   connection to Free Speech Systems, LLC.  Is that correct?

24   A    Correct.

25   Q    And on the declaration filed in the Info W cases, you

1   also affirmatively stated that there was connection to Alex

2   Jones.  Is that correct?

3   A    That's correct.

4   Q    All right.  So from April 18th, 2022, to the dismissal

5   of the Info W cases which happened on June 10th, 2022, you

6   did not provide any subsequent amendments to the

7   declaration.  Is that correct?

8   A    I don't recall doing any.  I don't think so.

9   Q    Now let's if anything changes in your declaration and a

10  new connection developed.  Do you understand that you were

11  required to supplement your declaration?

12  A    Yes.

13  Q    Okay.  But you didn't supplement it at any time, did

14  you?

15  A    I did not.

16  Q    Okay.  Now fast forwarding a little bit to May 19th,

17  2022, you sent an engagement letter to FSS outlining the

18  terms upon which you would serve as its CRO.  Is that

19  correct?

20  A    That's incorrect.

21  Q    Okay.  Can you clear that up for me?  Did you -- let me

22  back then.  Restate the question.  Did you draft an

23  engagement letter for FSS on -- for your -- excuse me --

24  strike.

25       Did you draft an engagement letter to serve as CRO of

1    FSS on May 19th, 2022?

2    A    Yes.

3    Q    Okay.  Did you send that engagement letter to anyone on

4    May 19th, 2022?

5    A    Yes.

6    Q    Who did you send it to?

7    A    Mr. Lee.

8    Q    Okay.  So you were actively seeking an engagement to

9    serve as the CRO of FSS as early as May 19th, 2022?

10   A    I wouldn't -- you know, I was -- Mr. Lee asked me to

11   put together an engagement letter but we'd not had any

12   discussions with FSS or any of its principals or any of its

13   counsel -- I had not -- about employment.  So I did

14   (indiscernible) gave him a draft of the engagement letter so

15   he could see the terms under which I would take the job on,

16   but we had not sat down with anybody and even gotten

17   background information at that point.  I can't say I'm

18   actively seeking.  I'm actively seeking information.

19   Q    So it's your testimony today that when you send out an

20   engagement letter, you're not seeking to be engaged?

21   A    Most of the time when I get asked to send an engagement

22   letter, they're asked -- they want to look at the -- look at

23   the terms of my engagement.  That's typically what happens

24   and they will call back and if you're got a problem or not.

25   So (indiscernible) anticipating an engagement but it doesn't

1   always happen.  You know, some people just like certain

2   clauses that we don't give on.  It's whatever.  And we

3   (indiscernible) ask for a draft and I sent a draft

4   engagement letter.  Yeah, I think it was draft.  And -- but

5   we had not sat down and talked with anybody about it at that

6   point in time.

7   Q   So is it your testimony then that as of May 19th, you

8   were desiring in an engagement with FSS as its chief

9   restructuring officer?

10   A   I'd say I was interested in it for certain.

11   Q   Okay.  Very good.  Now serving as the chief

12   restructuring officer of FSS, that an important role.

13   Correct?

14   A   Well, some people think so.  Some people don't.

15   Q   I'm asking you if you think it's an important role.

16   A   Well, I mean, it's a responsible role.  I mean, you

17   have to take it seriously.

18   Q   Okay.  In that role now you actually run FSS.  Correct?

19   A   Well, as much as any one person could run 50 people.

20   Q   Okay.

21   A   They still have their own -- I mean, I am the chief --

22   I (indiscernible) call it CRO because (indiscernible) chief

23   executive officers at this level so I have the

24   responsibility for everything going on but I don't do

25   everything.

1    Q    So it wasn't your testimony earlier that -- let me back

2    up.  Strike that.

3         You testified earlier that Alex Jones doesn't control

4    FSS now.  Correct?

5    A    That is -- Alex -- that is correct but Alex Jones has a

6    lot of influence over the employees there still.

7    Q    Okay.  But it also was your testimony that you make all

8    management decisions.  Is that correct?

9    A    That is correct.  He comes to me.

10   Q    Okay.  So that's a pretty significant role then at FSS.

11   Is it not?

12   A    It's a lot of responsibility so, yeah, I mean --

13   Q    Okay.  And it was certainly a connection, wasn't it?

14   A    It was -- (indiscernible) it's --

15   Q    In the --

16   A    (indiscernible) it's a connection today.

17   Q    Okay.

18   A    But InfoWars is not a connection today.

19   Q    When you're -- but when you were seeking employment as

20   the chief restructuring officer and drafting any engagement

21   letter, you didn't see that as a connection at that time?

22   A    No.

23   Q    Okay.  When did you believe that there was connection?

24   A    Well, I believe we were still negotiating working with

25   the PSA and that was in force, definitely there was a

1   connection because they were the funding source for the --

2   one of the funding sources for the PSA, but once that PSA

3   was voided -- I mean, they've had -- (indiscernible) they

4   were an independent -- they were no longer involved.  They

5   were no longer an influential entity and (indiscernible)

6   they had no part -- no place at the table.

7   Q    Now you had a meeting in Austin on May 24th.  Is that

8   correct?

9   A    Correct.

10  Q    Okay.  And that was to discuss the FSS restructuring.

11  Is that correct?

12  A    That was to get introduced to it and they explained

13  that -- you know, they -- (indiscernible) doing

14  (indiscernible) saw a lot of them going over the proposed

15  structure of the (indiscernible) trust and the PSA and the

16  funding sources and we had some quite discussions about the

17  funding sources.

18  Q    So on May 24th, you were talking about the PSA for the

19  Info W Debtors?

20  A    I'm sorry.  May -- I apologize.  You're right.  My

21  brain just jumped back two months because I remember that

22  vividly.  Yeah, May 24th, we discussed the FSS bankruptcy

23  and some of the issues involved.

24  Q    Okay.  So as of May 24th, there was already a planned

25  FSS bankruptcy being talked about?

1   A    I wouldn't say it was a plan.  There was a -- the

2   possibility of a bankruptcy was being talked about.

3   Q    Okay.  And you were seeking to serve as or being

4   considered as the chief restructuring officer of FSS in that

5   plan.  Is that correct?

6   A    I believe I was being interviewed for it, yes.

7   Q    Okay.  And you didn't think that that was an important

8   connection?

9   A    As it goes to InfoWars, no, I did not, again, because

10  FSS was no longer in the InfoWars bankruptcy.  They were

11  gone.

12  Q    Was FSS jointly liable for all of the Info W Debtor's

13  debts?

14  A    No.  They'd all been dismissed from our standpoint.

15  Q    What about the remaining debts?

16  A    Oh, the other three?  I was actually -- yes, that's one

17  of the considerations we had was why should we spend money

18  here.  I mean, they got all the money and they're the ones -

19  - they are jointly liable for that.

20  Q    Now the U.S. Trustee filed a motion to dismiss the Info

21  W cases on April 29th.  Correct?

22  A    I believe that's correct.

23  Q    All right.  And the motion was set to be heard on May

24  27th.  Correct?

25  A    Correct.

004967

1    Q    All right.  And on May 18th, the Info W Debtors filed a

2    motion seeking to continue the hearing to June 24th.  Is

3    that correct?

4    A    Correct.

5    Q    Did you authorize the filing of that motion to continue

6    the hearings?

7    A    Yeah.  I'm -- I never actually said I authorize you to

8    do this (indiscernible) but I was aware of it.  You know, we

9    were talking about it.

10   Q    He made you aware that he wanted to file the motion and

11   you didn't object to it.  Is that accurate?

12   A    Correct.  That's fine.

13   Q    All right.

14   A    (indiscernible) but I understand that.

15   Q    I'm sorry.  You wanted --

16   A    I wanted it sooner but I could understand the need to

17   (indiscernible) more time than June 10th.

18   Q    What did you think might need more be happen sooner?

19   A    Well, my hope you could do is get an agreement on

20   getting the bankruptcy dismissed.

21   Q    All right.  And then the hearing on the motion to

22   continue the dates was on May 19th, 2022.  Correct?

23   A    That was busy day so I'm going to have to accept your

24   word for the 19th.  I just --

25   Q    Well, the motion was filed on the 18th.  Correct?

```
 1    A    The motion for the continuance?

 2    Q    Yes.

 3    A    I'm sorry.  Yes.

 4    Q    And then the hearing for the continuance was on the

 5    19th.  Correct?

 6    A    Right.

 7    Q    Okay.  And the motion was never withdrawn at any point.

 8    Correct?

 9    A    The motion to --

10    Q    Continue.

11    A    -- continue?  I don't recall one way or the other.

12    Q    So there was not any sort of final decision to dismiss

13    the Info W cases as of May 19th then.  Correct?

14    A    Well, it was dependent on being able to work out with

15    you a mutual -- mutually agreed way of doing it.  So the --

16    Q    All right.

17         MR. RUFF:  I'm going to object as nonresponsive,

18    Your Honor.  I asked him if there was a decision to --

19         THE COURT:  I'm going to overrule.  He can answer

20    the question.

21         THE WITNESS:  Oh, (indiscernible) I definitely

22    knew in my mind I wanted to withdraw.  But (indiscernible) I

23    think I said earlier, once the Texas and Connecticut

24    Defendants released us with -- dismissed us with prejudice,

25    I mean, I knew at that moment, we're going to have to
```

1    terminate this bankruptcy and that's what we ended up with.

2    BY MR. RUFF:

3    Q    So if you knew you wanted to terminate the bankruptcy

4    right away, why were the Info W Debtors seeking to continue

5    to push it out until June 24th?

6    A    Because Mr. Lee was working on how he was going to get

7    this accomplished.  Plus we had to make sure everything was

8    finalized with the Texas and Connecticut matters in terms of

9    the state courts and, you know, what they had to do on the

10   dismissals.  I believe that was -- we were having to wait

11   for some of that time and then we had to allow time to work

12   -- negotiate with the U.S. Trustee's Office.

13   Q    And now Mr. Lee had sent an email to you on May 21st

14   that he was going over with you earlier recommending the

15   dismissal of the bankruptcy cases.  Correct?

16   A    Right.

17   Q    Okay.  Had he made a recommendation to dismiss the

18   bankruptcy cases before that?

19   A    I can't he made a recommendation.  We had discussed it.

20   I think he wanted to, you know, sit down and go logically

21   through it and make sure he wasn't -- we were covering all

22   the bases.

23   Q    And you let him know on May 23rd, yes, go forward.

24   Let's get these things dismissed.  Is that correct?

25   A    Yes.

1   Q    All right.  But that was all after May 19th.  Correct?

2   Nothing before that?

3   A    I mean, I can't say we didn't have discussions before

4   that.  I don't think he was yet committed to the -- you

5   know, to do it.  He hadn't gone through his legal analysis

6   and I looked at it from a practical business standpoint and

7   says, you know, there's no point in us being here.

8   Q    Okay.

9   A    But I -- you know, he represents the Debtors and he's

10  got to go through the legal process and tell me how we're

11  going to get it done and make sure we can -- everything is

12  taken care of.  So the final decision to pull the trigger

13  was May 23rd but that -- I had no doubt where we were going.

14  Q    Do you recall having a phone call with Mr. Battaglia on

15  May 17th?

16  A    On May 17th?  You going to have to help me out.  I

17  don't remember it.

18       MR. RUFF:  Pull up 155-13.  Can you go to Page 8,

19       please?  All right.  Can you blow up to 33

20       (indiscernible)?

21  BY MR. RUFF:

22  Q    Do you recognize this document, Mr. Schwartz?

23  A    It looks a copy of our time records.

24  Q    Okay.  Do you see that time entry there right where the

25  cursor is blinking?

1    A    I do.

2    Q    Can you read that for me?

3    A    It says call with R. Battaglia.

4    Q    Who is the R. Battaglia that's being referred to in

5    that time entry?

6    A    That's Ray Battaglia.

7    Q    Okay.  Do you recall what that call was about?

8    A    No, I do not and that's -- what's the date on that one?

9    May 17th?  No, I don't recall.

10   Q    Okay.  But Mr. Battaglia was representing Free Speech

11   Systems at that time.  Correct?

12   A    Right.

13   Q    Was that your understanding?

14   A    Yes.  He did represent Free Speech Systems.

15   Q    Okay.  But you have no recollection of what that call

16   is?

17   A    No.  I mean, access document -- (indiscernible) wait a

18   minute.  It may have been about access.  I don't know but

19   that's just because the entry above it's about access --

20   (indiscernible).  Working on the bank accounts.  No, I don't

21   know.

22   Q    So moving on, on May 25th, you had directed Mr. Lee is

23   prepare a motion to dismiss the Info W cases.  Is that

24   correct?

25   A    I directed him to get them dismissed so I guess that

1    means I directed him to get a motion or to work out with you

2    a motion.

3    Q    Okay.  But before that time, you -- there had been

4    discussions about a possible dismissal but no direction from

5    you to get the cases dismissed.  Is that correct?

6    A    Right.

7    Q    Okay.  Now ultimately, the United Stated Trustee and

8    the Info W Debtors stipulated to a dismissal of the Info W

9    cases on June 1st.  Correct?

10   A    Correct.

11   Q    All right.  But the cases were not dismissed until June

12   10th after the court held a hearing.  Correct?

13   A    Correct.

14   Q    All right.  At no time prior to the cases being

15   dismissed did you file a supplemental declaration.  Correct?

16   A    Correct.

17   Q    And at no time prior to the dismissal did you have your

18   employment application withdrawn.  Correct?

19   A    Correct.

20   Q    So you were still serving as the chief restructuring

21   officer of the Info W Debtors when their cases were

22   dismissed.  Correct?

23   A    Correct.

24   Q    But at no time prior to the Info W cases being

25   dismissed did you disclose to the Court or to the United

```
1    States Trustee your connection with Free Speech Systems as

2    its chief restructuring officer.  Correct?

3    A    That's is correct.  I didn't consider them an

4    interested party.

5    Q    So you didn't think that a co-liable debtor was a party

6    and interest to the Info W Debtors?

7    A    Co-viable?

8    Q    Co-liable.

9    A    Co-liable.  Okay.  I'm sorry.  It sounded like co-

10   viable.  No, I didn't.

11   Q    Is that usually your judgment that parties who are

12   jointly liable for a debt are not parties and interest?

13   A    I can't see -- I'd have to think about that.  I'm not

14   sure I agree with that.  I think it depends on a lot of

15   things but FSS was out of the picture as far as I was

16   concerned and they had no interest in InfoWars.  InfoWars

17   didn't have any interest in them.  I'm not sure if it's

18   called liable in this makes it necessarily an interested

19   party or not.

20            MR. RUFF:  I have no further questions

21   (indiscernible).

22            THE COURT:  Okay.  Mr. Lee, do you have any

23   redirect?

24            MR. LEE:  Two questions.

25            THE COURT:  Okay.
```

```
 1                    REDIRECT EXAMINATION

 2   BY MR. LEE:

 3   Q    Mr. Schwartz, between the period of May 19th through

 4   June 10th, '22, was there ever a matter of where you acted

 5   adversely to the interest of Info W Debtor?

 6   A    No.

 7   Q    Between the period of May 19th through June 10th, '22,

 8   was there ever a matter that involved a dispute between FSS

 9   and Info W Debtors on which you had to act?

10   A    No.

11   Q    Let's talk about the remaining creditors that we talked

12   about and the joint liability.  Do you recall whether or not

13   we discussed the remaining claimants before we went on

14   embarking on a new project?  Do you recall --

15   A    Yes.

16   Q    Okay.

17   A    We talked about that in the process of deciding whether

18   or not to terminate the bankruptcy.

19   Q    And tell the Court what you -- what we discussed.

20   A    Well, I remember that we discussed, one, it could be

21   better handled outside; two, because FSS is the -- and Mr.

22   Jones are the -- essentially, they're the big pocketbooks.

23   We had -- at that time, we had $70,000 for three companies.

24   That was it -- all the money.  So, you know, there was not

25   much -- you know, it was going to get resolved but it had to
```

```
 1    -- let them resolve when they resolve -- let them -- handled

 2    it and then in that process, resolve those claims on

 3    InfoWars -- the InfoWar Debtors.

 4    Q    And tell the Court and the creditors here whether any

 5    of the actions you took in the Info W Debtors cases while

 6    you were acting and consulting with FSS starting on May 24th

 7    -- did it adversely affect anything you did in the Info W

 8    Debtors' bankruptcy cases?

 9    A    No.

10              MR. LEE:  Pass the witness, Your Honor.

11              THE COURT:  Okay.  Any re-cross?  Okay.  Thank you

12    very much, sir.

13              THE WITNESS:  Thank you.

14              THE COURT:  Okay.  Mr. Shannon, any other

15    witnesses?

16              MR. SHANNON:  No other witnesses for us, Your

17    Honor.

18              THE COURT:  Okay.  Can I consider, I should say,

19    the evidence on your side completed?

20              MR. SHANNON:  Yes.

21              THE COURT:  Okay.  Turning now to the other side,

22    does anyone present any witness or any --

23              MR. RUFF:  No, Your Honor.

24              THE COURT:  Okay.  Mr. (indiscernible)?  Okay.

25    Okay.  What do you wish to tell me, sir?  Why don't we give
```

1    you -- everyone a brief opportunity to present any closing

2    statements and then give me a few minutes and I'll rule.

3           MR. SHANNON:  And I will keep it very brief, Your

4    Honor.

5           THE COURT:  I want you to take your time.  Don't -

6    - we'll go until we're done.

7           MR. SHANNON:  Your Honor, as we said in the

8    beginning, there is no dispute about these bankruptcy cases

9    -- this bankruptcy case -- the FSS bankruptcy case.  There's

10   no dispute that the applicants that this Debtor wants to

11   employ are disinterested, that they do not hold or represent

12   any interest adverse to this Debtors' bankruptcy estate.

13   There's no dispute there.

14          Again, the issue that the U.S. Trustee has brought

15   up and the only issue that the evidence has brought up is

16   this potential failure to supplement 2014 disclosures in the

17   Info W bankruptcy case.  And maybe the U.S. Trustee's

18   (indiscernible) agrees then it's not something that I knew

19   before.  Maybe it's -- maybe the U.S. Trustee is right, that

20   even though the agreement to dismiss the case has been

21   reached, you know what, Mr. Lee and Mr. Schwartz should have

22   supplemented their disclosures.

23          And if that's the case, though, Your Honor, it's

24   still not a good reason to decapitate this Debtor in this

25   case and basically shut FSS down, and there's been no

1   argument that denial of these applications to employ will

2   benefit the estate, and the case law says that's what

3   important.  There's been no argument or no evidence that

4   denial of these applications to employ will further

5   administration of these bankruptcies -- of this bankruptcy.

6   It simply wouldn't -- removing, you know, more than half of

7   the Debtors' attorneys -- it wouldn't help.

8          Now again, Your Honor, if there was a failure to

9   supplement the disclosures, I believe the Debtor has

10  submitted a reasonable alternative to what the sanctions

11  should be and that sanction should not be to deny the

12  application to employ.  You know what, if Mr. Lee made a

13  mistake, it's that he should have waited to dismiss the case

14  -- dismiss the Info W Debtors' cases before representing

15  FSS.  I'm sure if he went back that's what he would do.  And

16  the alternative that the Debtors suggest is disallow Shannon

17  & Lee, LLP's fees in that amount -- $24,409, and that would

18  basically put everybody in the situation that the U.S.

19  Trustee says people should have been in.  That actually puts

20  the Debtor in a better position, right, because they got --

21  they would have gotten free legal services.  That is -- the

22  Debtor's fine with that.  I believe that Shannon & Lee, LLP,

23  will continue to represent the Debtor if that's the Court's

24  ruling.

25          But there is no case law that mandates that

1    outcome.  It's not supported by the evidence which all the

2    evidence has -- all the evidence you've heard is that Mr.

3    Lee and Mr. Schwartz tried to do their fiduciary duties to

4    the Info W Debtors.  They've been trying to do their

5    fiduciary duties to this Debtor.  They've stood up to some

6    pressure from these parties that are supposedly or

7    potentially -- you know, that there potentially could be,

8    you know, insiders that I guess is what the U.S. Trustee is

9    worried about.  That's all the evidence that's been in front

10   of this Court.

11          So with that, Your Honor, unless you have any

12   questions from me, that's my presentation.

13          THE COURT:  I just have one.  So nobody's actually

14   talked about the fifth circuit standards for retention.

15   There's been responses to -- (indiscernible) gone back and

16   forth which was the problem with the pleadings and no one

17   ever talked about, right, what it means to hold an adverse

18   interest to the debtor or to the estate.

19          When you look at West Delta Oil, right, fifth

20   circuit said -- you look -- a professional possesses or

21   asserts any economic interest that would tend to lessen the

22   value of the estate or that would create an actual potential

23   dispute in which the estate in a rival claim (indiscernible)

24   to possess a predisposition under circumstances that render

25   such a bias against the estate.  That was a Utah case that

004979

1    the fifth circuit was looking on and said, look, that's a

2    good definition.  You got to look at it with the eyes and

3    attention to circumstances which may impair a professional's

4    ability to offer impartial disinterested advice to his or

5    her client, right.  That's what it means to have an adverse

6    interest.

7          And you look at cases like West Delta Oil and

8    Waldron versus Adams and Reese case and that case says --

9    I'm going to ask the United States Trustee the same

10   question.  It says attorneys engaged in the conduct of a

11   bankruptcy case should be free of the slightest personal

12   interest which might be reflected in their decisions

13   concerning the matters of the debtors (indiscernible) which

14   might impair the high degree of impartiality or detached

15   judgment expected of them.

16         I got it that you're saying no one should look to

17   the last case.  What's your answer to what the fifth circuit

18   requires me to look at?

19         MR. SHANNON:  Well, I would say, look, the

20   question is about Mr. Schwartz and Shannon & Lee, LLP, and

21   whether they have either an economic interest or some

22   interest that is adverse to this bankruptcy.  That's not the

23   case, Your Honor, and I believe that everything -- all the

24   evidence is support of that.  I believe that was clear based

25   on the application and there has -- none of the parties have

1   disputed that.

2          THE COURT:  Do you think Shannon & Lee, Mr.

3   Schwartz -- let's just get the real question, right.  Do you

4   think Shannon & Lee or Mr. Schwartz can render solid advice

5   or impartial advice to FSS if it meant taking an action

6   against an insider?

7          MR. SHANNON:  Your Honor, absolutely and I can

8   tell you that both Mr. Lee and I have taken that position.

9          THE COURT:  I didn't hear one today.  Which one

10  did you take?  The one that Mr. -- when he testified to that

11  was me.  Which one did you take?

12         MR. SHANNON:  Oh, that Mr. -- Mr. Jones -- Alex

13  Jones --

14         THE COURT:  Again, I -- this case is -- what

15  complicates this case is that there are well known people

16  involved in it.  I just want you to take all that out.  Just

17  --

18         MR. SHANNON:  No, I understand --

19         THE COURT:  -- and the facts that you have today -

20  - can a professional who is engaged in the -- all the

21  evidence that the United States Trustee has (indiscernible)

22  setting aside and let's just call it company A, owner A --

23  could Shannon & Lee provide -- give the Court comfort that

24  Shannon & Lee or Mr. Schwartz can provide impartial advice

25  to the estate based on what we've heard today, right?  And I

1    know -- just let me finish -- I know that you're saying that

2    I should just look at the last case as nothing, but, right,

3    I was here.  So what do I -- in considering the cases that

4    I'm thinking about, how do you then -- what weight or what

5    consideration should I give to what happened in the last

6    case as I consider whether you can render impartial -- fair

7    and impartial advice to the estate in this case?

8         MR. SHANNON:  Your Honor, I would actually point

9    out the track record, right.  I mean, it did not benefit

10   Alex Jones or FSS to not fight the Texas Plaintiffs or the

11   Connecticut Plaintiffs getting rid of their claims in the

12   Info W cases.  That was -- did not help those parties.  The

13   Info W Debtors said, that's not what -- and Mr. Schwartz

14   obviously was the one making this decision ultimately -- you

15   know, the decision that was made was how does it benefit

16   this estate and these Debtors.  That was the focus in those

17   cases.  It was not what benefits the owner.  It's not what

18   benefits the related parties.

19        I believe in this case, there was, you know, some

20   requests to do things that the Debtor didn't believe were

21   the best interest of the Debtor's estate.  Mr. Schwartz as

22   the CRO, you know, Shannon & Lee, LLP representing the

23   Debtor, obviously Mr. Battaglia as well, said those things

24   do not benefit the estate and that's what Mr. Lee testified

25   to about extending the automatic stay to Alex Jones.  He

1    said, no, we're not going to do that.  So I would actually

2    look at the track record in this case and the last case to

3    give the Court that comfort.

4            THE COURT:  What evidence can you point me to in

5    the record?  That's what today's about, right?

6            MR. SHANNON:  Well, Mr. Lee's testimony that he --

7    you know, that the Debtor here, FSS, denied or pushed back

8    on that request from Alex Jones.

9            THE COURT:  Thank you.

10            MR. SHANNON:  So that's in the record.  I also

11    believe that Mr. Lee's email on May 21st, right -- it really

12    points out what was considered in that decision.  It was not

13    any pressure from FSS, and again, frankly, I believe that

14    the -- you know, the dismissal or the not putting up any

15    opposition to the dismissal by the Texas Plaintiffs and the

16    Connecticut Plaintiffs in the Info W cases -- that was not

17    for the benefit of anyone else other than those Debtors.

18    And so that's the evidence I think the Court should consider

19    on that issue.

20            THE COURT:  What about Mr. Schwartz?  What about -

21    - I think -- I understand your position with Shannon & Lee.

22    What about Mr. Schwartz?

23            MR. SHANNON:  Well, Mr. Schwartz was the ultimate

24    decision maker.

25            THE COURT:  Well, I thought he was taking

1    direction from the initial trustee.

2         MR. SHANNON:  The initial trustee gave no

3    direction at all in that first case.  If you remember, that

4    was the emergency behind getting the former judges appointed

5    because the initial trustee had no role in that case.  The

6    initial trustee, frankly, is someone who is very close to

7    Mr. Jones.

8         THE COURT:  The conflict that I'm having in my

9    mind -- and again, I don't like it when judges don't share

10   their thoughts -- so Mr. Schwartz testified that, you know,

11   the owner has no authority on decisions as it related to the

12   bankruptcy case.  It certainly has influence and there's no

13   denying that, right, and it's an important consideration.

14   Who's putting in the cash collateral budget to pay for an

15   $80,000 travel expense where the (indiscernible) pays for

16   everything, right?  Like who's putting that in?  That's Mr.

17   Schwartz making that decision?  Is that -- that's Mr.

18   Schwartz saying, pay 100 percent of the legal expenses in

19   the Connecticut litigation?  That's Mr. Schwartz saying,

20   let's go 40/60 on an appeal on a case in which you're going

21   to get ready to file plan?  That's Mr. Schwartz saying, pay

22   PQPR, you know, $750,000 in the first -- that's Mr.

23   Schwartz?

24        MR. SHANNON:  It is ultimately Mr. Schwartz,

25   Judge, but I will say this.

1           THE COURT:  Maybe it is.

2           MR. SHANNON:  There are arms length negotiations

3      in that --

4           THE COURT:  That's what I'm saying, but who's the

5      (indiscernible) let's put in an $80,000 travel expense or

6      let's go 60 -- let's go 100 -- we'll pay 100 percent of the

7      state court litigation that's already started in

8      Connecticut?  Who's making that decision?  That's what --

9      where's the arms length there?

10          MR. SHANNON:  The demand would be by Mr. Jones and

11     really through Mr. Jones's counsel, saying, this is what we

12     need to do.  Otherwise, it's not worth Mr. Jones, you know,

13     continuing on in this company.

14          THE COURT:  Do you see the tension with this case

15     and as it relates to -- this case is interesting because

16     there's active litigation --

17          THE COURT:  And, Your Honor, the one thing I will

18     say --

19          THE COURT:  -- right, the Debtor and owners are

20     co-Defendants in litigation and so that's what makes this

21     tricky aside from the issue and it involves tortes.

22          MR. SHANNON:  The one thing I'll say, Your Honor,

23     is that if the CRO -- the application employed the CRO is

24     not done then who is making the entire decision.  There is

25     no other party to --

```
1            THE COURT:  I'm asking, who's making the decision

2    now?

3            MR. SHANNON:  It's Mr. Schwartz.

4            THE COURT:  Okay.

5            MR. SHANNON:  And that's why you have the first

6    day of this hearing Mr. Lee did not remember.  I can ask the

7    Court to take judicial notice.  I was the one there.

8            THE COURT:  Oh, I know why you asked the question.

9            MR. SHANNON:  That's why we agreed ultimately to

10   extend or to allow a relief from the automatic stay for the

11   Connecticut Plaintiffs to go forward.  That's no something

12   Mr. Jones wanted.  That's something that the Debtor believed

13   was in the best interest of this estate and that Mr.

14   Schwartz believed was in the best interest of this estate.

15           THE COURT:  Okay.

16           MR. SHANNON:  And so I think that's the evidence,

17   Your Honor, that it -- if Mr. Jones or if this Debtor was

18   acting strictly for the benefit of Mr. Jones, those things

19   wouldn't have happened, right.  And sure, there are -- there

20   is some give and take there, right, and he is the most

21   important person (indiscernible).

22           THE COURT:  No question.

23           MR. SHANNON:  But there is --

24           THE COURT:  That's not surprising in companies,

25   right.  That's not surprising especially in the nature of
```

```
 1   the business in which the Debtor's involved in.  That's not

 2   surprising.  So I don't want anyone to think that it's rare.

 3                MR. SHANNON:  So, Your Honor, that's the answer I

 4   have to your question.

 5                THE COURT:  Thank you very much.

 6                MR. SHANNON:  Thank you, Your Honor.

 7                THE COURT:  Okay.  Mr. Battaglia.  Yes, sir.

 8                MR. BATTAGLIA:  Thank you, Your Honor.  Ray

 9   Battaglia for Free Speech Systems.

10                A lot of what I heard today relates to what the

11   standard I know the Court holds attorneys to in terms of

12   their disclosures, in terms of the accuracy of what they put

13   in front of this Court, and I wish Mr. Lee had done a little

14   better on some of the dates and some of the other things.  I

15   understand the ambiguity over whether or not there was a

16   conflict based on the context of what was going on in the IW

17   case at that particular time.

18                It was clear well before you signed the

19   stipulation dismissing the case or the order dismissing the

20   case that this case was going to be dismissed.  There was

21   nobody propping up the case, not the Debtor, not my client

22   FSS, not Mr. Jones, not the Connecticut Plaintiffs, not the

23   U.S. Trustee's Office.  Everybody wanted the case dismissed

24   and well before you signed that order and well before May

25   19th if that's the key date, it was pretty clear that this
```

1    case was going to be dismissed.  The structure of how it was

2    be accomplished, what the literal language of an order or

3    stipulation would say, had some things to be worked out, but

4    there really wasn't any question that this case was -- that

5    that case -- the IW case -- was filed for the purpose of

6    trying to create a vehicle to settle litigation claims.

7         Once those litigants dismissed their claims with

8    prejudice -- claim that by the way they had held dearly,

9    steadfastly for four years against those Debtors -- they

10   just dismissed them literally overnight.  And so the purpose

11   of that case was gone, the purpose of the PSA, the purpose

12   of the litigation and trust -- all of those things were

13   gone, and so can someone hold up a candle and say, well,

14   there should have been a disclosure the first time you had a

15   conversation with me or a meeting in Austin on the 24th of

16   May.  Perhaps.  But at that point, FSS had gone from an

17   active participant to almost a stranger to the case, and so

18   -- I'm a firm believer that better to ask permission than

19   beg forgiveness and I think what you're hearing is some

20   begging of forgiveness today that it could have been done

21   better and cleaner, and I guess I could lay claim to

22   perfection.

23         I can't.  I screw up.  It happens.  I've been

24   doing this for 39 years.  I guarantee you I see pleadings

25   that I use as a template for the next case and go, oh, my

1    God, I can't believe I didn't catch that.  It happens every

2    day.  We're human.  But I think the real issue for the Court

3    is, what does that mean in terms of these parties' ability

4    to act on behalf of FSS and its creditors, and I don't think

5    it affects their abilities at all.  And as Mr. Lee

6    testified, there have been occasions where I assure you the

7    principles of the Debtor are not in league with FSS --

8    filing the immediate motion to lift the stay to allow Texas

9    case to go forward.  You could probably assume Mr. Jones

10   didn't like the idea of having to continue in that trial.

11   Filing the motion to lift the stay to allow the Connecticut

12   litigation to go forward and not proceed with other remedies

13   that are recognized by this Court and other courts about

14   injunctive relief and extension of the automatic stay.  Even

15   the removal that was done of the Connecticut litigation was

16   done with great hesitance and reluctance on our part but

17   only because it was unclear what the Connecticut court had

18   done, vis-à-vis FSS.  Not Alex Jones -- FSS.

19           So there have been numerous occasions where I

20   assure the Court that Mr. Jones and Mr. Jordan have had some

21   very terse conversations with us about what he thinks we

22   ought to be doing and we haven't done it.  And Mr. Lee and -

23   - I'll tell you, Mr. Shannon has had some terse

24   conversations with me on those topics as well.  So there's

25   no pushovers here.  There's nobody's doing Mr. Jones's

 1    bidding other than his lawyers who represent him, and I

 2    appreciate that the Court is concerned about the fee issues

 3    on the litigation and I accept that.  I understand it.

 4            I think that the thing that the Court doesn't get

 5    to hear is what's Mr. Jones's ability to pay.  What happens

 6    if he can't pay?  What happens if his state court lawyer

 7    who's set for trial and we want to negotiate to lift the

 8    automatic stay say, I won't go forward.  How do we deal with

 9    that?  We're liable for that claim.  FSS is liable for that

10    claim.  We've agreed to produce Mr. Jones and through

11    negotiations that were extensive about who would show up at

12    trial.  The idea of making sure he shows up and -- you know,

13    that's a cost.  I told you it came in late in the day.  With

14    more time would we have rethought it and done better?

15    Perhaps.  Perhaps not.  It's just -- it's important that he

16    be there.  I'm important to me that he be there.  It's

17    important to him as well, but it's important to me and on

18    behalf of FSS.

19            So I hear the issues and I don't want to say

20    they're gotchas because they're not.  I mean, things should

21    have been done better in the IW cases.  There should have

22    been perhaps some more disclosure.  There should have been

23    some dates that were fixed.  I assure you I wouldn't have

24    contacted anybody had I thought there was a conflict of

25    interest coming into this case.  But the idea that I would

1    contact people who had familiarity with the issues involved

2    in the case, it can't be foreign to the Court.  I mean, it

3    makes complete sense and as I said, if you were to decide

4    that these parties can't be retained, I don't know where to

5    go.

6          I came into this as co-counsel.  I've been a solo

7    practitioner now for seven years.  I'm not with a big firm

8    anymore.  I can't -- and I'm hitting my later years of

9    hopefully practicing law, I can't run this hard anymore.  I

10   can't -- I couldn't possibly handle this case without co-

11   counsel and I don't know who out there would even consider

12   for a moment jumping in if it wasn't Shannon & Lee.  So when

13   Mr. Shannon says decapitate the Debtor, that's exactly what

14   would happen here and that clearly wouldn't be in anybody's

15   best interest, particularly as we're negotiating hopefully a

16   plan to proceed.

17         You know, we've made significant advances in

18   fixing this Debtor to the point where it can contribute net

19   cash (indiscernible).  The goal here is, as I said in the

20   very first hearing in front of you, I understand what this

21   bankruptcy code is about is paying creditors and that's all

22   I'm about.  It's my job to maximize the value of this estate

23   to pay creditors who are owed legitimate claims and that's

24   what I intend to do, but it isn't going to happen without

25   the help of a CRO and one who knows the business and without

1   assistance of effective co-counsel.

2           I can't do it myself.  I'm not -- when I told you

3   earlier that I had applied to be co-counsel, the point I was

4   driving home is, I don't know what --

5           THE COURT:  Right.

6           MR. BATTAGLIA:  -- your ruling to day will do to

7   me because I couldn't conceivably professionally stay in

8   this case and say, I can deliver the results that I'm

9   required to deliver to a client in zealous representation.

10  So that's really what I meant and I'll be happy to answer

11  any questions.

12          THE COURT:  Thank you for your time.

13          MR. NGUYEN:  Thank you, Your Honor.  Ha Nguyen for

14  the U.S. Trustee.  I just want to make some comments to Mr.

15  Battaglia's statement.  He has a very grasp on disclosure.

16  He understands what needs to be disclosed and I think

17  partially that's why one of the reasons his application is

18  not being objected to, but what you heard on evidence today

19  -- you heard both Mr. Schwartz and you heard Mr. Lee -- they

20  sat up there and they said, you know, as of May 24th, they

21  didn't think there was a need for disclosure on May 24th.

22          Your Honor, that -- the case law in rule 2014,

23  that is not a decision for them to make.  2014 is about

24  laying all of your connections out on the table for the

25  Court and the parties to examine.

```
 1            THE COURT:  Why should it carry -- why should that
 2    carry into this case?
 3            MR. NGUYEN:  Your Honor, because this is the very
 4    connection that was concealed from you.  Your Honor, it's so
 5    important.  I mean, we have the technical requirements of
 6    327.  I agree with you.  The fifth circuit in Delta Oil
 7    explains it well.  But then there's another piece to this,
 8    and that piece is the disclosure piece.  And disclosure in
 9    the bankruptcy system is -- it's self-policed.  It's self-
10    policed by these professionals.
11            Like I said earlier, it's about the fox guarding
12    the henhouse, right.  So when you have a disclosure
13    violation, the Court should respond strongly because, you
14    know, that is what motivates other professionals to fully
15    disclose all of their connections.  Consequences for non-
16    disclosures are often harsh.  Sometimes people get
17    disqualified.  Sometimes people get full disgorgement of
18    their fees.  These are harsh remedies.  I understand.  But
19    they are required remedies to protect the integrity of the
20    bankruptcy system.
21            And, Your Honor, there was -- there is always --
22    since the beginning of this case, there was always a cloud
23    and I think Mr. Schwartz recognized it when he put in his
24    declaration.  There was always a question of loyalty here --
25    loyalty to Alex Jones or FSS.  That question has always been
```

 1    a big issue in this case, and, you know, I go back to the --

 2    I guess the August 3rd hearing when we found out that there

 3    was American Express payment on the cash collateral budget

 4    that was going to pay Alex Jones's housekeeper.  I think

 5    that was the testimony at the time.

 6         Who made that decision?  But Mr. Schwartz was the

 7    one sitting up there testifying about the American Express.

 8    Your Honor brings a good point about the 50/50 split for Mr.

 9    Reynal and Mr. Pattis.  You know, I had many conversations

10    with Mr. Lee over that weekend and it's like, I don't -- Mr.

11    Lee was fighting for 40/60 for both of the applications.

12    And I said, Mr. Lee, like why are we giving Mr. Jones a

13    discount because one was 40/60 the other was 50/50.  It was

14    an argument of, hey, you should do 40/60 for this -- you

15    know, for this one as well.

16         And I was asking Mr. Lee, why are we shooting

17    ourselves in the foot. I want the state to have a fair deal,

18    but why are you arguing for 40/60 to give Mr. Jones an extra

19    10 percent discount.  So we ultimately ended up on the

20    50/50.  And then there was another counsel that was filed --

21    I think the appellate counsel in the Texas litigation -- and

22    I had the same objections there.  They did 40/60.  I don't

23    understand why 40/60.  They should be 50/50.

24         THE COURT:  That will get reconsidered after

25    today, after reading (indiscernible) but --

1             MR. NGUYEN:  It needs to be 50/50, Your Honor.  So

2    on top of all of these concerns about potential bias, you

3    have the non-disclosure that happened in the prior case.

4    Remember, all of these parties were hired by Alex Jones.

5    Look at the engagement letter.  Alex Jones drew out --

6             THE COURT:  But that's typical in a small case,

7    all right.  I mean, it's not small in number but in terms of

8    small business where, you know, the owner hires everybody.

9    That's not surprising in a sub-Chapter 5 case.  So I'm --

10            MR. NGUYEN:  I agree, Your Honor, but think about

11   -- and like I said at the beginning of the opening, the

12   Court is a witness to everything that's gone on here.  We're

13   not talking about something that happened before a different

14   judge in a different case.  You were here throughout the

15   entire thing.  Statements were made to you, declarations

16   were filed.  Candor was important in the prior case.  Candor

17   is important in the case, and as Your Honor was going

18   through some of the exhibits, you know, there's an issue --

19   there's -- there are statements in Mr. Schwartz's

20   declaration that says May 19th and it turns out that that's

21   incorrect.  Mr. Schwartz testified he read his declaration,

22   but there's mistakes all over the place.

23            So that big issue -- that non-disclosure issue --

24   I just don't think you can get away from it.  And I think

25   it's important to remember what happened in the prior cases

1    because of May 19th, Mr. Battaglia said he would have

2    amended and disclosed, but the professional that sat up

3    here, they -- we asked them, you know, was this a connection

4    that should have been disclosed.  They all said no.  They

5    are still defiant about their duty to disclose.  Most

6    professionals would just come and file a supplement but

7    these professionals were --

8            THE COURT:  Well, I'm sure they're do it now if

9    you'll give them a chance.  You know, the question should

10   the -- you know --

11           MR. NGUYEN:  Your Honor, I --

12           THE COURT:  Go ahead.

13           MR. NGUYEN:  There was a connection that was not

14   disclosed.  Declarations were filed.  They were incorrect.

15   Statements were made to you to the contrary, that

16   (indiscernible) indicated that they were independent.  There

17   were multiple opportunities to disclose Free Speech System

18   as a connection.

19           Now they're coming in.  They're asking you to

20   approve this connection that they didn't disclose.  We can't

21   just -- we can't do that in terms of -- that just can't be

22   the case when there is an utter failure of disclosure, a

23   lack of acknowledgment from the professional, and now

24   they're asking you to bless it.  By blessing the application

25   now, you're actually compounding the non-disclosure in the

1    prior case because you're essentially approving it, and

2    that's the problem we have.

3            So there is a sense of bias here.  There are

4    questions and then you compound it by having this non-

5    disclosure that they refused to acknowledge.  I think it's a

6    huge problem, Your Honor, and I would ask the Court to

7    consider just integrity of the process -- integrity for

8    these creditors who are here, who are demanding candor.

9    Candor is important.  So I would ask the Court to deny these

10   two applications.  The system demands it -- of it.  I just

11   don't know how else to put it.

12           There will be harsh consequences to it, but, you

13   know, that's -- sometimes that happens when you're not

14   upfront about your connections with the Court.  And so, Your

15   Honor, that's all I have.  I won't belabor the point.  We've

16   been here for a while.  We take a strong position on it

17   because the system demands a strong response to a non-

18   disclosure of this sort.

19           THE COURT:  Thank you.

20           MR. SHANNON:  If I could just make one correction

21   --

22           THE COURT:  Sure.

23           MR. SHANNON:  There was no misrepresentation in

24   either Mr. Lee or Mr. Schwartz' declarations in the Info W

25   cases.  They weren't (indiscernible).  And I just want to

1    correct it and this is I think why Mr. Lee got so upset and

2    obviously filed a reply that he should not have.  There was

3    --

4              THE COURT:  Well, I think he can file what he

5    wants.  I just think I get questions based upon what gets

6    filed.

7              MR. SHANNON:  Exactly.  So I just -- I want to

8    make that one clarification, that it was not a declaration

9    that was mistakenly (indiscernible).  It was just not

10   supplemented maybe as it should be.

11             THE COURT:  Okay.  Thank you.  Folks, it's 6:32.

12   I'm going to take a look at something.  I'm going to come

13   out at 6:40.  I'm going to rule on it.  Thank you.

14             CLERK:  All rise.

15             (Recess)

16             THE COURT:  Okay, so we are back on the record in

17   Free Speech.  I'll just note for the record, Mr. Battaglia,

18   I did get a chance to look, and your order is on the docket,

19   so I just -- okay.

20             So what is remaining, two retention applications,

21   and they are filed at Docket Numbers 83 and 85.  They were

22   filed on August 12th.  The application to employ Shannon and

23   Lee as bankruptcy co-counsel to the Debtor and the

24   application to employ W. Marc Schwartz and Schwartz

25   Associates LLC (indiscernible) essentially as financial

1     advisors as well.  This is a court proceeding under 28

2     U.S.C. 157(b)(2)(A).

3             Court finds that there's been proper service of

4     the application and then proper notice of today's hearing.

5     The Court has considered the evidence, and here's my ruling

6     on the applications.  I do note, before I begin that -- here

7     is just the -- or -- or Free Speech -- well, we'll disagree,

8     but what the Court has done, that's just the nature of what

9     the Court has to do.  The Court is required to weigh the

10    evidence and apply the law as faithfully as I can and that's

11    what I believe that I'm doing now.

12            So the Debtor FSS seeks to employ Mr. Schwartz as

13    chief restructuring officer and his firm Schwartz Associates

14    LLC as advisors on Section 327(a) of the Bankruptcy Code.

15    FSS also seeks to employ Shannon and Lee as bankruptcy co-

16    counsel.  US Trustee objects to both employment

17    applications.  The Trustee argues that these professionals

18    failed to disclose important connections required under

19    Bankruptcy Rule 2014 and recently dismissed bankruptcy

20    cases.  The Sandy Hook plaintiffs filed a statement joining

21    in and supporting the US Trustee's objection.

22            In response, FSS argues (indiscernible) motion by

23    Schwartz and Lee that previously dismissed bankruptcy cases

24    are not a valid basis to deny retention of these

25    professionals in these cases.  FSS argues that these

 1   professionals satisfy the requirements for employment under

 2   Section 327(a) of the Bankruptcy Code in this case.  Based

 3   on our evidence and applicable law, the Court is going to

 4   deny the applications to retain Schwartz as CRO and

 5   Schwartz's LLC Associates as financial advisors and Shannon

 6   and Lee as co-counsel to FSS.

 7           On July 29, FSS started this --

 8           Yes.  That's fine.  I'm still writing.  Do you

 9   want to get him back on the line?

10           RECORDED VOICE:  -- are ten attendees in this

11   conference.  Your host has joined.

12           Conference muted.

13           THE COURT:  Okay.  As I said, based on the

14   evidence and applicable law, I'm going to deny both

15   retention applications.  On July 29, FSS started this case.

16   About three weeks later, FSS filed applications to employ

17   Schwartz as CRO along with his firm as financial advisors,

18   and Shannon and Lee as co-counsel.  Mr. Ray Battaglia has

19   always represented FSS as the (indiscernible) other proposed

20   counsel and has been approved today.  No party objected to

21   his retention, so he is retained as bankruptcy counsel to

22   FSS at this point.

23           Schwartz submitted a declaration in support of his

24   retention, stating that neither him nor Schwartz Associates

25   was contacted about serving as CRO for Free Speech until

1    July 19th, 2022, when (indiscernible) in the Debtor's

2    bankruptcy cases has reached a favorable outcome for those

3    debtors.  He says that for all practical purposes,

4    (indiscernible) to reorganize the InfoW debtors had

5    concluded because the bankruptcy cases no longer had the

6    necessary participants to implement the global settlement.

7    He had (indiscernible) to restructure and reorganize InfoW

8    debtors at that point and that also the work he was

9    performing was ministerial.

10           The Shannon and Lee retention application included

11   a declaration by Mr. Lee.  It states, and I quote, "The

12   first services of our attorneys, Shannon and Lee, provided

13   to FSS, occurred on July 24th, 2022.  They were provided by

14   Lee through Kyung S. Lee PLLC."

15           The application also disclosed that Mr. Lee

16   received payment for services rendered between May 24th and

17   May 31st, 2022.  Section 327(a) of the Bankruptcy Code

18   authorizes a Chapter 11 Debtor with the Court's approval to

19   employ one or another attorneys, accountants, or other

20   professional persons do not hold or represent the interests

21   adverse to the estate and other disinterested persons to

22   represent or help the Debtor carry out its duties under

23   Chapter 11.

24           I want to be really clear.  Debtors have the right

25   the choose their lawyers.  The Bankruptcy Court has the duty

1    to ensure Section 327 is satisfied.  The text of 327(a)

2    states that retention is subject to court approval.

3    Assuming that the technical requirements of Section 327 are

4    satisfied, the Bankruptcy Code gives a bankruptcy court

5    discretion to deny an application.  That should be used, in

6    my opinion, very sparingly.  But this Court must consider

7    the facts of each case.

8         The text of Section 327(a) also requires

9    application for two-prong tests for employment of

10   professionals.  In order to (indiscernible) employ a

11   professional that one, does not hold or represent an

12   interest adverse to the estate and is a disinterested

13   person.  The term "disinterested person" is defined under

14   Section 101(14) of the Bankruptcy Code.  Neither one of

15   these two prongs overlap because the definition -- Part C of

16   the definition of "disinterested person" includes a person

17   who does not have an interest materially adverse to the

18   estate.

19        The application to employ a professional requires

20   an accompanied verified statement of the proposed retention

21   requirement of Bankruptcy Rule 2014.  Under that, a

22   professional must disclose all known connections the

23   professional has with the debtor, including insiders with

24   the debtor, creditors and other parties in interest in the

25   case, other proposed professionals the debtor seeks to

1   retain, and the Office of the United States Trustee.

2            Such public disclosure provides important

3   transparency to the Bankruptcy process and helps bankruptcy

4   courts evaluate if a professional is disinterested and

5   doesn't hold an adverse interest to the estate.  We

6   emphasize the professional has to be disinterested and not

7   hold an adverse interest to the estate.  Professionals

8   retained under the Section 327 represent the estate.  Thus,

9   in some cases, a professional representation of the estate

10  may conflict with the interest of shareholders and secured

11  and unsecured creditors.

12           So what does it mean to represent or hold any

13  interest adverse to the estate and to be disinterested?

14  Bankruptcy Code does not define the phrase "represent or

15  hold any interest adverse to the debtor to the estate."  The

16  Fifth Circuit (Indiscernible) that the oil company 432 F.3rd

17  347, Fifth Circuit 2005 reviewed and adopted -- or reviewed

18  a definition used by other circuits.  And that was to

19  possess or assert any economic interest that would tend to

20  lessen the value of the bankruptcy estate that would either

21  create either an actual or potential dispute in which the

22  estate is a rival claimant or to possess a predisposition

23  under circumstances that render such bias against the

24  estate.

25           The Fifth Circuit held that while the definition

1    was helpful, had to be employed with an eye to the specific

2    facts of each case and with attention to circumstances that

3    may impair a professional's ability to offer impartial,

4    disinterested advice to the client.  The Fifth Circuit has

5    also held that the standards for (indiscernible) conflict

6    are strict and professionals engaged in the conduct of a

7    bankruptcy case "should be free of the slightest personal

8    interest which might be reflected in their decisions

9    concerning matters of the debtors' estates or which impair -

10   - might impair" -- excuse me -- "a high degree of

11   impartiality and detached judgment expected by them during

12   the course of administration."

13        I want to start with the oil, 432 F.3d at 355.

14   I'll also cite to Waldron v. Adams & Reese in re, right,

15   American International Refinery, Inc. 676 F.3d 455, pincite

16   462 Fifth Circuit 2012.  Under Section 101(14), the term

17   "disinterested person" means a person that's not a creditor,

18   an equity security holder, or an insider.  That's A; B, is

19   or was not within two years before the date of the filing of

20   the petitioner, a director, officer, or an employee of the

21   debtor; and C, does not have an interest materially adverse

22   to the interest of the estate or any class of creditors or

23   equity security holders by reason, any direct or indirect

24   relationship to or in connection with or interest in the

25   debtor, or for any other reason.

1              I'd say Lee and Schwartz satisfy parts A and B of

2       the definition of disinterested.  And I acknowledge that

3       Schwartz was retained as CRO pre-petition, but the actual

4       entity retained by FSS is Schwartz Associates LLC.  Right,

5       and so Schwartz Associates is not a creditor, equity

6       security holder, an insider and was not within two years of

7       the filing of the petition date a director, officer, or an

8       employee of the Debtor.  It's a fine distinction.  That's

9       why individuals who work for Schwartz LLC, as in Mr.

10      Schwartz, can be retained pre-petition and still not be held

11      to be an officer.  It's the entity that got retained, not

12      him individually.

13             The question for any other reason, what does that

14      mean?  It's also known as the catch-all clause.  It's

15      sufficiently broad to include any professional with an

16      interest or relationship that would even faintly counter the

17      independence or impartial attitude required by the Code.

18             I'll cite to Judge Iscara's decision on -- it's

19      either LTHM Houston Operations LLC 2014 WL 5449737

20      Bankruptcy Seventh District of Texas 2014.  In this the Code

21      requires that there may be additional instances based on the

22      facts where a professional may have an interest material

23      adverse to the estate.  The US Trustee objects to the

24      retentions mainly based on actions and failures to disclose

25      in three recently dismissed bankruptcy cases.  FSS really

1    wants the Court to overlook the history of the past as not

2    really relevant, but this case cannot be divorced from the

3    history of the prior cases.

4           Before FSS started this case, Schwartz served as

5    proposed CRO and Lee served as proposed counsel in

6    Subchapter 5 bankruptcy cases of InfoW LLC, IW Health LLC,

7    and Prison Planet TV LLC.  These entities were original

8    affiliates of FSS.  Mr. Jones owned 100 percent of the

9    equity in FSS.  He also owned 100 percent of the equity in

10   the InfoW entities.  FSS, Mr. Jones, and the InfoW entities

11   were also defendants in what I would call Sandy Hook-related

12   litigation, defamation lawsuits pending in Texas and

13   Connecticut State courts.

14          InfoW, IW Health, and Prison Planet filed

15   bankruptcy cases in the Southern District of Texas in April

16   of 2022.  Shortly before the filing, Mr. Jones assigned his

17   equity and his interest in these entities to a 2022

18   litigation settlement trust.  This Court was informed in

19   that case that the litigation settlement trust removed

20   control of the InfoW debtors from Mr. Jones.  The trust was

21   managed by an actual trustee and was supposed to be

22   eventually managed by two new trustees.  The trustees would

23   then have full governance authority over the Debtors.  The

24   litigation trust was first funded by Jones and FSS.

25          FSS, Mr. Jones, and the InfoW debtors also signed

1    a plan support agreement.  Part of the stated goal of the

2    InfoW cases was to negotiate a financial settlement between

3    the InfoW debtors and the Sandy Hook plaintiffs to resolve

4    defamation lawsuits pending in Texas and Connecticut.  Such

5    a settlement would have also resolved litigation against the

6    third-party contributors to the litigation trust, which

7    included FSS.

8           On April 29th -- well, I'll note, at least at the

9    beginning of the case, Mr. Schwartz was proposed CRO was

10   subject to the oversight and the direction of the initial

11   trustee, at least according to the court filings of the

12   litigation trust.  Mr. Lee was also proposed counsel for the

13   InfoW debtors and was taking direction from Mr. Schwartz as

14   CRO.  On April 29th, the US Trustee moved to dismiss the

15   InfoW cases, alleging, among other things, that the cases

16   were filed in bad faith and engineered to shield Mr. Jones

17   and FSS from liability.  An evidentiary hearing was

18   originally scheduled for May 27th.

19          The Court held a hearing on May 19th.  You've

20   heard a lot about that hearing today.  It's an important

21   hearing both for what was stated to the Court and what

22   wasn't disclosed.  Texas plaintiffs announced that they were

23   dismissing their claims against the InfoW debtors with

24   prejudice in the Texas defamation lawsuits, thus leaving Mr.

25   Jones and FSS as defendants in the Texas litigation.  The

1    Court also signed a stipulation on that day to that effect,

2    authorizing the parties to proceed in the Texas litigation.

3            Around that same time, the plaintiffs in the

4    Connecticut State litigation had filed a notice of dismissal

5    to claimants against the InfoW Debtors in the Connecticut

6    State court, which again, would have also left Mr. Jones and

7    FSS as defendants.  To allow the parties time to finalize

8    these state court dismissals with prejudice, which was the

9    issue at the time, Mr. Lee requested more time to respond to

10   the US Trustee's motion to dismiss the InfoW cases.  Among

11   the basis stated for the continuance was that Mr. Schwartz

12   needed more time to fulfill his fiduciary duties to other

13   creditors.

14           Mr. Lee also stated on the record at that hearing

15   that the other part that I have to do is renegotiate the

16   plan support agreement.  The debtors intended to

17   (indiscernible) with respect to a small Subchapter 5 plan.

18   Mr. Lee, with Mr. Schwartz right next to him, also told the

19   Court that they want me to know that Mr. Schwartz in his

20   fiduciary capacity is evaluating all alternatives.  Based on

21   his representations and agreements between the parties, the

22   Court reset an evidentiary hearing on the motion to dismiss

23   for some time in June.

24           What was unknown to the Court at this time, it

25   sounds like there was a meeting shortly after that hearing,

1    was that Schwartz and Lee would soon plan to start working

2    for FSS.  On May 25th, Mr. Lee starts working on a first-day

3    declaration for FSS, according to the time records admitted

4    into evidence, which means that around that time, Mr.

5    Schwartz was also part of the FSS team.  This continued into

6    early June, which means that Mr. Lee's statement about

7    exploring all options, if truthful -- and I don't doubt his

8    sincerity at the time -- but if it would have been played

9    out, then Mr. Schwartz would have then potentially found

10   himself negotiating as the CRO for the InfoW debtors on one

11   side and CRO for FSS on the other side.

12           Considering the history of the prior cases is

13   important, and that's why it's important, because what was

14   told to me on May 19th is that Mr. Schwartz was exploring

15   all options.  When you look at the statements filed in the

16   declarations in support of retentions, it's impossible to

17   recognize -- to reconcile, excuse me, that statement with

18   Mr. Schwartz's declaration that his duties are

19   (indiscernible) and that he had nothing to restructure or

20   reorganize.

21           Based on all (indiscernible) submitted by Mr. Lee

22   to Mr. Schwartz on -- Mr. Lee submitted an invoice to Mr.

23   Schwartz on behalf of FSS, stating that Lee and his comrade,

24   Mr. Shannon, met with Mr. Schwartz and counsel to Mr. Jones

25   to discuss issues about an FSS restructuring on May 24th for

1   five hours.  And that's -- right, that's five days after the

2   hearing.  On May 25th, Mr. Lee researched the information to

3   prepare first a declaration for Mr. Schwartz in connection

4   with an FSS bankruptcy.  On May 26th, he was organizing PQPR

5   valuation reports.  On May 27th, he coordinated with state

6   court counsel on state court sanction (indiscernible), and

7   "located critical documents for counsel to PQPR."  PQPR is

8   managed by Mr. Jones's father.

9          The next few days, Mr. Lee spent time analyzing

10  the data produced to state court counsel even though what

11  was represented -- even though, at that time, the InfoW

12  debtors were in the process of being dismissed with

13  prejudice.  On May 31st, they kept looking at a declaration

14  for Schwartz as CRO for FSS.  During this time, Mr. Schwartz

15  spent a lot of time working for FSS, hiring staff in order

16  with PQPR, its owners, and Mr. Jones.

17         Thus, at the time the bankruptcy strategy to

18  implement -- to be implemented in the InfoW cases

19  essentially failed and a group of parties went in order to

20  proceed with a new strategy for FSS.  Lee and Schwartz took

21  part in this strategy even though they were technically

22  supposed to work as fiduciaries for the InfoW Debtors.

23         I need to stress here, too, weren't they per se

24  (indiscernible) with secure letters and its counsel pre-

25  petition?  It happens all the time in large Chapter 11

1    bankruptcy cases.  Right?  It happens very often before

2    Chapter 11 cases are filed, either in an effort to avoid

3    bankruptcy or offer to negotiate in connection with the

4    Chapter 11 case.  Right?  Including the use of cash

5    collateral.  Right?  Debtors often want to have a consensual

6    use of cash collateral on the first day, try to enter

7    sometimes -- debtors may around the country enter into

8    restructuring support agreements and plan support agreements

9    or entering into pre-packaged Chapter 11 plans or --

10   various, many reasons to enter into negotiations with a

11   secured creditor.  Right?

12          What makes this case different is that Schwartz

13   and Lee were working for FSS.  They were also technically

14   working for the InfoW debtors.  Right?  And at some point,

15   the litigation trust and (indiscernible) broke down and who

16   was represented to the Court that Mr. Schwartz was taking

17   direction from?  Apparently that all had broke down.  So

18   there was a (indiscernible) separation between his affiliate

19   entities and the (indiscernible).  And there are other -- a

20   breach of corporate formalities disclosed in public

21   documents or things just went away.  And they could have

22   expired on their own.  Not to say that any of those things

23   were wrong.

24          It's just that, again, on June 2nd -- right, and

25   this is why things get tricky, but just leave it there.

1    Maybe there's nothing wrong, but on June 2nd, the InfoW's

2    response to the US Trustee's motion to dismiss.  Response

3    was filed by counsel for the debtors.  And despite their

4    representations and the declarations of that ministerial

5    work happening in May in this case, in the adjoined

6    pleading, professionals represented to the Court and to the

7    public that the InfoW cases still served our bankruptcy

8    purposes -- would they say -- nonetheless, the debtor's own

9    acknowledgment of their independent CRO.  How are you

10   independent if you're working for and hiring for FSS at that

11   time?  I don't really -- how are you -- what does

12   independence mean at that time?  I recognize that this also

13   was in the best interest of the debtors and their estates.

14   Right?

15          The InfoW cases are dismissed on June 10th, based

16   on internal records.  In July of 2022, Mr. Lee is assistant

17   counsel to Mr. Jones on the data issues between Mr. Jones

18   and FSS.  (Indiscernible) FSS for attending a focus group

19   and participated in a jury perception of Mr. Jones.  It was

20   a separate defendant in the Connecticut and Texas cases.

21   You're paid to do no effort, no evidence, of no effort to

22   separate your performance for the debtor and work performed

23   for FSS or potential claims that folks may have against each

24   other at that time.  The issue is that that's continued

25   post-petition and FSS's responses failed to appreciate this

1   point.

2          FSS's response focuses primarily on trying to cast

3   the US Trustee's Office in a negative light, rather than

4   proving that these professionals don't hold an adverse

5   interest to the estate and are disinterested.  During the

6   case, for example, FSS sought approval of a cash collateral

7   lawyer providing for approximately $80,000 in travel

8   expenses for the lawyer of FSS.  All of the travel expenses

9   for him and others were to be paid 100 percent by the FSS

10  estate.  I will tell you that no one called that out to me.

11  It was the Court who highlighted that issue.  And maybe

12  $80,000 is what's required for people to travel.  Of course,

13  that's not really the question.

14         The question is, who was negotiating on behalf of

15  the estate as to this 100 percent of all travel expenses to

16  go participate in a defamation trial on damages as a co-

17  defendant, 100 percent to be paid for by an entity in

18  bankruptcy?

19         In August of '22, FSS filed application to retain

20  two special counsels to represent it in the Connecticut

21  State court trial.  FSS's initial request was to, again, pay

22  for full legal fees on behalf of itself and the co-

23  defendant.  In a tort trial on damages, the estate proposed

24  to pay 100 percent for the legal fees for itself and its

25  owner as a separate defendant in the case.  Again, the Court

1   highlights that issue.  I must say I do believe that -- I

2   pre-empted the United States Trustee who has also stood up

3   right away and said this was an issue that we had, if I

4   remember that hearing correctly.

5        In September '22, in (indiscernible), special

6   counselor to FSS, who's one of the aforementioned special

7   counsel, filed a supplemental declaration which was drafted

8   by Mr. Lee.  And he states that since May 19th, FSS retained

9   Schwartz as its CRO and that Schwartz, as counsel for FSS, a

10   (indiscernible) defense lawyer (indiscernible) financial

11   executive was able to come and work at FSS in their

12   accounting department.  According to the declaration, he

13   recommends Jeffrey Schwartz as CRO.

14        I would note that Mr. Schwartz could not remember

15   if the retention occurred in May or later.  And there was

16   great confusion, although May 19th was cited in multiple

17   declarations filed in this case, FSS, Mr. Schwartz, Mr. Lee

18   essentially argue that maybe that was closer to June when it

19   was -- when those retention application, excuse me, when

20   those engagement letters were sent in by Mr. Jones in June.

21   But certainly the work, regardless of when the applications

22   were dated, certainly there was a meeting on the 24th when

23   the work started.

24        Mr. Schwartz also disclosed that FSS's books and

25   records were in disarray when he started working

1    (indiscernible), that the 2021 ledger had not been

2    completed, and the books had not been closed.  There was no

3    transaction that had been recorded in the 2022 ledger.  As a

4    result, both financial statements were produced for FSS for

5    the 18 years before his engagement.  Schwartz and Associates

6    also found out that reconciliations for 2021 are in 2022 and

7    were inadequate, out of their control -- actually, they

8    (indiscernible) controls, including lack of segregation of

9    duties, lack of supervision, reveal of accounting functions

10   -- this is all in Mr. Schwartz's declarations earlier in

11   this case -- more billings to PQPR.

12            I have issues about the relationship with FSS and

13   PQR, with their professionals certainly engaged extensively

14   with pre-petition.  The Court really -- I didn't hear any

15   evidence that they've analyzed it seriously post-petition.

16   And the estate made no claims against PQPR.  And recall that

17   PQPR is managed by an outsider.  They're approximately --

18   according to what was noted, right, in August of 2020 and

19   November 2021, there were security agreements signed on and

20   proto-signed on to the total of approximately $54 million.

21   That is subject to a fraudulent transfer litigation pending

22   outside of this district.  That may be 100 percent

23   legitimate and properly secured.  I don't know.  Someone

24   needs to do this work.

25            In this case, the professionals prior to post-

1    petition actions and this Court's assessment based on the

2    evidence colors the independence and the impartiality

3    required by the Bankruptcy Code.  Not just an appearance of

4    conflict of interest.  There are adverse interests to the

5    estate based on the evidence related to Mr. Jones and PQPR.

6    The lack of transparency and the lack of disclosures

7    required under Bankruptcy Rule 2014, which says any

8    connections, give this Court a lot of concern about whether

9    these professionals can impartially represent FSS, which may

10   include making difficult decisions about other parties, if

11   necessary.

12          The estate may -- I have no idea -- hold claims,

13   defenses to claims, and costs of actions against third

14   parties.  For instance, based on the time records entered

15   into evidence, Mr. Jones may allege a right to an indemnity

16   from FSS.  I know that he's been seeking personal expenses

17   paid.  Right?

18          And I know that Exhibit 163-8, there's a July 11th

19   time entry where counsel assisted Mr. Jones as counsel on

20   indemnity issues between FSS and Mr. Jones.  Right?  He had

21   first a cash collateral motion.  It was the Court who

22   questioned the material (indiscernible) for about $172,000

23   that consisted primarily of personal charges not related to

24   the business.

25          FSS's schedules also list pre-petition payments to

1   the same vendor for about a million dollars.

2   (Indiscernible) attorney at this time how much relates to

3   purely FSS's business expenses, but that work needs to get

4   done.  So consider I'm the Fifth Circuit guidance and an eye

5   to the specific facts here and with attention to

6   circumstances, there is evidence showing circumstances and

7   instances that have and may in fact impact future ability to

8   offer impartial and disinterested advice to FSS.

9        And I understand that that has consequences, and I

10  hope everyone hears it in my voice.  This is not easy for me

11  to do, but I'm required to make these decisions under law

12  and Bankruptcy Code affords me the discretion to do so.  And

13  I'm not even sure this is a discretion issue.  I think

14  there's a material adverse interest to the estate.

15       And I stress that this decision is based on the

16  facts presented in this case.  I really want to stress this

17  because I know a lot of people are listening.  No one should

18  read this decision as a critique of using local counsel or

19  using co-counsel in a case.  I understand that debtors needs

20  sometimes not to retain multiple law firms when appropriate.

21       Again, I stress debtors have an absolute right to

22  seek to retain professionals that will assist in their

23  Chapter 11 case.  I'm a firm believer in that.  This

24  decision has no application in those instances.  None.  This

25  decision also has no application whenever professionals

1     (indiscernible) by a group of affiliated debtors.  It

2     happens all the time in Chapter 11.  A debtor, sometimes a

3     financial advisor, sometimes an investment banker gets

4     retained by Company A and all of its related entities.

5          And sometimes that means a debtor, right, a group

6     of debtors file at the beginning because you're trying to

7     keep a group of entities out of bankruptcy as you negotiate.

8     And sometimes, right, debtors counsel has to advise clients

9     that, well, another subset has to go in at a later time.

10    And it often happens in restructurings.  Those often --

11    those instances are much different in the -- in this case.

12    In this case, you know, a proposed CRO and counsel were

13    actively representing the InfoW debtors.  Right?

14         Let's not forget whose interests are held by a

15    litigation trust and are solely represented, (indiscernible)

16    affiliated entities.  I also note that FSS is not without

17    counsel to continue this case.  I take what Mr. Battaglia

18    really said -- I really take it to heart.  I don't -- I

19    don't like where we are today.  I think I'm making the right

20    decision under the law.  I think I'm commanded by the law,

21    the Fifth Circuit case law, to make this decision.

22         I also know that what occurred today is limited to

23    today.  I think Shannon and Lee and Mr. Schwartz and

24    Schwartz and Associates can appear in another case in front

25    of me with no issues.  I mean zero.  I really mean that.  I

1    hope they can take comfort in that.  And any future case is

2    going to be just judged on those facts and nothing today or

3    in this case changes that for me or any professional.  I

4    hope to never make a similar decision as long as I'm on the

5    bench.  But judges are required to make difficult decisions

6    sometimes and this is one of those today.

7         I noted earlier, and I'll note it again, I find

8    there was some strong language used in the response to the

9    US Trustee's objection.  And I find nothing improper about

10   the arguments raised in those objections, not because I

11   ruled in the way that I did, but also just looking at it

12   independently, I take statements very seriously in the court

13   and filed with the Court, sometimes better to ask than to

14   make assumptions.  So something else I need to do today

15   based on what I've heard.  So Chapter 5 is the new addition,

16   relatively new addition, to the Bankruptcy Code.  And it

17   provides a streamlined process for small businesses to

18   reorganize.

19        So Chapter 5 involves the appointment of a

20   Subchapter 5 trustee to provide oversight of the debtor in

21   possession and helps facilitate negotiation of what will be

22   hopefully or consensually reorganized, reorganization plan.

23   As with any case, a Subchapter 5 bankruptcy requires a

24   debtor to be forthcoming about its affairs.  The Subchapter

25   5 trustee, the court, and its creditors are all

 1    stakeholders.  Interestingly, the debtor in Subchapter 5 is

 2    not mandated to investigate its own acts, conduct, and

 3    liabilities in financial condition.

 4          But 11 U.S.C. 1183(b)(2), a court for cost and on

 5    the request of a party of interest, the trustee or the

 6    United States Trustee may order an expansion of the

 7    Subchapter 5 trustee's power to include the power specified

 8    in Sections 1106(a)(3) and (a)(4) of the Bankruptcy Code.

 9    1106(a)(3) says, "Except to the extent the Court orders

10    otherwise, the trustee shall investigate the acts, conducts,

11    assets, liabilities, and the financial condition of the

12    debtor, the operation of the debtor's business, and the

13    design or ability of the continuance of such business, and

14    any other matter relevant to the case or to formulation of

15    the plan, and as soon as practical, upon a statement of an

16    investigation conducted, including any fact ascertained

17    pertaining to fraud, dishonesty, incompetent, misconduct,

18    mismanagement, or irregularity in the mismanagement of the

19    affairs of the debtor or to a cause of action available to

20    the estate."

21          It's not on a cause.  A cause is not defined in

22    the Bankruptcy Code.  When you look at cases, trying to

23    define a cause in the Fifth Circuit, or how a cause is

24    viewed, according to the Fifth Circuit apply a flexible

25    standard, giving the bankruptcy courts flexibility to

1 determine whether a cause exists.  And it's a fact in

2 (indiscernible) inquiry that must be determined on a case-

3 by-case basis.

4   The leading treatise (indiscernible) on bankruptcy

5 law provides that the standard for cause under 1183(b)(2)

6 should not be higher than the standard for cause, say, for

7 example, removing a Subchapter 5 trustee.  I agree with

8 that.  There always ought to be cause.  Weigh the facts and

9 the evidence and make a determination as to whether there's

10 cause based on the facts.

11   I don't like the factors because not all the

12 factors apply in every case, and this case is not different

13 -- it's far different than a Subchapter 5 case where someone

14 is trying to keep a pizza shop going.  Section 105(a) of the

15 Bankruptcy Code authorizes a court to sua sponte expand the

16 Subchapter 5 trustee's duties under 1183(b)(2) even though

17 the subsection requires -- uses the phrase "on request of a

18 party in interest" when you look at 105(a).  I do note that

19 a party has already requested that.  That hearing was set

20 for another date and under certain circumstances.  I believe

21 it was PQPR.  And I'm going to expand that today sua sponte.

22   There's a clear and pressing need to expand the

23 role of the Subchapter 5 trustee and to direct her to

24 investigate.  That doesn't mean that there's anything wrong.

25 It just means that in this particular case, there has to be

1     work done for the debtor to really understand the scope of

2     its assets and potential claims and liabilities.  I do note,

3     there's been a lot of talk about candor and how the Court

4     feels about it.  I'm would note and I do think there was a

5     lack of candor under Rule -- Bankruptcy Rule 2014 in the

6     last case.  And I do think there was some lack of candor in

7     this case.

8              I've expressed concern since the first hearing

9     about what happened.  And as this case has progressed and

10    based on what I've heard today and the evidence that I was

11    able to review, those concerns continue to exist.  And I

12    think if someone's going to investigate the Debtor in this

13    case, it really has to be someone impartial, someone with no

14    connection from the InfoW cases, who represented a party in

15    interest.  And I believe that's the Subchapter 5 trustee who

16    is independent and remains independent.

17             Someone has to do the work, and the Bankruptcy

18    Code gives the answer.  It's the Subchapter 5 trustee.  I

19    won't rehash the concerns that I have.  You heard them

20    earlier.  For other reasons I stated earlier about the

21    concerns that I've had with disclosure, lack of candor

22    leading into this case, there is cause to expand the

23    Subchapter 5 trustee's duties under Section 1183(b)(2), to

24    include exactly what the code says, investigate the acts,

25    conduct, assets, liabilities, and financial condition of the

1    Debtor, the operation of the Debtor's business, and the

2    desirability of the continuation of the business.

3            I want to give the Subchapter 5 trustee some

4    guiding.  I think that includes investigating the

5    approximately $54 million security claim listed in favor of

6    PQPR Holdings Limited LLC described in Schedule D at Docket

7    Number 121, investigating Free Speech Systems credit card

8    processor, solely for any insider relationship.  That's what

9    I'm focused on, the inside, if there's any potential insider

10   relationship that I should be aware of or anything that

11   gives the Subchapter 5 trustee any concern.  Right?

12           There maybe -- I don't think at this stage, I

13   don't think there's a need to disclose who it is.  And if

14   there is, I want there to be real caution before that's

15   done.  But if there's an insider, that needs to be

16   disclosed.  I think there also -- there has also been much

17   discussion about the $61 million, maybe $62 million member

18   draw 2021 and $254,000 member draw 2022 listed in the Free

19   Speech Systems comparative balance sheet as of December 31,

20   2021 and May 31, 2022 attached to Mr. Schwartz's declaration

21   filed at Docket Number 10.

22           Under 1106(a)(4), the trustee is to get to work

23   and file a statement detailing her findings as soon as

24   practicable, as described under 1106(a)(4).  Look, I realize

25   that there are other pending motions filed by the Sandy Hook

1    families to appoint a tort claimants' committee and to

2    remove Free Speech as a debtor in possession.

3          I'm not ruling on any of those issues and I'm not

4    describing any of them now.  I may need to take up one of

5    them soon.  I also note, and I state for the record, it is

6    rare, I think, in Subchapter 5 cases for -- the need for a

7    Subchapter 5 trustee to hire counsel or professionals to

8    assist in the duties.  And I think this is the case where

9    it's required.  So Ms. Hazleton, I think you need to find --

10   you need to get a team.  And I'm telling you, I want folks

11   with no connection to any of these cases to assist you in

12   your work.  It looks like you've already found one person.

13         Let's start the process of retaining what you

14   need.  I've charged you to do work and I need you to do it

15   as quickly as possible, but you can't do it on your own.  So

16   no one should read this as a Subchapter 5 trustee and think

17   that you know, I should -- don't cite this case as the

18   reason that you need to hire counsel.  There may be other

19   reasons.  I just think this case is different for all the

20   above reasons.  And again, I'm not saying anything is wrong.

21   You may find all the investigations are proper and that you

22   don't find anything.  Fine with me.  File that and say that.

23         But there has to be greater transparency in this

24   case.  I understand that PQPR may want to have discussions

25   about what that means, but it's going to cost what it costs.

1    I'm just telling you now.  Right?  You can work on a budget,

2    but I'm charging the trustee to do the work, and it'll cost

3    what it costs.  And I understand that that may require

4    negotiations with a secured lender as to what that means and

5    we already have a hearing teed up where we can take all that

6    up.

7         I don't know -- and really -- what you see in my

8    face is really listening to what Mr. Battaglia said and

9    weighing on me.  I don't want to rule anymore.  That's

10   enough for me today.  I think people have a right to listen

11   to what I said.  I'll enter some orders today, and I'll say

12   for the reasons stated on the record.  I will say this and I

13   don't want -- yeah, I'll say this.

14        I understand that that's going to require some

15   questions as to where that leaves Shannon and Lee and Mr.

16   Schwartz in terms of you know, retention and the work that

17   they've done.  And I'll be looking to the Subchapter 5

18   trustee for guidance here, but there was good work done

19   here.  And I think Schwartz and Associates, right, helped

20   the process.  We've got cash collateral budgets in place and

21   there was folks who would answer phone calls.  From what I

22   hear, what Mr. Schwartz encountered -- and I don't want

23   anyone to leave thinking that I don't think they should be

24   compensated for -- for good work in this case.

25        The US Trustee is free to disagree with me on

1    that.  And I'll be looking to guidance from the Subchapter 5

2    trustee as to what I heard in my gut is right or if I should

3    be concerned about something.  Everybody's rights are

4    reserved on this.  I don't want anyone to think anything

5    about these professionals.  I've ruled.  I didn't say

6    anything about them.  It just talks about the ruling, the

7    very difficult decision I had to make in this case.  That's

8    it.  That's what it means to me.

9            If it means something to anyone else, then you're

10   not paying attention to what I really said.  I have a great

11   amount of respect for people and the work that professionals

12   do in bankruptcy cases is not easy.  And I know that the

13   work that gets done when people aren't here across the

14   United States is difficult work.  It requires bankruptcy

15   lawyers.  Bankruptcy professionals have to balance a great

16   number of things.  The process is incredibly important as

17   well along the way.  Without process and without

18   transparency, people lose faith in the process.

19           And so standards must be satisfied to ensure that

20   the process can continue and people can have faith in the

21   process.  But also, right, Congress writes laws.  Judges

22   apply them as faithfully as possible.  And that's what I've

23   done today.  I wish everyone the best.  That's -- that's

24   enough for me today, folks.  You all have a good day.

25           Yes, sir.  Mr. Battaglia.

005026

1          MR. BATTAGLIA:  Mr. Schwartz's deposition was set

2     pursuant to the cash collateral hearing for Friday.

3     Obviously, he won't be appearing.  There was a 30(b)(6)

4     deposition notice that we had other opposition to, but I

5     honestly have no idea who I can even present, so I have no -

6     -

7          THE COURT:  Yeah, I understand that.  And I

8     understand that.

9          MR. BATTAGLIA:  (Indiscernible).

10          THE COURT:  I understand that there are decisions

11     that I've made that may have consequences.  And everybody's

12     going to have to think about what I did today.

13          MR. BATTAGLIA:  I understand, Your Honor.  I just

14     (indiscernible) parties should know --

15

16          THE COURT:  No, no, I understand.  That's what --

17     I'm looking at them, so I -- you all need to think --

18     everybody needs to think about that.  So I agree.

19          MR. BATTAGLIA:  And there's a lot for me to sort

20     out in my own mind in terms of who I pick up the phone and

21     call about a business issue tomorrow.

22          THE COURT:  Yeah.

23          MR. BATTAGLIA:  I'm not sure who that'll be.  We

24     were already cooperating with the Sub-B trustee on

25     investigation issues, so that's fine.  We'll keep doing

1     that.  I don't know what it means for me.  I will not

2     continue to represent a -- I don't -- never run away from a

3     representation --

4              THE COURT:  I understand.

5              MR. BATTAGLIA:  -- in my life.  But if I can't

6     meet my obligations as counsel --

7              THE COURT:  I understand.

8              MR. BATTAGLIA:  -- (indiscernible) what it means.

9     And I'll file appropriate pleadings if -- once I have some

10    time to digest this and figure out how we might be able to

11    move.

12             THE COURT:  I understand.

13             MR. BATTAGLIA:  Thank you.

14             THE COURT:  Have a good day, everyone.

15             CLERK:  All rise.

16             (Whereupon these proceedings were concluded at

17    6:32 PM)

18

19

20

21

22

23

24

25

```
 1                          I N D E X

 2

 3                          RULINGS

 4                                              Page        Line

 5    Applications for Retention of Co-Counsel

 6    and CRO DENIED                            228         9

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

005029

```
 1                        CERTIFICATION

 2

 3    I certify that the foregoing is a correct transcript from

 4    the electronic sound recording of the proceedings in the

 5    above-entitled matter.

 6

 7    Sonya M. Ledanski Hyde

 8

 9

10    Sonya Ledanski Hyde

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  September 23, 2022
```

005030

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

January 20, 2023

Nathan Ochsner, Clerk

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **FREE SPEECH SYSTEMS, LLC,** | § | **Case No. 22-60043** |
| | § | |
| **DEBTOR.** | § | **(Subchapter V Debtor)** |
| | § | **Chapter 11** |

**ORDER DENYING MOTION FOR REHEARING ON
DEBTOR'S APPLICATION TO EMPLOY LAW FIRM**
(RE: Docket No. 206)

This motion is denied for the reasons stated on the record at the January 20, 2023 hearing.

Signed: January 20, 2023

_____
Christopher Lopez
United States Bankruptcy Judge

005031

United States Bankruptcy Court
Southern District of Texas
**ENTERED**
January 20, 2023
Nathan Ochsner, Clerk

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **FREE SPEECH SYSTEMS, LLC,** | § | **Case No. 22--60043** |
| | § | |
| **DEBTOR.** | § | **(Subchapter V Debtor)** |
| | § | **Chapter 11** |

**ORDER DENYING MOTION FOR REHEARING ON
DEBTOR'S APPLICATION TO EMPLOY ADVISOR**
**(RE: Docket No. 207)**

This motion is denied for the reasons stated on the record at the January 20, 2023 hearing.

Signed: January 20, 2023

_____
Christopher Lopez
United States Bankruptcy Judge

005032